# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

**DANIEL J. ANKER,**                    :
    Petitioner,                        :
                                       :
    v.                                 : Civil Action No.  08-203 SLR
                                       :
**ELIZABETH NEAL**, Acting Warden,      :
John L. Webb Correctional Facility,    :
and **JOSEPH R. BIDEN, III,** Attorney  :
General of the State of Delaware,      :
    Respondents.                       :

### PETITIONER'S OPENING BRIEF
### IN SUPPORT OF PETITION FOR HABEAS CORPUS

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein@embarqmail.com
Attorney for Petitioner

Dated: June 30, 2008

## TABLE OF CONTENTS

                                                                    **PAGE**

**TABLE OF AUTHORITIES**                                              **I**

**NATURE AND STAGE OF PROCEEDINGS**                                   **1**

**SUMMARY OF ARGUMENT**                                               **3**

**STATEMENT OF FACTS**                                                **4**

**ARGUMENT**

  **1. ANKER WAS DEPRIVED OF HIS RIGHT TO COUNSEL UNDER
THE SIXTH AMENDMENT AND *UNITED STATES v. CRONIC*
BASED ON THE COMBINATION OF ERRORS MADE BY HIS
TRIAL COUNSEL COUPLED WITH THE FACT THAT HIS TRIAL
COUNSEL SUFFERED FROM A SEVERE PSYCHIATRIC
IMPAIRMENT AT THE TIME OF THE TRIAL**                               **21**

  **II. THE DECISION OF THE DELAWARE SUPREME COURT
THAT ANKER HAD FAILED TO PROVE THAT HE HAD BEEN
"PREJUDICED" UNDER *STRICKLAND* WAS CONTRARY TO
AND WAS AN UNREASONABLE APPLICATION OF *STRICKLAND***              **40**


**CONCLUSION**                                                       **46**

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Anker v. State*, 2006 Del. LEXIS 578 (Del. 2006)                              *passim*

*Anker v. State*, 2008 Del. Lexis 17 (Del. 2008)                              *passim*

 *Appel v. Horn*, 250 F.3d 203 (3d Cir. 2001)                                  24

*Ayers v. State*, 844 A.2d 304 (Del. 2004)                                     31

*Baldwin v. Reese*, 541 U.S. 27 (2004)                                         22

*Bell v. Cone*, 535 U.S. 685 (2002)                                            25,26

*Buehl v. Vaughn*, 166 F.3d 163 (3d Cir. 1999)                                 43

*Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001)                             27

*Campbell v. Burris*, 515 F.3d 172 (3d Cir. 2008)                              2

*Chadwick v. Janecka*, 312 F.3d 597 (3d Cir. 2002)                             24

*Cubbage v. Phelps*, 2008 U.S. Dist. LEXIS 31296 (D. Del.  2008)              44

*Duncan v. Henry*, 513 U.S. 364 (1995)                                         23

*Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002)                                24,32

*Fahy v. Horn*, 516 F.3d 169 (3d Cir.  2008)                                   40

*Getz v. State*, 538 A.2d 726 (Del. 1988)                                      37,38,39

*Hameen v. Delaware*, 212 F.3d 226 (3d Cir. 2000)                              24

*Horne v. State*, 887 A.2d 973 (Del. 2005)                                     21

*Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005)                                   24,42,43

*Johnson v. Rosemeyer*, 117 F.3d 104 (3d Cir. 1997)                            2

*Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir. 1999) (en banc),
*cert. denied*, 528 U.S. 824 (1999)                                            24

*McCandless v. Vaughn*, 172 F.3d 255 (3d Cir. 1999)                            23

*Nara v. Frank*, 488 F.3d 187 (3d Cir.  2007)                                  23

*Old Chief v. United States*, 519 U.S. 172 (1997)                             37

*O'Sullivan v. Boerckel*, 526 U.S. 838 (1999)                                  22

*Payne v. Tennessee*, 501 U.S. 808  (1991)                                     39

| Cases | Page |
|---|---|
| *People v. Stein*, 156 Cal. Rptr. 299 (Cal. Ct. App. 1979) | 36 |
| *Petition of State*, 597 A.2d 1 (Del. 1991) | 39 |
| *Smith v. State*, 669 A.2d 1 (Del. 1995) | 37 |
| *State v. Anker*, 2005 Del. Super. LEXIS 105 (Del. Super. 2005) | *passim* |
| *State v. Anker*, 2007 Del. Super. LEXIS 209 (Del. Super. 2007) | *passim* |
| *State v. Mahoney*, 868 A.2d 1171 (N.J. Super, App. Div. 2005) | 35 |
| *State v. Mahoney*, 908 A.2d 162 (N.J. 2006) | 35 |
| *State v. Walls*, 541 A.2d 591, 594 (Del. Super. (1987), *aff'd, Walls v. State*, 1990 Del. LEXIS 46 (Del. 1990) | 33,34 |
| *Strickland v. Washington*, 466 U.S. 688 (1984) | *passim* |
| *Taylor v. Horn*, 504 F.3d 416 (3d Cir. 2007) | 29 |
| *Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005) | 42 |
| *Williams v. Taylor*, 529 U.S. 362 (2000) | 23,41,43 |
| *United States v. Cronic*, 466 U.S. 648 (1984) | 3 |
| *United States v. Cross*, 308 F.3d 308 (3d Cir. 2002) | 42 |
| *United States v. Gormley*, 242 Fed. Appx. 853 (3d Cir. 2007) | 25 |

**Statutes and Court Rules**

| | |
|---|---|
| *Delaware Supreme Court Rule 66(a)(ii)* | 6 |
| *Del.Super. Ct.Crim. R. 61(b)(6)* | 40 |
| *Del.Super.Crim.R. 61(d)(4)* | 44 |
| *Del.Super. Ct.Crim. R. 61(f)* | 40 |
| *Del.Super. Ct.Crim. R. 61(g)(2)* | 40 |
| 11 *Del.C.* §271 | 31 |
| 11 *Del.C.* §512 | 31 |
| D.R.E. 404(b) | 37 |
| *Regulations of the Trustees of the Lawyers' Fund for Client Protection of the Bar of Delaware* | 34 |

**Statutes and Court Rules**                                                    **Page**

28 *U.S.C* § 2254(b) (2006)                                                    22,23

Antiterrorism and Effective Death Penalty Act of 1996,
104 P.L. 132,110 Stat. 1214 (1996)                                             23

*Rules Governing Section 2254 Cases, Rule 8*                                   29


**Miscellaneous**

*Weinstein's Federal Evidence*, §404.10[1]                                     37

## NATURE AND STAGE OF PROCEEDINGS

The Appellant, Daniel J. Anker ("Anker") and a co-defendant, Laura Larks ("Larks"), were jointly indicted in the Delaware Superior Court and charged with 19 counts of Theft (Felony) and 1 count of Conspiracy Second Degree. (A-15).  At the time of the alleged thefts, Anker was a member of the Delaware Bar.  Anker was a solo practitioner whose law practice was devoted primarily to residential real estate closings, including refinancing transactions.  Larks is Anker's daughter, and she was employed by Anker as a secretary/receptionist at his law office.  The theft charges concerned allegations that Anker and Larks appropriated various sums of money from a client escrow account maintained by Anker in his law practice. See, *State v. Anker*, 2005 Del. Super. LEXIS 105, *1.

Prior to trial, the Superior Court granted Anker's motion for a separate trial from from Larks. *Id.*  On June 19, 2005, Anker went to trial by a jury on 9 counts of Felony Theft and 1 count of Conspiracy Second Degree.[1]  On August 4, 2005, Anker was found guilty on all charges. (A-10).  On November 4, 2005, Anker was sentenced to a total of 5 years in jail, followed by probation.  He was also ordered to pay restitution of $554,046 to the Delaware Lawyers' Fund for Client Protection ("Lawyers' Fund") (A-21).[2]  On October 31, 2006, Anker's convictions and sentence were affirmed by the Supreme Court of Delaware on direct appeal. See, *Anker v. State*, 2006 Del. LEXIS 578 (Del. 2006) ("*Anker I*").

On July 2, 2007, Anker filed a Motion for Postconviction Relief under Superior Court Criminal Rule 61 ("Rule 61 Motion"). (A-21).  Anker's Rule 61 Motion was summarily denied by the Superior Court on July 26, 2007. See, *State v. Anker*, 2007 Del. Super. LEXIS 209 (Del. Super. 2007) ("*Rule 61 Decision*").  The Superior Court's decision to deny post-conviction relief was

---

[1] All of the other charges were *nolle prossed* by the State prior to trial. (A-1).

[2] After Anker was sentenced, Larks pled guilty to one count of Theft (Felony) and Conspiracy Second Degree.  She was sentenced to 5 years in jail, suspended after serving 24 months home confinement.  She was also ordered to pay $554,046.34 in restitution to the Delaware Lawyers' Fund for Client Protection.

-1-

affirmed on appeal by the Supreme Court of Delaware.  See, *Anker v. State*, 2008 Del. Lexis 17 (Del. 2008) ("*Anker II*").

This Petition for Habeas Corpus Relief was filed on April 9, 2008 (D.I. 1) (A-31). Thereafter, the parties stipulated to a Briefing Schedule (D.I. 7), which was approved by the Court. This is the Petitioner's Opening Brief in support of the Petition.[3]

---

[3] Ground No. 1 and Ground No. 2 in the Habeas Petition are being withdrawn.  In the direct appeal, the Delaware Supreme Court held that it was not "plain error" to have admitted the "Lawyers Fund" and "bad act" evidence.  *Anker I*, 2006 Del. LEXIS 578, *4-*7.  The Third Circuit has recently ruled that a finding of "no plain error" by the Delaware Supreme Court constitutes an independent and adequate state ground that bars federal habeas review.  See, *Campbell v. Burris*, 515 F.3d 172, 182 (3d Cir. 2008).  Ground 3 is also being withdrawn.  The decision not to admit the testimony of Anker's psychiatrist was an issue of state law that cannot be adjudicated in a habeas proceeding.  See, *Johnson v. Rosemeyer*, 117 F.3d 104, 109 (3d Cir. 1997).

## SUMMARY OF ARGUMENT

1. At the time of Petitioner's trial in the Delaware Superior Court, his attorney was suffering from a major depressive disorder which resulted in a constructive denial of counsel under the Sixth Amendment and *United States v. Cronic*, 466 U.S. 648 (1984).

2. The Petitioner's Sixth Amendment claim under *Cronic* was "fairly presented" to the Delaware courts, who completely ignored the claim and therefore did not decide the claim on the merits. Because the *Cronic* claim was not decided on the merits in the state court, the claim should be reviewed *de novo* in this habeas proceeding, rather than under the more restrictive review mandated by the AEDPA.

3. Even if Petitioner's Sixth Amendment claim is not controlled by *Cronic*, the Petitioner's trial attorney was "ineffective" under the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 688 (1984). The decision by the Delaware courts to summarily deny Petitioner's Sixth Amendment claim was contrary to and was an unreasonable application of *Strickland*.

## STATEMENT OF FACTS

### Background Facts

The historical facts concerning the nine counts of Felony Theft are, for the most part, not in dispute. Anker was a real estate lawyer practicing in Delaware as a solo practitioner. During the relevant times alleged in the Indictment, Anker's daughter, Laura Larks ("Larks"), was his sole employee. The nine counts of Felony Theft arose from nine separate real estate transactions in which Anker acted as the closing attorney.[4] Six of the real estate closings involved refinancings. In the remaining three closings, Anker represented the seller in two of the closings and represented the buyer in the other. See, *Anker I*, 2006 Del. LEXIS, *2.

