## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

**DANIEL J. ANKER,**
    Petitioner,

         v.

**ELIZABETH NEAL,** Acting Warden,
John L. Webb Correctional Facility,
and **JOSEPH R. BIDEN, III,** Attorney
General of the State of Delaware,
    Respondents.

:
:
:
:
: Civil Action No.  08-203 SLR
:
:
:
:
:
:

## APPENDIX TO
## PETITIONER'S OPENING BRIEF
## IN SUPPORT OF PETITION FOR HABEAS CORPUS

### VOLUME I

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein@embarqmail.com
Attorney for Petitioner

Dated: June 30, 2008

## TABLE OF CONTENTS

### VOLUME I

Page

Superior Court Docket Entries, State v. Daniel J. Anker, Case # 0402010394       A-1

Reindictment       A-15

Motion for Post-Conviction Relief - Delaware Superior Court       A-21

Petition for Writ of Habeas Corpus       A-31

Excerpts from testimony of Humera Bashir       A-36

Excerpts from testimony of Robert Carmine       A-41

Excerpts from testimony of Philip Urban       A-43

Excerpts from testimony of Douglas Ray       A-49

Excerpts from testimony of John Lesko       A-59

Excerpts from testimony of Maya Paveza       A-65

Excerpts from testimony of Margaret Caucci       A-71

Excerpts from testimony of Francis Caucci       A-75

Excerpts from testimony of Patricia Paoli       A-85

Excerpts from testimony of Russell Burkett       A-85

Excerpts from testimony of Barry Kintz       A-90

Excerpts from testimony of Kathleen Leahy       A-94

Excerpts from testimony of Joseph McCullough       A-97

Excerpts from testimony of Robert Carmine       A-100

Excerpts from testimony of Joseph McCullough       A-105

Excerpts from testimony of Joseph Robert Carmine       A-111

```
                    SUPERIOR COURT CRIMINAL DOCKET          Page    1
                      ( as of  05/08/2006 )

State of Delaware v.  DANIEL J ANKER                   DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.                         .


Co-Defendants:  LAURA LARKS

Assigned Judge: STOKES RICHARD F.

Charges:
```

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|-------------|-------------|--------|-------------|
| 001 | 0402010394 | IN04022088W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 002 | 0402010394 | IN04022089W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 003 | 0402010394 | IN04022090W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 004 | 0402010394 | IN04022091W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 005 | 0402010394 | IN04022092W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 006 | 0402010394 | IN04022093W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 007 | 0402010394 | IN04022094W | THEFT $1000 OR> . | NOLP | 06/27/2005 |
| 008 | 0402010394 | IN04022095W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 009 | 0402010394 | IN04022096W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 010 | 0402010394 | IN04022097W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 011 | 0402010394 | IN04022098W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 012 | 0402010394 | IN04022099W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 013 | 0402010394 | IN04022100W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 014 | 0402010394 | IN04022101W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 015 | 0402010394 | IN04022102W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 016 | 0402010394 | IN04022103W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 017 | 0402010394 | IN04022104W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 018 | 0402010394 | IN04022105W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 019 | 0402010394 | IN04022106W | CONSP 2ND | NOLP | 06/27/2005 |
| 020 | 0402010394 | IN04022107W | THEFT $1000 OR> | NOLP | 06/27/2005 |
| 021 | 0402010394 | IN05062249 | THEFT > $50000 | NOLP | 07/11/2005 |
| 022 | 0402010394 | IN05062250 | THEFT > $100000 | NOLP | 07/11/2005 |
| 023 | 0402010394 | IN05062251 | THEFT > $100000 | NOLP | 07/11/2005 |
| 024 | 0402010394 | IN05062252 | THEFT > $50000 | NOLP | 07/11/2005 |
| 025 | 0402010394 | IN05062253 | THEFT > $100000 | NOLP | 07/11/2005 |
| 026 | 0402010394 | IN05062254 | THEFT > $100000 | NOLP | 07/11/2005 |
| 027 | 0402010394 | IN05062255 | THEFT > $100000 | NOLP | 07/11/2005 |
| 028 | 0402010394 | IN05062256 | THEFT > $50000 | NOLP | 07/11/2005 |
| 029 | 0402010394 | IN05062257 | THEFT > $100000 . | NOLP | 07/11/2005 |
| 030 | 0402010394 | IN05062258 | THEFT > $100000 | NOLP | 07/11/2005 |
| 031 | 0402010394 | IN05071018 | THEFT > $50000 | TG | 08/04/2005 |
| 032 | 0402010394 | IN05071019 | THEFT > $100000 | TG | 08/04/2005 |
| 033 | 0402010394 | IN05071020 | THEFT > $100000 | TG | 08/04/2005 |
| 034 | 0402010394 | IN05071021 | THEFT > $50000 | TG | 08/04/2005 |
| 035 | 0402010394 | IN05071022 | THEFT > $100000 | TG | 08/04/2005 |
| 036 | 0402010394 | IN05071023 | THEFT > $100000 | TG | 08/04/2005 |
| 037 | 0402010394 | IN05071024 | THEFT > $100000 | TG | 08/04/2005 |
| 038 | 0402010394 | IN05071025 | THEFT > $50000 | TG | 08/04/2005 |
| 039 | 0402010394 | IN05071026 | THEFT > $100000 | TG | 08/04/2005 |
| 040 | 0402010394 | IN05071027 | THEFT > $100000 | NOLP | 07/18/2005 |
| 041 | 0402010394 | IN05071028 | CONSP. 2ND | TG | 08/04/2005 |

```
        Event
No.     Date           Event                        Judge
```

1   02/23/2004
    INDICTMENT, TRUE BILL FILED.NO 133
    SCHEDULED FOR ARRAIGNMENT AND BAIL REPRESENTATION 03/05/04 AT 8:30
    CASE REVIEW 03/29/04 AT 9:00
2   02/23/2004
    AUTHORIZATION FOR EXTRADITION.
3   02/23/2004
    RULE 9 WARRANT ISSUED.
4   02/25/2004
    SUMMONS MAILED.
5   03/02/2004                                    REYNOLDS MICHAEL P.
    RULE 9 WARRANT RETURNED, BAIL SET AT
    UNSECURED BOND                 10,000.00
    AWRNG/ENTER APPEARANCE OF ALLEN WENDELBURG, ESQ
    C/R 3/29/04 AT 9:00
6   03/02/2004                                    REYNOLDS MICHAEL P.
    RULE 9 WARRANT RETURN NOTICE FILED.
    TO: CARMINE/DOJ
    RULE 9 WARRANT HAS BEEN RETURNED IN SUPERIOR COURT; BAIL HAS BEEN SET.
    DEFENDANT WAS REMANDED TO THE CUSTODY OF CAPITAL POLICE FOR ARREST
    PROCESSING. CAPITOL POLICE SHOULD: (1) COMPLETE THE ARREST PROCEDURE;
    (2) CLEAR RULE 9 WARRANT WANTED PERSON RECORD; AND (3) FORWARD ARREST
    PAPERWORK TO INVESTIGATING AGENCY. INVESTIGATING AGENCY SHOULD:
    COMPLETE ANY REMAINING ARREST PAPERWORK AND RETURN ANY "PAPER" RULE 9
    WARRANT IN ITS CUSTODY TO THE PROTHONOTARY'S OFFICE, WITH ARREST
    INFORMATION RECORDED THEREON.
    ARREST DATE: 3/2/04
    ARREST NUMBER: 174081
    03/05/2004                                    REYNOLDS MICHAEL P.
    ARRAIGNMENT/BAIL STATUS/CONTROL FOR REPRESENTATION:  DEF. WAIVED
    READING OF INDICTMENT, PLEA OF NOT GUILTY ENTERED, JURY TRIAL DEMANDED
7   03/17/2004
    LETTER FROM ALLAN WENDELBURG, ESQ.          TO STUART SKLUT, DAG.
    AS YOU KNOW, I HAVE ENTERED MY APPEARANCE AS COUNSEL FOR DAN ANKER.
    PURSUANT TO CURRENT DISCOVERY LAW AND PRACTICE, I REQUEST PRODUCTION
    OF THE FOLLOWING.
    *SEE FULL LETTER IN FILE.
    03/29/2004                                   DEL PESCO SUSAN C.
    CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW 5/3/04 @ 9:00
8   04/12/2004
    LETTER FROM STUART SKLUT (DAG)    TO JUDGE HERLIHY
    RE: REQUESTING THAT A JUDGE BE SPECIALLY ASSIGNED TO THIS CASE.
9   04/12/2004
    LETTER FROM JUDGE HERLIHY    TO PRESIDENT JUDGE RIDGELY
    RE: REQUESTING SPECIAL ASSIGNMENT OF THIS CASE
    05/03/2004                                   HERLIHY JEROME O.
    CASE REVIEW CALENDAR FINAL CASE REVIEW CONTINUED.
    DEFENDANT'S REQUEST-CR-DEFENDANT NEEDS MORE TIME.
10  05/07/2004
    MEMORANDUM FILED FROM PRESIDENT JUDGE RIDGELY    TO JUDGE STOKES
    THIS CASE IS SPECIALLY ASSIGNED TO YOU FOR ALL PURPOSES UNTIL FINAL
    DISPOSITION.

SUPERIOR COURT CRIMINAL DOCKET
( as of   05/08/2006 )

Page    3

State of Delaware v.  DANIEL J ANKER                        DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|
| 11 | 05/18/2004 | OFFICE CONFERENCE PROCEEDING HELD. STOKES/SKLUT/LYONS/WENDELBURG/REMENTER SCHEDULING ORDER ESTABLISHED. | STOKES RICHARD F. |
| 12 | 05/18/2004 | PRETRIAL SCHEDULING ORDER: NOW THIS 18TH DAY OF MAY, 2004, A | STOKES RICHARD F. |

12   05/18/2004            STOKES RICHARD F.
PRETRIAL SCHEDULING ORDER: NOW THIS 18TH DAY OF MAY, 2004, A
TELCCONFERENCE WAS HELP TODAY IN THE ABOVE CAPTIONED NEW CASTLE COUNTY
CASES. THE FOLLOWING SCHEDULED WAS ESTABLISHED: 1. THE STATE SHALL
COMPLETE DISCOVERY ON OR BEFORE THURSDAY, JUNE 24, 2004. 2. THE
DEFENSE SHALL COMPLETE RECIPROCAL DISCOVERY ON QR BEFORE MONDAY, JULY
26, 2004 AND SHALL PROVIDE NOTICE OF ANY MENTAL EXPERT TESTIMONY. 3.
THE DEFENSE SHALL FILE ANY MOTIONS TOGETHER WITH SUPPROTING AUTHORITIE
S IN OR BEFORE MONDAY JULY 21, 2004. THE STATE AND (IF APPLICABLE, A
CO-DEFENDANT) SHAL FILE AN ANSWER ON OR BEFORE MONDAY, JULY 26, 2004
TOGETHER WITH SUPPORTING AUTHORITIES. THE DEFENSE SHALL FILE A REPLY
(IF DESIRED ON OR BEFORE MONDAY, AUGUST 2, 2004. 4. IN LIEU OF A FINAL
CASE REIVW DATE COUNSEL WILL INFORM THE COURT OF ANY PRETRIAL
RESOLUTION OF THE CHARGES ANS MAY SCHEDULED A PLEA BY APPOINTMENT. 5.
A JURY TRIAL IS SCHEULED TO BEGIN ON TUESDAY, DECEMBER 7, 2004 AND
IS EXPECTED RO LAST 3-4 WEEKS. 6. THIS ORDER MAY BE AMENDED FOR GOOD
CAUSE. IT IS SO ORDERED

45   06/09/2004            STOKES RICHARD F.
LETTER FROM JUDGE STOKES TO COUNSEL. RE: TRIAL AVAIALBILITY DATES.

14   06/15/2004
LETTER FROM RICHARD STOKES, ESQ   TO STUART SKLUT, ALLAN WENDELBURG
AND EDMUND LYONS, ESQ.
RE:   TRIAL DATES. DEAR COUNSEL:
TRIAL IN THE ABOVE CASES IS SCHEDULED TO BEGIN ON TUESDAY, DEC. 7,
2004 AND EXPECTED TO LAST 3-4 WEEKS.  I AM ALSO SCHEDULED TO BEGIN A
CAPITAL FIRST DEGREE MURDER TRIAL ON MON. NOV 8, 2004 WHICH IS EXPECTE
D TO LAST 3 WEEKS. AT THE TIME OF OUR TELECONFERENCE ON MAY 18TH, I
BELIEVED THE CAPITAL CASE WOULD HAVE ENDED BEFORE THE DEC. 7TH TRIAL D
ATE. AFTER OUR TELEPHONE CONFERENCE, I HAD TO RESCHEDULE THE MURDER
TRIAL TO BEGIN ON MONDAY, NOV 15TH.  DUE TO THIS SCHEDULE CHANGE
THE ABOVE TRIAL SHOULD BE RESCHEDULED TO AVOID A LATER CONTINUANCE
WHICH THE MURDER TRIAL MAY REQUIRE. I AM AVAILABLE TO TRY THIS CASE
ON THE FOLLOWING DATES: MON. FEB 7; MON, FEB 14; TUES, FEB 22; OR
MON, FEB 28, 2005. PLEASE CONFER WITH EACH OTHER AND ADVISE MY OFFICE
OF AN AGREED UPON TRIAL DATE.  SIGNED RICHARD STOKES.

13   06/16/2004            STOKES RICHARD F.
LETTER FROM EDMUND DANIEL LYONS, ESQ. TO JUDGE STOKES.
RE:  NOTIFICATION THAT PARTIES ARE PREPARED TO BEGIN TRIAL ON MONDAY

SUPERIOR COURT CRIMINAL DOCKET
( as of   05/08/2006 )

State of Delaware v.  DANIEL J ANKER                          DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

```
        Event
No.     Date            Event                          ·  Judge
```
--------------------------------------------------------------------------------
```
        2/7/05.
15    07/13/2004
        MOTION TO SEVER TRIAL OF DEFENDANTS FILED.
        BY ALLAN WENDELBURG,ESQ
        FAXED COPY OF MOTION TO JUDGE STOKES PER CISSY
16    08/02/2004                                   STOKES RICHARD F.
        LETTER FROM JUDGE STOKES TO COUNSEL. RE: MOTION TO SEVER.
        I WOULD ASK THAT THE STATE AND DEFENSE CONFER ONCE MR. ANKER'S
        TRANSCRIPTS IS COMPLETED. PLEASE COMPARE THE STATEMENTS. I WANT TO
        KNOW WHETHER A JOINT TRIAL WOULD BE APPROPRIATE IF THEESE CO-
        DEFENDANT'S HAD INCRIMINATED ONE ANOTHER. PLEASE LET ME KNOW BY SEPT.
        1, 2004
17    09/01/2004
        STATE'S RESPONSE TO DEFENSE MOTION TO SEVER FILED BY NEW CASTLE COUNTY
        ATTORNEY GENERAL
18    09/01/2004
        STATE'S RESPONSE TO DEFENSE MOTION TO SEVER
        FILED BY STUART SKLUT,DAG
        FAXED TO JUDGE STOKES OFFICE
24    09/08/2004
        LETTER FROM STUART E. SKLUT, DAG.              ·   TO JUDGE HERLIHY
        AS THE COURT IS AWARE, STATE V. MANLEY/STEVENSON IS CURRENTLY
        SCHEDULED FOR A NEW PENALTY HEARING STARTING ON FEBRUARY 1, 2005.
        STATE V. ANKER/LARKS INVOLVES ALLEGATIONS OF THEFT OF CLIENT ESCROW
        FRAUDS BY A DELAWARE ATTORNEY AND IS CURRENTLY SCHEDULED FOR TRIAL ON
        FEBRUARY 7, 2005 BEFORE JUDGE STOKES.
        AN OVERSIGHT ON MY PART RESULTED IN AN OVERLAP IN THE SCHEDULING OF  ·
        THESE MATTERS. IN LIGHT OF MR. BERSTEIN'S PHYSICAL ISSUES AND THE
        PENDING MOTIONS FILED BY THE DEFENSE IN STATE V. MANLEY/STEVENSON, I
        AM ASKING THE COURT IF THE FEBRUARY 1, 2005 TRIAL DATE FOR STATE V.
        MANLEY/STEVENSON IS VALID AND FIRM BEFORE I REQUEST ANOTHER TRIAL DATE
        FROM JUDGES STOKES IN STATE V. ANKER/LARKS.
19    10/15/2004
        NOTICE OF JOINDER IN OPPOSITION TO MOTION TO SEVER
        FILED BY EDMUND D LYONS,ESQ FOR LAURA LARKS
        PLEASE TAKE NOTICE THAT DEFENDANT,LAURA LARKS,BY AND THROUGH COUNSEL,
        OPPOSES CO-DEFENDANT,DANIEL J. ANKER'S MOTION TO SEVER FOR THE REASONS
        SET FORTH IN THE STATE'S OPPOSITION.
47    10/22/2004
        EMAIL FROM CISSY VAVALA TO COUNSEL. SCHEDULING HEARING TIME FOR JUDGE
        STOKES TO GIVE HIS DECISION ON THE MOTION TO SEVER. WED, 11/3/04 OR
        FRI. 11/5/04
```

SUPERIOR COURT CRIMINAL DOCKET
( as of   05/08/2006 )

Page      5

State of Delaware v.  DANIEL J ANKER                        DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

```
       Event
No.    Date        Event                                    Judge
```
------------------------------------------------------------------------------
        RESPONSE FROM STUART SKLUT, DAG. I AM AVAILABLE BOTH DATES.
20    10/27/2004                                  STOKES RICHARD F.
        LETTER FROM COURT TO STUART SKLUT, ESQ., EDMUND LYONS, ESQ. AND ALLAN
        WENDELBURG, ESQ. RE: ADVISING A TELECONFERENCE HAS BEEN SCHEDULED FOR
        WEDNESDAY, NOVEMBER 3, 2004 AT 9:00A.M.
21    11/01/2004
        LETTER FROM ALLAN WENDELBURG, ESQ TO JUDGE STOKES RE:   STATUS OF
        MOTION TO SEVER CASE WITH TRANSCRIPTS
49    11/01/2004                                  STOKES RICHARD F.
        LETTER FROM JUDGE STOKES  TO: COUNSEL. THIS WILL CONFIRM THAT THE
        TELECONFERENCE SCHEDULED FOR WED, NOV.3, 04 REGARDING MR. WENDELBURG'S
        MOTION TO SEVER HAS BEEN RESCHEDULED TO WED, NOV. 7, 04 AT 9:00 A.M.
22    11/04/2004                                  STOKES RICHARD F.
        LETTER FROM: JUDGE STOKES                TO: MR. WENDELBURG
            I HAVE RECEIVED YOUR OCTOBER 27TH LETTER AND NOTE THAT REFERENCE
        WAS MADE TO TRANSCRIPTS OF STATEMENTS GIVEN BY DANIEL ANKER AND LAURA
        LARKS.
            GIVEN THE LIMITED AMOUNT OF TIME UNTIL OUR TELECONFERENCE ON NOV.
        3RD, I REQUEST THAT YOU PROVIDE TO THE COURT, THE SPECIFIC PORTIONS OF
        THE STATEMNETS OF MR. ANKER AND MS. LARK, WHICH EVIDENCE THE
        ANTAGONISTIC NATURE OF THEIR DEFENSES.  WHILE SOME INFORMATION IS NOT
        SUFFICIENT FOR THE COURT TO FULLY RULE ON THE SEVERENCE ISSUE.
        IT IS SO ORDERED.
23    11/24/2004                                  STOKES RICHARD F.
        LETTER/ORDER ISSUED BY JUDGE: STOKES      TO: ALLAN WENDELBURG, ESQ.
        BY LETTER DATED OCTOBER 28TH, I REQUESTED, THAT YOU PROVIDE THE COURT
        WITH THE SPECIFIC PORTIONS OF THE STATEMENTS OF MR. ANKER AND MS.
        LARKS, WHICH EVIDENCE THE ANTAGONISTIC NATURE OF THEIR DEFENSES. WHILE
        SOME INFORMATION REGARDING MS. LARKS' DEFENSE WAS PROVIDED IN YOUR
        LETTER, THIS INFORMATION IS NOT SUFFICIENT FOR THE COURT TO FULLY RULE
        ON THE SEVERANCE ISSUE.
        AS OF TODAY'S DATE, I HAVE NOT RECEIVED THOSE PROTIONS OF THE TRANS-
        CRIPTS. IN LIGHT OF THIS, THE CONFERENCE SCHEDULED FOR WEDNESDAY,
        NOVEMBER 17TH IS HEREBY POSTPONED.
        PLEASE PROVIDE THESE MATERIALS TO THE COURT AS SOON AS PRACTICABLE.
        IT IS SO ORDERED.
25    12/14/2004                                  STOKES RICHARD F.
        LETTER/ORDER ISSUED BY JUDGE: STOKES
        BY LETTER DATED OCTOBER 28TH AND NOVEMBER 15TH, I REQUESTED, THAT YOU
        PROVIDE THE COURT WITH THE SPECIFIC PORTIONS OF THE STATEMENTS OF MR.
        ANKER AND MS. LARKS, WHICH EVIDENCE THE ANTAGONISTIC NATURE OF THEIR
        DEFENSES. WHILE SOME INFORMATION REGARDING MS. LARKS' DEFENSE WAS PRO-

SUPERIOR COURT CRIMINAL DOCKET                    Page      6
( as of   05/08/2006 )

State of Delaware v.  DANIEL J ANKER                         DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event<br>Date | Event | Judge |
|-----|------|-------|-------|
| | | VIDED IN YOUR LETTER, THIS INFORMATION IS NOT SUFFICIENT FOR THE COURT TO FULLY RULE ON THE SEVERANCE ISSUE. AS OF TODAY'S DATE, I HAVE NOT RECEIVED THOSE PORTIONS OF THE TRANSCRIPTS. IF I DO NOT RECEIVE THESE STATEMENTS BY FRIDAY, DECEMBER 17, 2004, DEFENDANT'S MOTION TO SEVER WILL BE CONSIDERED ABANDONED. IT IS SO ORDERED. | |
| 51 | 01/06/2005 | EMAIL FROM CISSY VAVALA, TO COUNSEL. WE ARE IN RECEIPT OF MR. LUGG'S 1/5/05 LETTER REGARDING THE ABOVE TRIAL DATES. PLEASE LET ME KNOW IF YOU ARE AVAILABLE ON THE FOLLOWING DATES AND TIMES. JAN. 11TH, 12TH OR 13TH AT 9:15 OR 9:30. RESPONSE FROM SEAN LUGG, DAG/ I AM AVAILABLE ON THE 13TH AT ANY TIME. | |
| 26 | 01/10/2005 | LETTER FROM SEAN LUGG TO JUDGE STOKES. RE:  DUE TO NEW ENTRY OF APPEARANCE, REQUESTS NEW TRIAL DATE. | GRAVES T. HENLEY |
| 27 | 01/26/2005 | LETTER FROM J. STOKES TO COUNSEL DATED 1/18/05 RE: MEMORIALIZE TELECONFERENCE HELD LAST THURSDAY THE STATE'S REQUEST FOR CONTINUANCE OF THE FEB. 7TH TRIAL DATE WAS GRANTED WITHOUT OBJECTION OF DEFENSE COUNSEL. BECAUSE OF ILLNESS, THE PREVIOUSLY ASSIGNED PROSECUTOR, MR. SKLUT, HAD TO WITHDRAW, AND THIS CASE WAS RECENTLY GIVEN TO MR. LUGG. THIS CASE IS COMPLEX AND MR. LUGG'S REQUEST FOR ADDITIONAL TIME TO PREPARE WAS REASONABLE. TRIAL WILL COMMENCE IN NCC ON 7/18/05 AND IS EXPECTED TO LAST 3 WEEKS COURT GRANTED MR. WENDELBURG'S REQUEST TO RE-NOTICE HIS MOTION TO SEVER WITHOUT OBJECTION. HE SHALL PROVIDE THE COURT WITH THE SPECIFIC PORTIONS OF THE STATEMENTS OF MR. ANKER AND MS. LARKS, TOGETHER WITH PROFFERS OF PROOF, WHICH EVIDENCE THE ANTAGONISTIC NATURE OF THEIR DEFENSES ON OR BEFORE 2/3/05. THE STATE SHALL FILE ITS RESPONSE ON OR BEFORE 2/17/05. ORAL ARGUMENT ON THE MOTION IS SCHEDULED FOR 3/17/05 AT 10 IN GEORGETOWN. EXCEPT AS MODIFIED HERE, THE PRETRIAL ORDER REMAINS IN EFFECT. IT IS SO ORDERED. JUDGE STOKES | |
| 28 | 02/04/2005 | RENEWED MOTION TO SEVER TRIAL OF DEFENDANTS FILED BY ALLAN WENDELBURG,ATTORNEY FOR DEFENDANT DANIEL J.ANKER (FAXED TO CISSY) | |
| 29 | 02/04/2005 | DEFENDANT DANIEL J. ANKLER, MEMORANDUM SUPPORT OF MOTION TO SEVER. FILED BY ALLAN WENDLEBURG, ESQ FAXED TO JUDGE STOKES. | |
| 30 | 02/10/2005 | LETTER FROM ALLAN WENDELBURG TO THE HON. RICHARD F. STOKES | |

SUPERIOR COURT CRIMINAL DOCKET
( as of   05/08/2006 )

Page     7

State of Delaware v.  DANIEL J ANKER                          DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.            AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|

RE: ENCLOSING A COPY OF DEFENDANT'S, DANIEL J. ANKER, RENEWED MOTION
TO SEVER TRIAL OF DEFENDANTS.
31   02/10/2005
LETTER FROM ALLAN WENDELBURG TO THE HON. RICHARD F. STOKES
RE: ENCLOSING A COPY OF DEFENDANT'S, DANIEL J. ANKER, MEMORANDUM IN
SUPPORT MOTION TO SEVER. RESPECTFULLY REQUEST ORAL ARGUMENT ON MY
RENEWED MOTION AT THE COURT'S CONVENIENCE.
50   02/16/2005
STATE'S RESPONSE TO DEFENDANT DANIEL ANKER'S RENEWED MOTION TO SEVER
TRIAL OF DEFENDANT'S.
FILED BY SEAN LUGG, DAG
53   03/05/2005
LETTER FROM ALLAN WENDELBURG, TO JUDGE STOKES. IN SUMMARY, THERE CAN B
BE NO MORE ANTAGONISTIC DEFENSE THAN THAT WHICH WILL BE MOUNTED
AGAINST MS. LARKS ON BEHALF OF MR. ANKER. THE STATEMENTS TAKEN BY THE
STATE PRIOR TO INDICTMENT FO NOT TOUCH ON MANY OF THE POINTS OF THE
RESPECTIVE DEFENSE AND DO NOT DEVELOP ANY OF THEM IN SUFFICIENT DETAIL
BUT IT IS OUR BELIEF THAT THE COURT SHOULD BE AWARE OF THE BROADER
NATURE OF THOSE DEFENSES IN CONSIDERING THE REQUEST FOR SEVERANCE.
32   03/11/2005
COPY OF LETTER TO JUDGE STOKES FROM ALLAN WENDELBURG, ESQ.
RE: STATMENTS TAKEN BY STATE PRIOR TO INDICTMENT DO NOT TOUCH ON MANY
OF THE POINTS OF THE RESPECTIVE DEFENSES, AND DO NOT DEVELOP ANY OF
THEM IN SUFFICIENT DETAIL, BUT IT IS OUR BELIEF THAT THE COURT
SHOULD  BE AWARE OF THE BROADER NATURE OF THOSE DEFENSES IN
CONSIDERING THE REQUEST FOR SEVERENCE.
(SEE FILE FOR ENTIRE LETTER)
33   04/04/2005                                    STOKES RICHARD F.
THIS IS MY DECISION ON DEFENDANT'S DANIEL J. ANKER'S MOTION TO SEVER.
DEFENDANT ANKER'S MOTION IS GRANTED.
IT IS SO ORDERED.
34   04/20/2005
LETTER FROM SEAN LUGG, DAG. TO COURT RE: ADVISING THE INTENT TO TRY
DEFENDANT ANKER FIRST.
35   06/03/2005
NOTICE OF SERVICE
PLEASE TAKE NOTICE THAT THE UNDERSIGNED COUNSEL DOES HEREBY CERTIFY
THAT, MAY 31,2005,HE SERVED A SUPPLEMENTAL DISCLOSURE OF ANTICIPATED
EXPERT TESTIMONY SEAN P.LUGG,ESQUIRE AND EDMUND D.LYONS,ESQUIRE BY
HAND DELIVERY. ALLAN WENDELBURG-ATT.FOR PLAINTIFFS
36   06/08/2005
NOTICE OF EXPERT TESTIMONY OF DEFENDANT'S MENTAL CONDITION

SUPERIOR COURT CRIMINAL DOCKET
( as of   05/08/2006 )

Page    8

State of Delaware v.  DANIEL J ANKER                          DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.            AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.                    .

| Event | | | |
|-------|------|-------|-------|
| No. | Date | Event | Judge |

--------------------------------------------------------------------------------
```
          FILED BY ALLAN WENDELBURG, ESQ.
 37   06/09/2005
          LETTER FROM ALLAN WENDELBURG TO JUDGE STOKES
          RE: ENCLOSING COURTESY COPY OF NOTICE OF EXPERT TESTIMONY OF DEF'S
          MENTAL CONDITION FILED WITH PROTHONOTARY IN NEW CASTLE COUNTY.
 38   06/09/2005
          NOTICE OF EXPERT TESTIMONY OF DEF'S MENTAL CONDITION FILED BY
          ALLAN WENDELBURG
 39   06/27/2005
          SUBPOENA(S) MAILED.
 40   06/27/2005
          REINDICTMENT - TRUE BILL FILED.NO 156
          TJT 07/18/05
 46   06/28/2005
          EMAIL FROM CISSY VAVALA TO COUNSEL. RE: REQUESTING TRIAL DATE.
          RESPONSE FROM STUART SKLUT, DAG. MR. LYONS WROTE AND INFORMED THE
          COURT THAT ALL PARTIES AGREED TO 2/7/05 TRIAL DATE
 54   06/28/2005
          LETTER FROM  CISSY VAVALA  TO COUNSEL. THIS WILL CONFIRM THAT A
          PRETRIAL CONFERENCE IS SCHEDULED FOR THURSDAY, JULU 7 2005 AT 9:00AM.
          IN NCC JUDGE'S CHAMBERS
 44   07/01/2005                                   STOKES RICHARD F.
          LETTER FROM  JUDGE STOKES    TO COUNSEL. RE: CONFIRM OFFICE CONFERENCE
          SCHEDULED FOR JULY 7, 05 AT 9:00
 41   07/06/2005
          EMAIL FILED TO CISSY VAVALA ADVISING THAT THE
          DEFENDANT WAS REINDICTED.
          CISSY VAVALA REQUESTED A COPY OF THE INDICTMENT.
 57   07/06/2005
          MOTION IN LIMINE FILED.
          FILED BY SEAN LUGG, DAG
 42   07/07/2005                                   STOKES RICHARD F.
          OFFICE PRETRIAL CONFERENCE HELD WITH JUDGE STOKES. ATTORNEY FOR
          STATE, SEAN LUGG, ESQ.  ATTORNEY FOR DEFENSE ALLAN WENDELBURG, ESQ.
          MOTION IN LIMINE IS TO BE SEALED PER JUDGE STOKES. COUNSEL WILL
          RESPOND TO MOTION BY MONDAY BY JULY 12, 2005 AND A TELEPHONE
          CONFERENCE WILL BE SET UP BETWEEN JUDGE STOKES, SEAN LUGG, AND
          ALLEN WENDELBURG FRIDAY, JULY 15TH. DEFENDANT IS TO BE RE-INDICTED
          BECAUSE ONE CHARGE WAS OMITTED. TRIAL TO BEGIN 7/18/05 AT 10 A.M.
          SEQUESTRATION ISSUES - BOTH SIDES AGREE TO WITNESS SEQUESTRATION
          WITH THE EXCEPTION OF STATE'S CHIEF INVESTIGATING OFFICER AND
          DEFENSE'S INVESTIGATOR MR. GLANDS. STATE WILL OBJECT TO MR. GLANDS
```

SUPERIOR COURT CRIMINAL DOCKET                Page    '9
( as of   05/08/2006 )

State of Delaware v.  DANIEL J ANKER                    DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.          AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|

PRESENCE DURING TESTIMONY, IF IN FACT, HE TOO WILL TESTIFY. THIS
WILL BE ADDRESSED AT TRIAL. DEFENSE MAY ENACT OUT OF STATE WITNESS
PROCEDURES TO SUBPOENA ONE STATE WITNESS, MS. BISHERES OF NEW YORK.
THE CRIMINAL OFFICE JUDGE MAY SIGN THE PAPERWORK FOR JUDGE STOKES TO
SAVE TIME. STATE MAINTAINS ALL DISCOVERY THEY HAVE HAS BEEN MADE
AVAILABLE TO DEFENSE.
NO COURT REPORTER    CC/SHERR                       ·

43   07/07/2005                              STOKES RICHARD F.
DOCUMENTS FILED, SEALED BY ORDER OF JUDGE STOKES.
RE: MOTION IN LIMINE

48   07/11/2005
REINDICTMENT - TRUE BILL FILED. NO 180

55   07/13/2005
DEFENDANT'S RESPONSE TO STATE'S MOTION IN LIMINE.
FILED BY ALLLAN WEDELBURG, ESQ

56   07/13/2005                              STOKES RICHARD F.
LETTER FROM JUDGE STOKES   TO COUNSEL. RE: AT THE PRETRIAL CONFERENCE
LAST WEEK, WE DISCUSSED THE STATE'S MOTION IN LIMINE. THE DEFENSE WAS
GIVEN THE OPPORTUNITY TO PRESENT FURTHER POINTS IN OPPOSITION TO THE
MOTION BY CLOSE OF BUSINESS ON MON. JULY 11TH. I HAVE NOT RECIEVED
ANYTHING MORE, AND THE RESPECTIVE POSITION DISCUSSED AT THE CONFERENCE
ARE STRAIGHTFORWARD AND DO NOT REQUIRE ELABORATION. WE WILL HAVE
ARGUMENT ON THE MOTION BY TELEPHONE ON THURSDAY, JULY 14 2005 AT 2:00
P.M. THE PASRTIES SHALL PARTICIPATE BY PHONE AT THE TIME AND A COURT
REPORTER WILL BE PRESENT.

52   07/18/2005                              STOKES RICHARD F.
TRIAL CALENDAR- WENT TO TRIAL JURY

07/18/2005                              STOKES RICHARD F.
JURY SELECTED.                                     ·

58   07/18/2005                              STOKES RICHARD F.
JURY TRIAL HELD. JUDGE STOKES PRESIDING, DAG: SEAN LUGG, DEF ATTY:
ALLEN WINDOLBURG, CR: JOHN DONNELLY, TOM MAURER,
CC: MARCELLE ADAMS.  JURY PANEL PICKED AND SWORN ON 7/18/05.   MOTION
FOR SEQUESTRATION - GRANTED. COUNT 10 OF THE INDICTMENT WAS NOLP
BEFORE THE TRIAL STARTED IN05-07-1027 BY THE STATE.   THE JURY FOREMAN·
EDWARD CULLERS WAS EXCUSED ON 7/19/05 DUE TO HIS WIFE WHO IS HANDICAPP
HAVING PROBLEMS AND NO ONE TO TAKE CARE OF HER WHILE HE FORFILLED HIS
CIVIC DUTY.  7/25/05 JUROR #6 CARL FORAKER WAS EXCUSED.  HE IS IN THE
HOSPITAL.  JUROR # 14/ALT 2 IS NOW JUROR # 6.  7/26/05 MOTION FOR
JUDGMENT OF ACQUITTAL ON COUNTS 6,7,8,9 - DENIED. MOTION TO AMEND
COUNTS 6,8,AND 9 ON THE INDICTMENT - GRANTED.  MOTION FOR RULE 29 -
DENIED.  MR. WILLIAM GLANZE WAS EXEMPT FROM THE SEQUESTRATION.

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    10
                       ( as of   05/08/2006 )


State of Delaware v.  DANIEL J ANKER                         DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.           AKA:        .
Defense Atty: JOSEPH M BERNSTEIN , Esq.


       Event
No.    Date          Event                               Judge
------------------------------------------------------------------------------
       JURY PANEL STARTED DELIBERATING ON 8/3/05.  VERDICT WAS RECEIVED ON  .
       8/4/05 AS TO COUNT 1 THEFT IN-05-07-1018 (TG), CT2 THEFT 1019 (TG),
       CT3 THEFT 1020(TG), CT4 THEFT 1021(TG), CT5 THEFT 1022(TG), CT6 THEFT
       1023(TG), CT7 THEFT 1024(TG), CT8 THEFT 1025(TG), CT9 THEFT 1026(TG)
       CT10 CONSP. 2ND 1028(TG). PSI ORDERED NO SENTENCING DATE GIVEN.  JUDGE
       SILVERMAN PRESIDED FOR THE VERDICT IN JUDGE STOKES ABSENCE. EVIDENCE
       BOXED UP AND PUT IN THE VAULT. DANIEL ANKER'S INTERVIEW TRANSCRIPTS
       ARE IN THE EVIDENCE BOX IN THE VAULT.
59     07/18/2005                                   STOKES RICHARD F.
       ORDER: IT IS HEREBY ORDERED, THAT THE PSYCHIATRIC OPINION TESTIMONY
       OF DR. KAYE AND OF DR. SHORE SHALL NOT BE ADMITTED AS EVIDENCE IN THE
       ABOVE REFERENCED CRIMINAL CASE FOR THE REASONS STATED ON THE RECORD
       ON 7/18/05. SIGNED BY JUDGE STOKES 7/18/05.
       CC: CLERK OF THE COURT-NEW CASTLE COUNTY, SEAN LUGG, DAG AND ALLAN
       WENDELBURG.
61     07/18/2005
       ARRAIGNMENT CALENDAR:  RULE 9 SUMMONS RETURNED..
       BAIL SET AT UNSECURED BOND                     10,000.00
       DEFENDANT ARRAIGNED, PLED NOT GUILTY, WAIVED READING OF INDICTMENT,
       REQUESTED TRIAL BY JURY.
       TRIAL 7/18/05
62     07/19/2005
       SUBPOENA(S) RETURNED - KATHLEEN LEAHY
63     07/19/2005
       SUBPOENA(S) RETURNED - HUGH LEAHY
64     08/03/2005
       CHARGE TO THE JURY FILED.
65     09/26/2005
       SUBPOENA(S) MAILED.
66     09/30/2005
       ENTRY OF APPEARANCE BY J BERNSTEIN ,ESQ.
67     10/03/2005
       LETTER FROM R. STOKES TO COUNSEL
       RE: SENTENCING IS RESCHEDULED UNTIL 11/4/05 @ 11
68     10/14/2005
       MOTION TO STAY EXECUTION OF SENTENCE FILED.
       FILED BY JOSEPH BERNSTEIN, ESQ & ALLAN WENDELBURG, ESQ
69     10/25/2005
       SUBPOENA(S) MAILED.
70     10/27/2005                                   .
       TRANSCRIPT FILED.
       JURY TRIAL TESTIMONY EXCERPT OF DOUGLAS RAY-JULY 19,2005
```

SUPERIOR COURT CRIMINAL DOCKET                Page    11
( as of   05/08/2006 )

State of Delaware v.  DANIEL J ANKER                    DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|

BEFORE JUDGE STOKES AND JURY
THOMAS MAURER,RPR
72    10/28/2005
STATE'S RESPONSE TO DEFENDANT'S MOTION TO STAY EXECUTION OF SENTENCE
FILED.
FILED BY SEAN LUGG, DAG
REFERRED TO JUDGE STOKES.
71    11/02/2005
TRANSCRIPT FILED.
JUDGE'S RULING ON MOTION IN LIMINE-JULY 18,2005
BEFORE JUDGE STOKES
JOHN DONNELLY,RPR
11/04/2005                                STOKES RICHARD F.
SENTENCING CALENDAR: DEFENDANT SENTENCED.
73    11/04/2005                          STOKES RICHARD F.
LETTER FROM NEAL A. SHORE MD              TO JOESPH BERNSTEIN, ESQ.
RE: PATIENT CARE WHILE INCARCERATED.
REFERRED TO MARY JANE WARD FOR SEALING.
75    11/04/2005                          STOKES RICHARD F.
SENTENCE: ASOP ORDER SIGNED AND FILED 11/10/05.
74    11/07/2005                          STOKES RICHARD F.
LETTER FROM JUDGE STOKES   TO JOHN R. DONNELLY, RPR, COURT REPORTER
RE: I HAVE REVIEWED THE TRANSCRIPTS OF MY BENCH RULING OF JULY 18, 05
IN PREPARING FOR FRIDAY, SENTENCING I NOTICED THAT THE FOLLOWING
CHANGES SHOULD BE MADE BEFORE THE MOTION IS PRESENTED:
THE CHANGES ARE UNDERLINED AND I HAVE CIRCLED THE PERTINENT PARTS OF
MY WRITTEN RULIG WHICH ARE ATTACHED. PLEASE MAKE THE CHANGES OR TREAT
THIS LETTER AS AN ERRATA SHEET, HOWEVER, AS YOU FEEL MAY BE
APPROPRIATE.
76    11/15/2005
TRANSCRIPT FILED.
EXCERPT OF SENTENCING-NOVEMBER 4,2005
BEFORE JUDGE STOKES
K.HALEY,RPR
78    11/15/2005
LETTER FROM SUPREME COURT TO KATHLEEN FELDMAN, COURT REPORTER
RE: A NOTICE OF APPEAL WAS FILED ON 11/08/05.
THE TRANSCRIPT IS DUE 12/19/05.
552, 2005
77    11/16/2005                          STOKES RICHARD F.
ORDER TO ADMINISTER MEDICATION, THIS 7TH DAY OF NOVEMBER 2005, THE
COURT HEREBY ORDERS THAT THE DEPT. OF CORRECTION AND ITS AUTHORIZED

```
                    SUPERIOR COURT CRIMINAL DOCKET            Page   12
                      ( as of  05/08/2006 )
```

State of Delaware v.  DANIEL J ANKER                    DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.           AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

```
       Event
No.    Date        Event                              Judge
```
--------------------------------------------------------------------------

```
       MEDICAL STAFF, INCLUDING DOCTORS AND NURSES EMPLOYED BY CORRECTIONAL M
       MEDICAL SERVICES, INC TO ADMINISTER PRESCRIBED MEDICATION TO DANIEL J.
       ANKER, AS PART OF HIS TREATMENT PROGRAM.
       IT IS SO ORDERED
79     12/22/2005
       LETTER FROM SUPREME COURT TO THOMAS MAURER, COURT REPORTER
       RE: AN EXTENSION TO FILE THE TRANSCRIPT HAS BEEN GRANTED.
       THE TRANSCRIPT IS NOW DUE 01/19/06.
       552, 2005
80     01/23/2006
       TRANSCRIPT FILED.
       SENTENCING-NOVEMBER 4,2005
       BEFORE JUDGE STOKES
       KIM HALEY,RPR
81     01/25/2006
       LETTER FROM SUPREME COURT TO JOHN DONNELLY, COURT REPORTER
       RE: AN EXTENSION TO FILE THE TRANSCRIPT HAS BEEN GRANTED.
       THE TRANSCRIPT IS NOW DUE NOT LATER THAN 02/21/06.
       552, 2005
82     01/30/2006
       MOTION FOR MODIFICATION OF SENTENCE FILED.
       BY JOSEPH BERNSTEIN,ESQ
       REFERRED TO JUDGE STOKES
83     02/03/2006                              STOKES RICHARD F.
       LETTER FROM  JUDGE STOKES   TO COUNSEL. RE: I HAVE RECIEVED MR.
       BERNSTEIN'S MOTION FOR MODIFICATION OF SENTENCE. THE STATE SHOULD
       INFORM OF ITS POSITION ON OR BEFORE MONDAY, FEBRUARY 13, 2006.
85     02/15/2006
       STATE'S RESPONSE TO DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE
       FILED.
       FILED BY SEAN LUGG, DAG
84     02/16/2006
       STATE'S RESPONSE TO DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE.
86     02/17/2006
       TRANSCRIPT FILED.
       TRIAL TESTIMONY-JULY 18,2005
       BEFORE JUDGE STOKES
       JOHN DONNELLY,RPR
87     02/17/2006
       TRANSCRIPT FILED.
       TRIAL TESTIMONY-JULY 20,2005
       BEFORE JUDGE STOKES AND JURY
```

SUPERIOR COURT CRIMINAL DOCKET                    Page    13
( as of   05/08/2006 )

State of Delaware v.  DANIEL J ANKER                         DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|-----|-------|-------|
| | | JOHN DONNELLY,RPR | |
| 88 | 02/17/2006 | TRANSCRIPT FILED.<br>TRIAL TESTIMONY-JULY 27,2005<br>BEFORE JUDGE STOKES AND JURY<br>JOHN DONNELLY,RPR | |
| 89 | 02/17/2006 | TRANSCRIPT FILED.<br>TRIAL TESTIMONY-AUGUST 1,2005<br>BEFORE JUDGE STOKES<br>JOHN DONNELLY,RPR | |
| 90 | 02/17/2006 | TRANSCRIPT FILED.<br>TRIAL TESTIMONY-AUGUST 2,2005<br>BEFORE JUDGE STOKES AND JURY<br>J.DONNELLY,RPR | |
| 91 | 02/17/2006 | TRANSCRIPT FILED.<br>CLOSING ARGUMENTS AND JURY INSTRUCTIONS-AUGUST 3,2005<br>BEFORE JUDGE STOKES AND JURY<br>J.DONNELLY,RPR | |
| 92 | 02/21/2006 | TRANSCRIPT FILED.<br>JURY TRIAL PROCEEDINGS-JUNE 19,2005<br>BEFORE JUDGE STOKES AND A JURY<br>THOMAS MAURER,RPR | |
| 93 | 02/21/2006 | TRANSCRIPT FILED.<br>JURY TRIAL PROCEEDINGS-JULY 21,2005<br>BEFORE JUDGE STOKES AND A JURY<br>THOMAS MAURER,RPR | |
| 94 | 02/28/2006 | LETTER FROM SUPREME COURT TO PATRICK O'HARE, COURT REPORTER<br>RE: AN EXTENSION TO FILE THE TRANSCRIPT HAS BEEN GRANTED.<br>THE TRANSCRIPT IS NOW DUE 03/23/06.<br>552, 2005 | |
| 95 | 03/09/2006 | | STOKES RICHARD F. |

LETTER/ORDER ISSUED BY JUDGE: STOKES. TO: COUNSEL. RE: RULE 35 MOTION
TO REDUCE MR. ANKER'S SENTENCE. THE STATE OPPOSES IT. UNDER RULE 35
A REQUEST FOR SENTENCE MODIFICATION MADE WITHIN 90-DAYS OF SENTENCING
DOES NOT REQUIRE EXTRAORDINARY CIRCUMSTANCES TO SUPPORT CHANGE. WITH
THIS PRINCIPLE IN MIND, I AM DEFERRING ACTION ON THIS REQUEST UNTIL

SUPERIOR COURT CRIMINAL DOCKET                    Page    14
( as of   05/08/2006 )        .

State of Delaware v.  DANIEL J ANKER                    DOB: 01/22/1955
State's Atty: SEAN P LUGG , Esq.              AKA:
Defense Atty: JOSEPH M BERNSTEIN , Esq.

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|

          DECEMBER 18, 2006. DEFENDANT MAY PROVIDE SUPPLEMENTAL INFORMATION AND
          THE STATE MAY RESPOND TO IT. FOR SCHEDULING PURPOSES, THE DEFENSE
          SHOULD SUBMIT FURTHER INFORMATION ON FRIDAY, DEC. 1, 2006. THE STATE
          MAY RESPOND ON FRIDAY DEC. 15, 2006.
          IT IS SO ORDERED.
96   03/21/2006
          TRANSCRIPT FILED.
          TRIAL PROCEEDING ON JULY 25, 2005
          BEFORE JUDGE STOKES.
97   03/21/2006
          TRANSCRIPT FILED.
          TRIAL PROCEEDING ON JULY 26, 2005
          BEFORE JUDGE STOKES.
98   03/21/2006
          TRANSCRIPT FILED.
          TRIAL PROCEEDING ON JULY 28, 2005
          BEFORE JUDGE STOKES
99   03/27/2006
          LETTER FROM: SUPREME COURT         TO: SHARON AGNEW
          RE: THE RECORD AND TRANSCRIPT MUST BE FILED WITH THIS OFFICE NO LATER
          THAN MARCH 31, 2006.
          552, 2005
     04/18/2006
          RECORDS SENT TO SUPREME COURT.
100  04/24/2006
          RECEIPT FROM SUPREME COURT ACKNOWLEDGING RECORD.
          552, 2005

          *** END OF DOCKET LISTING AS OF  05/08/2006 ***
              PRINTED BY: CSCDMOR

## REINDICTMENT- RULE 9 SUMMONS

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | INDICTMENT BY THE GRAND JURY |
| | ) | I.D.#0402010394 |
| DANIEL ANKER | ) | #0402010399 |
| LAURA LARKS | ) | |

The Grand Jury of New Castle County charges DANIEL ANKER AND LAURA LARKS

with the following offenses;

### COUNT I. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 11th day of January, 2002, in

the County of New Castle, State of Delaware, did take, exercise control over, or obtain property

consisting of United States Currency or other miscellaneous property valued in excess of

$50,000.00 but less than $100,000.00, belonging to Phillip Urban, or a bank or lending

institution, intending to deprive them of it or to appropriate it.

### COUNT II. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 6th day of March, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to Douglas Ray and/or Caroline Ray, or a bank or lending institution, intending to deprive them of it or to appropriate it.

COUNT III. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 3rd day of April, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to John Lesko and/or Amy Lesko, or a bank or lending institution, intending to deprive them of it or to appropriate it.

COUNT IV. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 7th day of April, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $50,000.00 but less than $100,000.00, belonging to Gary Paveza and/or Maya Paveza, or a bank or lending institution, intending to deprive them of it or to appropriate it.

## COUNT V. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 25th day of April, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to Francis Caucci and/or Margaret Caucci, or a bank or lending institution, intending to deprive them of it or to appropriate it.

## COUNT VI. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 4th day of June, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to Humera Bashir and/or Iqbal Bashir, or a bank or lending institution, intending to deprive them of it or to appropriate it.

## COUNT VII. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 19th day of June, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to Patricia Paoli or a bank or lending institution, intending to deprive them of it or to appropriate it.

### COUNT VIII. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 15th day of July, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $50,000.00 but less than $100,000.00, belonging to Hugh Leahy and/or Kathleen Leahy, or a bank or lending institution, intending to deprive them of it or to appropriate it.

### COUNT IX. A FELONY

#N_____

#N_____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or about the 18th day of July, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or obtain property consisting of United States Currency or other miscellaneous property valued in excess of $100,000.00, belonging to Barry Kintz and/or Donna Kintz, or a bank or lending institution, intending to deprive them of it or to appropriate it.

## COUNT X. A FELONY

#N_____

#N___ . _____

THEFT in violation of Title 11, Section 841 of the Delaware Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, between the 30th day of May and the 30th day

of July, 2003, in the County of New Castle, State of Delaware, did take, exercise control over, or

obtain property consisting of United States Currency or other miscellaneous property valued in

excess of $100,000.00, belonging to Mermaid Run Condominium Association, intending to

deprive them of it or to appropriate it.

## COUNT XI. A FELONY

#N_____

#N_____

CONSPIRACY SECOND DEGREE in violation of Title 11, Section 512 of the Delaware

Code of 1974, as amended.

DANIEL ANKER AND LAURA LARKS, on or between January 1, 2002 and July 30,

2003, in the County of New Castle, State of Delaware, intending to promote or facilitate the

commission of a felony, Theft, did agree explicitly or implicitly to aid each other in the

planning or commission of the theft, and the defendants did commit an overt act in pursuance of

the conspiracy by failing to disburse client funds.

A TRUE BILL

_____
FOREPERSON

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE              :

      v.                  : I. D. No. 0402010394

                           :

DANIEL J. ANKER,         :
     Defendant.            :

### MOTION FOR POST-CONVICTION RELIEF

1. County in which Petitioner was convicted:   New Castle County.

2. Judge who imposed sentence: The Honorable Richard F. Stokes

3. Date sentence was imposed: November 4, 2005

4. Offenses for which Petitioner was sentenced and length of sentence(s):

      (1) Theft >100,000 - 10 years at L-5, suspended after serving 5 years;
      (2) Theft>100,000 - 1 year at L-5, suspended for probation;
      (3) Theft>100,000 - 1 year at L-5, suspended for probation;
      (4) Theft>100,000 - 1 year at L-5, suspended for probation;
      (5) Theft>100,000 - 1 year at L-5, suspended for probation;
      (6) Theft>100,000 - 1 year at L-5, suspended for probation;
      (7) Theft>50,000 - 1 year at L-5, suspended for probation;
      (8) Theft>50,000 - 1 year at L-5, suspended for probation;
      (9) Theft>50,000 - 1 year at L-5, suspended for probation;
      (10) Conspiracy Second Degree -1 year at L-5, suspended for probation;

5. Does the Petitioner have any sentence(s) to serve other than the sentence(s) imposed because of the judgments under attack in this Motion?    **No.**

6. What was the basis for the judgment(s) of conviction?   Jury verdict of guilty.

7. Judge who accepted guilty plea or presided at trial:  The Honorable Richard F. Stokes

8. Did the Petitioner take the witness stand and testify?   **Yes.**

9. Did the Petitioner appeal from the judgment of conviction?   **Yes.**

     If your answer is yes, give the following information:
      (a) Case number of appeal:  No. 552, 2005
      (b) Date of Court's final order or opinion: October 31, 2006; motion for rehearing en banc denied on December 5, 2006.

10. Other than a direct appeal from the judgments of conviction, has the Petitioner filed any other motions or petitions seeking relief from the judgments in state or federal court?   **No.**

FILED PROTHONOTARY OFFICE   2007 JUL -2   PM 1:48

How many? N/A

If answer is yes, give the following information as to each: N/A

11. Give the name of each attorney who represented the Petitioner at the following stages of the proceedings relating to the judgments under attack in this Motion

(a) at plea of guilty or trial: Allan Wendelburg

(b) on appeal: Joseph M. Bernstein

(c) In any post-conviction proceeding: N/A

12. State every ground on which Petitioner claims that his rights were violated.

## Post-Conviction Claims

### Ground One

The performance of defendant's counsel in the trial amounted to ineffective assistance of counsel under the 6th Amendment to the U.S. Constitution and Article I, §7 of the Delaware Constitution in the following respects:

**Claim No. 1:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the investigation of the defendant by the Office of Disciplinary Counsel ("ODC") and actions taken by the Lawyers' Fund for Client Protection ("Lawyers' Fund"):

**Supporting Facts:** (1) Humera Bashir testified that the Lawyers' Fund had paid off two mortgages that should have been paid off from the proceeds of the sale of their residence. (Tr. 6/19/05, pp. 45-48). This testimony was not objected to by defense counsel. On cross-examination, defense counsel asked the witness additional questions about her contacts with ODC.

(2) Robert Carmine ("Carmine"), an investigator with the Attorney General's Office, was asked by the prosecutor if he had been assigned "to investigate the crimes committed by the defendant Daniel Anker?" Carmine responded that he had been assigned to open an investigation on a referral that the Attorney General's Office had received from ODC. (Tr. 6/19/05, pp. 97-98). This testimony was not objected to by defense counsel.

(3) On cross-examination by defense counsel, Philip Urban testified that the Lawyers' Fund had paid a mortgage that should have been paid off from the proceeds of the refinancing of his residence. (Tr. 6/19/05, p. 149).

-2-

(4) John Lesko testified that the Lawyers' Fund had paid off a mortgage that should have been paid off from the proceeds of the refinancing of his residence. (Tr. 6/19/05, p. 253). This testimony was not objected to by defense counsel.

(5) on cross-examination by defense counsel, Maya Pavesa testified that she had learned in July 2003 that ODC was "shutting [Anker's] practice down." (Tr. 7/20/05, p. 48).

(6) Russell Burkett ("Burkett") testified that Anker had handled a settlement when he purchased a house for cash in 2003. According to Burkett, a mortgage on the property was never paid off and the deed was not transferred into his name. Burkett also testified on direct examination that he and the seller of the property, Barry Kintz, went to ODC, "put charges" on Anker and got Anker "temporarily disbarred." (Tr. 7/20/05, pp. 169-170). Burkett also testified that Anker had "lied" to him about having professional liability insurance. (Tr. 7/20/05, p. 183). This testimony was not objected to by defense counsel.

(7) In the defense case, Burkett was recalled as a defense witness and it was brought out by defense counsel that the funds to pay for having his deed properly recorded and paying the real estate transfer taxes came from the Lawyers' Fund. (Tr. 7/27/05, pp. 96-97).

(8) Kathleen Leahy testified that the Lawyers' Fund had paid off a mortgage that should have been paid off from the proceeds of the sale of her residence. (Tr. 7/21/05, pp. 17-18). This testimony was not objected to by defense counsel.

**Supporting legal authorities:** In the trial, the only information given to the jury about the Lawyers' Fund was that it had paid off several of the mortgages of Anker's clients that were not paid off as a consequence of the real estate closings. In other words, all the jury knew about the Lawyers' Fund was the **result** of its involvement in the case. Conversely, the jury was not told and did not know how the Lawyers' Fund operates and, more importantly, how the Fund made the decisions to pay off the mortgages in question.

The authority and powers of the Lawyers' Fund is governed by Regulations adopted by its

-3-

A-23

Trustees.[1] Regulation IV provides as follows:

The Trustees will receive and consider for reimbursement from the Fund:

(1) Claims for losses due to the defalcation(s) or dishonesty of a member of the Delaware Bar within the practice of his or her profession or acting as a fiduciary who has resigned, died, been adjudged insane, been disbarred, suspended or otherwise disciplined, been convicted of embezzlement or misappropriation of money or other property of his or her clients or whose whereabouts is unknown;

(2) claims certified to the Trustees by the Board on Professional Responsibility of the Supreme Court of Delaware as appropriate cases for consideration because the loss was caused by the defalcation(s) or dishonest conduct of a member of the Delaware Bar, or

(3) or any other claims for losses due to the defalcation(s) or dishonesty of a member of the Bar which the Trustees, in the exercise of their discretion pursuant to paragraph (g) of Rule 66 of the Supreme Court, deem appropriate for consideration in that such consideration will advance the purpose of the Fund. Claims duly presented will be considered by the Trustees as fairly, fully and equitably as possible under the circumstances.

Thus, under *Regulation IV(1)*, the Lawyers' Fund could have paid off the mortgages simply because Anker had been suspended from practicing law and was found to have acted with "dishonesty" in a fiduciary capacity.[2] When a claim is made, the case is referred to one or more Trustees "for investigation." The Trustee(s) act as hearing officers and have broad discretion as to how the investigation is conducted. At the conclusion of the investigation, the Trustee(s) file a "report and recommendation." *Regulation IV (6)*. Regulation IV also does not specify any standard of proof needed to establish whether or not a claim has been proven. *Regulation IV(7)* ("The determination of any claim shall lie in the discretion of the Trustees").

Based on the above description of how the Lawyers' Fund works, it should be clear that simply telling the jury that the mortgages were paid off by the Lawyers' Fund has little, if any,

---

[1] See, *Regulations of the Trustees of the Lawyers' Fund for Client Protection of the Bar of Delaware.*

[2] Under *Regulation IV(1)*, a criminal conviction for embezzlement or theft is **not** a prerequisite for payment from the Fund. All of the mortgages were paid off by the Fund prior to Anker's criminal trial.

relevance to the issue whether Anker had the state of mind necessary to convict him of Theft. The evidence and issues involved in convincing the Lawyers' Fund to pay a claim are vastly different from the proof required for a criminal conviction. The Lawyers' Fund could decide to pay a claim simply because Anker was a "fiduciary" who was responsible for a defalcation or dishonesty even if he had not been convicted of any crime. Conversely, criminal liability cannot be premised on the fact that Anker, in his capacity as a "fiduciary," was vicariously responsible for any theft that occurred in connection with his law practice. In other words, Anker could have breached a fiduciary duty to his clients to ensure that the mortgages were paid off without necessarily having any criminal intent to steal. Any relevance of the mortgage payoff evidence, however, is far outweighed by the potential for such evidence to confuse and mislead the jury.

A case which clearly illustrates the confusion of issues and prejudice to a defendant that will result when violations of rules of professional responsibility are intermingled with criminal liability is *State v. Mahoney*, 868 A.2d 1171 (N.J. Super, App. Div. 2005). In *Mahoney*, the defendant, an attorney, was convicted of theft based on a misappropriation of client funds that he held in a fiduciary capacity. *Id.*, at 1175-1176. On appeal, Mahoney argued that the trial court committed reversible error when it allowed evidence that his "trust accounts" were not in compliance with the requirements of New Jersey's Rules of Professional Conduct ("Rules") and for the trial court to have instructed the jury as to the accounting requirements imposed by the Rules. *Id.*, at 1184 (the rulings made by the trial court "allowed the State to mix and blur the lines between civil and criminal concepts"). In reversing the defendant's convictions, the court held:

> The problem here was that the jury was provided with the text of a complex rule of professional accounting standards without any instructions on the relevance of the Rule to the issues before it. At no point was the jury instructed on which aspects of the Rule were relevant, to what issues, or how the Rule could assist the jury in reaching its decision. **The court made no effort to assist the jury in distinguishing between the state of mind that established the violation of an ethical rule, and the level of criminal intent necessary to establish guilt with respect to a crime.** The effect of the trial judge's one-sentence admonition was negligible in comparison to the prosecutor's extensive cross-examination and summation

-5-

> comments, which urged the jury to focus on the Rule's requirements
> and defendant's bookkeeping practices as indicative of his criminal
> behavior. We are thus compelled to reverse defendant's conviction.

*Id.*, at 1187 (emphasis added).[3]

In *Mahoney*, the Appellate Division also cited with approval the decision, in a similar case,

of the California Court of Appeals in *People v. Stein*, 156 Cal. Rptr. 299, 302 (Cal. Ct. App. 1979).[4]

In *Stein*, the court held that it was reversible error to have allowed the State to present evidence

concerning the defendant's violations of the California State Bar Rules of Professional Conduct and

to have instructed the jury concerning the requirements imposed by the Rules:

> We find that it was improper to use the professional rules of conduct
> to show that a violation of the rules, if any, would tend to prove that
> defendant possessed the specific intent required when, in fact, the
> violation of the rules, if any, could have occurred without any criminal
> intent. **Even though the instructions did not presume a violation of
> the rules, the only reasonable inference that the jury could have
> drawn was that evidence of a violation was in fact evidence
> establishing the required intent to commit the crimes charged.**

*Id.* (emphasis added).

Based on the above authorities, this issue was raised in Anker's direct appeal under a "plain

error" standard of review. In rejecting the above claim, the Court held:

> Anker has not shown that the admission of evidence
> that the Lawyer's Fund paid the mortgages was plain
> error. The Lawyer's Fund is not a tribunal.
> Furthermore, there is nothing in the record to support
> Anker's argument that the jury equated the payments by
> the Lawyer's Fund with his being found guilty of any
> crime. Rather, evidence that the Lawyer's Fund paid
> the mortgages was relevant to show that Anker did not
> pay them with the money entrusted to him.

*Anker v. State*, 2006 Del. LEXIS 578, *5 (Del. 2006).

In rejecting Anker's claim, the Delaware Supreme Court cited no authority and apparently

---

[3] This ruling by the Appellate Division was affirmed by the Supreme Court of New Jersey.
See, *State v. Mahoney*, 2006 N.J. LEXIS 388, *8-*9 (N.J. 2006).

[4] See, *Mahoney*, 868 A.2d at 1186.

-6-

ignored the fact that courts in New Jersey and California had ruled to the contrary on the issue. The ruling by the Delaware Supreme Court thus compounded the denial of a fundamentally fair trial that began when Anker's trial counsel failed to object to this evidence.

**Claim No. 2:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the emotional and financial impact of defendant's alleged thefts on the alleged victims:

**Supporting Facts:** (1) Humera Bashir testified that the defendant's failure to pay off the mortgages had "destroyed" her family's credit. (Tr. 6/19/05, pp. 45-48). This testimony was not objected to by defense counsel.

(2) John Lesko testified that the defendant's failure to pay off a mortgage that should have been paid off from the proceeds of the refinancing of his residence had a negative impact on his credit rating which took him nearly two years to straighten out. (Tr. 6/19/05, p. 252).

(3) Burkett also testified about a phone message he left for Anker that accused Anker of "stealing" $325,000 from him and being responsible for the bank foreclosing on his house. (Tr. 7/20/05, pp. 183-186).

**Supporting legal authorities:** Victim impact evidence is inadmissible in a trial, except in the penalty phase of a capital murder trial. See, *In re Petition of State*, 597 A.2d 1, 2-4 (Del. 1991).

**Claim No. 3:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the defendant's character and "bad acts" allegedly committed by the defendant. **Supporting Facts:** (1) Francis Caucci ("Caucci") testified that the defendant had failed to pay off a mortgage that should have been paid off from the proceeds of the refinancing of his residence. On cross-examination, defense counsel brought out that Caucci allegedly told defense counsel's investigator that Anker was a "scumbag," and that Caucci had been threatened by Anker's investigator. (Tr. 7/20/05, pp. 130-135).

(2) Joseph McCullough ("McCullough"), who was employed as an investigator for ODC, testified that Anker had improperly written checks on his client escrow account to pay for personal

expenses. McCullough also testified that Anker had misrepresented to the Delaware Supreme Court that the financial records for his client escrow account were in compliance with the Court's rules. (Tr. 7/25/05, pp. 166-170); (Tr. 7/26/05, pp. 56-57).   McCullough also testified that based on his preliminary investigation of Anker's financial records, ODC had decided to seek an interim suspension of Anker from the practice of law. (Tr. 7/25/05, pp. 173-175). McCullough also testified that some of the checks drawn on the escrow account went to the IRS to pay Anker's delinquent tax obligations. (Tr. 7/25/05, pp. 196-197). Finally, McCullough testified that he found at least twenty instances where telephone transfers had been made from Anker's escrow account to his office operating account without any supporting documentation.   The total amount transferred was approximately $97,000.00. McCullough was allowed to speculate that these transfers were made to cover shortages in Anker's operating account. (Tr. 7/25/05, pp. 202-206).  None of the above testimony was objected to by defense counsel.

(3) Defense counsel was ineffective when he failed to object to questions from the prosecutor during the cross-examination of Anker concerning Anker's false Certification Statements to the Delaware Supreme Court. (Tr. 8/2/05, pp. 17 and 26-31).

(4) Richard Forsten, Esquire ("Forsten") was the court appointed Receiver for Anker's law practice. At trial, Forsten was called as a witness by the defense. On cross-examination by the State, Forsten testified that in reviewing Anker's files and accounts, he discovered that Anker had received $211,000 from an insurance company in settlement of a property damage claim brought by his client, a condo association, but there was no record that the money had ever been paid over to the condo association. (Tr. 7/27/05, pp. 49-51). This testimony was not objected to by defense counsel even though a Theft charge relating to the alleged failure to pay the settlement proceeds to the condo association was *nolle prossed* by the State.

**Claim No. 4:** Defense counsel was ineffective in failing to educate the jury concerning the distinction between an attorney's liability for a violation of attorney disciplinary rules of conduct, on the one hand, and liability for criminal conduct, on the other hand. (Tr. 7/25/05, p. 214).

**Claim No. 5:** Defense counsel was ineffective in failing to utilize at trial evidence that had been developed by William F. Glanz ("Glanz"), an investigator who had been retained to assist in the preparation of the defense. The thrust of the defense case was that the thefts had been perpetrated by co-defendant Laura Larks ("Larks"). As a result of his investigation, Glanz had developed evidence that Larks had forged checks drawn on the escrow account and diverted funds from the escrow account for her own benefit. Glanz had also developed evidence that Larks had taken various steps, such as creating fake e-mails and preventing clients from dealing directly with Anker to conceal the thefts from Anker and to prevent him from discovering the thefts. None of this evidence was presented at trial.

**Claim No. 6:** The defendant was deprived of his right to the effective assistance of counsel because defense counsel had failed to disclose to the defendant that during the course of his representation defense counsel was suffering from a major depressive disorder which caused him to virtually neglect and ignore his professional obligations to his clients, including Anker, and which eventually led to the filing of numerous disciplinary charges against defense counsel by ODC. See, *In re Allan Wendelburg*, Case No. 501, 2006 (Del. 2006).

### Ground Two

Even if none of the individual errors specified in Ground One above, standing alone, amounted to a violation of Anker's Sixth Amendment right to effective assistance of counsel, when viewed cumulatively, the multiple errors show that Anker's Sixth Amendment rights were violated.

If any of the grounds were not previously raised, state briefly what grounds were not raised, and give your reasons for not doing so. **Answer:** the claims of ineffective assistance of counsel set forth herein were not raised in the direct appeal because the Delaware Supreme Court will not consider such claims on direct appeal.

-9-

WHEREFORE, Movant asks that the Court grant him all the relief to which he may be entitled in this proceeding.

*Joseph M B*

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
Attorney for Defendant

I declare the truth of the above under penalty of perjury.

Daniel J. Anker

Dated: 5/24/07

-10-

A-30

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DANIEL J. ANKER,**<br>Petitioner, | :<br>:<br>: |
| v. | : Civil Action No.<br>: |
| **ELIZABETH NEAL,** Acting Warden,<br>John L. Webb Correctional Facility,<br>and **JOSEPH R. BIDEN, III,** Attorney<br>General of the State of Delaware,<br>Respondents. | :<br>:<br>:<br>:<br>: |

## PETITION FOR WRIT OF HABEAS CORPUS
### UNDER 28 U.S.C. §2254

1. **Name and location of court which entered the judgment of conviction under attack:** Superior Court of the State of Delaware (New Castle County), 500 N. King Street, Wilmington, DE 19801.

2. **Date of judgment of conviction:** (1) conviction by jury - August 4, 2005; (2) sentencing date - November 4, 2005.

3. **Length of Sentence:** Petitioner was sentenced to 19 years in jail, suspended after serving 5 years, followed by probation.

4. **Nature of offense involved:** (1) 6 counts of Theft > $100,000; (2) 3 counts of Theft > $50,000; 1 count of Conspiracy Second Degree

5. **What was your plea?** - Not Guilty

6. **If you pleaded not guilty, what kind of trial did you have?** - Jury trial

7. **Did you testify at the trial?** - Yes

8. **Did you appeal from the judgment of conviction?** - Yes

9. **If you did appeal, answer the following:**

   **(a) Name of court** - Supreme Court of Delaware
   **(b) Result** - convictions and sentence were affirmed
   **(c) Date of result and citation** - October 31, 2006 (motion for rehearing denied on December 5, 2006); *Anker v. State,* 2006 Del. LEXIS 578

   **(d) Grounds raised:**

   1. Whether Anker was denied his right to a fundamentally fair trial when the State was permitted to introduce evidence that prior to the trial, the "Lawyers' Fund" had paid off many of the unpaid mortgages that were the basis of the Theft charges against Anker. This evidence, which was totally irrelevant to any issue in the trial, clearly suggested

to the jury that the legal profession, by paying off the unpaid mortgages, had already decided that Anker was guilty.

2. Whether Anker was denied his right to a fundamentally fair trial when the State was permitted to introduce evidence that the defendant was a tax delinquent and evidence of other "bad acts" committed by the defendant.

3. Whether Anker was denied his right to a fundamentally fair trial when the trial court ruled that the defendant would be barred from presenting expert psychiatric testimony that his "intent" to commit the alleged thefts was influenced by his relationship with his daughter, a co-defendant in the case.

**(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:**    Not applicable.

**(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:**    Not applicable.

10. **Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?**  Yes.

11. **If your answer to 10 was "yes," give the following information:**

(A) **(1) Name of Court** - Delaware Superior Court (New Castle County)

**(2) Nature of proceeding** - Petition for post-conviction relief under Superior Court Criminal Rule 61.

**(3) Grounds raised:** Whether the performance of defendant's counsel in the trial amounted to ineffective assistance of counsel under the 6th Amendment to the U.S. Constitution and Article I, §7 of the Delaware Constitution in the following respects:

**Claim No. 1:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the investigation of the defendant by the Office of Disciplinary Counsel ("ODC") and actions taken by the Lawyers' Fund for Client Protection ("Lawyers' Fund") to pay off several of the unpaid mortgages that were the basis of the Theft charges against Anker.

**Claim No. 2:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the emotional and financial impact of defendant's alleged thefts on the alleged victims.

**Claim No. 3:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the defendant's character and "bad acts" allegedly committed by the defendant.

**Claim No. 4:** Defense counsel was ineffective in failing to educate the jury concerning the distinction between an attorney's liability for a violation of attorney disciplinary rules of conduct, on the one hand,

and liability for criminal conduct, on the other hand.

**Claim No. 5:** Defense counsel was ineffective in failing to utilize at trial evidence that had been developed by William F. Glanz ("Glanz"), an investigator who had been retained to assist in the preparation of the defense.

**Claim No. 6:** The defendant was deprived of his right to the effective assistance of counsel because defense counsel had failed to disclose to the defendant that during the course of his representation defense counsel was suffering from a major depressive disorder which caused him to virtually neglect and ignore his professional obligations to his clients, including Anker, and which eventually led to the filing of numerous disciplinary charges against defense counsel by ODC. See, *In re Allan Wendelburg*, Case No. 501, 2006 (Del. 2006).

**(4) Did you receive an evidentiary hearing on your petition, application or motion?** No.

**(5) Result -** The Rule 61 Motion was denied. *State v. Anker*, 2007 Del. Super. LEXIS 209 (July 26, 2007); *aff'd, Anker v. State*, 2008 Del. Lexis 17 (January 9, 2008).

**(b) As to any second petition....** Not applicable

**(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?** Yes.

**(d) If you did not appeal......** Not applicable

12. **Grounds for Habeas Corpus Relief:**

**Ground 1.** Whether Anker was denied his right to a fundamentally fair trial when the State was permitted to introduce evidence that prior to the trial, the "Lawyers' Fund" had paid off many of the unpaid mortgages that were the basis of the Theft charges against Anker. This evidence, which was totally irrelevant to any issue in the trial, clearly suggested to the jury that the legal profession, by paying off the unpaid mortgages, had already decided that Anker was guilty.

**Ground 2.** Whether Anker was denied his right to a fundamentally fair trial when the State was permitted to introduce evidence that the defendant was a tax delinquent and evidence of other "bad acts" committed by the defendant.

**Ground 3.** Whether Anker was denied his right to a fundamentally fair trial when the trial court ruled that the defendant would be barred from presenting expert psychiatric testimony that his "intent" to commit the alleged thefts was influenced by his relationship with his daughter, a co-defendant in the case.

**Ground 4.** Whether the performance of Anker's trial counsel was "ineffective" under the 6th Amendment to the United States Constitution and *Strickland v. Washington*, 466 U.S. 668 (1984) in

the defendant's trial in the following respects:

**Claim No. 1:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the investigation of the defendant by the Office of Disciplinary Counsel ("ODC") and actions taken by the Lawyers' Fund for Client Protection ("Lawyers' Fund") to pay off several of the unpaid mortgages that were the basis of the Theft charges against Anker.

**Claim No. 2:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the emotional and financial impact of defendant's alleged thefts on the alleged victims.

**Claim No. 3:** Defense counsel failed to object to the introduction of evidence in the State's case-in-chief concerning the defendant's character and "bad acts" allegedly committed by the defendant.

**Claim No. 4:** Defense counsel was ineffective in failing to educate the jury concerning the distinction between an attorney's liability for a violation of attorney disciplinary rules of conduct, on the one hand, and liability for criminal conduct, on the other hand.

**Claim No. 5:** Defense counsel was ineffective in failing to utilize at trial evidence that had been developed by William F. Glanz ("Glanz"), an investigator who had been retained to assist in the preparation of the defense.

**Claim No. 6:** The defendant was deprived of his right to the effective assistance of counsel because defense counsel had failed to disclose to the defendant that during the course of his representation defense counsel was suffering from a major depressive disorder which caused him to virtually neglect and ignore his professional obligations to his clients, including Anker, and which eventually led to the filing of numerous disciplinary charges against defense counsel by ODC. See, *In re Allan Wendelburg*, Case No. 501, 2006 (Del. 2006).

With respect to **Claim 1 through Claim 5** above, it is further alleged that Anker was "prejudiced" under *Strickland* in that if a proper and timely objection had been made to the admission of the evidence referred to therein, there exists a reasonable probability that the outcome of Anker's trial would have been different. With respect to **Claim 6**, the major depressive disorder suffered by Anker's trial counsel at the time of Anker's trial resulted in a situation where Anker suffered prejudice *per se* under *Strickland* because his attorney had totally ceased to function as an attorney. *See, United States v. Cronic*, 466 U.S. 648 (1984)(prejudice is presumed where there is a constructive denial of counsel).

13. **If any of the grounds listed in 12 were not previously presented in any court, state or federal, state briefly what grounds were not so presented and give your reasons for not presenting them.** Not applicable.

14. **Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment now under attack?** No.

15. **Give the names and addresses of each attorney who represented you at each stage**

**of the judgment attacked herein:**

(1) the following attorney represented the petitioner during all or part of the period from the time of his arrest through conviction and sentence in the trial court.

> Allan Wendelburg, Esquire
> 24 Stirrup Run
> Stirrup Farms
> Hockessin, DE

(2) The following attorney represented petitioner on direct appeal

> Joseph M. Bernstein, Esquire
> 800 N. King Street - Suite 302
> Wilmington, DE 19801

(3) The following attorney represented the petitioner in state court post-conviction proceedings and on appeal in post-conviction proceedings

> Joseph M. Bernstein, Esquire
> 800 N. King Street - Suite 302
> Wilmington, DE 19801

16. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** Yes, sentenced on more than one count of Indictment.

17. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No.

**WHEREFORE,** petitioner prays that the Court grant petitioner all relief to which he may be entitled under this Petition

> _/s/ Joseph M. Bernstein_
> JOSEPH M. BERNSTEIN (#780)
> 800 N. King Street - Suite 302
> Wilmington, DE 19801
> 302-656-9850
> Attorney for Petitioner

I declare under penalty of perjury that the foregoing is true and correct.

> _/s/ Daniel J. Anker_
> Daniel J. Anker, Petitioner

Dated: _____

## Bashir - Direct — 29

1  was never given that information.
2       MR. LUGG: If I may approach the witness
3  again, your Honor?
4       THE COURT: Yes, you may.
5    Q.  Did you receive what you believed or what
6  was represented to you to be confirmation of the
7  payment to the Principal Bank?
8    A.  Yes.
9    Q.  And may I hand you this document. There are
10 two pages that I've handed to you; is that correct?
11   A.  Yes.
12   Q.  Do you recognize what I've handed to you?
13   A.  Yes.
14   Q.  And is that a check and the back copy of a
15 check that was provided to you?
16   A.  Mm-hmm.
17   Q.  How was that provided to you?
18   A.  That was faxed over. And the first thing I
19 had noticed was -- and this was faxed over in two
20 separate days -- the back of the check came first,
21 and the front of the check came afterwards, it didn't
22 come in at the same time or the same day. And then I
23 noticed that the date on the check was incorrect. It

## Bashir - Direct — 30

1  says July 4th of 2003, not June. Our closing was on
2  June. So I was a little suspicious there.
3       And then the back, the first thing I did
4  when I got to the back of the check was I started
5  calling my mortgage companies and verifying the
6  routing numbers, and say are these your routing
7  numbers? And they told me no.
8    Q.  Okay.
9    A.  And I did the same thing with Sovereign
10 Bank, once I got back, I called them up, and they
11 said no, these do not -- and it didn't actually tell
12 me which banks that these do belong to. So then I
13 believed that the front and back of this check,
14 they're two separate checks.
15   Q.  And the check that you've referred to is the
16 check for the, purports to be the Principal payoff,
17 correct?
18   A.  Right.
19       MR. LUGG: And at this point, your Honor,
20 admit as State's Exhibit 3 the Principal check.
21       MR. WENDELBURG: Without objection.
22       THE COURT: It's admitted.
23       THE CLERK: State's Exhibit No. 3.

## Bashir - Direct — 31

1  BY MR. LUGG:
2    Q.  You told us about a second check that you
3  investigated.
4       MR. LUGG: If I may approach again,
5  your Honor?
6       THE COURT: Yes, you may.
7    Q.  Again, I'm handing you two documents. Do
8  you recognize the documents that I've placed before
9  you?
10   A.  Yes. That's for the Sovereign Bank.
11   Q.  Okay. And is the first the front of the
12 check and the second one purports to be the rear or
13 the reverse of that check?
14   A.  Yes.
15   Q.  Did you investigate that check, as well?
16   A.  Yes, I did.
17   Q.  And was that, in fact, a payoff properly
18 made to Sovereign Bank?
19   A.  No. They came back and they said that was
20 not, they did not -- that's not their routing number,
21 that's not theirs, they didn't cash this check at
22 all.
23   Q.  And how were those documents provided?

## Bashir - Direct — 32

1    A.  Faxed over.
2    Q.  To you?
3    A.  Yes.
4    Q.  Okay. At your request?
5    A.  Yes.
6       MR. LUGG: State moves to admit this check
7  as State's 4.
8       MR. WENDELBURG: No objection.
9       THE COURT: It's admitted.
10      THE CLERK: State's Exhibit No. 4.
11      MR. LUGG: May I have just one moment,
12 your Honor?
13      THE COURT: Sure.
14      MR. LUGG: Thank you.
15 BY MR. LUGG:
16   Q.  After receiving those checks, both
17 indicating a date of July 4th, you understand that to
18 be the incorrect date, correct?
19   A.  Yes.
20   Q.  You were there on June 4th, right?
21   A.  Yes.
22   Q.  During what month did you receive those
23 checks?

Bashir - Direct 33

1    A.   I received those in July, mid-July sometime.
2    Q.   Okay. So it was after the 4th of July?
3    A.   Oh, yeah. And I had been asking for them
4    since June.
5    Q.   Okay. And after receiving those checks, did
6    you stop your investigation at that point?
7    A.   No. No, no, no. That is when I realized
8    something is going on. And I even called Wilmington
9    bank, and I think that was -- because that's
10   Mr. Anker's bank that issued the checks -- and I had
11   talked to them thinking that maybe the July 4th date
12   might have done something that, because it was
13   postdated accidentally, or something that, you know,
14   they weren't cashed. And they said that didn't
15   matter, as long as the money was in the account, you
16   know, that money, it would have been cashed in.
17       So what I decided to do is I had, since my
18   husband was actually now up in Albany working, and I
19   had to stay with my parents so they can watch my
20   daughter while I did all this in terms of talking to
21   the banks and dealing with everybody during the
22   daytime, I had a brother of mine take off from work.
23   And we drove down here on the morning, I think it was

Bashir - Direct 34

1    on the 23rd, because we received these checks around
2    the 21st or 22nd, it took about two days to get the
3    front and back -- because it didn't come in one day,
4    I got the backs one day and I got the front of the
5    checks the next day. And once I found out they were
6    incorrect, I wanted to physically see the checks, and
7    that's what I was coming down here, to physically see
8    the checks so I can flip it over and say, yeah, this
9    is correct or not.
10   Q.   Up until that point in time when you and
11   your brother get in the car to head down to Delaware,
12   how much time did you spend investigating and
13   researching this transaction?
14   A.   Every day. I mean, ever since that we found
15   out that our mortgage has not been paid off, every
16   day I was on the phone with the mortgage companies, I
17   was on the phone with, you know, just letting them
18   know what's going on, or just contacting Mr. Anker's
19   office, or something. And we had to start writing
20   the mortgage companies letters, also, because every
21   time you spoke with a different person. So I just
22   wanted to make sure that if anything's going on, I
23   documented, so I would write them letters just

Bashir - Direct 35

1    letting them know what's going on. So every day,
2    every day, and I had to stay with my parents, I
3    couldn't even move up to Albany at the time.
4    Q.   And your parents were helping out with your
5    daughter?
6    A.   Oh, my God, yes.
7    Q.   And was your son on the way at that point?
8    A.   I think early stage, yes.
9    Q.   Okay. And tell us about that trip down here
10   to Delaware. Where are you coming from at this point
11   in time?
12   A.   We were coming from Staten Island, New York.
13   Q.   Is that about a two-hour drive?
14   A.   Two-hour drive.
15   Q.   And did you drive down to Delaware?
16   A.   Yes, I did.
17   Q.   And did you go to Mr. Anker's office?
18   A.   We went to the office, we got there early in
19   the morning, and nobody was there, the office was
20   closed. And I called, and I happened to get a hold
21   of Mrs. Larks. And I wanted to meet up with her.
22   And she had no idea I was coming, so I was just,
23   like, I just want to see the checks, if I can somehow

Bashir - Direct 36

1    see the checks. And so she ended up coming
2    eventually to the office. And when I had asked
3    her -- I mean, a lot of stuff happened even during
4    that morning where we got there so early, she
5    wouldn't be able to meet us till 11:30. So we didn't
6    know where to go, with my brother and I, so I said,
7    okay, let's just maybe go somewhere up by Concord
8    Mall and just kind of wait around in a public place
9    where we can.
10   Q.   Before -- if I can interrupt you briefly --
11   did you go directly to the office that morning?
12   A.   Initially, yes.
13   Q.   What time did you go to the office?
14   A.   At 9:30.
15   Q.   At 9:30 in the morning?
16   A.   Yeah.
17   Q.   And what was the status of Mr. Anker's
18   office at 9:30 that morning?
19   A.   There was nobody there.
20   Q.   There was nobody there?
21   A.   It was closed, yeah.
22   Q.   What time -- and I apologize to take you
23   back a little bit -- what time of the day was that

Bashir - Direct    37

1    closing held on June 4th?
2    A.    Maybe, it was early, ten, or so.
3    Q.    Okay. How long did you stay at Mr. Anker's
4    office, after you got there at 9:30, how long were
5    you there?
6    A.    We waited a while. We waited at least until
7    10, 10:30, or so.
8    Q.    So you waited for about an hour for somebody
9    to show up?
10    A.    Yeah, we waited. And I actually called
11    Ms. Larks. And then she said she was doing something
12    or she was busy and she'll meet us at 11:30. She
13    gave us an 11:30 meeting time.
14    Q.    How were you able to get a hold of her?
15    A.    By calling. I called the office. Because I
16    called earlier, I think, to try to get it in the
17    morning.
18    Q.    And you were able to finally get a hold of
19    her?
20    A.    Yeah. And then she ended up calling me
21    back, and that's when I told her that I was coming
22    down and I needed to speak with her or somebody in
23    the office.

Bashir - Direct    38

1    Q.    Okay. So you were on your way down when you
2    talked to her?
3    A.    Yes.
4    Q.    And when you got there, there was nobody
5    there?
6    A.    There was nobody there.
7    Q.    Okay. And is that the office number that
8    you had called on your way down?
9    A.    Yeah.
10    Q.    Did you ultimately meet up with Ms. Larks
11    that day?
12    A.    I did. She got a hold of me through our
13    cell phone, and stuff, and we were able to call each
14    other and get in touch.
15    Q.    Did you meet with her?
16    A.    Yes, I did.
17    Q.    Where did you meet her?
18    A.    We ended up meeting in a different
19    conference room, or another room off to the side
20    within the same building, and this was more to the
21    right side. And we ended up -- we didn't meet in her
22    office, we just met over to the side, and we wanted
23    to see the checks. And then she told me she didn't

Bashir - Direct    39

1    have the checks. And she said her, she realized her
2    bookkeeper or accountant, somebody has the checks,
3    she doesn't have them.
4    And so I said, well, do you have a clearer
5    copy of the back, because some numbers were a little
6    bit off. And she ended up going to the office and
7    brought back another copy of the check with numbers
8    filled in. And that just wasn't good enough, I had
9    physically wanted to see the checks.
10    Q.    Did you ask to speak with Mr. Anker at that
11    point?
12    A.    Yes, we did. And I think he was away.
13    Q.    He was away?
14    A.    Yes.
15    Q.    Did you physically observe his office when
16    you returned back that day?
17    A.    No. I didn't go in the office. You know,
18    nobody ever goes near that office.
19    Q.    Okay. Did you head back home then?
20    A.    Yes, we did. We had a couple of other
21    things that were discussed, that settlement issue
22    came up again during that visit, during that talking
23    to her.

Bashir - Direct    40

1    Q.    This is, again, so we're clear, the
2    settlement issue is the settlement issue that Dan
3    Anker had told you about?
4    A.    The legal, that whole legal thing saying
5    that mortgages are paid off, but they don't show
6    being paid off because they have double booking. And
7    that's when I kind of tried to make her explain to me
8    what all that was about. I know there was something
9    she was probably saying, but I was trying to get her
10    to explain to me what is this double booking, and
11    everything. And she said Dan Anker's working on it,
12    he spoke with the Principal Bank's attorney on this.
13    And now, before she had told us, oh, we'd get 10,000,
14    now she's saying we're going to get 20,000 from them,
15    that's what he's trying to work out.
16    And I said, Well, who is this attorney?
17    I want to know because I want to talk to Principal.
18    And I had called in regard to this, and Principal
19    was, like, we have no idea what you're talking about,
20    none of this is happening, we don't know. So I was
21    trying to get some information that if this is
22    actually going on, let me go back to Principal and
23    see who is, you know, doing this or what it is, what

Bashir - Direct                                    45

1  Counsel. So we spent that weekend -- actually it was
2  our anniversary that weekend, and we spent our
3  anniversary fighting, bickering, and trying to get
4  this letter and everything written out, it was like
5  maybe a seven- or eight-page letter of everything
6  that happened in the past two months, details.
7  Because I was keeping track of everything, I knew
8  something was wrong.
9      Q.  So you're spending you're anniversary
10 dealing with this issue?
11     A.  Yeah.  We were up to, like, four or five in
12 the morning just typing this out.
13     Q.  And did you complete your recitation of your
14 history of contact before coming down here to
15 Delaware?
16     A.  Yeah, I did, just in case.  And I was, like,
17 if that doesn't go through, then I have to do
18 something about it now.
19         And then what we did was after that we ended
20 up going to Disciplinary Counsel's office, and I
21 ended up meeting with, I think Mr. McGinniss is his
22 name, and we ended up giving that letter over to him.
23     Q.  And was, at this point in time we're now

Bashir - Direct                                    46

1  sometime late in July you've indicated, correct,
2  2003?
3      A.  Yes.
4      Q.  Did your Sovereign and/or Principal
5  mortgages, were they paid off by that point in time?
6      A.  No, no.  They were coming after us, in a
7  sense.
8      Q.  What is the status back then in 2003 of that
9  property in New York while this is going on?
10     A.  That one, what we had done back in March, we
11 had put a down payment on a house that we were
12 building which we had saved up for, we had worked
13 very hard to do this.  And it wasn't going to be
14 ready until the end of October.  So at this time it
15 was in the process of being built, we had a mortgage
16 that we had been approved for for that house, and
17 that was all contingent upon these two mortgages
18 being paid off in time before our closing.  So we're
19 thinking, okay, you know, it will still happen,
20 everything's still early, things will be okay.
21         And so that was all still going on.  So as
22 far as, you know, we just knew we had that house, we
23 had money on it, and it's just slowly coming along,

Bashir - Direct                                    47

1  . and it's just a matter of we have to get these two
2  mortgages paid off before the closing on our New York
3  house.
4      Q.  Okay.  Were you ultimately able to keep that
5  house?  Is that the house you live in now?
6      A.  Yes, thank God.
7      Q.  How were you able to do that if these loans
8  weren't paid off?
9      A.  First we went to Disciplinary Counsel's
10 office, and that started, I guess, an investigation
11 into what was going on.  And then I think Mr. Forsten
12 came into play where he was doing the investigation.
13 So I was constantly in contact with him as to what
14 our case was and what we had owed, and just updating
15 him with our mortgages.
16         And then from there, at the same time I
17 ended up getting in touch with the buyer's mortgage
18 company, Gilpin Mortgage, and in touch with them
19 because they had, I found out that they somehow put
20 in a claim with Ticor Title Insurance Company, which
21 is Mr. Anker's title insurance company, thinking
22 maybe they might pay out.  So I got hold of their
23 attorney, and I wrote them a letter trying to find

Bashir - Direct                                    48

1  out -- well, at least pleading my case saying can you
2  please somehow pay off my mortgage because my house
3  up in Albany is contingent upon everything going on
4  here.  And they denied it, they said no, they came
5  back and they said no, they are not going to pay it
6  off.
7      Q.  Okay.  Was it ultimately paid off?
8      A.  It was ultimately paid off.  Because then my
9  next step was to go to the Lawyer's Fund.  And then I
10 pleaded to them.  And I was writing letters on a
11 daily basis to somebody or other to try to find out
12 who can help us.  So they finally came through for us
13 . in mid-October.  But at least they told us that they
14 were going to pay it off, but as to when the payoff
15 was going to happen, we didn't know.  So we were
16 still in the red because we didn't know if our payoff
17 was going to be in time for the closing.
18     Q.  Was it?
19     A.  It, thankfully, was actually the day before
20 our closing.  And it's because we didn't know we had
21 to make other arrangements, because we were getting,
22 our lease was up on the apartment, they had already
23 rented that apartment out to somebody else, and they

Bashir - Direct                                                 49

1  didn't have another apartment for us to move into.
2  We tried to get another backup, just as a backup
3  because we didn't know what was going to happen, an
4  apartment at another apartment complex. But then our
5  credit now was destroyed. We had excellent credit
6  before going into all of this, and now that we were
7  showing we defaulted for four months, or so, on our
8  mortgages, our credit was completely destroyed, so
9  nobody was willing to rent us another apartment. So
10 then we decided, okay, everything we own we'll put it
11 into storage, and my husband will have to live at a
12 hotel, I'll have to move back in with my parents
13 until everything gets resolved.
14    Q.   Did you expect any of this when you sat down
15 at that table on June 4th, 2003?
16    A.   No, not at all.
17         MR. LUGG: Can I have one moment,
18 your Honor?
19         THE COURT: Yes, you may.
20         MR. LUGG: Ma'am, thank you. My colleague
21 may have some questions for you.
22         THE WITNESS: Okay.
23         MR. WENDELBURG: May I first ask to have two

Bashir - Cross                                                  50

1  documents marked first for identification, please?
2         THE COURT: Sure.
3         THE CLERK: Be Defense Identification A
4  and B.
5                CROSS-EXAMINATION
6  BY MR. WENDELBURG:
7     Q.   Mrs. Bashir, good morning. My name's Allan
8  Wendelburg. We haven't spoken before, have we?
9     A.   No, I don't think so.
10    Q.   A few weeks ago did you get a phone call at
11 your house from an investigator acting on my behalf
12 named Bill Glanz?
13    A.   Yes.
14    Q.   And do you remember speaking with Mr. Glanz?
15    A.   Yes.
16    Q.   Do you remember Mr. Glanz asking you if you
17 would care to make a statement to him?
18    A.   Yes, he did.
19    Q.   And did you tell him that you couldn't deal
20 with him at that point, but you'd call him back?
21    A.   Right. Or he'd have to call me back.
22    Q.   Did you wind up calling him back?
23    A.   He did.

Bashir - Cross                                                  51

1     Q.   He called you back, and did you give him a
2  statement at that time?
3     A.   I had just briefly spoken with him.
4     Q.   Did he ask you some questions?
5     A.   He did.
6     Q.   And did you give him answers or tell him
7  that you would speak with him?
8     A.   Well, at the time it was very difficult for
9  me to talk, but I did try to speak with him briefly.
10    Q.   Okay. You wound up not giving him an
11 interview at that time; is that correct?
12    A.   No, I couldn't, my kids were... And I
13 really wasn't looking to actually give him an
14 interview, I was just looking to give him some small
15 questions that he just needed to know.
16    Q.   You had mentioned that in, I think it was
17 late July, if I have the chronology right, you put
18 together a multi-page later which you wound up giving
19 to the Office of Disciplinary Counsel?
20    A.   Yes.
21    Q.   Which was the time-line of all the problems
22 that you had been through concerning this settlement;
23 is that right?

Bashir - Cross                                                  52

1     A.   Yes.
2     Q.   Now, did you write that letter with the idea
3  that you were going to give it to the Disciplinary
4  Counsel?
5     A.   Not at that -- we had it as a backup because
6  we thought maybe the money would be wired that
7  morning, and it would be, there would be no problem,
8  but if it wasn't going to be, then I realized I had
9  to do something about it, this cannot drag on any
10 longer. And I didn't know who else to turn to.
11    Q.   Who were you writing the letter for? Who
12 was it intended to be received by?
13    A.   We had found out that there was a counsel
14 that helps, or if there's, you have an issue with an
15 attorney or somebody that you think is doing
16 something wrong. So that was basically just trying
17 to explain to them what had happened. And maybe they
18 might be able to help us out.
19    Q.   So when you and your husband -- and I take
20 it both of you together were doing this letter?
21    A.   Yes.
22    Q.   When you and your husband were drafting this
23 letter, the intent was that it would be seen by

Carmine - Direct

1   speak with anyone from Gilpin Mortgage?
2       A.   I spoke with Anne Riley very briefly about
3   it.
4       Q.   And did you learn of the loan that was taken
5   out by Mr. Chambers to effectuate the purpose of that
6   property?
7       A.   Yes. And I also spoke to Mr. Chambers.
8   I omitted that.
9       Q.   You spoke with him about this case, as well?
10      A.   Yes.
11          MR. LUGG: If I may approach? And,
12  your Honor, for ease of reference, at this point may
13  I have this marked as State's for Identification A?
14          THE COURT: Yes.
15          THE CLERK: Be State's A, your Honor.
16  BY MR. LUGG:
17      Q.   You indicated that you had researched and
18  obtained various records from and concerning the
19  defendant's escrow and operating accounts; is that
20  correct?
21      A.   Yes.
22      Q.   What bank, with what bank were those
23  accounts held?

Carmine - Direct    102

1       A.   The Wilmington Trust Company.
2       Q.   Okay. And who did you have contact with at
3   Wilmington Trust concerning Mr. Anker's accounts?
4       A.   Allison Berl was their contact person in
5   their fraud security unit. She's currently now in
6   their legal department, but receives all subpoena
7   requests from outside agencies.
8       Q.   And are these records that she has
9   accessible to her that she provided to you?
10      A.   That's correct.
11          MR. LUGG: May I approach the witness,
12  your Honor?
13          THE COURT: Certainly.
14      Q.   I'm handing you a document that is actually
15  opened to a page. Are you familiar with, reviewing
16  briefly what I've handed you, the documents that I've
17  provided to you?
18      A.   Yes. It's a book comprising escrow account
19  from January of '02 through August '03 for the Anker
20  law firm.
21      Q.   Okay. Turning to the portion that I've
22  placed before you, you heard Mr. Chambers testify,
23  and admitted as evidence were two mortgage pieces,

103

1   two loans that he had received from Gilpin Mortgage?
2   Are those funds, or the deposit or receipt of those
3   funds reflected in the account statement, escrow
4   account statement of Daniel Anker?
5       A.   Yes. There's a deposit slip for the escrow
6   account, account No. 25142128, dated June 4th, 2003,
7   it has a, it has four items of deposit on there. Two
8   of the items relative to the matter at hand is a
9   cashier's check, the first item is a cashier's check
10  from Gilpin Financial Services dated June 4th, '03,
11  in the amount of $210,400 payable to Dan Anker
12  attorney trust account. And it's, there's a footnote
13  on the bottom of the check, Chambers, comma, D.
14      Q.   Is there a second check also from Gilpin?
15      A.   There is. There's a second check also dated
16  June 4th, '03, payable to Dan Anker attorney trust
17  account for $22,600, and again footnoted Chambers,
18  comma, D.
19      Q.   Admitted as that -- I'm sorry?
20      A.   They are so indicated on the deposit slip.
21      Q.   Okay. And are those deposits reflected in
22  the general account statement for that month?
23      A.   They are.

Carmine - Direct    104

1       Q.   Have you reviewed those records -- strike
2   that, please.
3           Have you reviewed the HUD-1 or a settlement
4   sheet that was admitted through Ms. Bashir pertaining
5   to that real estate transaction?
6       A.   Yes, I did.
7       Q.   Okay. And are you familiar with the fact
8   that the disbursements were to be made based upon
9   this closing?
10      A.   It was so indicated on the settlement sheet.
11      Q.   Have you reviewed those escrow documents or
12  escrow statements that you received from Wilmington
13  Trust Company to find the disbursements of funds for
14  Principal and Sovereign Mortgage on behalf of
15  Ms. Bashir?
16      A.   I did.
17      Q.   And could you tell us if you found any
18  disbursements from Mr. Anker's escrow account prior
19  to July 30th when you became involved in this
20  investigation?
21      A.   No, there were none.
22      Q.   For either Principal or Sovereign?
23      A.   For Principal or Sovereign.

Carmine - Cross    105

1    MR. LUGG: I have no other questions at this
2   time.
3        MR. WENDELBURG: Your Honor, may I have just
4   a moment to consult with Mr. Lugg?
5        THE COURT: (No audible response.)
6        (Counsel confer.)
7        CROSS-EXAMINATION
8   BY MR. WENDELBURG:
9    Q.  Detective Carmine, good morning again.
10   A.  Good morning.
11   Q.  I understand that you're going to be called
12  to the witness stand after each of the homeowners in
13  this trial to testify as to what you found with
14  respect to each of their settlements. Is that your
15  understanding, as well? In other words, we're going
16  to see you nine times in this case?
17   A.  Unfortunately.
18   Q.  Well, there's nothing wrong with your
19  appearance, Detective, no.
20       In that case, I'm going to confine myself
21  just to the Bashir/Chambers settlement, but we'll
22  talk again after each time you get on the witness
23  stand.

Carmine - Cross    106

1        And, incidentally, you are also under
2   subpoena by the defense in this case, as well, are
3   you not, you understand that?
4    A.  I found a copy of a subpoena with a note
5   attached to it in my mailbox, yes.
6    Q.  Okay. And the note attached to it had to do
7   with scheduling you for this trial; is that right?
8    A.  Yes.
9    Q.  Okay. And that subpoena was a subpoena
10  duces tecum, was it not?
11   A.  I don't know, because I didn't get it until
12  today.
13   Q.  Okay. Have you seen the subpoena?
14   A.  Just glanced at it, because I would be here
15  for the duration.
16   Q.  If I use the term, "subpoena duces tecum,"
17  you've been in law enforcement longer than I've been
18  a lawyer, do you understand what duces tecum means?
19   A.  Yes.
20   Q.  It means bring documents with you?
21   A.  Yes.
22   Q.  Now, you have more documents in this case
23  than simply the escrow account information that's in

Carmine - Cross    107

1   front of you; is that correct?
2    A.  That's correct.
3    Q.  In fact, you're in charge of this
4   investigation, is that right, sir?
5    A.  Yes.
6    Q.  For the State, that is?
7    A.  For the investigative phase of it.
8    Q.  The documents that you -- well, if I may,
9   let me take a look at the book.
10       MR. WENDELBURG: May I approach the witness,
11  your Honor?
12       THE COURT: (No audible response.)
13   Q.  What do you have in here, Detective?
14   A.  The escrow account statements for the escrow
15  account, with copies of the checks, disbursements and
16  deposits.
17   Q.  Okay. So in here are not just the account
18  statements, but also photocopies of the checks
19  themselves that are reflected in the statements?
20   A.  That's correct.
21   Q.  Okay.
22   A.  And copies of the deposits.
23   Q.  The deposit slips, you mean?

Carmine - Cross    108

1    A.  The slips and the supporting documents or
2   items that were deposited.
3    Q.  The actual checks that went in?
4    A.  Yes.
5    Q.  Okay. You testified that you met with
6   Mr. Anker, my client, Mr. Forsten, the receiver, and
7   me at the Anker law office on August the 6th of '03;
8   is that correct?
9    A.  I said the 6th? No, we met later, we met on
10  the 18th, I believe.
11   Q.  I'm sorry. Was that the 18th of August?
12   A.  I might have said the 6th, but, yes, August
13  18th.
14   Q.  Was there just one such meeting, to your
15  recollection?
16   A.  Between the three of us at the law firm?
17   Q.  Yeah.
18   A.  Yes, sir.
19   Q.  Okay. What was the purpose of the meeting?
20   A.  I had made arrangements with Mr. Forsten to
21  meet with him and do a review of the office, and
22  Mr. Anker -- and I believe you had requested to be
23  there -- and Mr. Anker was also there. And I met

Carmine - Redirect    121

1    A.  It was under possession or under the control
2    of Mr. Richard Forsten.
3    Q.  So is that through whom you sought to obtain
4    these various documents that you've described for us?
5    A.  Yes.
6    Q.  And counsel began the cross indicating that
7    we may see you several times throughout this case.
8    You, in fact, conducted independent investigations
9    and review of documents pertaining to each of the
10    various transactions that were discussed at this
11    point in our opening statements; is that correct?
12    A.  Yes.
13    Q.  And, in fact, you've reviewed that binder of
14    material with respect to each of those transactions;
15    is that correct?
16    A.  Yes.
17        MR. LUGG:  Thank you.
18        MR. WENDELBURG:  No further questions,
19    your Honor. For the record, I'm not releasing
20    Detective Carmine from the defense subpoena at this
21    point.
22        THE COURT:  That's understood. Step down
23    for the present time, we expect to see you again.

122

1        MR. LUGG:  The State calls Phillip Urban,
2    your Honor.
3            ... PHILLIP URBAN,
4    having been duly sworn according to law, was examined
5    and testified as follows...
6        DIRECT EXAMINATION
7    BY MR. LUGG:
8    Q.  Mr. Urban, good afternoon. How are you?
9    A.  I'm fine. Thank you.
10    Q.  Good.
11        Mr. Urban, do you know a person named Dan
12    Anker?
13    A.  Yes.
14    Q.  How do you know him?
15    A.  He is my cousin.
16    Q.  And do you see him in this courtroom?
17    A.  Yes. He's sitting over there (indicating).
18    Q.  He's sitting over there, that's to my right
19    as I face you?
20    A.  Yes.
21    Q.  How long have you known Mr. Anker?
22    A.  He's been my cousin all my life, so it's 33
23    years.

Urban - Direct    123

1    Q.  In addition to the family relationship, have
2    you also had business dealings with Mr. Anker?
3    A.  Yes. He was my attorney for a mortgage and
4    a refinance.
5    Q.  Okay. You say for a mortgage and a
6    refinance. When was that first mortgage that you
7    talk about entered into?
8    A.  I guess, around '99.
9    Q.  Okay. And what were you mortgaging?
10    A.  A house, a property at 940 Wildel Avenue.
11    Q.  Is that where you currently reside?
12    A.  Yes.
13    Q.  Is that in New Castle County?
14    A.  Yes.
15    Q.  State of Delaware?
16    A.  Yes.
17    Q.  Okay. You mentioned that you obtained a
18    mortgage for that property; is that correct?
19    A.  Yes.
20    Q.  And through which bank did you secure that
21    mortgage for?
22    A.  WSFS.
23        MR. LUGG:  If I may approach the witness,

Urban - Direct    124

1    your Honor?
2        THE COURT:  Certainly.
3    Q.  Do you recognize the document that I'm
4    handing you?
5    A.  Yes.
6    Q.  And what is that document?
7    A.  This is the mortgage that I signed with
8    WSFS.
9    Q.  Okay. And that was in 1999 that you
10    achieved that property and that mortgage?
11    A.  Yes.
12    Q.  And how much did you borrow to secure that
13    property?
14    A.  $64,000.
15    Q.  Okay. Were you obligated to make payments
16    to WSFS after 1999 when that mortgage was executed?
17    A.  Yes.
18        MR. LUGG:  The State would move to admit the
19    mortgage document as the State's next exhibit,
20    please.
21        THE COURT:  Mr. Wendelburg.
22        MR. WENDELBURG:  No objection, your Honor.
23        THE COURT:  Very well. It's admitted.

Urban - Direct                    125

1    MR. LUGG: Thank you, sir.
2    THE CLERK: State's Exhibit No. 7.
3    MR. LUGG: Thank you.
4 BY MR. LUGG:
5    Q.  You indicate that you still live in that
6 property, correct?
7    A.  Yes.
8    Q.  At some point in time, and you told us about
9 your cousin representing you in a refinancing of that
10 loan; is that right?
11    A.  Yes.
12    Q.  When is it that you sought to refinance that
13 property?
14    A.  I think it was around 2002.
15    Q.  Okay. And why is it that you wanted to
16 refinance that property?
17    A.  I was buying a house for my deceased
18 cousin's two kids and her mother to live in so we can
19 raise the kids there.
20    Q.  Was that a house that was going to be near
21 your home?
22    A.  Yeah. It was about six blocks away.
23    Q.  Okay. And did you acquire a new bank or a

Urban - Direct                    126

1 new lender for the mortgage that you were going to
2 execute in 2002?
3    A.  Yes. That was GMAC.
4    Q.  Okay. And how many loans did you secure
5 with GMAC?
6    A.  I got a mortgage and an equity line, so,
7 two.
8    Q.  Two loans.
9       And did you complete the application and the
10 paperwork pertaining to those loans with GMAC?
11    A.  Yes.
12    Q.  And did you, in fact, receive the loans from
13 GMAC as you expected?
14    A.  Yes.
15    MR. LUGG: If I may approach again,
16 your Honor?
17    THE COURT: Sure.
18    Q.  Sir, I'm handing you a document. Do you
19 recognize what I've placed before you?
20    A.  It looks like the GMAC mortgage.
21    Q.  And what sum were you borrowing from GMAC to
22 enable you to transact on these two houses?
23    A.  Well, right offhand I can't remember.

Urban - Direct                    127

1    Q.  Reviewing that document as it's before you,
2 do you see the amount that you were borrowing from
3 GMAC?
4    A.  I'm looking for that now. (Pause.)
5    Q.  If I may draw your attention to the second
6 page of that, about a third of the way down, does
7 that indicate the sum that was to be borrowed?
8    A.  Yeah. $88,000.
9    Q.  Okay. And did you, in fact, to your
10 understanding, borrow $88,000 from GMAC?
11    A.  Yes.
12    MR. LUGG: The State would move to admit the
13 GMAC mortgage as the State's next exhibit.
14    THE COURT: Mr. Wendelburg.
15    MR. WENDELBURG: Without objection,
16 your Honor.
17    THE COURT: Very well.
18    THE CLERK: State's Exhibit No. 8.
19 BY MR. LUGG:
20    Q.  After receiving confirmation of your ability
21 to secure this loan, did you meet with Mr. Anker at
22 his office to refinance the property?
23    A.  I believe that it was Laura that I met with.

Urban - Direct                    128

1.    Q.  Okay. Mr. Anker wasn't present for this?
2    A.  I don't think so.
3    Q.  Was Mr. Anker, to your knowledge, did you
4 discuss with him your refinancing of that
5 940 Wildel property?
6    A.  Not that I can remember, but, you know, most
7 of my dealings were with Laura when I called on the
8 phone.
9    Q.  Okay. Do you recall speaking with Mr. Anker
10 about this mortgage with GMAC that you were taking
11 out to pay off the Wilmington Savings Fund Society
12 mortgage?
13    A.  At some point I did, I just don't remember
14 when.
15    Q.  So you did have a conversation with him
16 concerning this?
17    A.  Yeah.
18    Q.  And what were the contents of your
19 conversations with Mr. Anker concerning this new loan
20 that you were taking out?
21    A.  What was that question again?
22    Q.  What were the contents, what was the
23 substance of the conversations that you had with

Urban - Direct                    133

1    A.   Yes.
2    Q.   And does that document reflect the
3    preexisting mortgages which were to be paid off by
4    virtue of this refinancing?
5    A.   Yes.
6    Q.   And what were the sums to be paid off by
7    virtue of this refinancing?
8    A.   What was that question again?
9    Q.   What was the sum to be paid off by virtue of
10   this refinancing?
11   A.   $57,408.56.
12   Q.   And what bank was to be paid from that?
13   A.   The Wilmington Savings Fund Society.
14   Q.   And was it your understanding that that was
15   to occur after your closing or having this
16   refinancing?
17   A.   Yes.
18   Q.   Okay. Did that, in fact, occur?
19   A.   Apparently not.
20        MR. LUGG: The State would move to admit the
21   settlement sheet as the next State's exhibit.
22        MR. WENDELBURG: No objection, your Honor.
23        THE COURT: It's admitted.

Urban - Direct                    134

1         MR. LUGG: Thank you.
2         THE CLERK: State's Exhibit No. 9,
3    your Honor.
4    BY MR. LUGG:
5    Q.   You said, "Apparently not." Could you
6    please explain?
7    A.   Well, through the months and the year
8    afterwards I kept getting automatic deductions from
9    my savings account which was set up to pay the
10   mortgage. And then sometime last year I got a notice
11   saying that my mortgage was in default.
12   Q.   Okay. Which mortgage was that that you were
13   advised was in default?
14   A.   The one for the Wilmington Savings Fund
15   Society.
16        MR. LUGG: Okay. If I may approach,
17   your Honor?
18        THE COURT: You may.
19   Q.   You've indicated that you received a notice
20   that your mortgage was in default?
21   A.   Correct.
22   Q.   Do you recognize the document that I've
23   placed before you?

Urban - Direct                    135

1    A.   Yes.
2    Q.   What is that document that I've placed
3    before you?
4    A.   Foreclosure data sheet.
5    Q.   And what is that indicating foreclosure for? -
6    A.   Property of 940 Wildel Avenue.
7    Q.   And when did you receive that, if you
8    recall?
9    A.   Sometime last year.
10   Q.   Okay.
11   A.   Around the summertime.
12   Q.   The summertime of last year?
13   A.   Yes.
14   Q.   So we're talking late 2001, in early 2002 is
15   when you sought to refinance your property, correct?
16   A.   Right.
17   Q.   You were still receiving documents from the
18   original lender in last summer?
19   A.   I was still receiving deductions last summer
20   -- well, the -- yeah, I got them documents and
21   something, another document which was a penalty for
22   late payments, and stuff like that.
23        MR. LUGG: The State would move to admit the

Urban - Direct                    136

1    foreclosure data sheet as the State's next exhibit.
2         MR. WENDELBURG: Without objection.
3         THE COURT: It's admitted.
4         THE CLERK: State's Exhibit No. 10.
5    BY MR. LUGG:
6    Q.   When you learned of this problem concerning
7    your WSFS loan, that the payments were still being
8    deducted, what did you do?
9    A.   I contacted Dan's office.
10   Q.   And did you speak with Dan?
11   A.   No. I spoke with Laura.
12   Q.   Did you ever speak with Dan about the WSFS
13   loan?
14   A.   No. I don't believe that Dan was ever in
15   the office when I was calling.
16   Q.   Did you ever speak to him at any family
17   gatherings or family get-togethers concerning your .
18   problems with WSFS?
19   A.   No. We've really never seen each other at
20   the family gatherings.
21   Q.   Okay. And did you advise Ms. Larks of your
22   problems that you were having?
23   A.   Yes.

Urban - Direct 137

1    Q.  And what did you learn with respect to your
2  WSFS loan?
3    A.  From Mrs. Larks, she kept telling me that
4  they were having a problem at the bank and she was
5  working on it.  And this went month to month, as she
6  was saying that they were still trying to get the
7  problem ironed out.
8    Q.  Okay.  And what is your -- see, I'm having a
9  tough time figuring this out -- how are you related,
10  Ms. Larks would be your second cousin; is that right?
11    A.  I believe so.
12    Q.  How much contact have you had with her
13  through your 33 years?
14    A.  Probably, pretty much would be right there
15  with the law firm.
16    Q.  Okay.  Have you had more or less contact
17  with Mr. Anker throughout your lifetime than with
18  Ms. Larks?
19    A.  I've had more, but not a whole lot more.
20    Q.  Okay.  You were told that things were being
21  worked on?
22    A.  Correct.
23    Q.  And what was done with respect to your, the

Urban - Direct 138

1  payments that were coming out of your WSFS accounts?
2    A.  I started getting checks back from Dan's law
3  firm for reimbursements.
4    Q.  And who gave you those checks?
5    A.  Laura.
6    Q.  And how many reimbursements did you receive,
7  if you recall?
8    A.  Three or four.
9    Q.  Three or four.
10    MR. LUGG:  And if I may, your Honor, I think
11  for ease of reference, these may be best marked for
12  identification at this point.
13    THE COURT:  Very well.
14    THE CLERK:  It will be State's ID-B, C,
15  and D, your Honor.
16    THE COURT:  Thank you.
17    MR. LUGG:  May I approach the witness,
18  your Honor?
19    THE COURT:  Certainly.
20    MR. LUGG:  Thank you.
21  BY MR. LUGG:
22    Q.  Sir, I'm handing you what's been marked as
23  State's Exhibit for Identification B.  Do you

Urban - Direct 139

1  recognize that check?
2    A.  Yes.
3    Q.  Is that one of the checks that you received
4  to compensate you for the withdrawals to your WSFS
5  account?
6    A.  Yes.
7    Q.  And what was the value of that check?
8    A.  $2,300.
9    Q.  And what was the date of that check?
10    A.  April the 10th of 2002.
11    Q.  Okay.  The second document I placed before
12  you is State's for Identification C.  Is that a
13  document or a check that was presented to you?
14    A.  Yes.
15    Q.  Again, by whom?
16    A.  Daniel Anker's law firm.
17    Q.  Okay.  And who in particular handed that to
18  you?
19    A.  Laura.
20    Q.  And what is the value of that check?
21    A.  $7,500.
22    Q.  And what is the date of that check?
23    A.  November the 12th of 2002.

Urban - Direct 140

1    Q.  And what was your understanding as to what
2  that check was payment for?
3    A.  This was, to my understanding, was for
4  reimbursements for what was owed to me from WSFS
5  taking money out, and the settlement from the bank
6  saying that the problem's cleared up, for my
7  inconvenience.
8    Q.  What do you mean a settlement from the bank?
9    A.  Apparently, what I was told from Laura was
10  that for all the problems that had been going on with
11  the whole thing, this was a settlement for, just the
12  hassle that I have been going through getting the
13  whole thing resolved.
14    Q.  Did you ever see any signed settlement
15  papers or lawsuit papers?
16    A.  No.
17    Q.  Okay.  And did your uncle -- or your
18  cousin -- I'm sorry -- ever provide you with
19  documents pertaining to this settlement that you've
20  told us about?
21    A.  No.
22    Q.  Finally I present to you State's for
23  Identification D.  And do you recognize that

Urban - Direct    141

1  document?
2     A.  Yes.
3     Q.  Is that, again, a check that you were
4  provided?
5     A.  Yes.
6     Q.  And when was that check issued to you?
7     A.  January 13th of 2003.
8     Q.  Okay. And, again, what was your
9  understanding of what that check was to be for?
10    A.  That was for the reimbursements for
11  everything, for the bank still taking the money out
12  of the account.
13    Q.  Okay. At some point in time did you cease
14  the withdrawal of the funds from your account?
15    A.  Yes. I was instructed by Laura to go to the
16  bank and fill out the paperwork to stop the automatic
17  deductions and to have the bills sent, and she'd give
18  me the law firm's address to have everything sent to
19  them.
20    Q.  Did, in fact, you do this?
21    A.  Yes, I did.
22    Q.  And did the automatic withdrawals stop from
23  your account?

Urban - Direct    142

1     A.  Yes, they did.
2     Q.  And did you learn if your Wilmington Savings
3  Fund Society original mortgage from 1999 was paid or
4  satisfied?
5     A.  Just by word of mouth from Laura.
6     Q.  Okay. And were you making payments
7  throughout this time on your GMAC loan?
8     A.  Yes.
9     Q.  And was that both for the equity line and
10  for the mortgage that you secured?
11    A.  Yes.
12    Q.  And did you make those payments on a monthly
13  basis?
14    A.  Yes.
15       MR. LUGG: May I have one moment,
16  your Honor?
17       THE COURT: Yes.
18       MR. LUGG: Thank you, sir. I have no other
19  questions.
20       THE WITNESS: Thank you.
21          CROSS-EXAMINATION
22  BY MR. WENDELBURG:
23    Q.  Mr. Urban, good afternoon. I'm Allan

1  Wendelburg. I think we've spoken on the phone, but
2  we've never met before; is that correct?
3     A.  Correct.
4     Q.  Mr. Lugg has asked you to testify about the
5  financing of two separate houses in this case. One
6  is the house that you live in that you bought in
7  1999, and the other is a house that you bought for
8  somebody else in 2002; is that correct?
9     A.  Correct.
10    Q.  All right. And what you did was, if I
11  understand your testimony correctly, in 1999 you got
12  a mortgage from WSFS to buy your residence on Wildel
13  Avenue, and then in 2002 you got a refinancing of
14  that house which allowed you to put money down to buy
15  this second house that somebody else lives in; is
16  that right?
17    A.  Yeah.
18    Q.  Okay. Mr. Anker did the settlement on your
19  original property purchase of Wildel Avenue in 1999;
20  is that correct?
21    A.  Yes.
22    Q.  And Ms. Larks was not in his office at that
23  time; is that right?

Urban - Cross    144

1     A.  No, she was not.
2     Q.  Who did you deal with then?
3     A.  Chandler was the one I dealt with.
4     Q.  Chandler Land?
5     A.  Yes.
6     Q.  He was Dan's assistant in those days?
7     A.  Yes.
8     Q.  When the time came to refinance in 2002, who
9  did you initially ask to do the refinance settlement
10  for you?
11    A.  I'm pretty sure that I talked to Laura on
12  the phone.
13    Q.  And did you tell her both that you wanted to
14  refinance your present home and also buy another
15  house?
16    A.  I'm pretty sure that that was all disclosed
17  at that time.
18    Q.  This was all to be one deal together?
19    A.  Yeah. It was to refinance my house, and the
20  money from the -- the money that went above what my
21  mortgage was and the equity line was to pay for the
22  other house.
23    Q.  The other house was being sold to you by

Urban - Cross                                    149

1    A.  Yes.
2    Q.  Have we subpoenaed you to come and talk to
3  us?
4    A.  No.
5    Q.  Let's go back to the mortgage on your, the
6  WSFS mortgage on your Wildel Avenue house. Have you
7  at any time become aware that the mortgage on that
8  Wildel Avenue house, the one held by WSFS, has been
9  satisfied?
10   A.  I have, yes.
11   Q.  And do you know when that occurred?
12   A.  A couple months ago.
13   Q.  That it was satisfied, that the mortgage was
14  satisfied a couple of months ago?
15   A.  Right.
16   Q.  That's the old WSFS mortgage?
17   A.  Yeah. The Lawyers Association satisfied the
18  mortgage.
19   Q.  Okay. If I use the term mortgage, and then
20  I use the term note, do those document -- do those
21  terms mean anything different to you?
22   A.  Not really.
23   Q.  Okay. When you say that you believe that

Urban - Cross                                    150

1  your mortgage was satisfied a couple of months ago,
2  did you also understand that to mean that you no
3  longer owed a debt to Wilmington Savings Fund Society
4  for that house?
5    A.  Yes.
6    Q.  Okay. Mr. Lugg asked you to identify three
7  checks that were given to you by Laura to compensate
8  you in some way for payments made to WSFS. And in
9  one of those checks, one for $7500, your testimony, I
10  think, was that this included mortgage payments and a
11  settlement from the bank. Now, when you talk about
12  settlement from the bank, what is it that you mean?
13   A.  That's what I was told, it was a settlement
14  for the bank for the problem going on as long as it
15  did.
16   Q.  Okay. This was in addition to mortgage
17  payments that you had been obligated to make; is that
18  right?
19   A.  Yes.
20   Q.  Do you know how much of that $7500
21  represented the settlement and how much of it was
22  mortgage payments?
23   A.  No, I could not tell you.

Urban - Cross                                    151

1    Q.  Did anybody tell you?
2    A.  No.
3    Q.  I want to see that I understand the stages
4  that your relationship with WSFS went through and the
5  way that the payments were made, the way that you set
6  up payments and the way that you were told the
7  payments were being made.
8        Initially in 1999 when you took the mortgage
9  out from WSFS, did you arrange for the automatic
10  payments or automatic deductions that you've talked
11  about?
12   A.  Yes.
13   Q.  That was from the very git-go?
14   A.  Right.
15   Q.  And were these made, and I think you said
16  from your savings account, was it savings or
17  checking?
18   A.  No. I think it was my checking account.
19   Q.  And was that a WSFS checking account?
20   A.  Yes, it was.
21   Q.  And how long did that automatic payment
22  thing continue?
23   A.  Until I withdrew it, I guess, a year or so

Urban - Cross                                    152

1  after the mortgage was taken on the refinance.
2    Q.  Okay. So when you say you withdrew it, you
3  went to the bank, you told WSFS to stop making these
4  automatic deductions?
5    A.  I went there and filled out paperwork to
6  stop the automatic deductions.
7    Q.  Okay. And this was about a year after the
8  refi.?
9    A.  Yeah.
10   Q.  How were payments made then, if you know?
11   A.  The only thing I was told after that was
12  that Laura would have the bills sent to them and they
13  would handle everything from there. And at that
14  point I had had enough about it.
15   Q.  By then, I'm sorry?
16   A.  I had enough faith that they were sent
17  there.
18   Q.  When did you hear that your mortgage was in
19  default?
20   A.  When I got a letter from WSFS.
21   Q.  Was that before or after you stopped the
22  automatic deductions?
23   A.  That was well after I stopped the automatic

157

| | |
|---|---|
| 1 | THE COURT: You may call your next witness. |
| 2 | MR. LUGG: Thank you, your Honor. |
| 3 | The State calls Douglas Ray. |
| 4 | ... DOUGLAS RAY, |
| 5 | having been duly sworn according to law, was examined |
| 6 | and testified as follows... |
| 7 | DIRECT EXAMINATION |
| 8 | BY MR. LUGG: |
| 9 | Q. Mr. Ray, good afternoon. |
| 10 | A. Good afternoon. |
| 11 | Q. How are you? |
| 12 | A. (Pause.) |
| 13 | Q. Could you tell the jury a little bit about |
| 14 | what you do for a living. |
| 15 | A. I'm a law professor at the Widener |
| 16 | University Law School, with campuses in Wilmington, |
| 17 | Delaware, and Harrisburg, Pennsylvania. For the past |
| 18 | six and a half years I've been the dean of the law |
| 19 | school and stepped out as dean last July. |
| 20 | Q. Are you staying with the school? |
| 21 | A. Yes. |
| 22 | Q. Okay. And you indicated that you're a law |
| 23 | professor, is that -- during your deanship were you a |

158

| | |
|---|---|
| 1 | professor as well as fulfilling the dean's |
| 2 | responsibilities? |
| 3 | A. Yes. |
| 4 | Q. Okay. What are you going to do with the law |
| 5 | school now that you've stepped aside from the role of |
| 6 | dean? |
| 7 | A. I have research leave at the present time, |
| 8 | and I'll be teaching courses in labor law and |
| 9 | employment law. |
| 10 | Q. And prior to your deanship with the Widener |
| 11 | University School of Law, what had you done |
| 12 | professionally? |
| 13 | A. I came here from the University of Toledo |
| 14 | where I was a law professor and an associate dean for |
| 15 | 17 years. Prior to that I taught at the University |
| 16 | of Richmond Law School for three years. Prior to |
| 17 | that I was a lawyer in Minneapolis, Minnesota, for |
| 18 | three years. And at earlier stages of my life I've |
| 19 | worked for the U.S. Department of Labor and the |
| 20 | U.S. Army. |
| 21 | Q. When you came here to become dean of the |
| 22 | Widener University School of Law, did you acquire a |
| 23 | residence locally? |

Ray - Direct    159

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And where is it that you moved? |
| 3 | A. Our home is in Kennett Square. The address |
| 4 | is 26 South Ridge Drive, Pennsylvania. |
| 5 | Q. Okay. And when did you first purchase that |
| 6 | home, approximately? |
| 7 | A. We purchased the home in the fall of 1999. |
| 8 | Q. Okay. And you've lived there continuously |
| 9 | since? |
| 10 | A. Yes. |
| 11 | Q. Are you familiar with a person by the name |
| 12 | of Dan Anker? |
| 13 | A. Yes, I am. |
| 14 | Q. And do you see him in this courtroom? |
| 15 | A. Yes, I do. |
| 16 | Q. And can you identify him for us, please? |
| 17 | A. Yes. He's sitting off to your right in the |
| 18 | second chair next to his counsel. |
| 19 | Q. How is it that you know Mr. Anker? |
| 20 | A. I met Mr. Anker because his wife was a |
| 21 | member of the Widener faculty. And so when my wife |
| 22 | and I came to town from Ohio we met them at that |
| 23 | time, became social friends. |

Ray - Direct    160

| | |
|---|---|
| 1 | Q. Okay. By social friends, describe that. |
| 2 | How often did you get together, what type of things |
| 3 | did you do? |
| 4 | A. I think we went out to dinner with them a |
| 5 | couple of times. Over the course of my six and a |
| 6 | half years here Mr. Anker and I went fishing one |
| 7 | time, I remember. And one time I invited him to play |
| 8 | softball on the faculty softball team at the law |
| 9 | school. |
| 10 | Q. Okay. You indicated that his wife is or was |
| 11 | a professor at the law school? |
| 12 | A. Yes. |
| 13 | Q. As the dean, what was your relationship |
| 14 | professionally to Mr. Anker's wife? |
| 15 | A. I guess you would say I was her supervisor. |
| 16 | Q. And just so we're speaking about the same |
| 17 | person, what is his wife's name? |
| 18 | A. Her first name is Ann. |
| 19 | Q. Okay. And her last name? |
| 20 | A. For most of the... for most of the period of |
| 21 | time that I've known her she was using the name |
| 22 | Anker. I believe recently she may be using the name |
| 23 | Conaway, but I'm not sure. |

Ray - Direct    165

1    THE COURT: Yes.
2    BY MR. LUGG:
3        Q. I'm going to hand back to you what's been
4    marked as State's Exhibit 11. You indicated that you
5    were refinancing from Chase to Chase, so to speak?
6        A. Yes.
7        Q. Does that document indicate -- and I'm
8    directing your attention to lines 1501 and 1502 --
9    specific disbursements that were to be made from your
10   new loan that you acquired with Chase?
11       A. Yes, it does.
12       Q. And can you indicate for the jury what was
13   to happen at that refinancing with respect to the new
14   money and the old money?
15       A. My understanding is that we would assume the
16   indebtedness for our new mortgage, that our old
17   mortgage -- actually, we had two mortgages, we had a
18   primary mortgage and a secondary mortgage, that they
19   would be paid off out of the proceeds from the new
20   mortgage, as well as the $10,000 check which we
21   provided and they had given us.
22       Q. You, in fact, had at this point in time
23   completed the application process for that new

Ray - Direct    166

1    mortgage with Chase; is that correct?
2        A. Yes.
3        MR. LUGG: And if I may approach again,
4    your Honor?
5        THE COURT: Certainly.
6        Q. I'm handing you a document labeled,
7    "Borrower's copy." Do you recognize that document?
8        A. (Pause.) Yes. It appears to be the
9    mortgage and note that we were provided at
10   settlement.
11       Q. Okay. And that was the new mortgage. And
12   what is the date of that mortgage that you're
13   holding? If you can tell.
14       A. At the beginning it says, This document is
15   dated March 6th, 2003.
16       Q. Okay. And what is the value that you had
17   obtained by virtue of this loan? How much were you
18   borrowing at this point in time to refinance?
19       A. $245,000.
20       Q. Okay. And you indicated that that, too, was
21   completed and provided to you at the settlement?
22       A. Yes.
23       MR. LUGG: The State would move to admit the

Ray - Direct    167

1    mortgage and note as the State's next exhibit.
2        MR. WENDELBURG: No objection, your Honor.
3        THE COURT: It's admitted.
4        THE CLERK: State's Exhibit No. 12.
5        Q. These two documents, those being State's 11
6    and State's 12, the HUD-1, or settlement sheet and
7    the mortgage, what was your expectation as to what
8    was to happen with the old loans based upon your
9    acquisition of the new mortgage?
10       A. That the bank would, would mark them
11   satisfied, and that they would be -- and that the
12   satisfaction would be entered in our chain of title.
13       Q. Who was present at Mr. Anker's office on
14   March 6th when you conducted this settlement?
15       A. I was there with my wife Caroline, and
16   Mr. Anker's sister -- I'm sorry -- Mr. Anker's
17   assistant Laura Larks, who as I understand is also
18   his daughter, was present.
19       Q. Was Mr. Anker present?
20       A. Yes.
21       Q. Did you discuss the settlement and the
22   transaction that we have just displayed with
23   Mr. Anker at that time?

Ray - Direct    168

1        A. I don't recall a lot of discussion. And it
2    seemed to go very smoothly, the papers were handed
3    back and forth for signature, and that it just seemed
4    to go very smoothly.
5        Q. Okay. And did you at some point leave his
6    office after executing these various documents?
7        A. Yes.
8        Q. And at this point was, in fact, did you
9    learn that the original Chase note or mortgage was
10   paid or satisfied by virtue of funds disbursed from
11   that closing? .
12       A. That was my understanding.
13       Q. Okay. Did you learn that that, in fact, did
14   occur?
15       A. There were two mortgages. The smaller of
16   the two was a $28,000 mortgage, we did receive notice
17   from Chase that they marked it satisfied. And we
18   later received notice that that had been filed with
19   our title. We never received notice from them that
20   our larger mortgage amounting to about $220,000 was
21   satisfied.
22       Q. Again, referring to State's 11, that would
23   be the mortgage indicated in what you observed to be

Ray - Direct                                                     169

1    the line 1501, the $220,000 mortgage?
2        A.  Yes.
3        Q.  What did you do after learning that somehow
4    and for some reason that 220-some-thousand-dollar
5    mortgage was not paid?
6        A.  Well, originally we received, we continued
7    to receive mortgage statements on that, on that
8    mortgage from Chase.  So they were sending us the
9    monthly bills for our new mortgage which we paid, and
10   they were also sending us the monthly bills for our
11   old mortgage which we did not pay.  And we notified
12   Mr. Anker's office that we continued to get bills.
13       Q.  When you say you notified Mr. Anker's
14   office, who did you notify that you were still
15   getting these bills?
16       A.  I'm not exactly sure.  I think it was
17   probably his assistant, Laura Larks, who usually
18   answered the phone at the office.
19       Q.  Okay.  Did you ever speak with Mr. Anker
20   himself concerning the problems that you were having
21   with the payoff of this Chase loan?
22       A.  Yes.
23       Q.  And when is the first time, approximately,

Ray - Direct                                                     170

1    after that April 6th closing that you had direct
2    contact with Mr. Anker concerning the problems with
3    that Chase loan?
4            THE COURT:  Excuse me.  Just so the record's
5    clear, I thought you said April 6th or March 6th?
6            MR. LUGG:  Thank you, your Honor.  I'm
7    sorry.
8        Q.  March 6th closing.
9        A.  If I remember, we continued to get, to get
10   monthly statements noting we were in arrears from
11   Chase, and we continued to provide notice to his
12   office.  I cannot remember to whom, but at some point
13   I do remember getting in touch with Mr. Anker about
14   this -- especially, especially when the bank started
15   threatening us with foreclosure.
16       Q.  How is it the banks were threatening you
17   with foreclosure?
18       A.  They sent us a letter and a formal notice.
19       Q.  Okay.  And were there any notations or
20   notices placed upon your house during these times?
21       A.  At one point a representative of Chase came
22   out and hung something on our door indicating that we
23   needed to contact them immediately regarding,

Ray - Direct                                                     171

1    regarding a serious matter.  Their collection
2    department was making calls to my office, as well as
3    calls to our home.
4        Q.  Okay.  And you indicated that you at some
5    point had direct contact with Mr. Anker concerning
6    these issues; is that correct?
7        A.  Yes.
8        Q.  What was the first contact and the
9    discussion that you had with Mr. Anker, what did you
10   talk about?
11       A.  I'm not entirely sure what, you know, what
12   the first contact was.  There came a point where we
13   had contacted Chase Bank to the loan officer with
14   whom we had dealt.  And he had indicated to us that
15   the money had been sent to Mr. Anker's office.  So at
16   that point I did contact Mr. Anker by fax and
17   telephone to indicate to him that's what they were
18   saying, and that these were, you know, this was a
19   pretty serious matter.  I think that occurred toward
20   the middle to end of May.
21       Q.  When you contacted him and you advised him
22   that you were having these difficulties and that
23   there was representation made by Chase, what did

Ray - Direct                                                     172

1    Mr. Anker tell you?
2        A.  We were told that, that because of the heavy
3    influx of refinancings, that the banks were having
4    difficulty handling all of the business, that this
5    was not unusual.  We were told that, that this had
6    happened to others of Mr. Anker's clients.  And
7    Mr. Anker mentioned -- and I do not recall when -- he
8    mentioned to me that this had happened with regard to
9    his own mortgage, as well.
10       Q.  And this is information that Mr. Anker tells
11   you; is that right?
12       A.  Yes.
13       Q.  Okay.  And at some point in time did you
14   leave the state of Delaware or Pennsylvania to travel
15   for business?
16       A.  Yes.
17       Q.  When approximately was that that you left
18   the state for business?
19       A.  It was toward the end of May, somewhere
20   around the 26th or the 27th.
21       Q.  Okay.  And that's of the year 2003?
22       A.  Yes.
23       Q.  And at this point were you continuing to

Ray - Direct 173

1  have the problems with Chase as far as the original
2  mortgage?
3      A.  Yes.  Yeah, when I advised Mr. Anker that
4  the bank was saying the money was transferred to his
5  office, he agreed to look into it.
6      Q.  He told you he would look into it?
7      A.  Yes.
8      Q.  And, again, that was the conversation that
9  you had with him?
10     A.  That was before we left town, yes.
11     Q.  Okay.  Did you follow-up on that
12  representation of Mr. Anker that he would look into
13  it while you were traveling out of state after the
14  27th of May?
15     A.  Yes.  I telephoned him from, from Wyoming
16  where we were, and because he -- I think I was
17  supposed to call him back after he checked into it.
18     Q.  Okay.  And did he advise you as to whether
19  or not he had checked into things concerning your
20  Chase loan?
21     A.  Yes.  My recollection is that he said that
22  he and his accountant had gone over the books and
23  that they had not received the money.  And during

Ray - Direct 174

1  that conversation he asked for our authorization to,
2  to settle our claim against Chase.
3      Q.  Now, when you say "settle," are you
4  referring to a real estate settlement?  Or what type
5  of settling are you thinking at this point?
6      A.  I think it was in the context of settling
7  legal claims and potential lawsuits against them.
8      Q.  And you indicated -- who is it you're
9  speaking to about settling against Chase when you
10  were traveling?
11     A.  Yeah.  That was on the cell phone
12  conversation with Mr. Anker from Wyoming.
13     Q.  Okay.  This settlement discussion that you
14  had with Mr. Anker, tell us about that.  And tell us
15  about if there were any figures that were discussed
16  between you and he.
17     A.  My recollection is that, you know, he
18  indicated that Chase was, was way out of line in
19  terms of their collection efforts, calling my work
20  and continuing to institute collection efforts
21  against us when we had already paid off our mortgage.
22  And he asked for, for authority to settle our claims
23  against them for $400,000.

Ray - Direct 175

1      Q.  What is your thought at this point in time
2  when that figure of $400,000 was presented to you?
3      A.  I think, you know, I was skeptical at the
4  time.  I treated it not entirely seriously.  I told
5  him whether it was $40 or $400,000, we wanted our
6  mortgage paid off.
7      Q.  At the conclusion of your conversation were
8  any further arrangements made for you to have contact
9  with Mr. Anker concerning that, was what was
10  discussed of the $400,000 settlement?
11     A.  He had asked us for our cell phone numbers
12  so they could call us back later that day.
13     Q.  Did he call you back later that day?
14     A.  Yes, he did.
15     Q.  And what was he calling to tell you later
16  that day?
17     A.  He called to tell us that he had spoken with
18  the general counsel from Chase, and that, and that
19  Chase had agreed that they were in the wrong, that
20  Chase had agreed to settle our claim against them for
21  $400,000.
22     Q.  What are you thinking now?
23     A.  I'm still not sure that this is for real,

Ray - Direct 176

1  because it sounds like a lot of money.  And I'm still
2  not, not taking it entirely seriously.  But I did
3  follow-up the discussion with him and indicated that
4  if there was a settlement, that we should discuss
5  some sort of contingency fee for him.  And he
6  responded that since he had not signed a contingency
7  agreement with us initially, that he was not asking
8  for fees.  I indicated I wasn't comfortable with
9  that, and we negotiated back and forth for a while
10  and finally agreed that 25 percent of the settlement
11  should be treated as a contingency fee for the
12  lawyer.
13     Q.  And this negotiation you're having over the
14  fee is kind of a strange negotiation, is it not?
15     A.  Yes.
16     Q.  He didn't want to take any money, you're
17  telling us?
18     A.  That was his initial position, yes.
19     Q.  And you're forcing money upon him because
20  you felt he had done something for you; is that
21  correct?
22     A.  Yes.
23     Q.  Okay.  And you negotiated a fee structure.

Ray - Direct    177

1   What was it that you indicated?
2       A.   25 percent.
3       Q.   Of $400,000?
4       A.   Yes.
5       Q.   And so you would collect $300,000 and he
6   $100,000?
7       A.   That was my understanding.
8       Q.   Okay. You're still traveling. What state
9   were you in at this time?
10      A.   I believe we were in Wyoming. We could have
11  been on the border of Montana and Wyoming.
12      Q.   You're out west?
13      A.   Yes.
14      Q.   Okay. And you're now hearing about this
15  $400,000 settlement which you stand to collect
16  300,000. Do you make some arrangements with
17  Mr. Anker at the conclusion of this telephone call?
18      A.   I think we agreed to talk when we got back
19  in town. And I did call him when I returned to town.
20      Q.   Who did you call when you got back?
21      A.   I think I called Mr. Anker.
22      Q.   Okay. And where did you call him?
23      A.   I think I was in my office, and I think I

Ray - Direct    178

1   called him at his office.
2       Q.   Did you speak to him?
3       A.   I believe I did.
4       Q.   And what was the topic of discussion when
5   you had gotten back to town from Wyoming or Montana?
6       A.   He indicated that he had a settlement check
7   for us. And I may have indicated some skepticism at
8   the time, and he was, he responded that he was a
9   little troubled, that it sounded like I didn't
10  entirely believe him.
11      Q.   Did you believe what he was telling you?
12      A.   I don't know. I don't know. We did, I did
13  agree that my wife and I would go to his office. And
14  at that point I think I did start believing him,
15  because it did not feel, sound or smell like a
16  practical joke at that point.
17      Q.   So you thought this was a practical joke of
18  some degree up to that point?
19      A.   I don't know what I thought. I mean, it
20  just didn't -- yeah, I guess we did not take it
21  totally seriously, just in case it didn't happen.
22      Q.   Did you, in fact, go to his office at some
23  point after that phone call?

Ray - Direct    179

1       A.   Yes.
2       Q.   And what was the purpose of going to his
3   office?
4       A.   My wife and I went to his office at his
5   request to pick up the settlement check.
6       Q.   Who did you meet with when you went to pick
7   up this check?
8       A.   I met with Mr. Anker, and I believe that
9   Laura Larks was also present.
10          MR. LUGG: May I approach the witness,
11  your Honor?
12          THE COURT: Certainly.
13      Q.   I'm handing to you a document, a copy of a
14  document, I should say. Do you recognize what I've
15  handed to you?
16      A.   Yes.
17      Q.   What is that that I've handed to you?
18      A.   That is the check that we were provided that
19  day.
20      Q.   What is the sum of the check that you were
21  provided?
22      A.   It is made out for $300,000.
23      Q.   Okay. And the document I've handed you, in

Ray - Direct    180

1   fact, contains the front and back portion of that
2   check; is that correct?
3       A.   I believe so. And it does contain a, that
4   is my signature on the back.
5       Q.   You endorsed that check?
6       A.   Yes.
7       Q.   Did you deposit it?
8       A.   Yes.
9           MR. LUGG: The State would move to admit the
10  $300,000 check as the State's next exhibit.
11          MR. WENDELBURG: No objection, your Honor.
12          THE COURT: It's admitted.
13          THE CLERK: State's Exhibit No. 13.
14  BY MR. LUGG:
15      Q.   When you collected this check from Mr. Anker
16  at his office, did you talk about what was going on,
17  the settlement with Chase?
18      A.   Yeah, I believe we did.
19      Q.   Can you tell us about that conversation?
20      A.   I think, you know, I think, first off, my
21  wife and I were very thankful and grateful that this
22  amount of money had been provided. And I asked for
23  the opportunity to take Mr. Anker and his daughter

Ray - Direct                                    181

1    out for lunch to celebrate. I believe I mentioned at
2    this time, although it could have been in a later
3    meeting, that I was surprised that there wasn't a
4    formal settlement agreement from the bank that we had
5    to sign. I believe during that conversation that
6    Mr. Anker indicated that others of his clients had
7    also received recoveries because of similar breaches
8    by the banks.
9         Q.   In talking, you indicated that you were
10   surprised there was no formal signed document. What
11   is it that you mean by that, what would you be
12   looking for?
13        A.   I guess I would have, I would have thought
14   that there would be a settlement and release wherein
15   exchange for this money, that we would have to sign a
16   piece of paper releasing Chase from, from any further
17   liability and agreeing not to sue them in the future.
18   Now, I'm not absolutely positive, I know this
19   conversation took place a couple of times, but I'm
20   not, I'm not absolutely certain that took place in
21   the office on that day.
22        Q.   Okay. When you say the conversation took
23   place a couple of times, does that mean you discussed

Ray - Direct                                    182

1    the issue of a release from Chase multiple times with
2    the defendant?
3         A.   Yes, twice.
4         Q.   And were you ever provided with any
5    documents from Chase indicating the terms of the
6    settlement and the release of that company from its
7    obligation -- from your obligation, at least?
8         A.   Yes. At that meeting in the office I was
9    provided a copy of a letter bearing a Chase
10   letterhead on the top that did set out the terms for
11   the settlement.
12        MR. LUGG:  May I approach the witness,
13   your Honor?
14        THE COURT:  Yes, you may.
15        Q.   I'm handing you a document, sir. Do you
16   recognize that document?
17        A.   Yes, I do.
18        Q.   And you've described a document with Chase
19   letterhead. Is that, in fact, the document that you
20   were provided?
21        A.   That is the document that I was provided.
22        Q.   Okay. And you had indicated -- in reading
23   that document, did you have any follow-up concerns or

Ray - Direct                                    183

1    questions concerning this negotiated deal that
2    Mr. Anker had told you about with Chase?
3         A.   Yes. It is in the form of a letter, but it
4    is not signed. And we asked for a signed copy so
5    that we would have something to send to the
6    collection people at the Chase Bank.
7         Q.   Did you ever get a signed copy of that
8    letter?
9         A.   No.
10        MR. LUGG:  I ask that this be admitted as
11   the State's next exhibit, your Honor.
12        MR. WENDELBURG:  May I have just a moment to
13   look at it?
14        MR. LUGG:  You sure can.
15        MR. WENDELBURG:  Without objection.
16        THE COURT:  Very well.
17        THE CLERK:  State's Exhibit No. 14.
18   BY MR. LUGG:
19        Q.   Who did you ask for a signed copy of that
20   document?
21        A.   I believe I made the request in the presence
22   of both Dan Anker and Laura Larks.
23        Q.   Okay. What did you do with that money that

Ray - Direct                                    184

1    you received, that $300,000?
2         A.   We deposited it, we deposited it in the
3    Sun Bank of Delaware, and subsequently we wrote out
4    checks to several churches which we support. And we,
5    and we purchased an automobile for my wife.
6         Q.   You had indicated that you had some
7    skepticism, you thought it was a practical joke, and
8    then you get this check from Mr. Anker. What is it
9    that finally brought you to believe that this check
10   was, in fact, good money that belonged to you?
11        A.   I guess, several things. I mean, you know,
12   I liked and admired Mr. Anker, he was our lawyer, and
13   the check was real. The check, I mean, there was a
14   check from his escrow account. And at that point
15   that sort of resolved our doubts.
16        Q.   You indicated that he was your lawyer,
17   correct?
18        A.   Yes.
19        Q.   You're, in fact, a lawyer, as well; is that
20   right?
21        A.   I last practiced law in 1978, I've been a
22   law professor since then.
23        Q.   There are wide and varied topics within the

Ray - Direct                                    185

1  law, as we know it, are there not?
2      A.   Yes.
3      Q.   And have you routinely sought assistance,
4  such as real estate assistance, from other lawyers
5  throughout your time following your completion of law
6  school, and even in your practice?
7      A.   No. This was the first time, the 1999
8  mortgage was the first time that we had used a lawyer
9  for a closing.
10     Q.   Okay. Prior to that how were your closings
11 accomplished?
12     A.   In the other states in which we had
13 purchased houses it usually was handled by an
14 administrator at the title company.
15     Q.   Okay. Have you ever practiced real estate
16 law?
17     A.   No.
18     Q.   Have you ever engaged in real estate
19 closings?
20     A.   No.
21     Q.   After you received that money, were you
22 informed of or provided the information contained in
23 the E-mail which has now been admitted into evidence,

Ray - Direct                                    187

1  had, had managed to move them up from their original
2  offer.
3      Q.   It was Mr. Anker who told you this?
4      A.   Yes.
5      Q.   Did you have any further dealings with
6  Mr. Anker after this lunch that you had in
7  recognition of the settlement you received?
8      A.   Yes. At the lunch we, I also mentioned
9  that, you know, we were getting these notices from
10 the bank, and I agreed to fax those to his office,
11 which I did. And as the month continued and we kept
12 getting more and more notices of potential
13 foreclosure and more and more collection efforts,
14 ultimately Mr. Anker indicated that he had another
15 settlement because of the bank's failure to keep its
16 initial promises.
17     Q.   And it's Mr. Anker telling you this?
18     A.   Yes.
19     Q.   And this is a conversation subsequent to
20 that $400,000 settlement?
21     A.   Yes.
22     Q.   And what is it that he has told you he has
23 done for you now?

Ray - Direct                                    186

1  did the Chase collection efforts stop?
2      A.   No. Sometimes when we would call them back,
3  they indicated that our, that our account was under
4  review, and that led us to believe that Mr. Anker's
5  efforts had, had been successful. But the, the
6  efforts to collect did not stop. I continued to get
7  telephone calls at work, and at some point was sent a
8  notice of the bank's intent to foreclose.
9      Q.   You had indicated that you wished to thank
10 Mr. Anker by taking him out to lunch. Did you, in
11 fact, do that?
12     A.   Yes.
13     Q.   And can you describe for the jury what it is
14 you discussed at that lunch concerning Mr. Anker's
15 involvement with Chase?
16     A.   I think the lunch was primarily social.
17 We did indicate -- I say "we," but I indicated -- my
18 wife was unable to attend -- I did indicate that we
19 were very grateful for this opportunity and to
20 provide some support to these churches. And I think,
21 I think we either in that conversation or in a prior
22 conversation Mr. Anker had indicated that he had been
23 negotiating with the general counsel at Chase and

Ray - Direct                                    188

1      A.   Well, he had come to the law school, his
2  wife and I were having a meeting about some health
3  and scheduling issues, and she had asked that he be
4  present. And at the end of that meeting he met with
5  me privately to indicate that it was outrageous what
6  the bank was doing, that they weren't keeping their
7  promises, and that he had contacted them again, and
8  that they were now willing to, in light of what had
9  taken place in the past month, they were now willing
10 to, to increase the amount of the settlement.
11     Q.   So there is now a second settlement?
12     A.   Yes.
13     Q.   What is the -- when you're having this
14 private meeting after his wife had stepped out, was
15 there a figure discussed at this point as to what the
16 bank was willing to offer, based upon his
17 negotiations?
18     A.   Yes. He indicated that the bank was willing
19 to offer another $700,000.
20     Q.   Okay. And what else does he tell you about
21 those negotiations at that point in time?
22     A.   I believe he mentioned that he had also
23 convinced them to cancel our new mortgage.

Ray - Direct                    189

1    Q.  Okay. And are follow-up arrangements made
2  after that meeting in your office?
3    A.  Yes. We were again invited to his office to
4  pick up the check.
5    Q.  Did you travel to his office once again?
6    A.  Yes. My wife and I did both.
7    Q.  Were you provided a second check?
8    A.  Yes, we were.
9    Q.  Was there again a fee structure negotiated
10  with respect to this second settlement?
11    A.  Yes.
12    Q.  And were you provided any additional
13  documents reflecting the terms of the settlements,
14  legal settlements that you were advised with Chase?
15    A.  Yes. I had asked for a document summarizing
16  the disbursement of attorneys' fees and the amounts
17  that we had received so that, so that when it came
18  tax time we could figure that out.
19    MR. LUGG:  If I may approach the witness,
20  your Honor?
21    THE COURT:  You may.
22    Q.  I'm handing to you a document, sir. Do you
23  recognize this document?

Ray - Direct                    190

1    A.  Yes.
2    Q.  And what is that document that I have handed
3  to you?
4    A.  It is a document that was provided to us at
5  Mr. Anker's office entitled, "Disbursement
6  agreement." And it lists, it lists a previous
7  recovery of $400,000, and then a second recovery of
8  $700,000, and then a cancellation of mortgage, it
9  indicates disbursement of attorneys' fees of
10  30 percent on the $700,000, and a check issued to us
11  of $490,000.
12    Q.  And were you given that $490,000 check?
13    A.  Yes, we were.
14    Q.  And did you attempt to cash that check?
15    A.  Yes. We took it to a bank that is now
16  Sovereign Bank in Pennsylvania, and did deposit it.
17    Q.  And were you able to use the funds, that
18  $490,000?
19    A.  No. The check, the check did not clear, and
20  eventually payment was stopped.
21    MR. LUGG:  If I may approach the witness,
22  your Honor? And I would ask that the disbursement
23  agreement be entered as the next State's exhibit?

Ray - Direct                    191

1    MR. WENDELBURG:  May I have a look at the
2  document, your Honor?
3    THE COURT:  Sure.
4    MR. WENDELBURG:  (Pause.) No objection.
5    THE COURT:  It's admitted, then.
6    MR. LUGG:  Thank you.
7    THE CLERK:  State's Exhibit No. 15.
8  BY MR. LUGG:
9    Q.  Did you speak again directly with Mr. Anker
10  after you learned that that check was not cashed or
11  not cleared?
12    A.  Yes, I did.
13    Q.  Can you tell us about your next discussion
14  with Mr. Anker concerning that check?
15    A.  I believe we had, I believe we had telephone
16  conversations about it. And then, and then he and I
17  had lunch together.
18    Q.  Okay. Did you have any further discussions
19  about his negotiations with Chase concerning these
20  two settlements at that point?
21    A.  I'm not exactly sure. I did raise the issue
22  of the fact that there was not, there was not a
23  release and settlement agreement for us to, for us to

Ray - Direct                    192

1  sign. I also indicated I thought it was a lot of
2  money. And Mr. Anker indicated that he too thought
3  it was a lot of money, but that the banks had settled
4  for similar amounts for other clients, and that they
5  had not insisted on the settlement agreements in
6  those cases, as well.
7    Q.  And that's all coming from Mr. Anker, the
8  information you've just relayed?
9    A.  Yes.
10    Q.  You indicated that you met him again at a
11  later date?
12    A.  Yes.
13    Q.  And what was the nature of that next
14  meeting?
15    A.  He had asked to meet for lunch. We met for
16  lunch at a restaurant in the vicinity of the law
17  school. We discussed the failure of the check to
18  clear, and that it was apparently based on, I was
19  told that the money had been sent to the wrong
20  account and that it was being straightened out. But
21  at that lunch he provided another check for $10,000,
22  indicating that Chase had agreed to pay an additional
23  $10,000 to make up for their delays and mistakes so

Ray - Direct                     193

1    far.
2        He also indicated to me that because he had
3    had other settlements like ours, he was having, was
4    having a good year financially, that he was impressed
5    we wanted to give some of our recovery to churches,
6    and he would like to discuss making a gift to the law
7    school. He was an alumnus of our law school. And he
8    then provided a check of $50,000 made out to the law
9    school which he said was, was part of giving back,
10   you know, to share, to share his good fortune with
11   future generations.
12       Q.  Okay. And, first of all, concerning that
13   $10,000 check, you indicated that he gave that to you
14   when you were sitting there at the lunch table, so to
15   speak?
16       A.  Yes.
17       Q.  What time of year -- this all began back in
18   March of 2003?
19       A.  Mm-hmm.
20       Q.  This next, I guess, second lunch that we're
21   speaking of now, do you recall what month and what
22   time of year it was that you were having this lunch?
23       A.  I don't recall exactly. It could have been

Ray - Direct                     194

1    late June or early July. Probably late June.
2        Q.  Okay. Do you recall -- and did you prepare,
3    for various reasons, a chronology of the events that
4    you're now testifying to before this jury?
5        A.  Yes, I did. I was asked by the Delaware
6    Office of Disciplinary Counsel to provide a
7    chronological statement, and I did so in
8    August 2003.
9        Q.  Okay. Would that refresh your recollection
10   as to dates in particular -- you've indicated you
11   don't remember -- would it assist in refreshing your
12   recollection to review that statement?
13       A.  Yes, it would.
14       MR. LUGG: If I may approach, your Honor?
15       THE COURT: Yes.
16       MR. LUGG: And if I might have this marked
17   as a State's for Identification, please?
18       THE COURT: You may do so.
19       THE CLERK: State's Exhibit No. 16.
20       MR. LUGG: For identification.
21       THE CLERK: I'm sorry. It will be
22   State's ID-E.
23       MR. LUGG: Thank you.

Ray - Direct                     195

1    BY MR. LUGG:
2        Q.  I'm handing to you what has been marked as
3    State's for Identification E. First of all, I'm
4    looking at the cover of this document. Is that a
5    photocopy, a marked photocopy of the document that
6    you prepared?
7        A.  Yes, it is.
8        Q.  And turning to page 5 of that document, if
9    reviewing that assists in your recollection of the
10   timing of this lunch, please let me know?
11       A.  Yes. It was, I wrote on the statement,
12   I think it was July 14th, it could have been plus or
13   minus one day either way, but I did make this, I did
14   make this statement after reviewing my calendar.
15       Q.  Okay. And is it fair to say that the
16   statements that you've reviewed was made closer in
17   time than we sit here today?
18       A.  Yes.
19       MR. LUGG: If I may approach once again?
20       Q.  I'm handing to you another document. Do you
21   recognize this document?
22       A.  Yes, I do.
23       Q.  What is that that I've handed to you?

Ray - Direct                     196

1        A.  That is a check for $10,000 made out to my
2    wife and to me, and signed by Daniel Anker, and dated
3    July 14th, 2003.
4        Q.  And you, in fact, deposited that check into
5    your account?
6        A.  Yes, we did.
7        Q.  Were those funds then made available to you?
8        A.  Yes, they were.
9        Q.  Were there any other E-mails provided to
10   you, or documents provided to you concerning
11   Mr. Anker's negotiations with Chase Bank?
12       A.  Yeah. With regard to the check for $490,000
13   that we were provided, I was given copies of all
14   E-mail documents.
15       MR. LUGG: First, if I may have the $10,000
16   check entered as the next State's exhibit?
17       MR. WENDELBURG: No objection, your Honor.
18       THE COURT: It's admitted.
19       THE CLERK: State's Exhibit No. 16.
20   BY MR. LUGG:
21       Q.  You indicated that you were provided an
22   E-mail. Who provided you an E-mail concerning that
23   second settlement of which you were to receive

Ray - Direct                                                           197

1   $490,000?
2       A.   I believe it was provided by Mr. Anker.
3       Q.   Okay. And what were the terms of that
4   settlement, that $700,000 settlement, as you
5   understood it?
6       A.   It was the payment of money, and it also
7   indicated that our, our mortgage of $245,000 would be
8   cancelled.
9       Q.   Okay. And -- I apologize for stepping back
10  a bit, I'd like to step forward to where we were --
11  you indicated that at this meeting you were handed a
12  $50,000 check, a donation to the school?
13      A.   Yes.
14      Q.   And this was the culmination, is this the
15  last meeting that you had with Mr. Anker?
16      A.   Yes. It was the last face-to-face meeting.
17      Q.   Did you have any follow-up, any additional
18  telephone conversations with him after that July 14th
19  meeting?
20      A.   Yes. We, we had agreed that we would, you
21  know, we would talk to get all of this straightened
22  out. I was leaving for vacation July 15th to 20 to
23  go to Minnesota, and he was going to Florida, I

Ray - Direct                                                           199

1   letters from Chase?
2       A.   Yes.
3       Q.   And how long thereafter did that continue?
4       A.   Sometime in the early fall they instituted
5   foreclosure proceedings against us, and we then
6   started getting a lot of letters from lawyers
7   volunteering to help us through bankruptcy and
8   represent us in the foreclosure.
9       Q.   Did you have to hire a lawyer yourself to
10  deal with these issues?
11      A.   I don't know whether we had to, but we did
12  so.
13          MR. LUGG: Okay. May I have just one
14  moment, your Honor?
15          THE COURT: Yes.
16          (Mr. Lugg confers with Mr. Carmine.)
17          MR. LUGG: Thank you, your Honor. I have no
18  further questions at this time.
19              CROSS-EXAMINATION
20  BY MR. WENDELBURG:
21      Q.   Mr. Ray, did you ever have any contact
22  during this whole episode with Ms. Larks?
23      A.   Yes.

Ray - Direct                                                           198

1   think, before we got back. And so we agreed that we
2   would, we would meet upon his return from Florida.
3       Q.   Okay. Did you ultimately meet with him
4   after you returned and he returned?
5       A.   No, no. He called from Florida and
6   indicated that, that a complaint had been filed with
7   the Bar, I think it was, and that he would be
8   returning to town a little earlier and that he would
9   call me on his return. When I did not hear from him
10  I called him at his home.
11      Q.   Okay. And at that point did you then, after
12  this, hearing of this complaint with the Bar, what
13  did you do with respect to your interests and the
14  practices of Mr. Anker and the Bar Association?
15      A.   In my conversation with Mr. Anker, I believe
16  it was he who suggested that I contact the Office of
17  Disciplinary Counsel, and that I then called someone
18  at the Disciplinary Counsel's office, and they
19  requested the statement from us. And I understand
20  that that statement was then provided to the attorney
21  appointed as receiver from Mr. Anker's practice.
22      Q.   At that time, late July, early August 2003,
23  were you still receiving collections and default

Ray - Cross                                                            200

1       Q.   How would those contacts come about?
2       A.   Either I or my wife would call the office to
3   let them know about the latest collection effort or
4   to let them know that the check had not cleared.
5   I think we had more contacts with her than with
6   Mr. Anker.
7       Q.   Did you ever call Mr. Anker's office trying
8   to get in touch with him and get told by Ms. Larks
9   that he wasn't there or wasn't available?
10      A.   Yes.
11      Q.   How many occasions did that happen, do you
12  know?
13      A.   I don't know. I know it was, I know it was
14  several.
15      Q.   Okay. Did you ever have any E-mail
16  direct -- excuse me -- direct E-mail correspondence
17  either with Mr. Anker or with Ms. Larks?
18      A.   I believe that -- I don't recall at the
19  moment. I would send things to their office by fax,
20  I would notify them of the collection efforts by fax,
21  I don't recall, I don't recall E-mail.
22      Q.   Did anybody keep you up to date on these
23  so-called settlement negotiations by E-mail? In

John Lesko - Direct                                                    229

1    Q.  Who -- well, first of all, did you have any
2    loans or mortgages on your property back in December
3    2002 that you were seeking to refinance?
4    A.  Yes.
5    Q.  Who held that loan at that point in time?
6    A.  Washington Mutual.
7    Q.  So you were able to, at least you were
8    attempting to refinance with the same bank?
9    A.  Yes.
10   Q.  All right. You indicated that you contacted
11   the bank to do this. Were you successful in securing
12   a lower rate?
13   A.  Yes.
14   Q.  And did you, in fact, secure a mortgage
15   documentation from Washington Mutual as well
16   evidencing that lower rate?
17   A.  Yes.
18       MR. LUGG: Okay. If I may approach,
19   your Honor?
20       THE COURT: Certainly.
21   Q.  I'm handing to you --
22       MR. LUGG: And if I might have these marked
23   for identification? for ease of reference.

John Lesko - Direct                                                    230

1        THE CLERK: State's Identification F and G.
2    Q.  First, I'm handing to you what's been marked
3    as State's Identification F. Do you recognize that
4    document?
5    A.  Yes.
6    Q.  And what is that that I've handed to you?
7    A.  It's an approval letter from Washington
8    Mutual.
9    Q.  And what is the date of that document?
10   A.  January 27th, 2003.
11   Q.  And what is it that was being approved, to
12   your knowledge, from Washington Mutual?
13   A.  A loan amount, terms, you know, 30 years,
14   and an interest rate.
15   Q.  Okay. And what was the amount that you were
16   approved for pursuant to that loan or that document?
17   A.  On this document it was 140,000.
18       MR. LUGG: Okay. The State would move to
19   admit that document as its next exhibit.
20       MR. WENDELBURG: Without objection,
21   your Honor.
22       THE COURT: It's admitted, then.
23   BY MR. LUGG:

John Lesko - Direct                                                    231

1    Q.  If I may trade you, sir. I'm handing to
2    you, prior to visiting the clerk, State's for
3    Identification G. Do you recognize this second
4    document that I handed to you?
5    A.  Yes, I do.
6    Q.  And what is that document?
7    A.  It's an approval letter from Washington
8    Mutual.
9    Q.  Okay. And what is the date of that
10   correspondence?
11   A.  March 4th, 2003.
12   Q.  And what is approved by virtue of the
13   correspondence and what I've handed you?
14   A.  I'm just looking it over. The loan amount
15   for 140,000, 30-year term, five-and-a-quarter
16   interest rate.
17   Q.  And was that a lower rate than you had had
18   prior to March of 2003?
19   A.  Yes.
20       MR. LUGG: Okay. The State would move to
21   admit the subsequent document as its next exhibit.
22       MR. WENDELBURG: No objection, your Honor.
23       THE COURT: It's admitted, then.

John Lesko - Direct                                                    232

1        THE CLERK: These last two, your Honor, as
2    State's Exhibit 17 and 18.
3        THE COURT: Thank you.
4    BY MR. LUGG:
5    Q.  Now, after obtaining the lower rate and
6    obtaining the loan approval, did you then seek to
7    refinance the property?
8    A.  Yes.
9    Q.  And who did you use or attempt to use to
10   engage in this process?
11   A.  Dan Anker.
12   Q.  And how is it that you enlisted his help?
13   A.  I called his office sometime in March
14   letting them know that I'm in the process of
15   refinancing my mortgage and would like to have them
16   handle the settlement for me.
17   Q.  Okay. And did they -- when you say "they,"
18   who was it that you contacted?
19   A.  Well, the person I talked to was Laura
20   Larks.
21   Q.  Okay. And was a date scheduled to hold the
22   refinancing?
23   A.  Yes, it was.

John Lesko - Direct                                                    237

1    Q.   And was that signed in your presence?
2    A.   I assume so. I can't remember offhand.
3    Q.   Were there a lot of documents signed at that
4    time?
5    A.   There was a lot of documents, yes.
6    Q.   I notice that your signature is not on this
7    document. Did you, in fact, sign a copy of this
8    document?
9    A.   We signed documents.
10   Q.   Okay.
11   A.   We signed a number of documents, I remember,
12   you know, on that day. And I believe -- obviously I
13   didn't sign this one, but I do remember, you know,
14   signing something very similar to this.
15   Q.   Okay. And who gave you this to take home?
16   A.   I can't remember whether it was Dan or
17   Laura, they both were there, you know, here's the
18   document, so.
19        MR. LUGG: If I may approach to collect the
20   document, your Honor?
21        THE COURT: Sure.
22        MR. LUGG: Thank you.
23   Q.   Now, you indicated that they were both

John Lesko - Direct                                                    238

1    there. Please describe for us the roles that each
2    were playing in this transaction.
3    A.   Well, Dan was just explaining on the
4    settlement sheet what the different, all the
5    different figures were, the settlement charges, you
6    know, what the old loan amount was, what the new loan
7    amount is, the settlement charges, and then what was
8    due to us after the old loan was paid off and the
9    settlement charges were taken out.
10   Q.   And did you, in fact, receive a sum, a check
11   from this as money due to you after all was said and
12   done?
13   A.   Yes, I did.
14   Q.   And did that check clear?
15   A.   Yes.
16   Q.   Okay. And that sum is actually reflected at
17   the bottom portion of that HUD-1 statement; is that
18   correct?
19   A.   Yes.
20   Q.   All right. During this settlement held on
21   April 3rd, was there discussion, or did Mr. Anker
22   make any comments to you about other settlements or
23   issues involving, or real estate issues that he was

John Lesko - Direct                                                    239

1    encountering at that time?
2    A.   The only thing that my wife and I remember
3    was that when the settlement was over with we were
4    talking just in general terms, we hadn't seen each
5    other for a while, and Dan did mention a settlement
6    that he had where the bank messed it up and he
7    received some type of settlement for it.
8    Q.   Okay. I've asked this question a couple of
9    times to a few folks today, and bear with me, you
10   used the term "settlement" interchangeably in that
11   sentence. Are you referring to a real estate
12   settlement or a, what we term a legal settlement or
13   some type of lawsuit settlement with respect to this
14   transaction you described?
15   A.   I took it, you know, from the conversation
16   that it was some type of legal settlement.
17   Q.   Okay. Not a real estate settlement?
18   A.   Not a real estate settlement, no.
19   Q.   But arising from a real estate settlement,
20   as you've explained?
21   A.   Yes.
22   Q.   Okay.
23   A.   That's just the way I took it.

John Lesko - Direct                                                    240

1    Q.   Okay. And did this have any effect on you
2    or any impression upon you as you left the office
3    that day?
4    A.   Not really. What happened is I had to get
5    back to work, it was in passing at the end, so. Plus
6    I had to drive my wife home.
7    Q.   Was she going home?
8    A.   Yes.
9    Q.   All right. And after this had all happened
10   on April 3rd, what were your expectations with
11   respect to the loans that you had held with
12   Washington Mutual?
13   A.   Just like at our previous refinancing, that
14   the old loan would, gets paid off, or it would get
15   paid off, and then we would be receiving new monthly
16   loan statements for our new mortgage.
17   Q.   Did you begin to receive new monthly
18   statements for your new mortgage?
19   A.   Yes.
20   Q.   And did you learn that your old loan was, in
21   fact, paid off?
22   A.   In late April we received a loan statement
23   from Washington Mutual stating that we -- that they

John Lesko - Direct    241

1  did not receive, or that we owe a monthly mortgage
2  for March, a late payment fee for March, and then
3  also we had on the sheet what our monthly payment
4  would be for April, also.
5      Q.  Okay. And what loan was that pertaining to?
6      A.  That was for the old loan that was
7  refinanced, the original loan.
8      Q.  Okay. And were you also receiving the
9  documentation pertaining to the new loan and the
10 payments?
11     A.  Yeah. I believe sometime in early, it was
12 late April, early May we received our first payment
13 statement for our refinanced loan, our new loan. And
14 we subsequently paid that.
15     Q.  Okay. Now, when you received that
16 documentation about the first loan, the loan that you
17 had explained to us you expected to have been paid
18 off from the settlement, what do you do?
19     A.  Well, I talked it over with my wife, I
20 showed it to her, and I said I'm going to call our
21 loan officer at Washington Mutual, Jim McCarthy.
22 I called Jim, told him what we just received in the
23 mail. He thought that it was probably a

John Lesko - Direct    242

1  miscommunication within Washington Mutual between
2  different departments. He didn't seem all that
3  worried or upset at that time. And he wasn't upset,
4  I just wanted to let him know about it. And from
5  what I remember, the conversation was, you know, it
6  would probably just get taken care of internally by
7  Washington Mutual.
8      Q.  Okay. Did that, in fact, occur?
9      A.  No, it did not.
10     Q.  And what happens next, to your knowledge?
11     A.  Sometime in the middle of May we received a
12 phone call from Washington Mutual asking about a late
13 payment for March and April -- now April was not
14 paid. So they were asking for -- or the lady had
15 called and wanted to know why we didn't pay for March
16 and April, and the late payment charges. And we
17 explained to her that we went through a refinancing
18 in early April, and we talked to our loan officer,
19 and apparently, we understood that it was a
20 miscommunication within Washington Mutual and that it
21 was going to be, should have been cleared up. She
22 was interested to hear that. And that was the end of
23 the conversation.

John Lesko - Direct    243

1      Q.  Okay. Did that take care of the problem for
2  you?
3      A.  No, it did not.
4      Q.  All right. When is your next -- what alerts
5  you next to the fact that the problem is continuing?
6      A.  I called Jim McCarthy back from Washington
7  Mutual and told him about the phone call that we just
8  got from Washington Mutual. And he seemed surprised.
9  And he said he would check into it and make several
10 phone calls.
11     Q.  Okay. And does this take care of things?
12     A.  No, it does not.
13     Q.  All right. What happens next?
14     A.  Jim called us back within a day or two after
15 that phone call from Washington Mutual saying that he
16 talked to several people within Washington Mutual and
17 they're checking into it.
18     Q.  Did you at any point contact Mr. Anker to
19 find out the issues on his end?
20     A.  After I talked -- Jim called us back, told
21 us that he talked to several people from Washington
22 Mutual. When I got off the phone with Jim, we
23 decided to call Dan's office just to let him know

John Lesko - Direct    244

1  what's going on, to see what, see if he can check
2  into it and see what's going on, you know, with this
3  whole situation. So we called Dan's office. And I
4  talked to Laura, Laura answered the phone, and I
5  explained the situation to her.
6      Q.  Okay. And does that rectify your problems
7  at that point in time?
8      A.  No.
9      Q.  All right. You've described that we're in
10 the middle of May and where are we now that you've
11 made this phone call to Dan's office, the defendant's
12 office, what time of year?
13     A.  We're still probably toward the end of May.
14 I'm thinking, you know, May 20th through 25th.
15     Q.  Do you continue your efforts with both
16 Mr. Anker's office and with the various individuals
17 you've contacted at Washington Mutual?
18     A.  Well, my conversation with Laura, the first
19 time I called their office she said that obviously
20 it's a problem within Washington Mutual and that she
21 would contact Washington Mutual and check into the
22 situation.
23     Q.  And, again, does a problem with Washington

John Lesko - Direct                                             245

1  Mutual persist after that conversation?
2      A.  Yes.
3      Q.  What do you do next?
4      A.  Several days after talking to Laura we got
5  another phone call from Washington Mutual, a
6  different person, probably in response to Jim's phone
7  calls to various people, and asking for some
8  information on the settlement that we had. I told, I
9  gave her Dan's office, I gave him his name, his
10  office number, and to contact Dan's office to, you
11  know, have all the settlement information that she's
12  asking for either conveyed to or somehow faxed or
13  E-mailed or verbally conveyed to her.
14     Q.  To your knowledge, was that done?
15     A.  I don't know.
16     Q.  Are you still having problems at this point?
17  Now we're at late May, working into June of 2003.
18     A.  Yes.
19     Q.  And do you continue your efforts at that
20  point in time?
21     A.  Yes. I called Dan's office back. Laura
22  answers. I explained we just got another phone call
23  from Washington Mutual requesting some settlement

John Lesko - Direct                                             246

1  information and could you, you know, please get them
2  the information what he requested.
3      Q.  Again, do you know if that was done?
4      A.  Don't know.
5      Q.  At some point around this time do you have a
6  communication directly with Mr. Anker?
7      A.  Dan, sometime in late May, had a
8  conversation with Laura. She said they've been in
9  contact with Washington Mutual and that a settlement
10  with Washington Mutual is possible, and that they
11  would need a letter from us stating that Dan, Dan
12  Anker can negotiate a settlement with Washington
13  Mutual on our behalf.
14     Q.  Did you provide that letter?
15     A.  Yes.
16     Q.  Did you talk to Dan about the settlement?
17     A.  Not at that time, still hadn't talked to
18  Dan.
19     Q.  After you provided that letter, did you have
20  a contact or communication with Dan concerning
21  settlements?
22     A.  Yes. He called me in the afternoon of June
23  3rd, and I was at work, it was in the afternoon. And

John Lesko - Direct                                             247

1  Dan said that they reached a settlement with
2  Washington Mutual for $250,000, that the money would
3  be wired to his office, and for us to call tomorrow
4  to come to a mutual time to come in to pick up the
5  check for us.
6      Q.  Did you discuss how this whole now legal
7  settlement came into existence, how it happened?
8      A.  At that time?
9      Q.  Yes.
10     A.  No. The only thing I asked of Dan was,
11  obviously we should be getting everything in writing
12  from Washington Mutual, you know, and signed.
13     Q.  Okay. Did he tell you who had negotiated
14  with Washington Mutual the settlement?
15     A.  Our previous phone call with -- or my
16  previous phone call with Laura several days before, a
17  week before, and it still sticks in my mind, she said
18  that they've been in contact with Washington Mutual
19  with the general counsel, and that's why I thought,
20  hey, they're talking to the big guy. And his name
21  was Douglas MacIntyre.
22     Q.  And did Dan talk to you about having contact
23  with that person?

John Lesko - Direct                                             248

1      A.  No.
2      Q.  Did Dan talk to you about any other terms,
3  aside from that $250,000, that you would receive as
4  part of this legal settlement?
5      A.  Dan said he also negotiated a, I guess you
6  would call it an additional penalty, if our credit
7  wasn't restored within 30 days of the settlement
8  agreement, which I took at that time was June 3rd,
9  that it would be an additional $500 per day if our
10  credit was not restored.
11     Q.  Okay. And he indicated that he had
12  negotiated this on your behalf?
13     A.  Yes.
14     Q.  Okay. When did you get that $250,000 check?
15     A.  I never did.
16     Q.  Can you tell us about the efforts that you
17  undertook to receive what you were told by Mr. Anker,
18  the defendant, to be this settlement?
19     A.  Well, I talked to Dan on June 3rd, and again
20  I wanted to reiterate -- that's the only time I ever
21  talked to Dan, all the other conversations were with
22  Laura. So I called Dan's office back on June 4th to
23  see when we should stop in to pick up the check.

**Page 249**

John Lesko - Direct

1  Laura indicated -- I talked to Laura -- Laura
2  indicated that only 150,000 of the 250,000 was wired,
3  and they're still waiting for the other 100,000, so
4  call back tomorrow and then she would let us know
5  when to come in, we'll set up a time to come in.
6  I subsequently called back the following day, she
7  indicated that the 100,000, they still did not
8  receive the additional 100,000, and that they would
9  be contacting Washington Mutual to figure out with
10  them what the problem was.
11  Q.  Okay. From this -- and you've indicated now
12  that you spoke with Dan on the 3rd of June and then
13  spoke with his daughter the next --
14  A.  The next two days, yes.
15  Q.  The next two days. And from these
16  conversations did you understand that the defendant
17  had communicated the terms of this settlement to his
18  daughter because you are now discussing them?
19  A.  Yes. In fact, on one occasion calling the
20  office, I always talked to Laura, I said, I said, you
21  know, I would like to talk to Dan sometime. She
22  goes, Well, Dan's a very busy person, they discuss
23  the facts of the situation together, and talking to

**Page 250**

John Lesko - Direct

1  her is like talking to Dan, is what she told me.
2  Q.  Did any of these actions that were described
3  to you resolve the issues that you had had with that
4  first Washington Mutual loan?
5  A.  No.
6  MR. LUGG: If I may approach the witness
7  again, your Honor?
8  THE COURT: (No audible response.)
9  Q.  I'm handing you a document dated June 18th
10  of 2003. Do you recognize that document?
11  A.  Yes.
12  Q.  What does that document -- was that mailed
13  to you?
14  A.  Yes, it was.
15  Q.  And what does that indicate to you?
16  A.  It's a debt collection letter from
17  Washington Mutual dated June 18th, 2003.
18  Q.  And what collections actions or what loan
19  was that collections action pertaining to?
20  A.  That was for the original loan that was
21  being refinanced.
22  Q.  Okay. And you received this about two weeks
23  after Mr. Anker had told you that he had negotiated a

**Page 251**

John Lesko - Direct

1  deal with Washington Mutual?
2  A.  Yes.
3  MR. LUGG: The State would move to admit
4  this as the next State's exhibit.
5  MR. WENDELBURG: Can I take a look at it?
6  MR. LUGG: Sure.
7  MR. WENDELBURG: (Pause.) No objection,
8  your Honor.
9  THE COURT: It's admitted.
10  THE CLERK: State's Exhibit No. 20.
11  BY MR. LUGG:
12  Q.  Do you continue your efforts in contacting
13  Mr. Anker's office to resolve the issue of this now
14  debt collection against you?
15  A.  Yes.
16  Q.  And are you also contacting his office
17  concerning that $250,000 settlement?
18  A.  Yes.
19  Q.  Do you ever receive that $250,000 settlement
20  check?
21  A.  No.
22  Q.  And do you ever receive any penalty payments
23  for time that your credit was not restored?

**Page 252**

John Lesko - Direct

1  A.  No.
2  Q.  Can you tell us about the impact that, the
3  chronology and the events that you've described to us
4  up till mid-June had upon your credit?
5  A.  We sent away for our credit report
6  sometime either in June or July to check to see what
7  our credit report looked like. And it was on our
8  credit report that we were delinquent with the old
9  loan.
10  Q.  Okay. Was that ever fixed?
11  A.  It was fixed probably about a month ago.
12  Q.  A month ago?
13  A.  Yes, sir.
14  Q.  Meaning this year?
15  A.  This year, yes.
16  Q.  Okay. Through late June into early July,
17  did you have again repeated conversations with
18  Mr. Anker's office -- or did you make repeated
19  efforts to contact Mr. Anker's office?
20  A.  Yes.
21  Q.  Was Mr. Anker ever made available to you to
22  discuss the issues that you had?
23  A.  No.

1    Q.  Who was the person that you had contact with
2    when you called in?
3        A.  Laura Larks.
4        Q.  Were additional settlements or figures
5    discussed in these various phone conversations?
6        A.  Yes.
7        Q.  And did you ever receive a dime from
8    Washington Mutual for any of the hassle that you've
9    gone through in your credit report?
10       A.  No.
11       Q.  Ultimately was that original loan paid off,
12   to your knowledge?
13       A.  Yes.
14       Q.  And do you know how that was accomplished?
15       A.  It was paid off this past February 2005, and
16   it was paid off by the Lawyers Fund, I believe.
17           MR. LUGG:  May I have just one moment,
18   your Honor?
19           THE COURT:  Uh-huh.
20           (Mr. Lugg confers with Mr. Carmine.)
21           MR. LUGG:  I have nothing further at this
22   time, your Honor.  Thank you.
23           CROSS-EXAMINATION

---

John Lesko - Cross                            254

1    BY MR. WENDELBURG:
2        Q.  Mr. Lesko, you said that you've known Dan
3    Anker for a long time; is that correct?
4        A.  Yes.
5        Q.  And you said you played Little League
6    together, that's when you were kids?
7        A.  Yes.
8        Q.  Have you ever worked with Mr. Anker?
9        A.  No.
10       Q.  You said that he had done some prior
11   closings or settlements for you before the one in
12   question here; is that correct?
13       A.  Yes.
14       Q.  How long before this 2003 settlement were
15   those other ones done?
16       A.  When I built the house in 1990.  So he did
17   that settlement for us.  And there was two
18   refinancings on that prior to this last one.
19       Q.  All right.  In the last refinancing
20   apparently a person that you were working with in his
21   office was Laura, his daughter.  Was she involved
22   with his office for any of the prior settlements or
23   refinancings that you had done?

---

1        A.  No.
2        Q.  Who was involved then?
3        A.  I can't -- there's only one other lady that
4    I remember from his office, she was a black lady,
5    very nice, and her name escapes me.
6        Q.  Okay.  With respect to this last closing,
7    did Dan ever tell you that he had filed a lawsuit on
8    your behalf?
9        A.  No.
10       Q.  Did he tell you that he was going to file a
11   lawsuit on your behalf?
12       A.  No.
13       Q.  Did Laura ever tell you that either there
14   was a lawsuit filed or that she was going to see that
15   one was filed on your behalf?
16       A.  No.
17       Q.  I think you testified that the first
18   suggestion that you heard of a possible settlement
19   with Washington Mutual came in the middle of May or
20   possibly late May.  Who did it come from?
21       A.  Laura Larks.
22       Q.  And can you remember the terms that she used
23   to discuss this possibility of a settlement?

---

John Lesko - Cross                            256

1        A.  The only -- no, the first -- she, I talked
2    to Laura and she indicated that a settlement was
3    possible with Washington Mutual.  She needed a letter
4    from us so they can negotiate on our behalf.  We sent
5    them the letter.  And Dan -- and the next
6    conversation with her office was on June 3rd saying
7    that they reached a settlement.
8        Q.  Did Dan tell you that he had talked to Doug
9    MacIntyre?
10       A.  No.
11       Q.  Did you ever talk to Doug MacIntyre?
12       A.  No.
13       Q.  Do you know today who he is?
14       A.  No.
15       Q.  Who gave you the name Doug MacIntyre?
16       A.  Laura Larks.
17       Q.  And is it she who told you that
18   Mr. MacIntyre was allegedly the general counsel for
19   Washington Mutual?
20       A.  Yes.
21       Q.  Did you ever see any correspondence or
22   E-mail to or from Doug MacIntyre?
23       A.  No.

25

1  concerning that loan?

2      A.  We got, over a period of time, we got several

3  calls from their collections department, extremely

4  rude. We instructed them to contact the attorney for

5  the settlement.

6      Q.  Did you have communications with those folks

7  from Conseco?

8      A.  Yes, I did.

9      Q.  You spoke with them?

10     A.  Yes.

11     Q.  What were you alerted to with respect to this

12  mortgage?

13     A.  They said the loan was late in payment.

14     Q.  Did you investigate that loan with Conseco?

15     A.  Not with Conseco. No.

16     Q.  Can you tell us about any other involvement

17  that you yourself had concerning the loans with Conseco

18  or GMAC?

19  .   A.  Just that we referred each party to the

20  attorney's office.

21     Q.  And you indicated that your wife is in the

22  real estate industry; is that correct?

23     A.  Correct.

26

1      Q.  You have told us a few times, the judge

2  instructed you about your responses. Who did most of

3  the work with respect to the investigations?

4      A.  My wife would have.

5      MR. LUGG: Thank you, sir.

6      CROSS EXAMINATION

7  BY MR. WENDELBURG:

8      Q.  Mr. Paveza my name is Alan Wendelburg, have

9  you ever met Dan?

10     A.  Just at settlement.

11     Q.  Have you ever spoken to Dan after the

12  settlement?

13     A.  Say that again.

14     Q.  Did you ever speak to Dan after the

15  settlement?

16     A.  I don't recall speaking to him.

17     Q.  Did you ever receive any correspondence from

18  Dan after the settlement?

19     A.  Not that I am aware of.

20     Q.  Did you ever speak with Laura Larks after the

21  settlement?

22     A.  Several times.

23     Q.  Did she ever call you?

27

1      A.  I am sure she did.

2      Q.  Did you call the office and speak with her?

3      A.  Yes, I have.

4      Q.  Did you ever speak with anybody else at -- at

5  the Anker office after the settlement other than Laura

6  Larks?

7      A.  No.

8      Q.  So we can be sure, Mr. Paveza, my

9  understanding of your testimony is that the GMAC first

10  mortgage was paid but the Conseco, second mortgage, was

11  not; is that right?

12     A.  My understanding is the GMAC was paid late and

13  Conseco was not paid.

14     MR. WENDELBURG: Thank you. No further

15  questions.

16     MR. LUGG: Nothing further from the State,

17  Your Honor.

18     THE COURT: May he be excused. You are

19  subject to recall. You may step down.

20     MR. LUGG: State's next witness is Maya

21  Paveza. May we approach.

22     (Discussion held off the record.)

23     (The following sidebar conference was held.)

28

1      MR. LUGG: The reason I asked to approach each

2  of the witnesses as you are have learned has been

3  subpoenaed by the state and defense. Each once asked

4  me as to I guess they have planned trying to do next

5  week, whether they may be released. There was some

6  hesitation by counsel of Mr. Paveza. I would like to

7  be able to inform those folks if they need to come back

8  not sure if counsel has an intent to recall him.

9      MR. WENDELBURG: I don't have a present intend

10  to I may have a better idea after his wife testifies.

11  The defense subpoenas were all dated next Monday, July

12  25, and then was notes attached to each one of them

13  saying please call us at least a day or working day

14  ahead of time to fine tune when are you going to have

15  to show up. At this point I am not willing to release

16  Mr. Paveza.

17     THE COURT: Just have to wait and see.

18     MAYA PAVEZA,

19  having been first called by the State was affirmed

20  on oath, was examined and testified as follows:

21     DIRECT EXAMINATION

22  BY MR. LUGG:

23     Q.  Ms. Paveza, how are you?

A-65

31

1   A.  Nervous.

2   Q.  I am going ask you a few questions.  If you

3   have trouble hearing me, let me know?

4   A.  Okay.

5   Q.  We just met a person named Gary Paveza.  Do

6   you know him?

7   A.  My husband.  Yes, I do.

8   Q.  Where is this that you and Mr. Paveza live?

9   A.  2808 Fox Drive in Arundel in Wilmington.

10   Q.  How long have you lived there?

11   A.  We bought the house in July of 1999.

12   Q.  And some point in time did you seek to

13   refinance that loan that you had for that house?

14   A.  Yes.

15   Q.  And at the time when was it that you sought to

16   refinance?

17   A.  We have actually refinanced, I think, twice or

18   more but last was in April of 2003.

19   Q.  At that time how many loans did you have on

20   the property?

21   A.  Two.

22   Q.  Which companies?

23   A.  GMAC and Conseco.

---

1   help them obtain a contract.

2   Q.  Do you become -- how do you become familiar

3   with various attorneys, you indicated you make

4   recommendations to clients.  Have you become familiar

5   with various attorneys as a realtor?

6   A.  Yes.

7   Q.  And did you become familiar with Mr. Anker?

8   A.  Yes

9   Q.  You see him in the courtroom?

10   A.  Yes.

11   Q.  Could you identify him for us?

12   A.  Right over there.

13   Q.  Pointed and smiled in his direction?

14   A.  Yes.

15   Q.  How is it that you came to know Mr. Anker?

16   A.  A fellow classmate in my pre-licensing and her

17   boyfriend were purchasing a property and she had been

18   friends with Dan's daughter Laura.  So they chose to

19   use his firm for their settlement.

20   Q.  Did you ever choose to use Mr. Anker's firm

21   for your real estate dealings?

22   A.  I did when we refinanced.

23   Q.  Can you tell us how it is that you came to

---

30

1   Q.  Tell us a little bit about what you do for a

2   living?

3   A.  I am a realtor.  I sell houses.

4   Q.  And as a realtor, how do you involve yourself

5   in the settlement process?

6   A.  I will usually present some choices to my

7   clients as for as attorneys unless they already have

8   one that they prefer to use.  Once they pick an

9   attorney, myself and whatever office staff, depending

10   on the company, will get the files, appropriate papers

11   to the attorney.  They can do the title work along for

12   whatever other things that the lawyers offices do for

13   settlement.

14   Q.  Do you know what the lawyers offices do?

15   A.  I know they do the title, not sure if they

16   handle survey or if that is the mortgage company.  I

17   try to stay out of my client's financial affairs.  I

18   will coordinate with their mortgage people, you know,

19   as get paperwork to the lawyer's office.

20   Q.  What is your main function with respect to the

21   sale of the property?

22   A.  I show the houses, and when a client finds a

23   house that they like I will write the offer for them,

---

32

1   hire Mr. Anker and how you arranged for him to assist

2   in your settlement?

3   A.  I follow-up with my clients and asked for

4   feedback.  I felt things were good.  So when we started

5   working on refinancing, after the birth of our

6   daughter, it just seemed the natural choice for me

7   because a lot of my clients had been going to him.  So

8   I decided to go there, as well.

9   Q.  Did you, in fact, contact him to arrange a

10   time to hold your refinancing?

11   A.  Through his secretary or daughter, Laura.

12   Yes.

13   Q.  You indicated a person named Laura.  Did you

14   ever meet this person?

15   A.  Yes.

16   Q.  Did you come to know her?

17   A.  Yes.

18   Q.  You indicated she scheduled the meeting at the

19   time for settlement.  Correct?

20   A.  Yes.

21   Q.  When was that held?

22   A.  I don't remember if it was April 7 or April 8,

23   but it was the beginning of April of 2003.

A-66

33

1    Q. There were settlement documents placed before
2    you and your husband at the time?
3    A. Yes.
4    Q. Mortgage documents completed?
5    A. As far as I recall. Yes.
6    Q. Are you those documents dated with a date of
7    transaction?
8    A. I would believe so.
9    Q. You indicated you have a young daughter,
10   correct?
11   A. Yes.
12   Q. Was she with you at that settlement?
13   A. Yes.
14   Q. Where was your primary attention devoted
15   during that settlement?
16   A. To my daughter.
17   Q. Approximately how old was he at that time?
18   A. Shy of 2 months, I believe. February 10, 2
19   months.
20   Q. And did you have any communications with Mr.
21   Anker at that settlement concerning the refinancing of
22   your property?
23   A. Probably just normal indications as to where

34

1    we should sign or initial on the documents or normal
2    chatter about the baby.
3    Q. And can you indicate the role that Laura, the
4    person you told us about had in this real estate
5    transaction?
6    A. She did all of the paperwork that I was aware
7    of. Working sort of a real estate paralegal capacity,
8    and filling things out and providing us with, I guess,
9    settlement sheet. We really did not see Dan until we
10   sat down at the settlement table.
11   Q. What was the defendant's role at the
12   settlement table for this refinancing?
13   A. He went through the papers, instructed us
14   where to sign or initial and I believe he signed or
15   witnessed the document.
16   Q. You said he went through the papers with you?
17   A. Mostly with Gary, I was busy with Kat.
18   Q. This was done in your presence?
19   A. Yes.
20   Q. Now, was financing secured from another
21   company to enable you to hold this refinancing?
22   A. Yes.
23   Q. What company did you choose to acquire a new

35

1    loan with?
2    A. Gilpin Financial Services.
3    Q. Were documents executed with respect to that,
4    as well?
5    A. Yes.
6    MR. LUGG: If I may, Your Honor, State's 21
7    and 22. May I approach the witness?
8    THE COURT: Certainly.
9    BY MR. LUGG:
10   Q. If I may first present to you what is marked
11   State's Exhibit 21. Do you recognize that document?
12   A. It's a mortgage.
13   Q. Is that, in fact, the mortgage that you
14   acquired with Gilpin Financial?
15   A. I believe so.
16   Q. And you indicate you believe so. Could you
17   look through that. Did you sign any pages of that
18   document?
19   A. I have initialed. Let me look.
20   Q. If I can direct your attention third from the
21   last page?
22   A. Page 8. Yes, I signed that.
23   Q. You signed that. That was noting your

36

1    obligation to mortgage for that property?
2    A. Yes.
3    Q. With Gilpin Financial?
4    A. Yes.
5    Q. There is also a note there, as well?
6    A. Um-hmm
7    Q. Evidencing the terms of that loan?
8    A. Um-hmm.
9    Q. Was that executed within the offices of Mr.
10   Anker on April 7?
11   A. I don't recall. I assume.
12   Q. Look at the face page of that. Does that
13   indicate the dates of affect of that mortgage?
14   A. Yes.
15   Q. What is that date?
16   A. April 7, 2003.
17   MR. LUGG: If I may I approach, Your Honor.
18   THE COURT: Yes.
19   BY MR. LUGG:
20   Q. Handing you State's 22. What is that
21   document?
22   A. Settlement sheet, a HUD-1.
23   Q. Is that a document that you were asked to

A-67

1  review at the settlement on April 7th?

2    A.  Probably, yes.

3    Q.  Probably?

4    A.  Yes.

5    Q.  Do you recall reviewing a settlement sheet?

6    A.  I do not recall reviewing it at the settlement

7  but I am sure I did.

8    Q.  In fact, if you turn to the second page you

9  did not sign that document; is that right?

10    A.  No, I did not.

11    MR. LUGG:  May I approach to collect the

12  document.

13    THE COURT:  Sure.

14  BY MR. LUGG:

15    Q.  As a realtor, having completed those and

16  reviewed those documents on April 7, what was your

17  understanding of this transaction and its effect on

18  your Conseco and GMAC loans?

19    A.  They would be paid in full and satisfied.

20    Q.  Did that occur?

21    A.  No, it did not.

22    Q.  Tell us what happened, as you recall, from

23  your involvement with respect to the first GMAC loan?

38

1    A.  We -- Gary went to get a new car, and the

2  following day we received a phone call from our

3  salesperson saying that GMAC was requiring an

4  additional six thousand dollars to the car, which we

5  thought was preposterous because we had excellent

6  credit and never late on our mortgage.  So he intended

7  to return the car, and I believe that next day or the

8  day when he returned the car we received a phone call

9  from GMAC mortgage letting us know we are delinquent.

10    Q.  And after receiving that phone call, and you

11  use the term we; who are you referring to?

12    A.  My husband and I, Gary.

13    Q.  I ask you if you could please tell us about

14  the involvement that you had things that you did.

15  After receiving that advisement from GMAC, what did you

16  do with he respect to that loan?

17    A.  I notified GMAC that we had refinanced in

18  April, and gave them the name of our attorney.  I then

19  called Laura Larks.  I believe I attempted to call the

20  office.  No one was there.  So I called her office cell

21  phone.

22    Q.  And did you discuss with her the issues you

23  were having with GMAC?

1    A.  Yes.

2    Q.  Were your problems with GMAC thereafter

3  resolved?

4    A.  No.  She called me back and said that she had

5  spoken to someone at GMAC and they were going to bring

6  us a settlement of three times our monthly mortgage

7  payment because of a RESPA violation which she

8  explained was because they called us on a closed

9  account.

10    Q.  This is in what month that you were informed

11  of this?

12    A.  End of April 2003.

13    Q.  End of April.  That settlement was held April

14  7.  Correct?

15    A.  Yes.

16    Q.  Was there any follow-up concerning this

17  settlement with GMAC?

18    A.  Laura would keep me updated on her

19  negotiations, or the negotiations with GMAC for the

20  RESPA violations and damages because of the returning

21  of the car.

22    Q.  Was there ever a resolution of those

23  negotiation that you learned of?

40

1    A.  Yes.

2    Q.  How is it that you learned of some type of

3  resolution?

4    A.  Laura.

5    Q.  Please tell us how you learned of this; how

6  you were advised?

7    A.  Laura had been keeping me updated as the

8  process was going on, I would almost say bragging of

9  her accomplishments in her father's name and then came

10  to my house one day after work and said that Dan wanted

11  to tell me of the settlement, and that I shouldn't tell

12  him that she had already told me.

13    Q.  She told you that Dan wanted to tell you?

14    A.  Um-hmm.

15    Q.  That being Dan Anker?

16    A.  Yes.

17    Q.  Did Dan Anker, in fact, tell you about the

18  settlement?

19    A.  Laura made a phone call and put me on the

20  phone with Dan.

21    Q.  What did Dan tell you about the GMAC

22  settlement?

23    A.  There was a settlement negotiation and that we

53

1  Q.  Did you see that check being prepared?

2  A.  No.

3  Q.  Did you see it being signed?

4  A.  No.

5  Q.  You have previously identified a check. This

6  is State's Exhibit 23. I would like you to take a look

7  at the signature line on the check, under the signature

8  line?

9       MR. LUGG: Objection, hearsay, Your Honor.

10      MR. WENDELBURG: I have not asked the

11 question.

12      THE COURT: Ask the question. Don't answer

13 the question, just ask the question. What is the

14 question?

15 BY MR. WENDELBURG:

16      Q.  Your Honor, the question is, under the

17 signature line there are three initials. What I am

18 going to ask --

19      THE COURT: What is the question that you are

20 asking. I am asking you to -- come to sidebar.

21      (Discussion held off the record.)

22      (The following sidebar conference was held.)

23      MR. WENDELBURG: Your Honor, it might be

54

1  helpful if you could see the check. Your Honor, under

2  the Daniel J. Anker name, there are three initials LAL.

3  The only thing I want to ask her is whether they

4  were -- she recalled whether they were there when he

5  endorsed the check.

6       MR. LUGG: That is the extent of the question

7  that is fine.

8       THE COURT: Fine.

9       (Sidebar conference concluded.)

10 BY MR. WENDELBURG:

11      Q.  Ms. Paveza, if you look at State's 23, that is

12 the check that we have been talking about last few

13 minutes. You see the signature line in the bottom

14 right hand under the signature I see 3 initials LAL; do

15 you recall whether these LAL were there when you

16 endorsed the check?

17      A.  I don't recall.

18      Q.  Ma'am, you testified a few minutes ago that it

19 was, I think your term was nearly impossible to get a

20 hold of Dan after the settlement took place. Do you

21 remember using those terms?

22      A.  Um-hmm.

23      Q.  Why was that, to your understanding, why was

55

1  it nearly impossible?

2       A.  Laura controlled the office --

3       THE COURT: Strike that.

4       MR. LUGG: Objection, Your Honor.

5  BY MR. LUGG:

6       Q.  What difficulties, if any, did you come into

7  trying to get a hold of Dan?

8       A.  I wasn't able to.

9       Q.  Were you told things when you called the

10 office?

11      A.  Yes.

12      Q.  Let me try and narrow it down. When you

13 called the office in an attempt to get a hold of Dan,

14 did you speak with anybody but Laura?

15      A.  No.

16      Q.  So your phone conversations at least were

17 limited to speaking with Laura?

18      A.  Yes.

19      Q.  And what were you told by Laura about trying

20 to get a hold of Dan when you tried to get a hold of

21 him?

22      A.  He was not available.

23      Q.  Were you told anything other than that?

56

1       A.  In settlements or out of the office. She was

2  relaying messages.

3       Q.  So told you she was relaying messages to him?

4       A.  Yes.

5       Q.  You used the term when you were testifying

6  earlier -- you used a phrase that Laura was bragging

7  her accomplishments in your father's name. What do you

8  mean by that?

9       A.  She was relaying to me how she was negotiating

10 these RESPA settlements.

11      Q.  Did she tell you -- when you say these RESPA

12 settlements, you had one, correct?

13      A.  Two.

14      Q.  Two?

15      A.  Yes.

16      Q.  One with GMAC, one with Conseco?

17      A.  Yes.

18      Q.  Was she telling you about any other RESPA

19 settlements she was negotiating?

20      MR. LUGG: Objection, Your Honor. Hearsay.

21      THE COURT: Sustained.

22 BY MR. WENDELBURG:

23      Q.  Did she tell you that she had negotiated both

A-69

1   of your settlements?

2       A.  Yes.

3       Q.  Was the request made of you not to tell Dan
that you had prior knowledge of the settlements that

5   she had negotiated?

6       A.  Yes.

7       MR. LUGG:  Objection.  Hearsay, Your Honor.

8       THE COURT:  That is overruled.

9       MR. LUGG:  Very well.

10  BY MR. WENDELBURG:

11      Q.  Ms. Paveza, you testified earlier this morning
that Laura did all the paperwork.  When you say Laura

12  did all the paperwork, is that what you came to

13  understand from Laura, is that what you came to know

14  based on your real estate industry?

15  

16      A.  My knowledge of real estate industry.

17      Q.  How long have you been a realtor?

18      A.  I have been a realtor, licensed since the end

19  of 2001.

20      Q.  When you say licensed, did you work in the

21  real estate industry before 2001?

22      A.  Yes.

23      Q.  What did you do?

58

1       A.  I was in the office, administrative capacity.

2   I had been in marketing and advertising.  My mother had

3   been a realtor.

4       Q.  How long have you worked in the real estate

5   industry?

6       A.  On and off since 1986.

7       Q.  And can you give us -- I don't need you to go

8   in exhaustive detail from '86 to your license in 2001;

9   what kinds of things were you doing?

10      A.  Secretarial, advertising, marketing brochures,

11  photographs, websites, publications for realtors.

12  Worked for Aetna Miller Services.

13      Q.  Prior to 2001, did you have occasion to deal

14  with real estate attorneys?

15      A.  No.

16      Q.  You so your dealing attorneys has been since

17  2001?

18      A.  Yes, except when I bought and refinanced my

19  own house.

20      Q.  Since 2001 when you were licensed, can you

21  give us any indication of how many clients you have

22  represented either as buyers or sellers?

23      A.  I don't keep track, probably over 30, maybe

60

1   more.

2       Q.  We have in evidence the check for $80,600, and

3   you have testified as what you were told about the

4   negotiation of settlement.  Other than that particular

5   amount that is shown is on the check, was there, to

6   your knowledge -- let me rephrase the question.

7           Did you take part in any of the negotiations

8   of this settlement?

9       A.  No.

10      Q.  Were you ever called upon by Laura or Dan to

11  either approve or disapprove of the settlement amount?

12      A.  I don't recall, but I don't think so.

13      Q.  You mentioned at some point a RESPA settlement

14  for three times your monthly mortgage payment.  Who

15  told you about that?

16      A.  Laura.

17      Q.  Was it your understanding that this $80,600

18  was in any way reflective of this three times monthly

19  mortgage payment?

20      A.  I don't understand.

21      Q.  Was there any relationship in your mind

22  between this concept of three times the monthly

23  mortgage payment and $80,600 on the check you were

1   eventually presented with?

2       A.  My understanding was because the car was

3   returned there were potentially other damages, so

4   negotiations for the RESPA violation and the car sort

5   of, I guess, continued.  We never saw a check for that.

6   She had told us $4,500.

7       MR. WENDELBURG:  May I have a moment, Your

8   Honor.

9       THE COURT:  Yes.

10      (Discussion held off the record.)

11      THE COURT:  Can I see counsel at sidebar.  I

12  don't need the court reporter.

13      (Discussion held off the record.)

14  BY MR. WENDELBURG:

15      Q.  Ms. Paveza, in connection with the so-called

16  settlement the $80,600, did anyone from the Anker

17  office give you any documents?

18      A.  No.

19      Q.  Were you shown any -- let me do this.

20      MR. WENDELBURG:  May I have this marked for

21  identification, please.

22      THE COURT:  Yes.

23      THE CLERK:  Defense Identification G.

**73**

1  A.  24 years.
2  Q.  You said you lived in this house for about
3  seven area a half yours?
4  A.  Yes.
5  Q.  Did you seek to refinance that?
6  A.  Yes.
7  Q.  Who held the mortgage at that time?
8  A.  Home Comings Financial.
9  Q.  About how much did you owe, if you recall,
10  Home Comings at that time?
11  A.  About 230, 231 thousand dollars.
12  Q.  When is it that you sought to refinance that
13  property?
14  A.  It was March or April of 2003.
15  Q.  What prompted you to do this?
16  A.  My company merged with another company. That
17  company offered a mortgage for employees. So I
18  refinanced through them.
19  Q.  Employee discount, so to speak?
20  A.  Yes.
21  Q.  What was the company that you were seeking to
22  obtain this through?
23  A.  Nationwide Advantage Mortgage.

**74**

1  Q.  Did you go through an application process?
2  A.  Yes.
3  Q.  Who was applying for that?
4  A.  My husband and I.
5  Q.  Did you, in fact, secure a mortgage through
6  Nationwide Advantage?
7  A.  Yes.
8  Q.  How much were you borrowing from them?
9  A.  231 that we needed to refinance.
10  Q.  What was your intent with this money, you were
11  borrowing from Nationwide to do what?
12  A.  Repay my loan from Home Comings.
13  Q.  And to do this did you enlist the aide of a
14  lawyer to have a refinancing?
15  A.  Nationwide did, yes.
16  Q.  Who was the lawyer that you were placed in
17  contact with to accomplish this refinancing?
18  A.  Daniel Anker.
19  Q.  Do you see him in the courtroom?
20  A.  I never met Mr. Anker.
21  Q.  You never met him?
22  A.  No.
23  Q.  How is it that this -- did the refinishing

**75**

1  occur?
2  A.  Yes.
3  Q.  And how is it that you never met Mr. Anker?
4  A.  When we went to his office to sign the
5  paperwork he was not there. His daughter, Laura, was
6  there, and she indicated twice while we were waiting
7  that she had received phone calls from him indicating
8  the first time he was on his way, the second time that
9  he wasn't going to be able to make it. She asked if we
10  felt comfortable in signing the paperwork; after having
11  sat there for several hours at that point in time, we
12  decided that we been through the mortgage settlement
13  process before, so we would go ahead and sign the
14  paperwork. Then she was going to have Mr. Anker review
15  the documents, sign them appropriately, then forward a
16  copy of the documents to us.
17  Q.  Was that ever done?
18  A.  No.
19  Q.  You said you were at this office for several
20  hours. Where did you sit? Where did you stay?
21  A.  We were in the reception area, if you would
22  call it that. There was a small office off to the
23  left-hand side. We were sitting in the waiting room

**76**

1  with Laura while she was waiting for the documents and
2  waiting for Mr. Anker.
3  Q.  Did a person ever come or leave through that
4  area while you were waiting?
5  A.  No.
6  Q.  What time of day was it that you were going to
7  do this?
8  A.  Late afternoon.
9  Q.  What day of the week; do you recall?
10  A.  I believe it was a Friday, but I am not
11  positive about that.
12  Q.  Did you ultimately at some later date receive
13  settlement paperwork for the refinancing that you were
14  attempting to conduct in April?
15  A.  We received a copy from Mary Quinn who was
16  part of the individuals who were doing the research on
17  what occurred.
18  Q.  Did you ever receive paperwork that you signed
19  back then in April of 2003?
20  A.  No.
21  Q.  Did you ever receive a copy of the mortgage
22  that you had achieved, received, from Nationwide
23  Advantage?

A-71

1   A.  Again, the only copy that we received were
2   from Mary.
3         MR. LUGG:  May I approach the witness, Your
    Honor?
5         THE COURT:  Sure.
6   BY MR. LUGG:
7   Q.  I am placing before you a document.  Do you
8   recognize that document?
9   A.  Yes.
10  Q.  What is that that I have handed to you?
11  A.  It is a mortgage document that we signed.
12  Q.  Did you, in fact, initial the various pages of
13  that document?
14  A.  Yes.
15  Q.  Which company was issuing to mortgage to you?
16  A.  Nationwide Advantage.
17  Q.  What was the value of the mortgage that you
18  were securing?
19  A.  Can I look at this document?
20  Q.  Please.
21  A.  237 thousand dollars.
22  Q.  237 thousand dollars?
23  A.  Yes.

                                            78

1   Q.  And what was the effective date of this.
2   instrument?
3   A.  April 25, 2003.
4   Q.  You indicated that you had signed this
5   document, turning to the second to last page of this
6   document, is your signature reflected upon that page?
7   A.  Yes.
8   Q.  And do you recognize any other signatures on
9   that page?
10  A.  Yes, my husband's signature and Laura's
11  signature.
12  Q.  You indicated this copy was eventually
13  provided to you of this mortgage instrument?
14  A.  I am not sure if it was this instrument.
15  There was an instrument very similar to this one.
16  Q.  You now have a loan with Nationwide Advantage?
17  A.  Yes.
18  Q.  You making payments towards that?
19  A.  Yes.
20        MR. LUGG:  If I may I approach, Your Honor,
21  move to admit the mortgage as the next State's Exhibit.
22        MR. WENDELBURG:  No objection, Your Honor.
23        THE COURT:  It is admitted then.

1         THE CLERK:  State's Exhibit 24, Your Honor.
2   BY MR. LUGG:
3   Q.  You indicated that you were required to
4   complete a settlement sheet at a later date, correct?
5   A.  Correct.
6         MR. LUGG:  May I approach again, Your Honor?
7         THE COURT:  Yes, you may.
8   BY MR. LUGG:
9   Q.  Do you recognize what I have placed before
10  you?
11  A.  Yes.
12  Q.  What is that?
13  A.  Settlement document that we signed in October
14  of 2003 with Mary Quinn.
15  Q.  Who, if you know, is Mary Quinn affiliated
16  with?
17  A.  Whoever was responsible for the investigation.
18  Q.  Investigation of what?
19  A.  Of what occurred between Mr. Anker and us and
20  others.
21  Q.  Looking at this document, does this reflect
22  the refinancing that you were attempting to achieve in
23  April 2003?

                                            80

1   A.  Yes.
2   Q.  In fact, line I indicates a settlement date of
3   April 25, 2003, correct?
4   A.  Yes.
5   Q.  Disbursement date of six days later?
6   A.  Correct.
7   Q.  And is your first mortgage to Home Comings
8   reflected upon this document; if I may direct your
9   attention to line 104?
10  A.  Yes.
11  Q.  Again, was your understanding that the new
12  loan from Nationwide was to payoff Home Comings
13  mortgage?
14  A.  Yes.
15        MR. LUGG:  State would move this to be the
16  next State's Exhibit.
17        MR. WENDELBURG:  No objection, Your Honor.
18        THE COURT:  So admitted.
19        THE CLERK:  State's Exhibit 25.
20  BY MR. LUGG:
21  Q.  Now, if I can take you back, you indicated
22  that what is now State's 25 was executed in October of
23  2003.  You indicated it was to correct problems that

81

1   had occurred in the past; is that right?

2   A. Correct.

3   Q. Tell us about -- you indicated that you were

4   there for a few hours in late April 2003. At some

5   point you left after signing some documents?

6   A. Correct.

7   Q. Did you ever receive copies of documents that

8   you had signed?

9   A. No.

10  Q. Was that Home Comings mortgage paid off?

11  A. No.

12  Q. What happened? What did you learn?

13  A. What happened was I have access -- had access

14  to my account on-line. I do a lot of on-line banking

15  and checking of my accounts on a regular basis. So

16  from the period of time we signed it everyday I checked

17  our account with Home Comings to see if the mortgage

18  had been paid off, and it had not been. So on May 10,

19  2003, I contacted Nationwide Advantage Mortgage via

20  e-mail to let them know there have been some type of

21  problem because my mortgage was not paid off with Home

22  Comings that I was concerned because the payment was

23  due on May 1. From there they contacted Mr. Anker's

82

1   office, and questioned what occurred.

2       I received an e-mail back from Mr. Anker's

3   office, what was unclear who sent that indicating that

4   they would check into the situation.

5   Q. You indicated you were not clear who sent the

6   e-mail. What did you mean by that?

7   A. It came from DanAnkerlaw@AOL.com. It wasn't

8   signed by anyone.

9   Q. Did you, over the next few weeks, have e-mail

10  communications with a member of Mr. Anker's office on a

11  repeated basis?

12  A. Yes.

13  Q. Were any of the communication identifiable to

14  a particular sender throughout the correspondence that

15  you had?

16  A. There were a couple that I knew came from a

17  Laura simply because she indicated she had spoke to her

18  father.

19  Q. After that initial unsigned e-mail what did

20  you do?

21  A. I kept corresponding back and forth with

22  Nationwide and Mr. Anker's office to find out where the

23  money was. I was getting very nervous, starting to

83

1   receive phone calls from Home Comings Financial

2   concerned about our payment. I received a notice from

3   Home Comings, I had previously subscribed to their

4   electronic debit from my checking account, so they had

5   sent me a notice saying there wasn't -- a payment was

6   late. In my correspondence back with Mr. Anker's

7   office I received a note saying don't worry about it,

8   confirmed Home Comings received money. There was screw

9   up at their office and that it would be taken care of.

10  Q. Did you learn that to be the case?

11  A. No.

12  Q. What did you learn with respect to your Home

13  Comings mortgage at that time, that it had been paid?

14  A. No.

15  Q. Did you continue your efforts?

16  A. Yes.

17  Q. What did you do?

18  A. I called Home Comings Financial, and was able

19  to reach people there. I was also in contact with

20  Nationwide. Then I started to get really concerned

21  because we had people showing up at our door. We

22  started to receive foreclosure notices.

23  Q. What was the purpose of people showing up at

84

1   your door?

2   A. Investigators from Home Comings Financial sent

3   there to verify that the property was not vacated.

4   Q. And you had not vacated the property?

5   A. No.

6   Q. You are still living there?

7   A. Yes.

8   Q. What time of year was it that these folks

9   showed up at your doorstep?

10  A. Summer of 2003.

11  Q. This is a few weeks or several weeks after the

12  closing?

13  A. Yes.

14  Q. And was the Home Comings Financial situation

15  fixed thereafter?

16  A. Eventually it was fixed via a payment from the

17  Nationwide Advantage Mortgage. My husband had gotten

18  involved and had started to make phone calls.

19  Q. If you can limit your testimony here to things

20  that you did.

21  A. Sure. I, at that point, I had gotten out of

22  it. I let my husband handle everything.

23  Q. When is it that you said got out of it; what

A-73

85

1  time of year?

2      A.  It was probably mid June.

3      Q.  Mid June of 2003?

4      A.  Yes.

5      Q.  At that point in time you indicated had you

6  had e-mail communication with Dan Anker's office?

7      A.  Yes.

8      Q.  You indicated that some of the e-mails were

9  identifiable by the sender?

10      A.  Correct.

11      Q.  Who was it that you understood this to be?

12      A.  Laura.

13      Q.  That was the person present back on April 25?

14      A.  Correct.

15      Q.  How frequently did you communicate with Dan

16  Anker's office or with Laura Larks?

17      A.  Some days it was several times a day.  It was

18  at least once or twice a week on an ongoing basis.

19      Q.  What was the purpose of your communications?

20      A.  To get my mortgage paid.

21      Q.  What information were you provided with in

22  response to your seeking to get your mortgage paid?

23      A.  I was told that because there was a, quote,

86

1  unquote, screw up at Home Comings office we would be

2  entitled to some type of settlement from Home Comings.

3  The initial number thrown out via e-mail was 100

4  thousand dollars and it went up to 350 thousand at some

5  point in time.

6      Q.  How was it you were advised of this legal

7  settlement you are telling us about?

8      A.  Via e-mail.

9      Q.  Did you have any telephone communication with

10  the Anker office?

11      A.  I did not.

12      Q.  You indicated that you shut down, so to speak,

13  in June 2003?

14      A.  Correct.

15      Q.  Was the issue resolved in June of 2003?

16      A.  No.

17      Q.  What happened, if you know, with respect to

18  your efforts after June of 2003?

19      A.  Eventually, the Chief Counsel at Nationwide

20  Advantage Mortgage was involved, and she realized there

21  was definitely a problem in terms of the payment, and

22  they actually made a payment to get us caught up at

23  Nationwide Advantage Mortgage until such time as they

87

1  were able to determine what actually occurred here.

2  Eventually, Mary contacted us and let us know what was

3  going on at this point and that we needed to come in

4  and redo the paperwork.

5      Q.  What time of year is it that Nationwide steps

6  in to help and Mary asked for you to meet with her?

7      A.  Late summer, early fall.

8      Q.  Would that be before or after July?

9      A.  After.

10      Q.  How much time did you spend working on this

11  before you got out of it June of 2003?

12      A.  A significant amount of time.  It seems like

13  that was all I was doing was trying to figure out what

14  had occurred here between the phone calls I was making

15  to Home Comings and to Nationwide Advantage and the

16  e-mails that I was sending to Mr. Anker's office.  It

17  took us a significant amount of time.

18      Q.  Did you ever speak directly with Mr. Anker,

19  the person you had mentioned?

20      A.  No.

21      Q.  In fact, you told us you met him; is that

22  right?

23      A.  Correct.

88

1          MR. LUGG:  May I have one moment, Your Honor.

2          (Discussion held off the record.)

3          MR. LUGG:  Nothing further.  Thank you.

4          CROSS EXAMINATION

5  BY MR. WENDELBURG:

6      Q.  Good afternoon Ms. Caucci.  My name is Allen

7  Wendelburg.  I represent Dan Anker.  We have been

8  supplied by the State with copies of a lot of e-mails.

9  And what I would like to do, if I might, is show you a

10  whole stack of documents which I will ask the Court's

11  permission to have marked as Defense for Identification

12  simply collectively, not individually.

13          THE COURT:  Sure.

14          THE CLERK:  Defense Identification H.

15          MR. WENDELBURG:  May I approach, Your Honor?

16          THE COURT:  Sure.

17  BY MR. WENDELBURG:

18      Q.  This is a stack that's almost a half an inch

19  thick.  I'm not going to ask you to read each one

20  individually.  Can you, in general, identify for the

21  jury what those documents are?

22      A.  That those are copies of e-mail correspondence

23  between myself and Mr. Anker's office.  I believe there

A-74

1  would also be copies of some things between myself and

2  Nationwide Advantage Mortgage.

3      Q.  Make sure that is, in fact, what all those

4  things are.  I don't want to slip anything past you,

5  I'm not trying to.

6      A.  Yes.

7      Q.  Okay.

8          Ma'am, when you said a few minutes ago it

9  was -- you were unable to determine exactly who was

10  sending you e-mails from the Anker office, was that

11  because the e-mail address from when you were receiving

12  said Dan Anker Law?

13      A.  It was because it wasn't signed by anyone.

14      Q.  Did you have an understanding during the

15  period of receiving these e-mails I think dated from

16  may of '03 to mid July '03 who was sending these things

17  to you?

18      A.  Yes.

19      Q.  Who, to your understanding, was sending them?

20      A.  Laura.

21      Q.  Do you understand any of these e-mails to come

22  from Dan himself?

23      A.  I really couldn't tell who they were coming

90

1  from.  My understanding was they were coming from

2  Laura.

3      Q.  In fact, in those e-mails, didn't the sender

4  refer to you as Peg?

5      A.  I believe sometimes I was referred to as no

6  one in some instances.  I don't see any reference to

7  Peg.  I have signed them Peg when I sent them.

8      Q.  You testified, I think, that you never met Dan

9  Anker before the settlement.  You also -- did you ever

10  meet him after the settlement?

11      A.  No.

12      Q.  Did you ever speak with him, as far as you

13  know, at any time?

14      A.  I did not.

15      Q.  You testified that you had received offers in

16  settlement ranging from 100 thousand dollars going to

17  350 thousand dollars, from whom did you receive that

18  communication?

19      A.  They were in e-mails.

20      Q.  Did you accept any of these offers?

21      A.  They were not actually offers.  They were

22  indications that that was where we were in terms of

23  negotiations with Home Comings.

1      Q.  Did you ever receive a check from Home Comings

2  or from the Anker office in response to any of these

3  offers or proposals?

4      A.  No.

5      Q.  Did you ever ask when the check would show up

6  or where it was, what the status of the settlement was?

7      A.  I turned all that over to my husband.

8      Q.  I think you testified that you turned this

9  stuff over to your husband sometime in June of '03.

10  Some of the e-mails are dated in July of '03, did

11  that -- let many ask you this: Did you get completely

12  away from it in June of '03, did you stay in it to send

13  e-mails?

14      A.  I stayed in to send e-mails until July 11, it

15  looks like.

16      Q.  E-mails coming from your screen name, is it

17  fair to assume those are e-mails that you sent rather

18  than your husband using your screen name to send?

19      A.  Yes.

20          MR. WENDELBURG:  Just a moment, if I may, Your

21  Honor.

22          (Discussion held off the record.)

23  BY MR. WENDELBURG:

92

1      Q.  Ms. Caucci, you referred to a settlement that

2  was done in October of '03, done by someone named Mary

3  Quinn; is that -- to your understanding, who is Mary

4  Quinn?

5      A.  She is someone who works for an attorney who

6  was involved in the investigation.

7      Q.  Was your understanding that Mary Quinn is an

8  attorney or was at the time she did the settlement?

9      A.  No.

10      Q.  Yet you went through a second settlement

11  essentially a do over, if you will, of the old

12  settlement with Mary Quinn; is that correct?

13      A.  In the attorney's office.  Yes.

14          MR. WENDELBURG:  Thank you.  No further

15  questions.

16          MR. LUGG:  No questions from the State, Your

17  Honor.

18          THE COURT:  You may step down.

19          MR. LUGG:  State calls Frances Caucci.

20          FRANCES X. CAUCCI,

21      having been first called by the State was sworn on

22  oath, was examined and testified as follows:

23          DIRECT EXAMINATION

105

1 she started in the office sometime around ten o'clock
2 in the morning, she had given me her schedule. I don't
3 remember exactly what it was. I remember one day just
4 driving down to the office, I walked in in the hopes
5 that I would find Dan in there. In fact I did on July
6 14th approximately ten o'clock in the morning.
7    Q. Unannounced?
8    A. I showed up unannounced. Again, it was a
9 small office she sat in with a desk. Off to the left
10 was a door that was open, the light was on. I heard
11 his voice. I heard a man's voice in there. So I knew
12 he was in there. I was not going to leave until I
13 spoke to him.
14    Q. Did you speak to him?
15    A. I did.
16    Q. You told us about that first office where you
17 met Laura back in April. What was the condition of
18 that office?
19    A. It wasn't impressive. It was in disarray,
20 piles of paper everywhere. You know, did not look very
21 professional to me. And if I had a choice, had chosen
22 to do business with that office, I certainly would have
23 walked out that day. As I stated, you know, we were

106

1 directed by Nationwide to go to this attorney to
2 complete settlement papers.
3    Q. Were you able to get into that office to the
4 left, that office of Mr. Anker?
5    A. I did. When I first showed up I surprised
6 her. I was here to talk to Mr. Anker. So she asked me
7 to wait a second, she went into the office and shut the
8 door. They were in there speaking for a few minutes.
9 When she came out she said I could go in and speak to
10 Dan.
11    Q. What was the condition of that office?
12    A. It looked like any other office, it had some
13 plaques on the wall, you know, file boxes, so forth.
14 It was a small office.
15    Q. Did you speak with Mr. Anker at that point?
16    A. I did. I introduced myself as Frank Caucci.
17 I told him I was there to find out where we stood with
18 our settlement, and what he was doing about it.
19    Q. What did he tell you?
20    A. I wanted to confirm indeed he was in
21 conversation with someone on either end and he
22 confirmed pretty much everything that Laura had been
23 communicating to us in e-mails, that he had been

107

1 speaking with, you know, general counsel, and that, you
2 know, they had sent the check to Home Comings. Home
3 Comings had screwed up and that we are entitled to the
4 settlement, everyday it was not settled would be more
5 money for us. I told him, quite frankly, I did not
6 care about a settlement. I just wanted our credit
7 restored. I wanted this thing settled once and for
8 all.
9    Q. Did you have more of a discussion about the
10 mortgage and the settlement at that point in time?
11    A. Yes, I was in there approximately about 40
12 minutes. I remember after I expressed my
13 dissatisfaction with the way this was handled Mr. Anker
14 had offered a story, similar story of his own. He
15 stated that this had happened to him, similar situation
16 where the banks screwed up a mortgage or refinancing
17 that he done sometime ago, that it took about 18 months
18 for him to straighten it out. I remember thinking to
19 myself, I guess he is implying that I should be patient
20 and weight 18 months, but I certainly wasn't prepared
21 to do that.
22    Q. Had you done some homework before going to
23 this meeting?

108

1    A. Yes. Although we are instructed not to speak
2 to anyone, I took it upon myself to start calling these
3 people. I wanted to find out who had this money. A
4 check was cut for almost a quarter million dollars. I
5 had his secretary telling us that the original bank --
6 second bank, Nationwide Financial, had sent the balance
7 of our original mortgage to Home Comings back in May.
8 It wasn't clear, you know, who was at fault, Nationwide
9 or Home Comings at this point in July they were blaming
10 Home Comings as the bank in fault. That is when I said
11 to Mr. Anker I want something in writing that you have
12 contacted them they admit fault, that all of this is
13 going to go away.
14    Q. What did he tell you?
15    A. He said to me at when I demanded something in
16 writing, he said he did not work that way.
17    Q. What do you mean he does not work that way.
18 What does that mean?
19    A. I wasn't sure either. I said, what do you
20 mean you don't work that way? I just pick up the phone
21 and I call people. So he was, I guess he was trying to
22 lead me to believe that he did not have anything in
23 writing and he could not produce anything in writing.

A-76

109

1  I said that is not good enough. It's been two months.
2  I need something to satisfy my wife and I you are
3  working on our case. This is serious. They are going
4  to foreclose my property. My credit is ruined right
5  now.
6      Q.  When you tell them that, you want to know he
7  is working on that, he tells you I don't work that way,
8  what did you talk about next?
9      A.  I may have said call them right now.  That
10  would satisfy me. We may have gotten interrupted by a
11  phone call briefly or something like that, I remember
12  after he was finished he said that would he supply me
13  with that document to satisfy me.  He did not have it
14  there.  He would have his secretary prepare the
15  document for me.
16      Q.  You, at this point, have done, I used the term
17  homework, he is telling you these things.  What is your
18  impression at that point in time, when he tells you I
19  don't work that way, I will get that document for you?
20      A.  The whole time I was speaking with him I did
21  not have a very good feeling. My perception was he was
22  not being forthcoming. He was annoyed that I was there
23  almost.

110

1      Q.  What meat you think that he was annoyed that I
2  you were present?
3      A.  He wasn't making eye contact, changing the
4  subject. He told me they was going out of town, you
5  know, almost like I had interrupted his schedule
6  because I came in unannounced. I was persistent in my
7  questioning I was not going to leave there until I was
8  satisfied that he could prove to me someone was looking
9  into this matter.
10      Q.  Why were you so persistent?
11      A.  It was our credit, our house, we were going to
12  lose our home. This was a simple transaction, a
13  refinance. We did it at the attorney's office. I
14  couldn't believe this had gone on for two months or
15  more.
16      Q.  Did he ever indicate at any time a lack of
17  knowledge of your transaction?
18      A.  No, he seemed familiar with my case. He knew
19  who I was. So I did not get that impression at all.
20      Q.  Was there any further discussion before you
21  left at that 40 minute meeting?
22      A.  Um-hmm.
23      Q.  Did you discuss the actual terms of a

111

1  settlement, a legal settlement to be had against Home
2  Comings?
3      A.  When he brought the fact up about the
4  settlement, I said what are we talking?  What do you
5  mean a settlement?  He said I am entitled, my wife and
6  I are entitled to a settlement because the bank had
7  screwed up the refinance. And I said, what are we
8  talking? He said, how much do you want? I almost
9  thought he was joking with me or pulling my chain.  I
10  said, what do you mean how much do I want?  We have to
11  start somewhere. Pick a number.  You tell me, Dan,
12  what is a good number to start at, you are the
13  attorney. He says, I don't know, about 300 thousand.
14  Let's start at 300 thousand, knowing this was just a
15  big smoke screen. I didn't care about the settlement.
16  I wanted this thing resolved. At the time of the
17  accident obviously he did not know I had already been
18  in contact with Home Comings, also Nationwide on a
19  consistent basis to try to determine who had this check
20  because his office was telling me that Nationwide
21  mailed it to Home Comings. Nationwide was telling me
22  that they mailed it to his office. So there was a
23  discrepancy.

112

1      Q.  Was his explanation satisfactory to you as you
2  left the office that day?
3      A.  No, I felt worse after I left because I did
4  not have anything that I had asked for. I did not have
5  a document, something with Home Comings letterhead
6  proving to me he had spoken to either side, either
7  bank, you know. So I was even more frustrated.
8      Q.  Were the issues with respect to that Home
9  Comings loan resolved after you met with Mr. Anker on
10  July 14, 2003?
11      A.  Sorry, can you repeat that?
12      Q.  Were the issues or was the Home Comings loan
13  satisfied?
14      A.  After I spoke with Mr. Anker?
15      Q.  Yes.
16      A.  No, the loan was not satisfied until the end
17  of July when Nationwide, after my consistent phone
18  calls to their general counsel, bringing to their
19  attention the problem in Mr. Anker's office, they
20  finally realized those monies were gone. And so they
21  finally, thankfully, they paid a quarter million
22  dollars to Home Comings to satisfy that loan that did
23  not take place until close to the end of July.

1    MR. LUGG: May I have one moment, Your Honor.

2    (Discussion held off the record.)

3    MR. LUGG: Thank you. Counsel may have a few

questions for you.

5    CROSS EXAMINATION

6    BY MR. WENDELBURG:

7    Q.   Mr. Caucci, my name is Allen Wendelburg. I

8    represent Dan Anker. Who have you talked to about this

9    case since these problems arose?

10    A.   I have spoken to my wife, obviously, almost on

11    a daily basis during that period of time. I spoke to

12    three attorneys in the area, because of my concern,

13    because of my suspicions. I wanted someone else to

14    handle this to investigate get it, to get involved. I

15    was desperate at that point. So I contacted the

16    attorney who originally did our mortgage when we moved

17    into this area, Mr. Woods, Jim Woods, I believe he is

18    with the firm Boyle, Boyle Connelly, something like

19    that. I did speak to three other attorneys, gave them

20    the facts of the case and to see what recourse I had

21    and to see if I could retain their service to

22    investigate this.

23    Q.   Are you currently represented by counsel in

---

114

1    this matter?

2    A.   No, I am not.

3    Q.   Have you ever been represented by counsel in

4    this matter?

5    A.   Other than Mr. Anker, whatever his legal, you

6    know, obligation was to us.

7    Q.   You said that you have talked to three

8    attorneys in this case. Have you hired any of those

9    attorneys to handle this matter for you?

10    A.   No, I have not.

11    Q.   Who else have you talked to about this case?

12    A.   I mentioned to my in-laws that, you know, we

13    have this situation come up. I did not want to upset

14    them, nor did my wife. I am sure I mentioned it to

15    probably my mother, but I can't think of anyone else.

16    It is kind of an upsetting matter.

17    Q.   Have you talked to the Office of Disciplinary

18    Counsel about this case?

19    A.   At the end of July, trying to remember if

20    there was a woman Johnson, I think, because the end of

21    July, Nationwide had indicated to me, thinking around

22    the 31st of July 2003, that they, in fact, were already

23    investigating Mr. Anker, and that the Office of the

---

Disciplinary Counsel; is that correct?

2    Q.   Yes.

3    A.   They were going to take possession, I believe,

4    of his office. I was given a name of Mr. Forsten. He

5    was assigned, I believe, the case. So at that point, I

6    realized that obviously, someone else must have

7    complained and --

8    Q.   Have you talked to Mr. Forsten about this

9    case?

10    A.   Yes, I remember having a few phone calls

11    briefly with him.

12    Q.   Have you talked to representatives in the

13    Attorney General's Office about this case?

14    A.   Attorney General's Office.

15    Q.   Prosecutors office?

16    A.   This was -- yes, Mr. Carmine. I was contacted

17    to come in and bring, you know, documents and so forth

18    so I had a interview with Mr. Carmine, the

19    investigator.

20    Q.   Have you spoken with the prosecutor, Mr. Lugg,

21    about this case before today?

22    A.   Before today I never met Mr. Lugg. I met him

23    this morning briefly for five minutes.

---

116

1    Q.   Have you been contacted by anyone on behalf of

2    the defense about this case?

3    A.   Yes, there was an individual that served me

4    the subpoena last week. He represented himself as a

5    private investigator for Mr. Anker in the Anker case.

6    Q.   Did you talk to him about the case?

7    A.   I just spoke to him briefly. I told him I was

8    not interested in giving him any information.

9    Q.   Would it be fair it say you are angry at Mr.

10    Anker about this matter?

11    A.   I am angry. My credit has been negatively

12    impacted. You know, I am angry at Nationwide for

13    sending us to Mr. Anker's office.

14    Q.   Would it be fair to say you are angry at Mr.

15    Anker for this situation?

16    A.   Sure, I have, you know, some anger,

17    frustration because it went unresolved.

18    Q.   In all these things that you testified to are

19    going on, you testified that you met with Mr. Anker on

20    one occasion, that is July 14?

21    A.   Correct.

22    Q.   2003. How is that you are able to fix the

23    date?

1  business settlement out of state next week. I was

2  highly annoyed at that. I questioned him why is the

3  defense serving me with a subpoena. I am going to be

4  testifying for the prosecution. At that point I had

5  not received a subpoena from the prosecution yet.

6      Q. You received the correspondence some time ago

7  about the trial?

8      A. Yes, I had been told by Mr. Carmine that I

9  would probably be needed in court as Nationwide also

10  had, you know, asked us to do the right thing and

11  testify in court.

12      Q. Focus on this discussion you with Mr. Glance,

13  Bill. You were asked questions and asked a few other

14  certain statements to Mr. Glance which you respond

15  negatively. You did not say scum bag psychopath. You

16  began to say your comment was in response to something.

17  What was it that Mr. Glance said to you that you

18  responded that you were not going to speak to him?

19      A. He was anxious to tell me information about

20  Dan's side. It was evident to me he wanted to tell me

21  his side of the story. I did not think that was

22  appropriate. I thought that he knows that I am going

23  to be a witness, why would he be there to try to talk

1  to they about this. I did not think that was right. I

2  don't remember saying scum bag, I did not say Laura was

3  a sociopath.

4      Q. What was he trying to tell you, what was he

5  saying to you about the case?

6      A. You know, I, again, was trying to be polite he

7  was polite, but at the same time he was very clear he

8  stated that if I did not provide him with contact

9  information, in I did not participate in an interview,

10  that his words are, that they were going to bust my

11  balls and make me show up everyday until trial was

12  over. I took that as a threat, that kind of got me on

13  the defensive a little bit. I just had the subpoena, I

14  knew I had to show up at Court, but I believe I knew

15  that the trial was starting this Monday, 18th so I was

16  confused why I was subpoenaed for the 25th. I believe

17  Bill indicated that defense would be putting on their

18  portion of the trial next week.

19      Q. You explained in the midst of this comments he

20  made to you, did you give him your phone number,

21  contact information?

22      A. No, that is none of his business. I wouldn't

23  give that to anyone. He did not give me his card. He

1  pulled up in a red vehicle and handed me a subpoena.

2      Q. This is the first time today when you were

3  asked do you recognize that you have seen him since

4  that time?

5      A. I never met the man before that. I remember

6  back in 2003, end of 2003 I received a few phone calls

7  with a Bill leaving a message on there indicating he

8  was a private investigator. I never called him back.

9      Q. When says trying to tell you the defendant's

10  side of the story; what did he say to you; do you

11  recall?

12      A. You know, that, you know, it is in general, it

13  is not, you know, Dan's fault, there is a lots that I

14  don't know. I said I don't care to know it. It will

15  all come out in the trial. That's what the trial is

16  for.

17      Q. Did he tell you who his employer was when he

18  showed up to deliver the subpoena?

19      A. That is how he presented himself. He was a

20  private investigator for Dan Anker. I remember him

21  stating that his group or individuals working for him

22  are ex DEA agents, ex something or another. That was

23  supposed to impress me, I think.

1      Q. You were asked at the outset of your cross

2  examination that is the questioning of my colleague

3  about your conversations and communications you had

4  with a number of other people. Did any of the other

5  people tell you what to say or provide you information

6  as to what to testify to today?

7      A. No, absolutely not.

8      Q. Other that than comments you have indicated to

9  you offered to you by Mr. Glance last week, did anybody

10  offer any threatening statements to you how you should

11  testify or what you should say?

12      A. Well, I felt intimidated when Bill showed up

13  at my door because as I have indicated if I did not

14  provide him with this information, again, he said they

15  assuming defense was going to bust my balls. Again,

16  his words, not mine.

17      Q. Was this entire experience from April forward

18  to today a noteworthy experience in your lifetime?

19      A. Yes, that is something that I am not going to

20  forget. I am aggravated now just sitting here

21  recalling it. My wife and I work very hard. We had

22  perfect credit, as a result of this transaction, you

23  know whoever is guilty or at fault here we still wind

137

1    up the victims here because we have bad credit. It

2    costs us money in monitor our accounts, and we pay an

3    agency to alert us if anything happens with our credit

4    report. No one has ever once, you know, said they were

5    going to do anything about that. Yeah, I am -- it is

6    noteworthy, to say the least.

7        Q.   You indicated time line that you maintained

8    included that July 14 meeting; is that July 14 meeting

9    as you described it today relatively fresh in your

10   mind?

11       A.   Absolutely.

12           MR. LUGG:   Thank you.

13           RE-CROSS EXAMINATION

14   BY MR. WENDELBURG:

15       Q.   Mr. Caucci didn't you used to be a process

16   server?

17       A.   I was Pennsylvania State constable for a brief

18   period of time.

19       Q.   Did that mean you served subpoenas?

20       A.   Served subpoenas bench warrants, took

21   prisoners up for arraignment.

22       Q.   Your testimony is that you were intimidated

23   when Mr. Glance served you with a subpoena in this

138

1    case?

2        A.   I was because I shared in hindsight what I

3    thought was too much information, obviously he is

4    working for Dan Anker, when I shared with him the fact

5    that I had important business out of State Monday, I

6    was like I said I saw that the subpoena was for Monday,

7    and you know, I felt pressured and intimidated if I did

8    not give him information he was looking for, that he

9    indicated your office was going to bust my balls.

10       Q.   Mr. Caucci, weren't you also given a note with

11   that subpoena asking you to contact my office to

12   arrange for scheduling of your testimony?

13       A.   Yes, again, I did not feel that it was

14   appropriate since I was going to be a witness for the

15   prosecution. I immediately called Amy --

16       Q.   Who is Amy?

17       A.   I contacted Amy in the District Attorneys

18   Office to indicate that I had been served a subpoena

19   for this trial. I had not received anything from the

20   prosecutor yet. I explained to her what I said to you,

21   this gentleman came to my door. I thought that it

22   wasn't right that he come to ask questions of these

23   witnesses, you know, that is how the conversation

139

1    proceeded.

2        Q.   Mr. Caucci, did any of the details of your

3    meeting with Bill Glance last Thursday make it into the

4    log that you have told us about?

5        A.   No, I stopped taking notes on this event once

6    I was informed that the Office of Disciplinary Counsel

7    had taken over Dan's office and that he was being

8    investigated at that point. So my focus turned on

9    trying to recover our documents, or, you know, restore

10   or credit, and things like that.

11       Q.   Mr. Caucci, I think you may have gone a little

12   far afield. I take it your answer is no, none of Bill

13   Glance's incident made it into your log; is that right?

14       A.   No, I did not write anything down from that

15   day.

16           MR. WENDELBURG:   Thank you.

17           MR. LUGG:   Prompts nothing from the State.

18           THE COURT:   You may step down. Counsel take

19   care of the matter I mentioned at sidebar.

20           MR. LUGG:   Yes, Your Honor.

21           THE COURT:   All right. Why don't we have a

22   luncheon recess. As far as scheduling, I understand we

23   may have an early day this afternoon.

140

1            MR. LUGG:   We may, Your Honor.

2            THE COURT:   Which is fine. Give the jury

3    another extra time start up at 2:30 is 2:30; is that

4    okay.

5            (Jury left the courtroom at 1:16 p.m.)

6            (A short recess was taken.)

7            MR. LUGG:   Your Honor, a witness you have

8    instructed us, he is present.

9            THE COURT:   What I want to you to do is get

10   that log available so both of the lawyers can look at

11   it, either side somehow feels ti would be helpful to

12   you have come back if the log turns out to be further

13   interest you have to come back. Simply may look at it

14   and say it is all it is. For housekeeping sake we need

15   you to do that. You work with getting it to counsel

16   and both counsel look at it both entitled to look at

17   it. Mr. Wendelburg is entitled to look at it, as well,

18   only have to do it one time. You will all work that

19   out.

20           (A short recess was taken.)

21           THE COURT:   I was advised that we went into a

22   luncheon recess that the jury had inquired of the

23   bailiff with respect to is it Glance.

A-80

| | |
|---|---|
| 1   MR. WENDELBURG: G-L-A-N-Z. | 1   Q. What do you do for a living? |
| 2   THE COURT: Here is notes with you and Mr. | 2   A. Nurse anesthetist. |
| 3   Anker with you whether this is an appropriate thing I | 3   Q. What type of hours do you keep for that job? |
| 4   should tell the jury that the defense is a defense | 4   A. All of them. |
| 5   investigator and that passing notes to counsel | 5   Q. Scheduled to work today? |
| 6   certainly is an appropriate thing to do. So there is | 6   A. Yes. |
| 7   no misunderstanding of that. | 7   Q. Did you work yesterday? |
| 8   MR. LUGG: Fine, Your Honor. Finishing out | 8   A. Yes. |
| 9   the housekeeping from this morning, Mr. Caucci just | 9   Q. Appreciate you coming in today to be with us |
| 10   returned handed to Mr. Carmine a copy of that log that | 10   for a few moments this afternoon. |
| 11   we heard about. This is the original of the log. We | 11   A. Thank you. |
| 12   can deal with this at the recess if you wish to look at | 12   Q. Where do you live; what is your primary |
| 13   it now we can look at it now. | 13   residence? |
| 14   MR. WENDELBURG: I don't intend to call Mr. | 14   A. Park plaza. |
| 15   Caucci back today in any event. | 15   Q. How long have you lived there? |
| 16   THE COURT: Get through the rest of the day. | 16   A. September will be two years. |
| 17   We can talk about it later. | 17   Q. Prior to that, where did you live? |
| 18   (Jury enters the courtroom at 2:37 p.m.) | 18   A. In Bestfield. |
| 19   MR. WENDELBURG: Your Honor, my client has | 19   Q. Where is that? |
| 20   brought to may attention when we are off the record | 20   A. Development South West Wilmington. |
| 21   while the jury was being dismissed before lunch there | 21   Q. And when is the month and year, if you recall, |
| 22   was some talk between Mr. Lugg and me about I think the | 22   that you moved from Bestfield to park plaza? |
| 23   ball busting remark that may have been overheard I | 23   A. September 5 of 2003. |

| | |
|---|---|
| 142 | 144 |
| 1   don't recall specifically what was said between the two | 1   Q. And during your residence in Bestfield |
| 2   of us I don't think there is anything that is going to | 2   southwest of Wilmington, your time at Park Plaza; do |
| 3   prejudice the State or the defense Mr. Anker wanted to | 3   you also have a secondary property? |
| 4   make it clear to the Court that this may have been | 4   A. Yes. |
| 5   overheard. | 5   Q. Where is that? |
| 6   THE COURT: I don't know if it was. I did not | 6   A. Benson Street, Rehoboth. |
| 7   observe that myself tell you if it was, it does not | 7   Q. Beach property? |
| 8   matter already heard about it on the stand at some | 8   A. Yes. |
| 9   point once this getting explored further if it does I | 9   Q. A place I am sure you prefer to be right now? |
| 10   am going to say it is 403 going to get back on the | 10   A. Yes. |
| 11   trial. Bring the jury in. | 11   Q. At some point in 2003, did you choose to |
| 12   Good afternoon. You may call your next | 12   refinance that property in Rehoboth? |
| 13   witness. | 13   A. Yes. |
| 14   MR. LUGG: State calls Patricia Paoli. | 14   Q. Who prompted you to do that? |
| 15   PATRICIA PAOLI, | 15   A. Interest rates dropped. |
| 16   having been first called by the State was sworn on | 16   Q. And who was your original mortgage holder for |
| 17   oath, was examined and testified as follows: | 17   that property? |
| 18   DIRECT EXAMINATION | 18   A. ABN Amro. |
| 19   BY MR. LUGG: | 19   Q. And you said that the rates had dropped? |
| 20   Q. Mrs. Paoli, good afternoon. | 20   A. Correct. |
| 21   A. Good afternoon. | 21   Q. And did you seek a new lender, or a different |
| 22   Q. How are you? | 22   lender for that? |
| 23   A. Tired. | 23   A. A new loan. |

145

1    Q.  Through what company?

2    A.  ABN Amro.

3    Q.  Did you ultimately obtain a new loan?

4    A.  Yes.

5    Q.  How much were you hoping to loan from ABN Amro

6    to pay off your mortgage?

7    A.  I think it was 275 thousand.

8    MR. LUGG:  If I may approach the witness, Your

9    Honor.

10    THE COURT:  Sure.

11    BY MR. LUGG:

12    Q.  Handing you a package of documents.  Are you

13    familiar with the documents I have placed before you?

14    A.  Yes.

15    Q.  What are those documents; what do they pertain

16    to?

17    A.  This is -- those are settlement sheets from

18    the refinance of the beach house.

19    Q.  And does that indicate the amount you were

20    seeking to borrow?

21    A.  It does.

22    Q.  What was it?

23    A.  $276,250.

146

1    Q.  How much did you owe on that beach house at

2    the time?

3    A.  This is what I owed.

4    Q.  Is that the new loan that you are holding

5    before you?

6    A.  Yes.

7    MR. LUGG:  I move to admit the loan

8    documentation as the next State's Exhibit, Your Honor.

9    MR. WENDELBURG:  May I took a look at it.  No

10    objection, Your Honor.

11    THE COURT:  It is admitted then.

12    THE CLERK:  State's Exhibit 26.

13    BY MR. LUGG:

14    Q.  After attaining the new loan through ABN Amro,

15    did you schedule a time to hold a settlement for the

16    refinancing?

17    A.  Yes.

18    Q.  And did you select a lawyer to assist in that

19    refinance?

20    A.  Yes.

21    Q.  Who did you choose?

22    A.  Dan Anker.

23    Q.  Did you know Dan Anker?

147

1    A.  He did the settlement when I originally bought

2    the house.

3    Q.  Had you met him before?

4    A.  At the first settlement.  Yes.

5    Q.  Do you see him in the courtroom?

6    A.  I wouldn't recognize him.

7    Q.  You don't recognize him?

8    A.  No.

9    Q.  That's fine.  I appreciate your honesty.  When

10    is it that you refinanced your property at the beach?

11    A.  Summer of 2003.

12    Q.  And you indicated that you chose to use Dan

13    Anker, a person that you dealt with before.  Did you

14    schedule a time to meet at his house?

15    A.  I had a settlement date and time.

16    Q.  Did you go to his office on that date?

17    A.  Yes.

18    Q.  Who was present on that day?

19    A.  His daughter, Laura.

20    Q.  Was Dan there that day?

21    A.  She told me he was busy in another settlement.

22    Q.  Did you complete settlement documentation with

23    his daughter when you went there that day in summer of

148

1    2003?

2    A.  Yes.

3    Q.  Did you review the material prior to signing

4    that day?

5    A.  Yes.

6    MR. LUGG:  May I approach the witness, Your

7    Honor.

8    THE COURT:  Yes, you may.

9    BY MR. LUGG:

10    Q.  Placing before you a document, I apologize for

11    the lack of clarity.  Do you recognize the document

12    that I placed before you?

13    A.  Yes.

14    Q.  What is that document?

15    A.  It's part of the settlement, settlement sheets

16    from the refinance.

17    Q.  And are some portions in a grayish area more

18    difficult to see?

19    A.  Um-hmm.

20    Q.  Is that yes?

21    A.  Yes.

22    Q.  Again, for the record, the gentleman before

23    you is typing things down, keeping this, if you could

A-82

151

1  answer verbally to the questions.
2       Is a that a sheet that you were asked to sign?
3    A.  I signed many that looked like this.
4    Q.  Turning, is the second page is your signature
5  evidenced on that form?
6    A.  Yes.
7    Q.  Is that your signature?
8    A.  Yes.
9    Q.  What is the day you signed and reviewed that
10 document?
11   A.  6/20/03.
12   Q.  Looking at the front page; does that evidence
13 the property which you were seeking refinance on or
14 about June 20, 2003?
15   A.  I can't read the address.  It must be in the
16 gray box.  I can see it, 19 B Benson Street.
17      MR. LUGG:  The State would move this document
18 as the next State's Exhibit.  Counsel wishes to review
19 it.
20      MR. WENDELBURG:  No objection, Your Honor.
21      THE COURT:  Very well.
22      THE CLERK:  State's Exhibit 27.
23 BY MR. LUGG:

1  securing?
2    A.  27, I can't tell if it is a five or six.
3  $276,250.
4    Q.  Is that consistent with the sum you borrowed
5  in the documentation you were shown previously, that
6  new loan from ABN Amro?
7    A.  The one just showed me?
8    Q.  Um-hmm.
9    A.  Yes.
10   Q.  At the conclusion of this document, your
11 signing of this document, what was your expectation
12 with respect to the new ABN Amro loan and the old ABN
13 Amro loan?
14   A.  That this new one would payoff the old one.
15 Now I would only be paying on this new loan.
16   Q.  At a lower rate?
17   A.  Correct.
18   Q.  Did that, in fact, occur?
19   A.  No.
20   Q.  What happened?
21   A.  Next I know I went down to the beach, I had
22 late notices in the mailbox.  I think I ignored the
23 first one thinking that the two loans that had just

150

1    Q.  If I may return the document to the witness.
2       Were you provided a copy of this form at the
3  time of the refinance held in June of 2003?
4    A.  No, I did not receive any copies at all.  I
5  was told they would be mailed.
6    Q.  Turning to line 110 of the form before you.
7  If you could, are you able to make out that line?  I
8  apologize, again, the copying was relatively poor.
9  Does that indicate the amount of former mortgage you
10 held?
11   A.  Yes.
12   Q.  What was the figure that was owed?
13   A.  $271,643.
14   Q.  Is there a cents?
15   A.  There is, but I can't read it something then
16 8.
17   Q.  18 cents?
18   A.  Right.
19   Q.  Does the form also indicate, turning your
20 attention to line 202, principal amount of the new loan
21 that you were securing from ABN Amro?
22   A.  Yes.
23   Q.  What was the value of that loan that you were

152

1  overlapped because it but the same mortgage company,
2  until I kept receiving late payments and automated
3  phone calls saying I was late.  I called to say I am
4  not late on that loan, I have a new loan.  I refinanced
5  they said no, you did not.  We never received anything
6  that you refinanced your loan.
7    Q.  Did you continue your investigation of that
8  failure to pay the original loan?
9    A.  Yes.
10   Q.  Was that original loan ultimately paid, to
11 your knowledge?
12   A.  Yes.
13   Q.  When did that occur, if you know?
14   A.  ABN Amro took care of all of it.
15   Q.  Took care of everything?
16   A.  It was all the same company.
17   Q.  Did you attempt to make any contact with the
18 Anker law firm after learning that that original loan
19 was in default or delinquent?
20   A.  Yes.
21   Q.  Tell us about the efforts?
22   A.  First few phone calls were answered by his
23 daughter.  She said that he was busy.  Next time within

153

1  a few days phone was disconnected when I drove in there
2  the office was closed and a sign on the door it was
3  closed.
4      MR. LUGG: Thank you for your time.
5      CROSS EXAMINATION
6  BY MR. WENDELBURG:
7      Q.  Ms. Paoli, my name is Alan Wendelburg.  I
8  represent Dan Anker.  Did I understand you correctly at
9  the beginning when you said that you never met Dan
10  Anker?
11     A.  I met him at the first settlement.  I did not
12  meet him again at the second settlement.
13     Q.  Was there anyone else at the second settlement
14  other than Laura?
15     A.  No.
16     Q.  Did Laura ask you if you were all right to go
17  ahead with the settlement without Dan being there?
18     A.  Yes.
19     Q.  When was it, if you can recall, you started
20  getting these late notices on your old mortgage?
21     A.  I can't remember honestly how soon it was.
22     Q.  Was it within 30 days of your closing on the
23  refinance?

154

1      A.  I honestly don't remember.
2      Q.  How long was it between your receiving the
3  first late notice and your going to the Anker office
4  and finding it closed; do you recall?
5      A.  First notice I remember I ignored it thinking
6  it was just and overlap.  So I honestly don't remember.
7      Q.  When you first started calling the Anker
8  office, were you speaking to a live person or an
9  answering machine?
10     A.  I spoke to a live person because she gave me
11  his cell phone number.
12     Q.  Did you call that?
13     A.  Yes, and left a message.
14     Q.  You never spoke with Mr. Anker himself?
15     A.  No.
16     Q.  Did you make one other -- more than one
17  attempt to get to the office?
18     A.  I only made one to go because it was closed
   when I got there.
   Q.  On how many different occasions after getting
21  the late notices did you talk with Laura Larks; do you
22  remember?
23     A.  Only the first time that I called the office

155

1  to ask to speak to him, she said he was busy.
2      Q.  Did you call more than once?
3      A.  Yes.
4      Q.  On the second or third occasion, did you speak
5  to Laura or were you talking to an answering machine or
6  what?
7      A.  I can't remember.  It was only a matter of one
8  or two days that I was calling then I came in and the
9  office was closed.  It was very quick.
10     MR. WENDELBURG: Thank you.  No further
11  questions for you.
12     REDIRECT EXAMINATION
13  BY MR. LUGG:
14     Q.  You indicate that you received the defendant's
15  cell phone number?
16     A.  Yes.
17     Q.  And you left a message on that machine?
18     A.  Yes.
19     Q.  A was the message that you left for him?
20     A.  I don't remember the exact words, I know it
21  would be to the effect I received late notices.  I was
22  told I don't have a mortgage.  Call me.
23     Q.  Was there a introductory message prior to the

156

1  time you left a message; by that I mean when you phoned
2  did the phone ring a few times?
3      A.  I don't remember.
4      Q.  Was there a voice prompting you to leave a
5  message?
6      A.  I don't remember that either.
7      Q.  Was that call ever returned?
8      A.  No.
9      Q.  And was that call made prior to your visiting
10  the office?
11     A.  Yes.
12     MR. LUGG: Thank you.
13     RE-CROSS EXAMINATION
14  BY MR. WENDELBURG:
15     Q.  I am not sure if Mr. Lugg or I asked you this
16  question before; when you went to the Anker office for
17  the refinance you saw Laura there.  There was no one
18  else there.  You went through with signing the papers.
19  Where did that take place?
20     A.  In the, I guess you call it the foyer of Park
21  Plaza.  There are a lot of couches.  We sat outside his
22  office on a couch.  I never went inside his office.
23     MR. WENDELBURG: Thank you.

02/07/2006 09:18:01 AM

A-84

1  MR. LUGG: Prompts nothing further, Your

2  Honor. State calls Russell Burkett. May Ms. Paoli be

3  excused?

4          THE COURT: Understood the jury has a question

5  of Mr. Glanz handing notes. He is a defense

6  investigator, he can do that.

7          RUSSELL BURKETT,

8     having been first called by the State was sworn on

9  oath, was examined and testified as follows:

10          DIRECT EXAMINATION

11  BY MR. LUGG:

12    Q.  Mr. Burkett, how are you?

13    A.  Good.

14    Q.  I would like to ask you a few questions.

15    A.  Sure.

16    Q.  Where do you live now?

17    A.  104 Andrea Drive, Middletown, Delaware.

18    Q.  How long have you lived there?

19    A.  Just two years.

20    Q.  You bought that property in 2003?

21    A.  Correct.

22    Q.  And do you recall the date that you purchased

23  that property?

---

1  purchased or went to the place where I shot. So we

2  became friends.

3    Q.  When you say you are a shooter; what do you

4  mean by that?

5    A.  Shotgun, competitive shooter.

6    Q.  Is this a sport that you engaged in with Mr.

7  Anker?

8    A.  Yes.

9    Q.  And you indicate that you became friendly with

10  him?

11    A.  Very, friendly yes.

12    Q.  How long were you friends with the defendant?

13    A.  Two years.

14    Q.  Is that --

15    A.  Two years prior.

16    Q.  You met him approximately 2001?

17    A.  Approximately.

18    Q.  How frequently did you shoot with him?

19    A.  At least once a week.

20    Q.  And when I ask that question, what did that

21  mean, what are you doing as a shotgun competitive

22  shooter?

23    A.  More of the shooting that I did with Dan was

---

1    A.  Excuse me?

2    Q.  Do you recall what day you purchased that

3  property?

4    A.  I believe it was July 17th.

5    Q.  And where did you move from?

6    A.  I moved from Haddenfield, New Jersey.

7    Q.  In purchasing that property in Middletown, did

8  you enlist the assistance of a lawyer to conduct the

9  settlement?

10    A.  Yes, I did.

11    Q.  And who was the lawyer that was used to handle

12  settlement of that property?

13    A.  Dan Anker.

14    Q.  You see him in the courtroom?

15    A.  Yes.

16    Q.  Can you identify him for the record?

17    A.  Yes, the man sitting there.

18    Q.  To my right, your left?

19    A.  Yes.

20    Q.  How is it that you came to collect or use Mr.

21  Anker to conduct this real estate settlement?

22    A.  I sold my business and started a hobby of

23  shooting. Dan is also a shooter. The person I

---

1  practice. He would show up everyday where I was. We

2  would practice together. I even volunteered that I

3  would pull for him and his buddy.

4    Q.  What are you shooting at?

5    A.  We are shooting at clay targets.

6    Q.  When you pull for him, are you the person

7  essentially launching that target into the air?

8    A.  Yes, and he would pull for me, too.

9    Q.  How often would you get together to do this?

10    A.  I was there on occasion everyday and he was

11  just about during the week everyday.

12    Q.  Where is it that you were doing this?

13    A.  Doing it at an M and M in Pennsville, New

14  Jersey.

15    Q.  How far is that from Wilmington, if you know?

16    A.  I would say ten miles.

17    Q.  I guess the better question maybe how long

18  would it take you to get there from here?

19    A.  From Wilmington to there, 15 minutes, 12

20  minutes, something like that.

21    Q.  Now, was there a time scheduled to meet in Mr.

22  Anker's office to conduct this settlement?

23    A.  Originally?

1    Q.  Um-hmm.

2    A.  Originally we -- Dan instructed us he could

3  not represent either one of us.

4    Q.  Were you able to overcome that?

5    A.  He explained to us he would do the paperwork,

6  do the settlement, but, you know, that's basically he

7  would handle the settlement.  And I wasn't use to that

8  because I am from New Jersey.  We always had a Title

9  clerk, and a Title company.

10   Q.  Did not have lawyers involved?

11   A.  No, we don't, you know, they use a Title

12 company represents themselves, I guess you could say.

13   Q.  And so after you indicated first he told you

14 he could not represent the two of you?

15   A.  No.

16   Q.  Why did he explain that to you?

17   A.  He can only do the settlement.

18   Q.  Were there other issues that needed legal

19 representation beyond the settlement?

20   A.  I don't know what you mean.

21   Q.  You indicated that the defendant told you he

22 could on do the settlement?

23   A.  Correct.

1    Q.  Were you seeking legal assistance for other

2  issues other than the transaction?

3    A.  Would be a conflict to represent either one of

4  us.

5    Q.  Real estate was okay, anything else was not

6  going to be done; is that correct?

7    A.  Settlement was okay.

8    Q.  Now, who is this other person you have told us

9  about that you were purchasing from?

10   A.  He was a guy at M and M, Barry Kintz.

11   Q.  Did you meet him there, as well?

12   A.  Yes.

13   Q.  Did you become friends with Mr. Kintz?

14   A.  Yes.

15   Q.  Are you still friends?

16   A.  Yes.

17   Q.  You still live in his old house, right?

18   A.  Yes.

19   Q.  After the wrinkles were worked out, so to

20 speak, was there a time scheduled for you and Mr. Kintz

21 to meet at Mr. Anker's office to conduct the

22 settlement?

23   A.  Yes.

1    Q.  And are you married?

2    A.  Yes, I am.

3    Q.  And to your knowledge, was Mr. Kintz married?

4    A.  Yes.

5    Q.  Were your respective spouses brought with you

6  for the settlement?

7    A.  Yes, they were.

8    Q.  And were you provided paperwork at the time of

9  settlement?

10   A.  Yes, we were.

11   Q.  Before we get to that, I would like to ask you

12 a couple questions about your purchasing and financing

13 of this property.  What money did you use to buy this

14 property?

15   A.  Proceeds from the house in Haddenfield.

16   Q.  Were these proceeds that were in your

17 possession at the time?

18   A.  Yes.

19   Q.  Did you need to take out a new loan for the

20 house you were buying in Delaware?

21   A.  No.

22   Q.  How is it that the money required for this

23 purchase of the Middletown house was made available for

1  the transaction?

2    A.  I gave a ten thousand dollar deposit to Mr.

3  Anker to be held in escrow.  And then by his

4  suggestion, he wanted me to wire transfer the remainder

5  of 315 thousand to his account.

6    Q.  Did you do that?

7    A.  Yes, through his instructions.  Yes.

8    Q.  You wired 315 thousand dollars?

9    A.  Yes.

10   Q.  After doing that, was that money no longer

11 available to you in your account?

12   A.  No, it was no longer available to me.

13   Q.  How long, or how many days, or hours prior to

14 that settlement did you transfer that money?

15   A.  About two weeks.

16   Q.  What was your understanding as to what that

17 money was to be used for?

18   A.  For the purchase price.

19   Q.  Now, we talked about paperwork that you were

20 presented and executed at the settlement on that

21 particular day.  Do you recall signing certain

22 documents?

23   A.  Very little documents.  Yes.

165

1   Q. Sorry, very --

2   A. Very little documents because I questioned I

3   was a small developer in New Jersey. So I had been

4   through a lot of settlements, and I questioned about

5   the Title over and over to Mr. Anker.

6   Q. When you say your questioning the Title over

7   and over, what was it that you were inquiring of the

8   defendant at the time?

9   A. You know it's representation when you have

10  been to so many settlements you sort of learn what is

11  going to happen and, you know, I asked where the survey

12  was, and he said they are behind. There are redoes.

13  They are a little behind. I said, have they done it?

14  He said, not yet. So I questioned how can they do a

15  Title without the boundary lines? How can you do

16  boundary lines without a survey.

17  Q. What did he tell you?

18  A. He said trust me, I will take care of it for

19  you.

20  Q. Did you trust him?

21  A. Yes, I did.

22  Q. Did you sign those little bit of documents

23  that you say were presented to you?

166

1   A. Yes, because I did not receive a title report.

2   Q. Never?

3   A. Never.

4   MR. LUGG: May I approach the witness, Your

5   Honor.

6   THE COURT: Sure.

7   BY MR. LUGG:

8   Q. Handing you one document. Do you recognize

9   what I put before you?

10  A. This is our settlement sheet.

11  Q. Is that a document that was reviewed and

12  signed by you at the settlement for this property in

13  Middletown?

14  A. Yes.

15  Q. You see your signature on that document?

16  A. Yes.

17  Q. And property location is 104 Andrea Drive, in

18  fact, is that right?

19  A. Yes, it is.

20  Q. That is where you live now?

21  A. Yes, it is.

22  Q. And were you provided copy of that document at

23  conclusion of the settlement?

167

1   A. Yes, I was.

2   MR. LUGG: State would move to admit the

3   settlement sheet as the next state's Exhibit.

4   MR. WENDELBURG: Without objection, Your

5   Honor.

6   THE COURT: Admitted.

7   THE CLERK: State's Exhibit 28, Your Honor.

8   BY MR. LUGG:

9   Q. May I return the Exhibit to the witness, Your

10  Honor.

11  THE COURT: You may.

12  BY MR. LUGG:

13  Q. At the conclusion of the settlement be a was

14  your expectations with respect to the property at 104

15  Andrea Drive?

16  A. I expected that the deed would be transferred

17  to my name.

18  Q. Did that, in fact, occur?

19  A. It did not.

20  Q. Can you explain what happened after the

21  settlement?

22  A. Well, me and Dan were pretty good friends at

23  the time. I really trusted him. When I left I went

168

1   home, like I said I have done a lot of property

2   transfers. This is the only one that I have done in

3   the last 25 years without my own attorney. I was very

4   upset with myself. I went home, I read it, I read it.

5   I was unhappy. I called my lawyer from New Jersey. He

6   said Monday morning you call the Title company.

7   Q. Did you research the Title?

8   A. Yes.

9   Q. Was Title cleared to your name?

10  A. Title was never cleared to my name.

11  Q. Did you make any contact with the defendant

12  after that closing on that property?

13  A. Yes, I did.

14  Q. Can you tell us about that?

15  A. I talked to Dan on his cell phone. That's how

16  we talk to each other. We have each other's cell phone

17  number, which I still have, and I questioned him on it.

18  He said he would check on it, get back to me. I hadn't

19  spoken to him. I seen him at the shoot after that. We

20  shot a little. He said don't worry I will take care of

21  it. It is not a problem. I will straighten it out.

22  Don't worry. Finally I got a hold of the Title

23  company, they told me that he has not represented that

A-87

**169**

1  Title company in almost two years.
2      Q.  Okay.
3      A.  I was livid.
4      Q.  Did you have any further conversations with
5  the defendant about that transaction?
6      A.  No, I went and got another lawyer.
7      Q.  You indicated that the defendant told you I
8  will take care of it. I will look into it. Did he
9  ever contact you to advise you of what he looked into,
10  what he took care of for you?
11      A.  The next conversation I had with him, he
12  called me on the cell phone, said you better get a
13  lawyer.
14      Q.  He told you to get a lawyer?
15      A.  Yes.
16      Q.  When was that; if you recall?
17      A.  That was after we put charges on him, had him
18  temporarily disbarred.
19      Q.  Did you at some point go to the Office of
20  Disciplinary Counsel?
21      A.  We, me and Barry Kintz did.
22      Q.  And you indicated that the defendant had told
23  you during one of your conversations that I will look

**170**

1  into things. I will take care of it. Did he make any
2  other comments to you to assure you or reassure you as
3  to that transaction?
4      A.  Of course then I realized he had not paid the
5  mortgage off, had not transferred the deed. There was
6  no survey. He gave me a bogus title report. He has
7  325 thousand dollars of my money. I am living in a
8  house that is not deeded in my name. So I figured it
9  all out myself. I went and got an attorney Gene
10  DiPrinzio.
11      Q.  Are you still friends friendly with the
12  defendant?
13      A.  How could I be?
14      Q.  You still see him?
15      A.  I see him -- just seen him Sunday.
16      Q.  Where is that you see him?
17      A.  I see him shooting.
18      Q.  Tell me about that hobby shooting a little
  bit. What is involved to engage in this competitive
  shooting?
21      A.  Practice end of it is you just go to a
22  particular places, that is why I moved to Delaware
23  because I really got into it, I got pretty addicted to

**171**

1  shooting, in Delaware and Maryland there is a lot more
2  places to shoot. Five or six places within a half hour
3  of where I live we go on a daily basis and practice.
4  It is like a round of golf, you go around stations and
5  you shoot. There is tournaments on Sunday. You travel
6  around Pennsylvania, Maryland, Virginia, New Jersey.
7  We shoot tournaments, one whole grope you see the same
8  people we all shoot the same tournaments.
9      Q.  It is like a round of golf?
10      A.  Exactly, like a round.
11      Q.  How long -- you talk about practicing. How
12  long do you go out and practice when are you doing
13  this?
14      A.  Some people normally is 100. I usually shoot
15  250 at practice.
16      Q.  How long does that take you?
17      A.  About an hour and a half.
18      MR. WENDELBURG:  May we approach, please.
19      (Discussion held off the record.)
20      (The following sidebar conference was held.)
21      MR. WENDELBURG:  Your Honor, I was interested
22  in shot guns, I am wondering where we are going with
23  this.

**172**

1      MR. LUGG:  Your Honor, the case kind of comes
2  down to 2 halves, one money end, two money out. And as
3  you heard in opening we are hearing good about bit of
4  money was spent on shooting and shooting equipment.
5  There is also been indication he is not around his
6  office very often. One line of questioning is relevant
7  on two grounds, one to establish where he might have
8  been certainly to be sure various times; two, for the
9  jury to understand the money that is required to be
10  expended to he engage in the hobby I think is pertinent
11  in regard to --
12      THE COURT:  I think it would be relevant. You
13  can fine your questions to the time period charged in
14  the indictment talking about seeing him shoot last
15  Sunday, go back and focus on the time frame.
16      (Sidebar conference concluded.)
17  BY MR. LUGG:
18      Q.  You were telling us about the sport of
19  shooting.
20      A.  Yes.
21      Q.  I don't have many more questions for you.
22  Tell us about the time commitment. Dealing with time
23  frame leading up to July of 2003, what we are dealing

1 earlier, that he would take care of the problem for
2 you?
3    A. Yes.
4    Q. Do you recall being asked, -- let me lay some
5 foundation. One thing that you have not testified to
6 in this case, is getting a mortgage for the purpose of
7 this Middletown house, and as I understand it from your
8 testimony from the settlement sheet, you paid cash for
9 this house; is that correct?
10    A. Yes.
11    Q. So you did not go and get a mortgage. There
12 was no mortgage lender on your side of this
13 transaction?
14    A. No, there were not.
15    Q. Therefore, you did not have to satisfy any
16 mortgage lending requirements such as getting a survey
17 for the property; is that correct, no mortgage company
18 was asking you for a survey?
19    A. No.
20    Q. Because you did not have a mortgage and no
21 mortgage company was telling you that you needed a
22 Title binder?
23    A. There was mortgage on the house that I was

182

1 living in.
2    Q. No, that is not what I am asking you. You
3 testified now that nobody was telling you you needed to
4 get a survey to satisfy a mortgage requirement, there
5 was no mortgage, correct?
6    A. I needed a survey for the Title, though.
7    Q. Who was telling you this?
8    A. The Title company.
9    Q. Title company?
10    A. Yes.
11    Q. When you attended this closing, you went with
12 your wife?
13    A. Yes.
14    Q. And Mr. Kintz and his wife, were they there,
15 as well?
16    A. Correct.
17    Q. Prior to the settlement, I think you testified
18 several times that initially Mr. Anker told you he
   could not represent either of you; is that correct?
   A. Correct.
21    Q. He could do the paperwork for the closing for
22 the two of you or four of you, that was it. Correct?
23    A. No, that is what he quoted from the very

184

1 beginning when we asked him to represent the
2 settlement. That was his statement to both of us.
3    Q. How it was resolved that he did the closing in
4 that case?
5    A. I don't know what you mean.
6    Q. It sounds as though in lawyer's terms someone
7 perceived a conflict of interest, perhaps it was Mr.
8 Anker. Did he tell you there was what was called a
9 conflict of interest in doing the settlement for you?
10    A. He said there was no conflict of interest as
11 long as he did not represent either one of us.
12    Q. Under those terms, he agreed to do the
13 settlement for you?
14    A. Yes.
15    Q. You testified on direct examination that at
16 one point Mr. Anker called you on your cell phone and
17 advised you to get a lawyer?
18    A. Yes.
19    Q. Do you recall that conversation?
20    A. Yes, he told me he had insurance, and not to
21 worry. I found that to be a lie, too, his products
22 liability insurance --
23    Q. Let's stick to the question. He called and

1 told you that you needed to get a lawyer. When was
2 that?
3    A. When I said to him, you have lied about the
4 Title, your insurance, the survey, and you never paid
5 off the mortgage.
6    Q. Was this phone call that you placed to him, or
7 phone call he placed to you?
8    A. Phone call I placed to him, I believe, I am
9 not sure.
10    Q. Was this after or before you filed a
11 complaint?
12    A. After.
13    Q. How long after; do you remember?
14    A. I don't remember a day, hours, could have been
15 the same day.
16    Q. Have you had any further conversations with
17 Mr. Anker since that telephone conversation?
18    A. No, I have not.
19    Q. Have you called Mr. Anker's phone and left
20 messages for him since then?
21    A. Yes, I have.
22    Q. Did you ask him to call you back or just leave
23 messages for him?

A-89

1   A.  I asked him to call.  I still believed at that

2   moment maybe something went wrong until --

3       Q.  How many such phone calls did you make like

4   that to him, do you recall?  One or more than one?

5       A.  One, maybe.

6       Q.  Sorry?

7       A.  One, maybe.  I am not sure if I even talked to

8   him after that.

9           MR. WENDELBURG:  May I have a moment, Your

10  Honor.

11          (Discussion held off the record.)

12          MR. WENDELBURG:  No further questions for the

13  witness at this time.

14          MR. LUGG:  Briefly.

15          REDIRECT EXAMINATION

16  BY MR. LUGG:

17      Q.  So this is not an easy experience for you, is

18  it?

19      A.  Not at all.  I mean, you know, I still don't

20  have a Title, still don't have a survey, still lost a

21  lot of money.

22      Q.  You have been asked to testify in proceedings

23  involving a friend, who was a friend of yours, correct?

1       A.  Yes.

2       Q.  You indicated there was a question of

3   Mr. Wendelburg that after the shut down after you knew

4   there was this complaint to the ODC you called

5   Mr. Anker's cell phone and left a message?

6       A.  Yes.

7       Q.  What was the message that you were leaving for

8   him?

9       A.  That, you know, you are a liar, you deceived

10  me, you stole 325 thousand dollars of my money.  I am

11  living in a house with that belongs to someone else,

12  deed has never been changed, I have no title.  I have

13  no survey, Mortgage is not paid off.  Foreclosing on

14  it, on the mortgage that I am not responsible for.  How

15  could you do this?

16      Q.  That was the one message?

17      A.  That was the only.

18      Q.  Just so we are clear, you were asked about

19  calling him after that July date when approximately in

20  time was that phone call that you just told us about?

21      A.  I believe that was right after we found out

22  there were so many other people involved.  I thought it

23  was an isolated incident.  Once we found out there were

2           THE COURT:  I am going to instruct the jury

3   his speculation is not evidence.  You just ignore that

4   last statement.

5   BY MR. LUGG:

6       Q.  Follow me, response to the question was the

7   time of year was this in 2003?

8       A.  Yes.

9       Q.  Had you made any -- have you made any phone

10  call to Mr. Anker after or in late 2003, 2004 or 2005?

11      A.  No.

12          MR. LUGG:  Thank you, sir.

13          RE-CROSS EXAMINATION

14  BY MR. WENDELBURG:

15      Q.  Mr. Burkett, in fact, you called Mr. Anker's

16  telephone in November of 2003, telling him that you

17  knew he was going to be indicted did you not?

18      A.  Yes, I did.

19      Q.  Then --

20      A.  No, I didn't say that.  I said I read that you

21  were indicted today.

22      Q.  After he was arraigned, after the indictment

23  you called his phone again, did you not?

1       A.  I called him one time, told him I read in the

2   paper that he was indicted.

3           MR. WENDELBURG:  Nothing further, Your Honor.

4           MR. LUGG:  Nothing from the State, Your Honor.

5           THE COURT:  You may step down.  He is subject

6   to recall.  Is he excused.

7           MR. WENDELBURG:  Your Honor we ask that he not

8   be excused from the defense subpoena at this point.

9           MR. LUGG:  May we approach on scheduling, Your

10  Honor.

11          THE COURT:  Yes.

12          (Discussion held off the record.)

13          THE COURT:  Counsel has one witness

14  approximate length, I thought we could go ahead and let

15  you go home a little earlier.

16          BARRY THOMAS KINTZ,

17      having been first called by the State was sworn on

18  oath, was examined and testified as follows:

19          DIRECT EXAMINATION

20  BY MR. LUGG:

21      Q.  Mr. Kintz, how are you?

22      A.  All right, how are you.

23      Q.  I am doing well.  What is it that you do for a

1  living?

2      A.  Manage operations department for Tatnall

3  School.

4      Q.  How long have you been doing that?

5      A.  Five years this October.

6      Q.  Where is it that you live now?

7      A.  3107 Duncan Road, Wilmington, Delaware.

8      Q.  How long have you lived there?

9      A.  Little over two years, just about two years

10  now. It is two years actually.

11     Q.  Where did you live before this address?

12     A.  104 Andrea Drive, Middletown, Delaware.

13     Q.  You say that you have been at this house for

14  about two years. Were you at Andrea drive before that?

15     A.  Yes.

16     Q.  Did you sell that house?

17     A.  Yes.

18     Q.  Who did you sell that to?

19     A.  Mr. Burkett.

20     Q.  Have you seen him in the courthouse today?

21     A.  Yes.

22     Q.  Have you discussed your testimony with him

23  prior to coming onto the witness stand?

1      Q.  Did you see Mr. Anker at M and M while you

2  worked there?

3      A.  Yes.

4      Q.  Have you become friendly with Mr. Burkett?

5      A.  No, just see him as an acquaintance.

6      Q.  What was your relationship with Mr. Anker?

7      A.  There again, just an acquaintance, beginning

8  year we went out and did some hunting together and

9  that.

10     Q.  In 2003 when you sold your property, where was

11  the sale of that property conducted?

12     A.  Mr. Anker's office.

13     Q.  Who was present for the sale of that property?

14     A.  For the sale of that particular property, just

15  Mr. Anker himself. He sat us at a different table in a

16  room all together just went back and forth from room to

17  room. At the very end of the settlement his daughter

18  Laura we were told through Mr. Anker that she will

19  bring all the papers which we were to get to our house

20  which we never received.

21     Q.  Defendant told you that she would be doing

22  this for you?

23     A.  Excuse me?

1      A.  No, I have not.

2      Q.  And what was your relationship with Mr.

3  Burkett prior to the sale of this house?

4      A.  No relationship at all other than over at M

5  and M sporting facility, I seen him from time to time

6  over there shooting sporting clays.

7      Q.  Did you shoot sporting clays, as well?

8      A.  No.

9      Q.  What were you doing at M and M?

10     A.  Helping out the owner over there with

11  different events.

12     Q.  Did you work there?

13     A.  Yes.

14     Q.  Did you meet the people, various people who

15  would come to shoot at M and M?

16     A.  Yes.

17     Q.  And did you meet the defendant, Dan Anker,

18  while working at M and M?

19     A.  I had met him, gosh, when I was 14, which I am

20  49 now. Quite a while ago.

21     Q.  Did you maintain that acquaintance since you

22  were 14?

23     A.  Just from time to time seeing him passing by.

1      Q.  Mr. Anker told you his daughter would drop

2  papers off?

3      A.  Both he and she.

4      Q.  Is one of the documents that you were asked to

5  sign a settlement sheet for the transfer of that

6  property?

7      A.  Yes.

8      Q.  I am handing you what's been marked State's

9  Exhibit 28. Are you familiar with that document?

10     A.  Yes.

11     Q.  Is that, in fact, the settlement sheet

12  pertaining to the sale of 104 Andrea Drive in

13  Middletown?

14     A.  Yes.

15     Q.  At the time of that sale, did you have any

16  loans on that property at Andrea Drive?

17     A.  Yes.

18     Q.  With which company?

19     A.  Chase.

20     Q.  With Chase?

21     A.  Yes.

22     Q.  And were you intending to take care of that

23  loan or have that loan paid off pursuant to this

193

1   purchase?

2      A.   That was our intention.

3      Q.   Directing your attention to line 504 of

4   State's 29?

5      A.   Um-hmm.

6      Q.   Did that state the payoff figure or the

7   mortgage which you held on that property?

8      A.   Yes.

9      Q.   That was with Chase you have indicated?

10     A.   Yes.

11     Q.   What is the sum of that first mortgage that

12  was on that property or the loan that you had held on

13  that property?

14     A.   The original mortgage.

15     Q.   What was the value owed by you at the time of

16  the settlement in mid July 2003?

17     A.   $156,000.

18          THE COURT:  Say that again.

19          THE WITNESS:  $156,149.62.

20     Q.   What your expectation as to that sum when this

21  was completed?

22     A.   Previous dealings before usually the attorney

23  would take that and pay the mortgage off.

194

1      Q.   Were you provided money to pay that off?

2      A.   No, we were not.

3      Q.   Provided with any money at that transaction?

4      A.   Yes.

5      Q.   What was the figure you were provided with;

6   what was that for?

7      A.   That was the money which we had made on the

8   purchase of the house.

9      Q.   Directing your attention to line 603, does

10  that indicate a sum that was received by you after the

11  purchase of this house?

12     A.   Yes, it is.

13     Q.   $153,950.37?

14     A.   Yes.

15     Q.   Did you receive that that day?

16     A.   Yes.

17     Q.   Was your original mortgage paid off pursuant

18  to this transaction?

19     A.   It was paid off, no.

20     Q.   How is it that you learned this mortgage was

21  not paid?

22     A.   My wife -- we understood there was some slight

23  problems before.  So my wife on Monday morning, first

195

1   Monday after the settlement called the bank to see if

2   it was paid off.  They informed us that it was not.

3      Q.   Did you continue to check into that mortgage

4   issue whether a payment was made?

5      A.   Yes.

6      Q.   Did you learn at any time that monies were

7   dispersed to payoff that original mortgage?

8      A.   No, it did not at that time.

9      Q.   Again, when is it that this transaction took

10  place?

11     A.   Mid July.

12     Q.   Did you have -- at the settlement table this

13  is occurring, did you discuss any issues pertaining to

14  that settlement with Mr. Anker?

15     A.   No.

16     Q.   Did you discuss the sale of the property with

17  him?

18     A.   Just to make sure that everything was fine.

19     Q.   And did everything appear to be fine to you at

20  that time?

21     A.   To my knowledge it was, yes.

22     Q.   I apologize.  Do you see him in the courtroom?

23     A.   Yes.

196

1      Q.   When I say him, referring to the defendant Dan

2   Anker?

3      A.   Yes.

4      Q.   Where is it that you see him?

5      A.   Left hand side of the room to my left.

6      Q.   At the conclusion of the transaction, did Mr.

7   Anker make any comments to you about the property that

8   you had just sold?

9      A.   We just chatted for a little bit outside, and

10  seemed everything would be fine.  As I stated, he said

11  the papers will be delivered to our house, settlement

12  papers that is, and that was the end of it.  We took

13  our check and went to the bank, make sure everything

14  was good.

15     Q.   Was there an explanation offered to you why

16  you couldn't take copies with you that day in mid July?

17     A.   Just a busy day.

18     Q.   Prior to the closing, had you discussed

19  transfer of real estate and closing itself with Mr.

20  Anker?

21     A.   Yes, I did.

22     Q.   About how many times did you talk about it

23  with him?

A-92

197

```
1    A. With different phone calls and going to the
2  office, at least a half dozen.
3    Q. After you learned there was a problem with the
4  payoff of that first mortgage, did you contact Mr.
5  Anker?
6    A. I went to the office immediately, and the
7  office was closed.
8    Q. Do you remember when it was that you went to
9  his office?
10   A. Pretty sure it was that Monday, as soon as my
11 wife called.
12   Q. When you say it is closed, was there any other
13 folks there at the office when you got there?
14   A. There were at least four to six other people
15 standing outside the office. I looked -- went, looked
16 into the office door was closed, lights were out.
17   Q. Do you remember speaking with anyone, whether
18 or not you did speak to any one outside the office?
19   A. To a few people.
20   Q. Do you remember any of the folks that you met
21 that day?
22   A. No, I do not remember their names.
23   Q. Any physical descriptions?
```

198

```
1    A. I remember there was one -- pretty sure she
2  was an Indian person. She was very upset. She was
3  having the same exact problem.
4    Q. Have you discussed this issue with Mr. Anker
5  after you went to meet with him or meet at the office
6  that day?
7    A. I tried to call a few times, never got any
8  answer but no, I did not discuss it with him
9  afterwards.
10   Q. Where is it that you tried to call; what
11 number is it that you tried to reach him on?
12   A. His office phone and I also had his cell
13 phone.
14   Q. Did you leave any messages for him?
15   A. Yes.
16   Q. What was the nature of the message that you
17 left?
18   A. Just wanted to know why our mortgage was not
19 paid off.
20   Q. Did he return any of your phone calls?
21   A. No.
22   MR. LUGG: May I have one moment Your Honor.
23   THE COURT: Yes, you may.
```

199

```
1    (Discussion held off the record.)
2    MR. LUGG: Thank you.
3    CROSS EXAMINATION
4  BY MR. WENDELBURG:
5    Q. Mr. Kintz the settlement sheet from this
6  transaction says that the settlement took place on July
7  15, 2003; is that your recollection?
8    A. Without looking at it I know it was mid July.
9  Yes.
10   Q. You have the settlement sheet there with you?
11   A. Yes.
12   Q. Near the upper right hand corner of the first
13 sheet. It may have it up there.
14   A. July 15, 2003.
15   Q. To your recollection, is that when it
16 occurred?
17   A. To my recollection, that is when it occurred.
18   Q. Do you remember what day of the week it was?
19   A. Possibly a Thursday.
20   Q. My calender says it was a Tuesday. Do you
21 recall it as being a day other than that Tuesday, was
22 it a Monday or particularly scheduled for a Friday?
23   A. Just without looking at the calender, just mid
```

200

```
1  week. That's all I remember.
2    Q. You testified that your --
3    A. Okay, sorry, go ahead.
4    Q. Was there something else?
5    A. The settlement that we made on the 301 -- 3107
6  Duncan Road with Mr. Anker also that was on a Thursday.
7    Q. That was the house --
8    A. Tuesday, which this date would probably be,
9  correct.
10   Q. So you settled on the house that you were
11 selling to Mr. Burkett on Tuesday, then settled on the
12 house that you were buying two days later?
13   A. Yes.
14   Q. That was also with Mr. Anker's office?
15   A. Yes.
16   Q. Your testimony was I think that your wife
17 called the mortgage company the Monday following the
18 Burkett transaction to check to see whether the
19 mortgage was paid off?
20   A. Pretty sure. I think we were told it takes
21 three to five days for Mr. Anker to clear everything.
22   Q. So you called six days after your wife called,
23 six days after?
```

A-93

5

1   exposed to any media coverage about this case,
2   meaning radio, TV, newspaper, Internet?
3          THE JURY: No.
4          THE COURT: Let the record reflect a
5   negative response.
6          Sir, you may proceed.
7          MR. LUGG: Thank you, your Honor. The State
8   calls Kathleen Leahy. Ms. Leahy.
9          ... KATHLEEN LEAHY,
10  having been duly sworn according to law, was examined
11  and testified as follows...
12          DIRECT EXAMINATION
13  BY MR. LUGG:
14      Q.   Ms. Leahy, good morning.
15      A.   Good morning.
16      Q.   How are you?
17      A.   Fine, thank you.
18      Q.   Good.
19          I have a few questions I'd like to ask you.
20  First, not your address, but where is it that you
21  live now, the neighborhood?
22      A.   I live in Lewes, Delaware.
23      Q.   Okay. And how long have you lived in Lewes,

---

Leahy - Direct                                  7

1   from you?
2       A.   Nancy Devine and Julius Meisel.
3       Q.   And did you meet those folks in the course
4   of the sale of this property?
5       A.   Yes, at the settlement table.
6       Q.   Okay. You said you met them at the
7   settlement table. Where was that settlement table,
8   or where was the settlement held?
9       A.   The settlement was held at Daniel Anker's
10  office at Park Plaza.
11      Q.   Okay.
12      A.   July 15th, 2003.
13      Q.   Okay. And who was present for that
14  settlement?
15      A.   For the seller's side, which was myself, my
16  husband and our real estate representative Kathleen
17  Wilder from Patterson Schwartz.
18      Q.   Okay. And were Ms. Devine and Mr. Meisel
19  also present?
20      A.   For the buyers it was Ms. Devine,
21  Mr. Meisel, Mr. Anker, a woman representing Patterson
22  Schwartz by the name of Mia, and then a young lady
23  that worked in Mr. Anker's office.

---

Leahy - Direct                                  6

1   Delaware?
2       A.   Two years.
3       Q.   Okay. Prior to Lewes, where did you reside?
4       A.   2022 Delaware Avenue, in Wilmington.
5       Q.   Okay. And how long did you reside at that
6   address?
7       A.   Oh, I think, 25 years, I think. 1978 to
8   2003.
9       Q.   To 2003?
10      A.   Mm-hmm.
11      Q.   Okay. Did you live with anyone there?
12      A.   My husband and two children.
13      Q.   Okay. And did you all move to Lewes,
14  Delaware, together?
15      A.   No, just my husband and I.
16      Q.   The kids moved out?
17      A.   Yes.
18      Q.   Okay. How is it that you disposed of that
19  property, if you did? Or do you still own that
20  property on Delaware Avenue?
21      A.   No. We sold that July of 2003.
22      Q.   Okay. And with whom did you negotiate the
23  sale of that property, who was buying the property

---

Leahy - Direct                                  8

1       Q.   Did you learn that young lady's name?
2       A.   I don't recall it.
3       Q.   Okay. Did you have any contact with either
4   Mr. Anker or that young woman working there prior to
5   the 15th of July?
6       A.   No.
7       Q.   And jumping ahead a bit, did you have any
8   contact with either of them subsequent to that
9   settlement?
10      A.   No.
11      Q.   You indicated a person named Daniel Anker
12  was present at this law office to hold the
13  settlement. Do you see that person in the courtroom?
14      A.   Yes, I do.
15      Q.   And could you identify him for us, please?
16      A.   I believe he's the gentleman over there
17  with the glasses and the light-colored sport
18  coat (indicating).
19      Q.   Okay. And can you explain what happened at
20  that settlement, what was the transaction and what
21  were you required to do?
22      A.   We met, the three of us met, the three
23  sellers -- I mean, my husband and I and the real

Leahy - Direct    13

1  property?
2      A.   There were so many papers going around that
3  table, Mr. Lugg... at the one o'clock, I...
4      Q.   Okay.  Did you fill out what is called or
5  what is known as the settlement sheet?
6      A.   Yes.
7      Q.   Okay.  And does that deed tell the property
8  that you were disposing of by virtue of the sale?
9      A.   Yes.
10     Q.   Did you hold, or was there a loan held for
11 that property in Delaware Avenue?
12     A.   Yes.
13     Q.   And what bank did you hold this loan?
14     A.   Wachovia.
15     Q.   And what was your intent with respect to
16 that loan in this real estate transaction?
17     A.   That that mortgage would be paid, and then
18 the buyers would have to get the title of the
19 property by that mortgage being paid.
20         MR. LUGG:  May I approach the witness,
21 your Honor?
22         THE COURT:  Sure.
23     Q.   I'm handing to you a second document.  Do

Leahy - Direct    15

1      Q.   Okay.  How much is it that you owed at that
2  time to Wachovia?
3      A.   $50,826.90.
4      Q.   Okay.  And that was based upon the loan that
5  you had on that property prior to the sale?
6      A.   Correct.
7          MR. LUGG:  Your Honor, the State would move
8  to admit the settlement sheet as the next State's
9  exhibit.
10         MR. WENDELBURG:  (Pause.)  Without
11 objection, your Honor.
12         THE COURT:  Very well.
13         THE CLERK:  Be State's Exhibit No. 30.
14         THE COURT:  Thank you.
15         MR. LUGG:  Can I return the document to the
16 witness, your Honor?
17         THE COURT:  Certainly.
18         MR. LUGG:  Thank you.
19 BY MR. LUGG:
20     Q.   I have a few more questions about this for
21 you, ma'am.
22     A.   Mm-hmm.
23     Q.   At the time of this transaction -- strike

Leahy - Direct    14

1  you recognize what I've placed before you?
2      A.   This is the settlement sheet.
3      Q.   Okay.  Do you recall reviewing that sheet on
4  July 15th?
5      A.   Yes.
6      Q.   And did you sign that document?
7      A.   Yes.
8      Q.   And is your signature evidenced on the first
9  page of that?
10     A.   Yes.
11     Q.   Did you also sign the second page of that
12 document?
13     A.   Yes.
14     Q.   Okay.  Turning to the first page, the upper
15 left-hand portion, does that indicate the property
16 location that was being sold?
17     A.   Yes.
18     Q.   Okay.  Is that 2022 Delaware Avenue?
19     A.   Correct.
20     Q.   Okay.  Is the existing mortgage also
21 reflected on that sheet, the Wachovia mortgage?  And
22 I direct your attention to line 504.
23     A.   Yes.

Leahy - Direct    16

1  that.
2          Did you sell your house for more than
3  $50,000?
4      A.   Yes.
5      Q.   Okay.  And as part of the sale, were funds
6  disbursed to you at the table?
7      A.   Yes.
8      Q.   Okay.  How much did you receive at the time
9  of this transaction?
10     A.   272,579.37.
11     Q.   Okay.  And is that what is reflected in line
12 603 of this exhibit?
13     A.   Yes.
14         THE COURT:  Would you mind just repeating
15 that, please, for the record.  The sum, what was
16 that, 272...
17         THE WITNESS:  272,579.37.
18         THE COURT:  Thank you, ma'am.
19 BY MR. LUGG:
20     Q.   Okay.  And did you deposit those checks in
21 your account?
22     A.   Yes.
23     Q.   Or that check?

Leahy - Direct 17

1   A.  Mm-hmm.
2   Q.  And did that check clear?
3   A.  Yes, it did.
4   Q.  Okay. After the 15th of July, did you learn
5   anything with respect to that Wachovia mortgage?
6   A.  At the end of July or the beginning of
7   August we got a phone call from our real estate,
8   Kathleen Wilder, saying that she was sorry, but there
9   were problems with the settlement.
10  Q.  Okay. Was that Wachovia loan paid off at
11  that time?
12  A.  No.
13  Q.  It was not.
14      Taking you back, when you left on July 15th,
15  2003, what was your expectation with respect to that
16  property, what did you expect to have happened with
17  respect to your sale of that property and the
18  Wachovia loan?
19  A.  I expected that because I live in Delaware
20  and you have to use the buyer's attorney, who's an
21  officer of the court, that I had no other recourse,
22  this is how you make settlement. And I expected that
23  anything that was to be paid would be paid from this.

Leahy - Direct 18

1   Q.  Okay. And was that expectation held by you
2   when you, in fact, signed this document?
3   A.  Yes.
4   Q.  And turning to the second page of this
5   document, was this also signed by the lawyer you've
6   described as Mr. Anker?
7   A.  Yes.
8   Q.  And is that at the bottom portion of the
9   second page?
10  A.  Yes.
11  Q.  Was that Wachovia loan at some point after
12  August of 2003 paid?
13  A.  No.
14  Q.  Okay. Does that loan still exist with
15  Wachovia?
16  A.  No.
17  Q.  Okay. How is it that that loan no longer
18  exists?
19  A.  We applied to the Lawyers Fund for client
20  protection, and of April of 2004 is when that loan
21  was finally paid.
22  Q.  Can you describe for us the notifications or
23  efforts of Wachovia with respect to you and that

Leahy - Direct/Cross 19

1   preexisting loan?
2   A.  We received bills, monthly bills, to show
3   that, you know, it wasn't being paid, or the
4   interest. And then we would send the bills off to
5   Mr. Forsten who was the receiving attorney for these
6   problems. Then Wachovia would phone us. Then we
7   received a letter from Wachovia saying that we were
8   in breach, and that we had 30 days to pay off the
9   loan. It wasn't pleasant.
10      MR. LUGG: Can I have one moment,
11  your Honor?
12      THE COURT: (No audible response.)
13      MR. LUGG: Ma'am, thank you. Counsel may
14  have a few questions for you.
15          CROSS-EXAMINATION
16  BY MR. WENDELBURG:
17  Q.  Good morning, Mrs. Leahy. I'm Allan
18  Wendelburg, we just have a few questions for you.
19  A.  Sure.
20  Q.  To clarify your prior testimony, from the
21  settlement, and at the settlement table you received
22  a check in the amount of a little over $272,000; is
23  that correct?

Leahy - Cross 20

1   A.  Correct.
2   Q.  And that was the cash, cash that you took
3   away from the settlement table?
4   A.  Correct.
5   Q.  Okay. You testified, I think, that you had
6   not met Mr. Anker, my client, before the settlement,
7   you saw him at the settlement and you had never saw
8   him again afterwards; is that correct?
9   A.  Correct.
10  Q.  After you begin to receive communications
11  that your old mortgage had not been paid off, what,
12  if anything, did you personally do about that?
13  A.  Well, let's see. We made settlement
14  July 15th, 2003, and it was in a time span of
15  approximately two to three weeks that we received a
16  phone call saying that there were problems with the
17  settlement.
18  Q.  Who was that phone call from, if you recall?
19  A.  It was from our real estate person, Kathleen
20  Wilder.
21  Q.  Okay. Now, when you say "we received," is
22  this you or Mr. Leahy who got this call?
23  A.  Gee, we both live there together, and I

27

1    IRS checks?

2        A.    With respect to these two particular checks?

3        Q.    Yes, State's No. 53.

4        A.    Well, it appears that -- they appear to

5    be -- they don't appear to be his signature.

6        Q.    Mr. McCullough, I'm going to hand you what's

7    been marked State's Exhibit No. 50. Now, these are

8    two checks, both made payable to Ann Anker, and both

9    of them are machine-printed but appear to be

10    hand-signed.

11            Based on your recollection of your

12    conversations with Mr. Anker on the 29th of July, and

13    your examination of all the checks that you looked at

14    in this case, can you tell the jury whether the

15    signatures on State's No. 50 appear to be Mr. Anker's

16    signature or not?

17        A.    They appear to be Mr. Anker's signature,

18    yes.

19            MR. WENDELBURG: What I'm going to do,

20    because I've reached the end of my technical

21    expertise, is ask the bailiff, if the Court will

22    permit, to turn on this projector, back here, so the

23    jury can see on the screen what you're looking at on

26

1        Q.    Mr. McCullough, on July the 29th, you went

2    over a number of checks with Mr. Anker, and you

3    specifically referred to the Clay Target Sports

4    checks, or at least one Clay Target Sports check.

5        A.    Yes.

6        Q.    During that conversation, did Mr. Anker

7    acknowledge to you that any of the signatures on any

8    of the checks that you went over with him were, in

9    fact, his signature?

10        A.    No, we went over the checks. It was about

11    five or six major checks. And I recall him telling

12    me that some of those signatures were not his.

13        Q.    Did he tell you some of the signatures were

14    his?

15        A.    Yes.

16        Q.    And did you compare the signatures that he

17    had acknowledged to be his with signatures that he

18    said were not his?

19        A.    Yes.

20        Q.    And did you detect a difference between

21    those purported signatures?

22        A.    Yes. There appeared to be a difference.

23        Q.    And this was something that you could tell

28

1    the witness stand.

2            THE COURT: Uh-huh.

3            (Demonstration held.)

4    BY MR. WENDELBURG:

5        Q.    Mr. McCullough, up on the screen we have

6    State's Exhibit No. 50 on the top, which is a $10,000

7    check made payable to Ann Anker.

8            On the bottom of the screen, we have State's

9    Exhibit No. 53, which is a $44,000 check made payable

10    to the IRS.

11            I think your testimony now this morning was

12    that State's Exhibit 53, the IRS check, did not

13    appear to you to be Mr. Anker's signature, while

14    State's Exhibit 50, the Ann Anker check, did.

15            Can you tell the jury, in layman's terms,

16    what factors caused you to come to that conclusion?

17    What is it about those signatures that --

18        A.    They just appear to be different, the style

19    appears to be different.

20        Q.    How many other checks, if you can give us

21    either an exact or approximate number, did you review

22    in the course of your investigation to determine or

23    make a determination as to whether or not the

26

1    just by looking at the check, or was there any type

2    of an analysis that you performed on the check other

3    than just looking at it?

4        A.    Well, just looking at the handwriting, the

5    way it was written.

6        Q.    Now, the IRS checks that are before you,

7    were those shown to you on the 29th?

8        A.    No.

9        Q.    When did you see them?

10        A.    I saw them sometime in August or September

11    of 2003, once we began reviewing the files that

12    Mr. Forsten had gotten from Mr. Anker's office.

13        Q.    At the time when you reviewed the IRS

14    checks, did you have a recollection of the

15    conversation that you had had with Dan Anker in which

16    he said some of these signatures were his and some of

17    them were not?

18        A.    Yes.

19        Q.    And with that recollection in mind, did you

20    look at the IRS checks to see what their signatures

21    looked like?

22        A.    Yes.

23        Q.    What did you determine with respect to the

1  signatures appeared to be Mr. Anker's?

2      A.  I had mentioned to you earlier that my

3  function was to prepare a spreadsheet of all expenses

4  out of the escrow account. I did not do an analysis

5  of each check to determine whether it appeared to be

6  his signature or not. If money was taken out of that

7  escrow account, we recorded it in the spreadsheet

8  analysis. So I did not do a separate analysis of the

9  signatures.

10     Q.  Did you, in fact, analyze any other

11 signatures beyond these that we're looking at on the

12 screen?

13     A.  I'm sorry?

14     Q.  Did you look at any other of the signatures

15 on any of the escrow checks, other than State's

16 Exhibits 50 and 53 that we are looking at here, to

17 determine whether or not the signatures appeared to

18 be his?

19     A.  In going through the checks and in preparing

20 the spreadsheet, we would look at the authorized

21 signature on the right-hand side.

22         (Demonstration concluded.)

23     Q.  Mr. McCullough, yesterday you talked about

1  telephone transfers that you found reported in some

2  of the bank statements. And, in fact, you broke them

3  down in one of your spreadsheets to isolate just the

4  telephone transfers. You testified a little bit

5  about how a telephone transfer works. And I think

6  that you testified that it is not the same thing as a

7  wire transfer; is that correct?

8      A.  Correct.

9      Q.  The telephone transfers that you found were

10 all transferring money from one Wilmington Trust

11 account -- pardon me, one Anker Wilmington Trust

12 account to another Anker Wilmington Trust account; is

13 that correct?

14     A.  Correct.

15     Q.  Are you familiar with the process that's

16 used to make such a transfer?

17     A.  Not at Wilmington Trust, no, but I know of

18 other situations.

19     Q.  This is something that, as the name implies,

20 is just something that's done by a person on the

21 phone; is that correct?

22     A.  Correct.

23     Q.  A customer calls in and says, I want to

1  transfer money from account A to account B?

2      A.  Yes.

3      Q.  Within the same bank?

4      A.  Yes.

5      Q.  And there is no paper receipt for this

6  generated at the time; is that correct?

7      A.  Correct.

8      Q.  In other words, the person isn't there to

9  get a deposit slip or write a countercheck, or

10 anything like that?

11     A.  Correct.

12     Q.  You found over a dozen such telephone

13 transfers in the case of the Anker escrow account; is

14 that right?

15     A.  More than that, yes, quite a number.

16     Q.  Money being taken from escrow and being put

17 into operating?

18     A.  Yes.

19     Q.  Did you find records to -- excuse me. Does

20 a record exist as to who it was who actually made

21 this telephone call to effect the transfer?

22     A.  There may be a record, but I have not seen

23 any.

1  Q.  Were you able to locate any payroll records

2  in the Anker office?

3      A.  No.

4      Q.  Either for Dan or for Laura?

5      A.  Correct.

6      Q.  Did my client tell you what Ms. Larks's

7  salary was during the relevant period of time?

8      A.  I don't recall. I don't think so.

9      Q.  Do you recall if you asked him?

10     A.  I'm trying to recall. I recall him telling

11 me that the salary was paid out of the operating

12 account. And we had seen some checks out of the

13 escrow account to her, and he said essentially that

14 she should have been paid out of the operating

15 account, not the escrow account.

16     Q.  The spreadsheets that you did and the

17 analysis you performed covers the period of January

18 1, 2002, until the end of August of 2003, a little

19 bit more than a year and a half.

20     A.  Yes.

21     Q.  You have totaled the distributions to Laura

22 Larks during that period of time, direct

23 distributions to Laura Larks during that period of

1  time, both from the operating and escrow accounts; is
2  that correct?
3      A.  Yes.
4      Q.  And during that year-and-a-half period of
5  time, total distributions to Ms. Larks, in forms of
6  checks directly to her, total over $200,000; is that
7  correct?
8      A.  Somewhere in that area, yes.
9          MR. WENDELBURG:  May I have a moment,
10  Your Honor?
11         THE COURT:  Yes.
12         (Pause.)
13  BY MR. WENDELBURG:
14     Q.  Mr. McCullough, you talked a couple times in
15  this case about the computer that you found in the
16  reception area of Ms. Larks' desk in the office, and
17  you testified as to the attempts to start the
18  computer up, get information from it.
19         After your initial examination of the
20  computer, did you take the computer into your
21  custody, or take any steps to safeguard the
22  information in the computer?
23     A.  You mean that particular night?

1  find any signed, not "assigned," signed, signature,
2  checks in client case files?
3      A.  Oh, that particular night, I'm sorry.  I
4  thought you were talking about the computer. I'm
5  sorry.
6      Q.  Yeah.
7      A.  That night, we didn't find any client files.
8  Now, okay, my understanding is later on, once
9  Mr. Forsten's office got involved in retrieving the
10  files, they did find checks in the client file that
11  had not been mailed out.
12     Q.  Do you remember seeing any checks during
13  your investigation that were altered with White-Out?
14     A.  I believe there may have been some.
15     Q.  Did you find any records in your
16  investigation from any outside accountants or
17  bookkeepers?
18     A.  No, not really. I did speak with one of his
19  former accountants at a point to try to find out
20  what they had -- what kind of work they had done
21  and --
22     Q.  Well, without saying what that person said,
23  let me just ask you to identify the person.  Do you

1      Q.  That particular night.
2      A.  No.
3      Q.  How about later on?
4      A.  No.  Later on, I believe after the
5  suspension, that's the reason we had come over for
6  that meeting. I believe a day or two after the
7  suspension, Mr. Forsten and everybody else was there,
8  I had mentioned to Mr. Forsten's staff, you know, the
9  computer is here, and we got to -- you should bring
10  your tech people in here to either download, or to
11  take it, you know, because it's something that he
12  should have.
13     Q.  This was late July or early August?
14     A.  This would have been in early August, yes.
15     Q.  When you were looking through office files
16  on July the 29th, did you find any signed but
17  undistributed checks in those files?
18     A.  There was a category, assigned/unassigned.
   There was a category.  They had a category of
20  assigned and unassigned.
21     Q.  Assigned and unassigned?
22     A.  Yes.
23     Q.  I think my question wasn't clear.  Did you

1  know who he or she was that you talked to?
2      A.  Yes. I called Beth Nester. Her name was
3  listed on one of those certificates of compliance. I
4  called her up, and I had asked her what type of work
5  she had performed in terms of bank reconciliations,
6  so forth, so on.
7      Q.  One last housekeeping matter,
8  Mr. McCullough.
9          MR. WENDELBURG:  If I could have this
10  document marked for identification.
11         (Spreadsheets marked as Defense for
12  Identification W.)
13         THE PROTHONOTARY:  Defense ID W.
14  BY MR. WENDELBURG:
15     Q.  Yesterday afternoon you identified three
16  spreadsheets for us. One was your spreadsheet
17  showing all of the escrow checks. One was your
18  spreadsheet showing all of the operating account
19  checks. One was a smaller spreadsheet showing
20  selected escrow checks that were sorted by payee.
21  Let me ask you if you can identify this fourth
22  document for us.
23     A.  Yes, this is an Excel spreadsheet for the

Carmine - Direct                                   53

1  to that, that deposit was, as Ms. Berl indicated,
2  reflected in the account; is that correct?
3      A.  That's correct.
4      Q.  Ms. Berl was asked a few questions about the
5  tracing of the funds through the account. Do you
6  recall that?
7      A.  Yes.
8      Q.  Did you attempt to perform that function in
9  your investigation, trace the funds, so to speak?
10     A.  Well, I could see the fund -- I did review
11 the expenditures from the account, the checks written
12 on the account.
13     Q.  Had you reviewed the account, that full book
14 of account statements in the course of your
15 investigation?
16     A.  At one time or another, yes.
17     Q.  Okay. And did you review that account
18 statement with an eye looking for the payoff to the
19 original loan held by dean -- or Doug Ray to Chase
20 Mortgage?
21     A.  Yes, I did.
22     Q.  And is that payoff reflected in any of the
23 account statements maintained within that binder?

Carmine - Direct                                   54

1      A.  I could not locate anything, no.
2      Q.  Okay. Turning next, you saw first the
3  person named Phillip Urban?
4      A.  Yes.
5      Q.  Returning to the January portion of that
6  book in 2002, did you investigate that binder of
7  statements for payoffs to his original mortgagor,
8  Wilmington Savings Fund Society?
9      A.  Yes, I did.
10     Q.  And were you able to identify the
11 disbursement of funds from the escrow account to pay
12 off that loan?
13     A.  No, I was not able to.
14     Q.  Chronologically, Doug Ray was next. You
15 next investigated a case pertaining to John and Amy
16 Lesko; is that correct?
17     A.  Yes.
18     Q.  And we've heard about a deposit, a wire in
19 the month of April for the Lesko account; is that
20 right?
21     A.  I did.
22     Q.  And did you investigate and observe the
23 existence of that deposit into the account, as

Carmine - Direct                                   55

1  Ms. Berl has testified?
2      A.  Yes.
3      Q.  Did you continue to investigate the account
4  statements and the escrow books, so to speak, for a
5  disbursement for the original loan with Washington
6  Mutual?
7      A.  Yes, I did.
8      Q.  And were you able to find a disbursement
9  from the escrow account from April 3rd, 2003, to the
10 conclusion in August 2003 for that original mortgage
11 to Washington Mutual?
12     A.  No.
13     Q.  Next we return to Gary and Maya Paveza
14 chronologically; is that correct?
15     A.  Yes.
16     Q.  That was a settlement held in April of 2003;
17 is that correct?
18     A.  I believe it was, yes.
19     Q.  We learned, and they've told us about a
20 Gilpin settlement or Gilpin mortgage that they had
21 acquired. Have you reviewed those records and
22 ascertained whether there was a deposit on their
23 behalf from Gilpin Mortgage Company?

Carmine - Direct                                   56

1      A.  There was.
2      Q.  And when was that, if you can tell us.
3      A.  I have to find it here.
4      Q.  Thank you. Please take your time.
5      A.  (Pause.)
6          MR. LUGG:  Your Honor, as the investigator
7  is looking through that, may we approach briefly?
8          THE COURT:  Do we need the reporter?
9          MR. LUGG:  I think it would be best,
10 your Honor.
11         (The following took place at sidebar:)
12         MR. LUGG:  I've just see a line of new faces
13 in the back of the room, I'm not sure if counsel
14 either saw them come in.
15         THE COURT:  Is that his family?
16         MR. WENDELBURG:  Yes.
17         MR. LUGG:  None of those are witnesses?
18         MR. WENDELBURG:  No. Some of them are a
19 little young.
20         MR. LUGG:  They're not witnesses?
21         MR. WENDELBURG:  No.
22         MR. LUGG:  Thank you.
23         (Sidebar concluded.)

Carmine - Direct                                      57

BY MR. LUGG:

Q. Were you able to find that?

A. Yes. There was a cashier's check from Gilpin Financial Services, Incorporated, payable to Daniel Anker, Esquire, attorney trust account, dated 4/1/03 in the amount of $195,740, and footnoted, Paveza, comma, G. There's also an Artisans Bank official check in the amount of $6,186.19, it indicates the remitter was Gary Paveza, and pay to the order of Daniel J. Anker.

Q. And after investigating that portion of that particular offense, did you also continue your investigation to ascertain whether payoffs were made in accordance with the settlement sheet that we've observed to the Conseco and GMAC lenders?

A. I did.

Q. And in the month of April following that settlement, the real estate settlement, were there any payoffs on the behalf of Gary and Maya Paveza for either Gilpin or GMAC?

A. Not in April.

Q. You indicate not in April. Was there a payoff to one or both of those institutions in the

Carmine - Direct                                      58

month of May?

A. There was a payoff to GMAC in, I believe it was in May. (Pause.) Yes, it was the law office of Daniel J. Anker escrow account dated 5/8, 2003, payable to GMAC Mortgage, $433,712.75. And in the note section, "Paveza payoff."

Q. And were you able to find within those documents up until the month of August of 2003 a payoff disbursement from that escrow account for the Conseco loan held by Gary and Maya Paveza?

A. No, I could not.

Q. We next heard from Frank and Margaret Caucci concerning the loan that they had obtained from Nationwide Financial, and we've heard of the wire entering the accounts at the end of April of 2000 -- or the beginning of May of 2003. Did you review the May account statements pertaining to the Caucci transaction?

A. I did.

Q. And did you review the account statement subsequent to May with respect to that transaction?

A. Yes.

Q. And you have learned that they had an

Carmine - Direct                                      59

original mortgage with Homecomings Financial; is that correct?

A. That's correct.

Q. Did you in the course of your investigation identify a disbursement from Daniel Anker's escrow account to pay off the preexisting mortgage with Homecomings Financial?

A. I could locate none.

Q. You located none?

A. None.

Q. Mr. and Mrs. Bashir, Humera and Iqbal, did you learn in the course of your investigation the source of funds for that particular transaction?

A. I did.

Q. Okay. And, in fact, you've testified earlier as to Gilpin's involvement in that transaction; is that correct?

A. That's correct.

Q. And were you able to identify in the June statement the receipt of funds by Mr. Anker's escrow account for that particular real estate transaction?

A. There was a notice in here, yes.

Q. Sir, I apologize, I've sent you up

Carmine - Direct                                      60

relatively blind. Have you marked these documents --

A. No, I haven't.

Q. Please take your time and review them to find them in this unmarked document.

A. (Pause.) Okay. We're talking about a deposit going into the account?

Q. Yes.

A. Okay. I apologize, I was looking for Bashir name, it's in "Chambers."

Q. Who was the purchaser of that, did you learn?

A. Drew Chambers was the purchaser of the Bashir home.

Q. And do you see a Gilpin document pertaining to Mr. Chambers?

A. Yes, I do. It's a Gilpin Financial Services, Incorporated, check, cashier's check dated 6/4/03 in the amount of $210,400, payable to Dan Anker attorney trust account, and it's footnoted Chambers, comma, D. There's also a Gilpin, again, a Gilpin's cashier's check dated 6/4/03, payable to Daniel Ankle -- excuse me -- Daniel Anker attorney trust account, $22,600, again footnoted Chambers,

Carmine - Direct                    61

1   comma, D.

2       Q.   And we've learned from Mr. Chambers that he

3   had two mortgages, correct?

4       A.   That's correct.

5       Q.   Did you continue your investigation of this

6   account with respect to the Chambers/Bashir

7   transaction to identify the disbursement to either

8   Sovereign or Principal Mortgage on the Bashirs'

9   behalf?

10      A.   It was the Bashirs' mortgage. No, there was

11  no payments going out that I could find.

12      Q.   You found no payments going out from that

13  account?

14      A.   Yes.

15      Q.   Okay. Patricia Paoli, you've heard of a

16  wire, indicating by note a wire received by the

17  Wilmington Trust escrow account of Mr. Anker on her

18  behalf in June of 2003; is that correct?

19      A.   Yes.

20      Q.   And Ms. Berl has identified that receipt of

21  funds. Did you investigate the account statements

22  with respect to that wire transfer on Ms. Paoli's

23  behalf?

Carmine - Direct                    62

1       A.   I did.

2       Q.   Did you locate disbursements from

3   Mr. Anker's escrow account to ABN AMRO pursuant to

4   the instructions on the settlement sheet?

5       A.   No, I did not locate anything.

6       Q.   There was no disbursement?

7       A.   None that I could find.

8       Q.   Mr. and Mrs. Leahy, and we heard from

9   Ms. Leahy this morning, sold their property; is that

10  correct?

11      A.   Yes.

12      Q.   And do you recall who they sold their

13  property to?

14      A.   Nancy Devine and Julius Meisel.

15      Q.   And she indicated that was in the middle of

16  July of 2003; is that correct?

17      A.   Yes.

18      Q.   And in the course of your investigation, did

19  you investigate the account statements of that escrow

20  account for the source of funds for that particular

21  transaction?

22      A.   I did.

23      Q.   And were you able to identify the receipt of

Carmine - Direct                    63

1   funds into the escrow account of Mr. Anker for that

2   particular real estate transaction?

3       A.   I did.

4       Q.   And can you indicate what it is you found

5   with respect to the funds going into the account?

6       A.   I located three checks. The first was a

7   Gilpin Financial Services cashier's check dated

8   7/15/03 in the amount of $212,000 payable to Daniel

9   Anker attorney trust -- attorney trust account,

10  footnoted Meisel, comma, C.

11          The next was a Citizens Bank official check

12  payable to -- or dated -- excuse me -- dated 7/15/03,

13  payable to Daniel J. Anker in the amount of 29,500.

14  In the memo section is for C. Julius Meisel and Nancy

15  Devine.

16          And a third check, First Union official

17  check, dated July 15th, 2003, in the amount of

18  $45,000 payable to Daniel J. Anker. In the memo

19  section the initial "C.," C. Julius Meisel and Nancy

20  Devine. And they're reflected on the deposit slip

21  dated 7/15/03.

22      Q.   Okay. We've heard about a Wachovia mortgage

23  held by Ms. Leahy on that particular property sold.

Carmine - Direct                    64

1   Did you continue to investigate the account

2   statements subsequent to July 15th of 2003 to

3   identify disbursements to Wachovia?

4       A.   Yes.

5       Q.   Did you find the disbursement to Wachovia in

6   the amount of -- and I apologize -- it was a sum

7   slightly over $50,000 on their behalf?

8       A.   I found none.

9       Q.   You found none.

10          And, finally, if I could ask you about the

11  property transfer between the Kintzes and the

12  Burketts. Was that part of your investigation?

13      A.   Yes.

14      Q.   And had you investigated those account

15  statements to investigate, one, the source of funds

16  for the transfer of that property?

17      A.   Yes.

18      Q.   And have you identified the source of funds

19  for that purchase of the property by Mr. and Mrs.

20  Burkett from the Kintzes?

21      A.   Yes, I did.

22      Q.   And could you identify that for us, please?

23      A.   Could you refresh my memory on the month?

Carmine - Direct    65

1    Q.   It was in July of 2003.
2    A.   (Pause.) There was a Colonial National Bank
3    check dated 7/17/03, pay to the order of Russell
4    Burkett and Eleanor Burkett in the amount of
5    $315,000. And it is stamped on the back, "For
6    deposit only Daniel J. Anker attorney escrow
7    account," and was deposited on, according to the
8    deposit slip, on 7/18/03 into the attorney trust
9    account. There's additionally a Commerce Bank check
10   in the amount of $7,000 payable to Russell and
11   Eleanor Burkett. And it is also stamped, "For
12   deposit only Daniel J. Anker attorney escrow
13   account." And it also shows on the deposit slip as
14   being deposited.
15   Q.   Did you continue your investigation of that
16   escrow account to determine if the disbursement was
17   made for Mr. Kintz's preexisting mortgage?
18   A.   I could locate no disbursement.
19   Q.   There are no disbursements for that.
20        And to be clear, have you reviewed the
21   various settlement sheets in the course of your
22   investigation to assist you in this review of the
23   account statement?

Carmine - Direct    66

1    A.   Yes, to try to determine time frames and
2    amounts.
3    Q.   How many disbursements were made in
4    accordance with the settlement sheets at all from
5    your investigation, in the cases that we've discussed
6    over the past few days?
7    A.   The one GMAC is the only one I can recall.
8    Q.   The GMAC on the Paveza?
9    A.   On the Paveza. I'm sorry.
10   Q.   No others were discovered?
11   A.   No.
12        MR. LUGG: May I approach the witness,
13   your Honor?
14        THE COURT: Yes.
15   Q.   I'd like to ask you a few questions changing
16   gears just a bit. You did various things in this
17   investigation; is that correct?
18   A.   Yes.
19   Q.   A few days ago there was an inquiry as to
20   the receipt of a particular computer or computers
21   from the offices of Mr. Anker; is that correct?
22   A.   That's correct.
23   Q.   Did you, in fact, receive computers that

Carmine - Direct    67

1    were existed at one time in that office?
2    A.   I did.
3    Q.   Okay. You were asked about dates and times.
4    Do you recall when it was that you received these
5    machines?
6    A.   I do now, I recall after having found a note
7    in the file that I received those machines from Mary
8    Quinn, who was the paralegal in Richard Forsten's
9    office on January 3rd of '04. I believe I
10   incorrectly testified it was like November or
11   December of '03.
12   Q.   Okay. What was the purpose of your receipt
13   of these machines?
14   A.   To take custody of them. They had completed
15   the repair or reconstruction of the issues they were
16   addressing and we wanted to have them forensically
17   examined.
18   Q.   Okay. Were you advised of the location of
19   particular machines within that law office prior to
20   your receipt?
21   A.   Yes. I observed the machines there when I
22   was in there in August, and they were in relatively
23   the same position when I picked them up.

Carmine - Direct    68

1    Q.   How many machines were there?
2    A.   Two.
3    Q.   And where was the first machine?
4    A.   The first was a Dell, and it was at what I
5    will call a reception area at the desk there as you
6    entered the offices.
7    Q.   And in the course of your investigation did
8    you learn who primarily resided, for lack of a better
9    term, or used that location in the office?
10   A.   Laura Larks.
11   Q.   Okay. Where was the second machine?
12   A.   In Mr. Anker's, I would call it his personal
13   or private office.
14   Q.   And was that separate from that reception
15   area?
16   A.   Yes. And you could close the door.
17   Q.   And did you, what did you do with those
18   machines after you received them?
19   A.   I transported them the following week and
20   turned them over to Sergeant Kevin Perna of the
21   Delaware state police high tech crime unit.
22   Q.   Was there a third machine or computer that
23   was recovered in this investigation?

Carmine - Cross                105

1    Q.   Detective Carmine, were you ever asked in
2    this case to research any real estate documents? And
3    by that I mean go to the Recorder of Deeds office to
4    see what was there.
5        A.   No. The paralegal from Mr. Forsten's office
6    did that kind of research.
7        Q.   Did you prepare any spreadsheets or other
8    summaries of financial information that you had
9    received in connection with this case?
10       A.   No. I used, I worked off of the
11   spreadsheets supplied by Mr. McCullough.
12       Q.   The Lawyers Fund auditor?
13       A.   Yes.
14       Q.   Did you assist Mr. McCullough in his audit?
15       A.   No.
16       Q.   Were you present during any portion of his
17   audit?
18       A.   During certain portions we met a couple of
19   times to see the status of how they were coming on
20   it, but I didn't participate in any input of
21   information or anything.
22       Q.   I'm going to preface this next question by
23   asking you not to tell us anything that somebody else

Carmine - Cross                106

1    told you in connection with the subject of this
2    question. In other words, you know what the term
3    hearsay is, you've been around law enforcement for
4    nearly 40 years, don't tell us any hearsay.
5        Did you yourself conduct any investigation
6    of any of the escrow or operating account checks
7    drawn on Mr. Anker's account to determine the
8    authenticity of any of the signatures on those
9    checks?
10       A.   Yes.
11       Q.   Can you tell us what that consisted of?
12   again, without telling us hearsay.
13       MR. LUGG: Objection, your Honor, it's
14   hearsay. If we may approach to discuss?
15       THE COURT: Yes, you may.
16       (The following took place at sidebar:)
17       MR. LUGG: I see no other way -- and I
18   apologize for the sidebar -- but there is no other
19   response other than the hearsay response to the
20   question that was posed.
21       MR. WENDELBURG: Your Honor, what I'm
22   intending to get at here is to find out whether he
23   compared any of the signatures of those checks with

Carmine - Cross                107

1    known signatures to see whether --
2        THE COURT: Well, if he has known signatures
3    of Anker and he takes a look at the checks that he
4    can say they don't look like Anker's signature, if
5    that's what he did.
6        MR. LUGG: If that's the question, that's an
7    appropriate question. The question that was asked --
8        THE COURT: Well, it was very broad. Why
9    don't you focus it to see if he obtained known
10   signatures of Anker and looked at the checks, and
11   does he have an opinion whether the signature on any
12   of those checks were not Anker's based on what he
13   observed.
14       MR. WENDELBURG: Your Honor, let me put on
15   the record what Mr. Lugg's concerned about, and that
16   is that it's not to both sides in this case who Laura
17   was, she says she signed.
18       THE COURT: I think it's obvious, I mean, we
19   already have his name by Larks' initials.
20       MR. WENDELBURG: What Mr. Lugg's trying to
21   avoid is that statement coming in, and we've agreed
22   that he shouldn't.
23       THE COURT: No.

Carmine - Cross                108

1        MR. LUGG: Right.
2        THE COURT: Why don't you just narrow it so
3    we don't run afoul of that.
4        MR. LUGG: Thank you.
5        (Sidebar concluded.)
6    BY MR. WENDELBURG:
7        Q.   Detective, in your investigation did you
8    obtain examples of known signatures of Dan Anker?
9        A.   I didn't specifically request an exemplar.
10       Q.   Did you have examples of Mr. Anker's
11   signature that you knew to be such?
12       A.   Yes.
13       Q.   Okay. In the course of your investigation
14   -- and we're going back to two questions ago -- did
15   you take a known exemplar of Mr. Anker's signature
16   and compare them with any of the escrow or operating
17   checks to see whether they, the signatures appeared
18   the same to you?
19       A.   No.
20       MR. WENDELBURG: May I have just a moment,
21   your Honor?
22       THE COURT: Sure.
23       (Mr. Wendelburg confers with Mr. Anker.)

**153**

1  MR. LUGG: State calls Joseph McCullough as
2  its next witness, Your Honor.
3          ------
4  JOSEPH MCCULLOUGH, having been called on the
5  part and behalf of the State, having been duly
6  affirmed according to law, was examined and testified
7  as follows:
8          ------
9          DIRECT EXAMINATION
10         ------
11  BY MR. LUGG:
12      Q.  Mr. McCullough, how are you?
13      A.  Fine. How are you?
14      Q.  Getting things squared away in front of you.
15      Sir, can you tell the jury what it is you do
16  for a living presently?
17      A.  Presently, I'm an investigative auditor for
18  the Delaware Lawyers' Fund for Client Protection.
19      Q.  What is the Delaware Lawyers' Fund for
20  Client Protection?
21      A.  It essentially is a system that went in
22  place where we would randomly contact lawyers and
23  conduct financial investigations of a lawyer's

**154**

1  practice to see if he's maintaining his books and
2  records in accordance with the Delaware Rules of
3  Professional Conduct.
4      Q.  And are you familiar with or affiliated
5  with, in that capacity, with an organization we have
6  referred to as "ODC," Office of Disciplinary Counsel?
7      A.  Yes, I am.
8      Q.  Can you explain the affiliation of the
9  Lawyers' Fund for Client Protection and the Office of
10  Disciplinary Counsel?
11      A.  Well, approximately four years ago, the
12  Office of Disciplinary Counsel was looking for a
13  forensic investigator auditor to assist them in
14  conducting audits. So about four-and-a-half years
15  ago, I began working for them on a contract basis to
16  conduct these investigative audits.
17      Q.  What is a forensic investigator in the
18  accounting sense? Can you tell us a little bit about
   what you do?
20      A.  Yes. Prior to working for the ODC, I was a
21  special agent with the IRS Criminal Division for 28
22  years. I retired in 1998. And then from there, I
23  started my own private investigative firm. I would

**155**

1  occasionally do financial investigations.
2      But essentially a forensic investigator
3  would go out, take an examination of the books and
4  records, try to look beyond the records to see
5  exactly what's going on in the business, and we do
6  some various types of analysis to make sure that the
7  records are in compliance with the various rules and
8  regulations.
9      Q.  How is it that you became -- first of all,
10  are you aware of a forensic investigation or an
11  investigation of the accounts of a person by the name
12  of Daniel Anker?
13      A.  Yes, I am.
14      Q.  And were you asked to assist in that
15  investigation?
16      A.  Yes, I was.
17      Q.  And when is it that you were asked to assist
18  in this account investigation?
19      A.  Well, approximately the latter part of
20  July -- I believe it was July 28th -- I received a
21  phone call from the Office of Disciplinary Counsel.
22  And they had indicated they had received a complaint
23  about a mortgage that had not been timely paid.

**156**

1      Q.  What were you asked to do and what did you
2  then do?
3      A.  Okay, based on that, the ODC had contacted
4  Mr. Anker and set up an appointment. So I believe on
5  July 29th, on the afternoon of July 29th, I went to
6  Mr. Anker's office to conduct this forensic
7  investigative audit.
8      Q.  Did you, in fact, meet with the defendant on
9  the 29th of July?
10      A.  Yes, I did.
11      Q.  Where is it you met with him?
12      A.  I met him in Wilmington. I believe it's
13  called Park Plaza.
14      Q.  Can you describe the offices that you
15  reported to that day?
16      A.  Well, early in the morning, I went to the
17  ODC, because they had received a second complaint
18  about a mortgage that had not been paid. So I went
19  up there to try to gather the information so that,
20  later in the day, I could go out and conduct this
21  audit.
22      Q.  What time did you arrive at the offices that
23  day, if you recall?

1    A.    Approximately 9, 9 a.m.

2    Q.    That's the office of Park Plaza?

3    A.    No, I'm sorry, ODC. That morning, I arrived
at ODC's office. I met with Mr. Anker about 3:30 in
the afternoon. I think he was coming back from
Florida. He was on vacation and he was summoned to
be back. And I had gotten over to the Park Plaza
probably around 2 o'clock in the afternoon.

9    Q.    Approximately how many forensic audits of
attorneys' files have you done in your time with the
Lawyers' Fund for Client Protection?

12    A.    Approximately 200.

13    Q.    200?

14    A.    Yes.

15    Q.    Is it common that attorneys are summoned
from other locations to participate in the audit
process?

18    A.    Generally not, no.

19    Q.    On July 29th, you're now alerted to the fact
that there are two pending complaints you've
indicated concerning Mr. Anker's practice; is that
correct?

23    A.    That is correct.

1    Q.    You indicated that you arrived at the office
at approximately 2 o'clock in the afternoon?

3    A.    Yes.

4    Q.    This is that Park Plaza Building?

5    A.    Yes.

6    Q.    And are you able to go into the office at
that time?

8    A.    No, the office was closed.

9    Q.    What day of the week was that, if you
recall?

11    A.    That was on a Tuesday, Tuesday afternoon.

12    Q.    Did you remain at the office until it was
opened at some point in time?

14    A.    Yes. I mean, the appointment was roughly
3:30, but Mr. Anker was flying back from Florida, so
I wanted to make sure I was there when he arrived.
And also I wanted to make sure that nobody was at the
law practice, another client waiting to get their
mortgage paid. So that had been the case with the
first complaint. They had gone to the office on the
28th of July to get the mortgage paid and the office
was closed. So I went over the 29th, thinking that
maybe, you know, if there is someone else there to

1    complaint, I would be able to talk to them?

2    Q.    Did you find any other folks there when you
there, too?

4    A.    No, there was no one else there.

5    Q.    And did the defendant ultimately show up
while you were waiting there?

7    A.    Yes, he did.

8    Q.    And approximately what time did he arrive?

9    A.    It was probably around 3:30 in the
afternoon.

11    Q.    And did he then come into the office to meet
with you?

13    A.    Yes.

14    Q.    Please explain, as you're led into the
office, what are your initial observations as a
forensic account investigator?

17    A.    Well, originally, I went in the office, I
saw that he had a desk area where files all piled up
and they seemed to be disorganized and all over the
place. It was kind of an unkempt situation.

21    Q.    Were you permitted access into any other of
the rooms within with this law office while you were
there?

1    A.    Yes. Yes.

2    Q.    And can you describe the layout and the
condition of the other rooms as you entered them?

4    A.    Well, it appeared that the files were
disorganized and they didn't seem to be all organized
in the fashion -- in fact, we went looking for the
two complaints that we had, we went looking for the
actual client file, which is the client's name with
all the different paperwork that's in that client
file, we couldn't find the client file.

11    Q.    When you say "we" couldn't find the client
file, who was there with you at 3:30 in the afternoon
in these offices?

14    A.    Well, initially, it was Mr. Anker and I.
And then, at a later point, I believe that Mrs. Anker
had stopped in. And she also assisted us in trying
to locate the files.

18    Q.    And did you continue your investigation,
your review of this property, looking for accounts or
records of accounts as you were there?

21    A.    Yes. They had a computer. And I went on,
looked on the computer to see exactly what type of
recordkeeping they had maintained. Now, initially, I

**169**

1    A.  In January of each year, the lawyer who is
2  responsible for the escrow accounts, managing the
3  escrow accounts, is required to file a Certificate of
4  Compliance with the Delaware Supreme Court. The
5  certificate lays out various questions. They ask you
6  about how you're maintaining your escrow accounts,
7  how you're safeguarding client funds, so forth, so
8  on. It's a whole laundry list of questions you have
9  to answer yes or no on that certificate.
10       So I had his 2003 certificate in front of
11  me, which would cover the year 2002. You file it in
12  January of each year.  And I said to him, you know,
13  we have a problem here.  You know, I don't see any
14  bank reconciliations on a monthly basis, I don't see
15  client funds being identified properly, and we
16  basically have a real problem.
17     Q.  Now, when you say that you have his
18  certificate before you, is that the defendant's
19  certificate, Dan Anker?
20     A.  Yes. Mr. Anker, yes.
21     Q.  Is that a certificate that is actually
22  personally certified by the particular attorney who
23  is making those representations?

**170**

1    A.  Yes.
2    Q.  And what was indicated by Mr. Anker with
3  respect to his maintenance of his books in that 2003
4  form pertaining to 2002?
5    A.  He said everything was in compliance and
6  there was no issues, no noncompliance issues.
7    Q.  And did your investigation yield a different
8  result?
9    A.  Oh, yes, because I did ask him. I said,
10  look, have you done the bank reconciliations? And he
11  said, well, he didn't do them personally. I said,
12  have you reviewed them, because you're required to
13  review them, if you're going to answer the
14  certificate, at least review them and make sure
15  they're in compliance. He said that he had not
16  reviewed them and had relied on someone else.
17     Q.  Did you have any other discussions with the
18  defendant there, in his office, on the 29th of July?
19     A.  Yes. We went back to try to find some
20  checks, because there was some checks all over the
21  place. And at a point in time, I believe we found
22  two checks, mortgage checks, relating to the Bashir
23  mortgage that had not been paid. There were two

**171**

1  checks laying on the desk.
2    Q.  Were the Bashirs, was that one of the
3  complaints that you were investigating at that point
4  in time?
5    A.  Yes.
6    Q.  I interrupted. I apologize.
7    A.  So anyway, the checks were there. I looked
8  at the checks. And, you know, he showed me that the
9  checks -- he said, here are the two checks for the
10  Bashir checks. I said, well, these are original
11  checks that have not been mailed out. They're just
12  sitting here. You know, they have not been sent to
13  the mortgage company.
14     Q.  Now, so I understand correctly and the jury
15  understands correctly, how is it that those Bashir
16  checks came into your possession on the 29th?
17     A.  Well, they were laying in some files at the
18  bookkeeper's area.
19     Q.  And who drew your attention to them?  Was
20  it the defendant who indicated their presence?
21     A.  Well, we had been searching for the client
22  files, and I was looking for anything with the name
23  of Bashir, and some of the other complaints. I'm

**172**

1  looking for anything that they could find --
2    Q.  Okay.
3    A.  -- and I came across these checks. I
4  believe they were under stacks of other checks. But
5  I told him that these checks have not yet cleared the
6  account. They haven't even gone out. They
7  essentially were not mailed.
8    Q.  Did you discuss with Mr. Anker, the
9  defendant, further his personal use of these escrow
10  funds?
11     A.  I talked to him about -- I certainly said
12  that this does not look very good. We have a lot of
13  money missing. We have mortgages not paid, and we
14  have money going to you and other people out of the
15  escrow account. I said, we have a real problem here,
16  you know.
17     Q.  Now, is that the end of your investigation,
18  on the 29th?
19     A.  No.
20     Q.  Okay. What is it you do -- after the 29th,
21  what do you do as far as working with the Lawyers'
22  Fund for Client Protection?
23     A.  As a general rule, we conduct a full-scale

**173**

1  investigative audit, which will involve the analysis
2  of all the bank accounts, escrow accounts, the
3  reconciliations, and the various other line items
   that we would check.
5     So at the end of the night there, I told him
6  that we have to get a lot of these files. We have to
7  find the files, the client files. We have to get the
8  escrow records, the bank statements. We have to find
9  how bad this situation is.
10    Q. Did you secure various documents? You
11 talked about some checks that you had found
12 pertaining to a June statement. Did you collect the
13 various cancelled checks that were required
14 throughout this investigation?
15    A. Yes. Yes. That evening, I had made copies
16 of what I thought were significant checks out of the
17 escrow account. And essentially, I left there, and I
18 told him what he had to do. We had to get to the
19 bottom of this situation as soon as possible. So
20 that evening, I returned home and I sent an e-mail to
21 ODC, and just gave them a very brief general outline
22 of what had happened; because the next day I was in
23 Baltimore on another matter, which would have been

**174**

1  Wednesday, so they sent Mike Maginnis, who is the
2  Deputy Counsel for ODC. I sent him an e-mail and I
3  basically gave, you know, a general overview that
4  this might be tip of the iceberg. We have a problem.
5  We probably have about $300,000, $400,000 in unpaid
6  mortgages. And we don't have enough money in the
7  client account to pay them, as we speak. So
8  essentially, on Wednesday afternoon, I got a call
9  from ODC. I was in Baltimore. They said, could you
10 come back immediately, come back to Wilmington.
11    Q. Do you do that?
12    A. Yes.
13    Q. And what did you do next?
14    A. I went back to ODC. I showed them copies of
15 the checks that I had copied. And they asked me
16 various questions about the overall audit to date. I
17 told them it was ongoing. This was not -- you know,
18 this wasn't finalized yet.
19    Q. Were you asked to continue in assisting in
20 the investigation at that point?
21    A. Well, at that point, they made a decision
22 that they were going go seek interim suspension. So
23 that's a matter ODC handles. They basically were

**175**

1  going to go forward with a hearing, an emergency
2  hearing. So that was on a Wednesday. I think we had
3  a hearing before the Supreme Court Justices on
4  Thursday. And then the Justices ruled that he was to
5  be suspended for the interim until we get to the
6  bottom of this whole particular matter, and also that
7  the information be forwarded to the criminal
8  authorities for them to review that, to determine
9  whether there is any criminal violations.
10    Q. And at that point in time, did you then make
11 contact with the criminal authorities that you've
12 described to make them aware of the investigation
13 that you were participating in?
14    A. Yes. I believe ODC forwarded a letter to
15 the Attorney General's Office; and at the same time,
16 the Supreme Court Justices requested a Receiver take
17 over the practice, which means another law firm would
18 step in, take over the law practice from this point
19 forward, gather all the client files, secure the bank
20 account, change the name on the bank account, freeze
21 the funds that are there, and then move from there.
22    Q. At some point in time, did you meet with
23 Robert Carmine, an investigator with the State

**176**

1  Department of Justice?
2     A. Yes, I did.
3     Q. And do you see him in the courtroom?
4     A. Yes, I do.
5     Q. Can you describe him for us?
6     A. The gentleman sitting there (indicating).
7     Q. Did you make him aware of the investigation
8  you were conducting at that point in time?
9     A. Yes. He had received a package from the ODC
10 which basically was -- it's a petition package which
11 summarized what has transpired to date.
12    Q. Now, you've told us about what you do as far
13 as forensic accounting.
14    A. Right.
15    Q. Did you go through the files -- were they
16 made available to you -- the account statements, that
17 is -- in this particular case? I'm referring to
18 escrow and operating accounts.
19    A. At a later date, you're saying?
20    Q. You did that at a later date?
21    A. Yes.
22    Q. Did you compile spreadsheets reflecting the
23 data that you had secured and evaluated?

195

1  you discover them in the course of your
2  investigation?
3      A.  Yes, I did.
4      Q.  And to whom were those checks made payable?
5      A.  Well, Check No. 10533 was made payable to
6  Daniel and Ann Anker, on March 17th, 2003, for
7  $19,500.
8      Q.  And the second check?
9      A.  The second check was made out to Dan and Ann
10  Anker, in May of 2003, made payable to them for
11  $65,000.
12     Q.  Is there any indication on either of these
13  checks what file or client or law work those pertain
14  to?
15     A.  No.
16         MR. LUGG:  State would move to admit these
17  two checks together as the next State's exhibit.
18         (Defense counsel reviewing checks.)
19         MR. WENDELBURG:  No objection.
20         THE COURT:  Very well.  Admitted.
21         (Checks marked as State's Exhibit No. 52.)
22         THE PROTHONOTARY:  State's Exhibit No. 52,
23  Your Honor.

1  indicated that the checks were pay-outs, did you, in
2  fact, investigate to learn if those moneys were, in
3  fact, withdrawn from the particular account, this
4  escrow account?
5      A.  Yes.  These are all cleared checks.
6  Everything on here is a check that has cleared the
7  account.
8      Q.  So every one of the checks on this ten-page
9  document is money that left that account?
10     A.  That's correct.
11     Q.  Did Gary and Mya Paveza also show up in the
12  course of your investigation?
13     A.  Yes, she did.
14     Q.  And I'm directing your attention to page 6.
15  What was the total pay-out from the escrow account on
16  behalf of the Pavezas?
17     A.  There were three checks made to them
18  totaling $146,600.
19     Q.  And a few lines below, is there also an
20  indication of Gilpin referencing the Paveza file?
21     A.  Yes.  There are some checks to Gilpin in
22  regards to Paveza.
23     Q.  I apologize.  Moving up on that page,

194

1  BY MR. LUGG:
2      Q.  You indicated one of the reasons that you
3  stayed in this process was to attempt to recover
4  funds for affected parties; is that correct?
5      A.  Well, to assist the Receiver in the
6  collection of funds.  The Receiver has the ability to
7  collect the funds.
8      Q.  Did you, in the course of the investigation,
9  learn of the names of Douglas and Caroline Ray?
10     A.  Yes, I did.
11     Q.  And I'm directing your attention to page 5
12  of your report.  Were there, in fact, pay-outs made
13  to those individuals?
14     A.  Yes, there was.
15     Q.  And can you explain what the pay-outs that
16  you discovered?
17     A.  Well, there were two checks made payable to
18  Douglas and Caroline Ray for $310,000.
19     Q.  Okay.  Totaling $310,000?
20     A.  Yes.
21     Q.  Two different checks?
22     A.  Yes.
23     Q.  So I understand correctly, when you

196

1  there's a reference to what is called "First State
2  Auto."  Was there a check recovered made payable to
3  that entity?
4      A.  Yes.
5      Q.  Did you learn what the nature of that check
6  was?
7      A.  Yes, it was repairs for a personal car.
8      Q.  And there is a notation of the IRS, your
9  former employer, on this document.  What did you
10  learn with respect to the pay-outs to the IRS from
11  this escrow account?
12     A.  Yes.  We were able to determine there were
13  two checks made to the IRS.  One check cleared in
14  March of 2002, payable to the IRS, for $44,924.65.
15  The reference on the check stated "related to taxes
16  for the period 1998, 1999, and 2000."
17     Q.  The second check, what was that check?
18     A.  The second check is a check made to the IRS,
19  in June of 2002, for $9,740.84.  And it looks like
20  it's the tax period December 1999 forward.  It looks
21  like it's probably payroll taxes, self-employment
22  tax.
23         MR. LUGG:  If I may approach the witness

197

1 once again?

THE COURT: Yes.

3 BY MR. LUGG:

Q. I'm handing you two checks again bound with
5 a clip.

6 Are those, in fact, cancelled checks
7 referring to those IRS payments that you've
8 discussed?

9 A. Yes, they are.

10 Q. And were those uncovered in the course of
11 your investigation?

12 A. Yes.

13 Q. And based upon your experience, both as a
14 forensic auditor with the Lawyers' Fund for Client
15 Protection and your time with the IRS, what were your
16 conclusions with respect to the payments made from
17 the escrow account to the IRS at this time?

18 A. My conclusion is that these were delinquent
19 taxes that were being paid, and that probably the IRS
20 had been in touch with them about collection matters.

21 Q. Is there any indication from your
22 investigation or experience that these checks were on
23 behalf of particular clients?

199

1 Q. And how much was disbursed to Lynn Anker?

2 A. $900.

3 Q. There were payments made to PNC Bank, is
4 that correct, turning to Page 8 of your --

5 A. Yes.

6 Q. And can you indicate what the nature of
7 those payments were and the sum of the payments made
8 to PNC Bank?

9 A. Well, based on the reference on the check,
10 they were to pay off -- Mr. Anker was to pay off on
11 the third mortgage of $17,000, and also to pay off a
12 personal bank card for Mr. Anker.

13 Q. There also is an indication of moneys paid
14 to Porter Chevrolet; is that correct?

15 A. Yes.

16 Q. And can you explain what was paid, how many
17 checks and the value of each paid to Porter
18 Chevrolet?

19 A. There were two checks paid to Porter
20 Chevrolet: One for $9,906, and another one for
21 $43,127.

22 Q. What was the date of those two payments?

23 A. The checks were dated February 2003.

198

1 A. Well, it appeared to me to be for Mr. Anker.

2 MR. LUGG: State would move to admit the IRS
3 checks as the next State's exhibit.

4 (Defense counsel reviewing IRS checks.)

5 MR. WENDELBURG: No objection.

6 THE COURT: Very well. Admitted.

7 (Checks marked as State's Exhibit No. 53.)

8 THE PROTHONOTARY: State's Exhibit No. 53.

9 BY MR. LUGG:

10 Q. The next person you isolated is a person by
11 the name of "Laura Larks"; is that correct?

12 A. Yes.

13 Q. And were you able to isolate her and assess
14 how much money was paid to her from the escrow
15 account during the pertinent time of your
16 investigation?

17 A. Yes, I have.

18 Q. Can you indicate that to us, please?

A. Yes. The total amount of checks disbursed
20 to Laura Larks is $97,391.04.

21 Q. And is there reference to a person by the
22 name of "Lynn Anker"?

23 A. Yes.

200

1 Q. And was there -- you said February 2003. Is
2 there a specific date in February that you included?

3 A. Yes, February 24th.

4 MR. LUGG: If I may approach again?

5 THE COURT: You may.

6 BY MR. LUGG:

7 Q. I'm handing to you two documents. Are
8 those, in fact, the cancelled checks pertaining to
9 the payments made to Porter Chevrolet --

10 A. Yes, they are.

11 Q. -- dated February 24th, '03?

12 A. February 24th, 2003.

13 Q. Thank you.

14 MR. LUGG: The State would move to admit
15 these checks as the State's next exhibit, again
16 together.

17 (Defense counsel reviewing Porter Chevrolet
18 checks.)

19 MR. WENDELBURG: I have no objection to the
20 Porter checks, Your Honor.

21 THE COURT: Very well.

22 (Porter Chevrolet checks marked as State's
23 Exhibit No. 54.)

1 compliance with Supreme Court requirements for
2 essentially keeping track of funds; is that correct?
3 A. Yes.
4 Q. Not correctly identifying funds, and not
5 correctly keeping client funds separate from
6 attorney's funds; is that correct?
7 A. Not identifying client funds, not keeping a
8 record of client funds coming in and out, yes, and
9 basically reconciling the bank account.
10 MR. WENDELBURG: No other questions at this
11 time, Your Honor.
12 MR. LUGG: That prompts nothing from the
13 State, Your Honor. Thank you.
14 THE COURT: Thank you. You may step down,
15 sir. Thank you.
16 (Mr. McCullough excused.)
17 MR. LUGG: State recalls Investigator
18 Carmine.
19 ------
20 ROBERT CARMINE, having been recalled on the
21 part and behalf of the State, having been duly sworn
22 according to law, was examined and testified as
23 follows:

1 A. He was allegedly affiliated with Washington
2 Mutual and Homecomings.
3 Q. Did you investigate the existence of a
4 Douglas MacEntire with either Washington Mutual or
5 Homecomings?
6 A. I did.
7 Q. And can you tell us what you learned with
8 respect to his existence with those companies?
9 A. They had no Douglas MacEntire employed
10 during this time frame.
11 Q. And the time frame being January '02 through
12 August of '03?
13 A. Yes.
14 Q. The second name we heard of Kevin Snyder; is
15 that correct?
16 A. That's correct.
17 Q. In your investigation of this case, what
18 bank did you learn Mr. Snyder to be affiliated with?
19 A. He was supposed to be affiliated with Chase
20 Manhattan.
21 Q. Chase Manhattan?
22 A. Chase Manhattan Mortgage.
23 Q. Again, in that pertinent time frame, January

66

1 ------
2 DIRECT EXAMINATION
3 ------
4 BY MR. LUGG:
5 Q. Sir, you understand that you remain under
6 oath; correct?
7 A. Yes.
8 Q. I'm going to ask you a few questions about
9 your investigation into some of the names that we
10 have heard throughout this trial.
11 You've heard of purported settlements with
12 various companies; correct?
13 A. Yes.
14 Q. And were you made aware of these
15 settlements, legal settlements, with certain
16 companies during the course of your investigation?
17 A. I was.
18 Q. Were you made aware of the name "Douglas
MacEntire" during your investigation?
20 A. Yes.
21 Q. And in the course of your investigation,
22 with what financial institution or institutions was
23 Douglas MacEntire to be affiliated with?

68

1 of '02 through August of '03, did you investigate the
2 existence of a Kevin Snyder?
3 A. I did.
4 Q. And can you tell us of your results?
5 A. There was no Kevin Snyder employed.
6 Q. There's also a person named "Will O'Neill."
7 Do you recall hearing that name?
8 A. I do.
9 Q. And did you investigate the existence of a
10 person named Will O'Neill?
11 A. I did.
12 Q. And with what company was he to be
13 affiliated with?
14 A. Wilmington Trust Company.
15 Q. And did you contact Wilmington Trust?
16 A. I did.
17 Q. Did you speak with a Will O'Neill?
18 A. No. There was no Will O'Neill there.
19 Q. Okay.
20 A. I spoke with Alison Merrill.
21 Q. Again, during that pertinent time frame, was
22 a Will O'Neill working for Wilmington Trust?
23 A. No.

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2008, I electronically filed the foregoing **Appendix to Petitioner's Opening Brief in Support of Petition for Habeas Corpus, Volume I** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Elizabeth R. McFarlan, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

/ s/ Joseph M. Bernstein
JOSEPH M. BERNSTEIN (Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
E-mail: jmbernstein@embarqmail.com