In each transaction, the acts which the State alleged constituted the "thefts" were similar. In the refinancing closings, funds that were received from the "new" lender were duly deposited into Anker's escrow account. Those funds, however, were never applied to payoff the existing "old" mortgages that were being refinanced. In the two situations where Anker represented the seller, the the money deposited by the buyer was not applied to pay off the seller's mortgage. In the one situation where Anker represented the buyer, the money was not paid to the seller's mortgagee. *Id.* At trial, Robert Carmine ("Carmine"), the State's chief investigator, testified that he had reviewed the bank records for Anker's escrow account to determine whether or not the outstanding mortgages that should have been paid off in these nine closing transactions had, in fact, been paid off. According to Carmine, except for one instance[5], he could find no records to support a claim that these mortgages had been paid off. (Tr. 7/21, pp. 53-65)(A100-A102). Carmine's testimony was not contradicted or disputed by Anker. As discussed in greater detail herein, Anker's defense at trial was

---

[4] Except for one refinancing closing which occurred in December 2001, all of the other closings which led to the Theft charges occurred between March and July 2003.

[5] In the Paveza refinancing, (Count IV) Carmine did verify that GMAC was paid $433,712.15 on May 8, 2003, which was one month after the closing. (Tr. 7/21, pp. 57-58)(A-101). Also, when the files in Anker's office were reviewed, investigators found checks on Larks' desk which had been written, but not sent out, to pay off the mortgages in the Bashir/Chambers closing (Count VI). (Tr. 7/21, p. 58)(A-101).

that the thefts were actually committed by Larks. Anker claimed that Larks had created false e-mails and correspondence to deceive him and his clients and had withheld giving him information that would have exposed her misconduct or alerted him to her actions. Anker denied any role or participation in the thefts and claimed that because of Larks' deceptions, he was unaware that Larks was stealing funds from the escrow account and therefore lacked the "intent" to commit the charged crimes. See *See, State v. Anker*, 2005 Del. Super. LEXIS 105, at *3; *12-*13.

In addition to Carmine's testimony concerning the failure to pay off the mortgages, the State also presented testimony from the "victims" (the persons whose mortgages were not paid off) of the alleged thefts concerning their dealings with Anker and Larks after their respective closings took place. In each case, the events that transpired after the closings followed a similar pattern. Within a few months or sooner after the closing, the "victim" was contacted by their "old" mortgage lender and informed that the "old" mortgage was in default for non-payment. The victims then began to contact Anker's office to ascertain why the "old" mortgage lenders were claiming that they had not been paid off. This testimony by the "victims" is summarized in detail herein because it is critical to an understanding of Larks' role in the thefts as well as Anker's claim that his trial attorney was "ineffective" under the standards as established in *United States v. Cronic* 466 U.S. 648 (1984) or *Strickland v. Washington*, 466 U.S. 668 (1984).

### Philip Urban - Refinancing (Count I)[6]

Prior to refinancing his mortgage, Urban made mortgage payments to WSFS through automatic deductions from his WSFS savings account. At the time of the refinancing, the balance owed to WSFS was $57,408.56. After the closing, Urban noticed that the automatic deductions for his "old" mortgage were still being made. This led Urban to believe that the WSFS mortgage had not been paid off. Urban then contacted Anker's office about the WSFS problem. He told Larks

---

[6] Urban is Anker's cousin. (Tr. 7/18, p. 122)(A-43).

-5-

what was happening, but he never spoke directly to Anker.[7]  Larks told Urban that there was a problem at the bank and "she was working on it." (Tr. 7/18, p. 133-137) (A45-A46).  Subsequently, Urban began receiving checks from Anker's office to "reimburse" him for the deductions that WSFS was making from his savings account.[8]  These checks were given to him by Larks, who told him that the money was a "settlement from the bank" to compensate him for the problems that he had encountered. (Tr. 7/18, pp. 137-140) (A-46).  Larks also told Urban to contact WSFS and have them stop the automatic deductions from his account.  However, after the automatic deductions were stopped, Urban got a letter from WSFS stating that the "old" mortgage was in default. (Tr. 7/18, pp. 150-152) (A-48).  At trial, Urban testified (on cross-examination) that a few months before the trial, the unpaid mortgage to WSFS was paid off by the "Lawyers' Association." (Tr. 7/18, pp. 149-150)(A-48).[9]

### Douglas Ray - Refinancing (Count II)

Douglas Ray ("Ray")[10] testified that Anker conducted the closing on a refinance of his residence.  According to the HUD-1 prepared for the closing, Ray was getting a new mortgage for $245,000.00 from Chase Mortgage ("Chase") and two existing mortgages with Chase were to be paid off.  The payoff amounts were $222,778.26 and $28,347.18. (A-173).  After the closing, Ray was notified by Chase that the smaller of the two mortgages had been paid off, but he continued to get payment demands from Chase for the larger "old" mortgage.  Chase also threatened Ray that they

---

[7] According to Urban, most of his dealings with Anker's office concerning the refinance transaction were with Larks. (Tr. 7/18, pp. 127-128)(A-44).

[8] The total amount of the "reimbursements" paid to Urban by Larks was $10,700.00. (Tr. 7/18, p. 139-141)(A46-A47).

[9] Urban's reference to the "Lawyers' Association" actually refers to the Delaware Lawyers Fund for Client Protection ("Lawyers' Fund").  The Lawyers' Fund is vested with the discretion to reimburse members of the public for losses caused by defalcations committed by members of the Delaware Bar.  See, *Delaware Supreme Court Rule 66(a)(ii)*.  As discussed herein, in addition to Urban, several other victims in this case testified that their "old" mortgages were paid off by the Lawyers' Fund.

[10] Ray was a law professor and Dean of Widener Law School.  He met Anker through Anker's wife, Ann Conway, who was also a professor at Widener. (Tr. 7/18, pp. 157-160)(A-49).

would foreclose on the "old" mortgage. (Tr. 7/18, pp. 168-170)(A50-A51). Ray then contacted Chase directly and was told that funds had been sent to Anker's office to fund the new mortgage but that the old mortgage was not paid off. (Tr. 7/18, p. 171)(A-51). Ray subsequently contacted Anker's office and told Anker about the problems he was having with Chase. Anker told Ray that the banks were having problems handling a large number of refinancings and that he was having the same kind of problem with his own refinancing. Anker also told Ray that the money had not come in and he asked Ray to give him authority to "settle" his claims against Chase for $400,000.00. Later that day, Anker called Ray and told him that he had spoken with Chase's general counsel, who agreed that Chase was in the wrong, and told Ray that Chase had agreed to a $400,000.00 settlement. (Tr. 7/18, pp. 173-175)(A-52).[11] Ray subsequently met with Anker and Larks and Anker gave Ray a check for $300,000.00. (Tr. 7/18, pp. 178-180) (A-53).[12] After Ray received the $300,000.00 settlement, however, Chase continued its efforts to collect on the old mortgage and again threatened foreclosure. (Tr. 7/18, pp. 185-186)(A-55). Ray met with Anker again and told him that Chase was still pursuing its collection efforts. Anker told Ray that he had contacted Chase and they were willing to make a second settlement offer of an additional $700,000.00 and would also agree to cancel the new mortgage. (Tr. 7/18, pp. 186-188)(A-55). Ray subsequently returned to Anker's office and, this time, Anker gave Ray a check for $490,000.00. Ray also asked Anker to give him a written summary of the settlements and legal fees, which Anker provided.[13] Unlike the first "settlement" check, the $490,000.00 check never cleared the bank and payment was eventually stopped. (Tr. 7/18, pp. 189-190)(A-56). After Ray learned that the $490,000.00 check had been dishonored, he met with Anker again. He asked Anker why there was no formal settlement

---

[11] Ray also testified that he was "skeptical" about the entire transaction and did not take it seriously. However, in follow-up discussions with Anker, he told Anker that if there was a settlement with Chase, then Anker should be paid a fee for his work. Ray and Anker ultimately agreed that Anker would take a 25 per cent contingency fee for any settlement. (Tr. 7/18, pp. 176-177)(A52-A53).

[12] The check was drawn on Anker's escrow account. (SX-13)(A-174).

[13] See, SX-15 (A-176).

agreement or release that had to be signed. Anker told him that was not unusual. Sometime later, Ray met with Anker again. This time, Anker gave Ray a check for $10,000.00 and indicated the money had come from Chase to make up for their delays and mistakes. (Tr. 7/18, pp. 191-192)(A-56). Ray continued, however, to receive default letters from Chase. In early Fall 2003, Chase began foreclosure proceedings against Ray. (Tr. 7/18, pp. 198-199)(A-58). After Chase began foreclosure proceedings, Ray testified that he received numerous letters from lawyers who volunteered to "help him through bankruptcy." (Tr. 7/18, p. 199)(A-58).

### John Lesko - Refinancing (Count III)

John Lesko ("Lesko") testified that Anker conducted the closing on a refinance of his residence. (Tr. 7/18, pp. 229-232)(A-59). According to the HUD-1 prepared for the closing, Lesko was getting a new mortgage for $137,000.00 from Washington Mutual and an existing mortgage with Washington Mutual in the amount of $128,790.26 would be paid off. (SX-19)(A-177). After the closing, Lesko began getting letters and phone calls from Washington Mutual that payments were in default on the old mortgage. (Tr. 7/18, pp. 240-242)(A60-A61). Lesko called Anker's office and spoke to Larks. Lesko did not speak directly to Anker, but Larks told him that she needed a letter from him authorizing Anker to negotiate a settlement with Washington Mutual on his behalf. (Tr. 7/18, pp. 242-246)(A61-A62). Several days later, Anker called Lesko and told him that they had reached a settlement with Washington Mutual for $250,000.00.[14] The next day Lesko called Anker's office to find out when he could pick up the settlement check. Larks told him that only part of the settlement money had been received and they were looking into the matter. Lesko never received any settlement payment. (Tr. 7/18, pp. 246-250)(A62-A63). At trial, Lesko testified that his credit was damaged for over two years because his credit reports showed him as being delinquent on his mortgage payments. Lesko also testified that his mortgage was paid off in 2005 by the Lawyers Fund. (Tr. 7/18, pp. 252-253)(A63-A64).

---

[14] Except for the one phone call from Anker telling him about the settlement, all of Lesko's dealings were with Larks. (Tr. 7/18, pp. 249-250)(A-63).

**Gary and Maya Paveza - Refinancing (Count IV)**

According to the HUD-1 prepared for the closing, the Paveza's were getting a new mortgage for $195,740.00 from Gilpin Mortgage.  An existing mortgage with GMAC in the amount of $132,897.36 and a second mortgage to Conseco in the amount of $62,978.37 were to be paid off at closing. (SX-22)(A-179).  All of the paperwork for the closing was done by Larks and the Paveza's did not have any contact with Anker until they met him at the closing itself. (Tr. 7/20, pp. 32-34)(A66-A67).  After the closing, Maya Paveza learned from GMAC that their mortgage payments were not being made.  She then contacted Anker's office and spoke to Larks, who told her that it must have been a mistake.  Later, Larks called her back and told her that she had spoken with someone at GMAC and they were going to offer them a settlement. (Tr. 7/20, pp. 37-39)(A-68). Sometime after that conversation, Larks came to her house and told her that Anker wanted to tell her that they had reached a settlement with GMAC.  Larks then made a phone call and Maya Paveza spoke to someone she believed to be Anker, who told her there had been a settlement with GMAC. Sometime after that, the Pavezas received a check drawn on Anker's escrow account in the amount of $80,600.00. (SX-23)(A-181).[15]  Maya Paveza testified that Larks made all the arrangements concerning the GMAC settlement.  Whenever she contacted Anker's office, she always spoke to Larks, who told her that Anker was not available. (Tr. 7/20, pp. 54-55)(A-69).  When Maya Paveza opined that "Laura controlled the office," the court, *sua sponte,* stated, "Strike that." (Tr. 7/20, p. 55)(A-69).

**Margaret and Francis Caucci - Refinancing (Count V)**

According to the HUD-1 prepared for the closing, the Caucci's were getting a new mortgage for $237,000.00 from Nationwide Advantage Mortgage Company.  An existing mortgage with Homecomings in the amount of $231,426.42 would be paid off. (SX-25)(A-184).  Anker himself did not attend the closing, which was conducted by Larks.  At the closing, Larks did not give the

---

[15] The "settlement" check that was given to Paveza was actually signed by Larks. (Glanz Affidavit, Ex. A) (A-225)

Caucci's copies of any closing documents. (Tr. 7/20, pp. 74-76; p. 81)(A-71; A-73). In May 2003, Margaret Caucci checked the status of the account with Homecomings and discovered that the Homecomings mortgage had not been paid off. She then contacted Anker's office and received an e-mail from Anker's office indicating that they would look into the situation. (Tr. 7/20, pp. 81-82)(A-73).[16] Subsequently, Caucci received an e-mail from Anker's office advising that because Homecomings had "screwed up" the account, they would receive some kind of settlement from Homecomings in the range of $100,000 to $350,000. During this time, they were also receiving demands for payment and foreclosure notices from Homecomings. (Tr. 7/20, pp. 82-85)(A73-A74). Francis Caucci then contacted Anker's office and told Larks that he wanted to meet with Anker, but Larks kept putting him off. Eventually, Caucci showed up unannounced at Anker's office and told Larks he wanted to see Anker. Later that day, he met with Anker and discussed the situation. He asked Anker about the settlement and Anker confirmed everything that Larks had told him. He asked Anker to give him something in writing that he had contacted Homecomings and they had admitted they were at fault. Anker told him he did not work that way, and Caucci concluded that Anker did not have anything in writing from the bank. (Tr. 7/20, pp. 105-110)(A76-A77). Caucci knew that what Anker was telling him about the bank being at fault and being entitled to a settlement conflicted with what Nationwide and Homecomings was telling him. (Tr. 7/20, pp. 111-112)(A-77). On cross-examination, Caucci testified that he was "angry" at Anker because his credit had been "negatively impacted." (Tr. 7/20, pp. 115-116; 136-137)(A-78; A79-A80).

### Humera and Iqbal Bashir - Sale of Residence (Count VI)

Humera Bashir ("Bashir") testified that Anker conducted the closing on the sale of their residence to Drew Chambers, who was Anker's client. The contract sale price of the property was $263,000.00. According to the HUD-1 Statement, there were mortgage loans to Principal Residential Mortgage Company ($152,984.25) and Sovereign Bank ($27,482.67) that were to be paid

---

[16] Margaret Caucci never met or spoke to Anker. All of the e-mails apparently came from Larks. (Tr. 7/20, pp. 89-90)(A-75).

off as part of the closing. (SX-2)(A-170). Several days after the closing, Bashir contacted Principal and Sovereign to confirm that the mortgages had been paid off and learned that they had not been paid off. Bashir then made a number of calls to Anker's office to try to find out what was going on and why the mortgages had not been paid. After the closing, all of Bashir's contacts with Anker's office were with Larks, who told her not to worry and that the mortgages had been paid off. Bashir asked Larks for FedEx tracking numbers and copies of the cancelled checks.[17] She also kept calling Principal and Sovereign to find out if any payments had been received. In late July 2003, Humera Bashir, who had moved to New York after the closing, decided to make a trip to Delaware to see Anker and find out what was going on. She arrived at Anker's office around 9:30 a.m, but the office was closed. Bashir did however, make contact with Larks by phone and she made arrangements to meet her at the office at 11:30 a.m. When Bashir finally met with Larks, she asked Larks to produce the cancelled checks. Larks told her she did not have them and they were probably with the bookkeeper or accountant. Bashir asked to speak with Anker, but Larks told her that Anker was away. Larks also told Bashir that Anker was working on the matter and that they would get a $10,000 or $20,000 settlement from the bank. (Tr. 7/18, pp. 33-40)(A37-A38). Prior to sale of their home, the Bashir's always had excellent credit. After the closing, their credit reports showed that they were four months in default on their mortgages. As a result, their "credit was completely destroyed." (Tr. 7/18, p. 49)(A-40). The Bashir's also tried to get Anker's title insurance carrier to pay off the mortgages, but their claim was denied. After that, they went to the Lawyers' Fund for help and the Lawyers' Fund eventually paid off their mortgages. (Tr. 7/18, pp. 47-48)(A-39).

---

[17] At some point, Larks faxed to Bashir copies of checks payable to Principal and Sovereign. The checks were dated July 4, 2003. Bashir, however, continued to be suspicious because the banks were telling her that the checks had not been received by them. (Tr. 7/18, p. 29-30) (A-36). When the files in Anker's office were reviewed by investigators, they found checks on Larks' desk which had been written, but not sent out, to pay off the Bashir mortgages. (Tr. 7/25, p. 171)(A-106).

**Patricia Paoli - Refinancing (Count VII)**

Patricia Paoli ("Paoli") testified that Anker was hired to handle the refinancing of her residence in Rehoboth Beach. Larks handled all of the paperwork and Anker himself was not present at the closing. (Tr. 7/20, pp. 143-147)(A81-A82). According to the HUD-1 prepared for the closing, Paoli was getting a new mortgage for $276,250.00 from Wilmington Mortgage Services and an existing mortgage with ABN/AMRO ("ABN") in the amount of $271,643.18 was be paid off. (SX-27)(A-186). After the closing, Paoli began receiving notices from ABN that her mortgage payments were delinquent. She contacted ABN and told them that she had refinanced and had a new loan. ABN told her that they did not know anything about the refinance. (Tr. 7/20, pp. 151-152)(A-83). She then contacted Anker's office and spoke to Larks, who told her that Anker was busy. She called again a few days later and got a message that the phone had been disconnected. She then went to Anker's office and there was a sign saying the office was closed down. (Tr. 7/20, pp. 152-153)(A83-A84).

**Kathleen Leahy - Sale of Residence (Count VIII)**

Kathleen Leahy ("Leahy") testified that Anker conducted the closing for the sale of her residence to Nancy Devine and Julius Meisel. (Tr. 7/21, pp. 6-7)(A-94). According to the HUD-1, (SX-30)(A-188), Wachovia Bank held a mortgage on the property with a balance owing of $50,826.90 that was to be paid off as part of the closing. (Tr. 7/21, pp. 13-15)(A-95). Several weeks after the closing, Leahy learned that the Wachovia mortgage had not been paid off. (Tr. 7/21, pp. 17-18)(A-96).[18] Leahy testified that after the closing, she was constantly dunned by Wachovia because the mortgage had not been paid off. She also testified that the Wachovia mortgage was paid off in April 2004 by the Lawyers Fund. (Tr. 7/21, pp. 17-19)(A-96).

---

[18] Leahy's closing occurred on July 15, 2003. Anker's law office was closed down by the Office of Disciplinary Counsel two weeks later, on July 29, 2003. (Tr. 7/25, pp. 170-175)(A106-A108). That time sequence probably explains why Leahy did not have any post-closing contact with Anker's office.

## Russell and Eleanor Burkett - Purchase of Residence (Count IX)

The Burketts ("Burkett") hired Anker to conduct the closing on a residence they had purchased in Middletown form Barry Kintz ("Kintz"). Burkett was paying all cash for the house and he had wired the funds to Anker's escrow account several days prior to the closing date. (Tr. 7/20, pp. 163-164)(A-86). According to Burkett, he signed a few documents at the closing and received a copy of the HUD-1. After the closing, Burkett learned that the Deed to the property had not been recorded in his name. He than called Anker, who told him that he would check into it and get the matter resolved. (Tr. 7/20, pp. 167-168)(A-87). According to the HUD-1, the seller (Kintz) had a mortgage with Chase Mortgage, with a balance owing of $156,149.62, that was to be paid off at closing. After the closing, Kintz learned that the Chase mortgage had not been paid off. (Tr. 7/20, pp. 189-195)(A91-A92). In mid-July 2003, he tried to contact Anker's office, but learned that the office had been closed down. (Tr. 7/20, pp. 197-198)(A-93).

At trial, Burkett testified that after he learned the deed for the purchase of his property had not been recorded by Anker and that Kintz's mortgage had not been paid off, he and Kintz "put charges on [Anker]...and had him temporarily disbarred." (Tr. 7/20, pp. 169-170)(A-88). Burkett also testified about a phone message he left for Anker that accused Anker of "stealing" $325,000 from him and being responsible for the bank foreclosing on his house. (Tr. 7/20, pp. 183-186)(A89-A90). During the defense case, Burkett was recalled as a witness and testified that his deed was recorded and the transfer taxes and unpaid mortgage were all paid by the Lawyers' Fund. (Tr. 7/27, pp. 95-97)(A129-A130).

## Additional Evidence in the State's Case-in-Chief
## Robert Carmine

In addition to the testimony of the victims summarized above, Robert Carmine, the State's chief investigator, testified that he had reviewed the bank records for Anker's escrow account to determine whether or not the outstanding mortgages that should have been paid off in the nine closing transactions had, in fact, been paid off. According to Carmine, except for the one instance

involving the GMAC mortgage in the Paveza refinancing, he did not find any records to support a claim that these mortgages had been paid off. (Tr. 7/21, pp. 53-65)(A100-A102). Carmine also testified that the correspondence from Chase Mortgage concerning the Ray refinancing and offers of settlement to Ray, which purported to be from "Kevin Snyderman," was apparently fictitious. (Tr. 7/26, pp. 66-67)(A-103).

### Joseph McCullough

Joseph McCullough ("McCullough") was employed as an investigative auditor by the Lawyers' Fund and by the Delaware Office of Disciplinary Counsel ("ODC"). (Tr. 7/25, pp. 153-154)(A-104). McCullough told the jury that ODC had received two complaints concerning Anker, which involved mortgages not being paid off. On July 29, 2003, around 2:00 p.m., he went to Anker's office, which was closed, on the chance that he might encounter other clients of Anker who also had complaints. Around 3:30 p.m., he met with Anker, who had been "summoned" back from a Florida vacation. (Tr. 7/25, pp. 155-157)(A104-A105). Later that evening, after he left Anker's office, he sent an e-mail to Mike McGinnis, deputy counsel for ODC, to advise him that there was a serious problem with $300,000 to $400,000 in unpaid mortgages, which might be "the tip of the iceberg." McCullough also testified that the next day he was told that ODC was going to petition the Supreme Court that Anker receive an interim suspension from the practice of law and that a Receiver would be appointed by the Court to take over his practice. (Tr. 7/25, pp. 173-175)(A-108).

McCullough also testified that in the course of reviewing checks drawn on the escrow account, he found two checks, one drawn in March 2002 for $44,924.65, and the other drawn in June 2002 for $9,740.84, that had been sent to the IRS for payment of delinquent taxes owed from 1998 through 2000. (Tr. 7/25, pp. 196-197)(A109-A110).[19] McCullough also testified, without objection by defense counsel, that all Delaware Lawyers, including Anker, are required to file annual "Certificates of Compliance" with the Delaware Supreme Court concerning the integrity of their

---

[19] This testimony was not objected to by the defense even though the payments to the IRS predated eight of the nine Theft charges by twelve months or so.

escrow accounts. McCollough testified that he had obtained Anker's Certificate (presumably from ODC) for the year 2002 and that it appeared to him that Anker's escrow account was not in compliance with the Supreme Court's requirements even though Anker had certified that the account was in compliance. (Tr. 7/25, pp. 169-170)(A106).

### Richard Forsten

Richard Forsten, Esquire ("Forsten") was the court-appointed Receiver for Anker's law practice and testified as a defense witness. According to Forsten, the file organization at Anker's office was a "mess." (Tr. 7/26, pp. 217-222) (A-A123-A124). Ironically, the only file that was properly organized was the file for Larks' purchase of her own residence. (Tr. 7/27, pp. 75-76) (A-128). On cross-examination by the State, Forsten testified that in reviewing Anker's files and accounts, he discovered that Anker had received $211,000 from an insurance company in settlement of a property damage claim brought by his client, a condo association, but there was no record that the money had ever been paid over to the condo association. (Tr. 7/27, pp. 49-51)(A-125).[20] This testimony was not objected to by defense counsel.

### Overview of the Defense Case

As already noted herein, in the pre-trial severance motion, which was granted by the trial court, Anker represented that the core of his defense to the Theft charges would be that Larks had forged checks from the escrow account without his knowledge and had also forged other documents necessary to accomplish the thefts. Anker also claimed that Larks had created false e-mails and correspondence to deceive him and his clients and had withheld information that would have exposed Larks' misconduct or alerted him to her actions. *See, State v. Anker*, 2005 Del. Super. LEXIS 105, at *3; *12-*13 (Del. Super. 2005). Anker denied any role or participation in the thefts and claimed that because of Larks' deceptions, he was unaware that Larks was stealing funds from the escrow account and therefore lacked the "intent" to commit the charged crimes. *Id.,* at *11-*13.

---

[20] A Theft charge against Anker relating to the alleged failure to pay the settlement proceeds to the condo association was included in the original Indictment but was *nolle prossed* prior to Anker's trial. (A-19)

**Evidence that Larks Committed the Thefts**

At trial, Anker attempted to establish that Larks had a longstanding resentment and even hatred towards Anker, which would have provided a motive for Larks to steal money from Anker and his clients.  Anker's wife, Ann Conway ("Conway")[21] testified that Larks was the oldest of three daughters from Anker's first marriage.  (Tr. 7/26/05, pp. 103-104) (A-113).  According to Conway, Anker had been estranged from Larks for many years following an "acrimonious" divorce from Larks' mother.  Larks and Anker reconnected when Larks was 16 years old, at a time when Larks was "down and out and didn't have a job."   Anker gave her a job at his office even though Larks had not graduated from high school and had no relevant work experience.  When Larks began working at the office, Anker had two other employees who handled the real estate closings.  Those other employees eventually left and by the time of the alleged thefts, Larks had assumed all of the office responsibilities, including the real estate closings. (Tr. 7/26/05, pp. 105-112) (A114-A115).

In Conway's opinion, Larks was a "pathological liar."  Conway frequently told Anker that he had to get Larks "out of the office," but Anker would always "cover" for Larks.  Conway believed that Anker "blindly" trusted Larks and wanted her to succeed because he had tremendous "guilt" about his past estrangement from Larks. (Tr. 7/26/05, pp. 113-119) (A116-A117).  Anker's attorney also questioned Conway concerning her knowledge of Larks' feelings towards Anker.   When Conway attempted to describe that Larks had expressed anger and resentment towards Anker because she blamed him for the many years of their estrangement,  the State objected on grounds of "hearsay."   The testimony was stricken by the court without any argument or opposition from defense counsel.  (Tr. 7/26/05, pp. 122-128) (A118-A120).

Richard Morris was a defense witness who provided evidence concerning Larks' relationship with Anker and incriminating statement made by Larks.  Morris was a landscaper who cut grass for Anker at his residence.  He considered himself to be friends with both Larks and Anker.  Morris

---

[21] Conway was also an attorney, but she did not have any connection with Anker's law practice. (Tr. 7/26/05, p. 98) (A112).

testified about a phone conversation with Larks in April 2003. According to Morris, Larks seemed to have feelings of anger towards Anker. Larks also told Morris that she had "borrowed" money from Anker, but he did not know about it.[22] She also asked Morris not to tell Anker about the money. Morris had another conversation with Larks after Anker's office had been closed down. She sounded "scared" and told Morris that she had "f****d up." (Tr. 8/1/05, pp.17-32) (A136-A139).

Another witness called by the defense to testify concerning incriminating statements made by Larks was Maya Paveza. Although Paveza herself was one of the "victims" in the case, she was also a real estate agent who came to know Anker through a friend's acquaintanceship with Larks. (Tr. 7/20, pp. 31-32)(A-66). Paveza testified that, in mid-July 2003, she got a phone call from Larks. According to Paveza, Larks told her that one of Anker's clients had called the office about a mortgage payoff that had not been made and had threatened to contact ODC. Larks had apparently told the client that the office "accountant" was responsible, even though the office did not have an accountant and Larks knew that the payoff had not been sent out. She asked Paveza if she would call the client and pretend to be the accountant. Paveza testified that Larks was "panicky" about the situation. Paveza to Larks that she would not participate in such a scheme. She also told Larks that she had to take responsibility for any mistakes she had made. (Tr. 7/27, pp. 129-132) (A-131). Sometime after this conversation with Larks, she got a phone call from Anker, who was in Florida. Anker told her that he was being investigated by ODC about unpaid mortgages. Anker also told her he was returning to Delaware to meet with ODC investigators and that he had been unable to contact Larks.[23] The next day, Paveza met Anker and Conway at Anker's office. When she arrived, someone from ODC was already there. She tried to help Conway sort through Larks' desk, which

---

[22] Joseph McCollough, the ODC auditor, testified that he found transfers from the escrow account directly to Larks in the approximate sum of $200,000.00. (Tr. 7/26, pp. 32-33) (A98-A99).

[23] Conway testified that she had learned that Larks had her phone disconnected and had checked herself into the Rockford Center. The State objected to this testimony and the court struck the testimony without any argument being offered by defense counsel. (Tr. 7/26, pp. 137-138) (A-122).

-17-

she described as "chaos."[24]  Paveza also testified that Larks had "bragged" to her that she was negotiating "settlements" with GMAC and Conseco in Anker's name.[25] According to Paveza, Anker was in "shock" and she did not think he knew what was going on.  At that point, she also realized that her mortgage was one of the ones that had not been paid off.  (Tr. 7/27, pp. 133-135) (A-132).

To underscore the extent of Larks' deception, and to illustrate how Anker was susceptible to being manipulated by Larks, Ann Conway and Anker both testified about the refinancing of the mortgage on their personal residence, which occurred during the same time period as the indicted thefts.  In March 2003, Anker did the closing on a refinance of his personal residence.  As part of the transaction, a mortgage held by Washington Mutual and other assorted debts were to be paid off. After the closing, however, Conway told Anker that she was getting dunning notices from Washington Mutual that the "old" mortgage had not been paid off.  Anker, in turn, asked Larks to find out what was going on. (Tr. 8/1, 127-138)(A149-A152).  In May 2003, Larks showed Anker an e-mail, from "Doug McIntyre" at Washington Mutual which contained an offer of a  "settlement" of $250,000 plus cancellation of the debt.  Larks also told Anker that the money had been wired to his escrow account.  Larks also showed Anker another e-mail from Washington Mutual which offered Anker a job for five years at a salary of $250,000 per year. (Tr. 8/1, 140-143)(A152-A153); (DX-8) (A-193).  In June 2003, Larks showed Anker an e-mail from Washington Mutual repeating the job offer and also offering Anker a "settlement of $5,000,000". (Tr. 8/1, p.148)(A-154); (DX-10) (A-195).  Anker wrote back to Washington Mutual that he was accepting the settlement offer. (DX-11) (A-196).  When Anker asked Larks whether the $5,000,000 settlement had been wired to his account, Larks produced an e-mail, dated July 17, 2003 from a "Wil O'Neal" at Wilmington Trust

---

[24] Denise Alexander, who had formerly worked for Anker as a real estate secretary for several years and had been briefly re-employed by Anker in March 2003, testified that the files in the office were in "disarray" and that she had seen checks in the files that had never been sent out.  She told Larks about the situation but did not tell Anker. (Tr. 7/27, pp. 153-163) (A133-A135).

[25] The State objected to this testimony on grounds of "hearsay." The objection was sustained without any argument being made by defense counsel. (Tr. 7/20, pp. 56-57) (A69-A70).

confirming that he had a balance in his account of over $6,000,000. (Tr. 8/1, 150-152)(A-155).[26]
Conway testified that after the closing on their re-finance, she continued to get calls from her "old"
mortgage company that the mortgage was in default. When she questioned Anker about this, he told
her about the $400,000 "settlement" they were getting from Washington Mutual. Conway also
testified that when they returned from Florida to meet with the ODC investigator, she found their re-
financing file on the floor near Larks' desk. When she went through the file, it became clear to her
that the "old" mortgages on their residence had not been paid off. (Tr. 7/26, pp. 127-131) (A119-
A120).

As previously noted above, Anker himself testified in his own defense. Anker described that
Laerks was seven years old at the time of the breakup of his first marriage and how Larks was
"devastated" by those events. (Tr. 8/1, pp. 83-85) (A140-A141). He also related that he did not have
any contact with Larks for many years after that and how they came to renew contact with each other
in the late 1990's. (Tr. 8/1, pp. 89-92) (A-142). He also described how he came to offer her a job in
his office as a clerical assistant to Nicole, his office manager. (Tr. 8/1, pp. 97-100) (A-144). Anker
also described how the office was using computer software to manage the bookkeeping, but that he
did not know how to run the computer programs. (Tr. 8/1, pp. 100-102) (A144-A145). Anker also
testified that he did not know how to use e-mail or operate a word processing program. (Tr. 8/1, pp.
111-114) (A146-A147). Anker denied that Larks had permission to sign his name to checks. (Tr.
8/1, p. 109) (A-146).[27] When Nicole left Anker's employ, Larks assumed all of the responsibilities
of running the office. (Tr. 8/1, pp. 115-120) (A147-A148). Anker never denied that client funds
were misappropriated from his escrow account. Anker also did not deny that the record keeping for
the escrow account, for many years, was not in compliance with the requirements imposed by the
Rules of Professional Conduct. Anker testified, however, that he put his complete trust in Larks to

---

[26] Needless to say, all of the e-mails concerning the "settlement" with Washington Mutual
and the e-mail from Wilmington Trust were complete fabrications. (Tr. 7/26, pp. 66-68) (A-111).

[27] At trial, McCullough testified that many of the escrow checks did not appear to have been
signed by Anker. (Tr. 7/26, pp. 25-28) (A-97).

handle the closings in a proper manner.  Anker also testified that he did not know that money was being misappropriated from his escrow account and also denied that ever withdrew funds from the escrow account that he did not believe belonged to him. (Tr. 8/1, pp. 188-190) (A157-A159). Anker's defense was that he was actively misled and deceived by Larks as to the true state of affairs concerning his escrow account and the mortgage payoffs and he therefore did not have the criminal intent required to convict him of Theft.

Additional facts needed to resolve the issues raised in the habeas Petition are set forth in the Argument sections which follow.

**ARGUMENT**

1. **ANKER WAS DEPRIVED OF HIS RIGHT TO COUNSEL UNDER THE SIXTH AMENDMENT AND *UNITED STATES v. CRONIC* BASED ON THE COMBINATION OF ERRORS MADE BY HIS TRIAL COUNSEL COUPLED WITH THE FACT THAT HIS TRIAL COUNSEL SUFFERED FROM A SEVERE PSYCHIATRIC IMPAIRMENT AT THE TIME OF THE TRIAL**

---

### Procedural Background

The Rule 61 Motion filed by Anker in the Delaware Superior Court listed several specific claims which Anker alleged amounted to ineffective assistance of counsel. One of the claims alleged the following:

> **Claim No. 6:** The defendant was deprived of his right to the effective assistance of counsel because defense counsel had failed to disclose to the defendant that during the course of his representation defense counsel was suffering from a major depressive disorder which caused him to virtually neglect and ignore his professional obligations to his clients, including Anker, and which eventually led to the filing of numerous disciplinary charges against defense counsel by ODC. See, *In re Allan Wendelburg*, Case No. 501, 2006 (Del. 2006).

(A-29).

When a defendant asserts a claim of ineffective assistance of counsel in a post-conviction proceeding, the Delaware Supreme Court has held that it is the "preferable practice" to require the attorney who is the target of the claim to file an affidavit in response to the claims and, in the discretion of the trial court, to have an evidentiary hearing. See, *Horne v. State*, 887 A.2d 973, 974 (Del. 2005). In this case, however, that procedure was not followed. In the *Rule 61 Decision*, the Superior Court summarily dismissed **all** of Anker's Sixth Amendment claims, including "Claim 6," without requiring Anker's trial attorney to file a responsive affidavit, without holding an evidentiary hearing, and without so much as a mention of the allegations in "Claim 6" in the court's decision. *Id.*, 2007 Del. Super. LEXIS 209.

In the appeal from the *Rule 61 Decision*, Anker argued that the Superior Court had committed legal error in summarily dismissing "Claim 6":

-21-

In Claim 6, it was alleged that during the course of his representation defense counsel was suffering from a major depressive disorder which caused him to virtually neglect and ignore his professional obligations to his clients, including Anker. (A-26).   Anker's allegation that his trial counsel was impaired at the time of Anker's trial was supported in the record by the Report of the Board on Professional Responsibility cited in Anker's Rule 61 Motion. (A43-A44). [Footnote: According to Dr. Tavani, at the time of Anker's trial, his attorney was suffering from a "profound depression" which resulted in a "distorted view of reality" (A43-A44)]. The existence of these impairments, coupled with the serious nature of trial counsel's derelictions during the trial, as outlined in Claims 1 through 5, were certainly substantial enough to raise the possibility that there was a "constructive" denial of counsel during Anker's trial, which would have entitled Anker to post-conviction relief. *See, United States v. Cronic*, 466 U.S. 648 (1984)(prejudice is presumed where there is a constructive denial of counsel); *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (fact that defense counsel was asleep during critical parts of the trial amounted to a constructive denial of counsel under *Cronic* resulting in presumed prejudice to defendant. "Unconscious counsel equates to no counsel at all. Unconscious counsel does not analyze, object, listen or in any way exercise judgment on behalf of a client"). [**Footnote:** Dr. Tavani also described Anker's attorney as being "unplugged." (A44)].    The conclusion in the *Rule 61 Decision* that relief on this claim should be summarily denied without any further proceedings was incorrect as a matter of law. See, *Horne v. State, supra*, 887 A.2d at 975 ("preferable practice" in case of first Rule 61 Motion is to require response from attorney before summarily denying *Strickland* claim).

(Excerpt from Appellant's Opening Brief, pp. 18-19).

The Delaware Supreme Court's response to the above argument was to affirm the Superior Court's *Rule 61 Decision* without even a mention of the allegations in "Claim 6."  See, *Anker II*, 2008 Del. LEXIS 17.  The allegations in "Claim 6" are renewed in the Habeas Petition. (A-34).

### Habeas Standard and Scope Review - "Claim 6"

### Exhaustion of State Remedies

The federal habeas statute requires state prisoners to exhaust available state court remedies before seeking federal relief. 28 *U.S.C* § 2254(b) (2006); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (a state prisoner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process").  A claim is exhausted if it was "fairly presented" to the state courts.  *Baldwin v. Reese*, 541 U.S. 27, 29

(2004).[28]  Even if a state court neglects or refuses to consider the claim, it is still exhausted as long as the state court had the opportunity to address it. See, *Nara v. Frank*, 488 F.3d 187, 198 (3d Cir. 2007).  In this case, it is clear that Anker "fairly presented" a claim in the Delaware state courts that he was constructively deprived of his Sixth Amendment right to counsel under *Cronic* based on the psychiatric disability of his trial attorney.  Furthermore, it is equally clear that the Delaware Supreme Court failed to adjudicate this claim on the merits, even though they had the opportunity to do so.

### Standard and Scope of Review - Claim 6

The fact that the Delaware Supreme Court did not adjudicate Claim 6 on the merits is significant because it dictates the scope of this Court's review of that claim.  Anker's Habeas Petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 104 P.L. 132,110 Stat. 1214 (1996).  The AEDPA substantially restricted the power of the federal courts to review state courts' interpretation and application of federal constitutional law.  The standard of review under the AEDPA is controlled by  28 *U.S.C.*  §2254(d), which states:

> (d) An application for a writ of habeas corpus on behalf of a person
>
> in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[29]

---

[28] A petitioner has fairly presented his claim if he presented the same factual and legal basis for the claim to the state courts. See, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (*per curiam*).  A petitioner can "fairly present" his claim through: (a) reliance on pertinent federal cases; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).

[29] See, *Williams v. Taylor*, 529 U.S. 362, 405-407 (2000) (a state court ruling is 'contrary to' clearly established Supreme Court precedent...if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent. A state court decision is an 'unreasonable application' of (continued...)

It is clearly established, however, that the scope of review under the AEDPA is inapplicable in those cases where the state court either misunderstood the nature of the federal constitutional claim or where, as here, the state court simply ignored the claim entirely.  See, *Appel v. Horn*, 250 F.3d 203, 209-12 (3d Cir. 2001) (the petitioner had properly presented in the state courts a claim of the constructive denial of counsel but the state courts had misconstrued the claim as one of the ineffective assistance of counsel. Observing that "the two claims, of course, are different," the court held that the constructive denial claim had not been decided by the state courts and that the restrictive standards of §2254(d) did not apply;  *Everett v. Beard*, 290 F.3d 500, 508 (3d Cir. 2002) (deferential standards of review [under AEDPA] do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States"); *Hameen v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000) (restrictive standard of review under AEDPA was not applicable where the Delaware Supreme Court "did not pass on [the petitioner's] Eighth Amendment constitutional duplicative aggravating circumstances argument, even though it had the opportunity to do so").

In cases where the ADEPA is inapplicable under *Appel, Everett* and *Hameen*, the habeas petitioner's federal constitutional claims are to be reviewed *de novo* under pre-ADEPA standards of review.  See, *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) (In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review. Prior to AEDPA, federal habeas courts conducted a de novo review over pure legal questions and mixed questions of law and fact); *Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir. 2002) (*Hameen, Appel*, and *Everett* stand for the proposition that if an examination of the opinions of the state courts shows

---

[29](...continued)
Supreme Court precedent if it "identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case); *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 891 (3d Cir. 1999) (en banc), *cert. denied*, 528 U.S. 824 (1999) ("The federal habeas court should not grant the petition unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent. In making this determination, mere disagreement with the state court's conclusions is not enough to warrant habeas relief").

that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply).

### Discussion and Analysis of Anker's Sixth Amendment Claim Under *Cronic*

### (1) Overview of the Law

In the vast majority of cases, Sixth Amendment claims involving allegations of ineffective assistance of counsel are analyzed under the well established two-pronged "performance" and "prejudice" test established in *Strickland v. Washington*, 466 U.S. 668 (1984).[30] However, in *United States v. Cronic*, 466 U.S. 648 (1984), decided on the same day as *Strickland*, the Supreme Court identified a narrow category of cases where defense counsel "completely fails to engage in the adversarial process." *Id.* at 659. In such cases, counsel's conduct is "so likely to prejudice the accused" that prejudice is presumed. *Id.* The distinction between a Sixth Amendment claim under *Cronic* and a claim under *Strickland* was explained by the Supreme Court in *Bell v. Cone*, 535 U.S. 685, 697 (2002): "For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." In a footnote, the majority rejected the argument in Justice Stevens' dissenting opinion that *Cronic*, rather than *Strickland*, was controlling because "subsequent to trial, [defendant's attorney was] diagnosed with a mental illness that rendered him unqualified to practice law, and that apparently led to his suicide..." *Id.,* at 702-703 (Stevens, J., dissenting):

> In concluding that *Cronic* applies to respondent's ineffective-assistance claim, the dissent relies in part on inferences it draws from evidence that his attorney sought treatment for a mental illness four years after respondent's trial. While the dissent admits that counsel's mental health problems "may have onset after [respondent's] trial," it

---

[30]    In order to establish a claim of ineffective assistance of counsel under *Strickland*, the defendant must demonstrate that his attorney's performance was deficient and that he was prejudiced by this deficiency. *Id.*, at 687. The standard for attorney performance is "reasonably effective assistance," or "reasonableness under prevailing professional norms." *Id.*, at 687, 688. Under the second step of the *Strickland* analysis, Anker must show that his attorney's deficient performance prejudiced the outcome of his case. Under the "prejudice" inquiry, he question is whether a "reasonable probability" exists that counsel's unprofessional errors affected the outcome of the proceeding. *Id.* at 694. See, *United States v. Gormley*, 242 Fed. Appx. 853, 855 (3d Cir. 2007) (accord).

> speculates that counsel's mental health problems began earlier based on its "complete reading of the trial transcript and an assessment of [counsel's] actions at trial." But, as the dissent concedes, respondent did not present any evidence regarding his counsel's mental health in the state-court proceedings...nor does he suggest that his counsel suffered from mental health problems at the time of his trial.

*Id.*, at 697 n.4.

In *Bell*, the Supreme Court identified three situations in which courts should apply the *Cronic* standard of presumed prejudice. The first is when there is a "'complete denial of counsel'" at a critical stage in the trial proceedings. *Bell,* 535 U.S. at 695-96 (quoting *Cronic*, 466 U.S. at 659).[31] Second are situations in which a petitioner is represented by counsel at trial, but counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. And third, situations at trial where counsel could not render competent assistance. *Id.*[32]

What distinguishes this case from *Bell* is that here, unlike *Bell*, there is substantial evidence, that was presented to and totally ignored by the State courts, that Anker's trial attorney, Allan Wendelburg ("Wendelburg"), was suffering from a major psychiatric disorder at the time of his trial. That evidence, which will be discussed in detail herein, coupled with the numerous critical errors and omissions made by defense counsel in trial preparation and during the course of the trial, which will also be reviewed in detail herein, is sufficient to warrant the conclusion, under *Cronic*, that Anker's trial counsel was not functioning as an attorney and "could not render competent assistance." *Id.*, 466 U.S., at 659. See, *Bell*, 535 U.S. 717-718 (Stevens, J., dissenting) ("[P]resuming prejudice when counsel has entirely failed to function as an adversary makes sense... Counsel's complete failure to advocate, coupled here with his likely mental illness, undermines *Strickland's* basic assumption: that counsel has 'made all significant decisions in the exercise of

---

[31] "The Supreme Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25.

[32] Of course, if the defendant falls short of establishing a Sixth Amendment violation under *Cronic*, then the claim is subject to proof of "prejudice" under *Strickland*. See, *Cronic*, 466 U.S. at 659 n.26.

-26-

reasonable professional judgment.'" 466 U.S., at 690); *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (fact that defense counsel was asleep during critical parts of the trial amounted to a constructive denial of counsel under *Cronic* resulting in presumed prejudice to defendant. "Unconscious counsel equates to no counsel at all. Unconscious counsel does not analyze, object, listen or in any way exercise judgment on behalf of a client"). As discussed below, this combination of circumstances is sufficient to justify a presumption that [Anker's] conviction was insufficiently reliable to satisfy the Constitution." *Cronic*, 466 U.S., at 662.

### (1) Evidence of Psychiatric Impairment of Anker's Trial Attorney[33]

Shortly after Anker was indicted in March 2004, Wendelburg entered his appearance as Anker's attorney. (A-2). Wendelburg had been a member of the Delaware Bar since December 1979. During the course of his legal career, he was employed in various positions in the Delaware Attorney General's Office and had been in solo practice since 1999. Wendelburg married his wife Diane in 1985. After he started his solo practice, Diane became the office administrator and performed nearly all of the administrative functions in the office. She also had primary responsibility for their personal finances and tax obligations. (A-211).

In 2001, Diane was diagnosed with a serious illness. During her illness, Diane became increasingly unable to perform her job as office administrator. After a long period of illness and several surgeries, Diane died in November 2004. She was also survived by three minor children. During his wife's illness, Wendelburg hired a part-time bookkeeper, but she never took over all of Diane's responsibilities. Additionally, due to his wife's illness and his obligations at home with three children, Wendelburg became increasingly unable to devote necessary time to his law practice. (A-211). In early 2005, Wendelburg decided to close down his private law practice. In September 2005, he went to work as in-house counsel for Nationwide Insurance Company. (A211-A212).

---

[33] The following discussion is taken nearly verbatim from the findings made by the Delaware Board on Professional Responsibility and adopted by the Supreme Court of Delaware, which resulted in Wendelburg's suspension from the practice of law for a period of three years. See, *In Re: Allan Wendelburg, Esquire*, No. 501, 2006 (Del., December 6, 2006) (hereinafter "*Board Report*") (A-197, *et. seq.*).

These tragic events coincided with Wendelburg's representation of Anker, whose trial in the Delaware Superior Court commenced on July 18, 2005 and concluded on August 4, 2005. (A9-A10).

In April 2005, ODC received a complaint from one of Wendelburg's clients, D/B Constructors, Inc. which alleged that Wendelburg had completely neglected a litigation matter in the U.S. Bankruptcy Court and that said alleged neglect had resulted in the entry of a default judgment against D/B for $14,670.00    Between April 2005 and August2005, Wendelburg also failed to respond to numerous requests from ODC for a response to D/B's allegations. (A202-A204).

In September 2005, ODC received a complaint from Leah Hoopes ("Hoopes"), who had been employed as a paralegal by Wendelburg since January 2001.  According to Hoopes, on September 7, 2005, Wendelburg informed her that he would be closing down his office and starting a new job. There were discussions about sending a letter to Wendelburg's clients concerning the closure of the office, but that did not occur.  After that, Hoopes had only one more contact with Wendelburg.  On September 29, 2005, Wendelburg told her that he would be closing the office on October 30, 2005. Hoopes stopped working for Wendelburg on October 14, 2005.  After she stopped working for Wendelburg, Hoopes made numerous attempts to contact him because he had not sent her her final paycheck.  During this time, Hoopes also learned that she was ineligible to receive unemployment benefits because no money had been paid into the account for Wendelburg's law office. (A206-A207).  The above two complaints also prompted ODC to conduct an audit of Wendelburg's financial records.  That audit revealed numerous deficiencies that were not in compliance with the Court's financial recordkeeping requirements. (A-208).  In April 2006, Wendelburg's family doctor diagnosed him with "acute depression" and hypertension and prescribed an antidepressant.  In April 2006, Wendelburg was placed on medical disability by his employer.(A-212).

The hearing before the Board was held on May 10, 2006, ten months after Anker's trial. (A-198). The *Board's Report*, which was adopted by the Delaware Supreme Court,  included a summary of the testimony of Dr. Carol Tavani, a neuropsychiatrist, who was Wendelburg's treating physician. (A-212).  Dr. Tavani's testimony covered Wendelburg's psychiatric conditions and personal and

-28-

emotional problems.  Dr. Tavani testified that Wendelburg's medical and family history made him

predisposed for depression. (A-212).   According to the *Board's Report*:

> Dr. Tavani found no evidence of psychosis, but Respondent's
> memory, self-esteem and self-motivation are all suffering.   Dr.
> Tavani's diagnosis is that respondent has a very profound depression,
> a major depression derived from a severe prolonged not only
> bereavement, but anticipatory bereavement from his wife's lengthy
> illness.  **Respondent is depressed to the point of nonfunctionality.**
> **Respondent's condition is debilitating and his cognitive**
> **realizations and processing are very impaired...he was simply**
> **"unplugged."**

(A212-A213) (emphasis added).

Dr. Tavani's description of Wendelburg's psychiatric incapacity and the fact that the

problems in his law practice coincided with Anker's trial virtually compels the conclusion that

Wendelburg was severely impaired at the time of Anker's trial. Why the allegations in Claim 6 were

entirely ignored by the Delaware courts cannot rationally be explained or defended.[34]

### (2) Evidence that Wendelburg was not Functioning as an Attorney

### (a) Failure to Present the Defense Theory of the Case

Anker never denied that substantial sums of money was misappropriated from his escrow

account.  The core of Anker's defense, as disclosed in the pre-trial severance motion, was that the

thefts were actually committed by Larks, without his knowledge or participation, and that Larks had

concealed from him the fact that the "old" mortgages were not being paid off.  See, *State v. Anker*,

2005 Del. Super. LEXIS 105, *11 ("Anker claims his daughter must have set up the whole scheme.

He blames her for setting up fictitious settlements and for misleading him to believe that the firm's

---

[34] Concurrent to the submission of this Brief and Appendix, the Petitioner has filed a Motion
for an Evidentiary Hearing concerning the habeas claims.  See, *Rules Governing Section 2254 Cases,*
*Rule 8; Taylor v. Horn*, 504 F.3d 416, 429 (3d Cir. 2007) (In deciding whether to grant an
evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant
to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas
relief).

escrow and operating accounts were funded properly").[35]  For example, when Anker questioned Larks whether Washington Mutual had paid him a settlement for the "problems" with his own refinancing, Larks produced a completely false e-mail from Wilmington Trust confirming that he had a balance in his account of over $6,000,000. (Tr. 8/1, 150-152) (A-155).   In other words, in addition to showing that the thefts were committed by Larks, part of Anker's defense was that if he took any money from the escrow account, he did not do so with any criminal intent, but did so in reliance on Larks' false representations concerning the "settlements."  What happened to that defense between July 2004 and the start of Anker's trial in July 2005?

Apart from Wendelburg's psychiatric impairments, the most compelling evidence that Wendelburg was not functioning as an attorney during Anker's trial is found by reviewing whether Anker's "defense" was put into play in the trial itself and also by reviewing specific attorney errors made during the course of the trial.  A review of the trial record demonstrates that Wendelburg completely "dropped the ball" when it came to presenting the above described "defense" to the jury.

The State's theory of the case was that Anker and Larks were accomplices and co-conspirators, who were both criminally liable for the thefts.  See, *State v. Anker*, 2005 Del. Super. LEXIS 105, *14-*15.   That theory, combined with Anker's position as an attorney/fiduciary and Larks' employer, required that  Wendelburg  educate the jury as to the following matters: (1) Just because he was Larks' employer, Anker was not criminally responsible for  thefts that were actually committed by Larks; and, (2) Anker was not criminally responsible for the thefts just because the records of his operating and escrow accounts violated the Delaware Lawyers' Disciplinary Rules.

---

[35]  The Severance Motion was filed July 13, 2004. (A-4).  A few months before the Severance Motion was filed, Wendelburg hired William F. Glanz ("Glanz"), a private investigator with considerable forensic accounting experience, to assist the defense.  See, *Affidavit of William F. Glanz* (A-219).  As discussed in detail herein, Glanz had developed substantial evidence to support Anker's defense to the charges as outlined in the Severance Motion.

Additionally, Wendelburg needed to explain the law of "accomplice liability"[36] and "conspiracy"[37] to the jury.[38]  Finally, Wendelburg needed to show the jury that Larks was the one who failed to pay off the "old" mortgages and thereafter proceeded to loot the office accounts.

Prior to the trial, Glanz had developed substantial evidence that Larks alone was responsible for paying off the "old" mortgages and that Larks alone intentionally failed to make the payoffs. None of this evidence was presented to the jury.  Glanz could have testified that Larks was the person who was responsible for paying off the "old" mortgages and that she failed to do so.  (Glanz Affidavit, §3) (A-220).  Glanz also could have testified as to the steps taken by Larks after the closings to conceal from Anker the fact that clients were contacting the office about the unpaid mortgages. (Glanz Affidavit, §5) (A-221).  Glanz could have testified that between January 2002 and July 2003, Larks had deposited into her personal account at WSFS Bank the sum of $194,155.00 that had been taken from Anger's office accounts and that Larks had also stolen three checks totaling $6,197.50 which had been issued to Anker by third parties. (Glanz Affidavit, §7) (A222-A223).  Glanz also could have testified about substantial sums of money (approximately $163,000) that Larks paid to Maya Paveza for no apparent reason. (A224-A225).  In addition to not utilizing any of the above evidence, Wendelburg also failed to question Carmine, the State's investigator, about incriminating statements that Larks made to State investigators.  For example, Larks had admitted that she had signed Anker's name to many of the checks at issue in the case. (Glanz Affidavit, §4) (A220-A221).  Larks also made incriminating statements to State investigators about the payments to Paveza. (A-224).

---

[36] See, 11 *Del.C.* §271.

[37] See, 11 *Del.C.* §512.

[38] In order to convict Anker as an "accomplice" to thefts actually committed by Larks, the State had to prove that Anker "knew" that Larks was committing the thefts and that Anker did something to "aid" or "assist" Larks in committing the thefts.  See, *Ayers v. State*, 844 A.2d 304, 308 (Del. 2004).

The conclusion that Wendelburg was not functioning as Anker's attorney under *Cronic* is perhaps best illustrated by a review of the parties' closing statements to the jury. In its closing, the State emphasized that Anger and Larks were "accomplices" under Delaware law and therefore it did not matter which one of them actually "stole" the money. (Tr. 8/3/05, pp. 24-43)(A159-A164). In his closing, Wendelburg totally failed to explain the law of accomplice liability to the jury and did not answer or challenge the State's accomplice liability argument. In fact, Wendelburg's closing does not even mention accomplice liability. (Tr. 8/3/05, pp. 44-64) (A164-A169). Wendelburg also failed to explain to the jury that he could not be held criminally liable for acts committed by Larks merely because he employed Larks and that violations of the Disciplinary Rules did not establish criminal liability.

If Wendelburg had presented the evidence, discussed above, that Larks was the one who failed to pay off the mortgages and then concealed the thefts from Anker, Wendelburg could have made a persuasive argument to the jury that Anker could not be guilty as an accomplice because he did not know that Larks was stealing from the office accounts. In other words, Wendelburg needed to explain to the jury if they believed that the thefts were actually committed by Larks and also believed that Larks concealed the thefts from Anker, then Anker could not be Larks' "accomplice" because he was not aware that the thefts were taking place and therefore could not knowingly aid or assist Larks in committing the thefts. No such argument was ever made.

In addition to Wendelburg's complete failure to carry out Anker's proffered defense, on numerous occasions Wendelburg failed to object to the admission of irrelevant and highly prejudicial evidence, discussed herein, which not only influenced the jury's verdict, but also deprived Anker of a fundamentally fair trial.[39]

---

[39] In evaluating attorney "performance" under either *Cronic* or *Strickland*, the court is required to measure the alleged attorney error[s] against the state of the applicable law. *See, Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002), *cert. denied*, 537 U.S. 1107 (2003) ("The state of the law is central to an evaluation of counsel's performance ... a reasonably competent attorney patently is required to know the state of the applicable law").

### The Lawyers" Fund Evidence

The one category of evidence that had the least relevance, but possessed the greatest potential to confuse, mislead and prejudice the jury against Anker, was the testimony, individually and cumulatively, of Bashir, Urban, Lesko, Burkett and Leahy that their unpaid mortgages had all been "paid off" by the "Lawyers' Fund" at some time prior to Anker's trial. This evidence was not objected to at trial, yet the potential of that evidence to confuse and mislead the jury should have been obvious to even an inexperienced criminal defense attorney. The testimony that at least five mortgages, having a combined value of $573,639, had been paid off by the Lawyers' Fund, at a time when the criminal charges were still pending against Anger, no doubt sent a clear and strong message to the jury that the "Lawyers' Fund", i.e., Anker's own peers in the legal profession, had already decided that Anker was responsible for the missing money. Furthermore, the propensity for this evidence to persuade the jury that Anker was guilty was enhanced by the fact that the jury was also told that Anker was being investigated by ODC; that he had been temporarily disbarred; and that the court had appointed a Receiver to take over his law practice. If defense counsel had made a timely objection, the "Lawyers Fund" evidence would no doubt have been excluded. See, *D.R.E.* 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dAnker of unfair prejudice, confusion of the issues or misleading the jury..."); see, *State v. Walls*, 541 A.2d 591, 594 (Del. Super. (1987), *aff'd*, *Walls v. State*, 1990 Del. LEXIS 46 (Del. 1990). In *Walls*, the court granted a defense motion *in limine* to preclude the State from putting in evidence the fact of defendant's conviction by another jury on similar charges that had been severed from pending case:

> The verdict of the Pancoast jury is extremely prejudicial to the defendant's ability to obtain a fair trial by the jury in this case. **The conclusion of the Pancoast jury in reaching a guilty verdict adds little in relevant probative value to this jury's deliberations while having a devastating prejudicial impact.** Balancing these factors the Court concludes pursuant to D.U.R.E. 403 that the evidence of conviction is to be excluded in the State's case in chief.

*Id.*, 541 A.2d at 594 (emphasis added).[40]

It should have been clear to Wendelburg that simply allowing the jury to hear that the mortgages were paid off by the Lawyers' Fund had little, if any, relevance to the issue whether Anker was guilty of Theft.[41]   Furthermore, as an attorney, Wendelburg should have realized that this evidence also had great potential to confuse and mislead the jury.[42]   Wendelburg should have known that the evidence and issues involved in convincing the Lawyers' Fund to pay a claim were vastly different from the proof required for a criminal conviction.  Under *Regulation IV(1)*, the Lawyers' Fund could have paid off the mortgages simply because Anker had been suspended from practicing law and was found to have acted with "dishonesty" in a fiduciary capacity.  Furthermore, under *Regulation IV(1)*, a criminal conviction for embezzlement or theft is **not** a prerequisite for payment from the Fund.  Conversely, criminal liability cannot be premised on the fact that Anker, in his capacity as a "fiduciary," was vicariously responsible for any theft that occurred in connection with his law practice.  In other words, Anker could have breached a fiduciary duty to his clients to ensure that the mortgages were paid off without necessarily having any criminal intent to steal.

---

[40] In Anker's direct appeal, the court made an attempt to distinguish *Walls* by making the somewhat baffling assertion that "the Lawyers' Fund is not a tribunal." *Anker I*, 2006 Del. LEXIS 578, *1.

[41] In Anker's direct appeal, the Delaware Supreme Court applied "plain error" review and concluded that "evidence that the Lawyer's Fund paid the mortgages was relevant to show that Anker did not pay them with the money entrusted to him." *Anker I*, 2006 Del. LEXIS 578, *5.  What the court failed to note in its "relevance" analysis was that the jury had the same evidence of non-payment through Carmine, the State's investigator, and, more importantly, the fact of non-payment was never contested by the defense.  The court also failed to even acknowledge the existence of decisions from other jurisdictions, discussed herein, that the admission of such evidence in a criminal trial of the responsible attorney amounted to reversible error.

[42] Further potential for confusion existed here because the jury was not given any information about the Lawyers Fund itself.  In this case, the only information provided to the jury was the **result** of its involvement in the case.  The jury was not told anything about how the Fund operates or how the Fund made the decisions to pay off the mortgages in question.  See, *Regulations of the Trustees of the Lawyers' Fund for Client Protection of the Bar of Delaware.*

-34-

Thus viewed, the Lawyers' Fund evidence had little, if any probative value. On the other hand, the relevance of such evidence, no matter how attenuated, was clearly outweighed by its potential for unfair prejudice and potential to confuse and mislead the jury. The conclusion that admission of the Lawyers' Fund evidence, standing alone, was reversible error is supported by decisions in other jurisdictions where this very issue has been considered. See, *State v. Mahoney*, 868 A.2d 1171 (N.J. Super, App. Div. 2005). In *Mahoney*, the defendant, an attorney, was convicted of theft based on a misappropriation of client funds that he held in a fiduciary capacity. *Id.*, at 1175-1176. On appeal, Mahoney argued that the trial court committed reversible error when it allowed evidence that his "trust accounts" were not in compliance with the requirements of New Jersey's Rules of Professional Conduct ("Rules") and for the trial court to have instructed the jury as to the accounting requirements imposed by the Rules. *Id.*, at 1184 (the rulings made by the trial court "allowed the State to mix and blur the lines between civil and criminal concepts"). In reversing the defendant's convictions, the court held:

> The problem here was that the jury was provided with the text of a complex rule of professional accounting standards without any instructions on the relevance of the Rule to the issues before it. At no point was the jury instructed on which aspects of the Rule were relevant, to what issues, or how the Rule could assist the jury in reaching its decision. **The court made no effort to assist the jury in distinguishing between the state of mind that established the violation of an ethical rule, and the level of criminal intent necessary to establish guilt with respect to a crime.** The effect of the trial judge's one-sentence admonition was negligible in comparison to the prosecutor's extensive cross-examination and summation comments, which urged the jury to focus on the Rule's requirements and defendant's bookkeeping practices as indicative of his criminal behavior. We are thus compelled to reverse defendant's conviction.

*Id.*, at 1187 (emphasis added).[43]

---

[43] This ruling by the Appellate Division was affirmed by the Supreme Court of New Jersey. See, *State v. Mahoney*, 908 A.2d 162, 174-175 (N.J. 2006).

In *Mahoney*, the Appellate Division also cited with approval the decision of the California Court of Appeals in *People v. Stein*, 156 Cal. Rptr. 299, 302 (Cal. Ct. App. 1979).[44] In *Stein*, the court held that it was reversible error to have allowed the State to present evidence concerning the defendant's violations of the California State Bar Rules of Professional Conduct and to have instructed the jury concerning the requirements imposed by the Rules:

> We find that it was improper to use the professional rules of conduct to show that a violation of the rules, if any, would tend to prove that defendant possessed the specific intent required when, in fact, the violation of the rules, if any, could have occurred without any criminal intent. **Even though the instructions did not presume a violation of the rules, the only reasonable inference that the jury could have drawn was that evidence of a violation was in fact evidence establishing the required intent to commit the crimes charged.**

*Id.* (emphasis added).

In this case, Anker himself admitted on cross-examination that his escrow account was not maintained in compliance with the Delaware Rules of Professional Conduct. However, because defense counsel did not object or request a limiting instruction, this evidence came in without any explanation as to how any violation of the Rules was relevant to the issue of Anker's criminal intent. Likewise, evidence that the mortgages were paid off by the Lawyers' Fund came in without any objection by defense counsel or explanation as to how the payoffs were relevant to Anker's criminal intent. Given the lack of any explanation to the jury as to how such evidence might be relevant to Anker's criminal intent, the only reasonable inference that the jury could have drawn, as in *Mahoney* and *Stein*, was that if Anker violated the Rules concerning his escrow account and if the Lawyers' Fund paid off the mortgages, then Anker must be guilty of Theft.

### The "Bad Act" Evidence

The State's case-in-chief included evidence: (1) that for several years, Anker had falsely certified to the Delaware Supreme Court that his escrow and operating accounts were in compliance

---

[44] See, *Mahoney*, 868 A.2d at 1186.

with the Court's rules; (2) that Anker had been delinquent for several years in paying his federal

income taxes; and (3) that Anker had failed to pay a $211,000 insurance settlement to his clients.

Such evidence, which was not objected to by defense counsel, is classic "bad act" evidence, where

admissibility is subject to the requirements of D.R.E. 404(b), which provides:

> evidence of other crimes, wrongs or acts is not admissible to prove
> the character of a person in order to show action in conformity
> therewith. It may however, be admissible for other purposes, such as
> proof of motive, opportunity, intent preparation, plan, knowledge,
> identity, or absence of mistake or accident.

This exclusionary rule recognizes that while character evidence may be "relevant" under

D.R.E. 401, its prejudicial effect typically outweighs its probative value. See, *Weinstein's Federal*

*Evidence*, §404.10[1]; *Old Chief v. United States*, 519 U.S. 172, 180-181 (1997) ("The overriding

policy of excluding such evidence, despite its admitted probative value, is the practical experience

that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice").

This so-called "propensity rule" is also firmly entrenched in Delaware case law.  See, e.g., *Getz v.*

*State*, 538 A.2d 726, 730 (Del. 1988)  ("a defendant must be tried for what he did, not who he is").[45]

In this case, the "bad act" evidence described above was inadmissible under *Getz* because

it was pure "propensity" evidence.  Whether or not Anker falsely certified to the Supreme Court that

his escrow account was in order, and whether or not Anker paid his federal taxes on time had nothing

whatsoever to do with the sole issue in the case – whether Anker had the criminal intent to steal the

money that should have been used to make the mortgage payoffs.  The only inference the jury

possibly could have drawn from such evidence was that Anker was a dishonest person who lied to

---

[45] In *Getz*, the court held that "bad acts" evidence is admissible only when: (1) it is "material
to an issue or ultimate fact in dispute in the case;" (2) it is "introduced for a purpose sanctioned by
Rule 404(b) or any other purpose not inconsistent with the basic prohibition against evidence of bad
character or criminal disposition;" (3) it is "proved by evidence which is 'plain, clear and
conclusive;'" (4) it is not "remote in time;" (5) the court balances the "probative value of such
evidence against its unfairly prejudicial effort;" and (6) the jury is instructed concerning the limited
purpose for its admission. *Id.*, 538 A.2d at 733-34.  A ruling by the trial judge that the State's
proffered "bad act" evidence meets the *Getz* requirements is a "precondition" to its admissibility.
*Smith v. State*, 669 A.2d 1, 5 (Del. 1995).

the Supreme Court and didn't pay his taxes and therefore was guilty of the alleged thefts.  Such evidence is precisely the type of "propensity" evidence that is forbidden under *Getz*. *Id.*, 538 A.2d at 730.

In this case, **after** the jury had been exposed to Forsten's testimony concerning Anker's failure to pay over the $211,000 settlement, the trial court engaged in a *post hoc* analysis of that evidence under *Getz* and ruled that it was admissible. (Tr. 7/27, pp. 67-72)(A126-A127). Wendelburg did not object to either the timing or substance of the court's ruling, even though it was clearly incorrect under Delaware law.  In its case-in-chief, the State had produced direct evidence, through the testimony of nine "victims" and two investigators, to the effect that Anker had not paid off the mortgages.  Evidence that Anker may have committed a similar crime with respect to the $211,000 insurance settlement does not satisfy *Getz's* "materiality" requirement.  In *Getz* itself, the court rejected the State's argument that evidence of prior sexual misconduct by Getz was admissible to prove that Getz had committed similar acts for which he was on trial:

> [T]he State's argument in favor of a sexual gratification exception...proceeds upon the assumption that a defendant's propensity for satisfying sexual needs is so unique that it is relevant to his guilt. The exception thus equates character disposition with evidence of guilt contrary to the clear prohibition of D.R.E. Rule 404(b). **We are no more inclined to endorse that equation than we are to consider previous crimes of theft as demonstrating a larcenous disposition and thus admissible to show proof of intent to commit theft on a given occasion.**

*Id.*, 538 A.2d at 733-734 (emphasis added).

The evidence concerning the alleged $211,000 theft also failed to satisfy several other *Getz* requirements.  First, the evidence itself was lacking in specificity.  Forsten's testimony gave no indication when this $211,000 payment went missing.  No one from the condo association was called to testify that they never received the money.[46]  Finally, there was no proffer by the State as to how

---

[46] At a sidebar conference, Anker's attorney had proffered that the funds due to the condo association were eventually paid. (Tr. 7/27, p. 68)(A-126).

-38-

this evidence was material to any contested issue, especially since the State itself had *nolle prossed* the charge.[47]

### "Victim Impact" Evidence

As previously noted herein, four of the nine victims testified, without objection by defense counsel, that Anker's failure to pay off the mortgages had resulted in damage to their creditworthiness. They also testified that they were angry with Anker, who they viewed as the cause of their problems. Except in the penalty phase of a capital murder case, it has long been recognized that a jury may not consider evidence of the impact of the defendant's conduct on a victim. See, *Payne v. Tennessee*, 501 U.S. 808 (1991); *Petition of State*, 597 A.2d 1 (Del. 1991). In a time where the public is exposed, nearly every day, to media accounts of the often irreparable harm caused to the credit ratings of victims of economic crimes, this evidence, which had no relevance to the issue of guilt, no doubt influenced the jury to be prejudiced towards Anker.[48]

### Conclusion

If the court concludes that an evidentiary hearing is needed, then the court should defer ruling on the *Cronic* issue until after a hearing is held. If the court concludes that a hearing is not needed, and agrees with the foregoing argument that Anker was deprived of his Sixth Amendment right to counsel under *Cronic*, then "prejudice" is presumed and it is unnecessary to engage in *Strickland's* "prejudice" inquiry. On the other hand, if the court concludes that *Strickland*, rather than *Cronic*, is controlling, then the court should consider whether "prejudice" under *Strickland* has been established. The "prejudice" inquiry under *Strickland* is discussed in the following Argument.

---

[47] In the direct appeal, the court summarily concluded that the evidence was admissible under *Getz*. *Anker I*, 2006 Del. LEXIS 578, *6.

[48] In the direct appeal, the court held that the admission of the "victim impact" evidence did not rise to the level of "plain error." *Anker I*, 2006 Del. LEXIS 578, *7.

## II.  THE DECISION OF THE DELAWARE SUPREME COURT THAT ANKER HAD FAILED TO PROVE THAT HE HAD BEEN "PREJUDICED" UNDER *STRICKLAND* WAS CONTRARY TO AND WAS AN UNREASONABLE APPLICATION OF *STRICKLAND*

### Overview of "Prejudice" Analysis Under *Strickland*

If the Court concludes that *Strickland* rather than *Cronic* controls Anker's Sixth Amendment claim, then the AEDPA's limited scope of review is applicable and the Court must decide whether the Delaware courts' disposition of Anker's *Strickland* claim was either "contrary to" or represented an "unreasonable application" of *Strickland*.  See, *Fahy v. Horn*, 516 F.3d 169, 197-198 (3d Cir. 2008) ("In order to succeed on a claim of ineffective assistance, Fahy must show that the state court's decision is either contrary to, or involves an unreasonable application of, the standard set forth in *Strickland v. Washington*").

### Review of State Court Decisions

The Delaware Superior Court acknowledged that Anker's Rule 61 Motion alleged ineffective assistance of counsel under *Strickland  v. Washington*. See, *Rule 61 Decision*, 2007 Del. Super. LEXIS 209, *6-*7.  The Rule 61 Motion was summarily denied[49] by the Superior Court on the following grounds:

> Defendant does not state, detail, explain, or in any way address how the outcome of the proceedings might have been different had counsel not committed these alleged errors.[50]

* * * *

___

[49] The Superior Court did not request Anker's trial attorney to file an affidavit in response to the Rule 61 Motion. See, *Del.Super. Ct.Crim. R. 61(g)(2)*.  The Court also did not order the State to file a response to the Rule 61 Motion. *Id., Rule 61(f)*.  The court also did not afford Anker any opportunity to explain why the Rule 61 Motion should not be summarily dismissed. *Id., Rule 61(i)(6)*.  The court also did not offer Anker the opportunity to amend the Rule 61 Motion to cure any pleading deficiencies perceived by the court. *Rule 61(b)(6)* ("A motion may be amended as a matter of course at any time before a response is filed or thereafter by leave of court, which shall be freely given when justice so requires").

[50] *Id.*, *4.

> In this case, even if the Court assumed, without deciding, that counsel's performance was deficient, all of defendant's claims fail because he has not made any attempt to show that the deficient performance caused defendant prejudice.[51]

* * * *

> The Supreme Court's decisions in the direct appeal on the same issues raised in the context of the ineffective assistance of counsel claims preclude defendant from establishing prejudice resulting from such alleged ineffectiveness. *Skinner v. State, 607 A.2d 1170 (Del. 1992)*.[52]

Anker appealed the *Rule 61 Decision* to the Delaware Supreme Court, which affirmed the dismissal of Anker's Rule 61 Motion, holding that the Superior Court was correct in summarily dismissing the Rule 61 Motion:

> Because Anker did not substantiate any specific allegations of actual prejudice, the court did not err in summarily dismissing his claim.[53]

### Overview of "Prejudice" Determination Under *Strickland*

Under the AEDPA standard of review, the court must decide whether the Delaware courts' summary denial of Anker's *Strickland* claim was either "contrary to" *Strickland*, or represented an "unreasonable application" of *Strickland* to the facts of this case.  See, *Williams v. Taylor*, 529 U.S. 362, 405-407 (2000).   In *Strickland*, the court explained how the lower courts should make the "prejudice" determination:

> **The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors.** When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.

*  *  *  *

---

[51] *Id.*, *7.

[52] *Id.*, at *8 n3.

[53] *Anker II*, 2008 Del. LEXIS 17, *7-*8.  Parenthetically, the Supreme Court's decision appears to reject (but did not specifically overrule) its holding in *Skinner v. State* that served as an alternative ground for the Superior Court's *Rule 61 Decision. Id.*, *5 n.14 (a finding of "no plain error" does not automatically foreclose a claim under *Strickland* based on same attorney errors).

-41-

> **In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury...Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect**...Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.*, at 695-696.

*Strickland's* "prejudice" prong does not require a defendant to "prove" that but for his counsel's errors, he would have been found "not guilty." Such an outcome determinative test was squarely rejected by the court in *Strickland*:

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. **The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.**

*Id.*, 466 U.S. at 694 (emphasis added); see, *Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005) (The prejudice standard under *Strickland* "is not a stringent one"); *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (a defendant must show that there is "a reasonable probability" - "a probability sufficient to undermine confidence in the outcome," but less than a preponderance of the evidence, that his appeal would have prevailed had counsel's performance satisfied constitutional requirements).

Although *Strickland* phrases the "prejudice" inquiry in terms of "proving" prejudice, in reality, the "prejudice" determination is a three-step process. First, it is the defendant's burden to to identify and substantiate the errors made by trial counsel. See, *Thomas v. Varner*, 428 F.3d 491, 502, n12 (3d Cir. 2005) ("As it is the petitioner's burden to show prejudice, it is his responsibility to develop a record under which the merits of the suppression motion can be determined"). Second, the petitioner must show that he likely would have prevailed on the merits of the claimed attorney

-42-

error. *Id.*, at 502 ("Were it likely that the suppression motion would have been denied (or the objection overruled), then [petitioner] could not show prejudice").[54]  If the petitioner succeeds in the first two steps, the court then decides, as a matter of law, whether, in the words of *Strickland*, the error[s] were "pervasive" or "trivial."  See, *Strickland*, 466 U.S. at 696 ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"); *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) ("A court simply cannot make [*Strickland's* prejudice] determination without considering the strength of the evidence against the accused"); *Jacobs*, 395 F.3d at 105 ("because the prejudice determination here is purely a legal one, we need not remand to the District Court to make such a determination in the first instance or to allow the Commonwealth a second opportunity to challenge Jacobs' expert evidence"); *Thomas*, 428 F.3d at 502 (determination of prejudice is a legal conclusion).[55]

### State Court Rulings Were an Unreasonable Application of *Strickland*

In this case, as encouraged by *Strickland*, the Superior Court elected to assume that trial counsel's performance was deficient and focused instead on the prejudice inquiry. See, Rule 61 Decision, at *7.[56]  Petitioner submits that the Delaware Supreme Court's conclusion, quoted above,

---

[54] It should be noted that the inquiry whether the defendant would have prevailed on the merits of a claimed error is fundamentally different from *Strickland's* "attorney performance" inquiry.  For example, an attorney could make a "strategic decision" not to object to certain evidence, or decide that certain evidence should not be offered at trial, even though the objection would have been successful or the evidence would have been admissible.

[55] *Strickland's* prejudice inquiry also involves an evaluation of "cumulative prejudice."  In *Strickland*, the court held that if trial counsel made a series of deficient decisions, the prejudice flowing to the defendant from these errors must be analyzed cumulatively.  See, *Strickland*, 466 U.S. at 694-696 (decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all of counsel's deficient performance).

[56] In *Strickland* itself, the Court expressed a strong preference that lower courts should, if possible, decide claims of ineffective assistance of counsel by first deciding if there was any "prejudice" which resulted from the alleged deficient performance.  *Id.*, 466 U.S. at 697 ("The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed").  If a court considering a *Strickland* claim elects to focus initially on *Strickland's* "prejudice" prong, then the court is also required to assume that the challenged conduct was "unreasonable." *Id.*, at 688-689.

that "Anker did not substantiate any specific allegations of actual prejudice," is both contrary to *Strickland* and is also an "unreasonable application" of *Strickland*.

At the pleading stage, *Strickland* requires the habeas petitioner to "make concrete allegations of actual prejudice and substantiate them or risk summary dismissal." See, *e.g., Cubbage v. Phelps*, 2008 U.S. Dist. LEXIS 31296 (D. Del. 2008). See, *Del.Super.Crim.R. 61(d)(4)* ("If it plainly appears from the motion for postconviction relief and the record of prior proceedings in the case that the movant is not entitled to relief, the judge may enter an order for its summary dismissal"). In the *Rule 61 Decision*, the court below held that Anker's Motion should be summarily denied because Anker "did not make any attempt to show that the deficient performance caused defendant prejudice." *Id.*, at *7. Under the three-step test for establishing "prejudice" under *Strickland*, outlined in *Thomas v. Varner*, discussed above, *Strickland's* pleading requirement is satisfied if the petitioner can point to facts in the record or outside of the record that show attorney error and also make at least a preliminary showing that he would have prevailed on the merits of the claimed error. At that point, the court will be in a position, in the words of *Strickland*, to evaluate the effect of any errors in light of the totality of the evidence, *i.e.,*did the errors have a "pervasive effect," or were the errors "trivial" and "isolated?" *Id.*, 466 U.S. at 695-96.

In this case, it is submitted that the Rule 61 Motion filed by Anker in the Delaware Superior Court was more than sufficient to satisfy *Strickland's* pleading requirement, as outlined in *Thomas v. Varner*. Claims 1, 2 and 3 in the Rule 61 Motion all alleged that trial counsel was "ineffective" in failing to object to the admission of (1) the Lawyers' Fund evidence; (2) the victim impact evidence; and (3) the "character" and "bad act" evidence. Furthermore, rather than simply making a conclusory allegation that his attorney was "ineffective," Anker's Rule 61 Motion contained a detailed recitation of the evidence and testimony that should have been objected to and included pinpoint references to the trial transcript. Additionally, the Rule 61 Motion contained citations to legal authority to show why the evidence would have been excluded if a proper objection had been

-44-

made. (A22-A28).[57]  Finally, with respect to the Lawyers' Fund evidence (Claim 1), the Rule 61 Motion cited to the New Jersey decision in *State v. Mahoney*, which held that the admission of evidence in a criminal trial of violations of state disciplinary rules arising from the same conduct was "prejudicial" and required a reversal of the criminal convictions. (A25-A26).[58]

Claim 5 is different from Claims 1 through 4 in that it contains allegations as to matters that were outside of the trial record.  The allegations in Claim 5 describes the results of Glanz's investigation and alleges how Anker was "prejudiced" by Wendelburg's failure to utilize that evidence. (A-29).  See, *State v. Anker*, 2005 Del. Super. LEXIS 105, *11 ("Anker claims his daughter must have set up the whole scheme. He blames her for setting up fictitious settlements and for misleading him to believe that the firm's escrow and operating accounts were funded properly").

The State court rulings to summarily dismiss Anker's *Strickland* claim was both "contrary to" and amounted to an "unreasonable application" of *Strickland*.  The specific allegations of attorney error and prejudice set forth in the Rule 61 Motion were at least sufficient, at the pleading stage, for the court to have directed Wendelburg to file a response to the allegations, especially the allegation concerning Wendelburg's alleged psychiatric impairment.  If the court did not understand the allegations of "prejudice," the court should have directed Anker to amend the Motion or respond to the court's concerns.

---

[57] The allegations in Claim 1 are also applicable to Claim 4, which, in hindsight, is somewhat redundant to Claim 1.

[58] The Superior Court simply refused to acknowledge that "prejudice" under *Strickland* could be shown by citing the court to persuasive authority that admission of the type of evidence at issue had resulted in the reversal of a defendant's conviction.  *State v. Anker*, 2007 Del. Super. LEXIS 209, *7-*8 (merely arguing the Supreme Court was wrong and providing citations to cases from other jurisdictions in support of that argument does not establish prejudice.").

**CONCLUSION**

For the reasons set forth herein, the Court should conclude that Petitioner is entitled to habeas relief. The Court should vacate the defendant's convictions and direct that the State of Delaware either grant the Petitioner a new trial or release the Petitioner from custody.

_/s/ Joseph M. Bernstein_
JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein@embarqmail.com
Attorney for Petitioner

Dated: June 30, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2008, I electronically filed the foregoing **Petitioner's**

**Opening Brief in Support of Petition for Habeas Corpus** with the Clerk of the Court using

CM/ECF which will send notification of such filing to the following:

> Elizabeth R. McFarlan, Esquire
> Department of Justice
> 820 N. French Street
> Wilmington, DE 19801

> / s/ Joseph M. Bernstein
> JOSEPH M. BERNSTEIN (Bar #780)
> 800 N. King Street - Suite 302
> Wilmington, DE 19801
> 302-656-9850
> E-mail: jmbernstein@embarqmail.com