## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

**DANIEL J. ANKER,**
    Petitioner,

           v.

**ELIZABETH NEAL**, Acting Warden,
John L. Webb Correctional Facility,
and **JOSEPH R. BIDEN, III,** Attorney
General of the State of Delaware,
    Respondents.

:
:
:
: Civil Action No.  08-203 SLR
:
:
:
:
:

### APPENDIX TO
### PETITIONER'S OPENING BRIEF
### IN SUPPORT OF PETITION FOR HABEAS CORPUS

### VOLUME II

JOSEPH M. BERNSTEIN (DE Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein@embarqmail.com
Attorney for Petitioner

Dated: June 30, 2008

## VOLUME II

|  | Page |
|---|---|
| Excerpts from testimony of Ann Conway | A-112 |
| Excerpts from testimony of Richard Forsten, Esquire | A-123 |
| Excerpts from testimony of Richard Forsten, Esquire | A-125 |
| Excerpts from testimony of Russell Burkett | A-129 |
| Excerpts from testimony of Maya Paveza | A-131 |
| Excerpts from testimony of Denise Alexander | A-133 |
| Excerpts from testimony of Richard V. Morris | A-136 |
| Excerpts from testimony of Daniel J. Anker | A-140 |
| State's Closing Argument to Jury | A-159 |
| Defense Closing Argument to Jury | A-164 |
| State's Exhibit #2 | A-170 |
| State's Exhibit #9 | A-172 |
| State's Exhibit #13 | A-174 |
| State's Exhibit #14 | A-175 |
| State's Exhibit #15 | A-176 |
| State's Exhibit #19 | A-177 |
| State's Exhibit #22 | A-179 |
| State's Exhibit #23 | A-181 |
| State's Exhibit #20 | A-182 |
| State's Exhibit #25 | A-184 |
| State's Exhibit #27 | A-186 |

| | Page |
|---|---|
| State's Exhibit #30 | A-188 |
| State's Exhibit #37 | A-190 |
| Defendant's Exhibit #3 | A-191 |
| Defendant's Exhibit #4 | A-192 |
| Defendant's Exhibit #8 | A-193 |
| Defendant's Exhibit #9 | A-194 |
| Defendant's Exhibit #10 | A-195 |
| Defendant's Exhibit #11 | A-196 |
| *In Re Allan Wendelburg, Esquire,* No. 501, 2006 (Del. December 6, 2006) | A-197 |
| Affidavit of William F. Glanz | A-219 |

97

1   Arps. But I do, right now, basically as a sole
2   practitioner, do expert-testimony work, you know, as
3   a sole practitioner.
4       Q.  When did you marry your husband, Dan?
5       A.  We married in 1989.
6       Q.  Do you have children together?
7       A.  Yes, we have four.
8       Q.  Currently, you live in Pennsylvania; is that
9   correct?
10      A.  That's correct.
11      Q.  There's been a lot of testimony over the
12  past week or so about Dan's practice of law. And
13  you're aware, are you not, that, for several years,
14  Dan maintained a solo law practice in the City of
15  Wilmington?
16      A.  That's correct.
17      Q.  Were there any other attorneys --
18  Delaware-licensed attorneys who practiced with your
19  husband during that period of time?
20      A.  No.
21      Q.  Can you tell us, roughly, when did that
22  practice open?
23      A.  Let me see. It would be hard to my put

98

1   finger on it. Dan had worked at the Bank of
2   Delaware, and then he worked with Saul Ewing, and
3   then he went out into practice on his own. It's hard
4   for me put a date on that, but it would have been in
5   the early 1990s, so he would have been practice on
6   his own for quite a while now.
7       Q.  Did you ever participate in that practice
8   with him as another attorney?
9       A.  No.
10      Q.  Did you have a job, either part-time or
11  full-time, in that office?
12      A.  No.
13      Q.  Did you handle the books or records?
14      A.  No.
15      Q.  Did you work on any of his cases?
16      A.  No.
17      Q.  Did you have professional contact with any
18  of his clients?
19      A.  No.
20      Q.  There's been testimony in this case from a
21  number of former clients that these folks were also
22  social friends or acquaintances of your husband.
23  Did you have social contact with any one who was

99

1   represented by Dan from time to time?
2       A.  No.
3       Q.  One of these clients was Dean Douglas Ray,
4   the former dean of Widener School of Law.
5           You know or you knew Dean Ray; is that
6   correct?
7       A.  Yes, I do.
8       Q.  In his testimony, I think the term he used
9   was -- the term that he was asked about was the term
10  "supervisor."
11          Would it be fair to say that, while he
12  was the dean of the law school, he was your
13  supervisor?
14      A.  Technically, in the legal community, any
15  dean is the supervisor of a law professor. But in
16  the academic community, there really is no, quote,
17  supervision of law professors. I'm a full professor
18  of law. So unless I really foul something up, the
19  dean isn't going to interfere in anything that I
20  do.
21      Q.  As far as your teaching is concerned?
22      A.  That's right. I mean, whether -- you know,
23  in terms of what I teach, in terms of what I write,

100

1   in terms of what my professional affiliations are.
2       Q.  Did you and Dan also deal socially with Doug
3   and Caroline Ray?
4       A.  Yes, we did.
5       Q.  Can you describe, generally speaking, what
6   those social engagements consisted of?
7       A.  When Doug first moved to town, Caroline did
8   not move with him. She was back in Ohio. So Doug
9   was really, for the first year, two years, was in
10  Wilmington by himself. And so I basically befriended
11  Doug, and Doug would come over to the house, would
12  visit with us. A couple times we went out to dinner
13  with him. So, yes, I was friends with Doug, and Doug
14  became friends with Dan.
15      Q.  How did that come about, Doug Ray becoming
16  friends with your husband?
17      A.  Well, I invited him over to the house to,
18  you know, join us for dinner when he was just free
19  and didn't have any law-school commitments on the
20  weekend and Caroline wasn't there.
21      Q.  Other clients who have testified -- former
22  clients who have testified in this matter include
23  Phil Urban. Do you know who Phil Urban is?

101

1    A.  No.
2    Q.  Have you ever met Phil Urban before?
3    A.  No.
4    Q.  Do you know Russell Burkett?
5    ·A.  I wouldn't know him to look at him, but I
6    know who he is. I've heard of him.
7    Q.  Do you know who Rick Wooden is?
8    A.  Yes, I do.
9    Q.  Do you know whether Mr. Wooden is or was a
10   client of Dan's?
11   A.  Yes, I do know.
12   Q.  Ann, I want to talk about your knowledge of
13   Dan's family history as related to you by Dan.
14       MR. LUGG: Objection, Your Honor. The
15   question as posed calls for a hearsay response.
16       THE COURT: Why don't you rephrase the
17   question.
18   BY MR. WENDELBURG:
19   Q.  I'd like to refer -- I'd like to ask you
20   some questions about Dan's perception -- your
21   perception of Dan's perception of his family history.
22       MR. LUGG: Again, Your Honor, objection. It
23   calls for hearsay. We need to approach.

102

1        THE COURT: I'll see counsel at sidebar,
2    please.
3        (The following sidebar conference was held:)
4        MR. LUGG: Your Honor, asking this witness
5    to testify to, one, what her husband had told her or,
6    two, her perception of his perception, I'm not sure
7    exactly what is being sought there, but it's a
8    question designed to elicit hearsay. The defendant
9    hasn't been able to testify.
10       MR. WENDELBURG: It's a question to elicit
11   state of mind, and I think that we have been over
12   this before prior to today.
13       THE COURT: You're getting into law; right?
14       MR. WENDELBURG: Yes.
15       THE COURT: So why don't you establish a
16   foundation about -- it seems to me that you want to
17   show she knows, and maybe you can go to establish the
18   foundation as to what kind of relationship, without
     getting into hearsay between father and daughter, a
20   good relationship or not a good relationship, close
21   relationship. I think that you can take it that way
22   for a while and see how you go. I mean, from
23   what I can tell from the evidence, it's a

103

1    father-daughter-together relationship. I think the
2    prosecutor is saying basically you asked an
3    open-ended invitation in narrative form. When you
4    get a witness have an open-ended invitation to give a
5    narrative form, it gets all kinds of things spread
6    upon the record. It could be hearsay. See if you
7    can just focus it in some areas that you feel you
8    want to get into. If not, come to sidebar and I will
9    make a ruling.
10       (Sidebar conference concluded.)
11   BY MR. WENDELBURG:
12   Q.  Let's focus on some specific issues with
13   respect to Dan's history.
14       Do you know who Laura Larks is?
15   A.  Yes, I do.
16   Q.  Who is she?
17   A.  She is Dan's oldest daughter by his first
18   marriage.
19   ·Q.  Your understanding is that Dan was married
20   prior to your marriage to him; correct?
21   A.  That's correct.
22   Q.  And do you know how many children he had
23   from that marriage?

104

1    A.  Yes, he has three.
2    Q.  Who are they?
3    A.  Laura is the oldest, Lynn is the second, and
4    Amanda is the third.
5    Q.  I think you testified that there are four
6    children of your marriage to Dan; correct?
7    A.  Yes.
8    Q.  When you married Dan, did any of his three
9    oldest children live with you?
10   A.  When I married Dan, no, none of the children
11   lived with us.
12   Q.  At what point during your relationship did
13   you become aware that Dan had three daughters from a
14   previous marriage?
15   A.  I knew about Dan's children at the time I
16   married him.
17   Q.  You learned about them previous to that?
18   A.  Yes, I knew about them.
19   Q.  Had you met them before your marriage?
20   A.  Yes, I had.
21   Q.  How long before you were married to Dan did
22   you meet Laura Larks?
23   A.  I had met Laura on several occasions prior

105

1  to the time I married Dan.
2     Q. Can you tell the jury what, if anything, Dan
3  told you about his relationship with Laura?
4        A. At the time that we married?
5     Q. From the very first time that you even heard
6  about Laura.
7        A. Well, I knew that the divorce was very
8  acrimonious, and that Laura was the oldest child, and
9  she was the one who heard the arguments, and that she
10 was the one who was hearing from her mother the
11 mother's side of the divorce.
12       MR. LUGG: Your Honor, I object. The
13 witness is going well beyond that with the
14 response.
15       THE COURT: Anything what the mother said
16 would be out of bounds.
17 BY MR. WENDELBURG:
18    Q. Ann, what I'm trying to focus on here is
19 what Dan told you about his relationship with Laura,
20 what you heard about it from Dan. And stay within
21 those confines.
22       If you could continue your answer, what did
23 Dan tell you about his relationship with Laura,

106

1  starting from the beginning?
2        A. Well, Dan had said that his relationship had
3  basically been poisoned because of what was being --
4        MR. LUGG: Your Honor, may we approach?
5        THE COURT: Yes.
6        (The following sidebar conference was held:)
7        MR. LUGG: I'd ask that the last response be
8  stricken as hearsay. Counsel is attempting to
9  elicit, presumably, the defendant's state of mind,
10 offering statements made by another person, not
11 her's, which are hearsay. There's no exception
12 that's been proffered for this type of testimony.
13       THE COURT: You're talking about the mother?
14       MR. LUGG: I'm talking about the statement
15 the defendant felt his relationship was poisoned, or
16 something to that effect.
17       THE COURT: Uh-huh. Well, if the state of
18 mind is going back to the past events, that wouldn't
19 be state of mind, would it? We could say that
20 states of mind at the time he expressed it was either
21 good, strained, unstrained, close, not close, loving,
22 unloving. You're suggesting past facts --
23       MR. LUGG: That's correct, Your Honor.

107

1        THE COURT: With mental state, don't look
2  back to the past facts. It's the present mental
3  state at the time it was given: Light was green, was
4  it green ten minutes ago, that kind of thing.
5        MR. WENDELBURG: Your Honor, to take the
6  Court's analysis of the light being green --
7        THE COURT: The law is very much clear on
8  state of mind. The Supreme Court went to some length
9  explaining the mental state as an exception. You
10 can't be factual and go back in time. That, you
11 can't do.
12       MR. WENDELBURG: I think that the witness is
13 explaining here her factual background in offering
14 the testimony Dan's state of mind, Ann's state of
15 mind at the time that these offenses were committed
16 is what is at issue, I think the Court ruled --
17       THE COURT: You can do that if you ask the
18 proper question for that, but you can't go back in
19 time. I think the objection is mental state, bad
20 things back in time that you may have said to the
21 conclusion that it was poisoned. Is that where
22 you're coming from?
23       MR. LUGG: Yes, Your Honor.

108

1        MR. WENDELBURG: I don't think the witness
2  has gotten far enough through her answer yet to be
3  able to tell us as far as being able to tell exactly
4  where she is going, but I think that the comment down
5  here is that if during the period of 2001 through mid
6  2003, that's the relevant period for the defendant's
7  state of mind, if that -- if that --
8        THE COURT: He can say under that -- if you
9  ask direct questions, he can say in that time frame,
10 I had a bad relationship with my daughter. States of
11 mind -- was the relationship good, not good,
12 strained, hateful, resentful -- I mean, you can
13 qualify that.
14       MR. WENDELBURG: I think --
15       THE COURT: What you can't do is go back and
16 get all the narrative details in the past out in the
17 guise of the mental state. That, you can't do. If
18 you want to take a recess now and both sides can look
19 at the *Capano* case of the Supreme Court, there's a
20 discussion about this.
21       MR. WENDELBURG: Actually, that's not what
22 I'm thinking of right now, Your Honor. I'm thinking
23 halfway to phrase the question which wouldn't steal

**109**

1 the witness away from the factual background.
2        THE COURT: Why don't you draw her attention
3 to the paragraph. I'm not suggesting -- there's an
4 indictment which has set forth periods of time when
5 the defendant expressed his feelings about his
6 daughter to what were those feelings. You can do it
7 that way. You have the time frame. And it's geared
8 into what's germane here. And if what you want to do
9 is show it was a poor relationship, that ties into
10 the argument that the mother had in it for him. I
11 guess the defendant will take the stand and develop
12 it himself.
13        MR. WENDELBURG: He will take the stand and
14 develop it himself. What I'm wondering now is
15 whether she would be permitted to give the factual
16 background that was given to her by the defendant, by
17 my client, why he felt that way.
18        THE COURT: That's not a state of mind.
19 That's factual.
20        MR. LUGG: That's hearsay.
21        THE COURT: So if you want to get into the
22 state of mind and expressions, states of mind
23 relevant to the time frame what was said, that's

**110**

1 fine. If you want to go back, facts history, that's
2 not fine, okay?
3        MR. WENDELBURG: Okay.
4        (Sidebar conference concluded.)
5 BY MR. WENDELBURG:
6    Q.  Ann, before you answer my next question,
7 please, let me finish it, because it's going to be
8 pretty focused.
9        During the period of 2001 through 2003, and
10 as an ending date, let's pick July the 29th of 2003,
11 the day you came back from Florida, what do you
12 recall Dan telling you during that period of time of
13 approximately a year and a half about his
14 relationship with Laura?
15        THE COURT: You mean whether or not it was
16 good or bad? Is that what you mean?
17        MR. WENDELBURG: Or however he would have
18 characterized it at that time, Your Honor.
19        MS. CONWAY: And you're picking the date
20 July 29th, 2003 as the date?
21 BY MR. WENDELBURG:
22    Q.  As an end date.
23    A.  As an end date.

**111**

1    Q.  What I'd like you to focus on is the period
2 of time from, say, early 2001 through the middle of
3 2003.
4    A.  And you want me to pick out an adjective to
5 describe --
6    Q.  If one adjective will do it, how did Dan
7 describe to you his relationship with Laura?
8    A.  I think that Dan was hopeful that Laura had
9 turned the corner on her past, that she had somehow
10 overcome her past, and was going to actually make
11 something of herself despite her mental condition and
12 her --
13        MR. LUGG: Objection, Your Honor. I'd ask
14 that that be stricken.
15        THE COURT: The last part is stricken.
16 BY MR. WENDELBURG:
17    Q.  Don't talk about her mental condition,
18 but --
19        MR. LUGG: Again, Your Honor, I'd ask the
20 question be stricken, and that the witness be limited
21 in her response, as discussed at sidebar. I believe
22 she's gotten a little bit far afield from that.
23        THE COURT: I struck the part about the

**112**

1 mental condition, but the balance of the answer can
2 stand.
3 BY MR. WENDELBURG:
4    Q.  You've used the term "hopeful." How did Dan
5 express that to you?
6    A.  I think Dan had always viewed Laura as being
7 the brightest of the three girls, and that he had the
8 most hope for Laura, academically, and that, for many
9 years, she had been lost to him. There had been a
10 great rift between Dan and Laura for many years.
11    Q.  Now, at one point, did Laura come back to --
12 excuse me, come to work for Dan?
13    A.  Yes. She came back when she was barely 16.
14 She was down and out, she didn't have a job, and she
15 came back to Dad. And this was after there had been
16 many years of no speaking at all between Dan and
17 Laura. And I think that this was an opportunity, as
18 Dan saw it, to mend some of this lost time in their
19 lives. And I think that his greatest expectation had
20 always been for Laura, because he viewed her as the
21 smartest of the three.
22    Q.  Is this what he was saying to you at the
23 time, in 2001-2003?

113

1    A.  Yeah, basically.

2    Q.  Were there other things -- were you able to

3    observe how Dan treated Laura during that period of

4    time?

5    A.  Yeah.  There were incidents that had

6    happened while I was there.  We received, you know, a

7    telephone call at 11:30 at night, and I took the call

8    and it was, you know, the police calling, and it was

9    about Laura, and it was -- she had alleged, you know,

10    a rape --

11        MR. LUGG:  Objection, Your Honor.

12    Nonresponsive.

13        THE COURT:  Strike that.  Ask another

14    question.

15    BY MR. WENDELBURG:

16    Q.  Let me ask the question a slightly different

17    way.

18        You've talked about what Dan said to you

19    about his feelings for Laura, or about Laura, during

20    this period of time.  In addition to what you heard

21    from Dan, generally speaking, how did Dan treat Laura

22    during this period of time?  For example, did it

23    appear that he trusted her?

114

1    A.  Yes, but it was sort of a -- it was like a

2    rubber band.  I mean, it was sort of a give and take,

3    because it was -- he wanted her back, and she was

4    back, and so there was a part of him just sort of

5    blindly trusted her, because he so much wanted to

6    have her come back and be successful.  And I guess

7    what I'm saying by the give and take was because he

8    had me on the other hand saying, you shouldn't trust

9    her, but Dan, on the other hand, was just sort of

10    blind, because he just so much wanted this rift to

11    end.

12    Q.  Were there other people that worked in the

13    office during this period of time?

14    A.  Yes.

15    Q.  And who were they?

16    A.  Chandler Land was there for a period.

17    Nicole Alexander was there.  Laura came in, I think,

18    1996.  I think Nicole was out.  Chandler stayed down,

19    and Chandler was out.  And then, ultimately, it was

20    just Laura.

21    Q.  Do you know how long a period of time it was

22    that it was just Laura?

23    A.  Chandler was there for a while.  Nicole

115

1    didn't stay very long, but I don't recall exactly how

2    long Chandler left.

3    Q.  Did Dan tell you what he had Laura doing in

4    the office?

5    A.  I think that Laura had taken over the

6    real-estate closings.

7    Q.  That was what Dan had told you?

8    A.  Yes.

9    Q.  Did Dan tell you whether Laura had charge of

10    any of the books or records at the office?

11    A.  No, he didn't.  He said there was a

12    bookkeeper doing that.

13    Q.  When you said that Dan's relationship with

14    Laura seemed to be like a rubber band, that there was

15    a give and take, that he was blindly trusting her,

16    you also said that he had you telling her that he

17    should not trust her.  What did you say to Dan about

18    that?

19    A.  I told him that I thought she was a

20    pathological liar, and that he had to get her out of

21    his business, that she was -- that there are too many

22    things that were inconsistent that were going on in

23    his office.

116

1        He would complain constantly about mail

2    missing and Federal Express packages missing.  And I

3    said, Dan, it makes no sense, that you're the only

4    person in this building who doesn't get mail.  And

5    then he would cover for Laura.  And he would say,

6    Well, you know, Laura has got the tracking number for

7    this, this, this.  And she always had an excuse.  I

8    said, doesn't it dawn on you that you're the only

9    person in this position?  You know, why do you keep

10    covering for her?

11        Then I pointed out to him that I had ordered

12    a Dell computer, and Dan had asked me to process it

13    through Laura.  And it was the same thing:  I would

14    call Laura.  I said, where is my computer?

15        And she said, Oh, it's been ordered.

16        And I'd call a week later, she says, it's

17    been shipped, and I got the tracking numbers.

18        And I'd call back a week later, and she

19    would say, it's on back order.

20        And I said, how could it be on back order if

21    it's been shipped and you got the tracking number for

22    it?

23        Again, it's all these things that were

117

1    inconsistent. And I would complain to Dan. And he
2    would say, Laura is taking care of it. And I just
3    couldn't get through to him that she couldn't be
4    trusted. But his defenses would automatically go up.
5    And I was wrong, and Laura was right. And it was a
6    constant battle between the two of us, between Dan
7    and me.
8        Q.   Was there any discussion between Dan and you
9    about any other reasons why Laura should perhaps
10    leave the practice?
11        A.   Dan, again, had this tremendous guilt that
12    somehow he was saving her and --
13        MR. LUGG:  Your Honor, if I may interject
14    and object. I'd ask the witness to respond to the
15    question that is posed as opposed to offering a
16    narrative.
17        THE COURT:  Please just answer the question
18    as given.
19    BY MR. WENDELBURG:
20        Q.   We will get into the guilt a little bit.
21        Was there any other reason that was given --
22    that Dan gave -- for example, that was discussed
23    between the you of two as to why Laura might be

118

1    better out of the practice?
2        A.   I had offered a reason, and that it was time
3    for her to go back to school. And I had offered her
4    tuition remission at Widener to go back to college.
5        Q.   What was Dan's reaction to that?
6        A.   He said he would think about it.
7        Q.   You used the term "guilt" a moment ago.
8    Let me ask you to re-focus on that. Again, we're
9    talking about the period of time from 2001 through
10    the middle of 2003.
11        Did Dan express to you any feelings of guilt
12    regarding Laura during that period of time?
13        A.   It was a constant theme in our household.
14        Q.   Can you tell us how that was expressed?
15    How did it come out?
16        A.   Because every time that I tried to bring up
17    the fact that he absolutely had to get Laura out of
18    the office, he became combative, and it was affecting
19    our lives. It was affecting our marriage. It was
20    affecting our children's lives.
21        Q.   Laura wasn't living with you at any point
22    during this period of time?
23        A.   No.

119

1        Q.   Did she, however, come to the house --
2        A.   Yes.
3        Q.   -- have contact with you, Dan, and your
4    children?
5        A.   Yes.
6        MR. WENDELBURG:  Your Honor, may we approach
7    about scheduling?
8        THE COURT:  Sure. Let me see the court
9    reporter for a minute, please.
10        (The following sidebar conference was held.)
11        THE COURT:  I want to make it plain on the
12    record with respect to the conversation about mental
13    state, I used the example about the light being
14    green, obviously, that would be the example
15    presented, that you can't go back in time. The
16    analogy of mental state would be the victim feared
17    the defendant. And if it was mental state at the
18    time, that's fine, but you can't go back in time to
19    get out specific facts, so that's the point. I think
20    counsel appreciates that, but I want to state that on
21    the record. Yes, we will take a recess now.
22        THE COURT:  Okay. We're going to take a
23    recess. We will see you at two o'clock.

120

1        (Jury excused.)
2        (Luncheon recess held.)
3        THE COURT:  I guess you can resume the
4    stand.
5        (Ms. Conway resumed the stand.)
6        MR. LUGG:  Your Honor, counsel indicated
7    before the morning break that we were moving away
8    from the issues that we spent a good deal at sidebar
9    about; is that correct?
10        MR. WENDELBURG:  Well, we're going to move
11    away now from Mr. Anker's feelings about his
12    daughter. We are doing the flip side of this, the
13    daughter's feelings about Mr. Anker. The issues are
14    the same, or similar, but we are going into a
15    different subject area.
16        MR. LUGG:  Well, Your Honor, I appreciate
17    the guidance offered by the Court. And I spent a
18    lunch hour perusing the *Capano* opinion, some of the
19    decisions arising from that.
20        THE COURT:  It's actually pages 609-612,
21    781 Atlantic 2d., 556, 609-612, is what I had in
22    mind.
23        MR. LUGG:  And the reason that I would

**121**

1  suggest this on the record is that, even after

2  several of our discussions and my review of the

3  opinion, much of what was elicited from this

4  particular witness falls out of what was contemplated

5  under 803.3 of that opinion. And my hope is to avoid

6  coming up to sidebar repeatedly in the presence of

7  the jury. What the decision says, in my reading, is

8  that the state of mind may be offered, but memories

9  or factual recitations are excluded under the rule.

10  It says that.

11        THE COURT: Right. Exactly right.

12        MR. LUGG: Much of what we have heard about

13  were, in fact, factual recitations as opposed to --

14        THE COURT: I think we cut out a good part

15  of that stuff.

16        MR. LUGG: And I hope that we could continue

17  with that. And the other thing that was done in

18  *Capano*, there was an instruction offered to the jury

19  which, unfortunately, I don't believe was, at least

20  in my review, wasn't repeated in the opinion. I

21  would just ask if the Court could offer the jury an

22  instruction as to the use of the various pieces of

23  evidence that's heard throughout the morning.

**122**

1        THE COURT: You want to come up, when it is

2  offered, you'll have to do it then.

3        MR. LUGG: Very good, Your Honor.

4        THE COURT: Let's bring the jury in.

5        THE BAILIFF: Yes, sir.

6        (Jury entered the courtroom.)

7        THE COURT: You may proceed.

8        MR. WENDELBURG: Thank you, Your Honor.

9  BY MR. WENDELBURG:

10        Q.  Ann, this morning we were talking about

11  Dan's feelings expressed to you about Laura. I want

12  to flip the coin over now and talk about whether

13  Laura expressed a state of mind with respect to her

14  relationship with her father. And I want to, as

15  before, limit this to the relevant time period that

16  we have identified as January of 2001 through the end

17  of July 2003. Did you have discussions with Laura

18  during any of that period of time regarding her

19  feelings about her father?

20        THE COURT: Could I see counsel at sidebar,

21  please?

22        (The following sidebar conference was held.)

23        THE COURT: I guess the question is, what's

**123**

1  the relevant time period? Assuming the relevant time

2  period would be from the charges, which would be

3  January 2002 -- you said January 2001?

4        MR. WENDELBURG: I said it all morning,

5  didn't I?

6        THE COURT: You may have.

7        MR. WENDELBURG: I think I did, yeah. I

8  will rephrase the question to 2002.

9        Thank you, Your Honor.

10        (Sidebar conference concluded.)

11  BY MR. WENDELBURG:

12        Q.  Ann, I apologize. I think that all morning

13  I was misquoting the relevant time periods that we're

14  talking about in going back and looking at some

15  evidence that's been put in the case. I think I told

16  you January 1st of 2001. The relevant time period

17  that we're talking about here is January 2002 through

18  the end of July 2003. That is roughly an 18-month

19  period, a little bit more.

20        Focusing on that period of time, did you

21  have any conversations with Laura regarding her

22  feelings concerning her father?

23        A.  Yes, I did.

**124**

1        Q.  And was there one conversation or more than

2  one?

3        A.  I can recall at least two, specifically.

4        Q.  Can you tell us -- give us a little bit of

5  background, how did these conversations arise?

6  Where were they, for example? Who else was there?

7        A.  These were family conversations that took

8  place in our home, and they involved Laura, Lynn, and

9  Amanda.

10        Q.  And does that hold true for both of these

11  conversations that you can recall?

12        A.  Yes.

13        Q.  Let's leave Lynn and Amanda out of it, but

14  tell me how the conversation went between Laura and

15  you.

16        A.  Laura had expressed frustration to me that

17  she had been alienated from her father for so long,

18  regret that she had spent years apart from her

19  father; and that she felt that the blame for that was

20  her mother; and that she was glad to be back in the

21  family; and she felt very strongly that she wanted

22  her father to know her children, and to re-establish

23  herself as a part of our family.

125

1     Q.   Was that the nature of both of the
2  conversations that you had with her regarding her
3  feelings for her father?
4     A.   No. The second conversation was much more
5  emotional. All of the girls suffered from this
6  feeling of alienation and sort of trying to come back
7  into the fold. And I had suggested to the girls,
8  that since they all enjoyed poetry, that if they had
9  a hard time expressing themselves, that they might
10  want to express themselves in poetry. And, in fact,
11  each of the girls wrote a poem. And I asked them to
12  read their poems. And it became clear that there was
13  a lot of very raw emotion there. And it was all
14  directed towards the time that their father left --
15     MR. LUGG: Your Honor --
16     MS. CONWAY: -- their mother.
17     THE COURT: I'm going to sustain the
18  objection. Strike that last response.
19     MR. LUGG: Thank you.
20  BY MR. WENDELBURG:
21     Q.   Not going back historically, but at the time
22  the poem was written, what were the feelings
23  expressed by Laura in that poem with respect to her

126

1  father?
2     MR. LUGG: Again, objection. Hearsay,
3  Your Honor.
4     THE COURT: Same. It's stricken.
5  BY MR. WENDELBURG:
6     Q.   Did you read the poem?
7     A.   Yes, I did.
8     Q.   Did you talk to Laura about it?
9     A.   Yes, I did.
10     Q.   And did you explore with her further her
11  feelings about her father in that conversation?
12     A.   I did. And I suggested that it seemed that
13  she had never gotten past her anger and resentment
14  and I suggested --
15     MR. LUGG: Your Honor, I object. The
16  question is to the witness's state of mind, not as to
17  her speculation as to her state of mind.
18     THE COURT: You have to talk about the state
19  of mind.
20     Ladies and gentlemen, we will be hearing
21  testimony about state of mind of the defendant and
22  his relationship to Ms. Larks, as well as Ms. Larks
23  to Mr. Anker, the father. This is state-of-mind

127

1  testimony. It's not offered for the truth of the
2  matters, but just for the state of mind of the
3  people, okay?
4  BY MR. WENDELBURG:
5     Q.   Let's stick to the strict phrase just used
6  by the Court.
7     Did you explore further with Laura in that
8  conversation, after reading the poem, her state of
9  mind with respect to her Dad?
10     A.   I did. And I felt that her state of mind
11  was very fragile, and I had suggested that she should
12  pursue counseling.
13     Q.   Do you know whether that, in fact, occurred?
14     A.   At the time, my sense was that she did not.
15     Q.   Did there come a time in 2002 through 2003
16  that you and Dan decided to re-finance your house?
17     A.   Yes.
18     Q.   Tell us how that came about.
19     A.   Well, it was my understanding that there had
20  been difficulties with our mortgage, and that we had
21  been receiving constant dunning telephone calls from
22  the mortgage company. And I don't do the family
23  finances. I mean, this is something that Dan

128

1  handles. And when I would receive the calls at home,
2  I would simply refer them to Dan. And I would say, I
3  don't know how to handle this, call my husband, but I
4  had expressed to Dan extreme frustration that this
5  had to stop, because they were harassing us. They
6  were harassing me, and so I sent them to Dan.
7     Q.   And did the issue of re-financing the
8  mortgage come into your conversations with Dan?
9     A.   Not until later. I mean, I had turned over
10  all the harassing phone calls to Dan. And then it
11  was sometime subsequent to that that I heard about
12  the re-financing.
13     Q.   And was it from Dan that you heard about it?
14     A.   Yes.
15     Q.   What did he tell you about the re-financing?
16     A.   To the best of my recollection, it was an
17  outgrowth of the harassment by the mortgage company
18  over our mortgage, and the fact that the fallout from
19  that was that they were putting things in our credit
20  report, and we were getting bad credit, which was
21  devastating to us. And my understanding was that Dan
22  had basically said to them --
23     MR. LUGG: Your Honor, I'm going to object.

129

1   She has been asked a question as to her recollection,
2   and she is being speculative as to what occurred, has
3   gone far afield in the question.
4       THE COURT: I'll sustain the objection.
5   BY MR. WENDELBURG:
6       Q.   Let's rephrase the question.
7       What did Dan tell you about the re-financing
8   that was going on?
9       A.   Dan told me that, as a result of speaking
10  with the mortgage company and as a result of all of
11  the harassment and fallout in terms of the damage to
12  our credit, that the mortgage company was going to
13  undertake to do the re-finance of the mortgage
14  themselves at a better rate than we would normally
15  get.
16      Q.   And as time went on, did Dan tell you about
17  additional terms that were being offered by the
18  mortgage company?
19      A.   Yes, that's correct.
20      Q.   And what were those terms?
21      A.   That they were offering a settlement for the
22  violations that have occurred for the harassing phone
23  calls, and the constant dunning to us, and things

130

1   like that.
2       Q.   When you say "settlement," what do you mean?
3       A.   That they were offering money in settlement
4   of the violations that occurred, for the dunning
5   phone calls, and things like that, the harassment
6   that occurred on the primary mortgage.
7       Q.   And were you told what the terms of
8   settlement were going to be, by Dan that is?
9       A.   Dan told me that the figures changed. The
10  original figures were, I think, $400,000 to a half
11  million dollars, and then the numbers changed. They
12  grew over a period of time.
13      Q.   And did Dan tell you where he was getting
14  this information?
15      A.   He was getting the information through some
16  person at Washington Mutual.
17      Q.   Now, did you ever have contact with that
18  Washington Mutual person yourself?
19      A.   No.
20      Q.   With respect to this re-financing, do you
21  know, from your own personal knowledge, whether it
22  ever, in fact, occurred?
23      A.   The --

131

1       Q.   The re-financing that you just described.
2       A.   -- re-finance, it was my understanding
3   re-finance occurred.
4       Q.   Is it still your understanding that the
5   re-financing occurred?
6       A.   No. I know now it didn't.
7       Q.   How do you know that?
8       A.   We were on vacation in Florida in July and
9   we received a call -- I think Dan received a call
10  from you, actually. And we were called back to
11  Wilmington. And I went into Dan's office. And I was
12  sitting at Laura's desk. And I actually looked down
13  to the right on the floor and I found our file and --
14      Q.   When you say "our file," what do you mean?
15      A.   Well, it was a file that contained the
16  documents that would have been our re-finance. And
17  there was the settlement sheet. And there were
18  checks that had never been disbursed. So at that
19  point, I realized that no re-finance had ever taken
20  place.
21      Q.   Did you question Dan about this?
22      A.   I didn't question Dan. There was another
23  man there, I've forgotten his name. There was

132

1   another man who was there with us who was there on
2   behalf of the Receiver. And I was just in shock and
3   I just -- I just handed this file, and I said, what
4   does this mean? I mean, this is frightening. I
5   mean, it looks to me like this thing never happened
6   which means that, you know, something is wrong. So I
7   just took the file and I handed it to him.
8       Q.   There's been testimony in this case that
9   that meeting actually occurred on July the 29th of
10  2003, either in the afternoon or early evening.
11      Do you recall the name of the person to whom
12  you gave the file?
13      A.   Mr. McCullough is possibly who it was.
14      Q.   Have you ever seen that file again?
15      A.   No, I have not.
16      Q.   You testified about two or three things that
17  were in the file, a settlement sheet, and what else
18  was in there?
19      A.   There were checks.
20      Q.   Checks?
21      A.   They were checks to mortgage companies that
22  should have been disbursed but never were.
23      Q.   Do you recall whether those checks had been

133

1  signed?
2      A. I don't recall.
3      Q. Do you recall any of the other contents of
4  that file?
5      A. There appeared to be a settlement sheet and
6  at least two checks. And the checks that should have
7  gone out -- I mean, the most important checks that
8  should have gone out to the mortgage companies were
9  not sent out.
10     Q. Let's go back to an earlier stage in the
11 re-financing process. At least I believe it's
12 earlier from the way you testified.
13     You said that you were told by Dan that the
14 mortgage company was offering you a settlement which
15 was in addition to simply a re-mortgage of the house.
16 And you said that the terms kept changing, that the
17 numbers kept going up.
18     Do you recall what Dan told you about how
19 high those numbers were going?
20     A. Well, they ultimately ended up over a
21 million dollars, but they started out lower than
22 that. But as I said, the numbers kept increasing
23 because, at first, they would say, you know, the

134

1  money is going to be here this date, and then the
2  money was not there. And then they said, oh, but now
3  the money will be here two weeks from now, but then
4  the money wasn't there then. And, oh, because the
5  money wasn't there then, then the amount would
6  increase. And so it was this constant promise of the
7  money will come, but the money wouldn't be there.
8  And, oh, but because we messed that up, now we are
9  going to increase the money, and then we are going to
10 set a new deadline. And then that deadline would
11 pass, and then because that deadline has passed,
12 there was no money. Oh, well, we will compensate you
13 for that, and so we will add some more money it. So
14 this is sort of what I was hearing.
15     But you have to understand, at the same
16 time, I had all this other stuff going on that I was
17 having to deal with professionally. And so, I was
18 kind of doing my life. And at the same time, I was
19 kind of listening to what Dan was telling me. So,
20 you know, kind of we were going in our two separate
21 directions.
22     Q. The information, however, that you've just
23 recounted to us all came to you from Dan?

135

1      A. Yes.
2      Q. Did he tell you where he was getting that
3  information?
4      A. I know that he and Laura were constantly --
5  he would say that he would call Laura and said, you
6  know, what's the latest word. And she would be the
7  one to relaying the information to him. And she
8  would always say, you know, I can't get these people
9  on the phone, the line is always busy. But I got an
10 e-mail, you know, from them. And that's all I know.
11     Q. At some point during this process, were you
12 told by Dan that money was actually coming in from
13 Washington Mutual?
14     A. No. Actually, no money ever did come in
15 from Washington Mutual.
16     Q. Were you told by Dan that some of the
17 settlement money had actually started to show up in
18 your bank accounts?
19     A. Now, we did hear that at some point money
20 did come in, but it was late. I don't remember when
21 it came in. But I know it was never according to
22 what the promises were.
23     Q. In July of 2003, you and Dan were on

136

1  vacation in Florida; is that correct?
2      A. That's correct.
3      Q. And do you recall approximately when you
4  went there?
5      A. The second or -- maybe the second week of
6  July. I'm not sure.
7      Q. You testified that Dan told you that he got
8  a call. And then I think you testified that you and
9  he returned to Delaware. When Dan got this call,
10 what did he say to you about it?
11     A. He said that we have to get back to
12 Delaware, immediately.
13     Q. Did he tell you why?
14     A. He said, something has gone drastically
15 wrong. He said, I can't believe Laura would steal
16 from me.
17     Q. Did he explain what he meant by any of this?
18     A. No.
19     Q. When you heard that from your husband, what
20 did he do?
21     A. I packed the kids up and said, we're heading
22 home.
23     Q. What steps did you take to get home? Did

137

1  you call the airline?
2      A.  I called the airlines. You know, we had to
3  pay substantial change fees to, you know, get back,
4  but we got the first plane back.
5      Q.  Were you present in the room, or wherever it
6  was, that Dan received this phone call to come back?
7      A.  Yeah, I was.
8      Q.  How long after that call was received did
9  you start making taking steps to get back here?
10     A.  Ten minutes.
11     Q.  Was there any further conversation between
12 you and Dan in the process of getting back to
13 Delaware regarding the phone call or the reason for
14 going back?
15     A.  Would you repeat that question?  I'm sorry.
16     Q.  You testified Dan got a phone call, and you
17 were there.  He told you, we have to get back,
18 something has gone drastically wrong, I can't believe
19 Laura would steal from me.  Within ten minutes, you
20 started making plans to get back here.
21     During this period of time, from the time
22 you started making plans to get back until the time
23 that you got back, did you and Dan have one or more

138

1  conversations about the reason why you had to come
2  back to Delaware?
3      A.  Not really.  Dan just said, something has
4  gone wrong in the books.  And he said, you know,
5  Laura -- he said, I can't believe that Laura had done
6  this.  He had been trying to reach Laura.  She had
7  turned off her phone.  She couldn't be reached.  And
8  apparently, the next thing that we heard, she had
9  checked herself into the Rockford Center.
10     MR. LUGG:  Your Honor, I'm going to object.
11 And I'd ask the witness please limit her responses to
12 the questions.
13     THE COURT:  Yes.  The last response is
14 stricken.  Please just respond to the questions that
15 are asked.
16 BY MR. WENDELBURG:
17     Q.  I'm focusing here on conversations you and
18 Dan had in the first several hours after this word
reached you, in Florida.
20     I take it, you flew back to Delaware from
21 Florida?
22     A.  Mm-hmm.
23     Q.  With the kids?

139

1      A.  Correct.
2      Q.  Did you and Dan talk between yourselves on
3  the way back up about the reason -- about what was
4  going on at home?
5      A.  Well, apparently, he had heard enough from
6  you to know that he had been reported to Disciplinary
7  Counsel and --
8      Q.  Did he tell you that he had heard that he
9  had been reported to the ODC?
10     A.  Right, he told me that.
11     Q.  And did he tell you what the nature of the
12 allegations were?
13     A.  To the extent that there was something to
14 do with no mortgages and, you know, maybe missing
15 funds.
16     Q.  Did he tell you that he knew anything about
17 these mortgages or missing files?
18     A.  No, he said he did not.
19     Q.  Did you attempt to contact anybody, other
20 than the members of your immediate family, on your
21 way back to Wilmington?
22     A.  Yes.  Apparently, there was some point
23 person at Washington Mutual who Laura was always in

140

1  contact with.
2      Q.  Is this what Dan told you?
3      A.  Right.  And he gave me the name.  And so I
4  called Information on my cell phone, seeing if I can
5  get in touch with this guy, and find out what was
6  going on.  And I tried every spelling I could come up
7  with and --
8      Q.  What was the name you were looking for?
9      A.  Doug Maguire or Doug MacEntire, or something
10 like that.  And I had no clue what the spelling was.
11 So I just would call Information and try everything
12 that I could.
13     Q.  You were not able to reach Doug MacEntire?
14     A.  No, so I'm not sure a person existed.
15     Q.  Did you try to contact anybody else on the
16 way back from Florida?
17     A.  I tried to contact a person at Wilmington
18 Trust whom Laura had said we had to call --
19     MR. LUGG:  Your Honor, again, if the witness
20 could please answer the question without the
21 commentary of hearsay.
22     THE COURT:  Yes.
23     Please confine yourself to answering the

217

1 ever run a solo-practitioner law firm; is that right?

2    A. No, I have not, and I'm not sure that I

3 would want to.

4    Q. Now, in addition to being a practicing

5 attorney, were you requested, in late July of 2003,

6 to take any part with respect to the operation of the

7 law firm of Dan Anker?

8    A. Yes, I was.

9    Q. Can you tell the jury how that came about?

10 What happened?

11    A. I came back to my office, and there was a

12 voice message from the Office of Disciplinary

13 Counsel. And, of course, my main reaction was, what

14 are they calling me about? So I called, and I was

15 told that a member of the Supreme Court thought that

16 I might be an appropriate person to act as Receiver

17 for a lawyer who had been suspended, or was about to

18 be suspended, from practice, and would I be willing

19 to serve in that capacity. It's kind of an offer you

20 can't refuse and, of course, I was flattered, and so

21 I said yes.

22    Q. What does a Receiver do in a situation like

23 this?

218

1    A. Well, when a lawyer is suspended from the

2 practice of law, the Receiver comes in essentially to

3 take over that practice and, you know, look out for

4 their clients and make sure that the clients are

5 properly tended for and cared for, you know. The

6 point of is, you don't want clients to suffer because

7 a particular lawyer has been suspended from practice.

8    Q. And you testified that you accepted this

9 appointment as the Receiver for Mr. Anker's practice.

10 Did you receive some confirming court order at some

11 point in the not-too-distant future appointing you to

12 Receiver?

13    A. The Chancery Court issued an order

14 appointing me Receiver the day after I got the phone

15 call, is my recollection. I believe it was August

16 1st or July 31st, as I recall.

17    Q. After receiving this appointment, what did

18 you do about it?

19    A. Well, I got keys to Dan's office, and I went

20 to Dan's office. His office was at Park Plaza

21 Condominium. The condominium folks already knew that

22 I was coming. I think the Office of ODC might have

23 told them or somebody told them, but they knew that I

219

1 was coming, and I let myself in and started to assess

2 the situation.

3    Q. Did you take any staff with you on this

4 first occasion?

5    A. My recollection is that I took my

6 real-estate paralegal at the time with me. Her name

7 was Mary Quinn, or is Mary Quinn.

8    Q. She is no longer your real-estate paralegal?

9    A. Correct. Since then, she has left Klett

10 Rooney, and I have a different real-estate paralegal.

11    Q. When you and Ms. Quinn went to the Anker

12 office at Lovering Avenue, what did you find?

13    A. To be charitable and to be kind in the

14 description, the office was a mess. There were

15 stacks of paper all over the place. Those stacks of

16 paper weren't necessarily all related to the same

17 thing. You know, there was not a lot of organized

18 files that you might expect to find. For example, if

19 you're looking for the Smith closing, you might

20 expect to find an ordinary file labeled Smith, with

21 all the Smith documents there. That was not the case

22 in Dan's office. There were some files that had some

23 documents in them, but it was not particularly well

220

1 organized. You know, my office is somewhat messy,

2 but I know where everything is. There's a pile for

3 everything. If it's not in a pile, otherwise, it's

4 in a folder. It's out in the file cabinet. Dan's

5 office was not organized by any stretch of the

6 imagination.

7    Q. Were you aware that anybody else had been to

8 that office to search the office or search for

9 contents of the office prior to your getting there?

10    A. I'm not aware of anybody searching the

11 office. I think that the accountant for the Office

12 of Disciplinary Counsel, Joe McCullough, had been

13 there a day or two before, but I don't believe that

14 he did any sort of search a police officer would.

15    Again, this is just my understanding. He

16 had been there to review the books and records.

17    Q. Do you recall the day of the week or the day

18 of the month that you went, first, to Mr. Anker's

19 office?

20    A. My recollection is that it was a Friday.

21 That Thursday is when I got the call asking if I

22 would be willing to serve. And Friday morning, or

23 Thursday afternoon, the orders were signed, but

221

1    Friday morning was when I first went over.

2    Q. Was there anybody at the office when you got

3    there?

4    A. The office was locked, and I had a key and I

5    met with the manager for Park Plaza, as I recall, and

6    introduced myself and, you know, went in.

7    Q. How long did you spend there that first day?

8    A. I think I probably spent all day there, or

9    nearly all day there, that first day.

10    And, you know, as I said, the office was a

11    mess, and it was a daunting task. And there were all

12    sorts of stories and issues I had heard about clients

13    who had not had their mortgages paid off, and that

14    sort of thing. So, you know, the first item of

15    business was to try to make sense of it, and try to

16    start to get it organized and find what papers were

17    there, and what documents may be still needed to be

18    recorded, and that sort of thing.

19    Q. Were you given a list of clients or files to

20    be particularly aware of before you went there the

21    first day?

22    A. I can't recall if I was given a list before

23    I went or not. I think I was told at least some

222

1    names of some problem mortgages, but my recollection

2    is that the initial names I was given -- and I think

3    they were people who had called the ODC to complain,

4    even after that first Friday -- there were still a

5    couple of unpaid mortgages we didn't become aware of

6    until the following week.

7    Q. So what did you and Ms. Quinn do there for

8    that first day?

9    A. Well, we looked -- we had -- I think you're

10    right, I think we did have a couple names. We looked

11    through their files. And we just tried to make sense

12    of the office. We looked for a list of current

13    clients, because I wanted to contact all of Dan's

14    existing clients and let them know what was going on.

15    We changed the message on the phone system so that,

16    if people called the number, they would be directed

17    to me. I left a message, you know, "This is Richard

18    Forsten. Dan Anker has been suspended from the

19    practice of law, and I've been appointed Receiver and

20    you can reach me at," and I left my number. And, in

21    fact, we did get several calls at my office based on

22    that message. We put a sign up on the door with a

23    notice that Mr. Anker had been suspended, and that I

223

1    had been appointed Receiver, directing them to my

2    office. We changed the locks. It took forever for

3    the locksmith to arrive. I don't think he came until

4    like six or seven that night, but we changed the

5    locks on the front door. There was actually a

6    back-door fire escape that had stuff piled in front

7    of it. And we broke the key off on that lock,

8    although we didn't do that until the following Monday

9    or Tuesday, as I recall.

10    Q. So was the first day, then, spent gathering

11    documents and sorting them?

12    A. And figuring out -- yes, it was spent

13    gathering documents, sorting them, and figuring out

14    how we were going to sort them best.

15    Q. How long did that process take? Were you

16    able to get through in the first day?

17    A. Oh, no. We had -- one of the folks at our

18    office comes in and just works kind of a

19    five-to-eight shift, Mondays through Thursdays. And

20    so one of the things that I had her do that following

21    week, starting Monday or Tuesday, was go to Dan

22    Anker's office at night. And basically our mission

23    was to go through each pile of paper and all papers.

224

1    And if we had found a folder with that client name or

2    about that particular thing, take the paper, put it

3    in that folder. And if we found something that did

4    not have a folder, then we would write that, we would

5    create a folder for it, and then any additional

6    papers that we would find relating to that matter or

7    that client, we would put in the folder we created.

8    So we spent probably the first week just trying to go

9    through and sort everything that we found.

10    Q. Then what did you do with the papers after

11    they were all sorted, or as they were sorted?

12    A. Well, there was a lot going on, because we

13    were getting calls from various folks who were upset

14    because their mortgages apparently had not been paid.

15    You know, we found the bank records, and we were

16    trying to figure out where the money went. And there

17    was just a lot of things to do when you're walking

18    into an office essentially cold.

19    On Monday, I remember I met with Mrs. Anker,

20    Dan's wife, and she described various things that she

21    knew about to me. As I said, we continued to look

22    for a client list. We found an old client list. And

23    as I recall, Mrs. Anker told me it was a list that

1  that account at least alive or solvent?

2  A.  I saw that there were transfers from the

3  escrow account to the operating account without any

4  apparent notation or reason for the transfer.

5  Q.  You indicated that you knew the balance when

6  you shut that, basically locked down this office. Can

7  you tell us, if you recall, what the balances were for

8  operating an escrow account?

9  A.  Escrow account was approximately 90 thousand

10  dollars. The operating account I want to say was

11  around nine thousand dollars or, so may have been a

12  little less than that.

13  Q.  That is 99 -- say 100 thousand dollars between

14  two accounts?

15  A.  Yes.

16  Q.  You have told us about a list of people who

17  had not had their work done for them, correct?

18  A.  Who had not had mortgages or other things that

19  should have been paid off, paid off. Correct.

20  Q.  You told us a little bit about the other types

21  of work that the defendant was doing. In fact, in your

22  investigation, you have told us about condo association

23  representation, bankruptcy, Chancery Court work, is it

50

1  not true that there are also some organization or

2  entities which failed to have money owed to them, or

3  belonging to them disbursed to them in that pertinent

4  time period?

5  A.  I forget the name of the particular condo

6  association. There had been a fire, and there had been

7  insurance proceeds that had been paid over. Dan was

8  holding them in escrow, 211 thousand dollars, I believe

9  was the amount. It came, as I recall, with a check,

10  and as I recall there was a cover letter that said

11  don't cash this check until we settled everything. I

12  forget who the attorney was on the other side, but the

13  money was deposited into Dan's escrow account, and

14  never paid over to the condominium association.

15  Q.  That was 200 thousand dollars you said?

16  A.  I think 211 thousand dollars, 210 thousand

17  dollars.

18  Q.  Nonetheless, the balance when you shut things

19  down was around 90 thousand dollars?

20  A.  Correct.

21  Q.  And did you learn if this money was ever paid

22  to that condo association?

23  A.  Money had not been paid to the association at

1  the time I became receiver.

2  Q.  We have gone through a few times now, the role

3  of different actors in a real estate transaction. You

4  were asked this morning what does a real estate

5  paralegal do? What is their role? And they are an

6  important piece of the transaction; is that correct?

7  A.  Very important. Correct.

8  Q.  The lawyer equally is a very important

9  participants in the transaction. Correct?

10  A.  I would like to think so. My real estate

11  paralegal may disagree.

12  Q.  You are getting a fee out of this, right?

13  A.  Not getting a fee to be here.

14  Q.  Thank you. When I say "this," you are getting

15  a fee based upon your work that you are doing as a

16  lawyer for that real estate transaction?

17  A.  Well, the firm gets money. At some point, you

18  know, my real estate paralegal gets paid, then I get

19  paid. I am the boss as compared to the real estate

20  paralegal.

21  Q.  Law work that is done is paid for, there is

22  work that is done. Let's talk about that a little bit.

23  Real estate paralegal does -- sets up, gets things

52

1  ready. You tell us have told us that that person, he

2  or she, brings material to you, you review it, look it

3  over, make sure things are where they need to be. I

4  think you used the term kosher in describing the

5  paperwork. Correct?

6  A.  I don't think I used the term kosher, but

7  generally correct.

8  Q.  You look at it. You look it over. You make

9  sure everything is where it should be and is then the

10  real estate settlement, event scheduled or has that

11  already been done?

12  A.  Typically the settlement is scheduled and the

13  real estate paralegal will give me the documentation

14  either the afternoon before or, you know, if the

15  settlement is in the afternoon, you know, in the

16  morning, depends a little bit on the lenders because

17  unfortunately lenders like to wait as long as they can

18  to sent the mortgage and other documents. Sometimes we

19  will have settlements, we try to schedule for 10 or 11

20  because FedEx has not brought the documents form the

21  lender yet. We have to push them back, maybe looking

22  at those particular documents five minutes before the

23  closing, but the goal is to have documents from the

65

1  ever been involved in a settlement or some type of
2  pretrial resolution in a civil forum, some type of
3  settlement?
4      A.  Have I ever settled a matter or case, just
5  generally speaking, certainly.
6      Q.  Are there releases to be signed?
7      A.  Yes, typically.  Yes.
8      Q.  Have you ever settled a case without there
9  being any release, without there being any
10 documentations for a half million dollars?
11     A.  No.
12     Q.  For 300 thousand dollars?
13     A.  We have settled some cases simply with a
14 stipulation of dismissal sometimes and not a release,
15 some construction disputes, but where there is, you
16 know, any personal liability alleged or generally
17 speaking you get a release just because it is a good
18 idea.
19     Q.  You when you say a stipulation of dismissal
20 that is actually a document, again, that is signed and
21 agreed to between the parties; is that right?
22     A.  Correct.  If a lawsuit has been filed, a
23 stipulation of dismissal is a piece of paper signed by

66

1  all attornies for the different parties.  That gets
2  filed with court to stipulate to the dismissal of the
3  lawsuit.
4      Q.  Typically, again, if you can't answer tell me,
5  how long from the time that a particular issue arises
6  prompting that lawsuit, and the settlement, how much
7  time typically lapses between the two events?
8      A.  It can vary widely.  You know, from a matter
9  of say weeks sometimes a lawsuit will be filed and
10 won't be settled for a year or two depends on the facts
11 and circumstances.
12     Q.  Yet each settlement is accompanied with some
13 time of documentation resolving the claims between
14 parties?
15     A.  Every settlement that I have been involved in
16 there is been some sort of documentation of that.  Yes.
17         MR. LUGG:  May I have one moment, Your Honor.
18         THE COURT:  Yes, you may.
           (Discussion held off the record.)
           MR. LUGG:  Thank you, sir.
21         THE COURT:  We will let the jury go in recess.
22 I want to talk to counsel about something else.
23         (Jury left the courtroom at 11:39 a.m.)

67

1          THE COURT:  You may step down, Mr. Forsten for
2  the present purposes.  Thank you, sir.  I can tell you
3  having been a receiver, everyone is appreciative of
4  your hard work.
5          THE WITNESS:  Thank you, Your Honor.
6          THE COURT:  I made that comment outside the
7  presence of the jury.  I think that expresses
8  everyone's feeling in Court.  Out of an abundance of
9  caution my proposal is to give the jury an instruction.
10 I want to read it to both of you, of course, I will
11 consider any comments you may have.
12         You have heard evidence about a shortfall of
13 about 1.6 million dollars in funds, that did not go to
14 Mr. Anker's clients, about the failure of the Anker
15 office to pay a 211 thousand dollar fire settlement to
16 a condominium association.  You must not use that
17 evidence as proof that the defendant is a bad person or
18 has a bad character trait and therefore committed the
19 indicted offenses because of that character or trait.
20 You must why to over evidence only to help you decide
21 whether or not the defendant had intent or knowledge or
22 whether or not there was a mistake concerning the
23 charged offenses.  You must not use this evidence for

68

1  any other purpose.
2          MR. WENDELBURG:  Your Honor, I have no
3  objection to this Court's proposed instruction.  I
4  would advise the Court that later on in our case, we
5  intend to show that there were, in fact, other
6  incidents where money was not supposed to go where --
7  did not go where it was supposed to, that are not
8  indicted by the State.  Although the monies were
9  eventually made up, and apparently were not completed
10 thefts.  While I think the court's proposed instruction
11 is fine with respect to the Mermaid Run 211 thousand
12 dollar check, it may be necessary at some point along
13 the line to give a similar instruction with respect to
14 other incidents that are going to come out during the
15 at defense case.
16         MR. LUGG:  The instruction is appropriate,
17 404(b) instruction.  The evidence elicited wouldn't be
18 404(b) rather an affirmative evidence, I didn't think
19 an instruction would be needed.  I cannot object to
20 that.  It is appropriate.  I think only issue whether
21 counsel wishes not to have that, which is often a
22 strategic decision, counsel wishes to have it, I think
23 it is absolutely appropriate.

A-126

69

71

1    MR. WENDELBURG: I don't wish the instruction.

2  I certainly don't object to it. I think it is

3  appropriate.

4      THE COURT: I am going to give it to the jury

5  unless you tell me not to. All right. Court staff

6  will have extra time taken for the break. Just for the

7  record, obviously, there is a strategy here both in the

8  prosecution and defense. There is a both sides are

9  very professional and the case is extremely well

10  prepared. All I am doing is out of an abundance of

11  caution, don't think anything of it other than that is

12  where I am coming from. For the record, this would be

13  a 404(b) instruction, 404(b) instruction, of course,

14  follows an analysis from the Getz and DeShields cases.

15  DeShields of course is 706 A2d 502. Getz, of course,

16  is 586 A2d, 726. This would be bad act evidence

17  finding that the bad act evidence is material to an

18  issue of ultimate fact in dispute in this case. The

19  issue on criminal intent, knowledge, mistake, absent a

20  mistake are very much a significant issues in this

21  case. They are definitely part of what is necessary

22  for the prosecution to show its case in chief. These

23  are elements; knowledge, intent must be shown by the

1  emotional or inflamed, or not be able to give a

2  considered consideration of the evidence based upon the

3  instructions of law.

4      Similarity of the prior wrong to the charged

5  offence, some similarity, of course, but not so similar

6  that the jury will have a closed mind. The affect on

7  this limited instruction, I have shared the limiting

8  instruction. Juries are presumed to follow

9  instructions of judges. I have already indicated the

10  evidence is material to the case in chief, has

11  independent logical relevance. All right. So I just

12  wanted to do that, only out of an abundance of caution.

13  We will take our recess. We will add time on it so you

14  are not short changed in staff. You let me know in

15  chambers.

16      (A short recess was taken.)

17      THE COURT: Ask you to get back on the stand.

18      (Jury enters the courtroom at 12:15 p.m.)

19      MR. WENDELBURG: Update the court --

20      (Discussion held off the record.)

21      THE COURT: I am going to give you an

22  instruction. You have heard evidence about a short

23  fall of about 1.6 million dollars in funds, that did

70

72

1  prosecution in this case in chief. This is a proper

2  purpose. It is not -- nothing about this evidence that

3  is improper. Evidence is presented by plain, clear,

4  conclusive evidence. We have Mr. Forsten who has

5  examined the bank records, has been a receiver

6  certainly very able to express an opinion on this

7  point. I believe that other parts of the trial we have

8  allusions to these points as well to other witnesses

9  would have familiarity with the records, can certainly

10  speak to that.

11      These other bad acts not remote in time from

12  the charged offences, right part and parcel of the time

13  of these various charges. The probative value of the

14  evidence is such that on balancing that under Rule 403,

15  set forth in DeShields, the extent to which the point

16  can be proved is disputed; issues here on intent,

17  knowledge, absence of mistake are very much disputed.

18  Proof is shown by a competent testimony, people

19  familiar with the records as indicated, evidence has

20  probative force, State has a need for this evidence,

21  unless prejudicial proof is not available, evidence is

22  not inflammatory or prejudicial, nothing about this

23  evidence that is going to cause the jury to become

1  not go to Mr. Anker's clients, about the failure of the

2  Anker office to pay a 211 thousand dollars fire

3  settlement to a condominium association. You must not

4  use that evidence as proof that the defendant is a bad

5  person, or has a bad character trait, and therefore

6  committed the indicted offences because of that

7  character or trait. You may use this evidence only to

8  help you decide whether or not the defendant had the

9  intent or knowledge or whether or not there was a

10  mistake concerning the charged offenses. You must not

11  use this evidence for any other purpose. All right,

12  you may proceed.

13      MR. WENDELBURG: Thank you, Your Honor.

14  BY MR. WENDELBURG:

15      Q. Before we took the last break, you answered a

16  number of questions for the prosecution. I want to

17  follow-up on a few of them. First you talked about a

18  document called a release. I think you described what

19  a release is, how it is involved in the litigation

20  process. Typically when parties to litigation or

21  disputes sign releases, are there conditions under

22  which the release is to be signed.

23      Let me rephrase the question. Didn't a

A-127

73

1  release show the terms on which a settlement has been
2  reached, usually?
3      A.  Typically a release will reflect the terms of
4  the settlement, the payment of the cash or for release
5  of claims whatever the settlement is.  Sometimes there
6  will be a separate settlement agreement, the release is
7  attached as an Exhibit to that.
8      Q.  If there are additional terms of the
9  settlement, beyond simply paying cash, are those --
10 does a release often times contain a recitation of
11 those other terms?
12     A.  It may or may not, depending.  You can have a
13 separate agreement with a release or you can have a
14 release basically incorporate the terms.  It depends on
15 who is drafting it, what that preference is, what the
16 situation is.
17     Q.  Is it unusual in your experience for parties
18 to wait to sign a release until all the conditions of
19 the settlement have been fulfilled?
20     A.  I am not sure I understand the question.
21     Q.  Let me give you an example; if a release says
22 that a party is to pay to another party a sum of money,
23 and clear that party's credit, and satisfy that party's

74

1  mortgage, and any other conditions that the parties
2  wish to put in the settlement, is it unusual in your
3  experience to wait until all of these conditions have
4  been met before the release has been signed?
5      A.  I would say that it would be unusual to wait
6  because you want to have something in writing that
7  reflects what the parties are going to do.  So that is
8  why you can sometimes have a settlement agreement then
9  a release.  The agreement may specify a release, get
10 signed later, typically if a release is given and it
11 sets forth the conditions that are present you have
12 that signed so you have an enforceable agreement.  If
13 you were the party obligated to do certain things you
14 want to know when you did those things you were
15 released, you wouldn't have to wait around for the
16 other party to sign the document, you would kind of --
17 they have no incentive to sign that thing.
18     Q.  In the settlement agreement that you talked to
19 is distinguished from the release can that take the
20 form of correspondence?
21     A.  I suppose it could.
22     Q.  With respect to the condition of the files in
23 Dan's office when you first took over as receiver, I

75

1  think you have testified that you did look over the
2  files, the case files, the client's files, if you will,
3  this were contained in the office; is that correct?
4      A.  Yes.
5      Q.  I think at the very beginning of your
6  testimony yesterday afternoon you said to be charitable
7  the place was a mess, correct?
8      A.  To be charitable.  Yes.
9      Q.  Does that also include the condition of many
10 or all of the client files?
11     A.  Virtually all of the files for 2003 were
12 incomplete, or were not even necessarily put together
13 as files.  You find some documents but not all
14 documents.  You might find a couple documents somewhere
15 else in a different file.  Some of the files were
16 labeled with client names, just not everything was in
17 there.  For some of the transactions there was nothing
18 with that file name.  We had to create it from what we
19 found in the office.
20     Q.  Did you, in fact, in your search through the
21 files, find a real estate file regarding a purchase of
22 a property by Ms. Larks and her husband?
23     A.  Yes.

76

1      Q.  Do you recall the condition of that file when
2  you found it?
3      A.  The real estate closing file for Laura Larks
4  purchase of her home was probably the only textbook
5  example of everything being in its place.  It was there
6  were tabs, it was all, you know, properly there.  That
7  was probably was the best file that we found.
8      Q.  In connection with your looking through the
9  documents in Dan's practice office, did you find
10 undisbursed but signed checks?
11     A.  I am not sure what you mean by undisbursed.
12 We found signed checks made out to their parties, yes.
13     Q.  Which had not been processed, correct, in
14 other words, not deposited into a bank?
15     A.  They were still sometimes sitting in files.
16     Q.  You testified in response to one of Mr. Lugg's
17 questions that with respect to a real estate
18 settlement, a lawyer is supposed to be there.  What is
19 it that places that requirement on the lawyer,
20 generally speaking?
21     A.  Generally speaking, there is another arm, a
22 Board of Unauthorized Practice of Law, and that
23 board -- you are not allowed to practice law unless you

A-128

93

1    Q.   How often in those discussions have you
2    discussed this trial which you are now testifying?
3       A.   Not too much because Dan did not want to talk
4    about it.
5    Q.   You did understand that he was facing criminal
6    charges. He told you about that?
7       A.   Actually, yes.
8    Q.   You discussed that various times in your
9    conversation?
10      A.   Not much.
11   Q.   What is it that you do for a living?
12      A.   I have shoe stores in Philadelphia.
13   Q.   And you traveled down from Philadelphia to
14   appear here today; is that right?
15      A.   Yes.
16   Q.   Did you have to rearrange your schedule for to
17   be --
18      A.   Yes.
19   Q.   Last minute you were called Saturday, here you
20   are on Wednesday?
21      A.   I was down the shore. My brother has cancer.
22   I was staying with him. He had surgery Tuesday. I sat
23   with him Saturday night, Sunday, and Monday.

94

1    Q.   As far as the financial transaction that you
2    have told us about, discussion, did you have any idea
3    of the details of the money that Dan was coming into?
4       A.   Only thing I knew I was told it had something
5    to do with Texas. Dan did not tell me all the ins and
6    outs because our business at the time was off. I said
7    how is your business, he said might it turn out to be
8    okay if this deal goes through, something to do with
9    Texas.
10   Q.   You indicated that this might have been some
11   point in 2003?
12      A.   Yes.
13   Q.   Any idea what month in 2003?
14      A.   I have no idea. I am thinking Fall, maybe,
15   not sure.
16   Q.   Fall 2003?
17      A.   I am not sure.
18   Q.   And at the time, based on what you told us
19   that was a forecast or projection, I might be coming
20   into this money if things work out?
21      A.   Yes.
22   Q.   No indication that any was received; is that
23   right?

95

1    A.   Right.
2       MR. LUGG:   I appreciate your time. Thank you.
3       THE COURT:   Anymore for him?
4       MR. WENDELBURG:   No, this witness may be
5    excused as far as the defense is concerned.
6       MR. LUGG:   As well as the State.
7       THE COURT:   You may be excused.
8       MR. WENDELBURG:   Russell Burkett to be
9    recalled, Your Honor.
10      (Russell Burkett retakes the stand.)
11      THE COURT:   You are still under oath.
12      THE WITNESS:   Thank you.
13   BY MR. WENDELBURG:
14   Q.   Mr. Burkett, when you were here last week you
15   testified that among other things Mr. Anker caused a
16   property settlement to take place, yet -- where you
17   bought your house yet your deed has never been
18   recorded. Do you recall that testimony?
19      A.   That's not what I said, I don't believe, if I
20   did I said it in error. My deed was transferred.
21   Q.   In fact, my deed was transferred less than 30
22   days after the settlement took place; is that right?
23      A.   That is correct.

96

1    Q.   It was done at your request by another lawyer
2    that you hired?
3       A.   That is correct.
4    Q.   You were reimbursed for the transfer tax by
5    the lawyer's fund for client protection; is that
6    correct?
7       A.   Real estate transfer?
8    Q.   Transfer tax?
9       A.   It was either paid to the state or it was made
10   good.
11   Q.   It was made good?
12      A.   Yes.
13   Q.   With respect to the mortgage, mortgage on the
14   property which the Kintz had put there, which was still
15   on the property when you bought it, did you testify
16   last week that you have received foreclosure notices
17   and Dunning correspondence or communications with
18   respect to the Kintz mortgage?
19      A.   I had communications. I hadn't received it.
20   Q.   You have not received, you had not received
21   it?
22      A.   No.
23   Q.   In fact, Mr. Burkett, the mortgage that the

A-129

97

1   Kintz's had on that property has been satisfied, has it
2   not?
3       A.   Correct.
        Q.   There is no longer an encumbrance of any sort
5   as a result of the Kintz ownership?
6       A.   There is none.
7       Q.   With respect to your contacts with Mr. Anker
8   which you testified took place in 2003?
9       A.   Yes.
10      Q.   Is it your testimony still that these
11  conversations took place at a place called M and M,
12  which is a shooting range?
13      A.   I don't quite know what you mean in reference
14  to -- explain -- may I hear it again.
15      Q.   You testified last week that you had a number
16  of conversations with Mr. Anker that took place in 2003
17  at a place called M and M, that is where people go to
18  shoot?
19      A.   In reference to just general shooting or --
20      Q.   In reference to the acquisition of your and
21  your wife's home?
22      A.   Yes.
23      Q.   In Delaware?

98

1       A.   Yes.
2       Q.   And you testified that these conversations
3   took place close to the time that your settlement took
4   place, which was July of 2003; is that correct?
5       A.   Yes.
6       Q.   You testified that after the settlement took
7   place you talked with Mr. Anker at M and M about things
8   that had occurred at the settlement, correct?
9       A.   No, that is not correct.
10      Q.   It is not correct that you took -- those
11  conversations took place at M and M, or not true that
12  the conversations too took place at all?
13      A.   Did not take place at M and M.
14      Q.   Where did they take place?
15      A.   Cell phones.
16      Q.   Did you see Mr. Anker at M and M after the
17  July 15, 2003 settlement?
18      A.   Yes, I did, on occasion.
        Q.   When did you see him there?
        A.   I would see him occasionally at M and M. I
21  sometimes run the office, I would have to give him some
22  stuff to go out and shoot, you know, make sure that
23  there was a golf cart in. I did not have conversation

99

1   with him.
2       Q.   Is it your testimony you and Mr. Anker shot
3   together on several occasions at 2003 at M and M?
4       A.   If I could explain --
5       Q.   If you can answer the question, if you feel
6   further explanation is necessary we can get into that.
7   Is it your testimony that you and Mr. Anker shot on
8   several occasion in 2003 at M and M?
9       A.   I did, yes.
10      Q.   On how many occasions at M and M on 2003?
11      A.   Could have been five, could have been 25. May
12  I explain now?
13          MR. WENDELBURG:   Excuse me just a moment. I
14  have no further questions at this time.
15  BY MR. LUGG:
16      Q.   Can you explain?
17      A.   Yes. I retired in 1997, took up golf. I did
18  not like the game, so I took up shooting. Friends of
19  mine introduced me to it. I traveled to Florida,
20  Texas, fished with them, became friends with people at
21  M and M. I started hanging out there. I say that I
22  was there four, or five times a week. I would shoot
23  with everyone that came in the room -- in the driveway,

100

1   rather. I had pulled for Mr. Anker on five stand
2   because you can't do that yourself. Prior to about 18
3   months ago, they became "animated," now you can go out
4   on yourself, if Mr. Anker came or anyone else, not just
5   Mr. Anker. I would go out pull for them, make sure
6   machines were working. I was traveling the course with
7   everyone. I did not just shoot with Mr. Anker. I
8   shoot with anyone that came in there if they needed me
9   to. If you came to M and M you could not prior to 18
10  or 20 months ago go out and shoot by yourself. You had
11  to have someone there. He always had someone there.
12  He had a little boy -- if he did not then I went out.
13  I pulled for him. I always pulled the five stand for
14  him when he asked me. He needed me do that. I was in
15  a building, he was in front of me.
16      Q.   You say pull five stand that means you are --
17      A.   Explain it to you, there is a board in front
18  of me. I go in a room, five stations. I pull five
19  targets for him on station one, he moves to 2, 3, 4 and
20  five. I did that. If I went out, and pulled the
21  course for him, I took my gun and shells sometimes,
22  most of the time I did not; on many, many occasion, I
23  practiced with Mr. Anker. I don't believe I ever shot

129

1     (Jury enters the courtroom at 3:07 p.m.)

2     THE COURT: You may continue.

3  BY MR. WENDELBURG:

4     Q.  Ms. Paveza, when we recessed earlier this

5  afternoon, we were getting into a conversation that you

6  had with Ms. Larks over the telephone. I believe you

7  testified it was the second week some of July or so of

8  2003?

9     A.  Yes.

10    Q.  Would you please tell the jury the substance

11 of that conversation?

12    A.  There were actually two conversations.

13    Q.  Okay. First one first, then the second one?

14    A.  Okay. First conversation entailed Laura

15 calling me and she was concerned because a client was

16 threatening to call the ODC, because she hadn't sent a

17 payment in, and she wanted to know what to do.

18       She was afraid that if they called ODC they

19 would shut down her father's practice. It would be her

20 fault.

21    Q.  When you say a payment, ma'am, did she say

22 what sort of a payment she was talking about?

23    A.  I understood it to be paying off a mortgage

130

1  from a settlement from one of real estate transfers.

2     Q.  Good ahead.

3     A.  I told Laura to correct it, you know, if you

4  are that concerned make it right, find out what you

5  need to do to get it paid. That was really it.

6     Q.  Was this a transaction in which had you taken

7  part was this one of your clients?

8     A.  No.

9     Q.  Do you recall Ms. Larks using a name in that

10 conversation?

11    A.  She did use a name. I remember thinking it

12 was, you know, now this being 2 years later, I remember

13 thinking it was a B possibly and Italian sounding, it

14 was not one of my clients, because it wasn't a name

15 that I was familiar with, and then she called me again

16 about the same matter and said --

17    Q.  How long later?

18    A.  I think it was probably the next day.

19    Q.  Okay. Again did she call you on your cell

20 phone?

21    A.  No, this time she called me at home.

22    Q.  Tell us about that?

23    A.  I remember sitting in any office in front of

131

1  my computer, she was rambling on about the same person,

2  and that she couldn't find the accountant. The

3  accountant was married. She did not know her married

4  name, couldn't find her to have her call this person,

5  would I take this person's name and phone number and

6  call them and pretend to be the accountant and explain

7  what had happened.

8     Q.  Did you respond to that?

9     A.  I told her I wouldn't do that.

10    Q.  Can you describe -- both were telephone; is

11 that correct?

12    A.  Yes.

13    Q.  To the extent that you can hear Ms. Larks over

14 the phone during those two conversations, can you tell

15 the jury what her demeanor was?

16    A.  I would say she was getting pretty frantic and

17 panicked, definitely irritated with me I was not

18 willing to do that. I could hear that in her voice.

19    Q.  It was the second?

20    A.  Yes.

21    Q.  How about the first, tell us what her demeanor

22 was on that?

23    A.  She was upset. She was panicking, saying it

132

1  would be all her fault they would shut her father down

2  because she did not send a payment.

3     Q.  Can you tell the jury how long this first

4  conversation took?

5     A.  I was talking to her while I was driving to a

6  house in Pennsylvania, five minutes, maybe ten minutes.

7  She was rambling about the same thing. I just kept

8  saying, you have to correct what you did wrong.

9     Q.  Second conversation, a day or so later, how

10 long did that conversation take?

11    A.  Just a couple of minutes. She was pretty

12 straight to the point. She couldn't find the

13 accountant, didn't know her name, which I thought was

14 so odd. This person is demanding, you know, this be

15 resolved, could I please call them and pretend to be

16 the accountant. Just, you know, very quickly I did not

17 need to think twice. I said no, I wouldn't do that for

18 her. She needed to take responsibility for her own

19 mistake, which is what I was trying to teach her.

20    Q.  Ms. Paveza, later in July of the year 2003,

21 did you go to Dan's office at his request at which time

22 you conducted a search of the office for documents and

23 things?

A-131

133

1    A.  Yes, I only searched around the desk where

2    Laura sat.

3        Q.  How long were you there that day?

4        A.  It may have been an hour, maybe a little bit

5    more, it wasn't very long before I realized what had

6    happened, our mortgage was one of the ones not paid

7    off.

8        Q.  Now, why did you go there that day?

9        A.  Dan had called me from Florida indicating that

10   he had received a phone call saying that he needed to

11   get back here. ODC was sending, I guess, an accountant

12   or someone to the office they had received a complaint.

13   He did not -- couldn't reach Laura, could I help to try

14   to reach Laura. They were going to be back in town the

15   next day or so; from what he was telling I did not

16   believe it was true, and so I said, you know, I have to

17   show a listing in the city when, I am done I will meet

18   you in the office try to help go through things.

19       Q.  What time, roughly, did you get to Dan's

20   office that afternoon?

21       A.  I do not recall exactly. I think it was like

22   mid afternoon probably, you know, three o'clock, maybe

23   even later.

134

1        Q.  Who was there when you got there?

2        A.  Dan, and a gentleman from the ODC, an

3    accountant.

4        Q.  Did you have the opportunity to observe Dan,

5    see him, talk to him during the hour or so that you

6    were there that day?

7        A.  Dan was looking through papers trying to see

8    things. I was mostly with -- at Laura's desk. She and

9    I were trying to sort of organize this chaos, was

10   trying to look on the computer because I used to be a

11   technology to see if I could, you know, figure out the

12   accounting software. There was nothing there nothing

13   that I could find.

14       Q.  You found no accounting software at all?

15       A.  There was software. I couldn't find anything

16   entered into it.

17       Q.  Can you describe for the jury Dan's demeanor

18   while you were there for that hour or so?

19       A.  I think he was in shock.

20       Q.  Why do you say that?

21       A.  Well, because I don't really think he knew

22   what was going on.

23       Q.  What was it about his actions or his words

135

1    that led you to that conclusion?

2        A.  Just sort of his overall mannerisms, how he

3    was how Ann was, you know, they were on this nice

4    family vacation. They went to the ATM. There was no

5    money in the bank. She didn't know what was going on.

6    They were told to get back here. I think he was just

7    in shock. Just sort of blank stare, almost.

8        Q.  You may have testified to this last week, I

9    forget. Forgive me for going over old ground. How

10   long had you known Laura and Dan before end of July of

11   2003?

12       A.  I think first settlement had occurred in their

13   office that I had been introduced to them was February

14   or March of 2002.

15       Q.  During that period of time, February or March

16   of 2002, to July end of July of 2003, were you able to

17   form an impression as to what sort of attitude Dan took

18   towards his daughter Laura?

19       A.  Yes, he was probably would have done anything

20   for her. I sort of felt a little protective of Laura,

21   too, would have conversations with Dan on occasion

22   about her domestic situation with her husband.

23       Q.  What was it that -- strike that question.

136

1            MR. WENDELBURG:  Your Honor, may I have a

2    moment.

3            (Discussion held off the record.)

4            MR. WENDELBURG:  Nothing else at this time,

5    Your Honor. Thank you.

6    BY MR. LUGG:

7        Q.  Hello again.

8        A.  Hi, Sean.

9        Q.  We have spoken a few times now in this

10   courtroom?

11       A.  Yes.

12       Q.  I won't take much more of your time. You were

13   asked a couple questions about a conversation you had

14   with Laura sometime in mid July about an issue with

15   accounting; is that right?

16       A.  Yes.

17       Q.  That is, in fact, the only time that any

18   requests or call of that sort was made to you by Laura;

19   is that correct?

20       A.  Asking me to pretend to be someone. Yes.

21       Q.  You indicated that you represented various

22   other folks as a realtor who were similarly affected as

23   you were in dealing with defendant's office, correct?

153

1      MR. WENDELBURG: Thank you. Nothing further.

2      MR. LUGG: Prompts nothing from the State.

3      THE COURT: You may step down. Thank you,

4  ma'am. May I see counsel about scheduling for a

5  moment.

6      (Discussion held off the record.)

7      THE COURT: We will take a recess then.

8      (Jury left the courtroom at 3:41 p.m.)

9      THE COURT: Bring in the jury.

10     (Jury enters the courtroom at 3:58 p.m.)

11         DENISE ALEXANDER,

12   having been first called by the Defense was

13  affirmed, was examined and testified as follows:

14       DIRECT EXAMINATION

15  BY MR. WENDELBURG:

16     Q.  Ms. Alexander, good afternoon. Do you know

17  Dan Anker?

18     A.  Yes.

19     Q.  How did you come to know him?

20     A.  He was my employer.

21     Q.  Far what period of time?

22     A.  From 1991 to 1998.

23     Q.  What was the nature of your employment?

154

1      A.  I was a real estate secretary.

2      Q.  We use heard term a lot, real estate paralegal

3  in this trial, do you know when -- your duties were

4  those of a real estate paralegal, as well as a

5  secretary?

6      A.  Yes.

7      Q.  Yes, they were?

8      A.  They were.

9      Q.  In 30 seconds or less, if you can, what does a

10  real estate paralegal do; what did you do as a real

11  estate paralegal in Dan's office?

12     A.  I opened the file for our clients, called,

13  make contact with them, after Dan had talked to them, I

14  would set up with the mortgage company a settlement

15  date, contact the Title haven't done it in awhile,

16  Title searcher to get a Title on the property. And

17  then I would contact the surveyors, it's been awhile, I

18  am trying to remember a whole lot that I would do.

19  Talk to the real estate Agent, go over the agreement of

20  sale, then do a rough draft of a settlement sheet.

21     Q.  What else did you do as a real estate

22  paralegal in the office?

23     A.  We would be responsible to disburse funds, go

155

1  to the prothonotary's office, record documents recorder

2  of deeds basically, and put the file in order, and file

3  it in a storage area.

4      Q.  Were you responsible for any post settlement

5  contact with clients, mortgage lenders, or I think you

6  testified about Recorder of Deeds?

7      A.  Yes.

8      Q.  What sort of duties did you have after the

9  settlement acquisition or refinance had taken place?

10     A.  You have to disburse all funds to the buyers,

11  seller, mortgage company, Title company, meaning could

12  be Title searcher fee, and then the Title insurance

13  company, send their fees out.

14     Q.  Who prepares the checks?

15     A.  It varies, if the intern was there or his

16  assistant or another attorney, at the time it was

17  Chandler who printed the checks out, then Dan would

18  sign them.

19     Q.  You worked at the Dan's office from 1991

20  through 1998, was this full-time?

21     A.  Yes.

22     Q.  At some point in 1998 did you leave that

23  employment to go somewhere else?

156

1      A.  Yes.

2      Q.  After 1998, were you invited to come back to

3  the Anker office in any capacity?

4      A.  Yes.

5      Q.  Can you tell us when that happened, and what

6  were you asked to do?

7      A.  In between the months of March and until June,

8  2003, I believe, and I was just a file clerk trying to

9  get the files in order, make sure that everything was

10  disbursed out, but that disbursing really wasn't my job

11  just to make your all filing was handled.

12     Q.  When you came back to the Anker office in

13  March of 2003, you were not acting as a real estate

14  paralegal at that time?

15     A.  No.

16     Q.  You were acting, as you described it, a file

17  clerk?

18     A.  Yes.

19     Q.  What were your hours?

20     A.  6 to 9.

21     Q.  P.m. or a.m.?

22     A.  P.m.

23     Q.  Was it five days a week?

A-133

157

1    A. No.

2    Q. How often were you there?

3    A. Probably three days out of a week.

4    Q. Was it a regular schedule or vary from week to

5    week?

6    A. 6 to 9.

7    Q. How about days of week, was it a fixed

8    schedule or varied?

9    A. Varies.

10    Q. Who decided when you would be there?

11    A. Mr. Anker.

12    Q. Would he call you and ask you to come in on a

13    particular day?

14    A. I would call him.

15    Q. You were paid on an hourly basis for your

16    service?

17    A. Yes.

18    Q. Who else was working in the office when you

19    came back on a part-time basis in March 2003?

20    A. Laura Anker.

21    Q. You knew her as Laura Anker at that time?

22    A. Yes.

23    Q. Did you also know her any time as Laura Larks?

158

1    A. No.

2    Q. What was the relationship between Laura Anker

3    and Dan Anker?

4    A. From what I heard was it was okay.  I

5    didn't -- I really wasn't in the office when both of

6    them were present.  I just thought everything was okay

7    at that time.

8    Q. Let me rephrase the question a little bit.  To

9    your understanding, were Laura and Dan related to each

10    other?

11    A. Yes.

12    Q. That was as what?

13    A. Father and daughter.

14    Q. You testified that you were not in the office

15    when both of them were in the office together; is that

16    correct?

17    A. Yes, that's what I am testifying to.

18    Q. When you came back on a part-time basis

working as a file clerk, specifically what was it that

you were doing?

21    A. I was taking a real estate file and going

22    through it to put it in chronological order, and making

23    sure that everything was like it was completed file,

159

1    meaning disbursements were inside of a file, or any

2    checks

3    Q. When you started back working part time, what

4    was the general conditions of the files?

5    A. Disarray, it was cluttered, just totally out

6    of order.

7    Q. The files that you are talking about, were

8    these files that were bound together in some way or

9    held together in any type of container?

10    A. In an accordion file folder, or legal file

11    folder.

12    Q. When you came back to resume duties as a file

13    clerk, did you find all the documents that you were

14    supposed to find in the files?

15    A. Not -- no, I did not, not always.

16    Q. If you did not find them there, what would you

17    do?

18    A. I would pull Laura to the side and ask her and

19    she said she would handle it.

20    Q. During periods of March through June of 2003,

21    did you have any duties with respect to direct

22    assistance of Laura?

23    A. Well, what I had done just to assist her was

160

1    to print out a copy of the duties that I typed in the

2    memo.

3    Q. Was this something you did after you got back

4    in March of 2003, you typed this thing up?

5    A. It was already on the computer.

6    Q. You had put it on there before?

7    A. Yes.

8    Q. In your full-time capacity?

9    A. Yes.

10    Q. You gave this to Laura?

11    A. Yes.

12    Q. Without reciting by memory what was on it, can

13    you describe for the jury, generally speaking, what the

14    subject of this memo was?

15    A. It was a list of my duties and tasks to work

16    on real estate files; who to contact, how to disburse

17    checks, and to go to the Recorder of Deeds when

18    necessary.

19    Q. When was it that you gave that memo to Laura;

20    do you recall?

21    A. No, I don't have the actual date, might have

22    been, like, the second day I was there.

23    Q. This is many March of 2003?

161

1    A.  Yes.

2    Q.  Did this memo -- did you type this memo on the

3  computer and reception area?

4    A.  Yes.

5    Q.  Did it till reside there when you got back

6  there in March of '03?

7    A.  Yes.

8    Q.  As far as you know, was that ever taken off

9  that computer during the time that you were there?

10    A.  No, if I was able to access it, it was still

11  there.

12    Q.  Did you have occasion to use that computer

13  when you came back part time?

14    A.  No, the only thing I was supposed to do was

15  just to type -- print that off for her.  I am only

16  there just to file.

17    Q.  Your file clerk duties did not require to you

18  use a computer or print anything out?

19    A.  No.

20    Q.  When you got back in March of 2003, and

21  started going into the files, were you -- did you

22  become aware of any signed but undisbursed checks?

23    A.  Yes.

162

1    Q.  What did you find?

2    A.  Several -- in that I believe refinance checks

3  or mortgage foreclosures.  I saw a couple of checks

4  that were old.  They should have been disbursed.

5    Q.  How old were they; do you recall?

6    A.  I don't recall, but I know that at that time

7  it was March and it was probably months, at least two

8  months.

9    Q.  Did you bring those checks to anybody's

10  attention?

11    A.  To Laura.

12    Q.  What did you tell Laura?

13    A.  Those needed to be disbursed or re-printed and

14  sent out.

15    Q.  Do you, in fact, know whether any of those

16  checks were disbursed of that --

17    A.  I do not know.

18    Q.  You said that you never saw Dan and Laura

19  together in the office after you began work there part

20  time.  Did you ever see Dan in the office after you

21  began working there part time?

22    A.  Yes, on the days when I would receive my

23  paycheck.

163

1    Q.  How often was that?

2    A.  Every other week.

3    Q.  And would you have any conversation with Dan

4  other than to collect your paycheck?

5    A.  Yes, about the hours that were listed on the

6  paycheck.

7    Q.  The checks that you have talked about having

8  found in files after returning to the office, did you

9  ever bring those to the attention of Dan?

10    A.  No, I just made Laura aware at that time.

11    MR. WENDELBURG:  May I have moment, please,

12  Your Honor.

13    (Discussion held off the record.)

14    MR. WENDELBURG:  No further questions at this

15  time Your Honor.

16  BY MR. LUGG:

17    Q.  Is there a 26.2 disclosure, Jencks?

18    MR. LUGG:  May I have a moment, Your Honor.

19    THE COURT:  Yes, you may.

20    (Discussion held off the record.)

21  BY MR. LUGG:

22    Q.  Hi there?

23    A.  Hi.

164

1    Q.  How are you?

2    A.  Fine, yourself?

3    Q.  I apologize for the delay.  We have never met

4  before, correct?

5    A.  Correct.

6    Q.  My name is Sean Lugg.  I have a couple

7  questions for you.

8      You said that you had conversations with the

9  defendant in his office about the paycheck.  You said

10  there was a discussion about hours.  What was that?

11    A.  Well, he wasn't sure if I was there the whole

12  entire three hours.  He just had a question about that

13  because it was from 6 to 9.

14    Q.  You did, in fact, go there from 6 to 9, did

15  you not?

16    A.  Yes.

17    Q.  You indicated that you left in '98 after the

18  seven-year stint as the real estate secretary?

19    A.  Yes.

20    Q.  You came back in March of 2003; is that right?

21    A.  Yes.

22    Q.  That is what you are telling us about certain

23  files that had checks in them; is that correct?

17

1          MR. WENDELBURG:  Defense calls Richard

2    Morris.

3          RICHARD V. MORRIS, JR.,

     having been first called by the Defense was sworn

4

5    on oath, was examined and testified as follows:

6          DIRECT EXAMINATION

7    BY MR. WENDELBURG:

8      Q.  Mr. Morris, please tell the jury your name and

9    your occupation?

10     A.  Richard V. Morris, Junior, mechanic for

11   Christiana School District.

12     Q.  How long have you work for Christiana?

13     A.  Since January of 2000.

14     Q.  What do you do for Christiana School District,

15   what sort of mechanic are you?

16     A.  A diesel mechanic.

17     Q.  Are you certified?

18     A.  No.

19     Q.  How long have you worked as a diesel mechanic?

20     A.  25 years.

21     Q.  What sort of training do you have? .

22     A.  Three years of Votech and two years after that

23   from an Exton Automotive Training Center.

18

1      Q.  How long have you gone to school?

2      A.  12th grade and two years after that.

3      Q.  Are you married?

4      A.  Yes.

5      Q.  Children?

6      A.  Yes.

7      Q.  Where do you live?

8      A.  406 Waterford Court in Hockessin.

9      Q.  How long have you lived there?

10     A.  Since January.

11     Q.  Before that where?

12     A.  Willow Run in 1610 Mongtomery Road.

13     Q.  How long were you there?

14     A.  18 and a half years.

15     Q.  Have you lived all your life in Delaware?

16     A.  Yes.

17     Q.  At one point were you self-employed?

18     A.  Yes.

       Q.  What was the nature of that employment?

       A.  Lawn service.

21     Q.  You still do that?

22     A.  Yes.

23     Q.  How long have you done it?

19

1      A.  Since 1988.

2      Q.  What is the name of business?

3      A.  A-1 Turf Management.

4      Q.  Is it a corporation?

5      A.  No.

6      Q.  Sole -- you own it yourself?

7      A.  Yes.

8      Q.  Describe for the jury the size of this A-1

9    lawn service?

10     A.  Now or when it was -- I did it full-time.

11     Q.  When you did it full-time?

12     A.  It was very large, I would say not fairly

13   large, I would say a medium grass company, about 70

14   accounts.  We dealt with higher end clientele.

15     Q.  How many people did you employ either as

16   employees or subcontractors?

17     A.  Subcontractors, 12 to 14 people.

18     Q.  Was this a seasonal business or year round?

19     A.  There were always something to do year round.

20     Q.  You said that at one point did you this

21   full-time; does that mean are you not doing it

22   full-time now?

23     A.  Yes.

20

1      Q.  When were you full-time?

2      A.  From 1994, '95, if I can recall, until 2000.

3      Q.  And what happened then in 2000?

4      A.  My daughter needed an operation.

5      Q.  Did you quit the lawn business?

6      A.  No, I just scaled it back to part time, and I

7    took a job with the State so that I could get the

8    insurance for my daughter.

9      Q.  Does A-1 Turf Management remain in the scaled

10   back mode?

11     A.  Yes.

12     Q.  Still operating?

13     A.  Yes.

14     Q.  In the course of operating A-1, did you have

15   occasion to meet Dan Anker?

16     A.  Yes.

17     Q.  Tell us how that came about?

18     A.  He had one of my men on -- we do Shadow Lane a

19   few accounts on his road.  He asked one of them to give

20   him a bid.  They did, and he accepted it.

21     Q.  What was the bid for?

22     A.  Cutting grass.

23     Q.  Anything else?

21

1    A.  Mulch, trim, weeding the beds.  It eventually
2  worked into more work.
3    Q.  What sort of a contract, is this an annual
   thing, a weekly thing, what was asked for?
5    A.  Weekly cuttings, mulching as needed and
6  weeding as needed.
7    Q.  Did you prepare a proposal for Mr. Anker?
8    A.  No, I did not, just verbal.
9    Q.  Did you talk to him directly to give him this
10  verbal proposal?
11    A.  No, I did not, my man did.
12    Q.  Do you know who they talked to?
13    A.  I believe it was to Mr. Anker.
14    Q.  At some point did you make personal contact
15  with Mr. Anker?
16    A.  Yes, I did.
17    Q.  Tell us how that came about?
18    A.  I had eventually took over the account because
19  the one guy left us, and I had spoken to him a few
20  times outside of the house.
21    Q.  Spoken to Dan?
22    A.  Yes.
23    Q.  Can you tell us what time frame we are talking

22

1  about here?
2    A.  I would say 2000, between 2001 and 2002, best
3  of my knowledge.
4    Q.  Did you come to know Mr. Anker in the course
5  of working for him?
6    A.  Yes, I did.
7    Q.  How often did you see him?
8    A.  Towards the end, maybe one a week.
9    Q.  At the beginning when you -- after you first
10  met Mr. Anker himself, did you start doing the work on
11  his property yourself?
12    A.  Yes.
13    Q.  How often were you there?
14    A.  Once a week.
15    Q.  Did you see him on these occasions?
16    A.  Occasionally.
17    Q.  As many as half the time?
18    A.  Yeah, I would say that.
    Q.  Can you describe the relationship that you had
   with Mr. Anker, it was strictly professional, did you
21  also come to personal terms with him?
22    A.  I believe that we became on personal terms.
23    Q.  How long had you been working for him when you

23

1  became on personal terms, as well?
2    A.  Year and a half, two years, to the best of my
3  knowledge.
4    Q.  Did you have conversations with Mr. Anker
5  during this period of time which had to do with things
6  other than cutting and mulching his property?
7    A.  Sure.
8    Q.  What did you talk about?
9    A.  He liked to shoot sporting clays, and he
10  had -- I like to hunt.  He liked to Hunt, and we struck
11  up a few conversations over there.
12    Q.  Did you talk about other personal things in
13  addition to hunting and shooting?
14    A.  Yeah.
15    Q.  What sorts of things?
16    A.  His family and my family, and we found out
17  later that he knew my brother.  He did work for my
18  brother and his tow truck business.
19    Q.  Did you come to know Mrs. Anker, Ann, during
20  this periods of time?
21    A.  Yes.
22    Q.  Was she at the house when you would go to cut
23  and mulch then?

24

1    A.  On occasion.
2    Q.  Did you become friends with her?
3    A.  Yeah, after awhile I would say, yes.
4    Q.  Did you come to know Dan's daughter, Laura
5  Anker?
6    A.  Yes.
7    Q.  Also known as Laura Larks?
8    A.  How did that come about, I used to call to the
9  office to get billing in and stuff like that to them,
10  and Laura and I would strike up conversations.  We just
11  hit it off.
12    Q.  Did you ever meet her in person during this
13  period of time?
14    A.  Yes.
15    Q.  How did that happen.
16    A.  She was up to the house one time.
17    Q.  Which house?
18    A.  Mr. Anker's.
19    Q.  Can you recall approximately when that was?
20    A.  To the best of my knowledge, it would have
21  been, I think it was the spring of 2003.
22    Q.  Prior to meeting her in person at Dan and
23  Ann's house, how many conversations had you had with

25

1 Laura?
2     A. Several.
3     Q. And these were telephone conversations?
4     A. Yes.
5     Q. And as far as you know, she was at the office
6 because that is where you called?
7     A. Yes.
8     Q. Did you discuss personal things, as well as
9 business things in any of those?
10    A. Yes.
11    Q. Can you tell the jury what sort of things you
12 discussed?
13    A. We talked about kids. We talked about her
14 home. We talked about my home. We talked about money.
15 We talked about salaries, all kinds of stuff.
16    Q. So by the time you finally met Ms. Larks or
17 Ms. Anker at Dan and Ann's home, those conversations
18 had already taken place?
19    A. Yeah, a few of them.
20    Q. Now, after you met Ms. Larks, did you continue
21 to have telephone conversations with her after that?
22    A. Yes.
23    Q. What was the nature of those telephone

26

1 conversations, just the general subject matter?
2     A. Pretty much the same thing and pretty much the
3 same.
4     Q. Did you become friendly with Laura Larks
5 during this period of time?
6     A. Yes, I would believe we were friends.
7     Q. Mr. Morris, as you know, we are here because
8 Dan Anker is on trial for theft. I would like to ask
9 you if you had a conversation with Laura Larks in
10 April, early April of the year 2003 in which she
11 expressed any opinion regarding her -- any attitude
12 towards her father, Dan?
13    A. Yes.
14    Q. Can you describe for the jury what happened in
15 that telephone conversation; first who made it?
16    A. I called her.
17    Q. Where was she? Where did you call?
18    A. I called the office. I was calling for Mr.
Anker and he wasn't in.
    Q. Okay.
21    A. Laura and I got to talking. She -- her and I
22 got to talking about kids and stuff, and we talked
23 about -- she said her dad wasn't in. She said she was

27

1 kind of like Po'd at him, and she was pissed.
2     Q. Without going into any family history that you
3 may have heard about with respect to Laura and Dan, did
4 Ms. Larks express to you during that early April
5 telephone conversation her attitude towards her father,
6 don't go into any factual background. Did she tell you
7 how she felt at that time?
8     A. She said he was a son of a bitch.
9     Q. Was that her term?
10    A. Yes, he was a bitch to work for. I asked her,
11 why stay. She said, the money was good.
12    Q. How long did this phone conversation take?
13    A. 20 minutes, best of my knowledge.
14    Q. Can you describe Ms. Lark's tone of voice when
15 she was describing her father this way?
16    A. She was angry.
17    Q. How could you tell?
18    A. Just by the way she said it. If I, you know,
19 how -- I don't know if -- you get angry are you angry,
20 you can tell. She kind of raised her voice a little
21 bit.
22    Q. You have said the whole conversation took
23 about 20 minutes. If you can recall, the point time

28

1 during the conversation when she was expressing the
2 attitude toward her father, how long did that go on
3 for?
4     A. Half the conversation.
5     Q. Now, I want to take you up to late April,
6 2003. Did you have any conversation with Ms. Larks
7 regarding finances, her involvement with finances,
8 money at the Anker law office. Did you have any such
9 conversation with Ms. Larks in late April 2003?
10    A. Yes, I did.
11    Q. Again, let's go true how this conversation
12 took place. Was this an in-person conversation or
13 phone conversation?
14    A. Phone conversation.
15    Q. Do you remember who placed the call?
16    A. I placed the call again.
17    Q. Was it that you called to?
18    A. I called the office.
19    Q. Did Ms. Larks answer the phone?
20    A. Yes.
21    Q. What was the purpose for your call that day?
22    A. Same thing, billing.
23    Q. Did you have a conversation with Ms. Larks

A-138

29

1 about billing?

2    A. Yes, I did.

3    Q. In the course of that conversation, did Ms.

4 Larks express to you any facts about money at the Anker

5 office?

6    A. She said she borrowed some money from her dad.

7    Q. Can you tell the jury what she said?

8    A. She borrows of money, she did not tell her

9 dad, that he did not know. She asked me not to tell

10 him.

11    Q. How did this topic come up?

12    A. She just told me.

13    Q. Did you ask her about it first?

14    A. No.

15    Q. Did you ask her whether she had taken money

16 from the account, office account?

17    A. I did not ask her if she took it.

18    Q. Did she tell you how much money was involved

19 in this borrow?

20    A. No, I did not ask.

21    Q. How long did that portion of the conversation

22 take?

23    A. 15, 20 minutes.

30

1    Q. Can you describe her demeanor during -- tone

2 of voice during that portion of the conversation?

3    A. A little excited.

4    Q. Now, with respect to telling her dad or not

5 telling her dad, can you tell the jury exactly to the

6 best of your recollection what she said to you about

7 that?

8    A. She asked me not to tell her dad.

9    Q. Did she tell you why?

10    A. She did not say.

11    Q. In late July of 2003, Dan Anker's practice was

12 shut down. Do you recall that event?

13    A. Yes.

14    Q. Did you have any conversation with Ms. Larks

15 after the shutdown of the office regarding the reason

16 or cause for that shutdown?

17    A. Yes, I did.

18    Q. Can you tell the jury how that conversation

19 came about?

20    A. I called Ms. Lark at her home.

21    Q. You had her home phone number?

22    A. Yes.

23    Q. Had you had previous telephone conversations

31

1 with her at her home before this?

2    A. No, she gave me the number because she wanted

3 to have me out to do some work prior to this going

4 down.

5    Q. Can you give the jury as idea as to when this

6 last conversation took place?

7    A. Excuse me?

8    Q. When did this phone conversation with her at

9 her home take place?

10    A. To the best of my knowledge the end of July,

11 maybe August, beginning of August.

12    Q. At the time of that conversation did you know

13 that Dan's office had been shut down?

14    A. Yes.

15    Q. Did you discuss this with Laura?

16    A. Discuss the office being closed down?

17    Q. Yes.

18    A. I called her.

19    Q. You told her?

20    A. No, I called her.

21    Q. Sorry, you called her?

22    A. And I told her, I said, you know, of course

23 hearing the first conversation, having the first

32

1 conversation with her about her taking this money, I

2 put 2 and 2 together. I called her at home and told

3 her I said, what's going on? She said I fucked up.

4    Q. That was her words?

5    A. That was her words.

6    Q. What happened in the conversation after that?

7    A. She said she was going to go in. I said go

8 in, they won't just tell them. Just go in and tell

9 them. They won't -- that way get it done and over

10 with. She said she was going to.

11    Q. When you said go in, did she elaborate to you

12 as to what go in meant, where was she going?

13    A. I told her to go in and see the prosecutor.

14 She said she was doing that.

15    Q. How long did that portion of the conversation

16 take?

17    A. She did not stay on the phone long; maybe ten,

18 15 minutes.

19    Q. Did you describe her demeanor during that

20 conversation?

21    A. It -- scared.

22    Q. She seemed scared to you?

23    A. Yes.

81

1    What it is is you take a settlement HUD-1 settlement

2    sheet which had a lot of line item numbers, it pulls

3    them all together simply lists it as money in and money

4    out and to whom. Money in equals money going out.

5    That is for that each particular account. So I think

6    she would look at those and also look at the accounts

7    in general so that each the account had to balance, but

8    each part of the account also had to balance.

9        Q. So Ms. Nestor was asked to look at recaps or

10   the descriptions of the expenditures, and the receipts,

11   as well as the general office books?

12       A. Sorry, expenditures for what?

13       Q. For each individual settlement, real estate

14   settlement?

15       A. I think that she looked at them because they

16   had, I think had check numbers opposite them and it was

17   a way to just match up that with the carbons of the

18   checks and the bank statements.

19       Q. How long was Chandler Land employed by your

20   office?

21       A. From 1994 or '95, to the end of '99 or 2000.

22   I don't recall the end date.

23       Q. Where did Mr. Land go after your office?

82

1        A. He went to Rick Wooden's office.

2        Q. At the time Mr. Land left your employment, was

3    there anyone besides you and Mr. Land employed by the

4    law office of Dan Anker?

5        A. Yes.

6        Q. Who?

7        A. Laura Anker at the time, and I think Nicole

8    may have still been there, Nicole Alexander.

9        Q. Do you recall how long after Mr. Lands left

10   that Nicole Alexander left?

11       A. No, it was probably less than a year, more

12   than three months. I just don't recall.

13       Q. After Nicole Alexander left was she replaced

14   by anybody?

15       A. Laura was there when Nicole left. They gave

16   plenty of notice and Laura initially had started as an

17   assistant filing and helping Nicole and things like

18   that, and when Nicole left Laura kind of merged into

19   that position.

20       Q. So you went from two employees being Nicole

21   and Laura, to one employee, that being Laura?

22       A. Yes.

23       Q. Laura is your daughter. What year was she

83

1    born?

2        A. 1981.

3        Q. She was a child of your first marriage; is

4    that correct?

5        A. Yes, my first born.

6        Q. Your first wife's name was what?

7        A. Patricia.

8        Q. Known as Patty?

9        A. Yes.

10       Q. When are were you and Patty married?

11       A. 1979 or 1980.

12       Q. How many children do you and Patty have

13   together?

14       A. Three.

15       Q. Your marriage to Patty came to an end?

16       A. Yes.

17       Q. What year was that?

18       A. I think 1987 or 1988.

19       Q. That was the year you graduated from the law

20   school?

21       A. Yes.

22       Q. How old was Laura at that point?

23       A. She was probably seven.

84

1        Q. At the time of breakup of your marriage with

2    Patty, was it you who left the marital home?

3        A. Yes.

4        Q. And was Laura living in marital home at that

5    time?

6        A. Yes.

7        Q. By that time you had three children; is that

8    correct?

9        A. Yes.

10       Q. And this was Laura and two younger girls?

11       A. Yes.

12       Q. Were all girls living in the marital home at

13   the time you moved out?

14       A. Yes.

15       Q. Describe the general atmosphere?

16          MR. LUGG: Your Honor, I am going to object as

17   to relevance.

18          THE COURT: Why don't you see if you can

19   rephrase it to a particular person.

20   BY MR. WENDELBURG:

21       Q. Can you describe for us the reaction that your

22   daughter Laura had to you leaving the home?

23       A. It was devastating.

85

1    Q.  Describe it, please?

2    A.  She cried, she broke down, she cried

3    uncontrollably.  She begged me to stay.  She said she

    would do whatever -- she did not want it to happen, it

5    was clear.  And she -- it was a very, very -- it's

6    very, very difficult time for her and the other two,

7    obviously, were younger, and did not understand but

8    Laura was deeply affected and so was I.

9    Q.  How do you know that Laura was deeply

10   affected?

11   A.  I could tell by the way she reacted it was

12   absolutely devastating.  My impression was that from

13   her, it came out of the blue.

14   Q.  Who told her about this?

15   A.  Her mother and I in her bedroom along with her

16   two sisters.

17   Q.  Do you have a recollection of having that

18   conversation?

19   A.  Absolutely.

20   Q.  How long after that did you leave the marital

21   home?

22   A.  Probably within a day or two.

23   Q.  Did you continue to have contact with Laura

86

1    after that?

2    A.  Yes.

3    Q.  You answered yes?

4    A.  Yes, I did.

5    Q.  What sort of contact did you have?

6    A.  Well, initially in working through the

7    unpleasantries of a divorce there is --

8        MR. LUGG:  If I can ask the witness to answer

9    the question.

10       THE COURT:  Just be specific.  Wait.

11       THE WITNESS:  I saw her periodically.  I

12   endeavored to see her whenever I could.  My general

13   recollection was once during the week and every other

14   weekend.

15   BY MR. WENDELBURG:

16   Q.  What was the nature of your relationship with

17   her during this period of time?

18   A.  It was difficult immediately afterward.  It

    was difficult for some period of time.

     Q.  How long was that period of time?

21   A.  You know, I just don't know.  You know, for

22   until the tempest calmed down, then it calmed down

23   things seemed to take a more normal routine with

87

1    respect to that visitation schedule.

2    Q.  How would visitations take place?

3    A.  I would pick them up at their mother's house.

4    Q.  All three girls?

5    A.  Yes.

6    Q.  What would you do?

7    A.  Well --

8        MR. LUGG:  Objection, relevance.

9        MR. WENDELBURG:  Move on.  Sustained.

10   BY MR. WENDELBURG:

11   Q.  Your relationship with Laura, did it change

12   over the years?

13   A.  Yes.

14   Q.  How so?

15   A.  She stopped wanting to come to be with me.

16   Q.  You left when she was seven.  How old is she

17   now that you noticed this change?

18   A.  It was probably in 19 -- by 1989, early 1990.

19   Q.  A year or two older she was than when you

20   left?

21   A.  Yes.

22   Q.  And how is it that she would express this

23   unwillingness to come?

88

1    A.  Initially it was -- she had other things to do

2    and it reached a point where she simply said I don't

3    want to be with you.

4    Q.  When you heard I don't want to be with you,

5    was this over the telephone or in person; how would it

6    be expressed to you by her?

7    A.  Well, well, it for a while.  I simply thought

8    there were other plans as which is typical for children

9    but it became so -- a pattern.  So I simply asked her

10   when I was picking up the other two, she just said --

11       MR. LUGG:  Objection, Your Honor.  Hearsay.

12       THE COURT:  Describe the attitude and

13   relationship that is what he is trying to.

14       THE WITNESS:  Attitude became disinterested, I

15   guess, at that point.

16   BY MR. WENDELBURG:

17   Q.  Did that --

18   A.  Don't want to be with you sort of attitude.

19   Q.  Did that attitude change?

20   A.  No.

21   Q.  At some point, however, she came to work for

22   you?

23   A.  Correct.

89

1    Q.  Under what circumstances did that occur?

2    A.  I had not actually seen Laura from around that

3  point in time until years later, in the late 1990s. My

   recollection is I received a note from her, that and it

5  was my impression that she wanted to meet with me, and

6  a meeting was arranged and that was -- I am afraid I

7  don't want to elaborate because I have been cautioned

8  about that already.  There were other contacts during

9  that period.

10    Q.  You have described a long period of time of no

11  contact; is that correct?

12    A.  Personal contact.  Yes.

13    Q.  Without telling the substance of any of these

14  was there a third party contact, were you dealing

15  through intermediaries?

16    A.  Yes.

17    Q.  How long was that period of no direct contact?

18    A.  From the early '90s, all way up until I got

19  that note from her, which I found it in the mailbox.

20    Q.  Did you make any attempt to contact her during

21  this period of time?

22    A.  Not personally, no.

23    Q.  How was the note delivered to you?

90

1    A.  It was stuck in the mailbox.  It was brought

2  in by someone, it was given to me.

3    Q.  This is at your home?

4    A.  Yes, on Shadow Lane.

5    Q.  As a result of receiving that note from Laura

6  what, if anything, did you do?

7    A.  I contacted her.

8    Q.  Were you able to reach her by telephone or

9  some other way?

10    A.  I think it was phone.

11    Q.  What was the nature of your contact at that

12  time?

13    A.  I acknowledged getting the letter.  I told her

14  -- we spoke for a fair amount of time.  I told her that

15  I would preferred, given our history, would be best to

16  simply to meet and to go over these things face to

17  face.

18    Q.  Did she agree to that meeting?

     A.  Yes.

     Q.  Did you have it?

21    A.  Yes.

22    Q.  Tell us about the meeting?

23    A.  Well, it wasn't an event, it was a continuum.

91

1  We spoke about a lot of different things.  Her

2  hostilities, her confusion, questions that she had,

3  other issues in general that come up between an

4  estranged daughter and her father.

5    Q.  Were any of those hostilities directed to you?

6    A.  Yes.

7    Q.  What were they?

8    A.  Well, we had -- this had all been the subject

9  of prior meetings through intermediaries, but Laura was

10  either at or near being an adult.  She was well through

11  high school, I had was aware she was doing well in

12  school, and I believe that she was at a point where she

13  wanted and expected to get answers that she had at that

14  time.

15    Q.  You mentioned the term hostility; in what way

16  did she express hostility to you?

17    A.  Abandoning her mother, walking out on her

18  mother, walking out on them.  During that time my

19  present wife and I had four children, three more girls

20  and a boy.  There was hostility about disparate

21  treatment between both sets of children, and topics

22  such as that, and I guess things that people hear and

23  they need to get an explanation for them.

92

1    Q.  Did you give her any of those explanations?

2    A.  I did then.

3    Q.  How long had it been since you had any such

4  conversations with Laura?

5    A.  Personally, not through any other -- that was

6  probably the first time I had ever.

7    Q.  How did she react to the explanations you

8  gave?

9    A.  She cried.  It was very emotional, it was very

10  candid, it was she asked why I hadn't told her before.

11  Is that seems to be yet another issue, as why wasn't

12  she told previously --

13        MR. LUGG:  Your Honor, may we approach.

14        THE COURT:  Yes.

15        (Discussion held off the record.)

16        (The following sidebar conference was held.)

17        MR. LUGG:  Your Honor, I object to the

18  relevance of these questions and testimony that's been

19  offered.  The scope of admissibility is state of mind

20  is it was offered but direct communications, contacts,

21  so forth I think fall well beyond state of mind.

22        MR. WENDELBURG:  I think direct communications

23  show exactly what the state of mind were, Your Honor,

93

1  with respect to both of these co-defendants.
2      THE COURT: If you can, for purpose of state
3  of mind get into bloody details.
4      MR. LUGG: Second part of that is we have
5  discussed pertinent time frames throughout this trial.
6  We are, as far as can I gather, somewhere in the mid
7  '90s at this point.
8      THE COURT: I was -- assumption was at
9  sometime he was going to explore --
10      MR. WENDELBURG: She came back.
11      THE COURT: She was replaying whatever her
12  name is, she was trying to get a job in the law firm.
13      MR. WENDELBURG: I think we are a few months
14  away from her being hired.
15      MR. LUGG: The reason I mention this, there
16  was a mention of intermediary contact which opens a
17  wide range. I think once we are getting into the law
18  firm getting close in time, I ask it be limited.
19      THE COURT: Focus it. I took it was close in
20  time when she more or less reconciled.
21      MR. WENDELBURG: That is where we are.
22      (Sidebar conference concluded.)
23  BY MR. WENDELBURG:

94

1      Q. Can you put a time frame for this meeting,
2  this encounter between you and Laura; when did it
3  happen?
4      A. This personal encounter between she and myself
5  would have been in the late '90s, I suppose would have
6  been the context of it.
7      Q. Okay. At some point --
8      After you had this conversation with Laura,
9  did you offer her a job in your office?
10      A. Not immediately. I did at some point.
11      Q. Tell us what steps you took with respect to
12  her after having this conversation with her?
13      A. What steps I did for what?
14      Q. After you had this conversation with her when
15  you had a direct exchange of feelings, what, if
16  anything, did you do with respect to her?
17      A. I encouraged her to finish high school, she
18  had dropped out, of AI, I believe in her junior or
19  possibly senior year. I am not sure.
20      Q. What other steps, if any, did you take with
21  Laura?
22      A. I am pausing because I am simply trying to
23  figure out how to answer that as tightly as possible.

95

1  I did a lot of things. I encouraged her to go back to
2  school. I encouraged her to find a place to live that
3  was her own. I encouraged her to get a job, most
4  important thing at that time was to finish high school
5  which she did through either the James Groves High
6  School high school program, or G.E.D. not sure which.
7  I believe Laura told me it was evening high school
8  diploma degree. She did do that. At some point along
9  in there Laura became pregnant, which then led me,
10  again, it became acute that she needed a stable
11  environment and to continue to do what she could do get
12  a job.
13      Later time frames are all of a blur with
14  Laura, because so many things had happened that I had
15  learned about them. Anyhow, at some point, she worked
16  as a maitre'd at a restaurant and maybe one or two
17  different ones. She then -- I gave her a job as an
18  assistant to Nicole or to the office in general.
19      Q. When was that?
20      A. In the late '90s into 2000 it started, I think
21  in the late 1990s and then obviously it's involved from
22  there to where we are today.
23      Q. In the first month that she worked in your

96

1  office, what did she do?
2      A. She took out trash, washed windows, she filed,
3  she mailed letters, typed letters, she ran errands,
4  that sort of clerical assistant sort of a job function.
5  The goal was to help her develop some responsibility
6  with having a few jobs, doing duties whether she liked
7  them or not and also to continue to learn and develop
8  personally.
9      Q. How did you pay her?
10      A. How much?
11      Q. Was she salaried or hourly?
12      A. At the beginning I think it was probably
13  hourly. I am sure it was.
14      Q. Did that later evolve into a different form of
15  payment?
16      A. It evolved, yes, into a salary, basically, not
17  basically, it did.
18      Q. There is a period of time in which Laura's
19  employment with your office overlapped Nicole's
20  employment with your office?
21      A. Yes.
22      Q. You estimate that as a few months to a year?
23      A. Yes.

97

1    Q.   Not more than a year, not less than a few
2    months; during that period of time was there any
3    training set up for Laura?
4        A.   Yes.
5        Q.   What was that?
6        A.   She would -- she primarily was Nicole's
7    assistant to Nicole would have her do some of the leg
8    work that was involved with putting together real
9    estate transactions, making phone calls to a surveyor,
10   making calls to a title company, writing them down when
11   they were done, and when we could expect what the
12   response if it was a survey that had got received, if
13   it was a search that had got received, what to do with
14   them after that.
15       Q.   Nicole testified here earlier she had
16   considerable experience in doing real estate
17   transactions as a paralegal?
18       A.   Yes.
19       Q.   At that time she worked for you, was she
20   capable of handling the entire real estate paralegal's
21   function in your firm?
22       A.   Not initially.  I trained her.
23       Q.   By the time she left?

98

1        A.   Yes.
2        Q.   By the time she was training Laura?
3        A.   Yes.
4        Q.   Was there any expectations on your part as to
5    how far Laura's training would go?
6        A.   Yes, it would go to the extent she could
7    handle the file management for real estate and some of
8    the other related cases.  There was a lot of collection
9    work, which is pretty routine, similar to what -- to
10   the routine matters that happen before real estate
11   settlements that staff usually do.  And there were
12   other routine sort of things, Bankruptcy, for instance,
13   filing a lift stay motion.  At that point I was
14   representing some banks in foreclosure work, when
15   people went into Bankruptcy, and their mortgage wasn't
16   paid there is a procedure to follow to allow the
17   mortgage company to realize on its collateral.
18       Q.   In other words, to continue it's foreclosure?
19       A.   Or to work out a deal, with a deal meaning a
20   repayment plan with the debtor in Bankruptcy.
21       Q.   It was the sort of thing that Laura was being
22   trained to do?
23       A.   Yes, over -- there wasn't a session called

99

1    this month we are doing re-closing duties for real
2    estate, but as they came in, and I worked on them or
3    Chandler worked on them, or Nicole worked on them, we
4    tried to assimilate Laura into the process initially
5    with the goal of explaining what we are doing, as
6    opposed -- what those papers meant with the hope she
7    would -- knowing how the puzzle fit together, she would
8    become more self sufficient.
9        Q.   Did the training appear to you to be
10   successful as it was going on?
11       A.   Yes.
12       Q.   How so?
13       A.   Laura is a bright young lady.  She got to the
14   point where we are doing settlements, while Nicole was
15   still there, while Chandler was still there, where
16   files were worked up, in a completely acceptable manner
17   that the post closing file work was done and dispensed
18   and in a completely acceptable manner.  And with that
19   supervision I came to realize through my direct
20   observation, through Nicole's observations, and my
21   other observations she was a quick learner and was
22   doing a good job.
23       Q.   Was there a period of time when Laura, Nicole

100

1    and Chandler Land were all working in your office at
2    the same time?
3        A.   Yes.
4        Q.   How long a period was that?
5        A.   I think Chandler stayed longer than Nicole.
6    He may have been there through 2000.  Nicole left
7    before then, and I can't really narrow to down much
8    more closely than '99, 2000 somewhere in there.
9        Q.   Was Laura given any instruction in keeping the
10   books for the office?
11       A.   Yes.
12       Q.   What was that?
13       A.   Instructions were to -- well, we had Quick
14   Books, Quick Books is a software program that you keep
15   track of all expenses in the income for the firm.  It
16   is also an -- I believe it handles the escrow accounts
17   and the operating account.  So that again, with respect
18   to the escrow account, it could keep track of Dan
19   Anker's closing, and everyone else's closing as these
20   individual transactions, plus globally to make sure
21   that everything balanced out also.  That is how I
22   understood it.
23       Q.   Did you operate this program yourself?

101

1    A.   No.

2    Q.   Did you know how to?

3    A.   No.

4    Q.   Can you describe yourself the extent of your

5    familiarity with computers hardware and software when

6    Laura was hired by you?

7    A.   I virtually had none. I had none. I didn't

8    have a computer at that point.

9    Q.   There was none in the office?

10    A.   I sure was there. I know there was --

11    there was a monitor and the computer, and floppy discs

12    and Nicole and Chandler they worked on those. I didn't

13    have one in my office.

14    Q.   Do you know whether Nicole's and Chandler's

15    computers were networked?

16    A.   I don't think they were then, in fact, I don't

17    think any of them were ever networked at any point.

18    Q.   Did you ever take any specialized training in

19    the operation of computers?

20    A.   Taken no training in computers.

21    Q.   To this day?

22    A.   No formal training, no.

23    Q.   Did you have e-mail in your office when Laura

102

1    arrived there -- I don't mean your office personally, I

2    mean the law office; was there an Internet connection.

3    A.   I don't honestly know. I guess.

4    Q.   Don't guess. Let's go back to the Quick Books

5    software. To your knowledge, what training, if any,

6    did Laura receive on how to work Quick Books?

7    A.   My understanding was that Ms. Nestor, I think

8    she recommended it at some juncture, and she may have

9    actually helped Laura put it in. I think Chandler may

10    have also helped her installing it. And I could see a

11    little icon on it, I think on the computer on the

12    computer screen when you turned it on.

13    Q.   Was the extent of your knowledge of how Quick

14    Books worked?

15    A.   I knew how it was supposed to work. I think

16    at the time that lawyers converted from manual systems

17    to this system because it was reliable.

18    Q.   When you say that you think that both Nestor

19    and Chandler may have helped Laura set that up, do you

20    know what training, if any, she was given in how to

21    operate this system?

22    A.   The only training she would have had I.

23    Imagine --

103

1         MR. LUGG:  If the witness can testify what he

2    knows.

3         THE COURT:  You have to be from a personal

4    knowledge, if you personally know. It is not what you

5    heard from others. What you personally know.

6         THE WITNESS:  I can say from personal

7    knowledge, that Chandler and Nicole and Beth Nestor

8    assisted Laura installing that program.

9    BY MR. WENDELBURG:

10    Q.   Did you ever watch Laura operate that program?

11    A.   Quick Books?

12    Q.   Yes.

13    A.   I would see things on the screen from time to

14    time that she said was Quick Books.

15    Q.   Did you see her actually making entries?

16    A.   Yes.

17    Q.   Or performing functions?

18    A.   Yes.

19    Q.   With what you perceived to be Quick Books?

20    A.   What I thought was Quick Books.

21    Q.   Were you ever given any documents generated by

22    Quick Books by Laura?

23    A.   I don't know.

104

1         MR. WENDELBURG:  May we approach regarding

2    scheduling?

3         THE COURT:  Yes.

4         (Discussion held off the record.)

5         THE COURT:  We will take a lunch break.

6         (Jury left the courtroom at 1:05 p.m.)

7         MR. LUGG:  I think an instruction needs to be

8    issued explaining the absence of Laura Larks. She is a

9    witness we heard about.

10         THE COURT:  Absence, yes.

11         MR. LUGG:  I can forward that to the Court.

12         THE COURT:  It is all his fault. If you can

13    do that share that with anything else you can think of

14    that's -- I would say other than standard just do it.

15    We will have a prayer conference, maybe we can go to

16    the jury tomorrow.

17         MR. LUGG:  That was our hope jointly.

18         THE COURT:  I am not going to be against that.

19         MR. WENDELBURG:  Do you prefer to charge

20    before or after?

21         THE COURT:  I will leave that up to the

22    lawyers. We can do it either way. Some lawyers say

23    well, they -- what they would like to do is get the

109

1  the relevant period of time?

2      A.  No.

3      Q.  You and your wife had personal checking
accounts with Wilmington Trust and PNC; is that

5  correct?

6      A.  Correct.

7      Q.  Were those both joint accounts?

8      A.  I believe so.  Yes.

9      Q.  Who were authorized signatories on the

10 operating and escrow office accounts?

11     A.  Me.

12     Q.  Anybody else?

13     A.  No.

14     Q.  Was Laura given permission by you to sign your

15 name to checks either operating or escrow?

16     A.  Of course not.

17     Q.  Given permission to sign your name to

18 operating or escrow checks even if she put your

19 initials next to her signature?

20     A.  No.

21     Q.  With respect to your personal accounts --

22 start with the Wilmington Trust account.  Was any

23 information regarding your personal accounts kept in

110

1  the office?

2      A.  Probably.

3      Q.  And what was that information?

4      A.  Probably the checkbook and the register, and,

5  perhaps, a statement or two.

6      Q.  How about deposit slips?

7      A.  I think they are in part of checkbook.

8      Q.  With respect to the PNC account, were was any

9  documentation regarding that account kept in the

10 office?

11     A.  Probably the same, although the PNC, I think

12 predated the Wilmington Trust in time.  That goes back

13 a ways.

14     Q.  So it was an older account?

15     A.  Believe so, yeah.

16     Q.  Was it at any point closed or deactivated,

17 terminated?

18     A.  Yes.

19     Q.  When was that?

20     A.  I don't recall, Mr. Wendelburg, 2002?  I just

21 don't know.

22     Q.  Was that before or after the office was

23 closed?

111

1      A.  Would have been before.

2      Q.  Okay.

3          Going back to e-mail after your internet

4  access to your personal computer was stopped, did you

5  then have any other way of accessing e-mail, or sending

6  or receiving e-mail communications?

7      A.  No.

8      Q.  Was there any other way of sending or

9  receiving e-mail communications from the office as a

10 whole after that?

11     A.  Well, I suppose e-mails could have been sent

12 from Laura's computer.

13     Q.  To your knowledge, did Laura send or receive

14 e-mails from her computer after yours went down?

15     A.  Yes.

16     Q.  How frequent an occurrence was that, by your

17 personal observation?

18     A.  You know it was a lot.  There would be

19 situations where I would say contact so and so, contact

20 this person, whatever, and she would tell me she would

21 e-mail them.

22     Q.  Okay.

23          And did you ever -- do you know if she -- did

112

1  she ever tell you that she received e-mails on her

2  computer after yours went down?

3      A.  Sure.

4      Q.  After your e-mail access ended, did you use

5  Laura as your conduit for e-mail?

6      A.  Yes.

7      Q.  How did that work?

8      A.  She would bring e-mails to me, if they

9  required a response I would either dictate it to her or

10 write it down and ask her to reply to it.

11     Q.  Did she acknowledge to you that she was

12 sending the replies that you dictated to her?

13     A.  I had no reason she wouldn't do it.

14     Q.  How frequently did you use this method of

15 communication through essentially e-mail, intermediary

16 being Laura?

17     A.  In 2003?

18     Q.  Yes.

19     A.  Well, Mr. Wendelburg, the best I can tell you

20 whenever I got one, it was printed and given to me.

21 Whenever I needed to respond to one, I told her to

22 respond and told her what to say but, you know, I can't

23 put a number on it.  It was, you know, more than a few

113

1  and less than a gazillion. I just don't know.

2     Q. Did you ever use Laura's computer yourself to

3  send or receive e-mail?

4     A. No.

5     Q. Did you ever use Laura's computer yourself for

6  any purpose?

7     A. No.

8     Q. In the first half of 2003, let's start from

9  the beginning of the year up to the end of July of

10 2003, what was the extent of your expertise with

11 respect to creating word processing documents on a

12 computer?

13    A. Zero.

14    Q. Had you ever done it?

15    A. No.

16    Q. Down how to open a word processing file?

17    A. No.

18    Q. Do you know how to open a word processing

19 program?

20    A. No.

21    Q. Do you know what the word processing program

22 was that was used in your office?

23    A. I know now, I think.

114

1     Q. Did you know before the end of July 2003?

2     A. No.

3     Q. Did you know with a word processing program

4  was before the end of July 2003?

5     A. I knew what word processing meant it, was a

6  method or program to process documents, letters.

7     Q. Did you ever type a letter on your computer in

8  your own office?

9     A. No.

10    Q. Did you ever type a letter on Laura's

11 computer?

12    A. No.

13    Q. Was there a third computer, did Chandler have

14 a computer?

15    A. Yes, and that was in the back room, but I

16 think that was one that had found its way to the

17 computer graveyard because it was supposedly obsolete.

18    Q. In the first half of 2002, until the office

19 was closed, was this computer in operation, plugged in,

20 functioning?

21    A. During 2002?

22    Q. 2003?

23    A. I don't know. My guess is no.

115

1     Q. How about 2002?

2     A. I don't think so.

3     Q. Did that computer cease to be used when

4  Chandler left the office?

5     A. I think so.

6     Q. After Chandler and Nicole left the office,

7  both left your employ, the only remaining employee was

8  Laura, can you give the jury an overview on how the

9  process of doing a real estate settlement worked,

10 acquisition or refinance, what was Laura's role?

11    A. Laura's role with respect to real estate

12 transaction that involved a conveyance of Title would

13 be to -- the client would call, we would ask them to

14 send in the contract. That would have us open the

15 file. Nothing really happened at that point until the

16 client advised us there was a commitment letter from a

17 mortgage company agreeing to loan the money.

18       That triggered the Title search, getting a

19 survey, getting mortgage payoffs preparing the deed,

20 coordinating with the realtors, making sure the keys

21 were available, if it was new construction, making sure

22 that a certificate of occupancy would be available by

23 the time of closing so that the buyer could occupy the

116

1  property. Warranties, again, with new construction,

2  homeowner warranties. Basically, in gathering that

3  information it would be put on a settlement sheet,

4  which was a work in progress usually all the way up

5  until we got the final instructions from the mortgage

6  company and those, when I say that I mean it would say

7  the amount of the loan, if the buyer had paid an

8  application fee, whether they still had to pay it,

9  whether this were points involved, how they were

10 supposed to take Title, if it was, for instance, if it

11 was an unmarried man and a woman, as opposed to a man

12 and a woman settlement the rest of those numbers and

13 data into the settlement sheet so that it was ready to

14 go to closing for both people to review.

15       In connection with that, we -- it was my

16 practice to do what I call a sources and uses or recap

17 sheet, because although we had a HUD-1 program, I grew

18 up doing real estate with a settlement sheet and a

19 piece of paper, you write them in, then you figure it

20 out because the numbers are all over both sides of --

21       MR. LUGG: Again, Your Honor, if I may

22 interrupt; may the response be responsive to the

23 question.

117

1    THE COURT: Explain -- I think he is trying to
2  explain to the understanding of structure of a
3  settlement sheet and whatnot.
4    MR. LUGG: Question, sorry, was what did Laura
5  do in real estate.
6    THE COURT: Tie it into her and --
7    THE WITNESS: Laura did all this. And right
8  before closing, a sources and uses or recap sheet would
9  be done, and it would show money in and money out, so
10  that it balanced. It had to be in harmony. If it did
11  not, it meant there was a mistake on the settlement
12  sheet that had to be rectified, and it was sort of a
13  back up to find a mistake that might not otherwise come
14  through on typing the document on the computer. Laura
15  did all that. If there was a problem, she would come
16  to me if she couldn't get the settlement sheet or the
17  recap to balance, she would come to me and say I can't
18  make this balance. I need you to help me. I would do
19  it. Aside from Title problems, survey problems or the
20  recap sheet, I looked at the papers right before
21  settlement to make sure I had everything, then I would
22  conduct the settlement. That was her role up to point
23  of closing.

118

1  BY MR. WENDELBURG:
2    Q.  Okay. And with respect to making certain that
3  money had come in, from, for example, new mortgage
4  lender, or in the case of the Kintz/Burkett where there
5  was no mortgage but Mr. Burkett was funding this
6  purchase himself, what role, if any, did Laura have in
7  insuring that money got into your escrow accounts?
8    A.  Checks were taken by Laura after the closing
9  after all papers were signed to Wilmington Trust
10  Company and deposited.
11    Q.  With respect to mortgage money that would come
12  in, presumably before the actual closing, it would come
13  in before the actual closings; is that correct?
14    A.  Checks?
15    Q.  Or wires?
16    A.  Well, checks obviously would have to be there
17  by the time of closing. The wires were supposed to
18  arrive at some point during the closing.
19    Q.  Again, we are talking about a sale, not a
20  refinance, correct?
21    A.  Yes.
22    Q.  What role, if any, did Laura have in insuring
23  that money was there?

119

1    A.  On wires?
2    Q.  On wires?
3    A.  She would call the bank. She would let me
4  know if the money had arrived. Once she confirmed to
5  me that it arrived, I concluded the settlement by
6  disbursing funds giving the seller his or her check,
7  giving the real estate brokers their checks, giving
8  anyone else whose happened to be there that was
9  entitled to money from the settlement giving them
10  checks, and that then I would conclude the closing.
11  That would be the end of the closing as far as the
12  client is concerned.
13    Q.  What then were Laura's duties with respect to
14  post-closing matters?
15    A.  Laura would take the file, use the sources and
16  uses to make sure that all the checks got disbursed to
17  the various parties that were entitled to receive
18  money, a lot of times the new lending institution
19  would -- they have to get back their notes and other
20  things. She would send that back, follow their
21  checklist for that, send the deed to the Recorder of
22  Deeds along with the mortgage, mail out the payoff to
23  the seller's mortgage company, with unless it was local

120

1  by Fed Ex along with a copy of the bank's payoff
2  statement.
3    Q.  What was your role in this post-closing
4  process?
5    A.  Virtually nothing other than to give it to her
6  and tell her to conduct the post-closing activities
7  that needed to be done.
8    Q.  When Nicole Alexander worked for you in the
9  capacity of real estate paralegal, did her duties
10  differ any from what you described as Laura's duties
11  during her real estate time she was the real estate
12  paralegal?
13    A.  No.
14    Q.  With respect now to a refinance which is a
15  different process than a purchase and sale. Can you
16  describe for the jury what Laura's duties were with
17  that?
18    A.  A refinance is similar, you don't have the
19  seller. You have the owner of the house refinancing.
20  You don't have the sellers as a constituent in that
21  transaction. Aside from that, you undertake basically
22  the same undertaking, that is a Title search to find
23  out if there is a mortgage on the property, get the

1    A.   Yes.

2    Q.   Who told you that?

3    A.   Laura.

     Q.   Can you tell us the circumstances under which

5    she told you that?

6    A.   Well, as I was preparing for the settlement I

7    called the real estate agent, perhaps he called me,

8    Dan, there is a problem. You appear to not have title

9    to the property. I said, what do you mean? I have the

10   deed right here in front of me. And he told me that

11   the property had gone to a tax sale for delinquent

12   taxes for like 3 or $400. We were still within what's

13   called the appeal period to contest a forced sale, and

14   I had Laura contact an attorney up there who said he

15   would file the papers. I was then told by the buyer, I

16   was not told personally, Laura said look, the buyer

17   wants this property. He knows he got it cheap. He

18   wants to keep it. He is willing to honor the purchase

19   price for the contract that you have, and with that

20   understanding I said okay, but we had to have the money

21   before the appeal period lapsed on the time to contest

22   the sale.

23        And I was told that the money was wired to my

1    escrow account.

2    Q.   Who told you that?

3    A.   Laura.

4    Q.   Did you, in fact, check later to see whether

5    this money was there?

6    A.   No.

7    Q.   Why not?

8    A.   For the many, many, many transactions that I

9    have done, I -- well, I had no reason to question her.

10   I have no reason to question Nicole Alexander or

11   Chandler Land if he said money was wired into the

12   account and they told me it was confirmed to be there,

13   and that was sufficient to me in this case it was my

14   daughter, I just believed it.

15   Q.   Did you ever actually receive that money?

16   A.   No, not that much.

17   Q.   When you have told -- talked to us a lot of

18   people have talked to us about refinishing; did there

     come a time when you and Ann decided to refinance your

     house on Shadow Lane?

21   A.   Yes.

22   Q.   Tell us about that?

23   A.   I had difficulties with my mortgage company

1    for quite some time leading up to March of 2003. My

2    credit report was bad, my mortgage was listed at least

3    twice with the same mortgage company. The mortgage

4    kept being transferred from one servicer to another,

5    the one that had it at the time said they would work

6    things out and get the matter straightened out, it did

7    not happen. The frustration level of myself and my

8    wife continued to escalate. We were literally getting

9    calls all the time. I finally, I think, I wrote them a

10   letter at some point; in any event, it got to a point

11   in early 2003 where I said, Laura, this stuff has got

12   to stop, and if this lender can't resolve the issues

13   between who actually owns the mortgage and who I am

14   paying, who they are, then perhaps they ought to

15   refinance it themselves. That led to a refinance in

16   March of 2003 with Washington Mutual.

17   Q.   What part did Laura play in this process for

18   you personally?

19   A.   She discussed -- I would bring in the Dunning

20   notices, bring in letter, I would tell her I spoke to

21   bill collectors the night before. I would tell her to

22   look into this. Laura had the expertise to deal with

23   mortgage companies. She had been doing it since she

1    had been there, got trained to the point of how to deal

2    with mortgage companies, how to get payoffs, how to

3    coordinate things. And, you know, I at that level my

4    frustration level was maxed out, and it was conveyed to

5    them that this was a very serious situation, and that

6    the mortgage should be refinanced since they can't seem

7    to bring a resolution to the Dunnings and whoever else

8    they were servicing the loan for, and Laura replied to

9    me that they would consider it and ultimately ended up

10   in a mortgage commitment from Washington Mutual.

11   Q.   In connection with your negotiations -- let me

12   ask you a little bit about the actual way the

13   negotiations went between yourself and was it

14   Washington Mutual?

15   A.   Yes.

16   Q.   Were you having communications with Washington

17   Mutual yourself or were those communications being done

18   through Laura?

19   A.   Through Laura.

20   Q.   All of them or some of them?

21   A.   Well, all of them. There were -- I think

22   there were e-mails that were sent, or letters, not sure

23   which they were done at my direction by Laura.

129

1   Q. Did Washington Mutual send letters to you that
2 came directly to you?
3   A. We got the commitment letter.
  Q. Who gave you the commitment letter?
5   A. Laura.
6   Q. Do you recall whether it came to the office or
7 to your house?
8   A. I don't know, could have been both; it could
9 have been faxed to the office or sent to the house. I
10 just don't.
11   Q. By what medium did it show up, if you know?
12   A. I guess it came by Fax.
13   Q. After you received this so-called commitment
14 letter from Washington Mutual, what did you do?
15   A. We proceeded to comply with the commitment
16 letter and they sent the documents and we signed the
17 documents, and we closed the loan.
18   Q. When you say "closed the loan"; what happened?
19   A. We signed the papers, mortgage, the note, the
20 disclosure statement, and there may have been a couple
21 other pieces of paper that typically some sort of a tax
22 -- request for tax return document that can be sent to
23 the IRS. If the underwriter wants to confirm your

130

1 income, things like that, but they were all signed, and
2 given back to Laura to forward. We live in
3 Pennsylvania, forward documents back to Washington
4 Mutual. They were going to record everything. We were
5 so fed up once we signed the papers and they funded the
6 loan so we thought, we didn't care what they did with
7 them. I didn't care what they did with them.
8   Q. Where was Washington Mutual located?
9   A. Person that communicated with my office was
10 from Texas.
11   Q. Had you ever done business with Washington
12 Mutual before on behalf of clients involving refinances
13 and purchases?
14   A. I probably have. I know I have.
15   Q. I am going hand you a document that's been
16 marked Defense for Identification X. It is a folder
17 with a bunch of documents in there, ask if you can
18 identify what's in there.
  A. I am not through it, but yes, I do recognize
it.
21   Q. What are the documents in that?
22   A. There is a note, promissory notes, promise to
23 repay a mortgage, there's an insurance acknowledgment

131

1 letter saying we have insurance on the property, truth
2 in lending disclosure form, errors and omissions
3 compliance letter which means if there are any mistakes
4 or oversights by the lender we agree to comply with
5 them after the closing. Insurance acknowledgement
6 letter again, escrow letter. Escrows are for taxes and
7 insurance. Saying that -- I did not read this one,
8 they have the right to escrow for taxes and insurance.
9 Addendum to the settlement sheet, showing it was being
10 paid, request for tax return form that I mentioned, one
11 for me and one for my wife, an e-mail from Tina at
12 Washington Mutual saying fill in the relevant -- I
13 don't know if you want me to read or just identify
14 them.
15   Q. Identify them?
16   A. E-mail from someone at Washington Mutual,
17 settlement sheet, also known as a HUD-1, both pages,
18 commitment letter, saying what the terms of the loan
19 were and signed by someone with an unrecognizable
20 signature. Multi-page document that is called
21 a amortization schedule which shows allocation to each
22 payment to principal and interest and outstanding
23 balance. Disbursement cover letters to each of the

132

1 people listed on the settlement sheet that were to be
2 paid off. Some of them, not all of them. I think
3 that's it in this file.
4   Q. Are those documents which were normally
5 associated with a refinishing such as you and Ann were
6 attempting to do on your house?
7   A. Yes.
8   Q. Are they specific to the refinancing on your
9 house?
10   A. Yes.
11   Q. Under the terms of the supposed refinancing on
12 your house were you supposed to receive -- who was
13 entitled to get disbursements from that refinancing?
14   A. When you say -- the people that were supposed
15 to be paid was Washington -- Fleet slash Washington
16 Mutual, second mortgage with Household Finance, and
17 then I think two or three credit cards. Now, the
18 Washington Mutual and the second mortgage are the ones
19 listed on the settlement sheet there was an addendum to
20 the settlement sheet which I did, which also showed the
21 two mortgage companies being repaid.
22   Q. Washington Mutual and HFC?
23   A. Sorry, the credit cards that were supposed to

133

1  be paid I think Advanta and MBNA, I believe.
2      Q.  Any other loans that were supposed to be paid
3  off as a result of this refinancing?
4      A.  Discover and portion of the cash ought to be
5  applied to the Washington Mutual car loan.
6      Q.  What is the Washington Mutual car loan?
7      A.  In February of '03 Washington Mutual gave me a
8  car or line of credit in the amount of 100 thousand
9  dollars that was so that I could buy a car.  I had a
10  1999 Suburban which was leased, had a lot of miles, it
11  was over the allowed limit, and my credit was in such
12  disarray, that I couldn't buy.  I couldn't buy a car.
13  I couldn't finance it.  At one point that is how I
14  found out my mortgage was in foreclosure.  Someone at a
15  car dealership told me hey, there is a possible problem
16  this is probably a mistake but your house appears to be
17  in foreclosure.  So that's my state of mind leading up
18  to this I finally through Laura said look, I can't do
19  anything.  I can't move.  They have said now they are
20  going to give me a mortgage commitment but that is in
21  March.  What am I supposed to do so do right now?  The
22  lease was coming to and end, I believe, I couldn't do
23  anything with it.  I had four or five thousand dollars

134

1  for it, so that was the Genesis of the 100 thousand
2  dollars loan.
3      Again, I received some sort of an e-mail from
4  Washington Mutual that said that you could repay the
5  loan from the cash out portion of your mortgage
6  refinance.  So that was the reference to the Washington
7  car loan disbursement on the March 15 settlement
8  statement.
9      Q.  Did Washington Mutual, in fact, give you 100
10  thousand dollars line of credit as you described?
11      A.  Speak now?
12      Q.  Yes?
13      A.  No.
14      Q.  Who told you they were doing this?
15      A.  Laura and I received some e-mail from someone
16  that said we are giving you 100 thousand dollar line
17  which you can use pay for it out of the, you know, out
18  of the mortgage refinance on the cash out portion.
19      Q.  This e-mail was from someone at Washington
20  Mutual?
21      A.  Yes.
22      Q.  Who showed it to you?
23      A.  Laura.

135

1      Q.  Do you know which computer received that
2  e-mail?
3      A.  I have no idea.  It wasn't mine.
4      Q.  Yours wasn't working at that point?
5      A.  No, I don't think it was working.
6      Q.  How much -- you have talked about paying off
7  car loan with a cash out portion, portion of cash out
8  from the refinancing, were you, in addition to paying
9  off a car loan, supposed to get any actual cash out of
10  this refinance?
11      A.  Yes.
12      Q.  How much?
13      A.  $67,616.51.  Commitment was a 425 thousand
14  dollars, 30 year conventional fixed rate loan.
15      Q.  Do you recall the terms of that loan, 30 years
16  at what the interest rate was?
17      A.  I can't tell you.  I think it was 4.85.  4.65
18  percent 30 years fixed principal and interest $2191 a
19  month.
20      Q.  Were you, in fact, told that the $68,161 had
21  been received in your escrow account?
22      A.  Yes.
23      Q.  Who told you that?

136

1      A.  Laura.
2      Q.  As a result of that, was did you write a check
3  against the account?
4      A.  Yes.
5      Q.  For that amount of money?
6      A.  For what amount.
7      Q.  68 thousand dollars?
8      A.  I don't recall.  I know that the -- I don't
9  know one or two of those credit cards actually were
10  paid off from this settlement.
11      Q.  You had mentioned before you had described
12  before the process for doing a refinance in a lawyer's
13  office, in your lawyer's office.  It was necessary --
14  were you instructed that you needed to go to some other
15  lawyer's office in order to complete this refinance?
16      A.  No.
17      Q.  In your experience, would it have been
18  necessary for to you do that?
19      A.  Not for a Pennsylvania property.
20      Q.  Why is that?
21      A.  Pennsylvania has different rules than
22  Delaware.  Delaware considers handling of real estate
23  whether it is refinance or Title transfers to be the

137

1  practice of law, and Pennsylvania does not, just has a
2  different view of on it Title companies can do it, if
3  it is a refinance I suppose anybody can do it.  If
4  Title insurance is a component of it, then a title
5  company would do it.  In Pennsylvania that does not
6  mean you can't have one, just means you don't have to
7  have one.
8      Q.  You testified that at least for a few months
9  up until this supposed March 15, 2003 financing you had
10  been receiving Dunning notices and phone calls from one
11  or more mortgage company; is that correct?
12     A.  Correct.
13     Q.  After the March 15, '03 event, did those
14  notices stop?
15     A.  No.
16     Q.  What happened?
17     A.  It just never missed a beat.  It intensified.
18  Now you are X months behind Mr. Anker or Ms. Anker.
19  What are you going to do about it?  We had a notice put
20  on your door 41 or 941 notices, which is some sort of
21  required notice that a lender has to put on your
22  property.  We told them we refinanced, told them over
23  and over.  We told them to quit bothering us.  It never

138

1  stopped.  We were furious.  We were frustrated.  I
2  would get correspondence from them and it was at the
3  point I just stopped opening them I would come in give
4  them to Laura, and say this has got to stop.  It got
5  refinanced.  You better get a hold of someone who knows
6  what they are doing and work this out.
7      Q.  Did she acknowledge this assignment?
8      A.  Yes.
9      Q.  Did she tell you what she was doing in order
10  to carry it out?
11     A.  She had been in contact with Washington Mutual
12  with their general counsel or an attorney for
13  Washington Mutual.
14     Q.  Show you any documented proof of this?
15     A.  I think there was some e-mails from Washington
16  Mutual from an attorney or someone purporting to be an
17  attorney.
18     Q.  Who showed you these e-mails?
19     A.  Laura.
20     Q.  You don't from which machine they were
21  printed?
22     A.  I just know it wasn't from mine.
23     Q.  With Laura as your intermediary, did you

139

1  attempt further negotiation with Washington Mutual
2  resulting in any type of commitment or payment?
3      A.  Yes.
4      Q.  Tell us about that?
5      A.  We thought that the refinance was going to
6  resolve this ongoing problem between Washington Mutual
7  and the other mortgage service providers, and it just
8  did not happen.  I think Fleet Mortgage claimed they
9  owned it, another service lender was Cendant or
10  something they claim to be owed money.  We were getting
11  calls from all three, and the frustration level
12  continued to escalate.  We simply said this is
13  unacceptable.  We have paid these things off, paid off
14  credit cards and you won't let up.
15         I told Laura to get someone on the phone, and
16  she said I can't get a hold of these people, this
17  person, the best way to do it is through e-mail.  If
18  you try to call them you will just get a busy signal or
19  no one will answer the phone, things like that.
20     Q.  So what did you do?
21     A.  I sent them an e-mail or get in touch with
22  them no matter how you got to do it.
23     Q.  At some point did you reach an agreement with

140

1  Washington Mutual for any type of financial settlement
2  resulting from all the problems that you had?
3      A.  So we thought.  Yes.
4      Q.  Okay, what was the -- were the terms of the --
5  first, who told you what the terms of the settlement
6  were?
7      A.  I think it was this fellow from Washington
8  Mutual.
9      Q.  Did you talk to this fellow?
10     A.  No.
11     Q.  Who did?
12     A.  Laura.
13     Q.  Do you know what the terms were that were
14  proposed?
15     A.  Initially 250 thousand dollars, cancellation
16  of the debt and line of credit.
17     Q.  Can I have this document marked for
18  identification?
19         THE CLERK:  Defense Identification CC.
20  BY MR. WENDELBURG:
21     Q.  Here is Defendant's Identification double C.
22  Can you tell us what that is?
23     A.  It is an e-mail from McIntyre, Doug dated May

141

1    12, 2003 to Dan Anker Law. It is signed Doug. You
2    want me to -- I recognize it yes.
3        Q. You do recognize it?
4        A. Yes.
5        Q. When did you first see it?
6        A. When Laura gave it to me.
7        Q. What did she tell you?
8        A. Here is a proposal to, you know, get this mess
9    resolved.
10        Q. Did you believe at that time that was a
11    genuine bona fide proposal?
12        A. Yes.
13        Q. Why?
14        A. Because the frustration level we had, the fact
15    we had done a refinance, the fact it had not been
16    resolved a darn thing, led us to believe there were
17    some serious internal problems with Washington Mutual,
18    both my wife's and my credit was affected. The value
19    of our house was such that this number and the
20    cancellation of the debt did not seem outrageous in
21    light of the fact that it was in foreclosure.
22        Q. What are the terms proposed in the e-mail?
23        A. 250 thousand dollars.

142

1        Q. What was -- read the e-mail, if you would,
2    please?
3        A. Out loud?
4        Q. Yes.
5        A. Dear, Mr. Daniel J. Anker, please allow me
6    until tomorrow to give you a written confirmation
7    settlement. I need to determine exactly when all money
8    will be sent to you. You will receive 250 thousand
9    dollars tomorrow. Thank you, Doug.
10        Q. On the basis of that e-mail, and your
11    conversation with Laura, what was your belief?
12        A. Well, there was more, to my belief, than just
13    this. I thought I was getting this money. I thought
14    the mortgage was cancelled. I thought the line of
15    credit was cancelled and there were other issues;
16    namely get the mortgage removed of record, get the
17    credit report cleared up.
18        Q. The May 12 e-mail says that you will be
19    receiving, 250 thousand dollars tomorrow; was it your
20    belief that it was receive the next day?
21        A. Yes.
22        Q. Why did you believe that?
23        A. Laura told me it was wired into my Wilmington

143

1    Trust accounts.
2        Q. Did that solve your mortgage problems?
3        A. No.
4        Q. What happened then?
5        A. The same scenario, it continued, you know,
6    unabated, may have been slight gaps in communications
7    but it started up again, and continued right through to
8    the day my office closed.
9        Q. With there further negotiations between you
10    and Washington Mutual using Laura as an intermediary?
11        A. Yes.
12        Q. Tell the jury about them?
13        A. I want -- by that point in my understanding
14    with Washington Mutual I had done a closing with John
15    Lesco who you have heard from earlier in this trial.
16    John had a mortgage with Washington Mutual, and so
17    that's the back drop. Now, Washington Mutual offered
18    me a job for five years for 250 thousand dollars a
19    year, and I think there was some large cash component
20    to that, also. Should I stop now?
21        Q. Well, what was the eventual outcome of the
22    supposed negotiations with Washington Mutual?
23        A. I told them that I was interested in it, but I

144

1    had issues with my credit that were still hanging out
2    there, and I had the John Lesco issue, which had
3    surfaced, and I had another client who told me that
4    they had issues with their escrow account and the real
5    estate taxes not being paid. So what I told them is
6    this all sounds really great. I am not doing anything
7    until those issues are resolved.
8        Q. Were any releases, or other types of
9    settlement documents ever sent to you by Washington
10    Mutual in the course of these proceedings?
11        A. No.
12        Q. Do you know why?
13        A. It was my position I wasn't signing a release
14    for myself, or have my clients sign one for any sum of
15    money because the driving force was to get the credit
16    issues resolved and in my case, to get the mortgage
17    foreclosure stopped and I believe John Lesco was on the
18    same path if not quite down the road as I was as far as
19    I was to foreclosure, was unwilling to sign anything
20    until those matters were cleared up. That was the most
21    important thing to everybody.
22        Q. With respect to any of your clients who have
23    testified in the past couple of weeks with respect to

147

1    Q.    At the time did you respond to that e-mail?

2    A.    Yes, I did.

3    Q.    How did that e-mail first come to you?    —

4    A.    Laura gave it to me.

5    Q.    Did she tell you anything when she gave it to

6    you or just hand this to you?    .

7    A.    Here is another communication, she seemed, you

8    know, excited about it.  Thought it was good news.

9    Made her somewhat curious whether she would remain

10   employed by me.

11   Q.    That is what she asked you?

12   A.    She did not ask me.  She expressed

13   reservations about it, I guess it was a question.  You

14   know, does this -- will I still be working for you?  I

15   told her, Yeah.

16   Q.    At some point was there a further offer made

17   by Washington Mutual to you?

18   A.    I remember, I think replying to this one

19   through letter I dictated for Laura.  I think I

20   referred my response earlier that I told them we had to

21   get these other things off the table.  I was interested

22   but we are not going any further until my mess and

23   Lesco's mess and another person's tax escrow issue was

145

1    supposed financial settlements received from mortgage

2    companies, were you ever presented with any settlement

3    documents or releases for them to sign?

4    A.    By the banks?

5    Q.    By the banks?

6    A.    No.

7    Q.    Do you ever direct -- this may overlap what

8    you just told us; did you ever direct Laura to type up

9    releases or settlement documents for any of these

10   people, the Rays and the Pavezas?

11   A.    No, not that I recall.

12   Q.    We will go onto the clients in a few minutes

13   but what I want to do now is to ask you to look at some

14   documents in connection with your own alleged financial

15   settlement with Washington Mutual.

16        MR. WENDELBURG:  Can I have those marked for

17   identification as defendant's next three.

18        THE CLERK:  Defendant's double D, double E,

19   double F.

20   BY MR. WENDELBURG:

21   Q.    Here is Defense double D for Identification,

22   can you tell us what this is?

23   A.    Yes.  This is an offer of employment from

146

1    Washington Mutual to me dated May 30, 2003 to be their

2    local counsel in that region, meaning Delaware.

3    Q.    What does it say; who is it from?  What is it

4    dated?    .

5    A.    It is from McIntyre, Doug to Dan Anker Law,

6    subject Washington Mutual, date 5/30/2003.  Dear, Dan;

7    you want me to read the whole thing?

8    Q.    Go ahead?

9    A.    The past several days I have been discussing

10   several possibilities of employment for you with my

11   colleagues here in Texas.  We unanimously feel you

12   would prove to be a great asset for our company.  At

13   this time we would like to make this initial offer.

14   You will be our local counsel in Delaware.  Your main

15   function would be to handle our numerous foreclosures

16   for your State.  Other responsibilities can be

17   discussed or decided at your discretion.  You will be

18   put on a yearly retainer of 250 thousand dollars

19   replenished as necessary.  The contract will also be

20   supplied which require that Washington Mutual keep you

21   on retainer for a minimum of five years.  Please get

22   back to me with negotiations or acceptance at your

23   convenience.  Doug.

148

1    resolved.

2    Q.    Let me hand you what's been marked Defense

3    Identification EE, ask if you recognize this?

4    A.    That, yes.

5    Q.    What is it?

6    A.    Letter from McIntyre, Doug, to Dan Anker Law,

7    subject Washington Mutual.  Dated June 5, 2003.    .

8    Q.    Is this a letter or an e-mail?

9    A.    It looks like an e-mail.

10   Q.    Okay, sorry.

11   A.    Dear, Dan; please allow this e-mail to serve

12   as our, quote, official offer to you.  Sum of five

13   million dollars will be paid to you over a minimum of

14   three months, but could be extended for any time period

15   acceptable to you.  In addition to that, Washington

16   Mutual will be honored to have you join their team.

17   You would replaced on a retainer of 250 thousand

18   dollars per year.  If you consider employment by

19   Washington Mutual, we would love to further discuss

20   your ideas on training and compliance.  I will be on

21   vacation on the next ten days beginning Friday, June 6.

22   Please get back to me at your pleasure.  Thank you,

23   Doug.

149                                                                         151

1    Q.  Who gave you that e-mail?

2    A.  Laura.

3    Q.  Was any comment made when she gave that to

4    you; did she made any comment to you when she gave it

5    to you?

6    A.  Yes, she seemed ecstatic.

7    Q.  Do you recall what she said?

8    A.  No.

9    Q.  Did you respond to that e-mail?

10   A.  Well, now you showed me this one, I replied to

11   one of these two. I am not sure which.

12   Q.  Let me show you Defendant's double F, see if

13   you can recognize that.

14   A.  Yeah, this is the response that I referred to

15   earlier, but thought it was to the first e-mail.

16   Q.  Can you read us that?

17   A.  This is a letter, this is an actual letter on

18   my stationary to Douglas McIntyre, Esquire, Washington

19   Mutual re Anker slash Washington Mutual. Dear, Doug;

20   thank you four your offer of settlement dated June 5,

21   2003. Cash settlement offer of five million dollars

22   payable in three months or sooner is hereby accepted.

23   I assume the first third of the installment will be

1    of it. I can't recall amounts. I recall specific

2    instances where Laura said he did not send it today,

3    will be in on Monday, or it was sent but it hadn't

4    found its way to your account yet, things like that,

5    which would delay it a few days then ostensibly she

6    would say, yeah, so much of it is here.

7    Q.  Laura would say this?

8    A.  Yes.

9    MR. WENDELBURG: Have this marked as double G

10   for identification, Your Honor.

11   BY MR. WENDELBURG:

12   Q.  At some point did you come to question whether

13   this money was actually going to your bank account or

14   not?

15   A.  I asked her whether we got it.

16   Q.  What was her response on those occasions?

17   A.  Well, as I just mentioned on occasion she

18   would say yeah, some of it is there, or other times she

19   would say, well, they are sending it at a later point,

20   I think one of these says the guy is on vacation. So

21   that was a delay but sooner or letter it got down a

22   point where I was told there was money wired into my

23   account.

150                                                                         152

1    wired in the near future. Please confirm the date of

2    each payment. I would like to convey my sincere

3    interest in your employment offer. However since the

4    specific terms needs to be worked out, I'm not in a

5    position to accept it at this juncture. In addition

6    from a legal, and ethical perspective I believe it

7    would be prudent to consummate the settlement

8    agreements prior to any prospective employment with

9    Washington Mutual. The foregoing caveat stated, I

10   would like to commence discussions regarding details of

11   possible employment opportunities with your

12   institution. Thank you. Very truly yours Daniel J.

13   Anker.

14   Q.  Is that the letter that you dictated?

15   A.  When you say -- yes, I probably verbally

16   dictated it, not in a sense of dictating it into a

17   dicta phone. I dictated it to Laura. I could have

18   written it out myself, also, I just don't remember.

19   Q.  Washington Mutual is offering, you are

20   accepting a large sum of money as a financial

21   settlement for your credit problems. Now, did you

22   start to see that money show up?

23   A.  I was told that money was wired in, portions

1    Q.  Did you ever receive any e-mail confirmation

2    of the amounts of money being wired into your account?

3    A.  From who?

4    Q.  Or the amounts into your account, I should

5    say?

6    A.  I think at some point later on I think

7    Wilmington Trust did.

8    Q.  I will hand you what's been marked Defense

9    double G, ask if you can tell us what that is?

10   A.  This is a letter from O'Neal, Wil, WTC, to Dan

11   Anker Law, subject WTC accounts. Dear Dan, the

12   balances in your accounts is as follows, this is what

13   is actually there, not what you may see, Amanda Anker

14   $875, Ann and Dan Anker, 160 thousand dollars, Dan

15   Anker, $6,563,485.25, and Daniel Anker $24,684.46. I.

16   will update you on your money market account after 12

17   noon today. My IP guy is currently working on that

18   account program. I do not have access to it. I will

19   be depositing another five hundred thousand dollars

20   into your checking account today. Thank you for your

21   patience, Wil. Dated July 17, 2003.

22   Q.  Where did you get that e-mail?

23   A.  Where? I got it at my office.

A-128
A-155

153

1    Q.  From whom did you get it?

2    A.  Laura.

3    Q.  She hand it to you?

     A.  Yes.

5    Q.  Did she make any comment when she gave that to

6    you?

7    A.  It was always the same, you know, she was

8    ecstatic. I don't remember her saying anything in

9    particular. I was frustrated because, again, I was

10   being told at various points I had money in an account,

11   various accounts, yet I know not long after this date I

12   was on vacation, checked our MAC card repeatedly for

13   balance statements and there was nothing close to this

14   there.

15        MR. WENDELBURG: Again, Your Honor, may I have

16   this marked Defense for Identification double H.

17   BY MR. WENDELBURG:

18   Q.  Did you attempt to, again, verify the amounts

19   that were actually in your account?

20   A.  I verified through Laura. I attempted to

21   verify accounts with my own account, my wife and I

22   repeatedly checked our MAC card when we were in

23   Florida, and just wasn't there. Of course, you know --

154

1    I guess we will get to it later.

2    Q.  When did you go to Florida?

3    A.  The exact date we left I am not sure. What I

4    recall is that it was a day or two after the Kintz to

5    Burkett closing, which I think was in July 15, 16

6    somewhere in that neighborhood. I think I was leaving

7    the next day but it could have been two days later. I

8    don't know.

9    Q.  While you were in Florida, did you attempt in

10   any way it verify the amounts in your personal account?

11   A.  Oh, Yeah, daily. More than daily. Two or

12   three times a day I would call Laura. What in the hell

13   is going on. She said well, whoever this IP guy is

14   they are still updating your this, that, or the other.

15   It is going to be in there. You know, this is just

16   unacceptable. I am down here with my family, and my

17   MAC card, no matter what machine I go to, tells me the

18   same thing, there is not anything close to that in

19   there.

     Q.  Let me hand you State's for Identification

20   double H. Can you tell us what this is?

22   A.  This is a letter from L.

23   Larks01@IMcingular.com to O'Neill, Will WTC@AOL.com,

155

1    also has another thing in the other one says sent from

2    the internet, parenthesis, details, close parenthesis.

3    Q.  Do you recognize the document?

4    A.  I think I have seen it since then, but I don't

5    think I was back from Florida on July 28.th I could

6    have been, but I don't think so.

7    Q.  Do you recognize the sender's address LLarks01

8    IMCingular.

9    A.  Larks is my daughter, Laura's married name. I

10   had, looking at it now, clueless why it came from that

11   address. It is referring --

12        MR. LUGG: Your Honor, I object to the

13   reference. There's been no foundation to acknowledge

14   this.

15        THE COURT: Sustained.

16   BY MR. WENDELBURG:

17   Q.  Do you or do you not recognize the sender's

18   address?

19   A.  No.

20   Q.  No?

21   A.  Well, I recognize my daughter's married name.

22   Q.  Right.

23   A.  I don't recognize the other stuff there.

156

1    Q.  I would now like to turn to other sources of

2    supposed income for you or your office in 2003.

3        At sometime after March 15 of 2003, which was

4    the supposed date of refinancing, was there any

5    conversation -- did Laura say anything to you about

6    receiving any money on behalf of your wife, Ann?

7    A.  Yes, she had received money on -- from one of

8    the credit card companies who was supposed to be paid

9    off from the March 15, 2003 closing.

10   Q.  What were the -- why was this money being

11   received; did Laura tell you that?

12   A.  Because the Dunning was relentless, and the

13   credit card company acknowledged it. They acknowledged

14   it that it was disputed and that they further

15   acknowledged once an account is disputed, they have to

16   furnish proof of it or, you know, something. They just

17   can't ignore it and keep Dunning you.

18   Q.  Did Laura tell you what the terms of this cash

19   settlement were?

20   A.  I think it was $65,000.

21   Q.  Do you remember when she told you?

22   A.  No.

23   Q.  Do you recall when she told you the money had

185

1   Q. For his personal house?

2   A. Yes.

3   Q. Was that refinancing eventually accomplished?

    A. Yes, it was.

5   Q. During the course of your representation of

6 Mr. Talmo, without getting into the substance of

7 anything that Mr. Talmo said, did it become apparent

8 there was a conflict between your office and Mr. Talmo?

9   A. Based on his conversations or statements to

10 me, yes.

11   Q. As a result of your becoming aware, did you

12 tell Mr. Talmo to do anything or give him any advice?

13   A. Yes.

14   Q. Did you tell him anything about your actions

15 in with respect to your work on his behalf, did you

16 tell him what you had done for him?

17   A. I told him that I had done his refinance and

18 that at that point in time I thought it had been done

19 properly.

20   Q. Give us a time frame?

21   A. It was in the spring, late spring, early

22 summer of 2003.

23   Q. I think I may have cut you off. What is the

186

1 substance of the advice or facts that you give to

2 Mr. Talmo in response to learning there was a conflict?

3   A. I advised Mr. Talmo that two things, one,

4 foremost if he thought a crime had been committed, he

5 should report it immediately to the police. Secondly,

6 whether he thought a crime had been committed or not,

7 he should report me immediately to the Office of

8 Disciplinary Counsel, if he thought that I had acted

9 inappropriately, and unprofessionally.

10   Q. This is in the spring of 2003?

11   A. Yeah, sometime in there.

12   Q. This is before you went to Florida?

13   A. Sorry.

14   Q. Is this before you went to Florida?

15   A. Yes.

16   Q. Did you, in fact, write Mr. Talmo -- did you

17 direct a letter be sent to Mr. Talmo with any of this

18 information in it?

    A. Yes.

    Q. How did you attempt to accomplish that?

21   A. By hand delivery from by Laura, he worked --

22 you have heard reference to my settlement room which

23 was around the corner. Mr. Talmo's office was right

187

1 next to that settlement room. Literally, only around

2 the security desk to settlement room, it was right

3 there.

4   Q. Did you write that letter yourself?

5   A. Yes.

6   Q. You hand wrote it out?

7   A. I believe I hand wrote it out. I gave it to

8 Laura to type it, then I reviewed it again, then it was

9 finalized and signed, and I directed Laura to give it

10 to Dan.

11   Q. Who is Jenny Dean?

12   A. Jenny Dean is an another client of mine, a

13 repeat client as I think Dan Talmon was, Jenny Dean I

14 did a refinance for her, in that time frame, and the

15 only thing can I tell you about when it was is that it

16 was after Talmo, and before, obviously, my office was

17 shut down.

18   Q. Again, without getting into the substance of

19 anything, you were told by Ms. Dean did you become

20 aware that a conflict that existed between Ms. Dean and

21 your office to the way that settlement was handled, the

22 refinancing was handled?

23   A. Yes.

188

1   Q. In response to learning that, did you give Ms.

2 Dean any facts or advice?

3   A. Yes.

4   Q. What did you tell her?

5   A. I told her that she should notify the Office

6 of Disciplinary Counsel.

7   Q. When did this occur in relationship, for

8 example, to your trip to Florida in mid July of '03?

9   A. It was before that.

10   Q. It was during calender year of 2003?

11   A. Yes, I think hers was in, maybe, when I told

12 her, I don't know. I may have told her in July, it was

13 before I went on vacation. I believe it was before the

14 Kintz to Burkett closing, which is one of the subject

15 matters at issue here.

16   Q. Did you know that any of the money that you

17 received from your escrow accounts was property of

18 someone else and not you?

19   A. No, sir.

20   Q. Up until you were called back from Florida,

21 you were called and came back from Florida that late

22 July of 2003, did you know that any money that was the

23 property of others was being misappropriated from your

A-157

189

1  escrow account?

2      A. Absolutely not.

3      Q. Did you accept any money from your escrow

account knowing that it belonged to someone else and

5  not you?

6      A. Absolutely not.

7      Q. Your daughter Laura worked in your office from

8  sometime in 1999 or 2000, up until the office was

9  closed at the end of July of 2003, correct?

10     A. Correct.

11     Q. Sometimes part time, for the most part she was

12  full-time?

13     A. Correct.

14     Q. Did you Trust Laura during that period of time

15  to handle books and handle property of clients and

16  others in that office as you have described?

17     A. Yes, I did.

18     Q. Did you at any time authorize Laura to take

19  property from the escrow or operating accounts that did

20  not belong to her?

21     A. Absolutely not.

22     Q. Did you ever authorize Laura to sign your name

23  to a check, either operating or escrow during that

190

1  period of time?

2      A. No.

3      Q. Did you ever authorize Laura to use an escrow

4  or operating check during that period of time in anyway

5  other than that you specifically directed?

6      A. No.

7      Q. Did you Trust Laura that much?

8      A. She is my. Daughter, we had done a lot of

9  transactions leading up to then. There were never any

10  problem. I was proud of Laura, in my view she had

11  turned the corner from somewhat checkered past. She

12  finished high school.

13     MR. LUGG: The question is beyond -- the

14  answer is beyond the scope of the question why did he

15  trust her in the business dealings. We are getting far

16  afield.

17     THE COURT: Just explain why you trusted her,

18  okay.

19     THE WITNESS: I was trying to, Your Honor. I

trusted her because she is my daughter. I love her. I

21  had absolutely no reason to not to believe her. There

22  were enumerable other transactions that I had taken her

23  words from, in my entire career, as a solo practitioner

191

1  beginning with Nicole Alexander, I operated the same

2  way. Nicole was a young woman at the time also, I had

3  no reason specifically to disbelieve my daughter.

4  BY MR. WENDELBURG:

5      Q. When you say especially disbelieve your

6  daughter you mean specifically beyond any other person,

7  are you --

8      A. Well, I am -- it is my daughter. I trust my

9  family. I trust my family implicitly, as opposed to

10  someone I may hire who I have to develop a trust with.

11  So, yeah, I trusted her implicitly and up until this

12  disaster I had absolutely no reason not to.

13     MR. WENDELBURG: No further questions at this

14  time, Your Honor.

15     THE COURT: All right. I think at this point

16  direct examination is done. Ready for cross

17  examination. I think just for scheduling purposes why

18  don't we -- if the jury would be okay to come in

19  tomorrow at a time say we could get to trial going at

20  9:30, means you come in around 9:00; is that all right?

21  So then why didn't we start trial then tomorrow at

22  9:30. And remember even if I don't, media coverage,

23  radio, TV, newspaper, Internet about the case, avoid it

192

1  over the course. The other point that I know talking

2  about the case among yourselves, or family, or anything

3  like that. The only time you talk about the case is

4  when 12 of you finally decide the case based upon the

5  law and go in and deliberate upon a verdict.

6      (Jury left the courtroom at 4:44 p.m.)

7      THE COURT: You may step down. Housekeeping,

8  that sidebar talking about Rule 403 I have in mind that

9  substantially outweighs. Can we get the amended

10  indictment over tomorrow? I permitted the amendment.

11  I will get that done. She is in early. As I said

12  before, I have a standard set of instructions. I have

13  a set of instructions including mistake and claim of

14  right, you are going to have one on --

15     MR. LUGG: I just handed to Mr. Wendelburg one

16  page, if there is no controversy may be able to hand it

17  to you now.

18     THE COURT: You have a problem?

19     MR. WENDELBURG: I don't have a problem with

20  the substance of that.

21     THE COURT: I ask this be typed up. Any other

22  instructions that you can think of?

23     MR. LUGG: Counsel mentioned coming back, if

**21**

1  testimony is permissible under the Delaware statute
2  which reads in pertinent part as follows; in a criminal
3  prosecution, voluntary out-of-court statements of a
4  witness who is present and subject to cross examination
5  may be used as affirmative evidence with substantive
6  independent testimony of value.  Rule of subsection A
7  shall apply regardless of whether the witness's in
8  Court testimony is consistent with the prior statement
9  or not.  With regards to this provision, caution must
10  be exercised by the jury when a conflict exists between
11  the out-of-Court statements and in-court testimony, or
12  when a conflict exists among the out-of-court
13  statements themselves.  The jury should be particularly
14  careful if there is no evidence to corroborate an
15  inconsistent out-of-court statement.
16      Laura Larks was mentioned throughout this
17  trial as possibly being in a position to testify about
18  the matters in question, but she did not testify.  You
19  may be naturally curious about why she was not called.
20  She is unavailable as a witness.  You are instructed
21  that you, as judges of the facts, may draw no
22  inference, or reach any conclusion whatsoever against
23  either party from her failure to testify at this trial.

**22**

1      I will be allowing you -- I have allowed you
2  to take notes during the trial.  The purpose of taking
3  notes is to assist you during your deliberations.
4  During your deliberation you should not allow notes
5  taken by one juror or several to control your
6  consideration of the evidence.  Instead, give due
7  regard to the individual recollection of each juror,
8  whether or not supported by written notes.  The
9  ultimate judgement should be the product of the
10  collective memory of all 12 jurors.
11      I have also -- will permits you to take with
12  you notebook binders which will have Exhibits.  The
13  fact that evidence is contained in the binder does not
14  mean you should give it more weight than other evidence
15  in the case.  Documents have no more or less weight
16  than the other evidence presented.  I instruct you that
17  your verdict must be based solely and exclusively on
18  the evidence in the case, it cannot be governed by
19  passion, prejudice, sympathy, or any motive whatsoever
20  except a fair and impartial consideration of the
21  evidence.  You must not, under any circumstances, allow
22  any sympathy which you might have or entertain for any
23  of those involved to influence you in any degree

**23**

1  whatsoever in arriving at your verdict.  The Court does
2  not charge you not to sympathize with them because it
3  is natural and human to sympathize with persons
4  involved in litigation.  The court does charge you not
5  to allow that to enter into the consideration of the
6  case or influence your verdict.
7      The role of an attorney is to zealously and
8  effectively advance the claims of the party the
9  attorney represents from the bounds of the law.  An
10  attorney may argue all reasonable inferences from the
11  evidence in the record.  It is not proper for an
12  attorney to state an opinion as to the truth or falsity
13  of any testimony or evidence, or the guilt or innocence
14  of an accused.  What an attorney personally thinks or
15  believes about the testimony or evidence in the case is
16  not relevant.  You are instructed to disregard any
17  personal opinion or belief concerning the testimony or
18  evidence which an attorney offers during the opening or
19  closing statements or at any other time during the
20  course of a trial.  Further, what an attorney states in
21  opening or closing arguments is not evidence.  Evidence
22  consists of testimony from witnesses testifying from
23  the witness stand, and Exhibits introduced through

**24**

1  their testimony.  It is this evidence only which you
2  may consider in reaching your verdict.
3      We are at the point now for the -- hear from
4  the lawyers.  You may proceed.
5      MR. LUGG:  Thank you.  Ladies and gentlemen,
6  good morning.  We told you at the beginning of this
7  case there are a few times that we get to address you
8  directly.  This is one of those times.  Counsel for
9  defense will have an opportunity to address you after I
10  conclude and fortunately or unfortunately I will have a
11  chance to speak to you one last time.  That will be the
12  end of the case.  I am sure you are looking forward to
13  that.  You have been appearing for court three weeks,
14  essentially straight, appeared everyday diligently
15  received, reviewed and heard the evidence that has been
16  admitted in this trial.  For that at the outset I thank
17  you, bear with us for a few more moments.
18      You just heard an instruction that what we
19  tell you as lawyers is not evidence.  What we tell you
20  can be opinion.  So why do we stand before you at the
21  end of a case and offer summations, what is called
22  closing argument.  What we can do, what I will offer to
23  you in a few brief moments is offer you a structure, a

25

1  framework on how to review the evidence in light of the
2  instructions and the law you have just been told about.
3  You will hear at the conclusion of all of our
4  arguments, you control how you deliberate, how you
5  review the evidence, how you decide the case. The
6  evidence in this case, Ladies and Gentlemen of the
7  Jury, establishes several things. It establishes the
8  commission of theft, which counsel conceded at the
9  outset, that is not much of an issue of dispute. The
10  evidence establishes there are two people involved and
11  the evidence establishes this man, seated at this
12  table, committed thefts of his clients. He stole
13  client money.
14      That is what this case is about. This is a
15  recurrent theme in this trial, a theme we discussed in
16  opening and a theme that must be discussed again. That
17  is Trust. That Trust has been coupled with greed and
18  deceit. Greed in the acquisition of money. Deceit in
19  keeping the plan going. The defendant, Daniel Anker's,
20  greed and deceit premised upon that Trust formed the
21  calculus by which he was able to take, intending to
22  deprive hundreds of thousands of dollars of his
23  clients' money. The evidence establishes these facts,

26

1  this formula enabled him to steal this money.
2      You heard several witnesses testify that they
3  placed their trust in this man, the defendant. They
4  trusted him to receive the money. They trusted him to
5  disburse the money, and what you have heard is that
6  that did not happen. You heard that that money went
7  right out the door to personal expenditures for cars,
8  for guns, to family, on the pink checks that we have
9  heard are escrow account checks.
10      Daniel Anker, lawyer, defendant in this case,
11  stole this money, appropriated it and used it for his
12  very own benefit. He signed those checks, others
13  signed these checks with his knowledge, as you have
14  heard. He stole this money. Mr. McCullough helpfully
15  reviewed, you heard about binders, accountant reviewed
16  and prepared a spreadsheet by payee, indicating where
17  this money went, personal expenditures, hundreds of
18  thousands of dollars, defendant attempted to explain
19  some of them but remember, he did not explain them all.
20  He was asked what about your in-laws. I am not sure
21  what that was about. 11 thousand dollars. This is --
22  and counsel used the term in openings, a paper case, a
23  white collar case, various terms have been used. That

27

1  is an important fact to keep in mind. Because the fact
2  that this is done by paper makes it a more palatable
3  crime. The defendant is not breaking into people's
4  houses. Counsel told us at the outset, this is done by
5  paper in some cases given today's technology, by the
6  transfer of zeros and ones and wire transfers. Zeros
7  and ones being computer bits, such as what a Sergeant
8  Perna told us. There is no face to that money, no face
9  to that. The face does not come to that money, person
10  involved did not come with that until the complaint
11  comes weeks, months later.
12      This is not personal, this is just about
13  money. We discussed briefly at the outset the common
14  theme thread, trait that unites you all as jurors.
15  That trait is common sense. And what you will do, what
16  you may do, when you retire to deliberate this case,
17  that mantra is lifted, no one is going to ask you again
18  did you read about it, discuss the case among
19  yourselves. That is done, because what you will do
20  when we are done is exactly what we told you not to,
21  the judge told you not to. You go back, you discuss
22  everything about this case down to your impressions of
23  anyone in this courtroom, but what you carry with you

28

1  is the common sense. That common sense cannot leave
2  you as you evaluate the evidence. What does your
3  common sense tell you when you hear the statements,
4  when you hear the evidence, you hear the testimony?
5  What does common sense tell you when a person with
6  banking experience, 15 years of law practice, four
7  years of law school says I thought I was getting a job
8  offer having never been contacted, having never had an
9  interview, but I thought this was for real. Ladies and
10  gentlemen, use your common sense. What did it tell you
11  when there is a claim there is a five million dollar
12  settlement unsupported by any documentation and
13  concededly never come to fruition because negotiations
14  are still ongoing. What did your common sense tell
15  you?
16      You have been instructed about the law. One
17  of the helpful things for closing is that you have
18  heard the law from Judge Stokes before we start. You
19  don't have to hear it all from us again, but it is
20  important to consider some of the instructions that
21  have been offered to you. One, the elements that must
22  be established as to the thefts. The defendant took
23  the property of another, sum is indicated in the list

A-160

of individuals as have you heard read to you. Fifty to one hundred thousand dollars, or over one hundred thousand dollars. Secondly, that he intended to deprive them of that property. We are going to talk more about that in a few moments. Those are the elements you must feel are satisfied beyond a reasonable doubt.

Second is the conspiracy offense. The defendant intended to promote the commission of the theft. He agreed with another, in this case you have heard of that person Laura Larks one of those committed an overt act in the pursuance of the conspiracy. That is the framework upon which you lay the evidence. You heard also in the instructions a theory called accomplice liability. There are two ways by which you may find this defendant guilty as a principal, or as an accomplice. That accomplice liability instruction tells you how you find when a person is an accomplice, do they assist, help. Do they engage in conduct that would constitute the felony.

You may find the defendant guilty as a principal or accomplice and the facts of this case bear out both theories. You have heard about Laura Larks.

You have been told she is unavailable, of course, but have you heard there was an elaborate scheme concocted between implicitly or explicitly by virtue of their conduct between the defendant and Ms. Larks by which they both acquired substantial sums of money to be sure reviewing the records, the defendant in this case benefitted substantially more than his daughter. He got a heck lot more money. He intended to take that money he stole from his clients.

There are a variety of ways to view and assess a criminal case. This case lends itself to a framework that I will offer you first, what happened. What is the crime proven. Second who and how -- who is criminally responsible. Those are the two things, the facts who is criminally responsible the intent.

Viewing it in this light, the first prong; what happened. Counsel conceded and as that trial has been developed, is not he heavily controverted, thefts were committed. Phil Urban January 11, 2002, more than 57 thousand dollars was stolen. Douglas and Caroline Ray, March 2003 more than 22 thousand dollars. John and Amy Lesco, April 3, 2003, more than 128 thousand dollars. Gary and Maya Paveza, April 2003, more than

62 thousand dollars. Frank and Margaret Caucci, April 2003, more than 231 thousand dollars stolen. The Bashirs, Drew Chambers, June of '03, more than 180 thousand dollars stolen. Trish Paoli, June 2003, more than 271 thousand dollars stolen. Leahys, Julius Misel, Nancy Devine July 2003, more than fifty thousand dollars stolen. Finally, Kintz and Burketts, July of '03, more than 165 thousand dollars stolen, evidence that was admitted primarily during first the few days of this trial establishes that that money on each of their accounts, in each transaction was placed into the defendant's escrow account for a particular purpose as designated by the sheets that have been offered, that money came in, that money never went where it was supposed to go because that money was stolen.

That is what happened, ladies and gentlemen. The evidence supports that the total of those transaction, total amount stolen based upon figures I have given to you based upon evidence that you will resolve is over $1,360,000. Dan Anker, the defendant, took this money. He, aided by, and aiding his daughter, took 1.3 million dollars of client money. Greed fed by trust, acquired and prolonged by the

deception.

The second portion of the proffered calculus is what this case has become about. Who is criminally responsible for taking that incredible sum of money? Your jobs, ladies and gentlemen, is to assess this man's criminal responsibility. We have said from the outset, instructions tell you about conspiracy, accomplice liability. This is not an "either or" proposition. The defendant, his daughter were in this together. Based upon the evidence admitted in this trial for your consideration, the defendant, Dan Anker, is criminally responsible for stealing client funds. He took this money. He applied it for his own use. He bought things you heard about, the guns, the cars, disbursements to family, that is how he used the money.

Again, we return to the jury instructions, what has just been read to you, and in evaluating the defendant's criminal responsibility some important helpful facts were offered to you as Judge Stokes tells you. It is difficult to know what is going on in another person's mind. Of course, for this reason our law permits you, the jury, to draw an inference, or in other words to reach a conclusion about the defendant's

33

1 State of mind from the facts and circumstances
2 surrounding the act the defendant is alleged to have
3 done. The facts and circumstances surrounding the
  acts. And you may consider whether a reasonable person
5 in the defendant's circumstances would have had or
6 lacked the requisite state of mind or belief. Two
7 important points to assist you in your deliberations.
8 Facts and circumstances surrounding the acts and a
9 reasonable person and not just a reasonable person, a
10 reasonable person in the defendant's circumstances.
11      This is, again, where that common sense comes
12 in. Your evaluation must focus on a reasonable person
13 in the defendant's circumstances.
14      Fifty year old person, bank experience in the
15 law department, Bank of Delaware, now PNC Bank, law
16 school. He indicated 15 years legal experience,
17 private practice, big firm, solo practitioner. A
18 reasonable person under those circumstances, ladies and
19 gentlemen.
20      Now, employ the common sense, read the
21 instructions, not based on what the defendant tells
22 you, but based on what a reasonable person in his
23 position under these circumstances. The defendant had

34

1 the requisite intent the facts establish that what does
2 your common sense tell you about his intent? He
3 intended to take the money. He intended to use it. He
4 committed the theft. He was spending this escrow
5 account money, spending minimal time in the office, did
6 not look at any statements. He did not want to. He
7 was spending the money, ladies and gentlemen. His
8 claimed blind indifference does not relieve him of
9 criminal responsibility.
10      This blind indifference is, in fact, an
11 element, or a factor that you may and must consider in
12 assessing his intent. He did not want to see the
13 books. He avoided them. And think about how these
14 thefts were set up. You heard from these witnesses.
15 You heard several of them tell you when they went to
16 that closing table, not Laura Larks, Dan Anker tells
17 them, you know, there might be some problems. Prime of
18 the pump, ladies and gentlemen. There were problems.
  These folks did not know at the time they were coming
  down the pike there were problems.
21      Why would the defendant tell these people this
22 at the table? When you heard from Dade Werb, you heard
23 from Mr. Forsten, Richard Forsten tell you this is not

35

1 common, neither one had in their 15 years experience
2 each, any problems such as this. Why would this man at
3 that table say there may be some issues in this case.
4 These people remembered that because that was somewhat
5 unique to them. They remembered that by the one
6 person, the defendant, the person sitting at that
7 table.
8      What does he tell you about the skills that he
9 developed? He knew he developed over 15 years the
10 ability to deal with clients. He tells us that he told
11 I hope I had this beforehand, to be sure we talked
12 about the fact that law practice is practice, you
13 develop skills through years, 15 years of experience in
14 dealing with client concerns, complaints, issues, all
15 benefitted him in 2002 and 2003, when these people sat
16 at that table and these skills were used to allay their
17 concerns fears to prolong this process to enable those
18 funds to be available to him for his use, not as
19 directed by the clients.
20      What does he tell these folks, relax, I am
21 working on it, negotiating on your behalf. Relax, I
22 have insurance. Those are the comments that these
23 witnesses tell you were offered to them by the

36

1 defendant. What is helpful with respect to your
2 analysis in light of these witnesses' statements and
3 testimony is that they provide something not always
4 available in the criminal case, that is they
5 corroborate one another. When one person comes in and
6 tells you something, there is nothing else to support
7 that you may have questions about that person's
8 testimony or statements to you, but these folks; the
9 Cauccis, Mr. Ray, Paveza they all come in and tell you
10 from different perspectives, positions discussions,
11 never having met, most of them, they tell you these
12 comments are offered to them. Those are issues that
13 you can consider in assessing the value of the
14 information they provide to you.
15      Things start to fall apart a little bit.
16 There are two people little bit more diligent than the
17 others, Douglas Ray, Maya Paveza, law school Dean and a
18 person in the real estate industry. They are getting
19 too close. They are offered fake payoffs to put them
20 at arm's length. Meanwhile there is still a
21 substantial sum of money. Wheels are spinning. The
22 defendant couldn't keep up. He went so far as to have
23 a celebratory lunch proclaiming his victory with a

1  mortgage company, with the Dean of Widener University
2  School of Law having never seen one document, one
3  settlement paper. Ladies and gentlemen, the defendant
4  knew what he was doing. He intended to take this
5  money.
6       Mr. Ray tells you this all seemed funny, it
7  did not seem right, but the defendant's representations
8  the admiration that he had for the defendant prompted
9  him when that check hit the table, does not seem right
10 but you know what, you are telling me this I believe
11 it. This is what Mr. Ray tells you. Pavezas I
12 negotiated on your behalf. John Lesco, I am working on
13 a 250 thousand dollar settlement for you. Frank
14 Caucci, I don't deal with writing, I pick up the phone.
15 Mr. Caucci investigated. He went in there and
16 confronted the defendant. He had every opportunity to
17 look the files says he never picks up. I am working on
18 it. I deal with things on the phone. I can't hand you
19 a piece of paper. Mr. Burkett, I have insurance, don't
20 worry about it. Those are the facts surrounding the
21 acts allege to have occurred. These are the facts
22 surrounding the case, surrounding the defendant which
23 assist you in establishing his intent, his criminal

1  responsibility for those offences. Those facts
2  resoundingly indicate defendant is responsible.
3       To be sure as indicated, Laura benefitted from
4  this scheme, to be sure not as much as her father, but
5  it, again, is not an either or proposition. The
6  evidence establishes the criminal responsibility of
7  both, but your job in this case State of Delaware
8  versus Daniel Anker, is to assess the criminal
9  responsibility albeit as a principal or an accomplice
10 this man, the defendant, Dan Anker.
11      You had the opportunity to hear from the
12 defendant, Daniel Anker most of the day Monday, few
13 hours yesterday. Judge Stokes offered you an important
14 instruction with respect to your assessment of him.
15 The instruction applies -- that applies to each
16 witness, in evaluating the credibility of the defendant
17 and subsequently assessing the weight and value of his
18 testimony consider following things that you were told;
19 his means of knowledge, strength of memory,
20 reasonableness or unreasonableness of the testimony,
21 consistency or inconsistency of the testimony, motives
22 actuating him, the fact, if it is a fact, that his
23 testimony has been contradicted, his bias, prejudice or

1  interest in the outcome, and his manner and demeanor
2  upon the witness stand. Those are things that you may
3  use to assess the defendant's criminal responsibility,
4  and also his credibility, credibility of the
5  information that he offers to you. What did you learn?
6  You learned that he incorrectly advised the Supreme
7  Court about his record keeping. Career, license,
8  clients. You did learn that he did a number of
9  items -- that he did not do number of thing that he
10 certified to having done.
11      He signed the certification saying this was
12 true and accurate. You know that he had knowledge of
13 the import of these representations based upon a review
14 of his files in 1995 where he claims to have maintained
15 fastidious records. He knew in 2002, 2003, how
16 important it was to present the image of an organized,
17 efficient lawyer. He did that, but he tells you
18 because now confronted with the evidence that has been
19 admitted in this case, the fact people have been
20 through his office, his files that was incorrect. He
21 offered that because it applied to his career and his
22 license. He knew what he had to tell them in 2003,
23 despite the fact the office was in disarray, it was a

1  mess, had not reviewed any statements. These are
2  facts, this is evidence surrounds the defendant as he
3  testifies before you, surrounds him as you assess his
4  credibility. The defendant's testimony on important
5  issues is contradicted on several points. First, you
6  heard yesterday that he acquiesced, authorized by
7  silence, signing of business checks by others.
8       You assess the value. He approached his
9  daughter for assistance two months prior to trial. She
10 tells you about the conversation, tells you about the
11 discussion. Interest in the outcome, ladies and
12 gentlemen, that is a fact to consider when assessing
13 what is offered to you by the defendant. She was told
14 you have to practice your Js. You don't do them quite
15 right. The defendant offers you an elaborate story of
16 money paid for different expenditures. He is presented
17 with circumstantial evidence, checks, expenditures as
18 he appeared before you, questioning of his counsel. He
19 tells you this one I think was from a real estate
20 settlement in Pennsylvania. This was based upon a line
21 of credit. He had answers for each one presented to
22 him. But when confronted with things that were never
23 discussed there was no answer. We heard about the in

**41**

1  laws, 11 thousand dollars, couldn't come up, did not
2  indicate where that came from, did not indicate why
3  they received escrow funds, concedes they were never
   clients. These are proceeds of a theft.
5         He went so far as to say he would be
6  speculating on checks that predated this purported
7  Washington Mutual refinancing of his property.
8  Speculating there is no basis for this other than the
9  fact that these were stolen funds.
10        Few other remaining factors that we discussed
11 must be considered; motives, bias, prejudice, manner,
12 demeanor upon the witness stand. You had unique, have
13 the unique ability of returning to the jury room and
14 discussing not only what someone tells you, but how
15 they tell it to you, how they behave, how they act,
16 observations that you make of them, because mannerisms,
17 demeanor are often times just as important as the
18 information that is told to you. You sat in these
19 chairs. You observed the defendant sit here, and offer
20 you information. You observed his demeanor. That is
21 an incredibly important factor in assessing the
22 information he offers to you.
23        From the defendant's testimony, from his

**42**

1  demeanor, you learned some important things. Dan Anker
2  is about Dan Anker. We heard a long history going back
3  to the '80s of the life of Dan Anker. What we learned
4  from that he was married at the time, three young girls
5  in the late '80s. He decided to leave, he went and
6  remarried. He was thinking about Dan Anker. He worked
7  at Bank of Delaware, paid for his law school education,
8  he left almost immediately upon graduation, by his own
9  admission. He is thinking about Dan Anker. He gets an
10 offer from a prestigious firm, works there for a time.
11 His friends for many years, I have some office space
12 work here free. No strings attached. No risk
13 opportunity, plus he now gets a big client, Wooden
14 Industries leaves that firm thinking about Dan Anker.
15        Hundreds of thousands of dollars of client
16 funds he spends for his own benefit. He is thinking
17 about Dan Anker. He buys cars. He buys guns, BMW,
18 Yukons 20 thousand dollars gun, money to his wife,
   money to his in-laws, he is thinking about Dan Anker.
   He is caught. He is charged with criminal offences.
21 His practice is shut down. He comes before you, takes
22 that stand, he lays this at the feet of his daughter.
23 He is thinking about Dan Anker. What are the motives

**43**

1  actuating his testimony. What is his interest in the
2  outcome. These are things that, ladies and gentlemen,
3  you are required to and instructed to consider in
4  assessing the value of the information offered to you.
5         He has a direct, clear bias. He has an
6  interest in the outcome. He carries that bias, that
7  interest with him. It cloaks him as he testifies from
8  that witness stand and offers information to you. The
9  facts and circumstances surrounding each event, the
10 facts and circumstances that were detailed to you of a
11 15 year period establish and offer information to you
12 as to his credibility. These are facts for you to
13 consider.
14        Ladies and gentlemen, this case boils down to
15 trust, greed and deceit. That is what happened here.
16 These individuals, those nine transactions, those
17 people who went into that office trusted the defendant.
18 They did not realize at the time greed and deceit that
19 was awaiting them, but it was there. The defendant
20 used that trust to feed that greed and through deceit
21 prolonged the theft, prolonged the scam and used the
22 money, ladies and gentlemen, the evidence presented to
23 you through the past several days establishes beyond a

**44**

1  reasonable doubt that the defendant's guilt of the
2  charged offenses.
3         THE COURT: You may close.
4         MR. WENDELBURG: Thank you, Your Honor.
5  Ladies and gentlemen, good morning for the last time,
6  even if we are here tomorrow. Trust, greed, deceit,
7  they are all here. They are all here. We will talk
8  about them. There is something else here, an
9  undercurrent in this case through all the State's
10 witnesses, through all the defense witnesses, people
11 with an interest in the case, people with no interest
12 in the case, professionals volunteers, everybody, the
13 underlying theme of this case is that the scam that you
14 have heard about for the past two and a half weeks
15 could never work. It was born to fail. It was similar
16 to a check kiting scheme, what is sometimes called a
17 Ponzi scheme. It can't have an end, unless the crook
18 just runs away after he made a big score. That is the
19 only way that could have worked because money was being
20 stolen too fast over too short a period of time for it
21 ever to have been made up.
22        With the exception of in the case of the
23 State's indictment Phil Urban settlement which we are

45

1  going to deal with separately, all of the offences in
2  this case occurred from March of 2003, to the middle or
3  end of July 2003, a period of about four months, a lot
4  of money went out the door during that period of time.
5  A lot of money was spent, for this, ladies and
6  gentlemen, was a scheme that could not have lasted much
7  longer, in fact it is surprising for having lasted as
8  long as it did.
9       The prosecution asks you to apply your common
10 sense to this case, so do I. Is this the way a fifty
11 year old lawyer steals money? Is this the way somebody
12 with 15 years of practice, four years of law school,
13 presumably four years of college, years in the banking
14 industry, someone who is familiar with the way things
15 work, is this the way that that kind of a person steals
16 money or even advises his daughter to steal money or
17 helps his daughter steal money, that just does make
18 sense. This scheme just never really had a chance.
19 For that reason and that reason alone, we have to be
20 very skeptical when we are trying to attribute this
21 scheme with an intent to steal this way, to somebody
22 with the level of sophistication and knowledge this
23 defendant has.

46

1       However, the co-defendant in this case, who is
2  to be tried separately, and who has not testified in
3  this case, is, when she starts, by my calculations
4  about 20 years old. She has not finished high school.
5  She has worked on a GED. There is no testimony in this
6  case, in fact, no evidence that she ever held a
7  position of this responsibility before, or was ever in
8  a situation or system that was as relatively
9  sophisticated as this small office was. What we have,
10 what you have to consider is a young woman barely out
11 of adolescence who is suddenly given a tremendous
12 amount of responsibility, not a heck of a whole lot of
13 supervision or oversight. What she is was given was a
14 tremendous amount of money, control of that whether
15 this is explicitly given to her or assumed by her, and
16 the ability to manipulate not only that money, but the
17 man who supposed to be controlling it.
18      You have heard a lot, ladies and gentlemen, as
19 Mr. Lugg has said about history of Dan Anker that goes
20 back into the '80s. You also have heard a lot about Dan
21 Anker's family, only two members of that family of that
22 family in back in the '80s have testified Dan and late
23 yesterday as the State's last witness his second

47

1  daughter Lynn. We will get to Lynn in a little bit.
2  You also have heard that some pretty special
3  circumstances, to put it generally, have occurred in
4  that family, that have made an under current of
5  tension, of high emotion, of strong feelings, and of
6  motives for a whole lot of things. You have heard,
7  ladies and gentlemen, how Laura came back, how for a
8  long time in Dan's words they did not have much contact
9  with him. You have not been told what she has been
10 doing during that time, you have heard the evident
11 relief, the gratefulness, the joy to which her father
12 welcomed her back to his family, years later took her
13 into his practice, gave her responsibility, trusted her
14 trained her. How she got into the position she was in,
15 when the events that we have been talking about here
16 for the past two and a half weeks came to unfold. You
17 have had the opportunity to hear from the defendant's
18 own mouth what happened in that office. You have heard
19 from the mouth of witnesses in this case, not members
20 of his office, victims, people whose money was taken,
21 the interaction they had with Dan Anker and Laura
22 Larks. You have heard both from Dan, and from people
23 who knew how his office worked, for example, Richard

48

1  Wooden for example Chandler Land, the control that
2  Laura had over this situation. Another underlying
3  theme of this case, the testimony that you have heard
4  is that the person who dealt with the books, and the
5  person would dealt with the people, and the person who
6  dealt with the papers, is the co-defendant who is not
7  on trial here.
8       Mr. Lugg has told you repeatedly this is not
9  an "either or" situation. That's true. However, it is
10 not a situation where you have to convicted both or
11 convict none. Laura Larks is not on trial. Dan Anker
12 is on trial. His is the only case which you have to
13 consider.
14      In looking at the plain facts, not disputed
15 facts, but the plain facts in this case, you see that a
16 number of different types of thefts, or attempted
17 thefts occurred in this case. This is not the order
18 that you heard about them in the trial, but this is the
19 order in which they occurred, based on witnesses'
20 testimony from the stand. You have heard that before
21 Phil Urban realized that his mortgage, refinancing
22 money had been taken, there were a series of property
23 transfer that is occurred in Sussex County. Those

49

1   property transfers were being done by Wooden and
2   Associates, various members of that organization to
3   acquire pieces of land for eventual commercial
4   development. You have heard from a succession of
5   witnesses in this case that happened in that case -- in
6   those cases was money was put by the Wooden Group into
7   the Anker escrow account for the purpose of paying
8   transfer taxes to the County and the State. You have
9   heard after a period of time the Wooden Group and its
10  members realized that that money had not been paid
11  over. It went into the account, but their deeds had
12  not been recorded, which means property transfer taxes
13  had not been paid, which means checks had not gone out
14  of the Anker account. Who did they call? They did not
15  call Dan. They called the person they knew who was
16  controlling the payment of those taxes. They called
17  Laura. In order to get those taxes paid, Chandler Land
18  was essentially, verbally, if not -- certainly not
19  physically beating on Laura to get it done. Eventually
20  after call after call after call, after month and month
21  and month with the use of this money still sitting in
22  that account Laura paid the taxes.
23          The next thing that happened, you have heard,

50

1   is that Phil Urban's money was taken. How was it
2   taken? I suggest to you, ladies and gentlemen, that
3   Phil Urban's case is different from all the other
4   mortgages and refinance cases in one remarkable
5   respect. You heard from the defense witnesses in this
6   case that Phil Urban's mortgage, the mortgage he was
7   trying to refinance had already been satisfied, in
8   fact, the document that shows that satisfaction is in
9   evidence as a defense Exhibit. Mr. Anker testified it
10  show up on the Title search. What did that mean? It
11  means that when Phil Urban went to refinance, when he
12  went to borrow a mortgage from another lender to payoff
13  his old lender, the mortgage that was the subject of
14  that refinance was marked with the Recorder of Deeds
15  stamp as already having been taken off. What does that
16  show to someone reviewing a Title search on this
17  property? It means that that debt may not exist
18  anymore. Regardless of whether money was being taken
19  out of Mr. Urban's account, as a matter of record, that
20  mortgage didn't exist. It is satisfied.
21          At that point, ladies and gentlemen, a red
22  flag goes up that says steal my money. It does not
23  have to be used to be paid to the old mortgage company

51

1   because that mortgage did not exist anymore. This is
2   off the books. It is satisfied. Who is in the
3   position to see that when it first comes into the
4   office? The person who first reviews the Title
5   searches. The person who is in charge of handling the
6   money. The person who is in contact with the client.
7   That, ladies and gentlemen, is the co-defendant.
8           The urban mortgage is handled slightly
9   differently. Understand that the second theft which is
10  alleged does not happen until 14 months later. The way
11  the Urban mortgage is done is almost a practice run for
12  what happens later. Phil Urban tells you that he gets
13  Dunning notice after notice. The old mortgage is not
14  paid off. He has done the refinance. He did not
15  understand it. Who does he contact? Laura. What
16  arrangement is made with Laura? We will reimburse you
17  for the money that the bank is taking out of your
18  account. Does Dan tell him that? No. Laura tells him
19  that. Is he reimbursed? He is reimbursed, but it
20  still does not stop. So what does he do? He contacts
21  Laura. What are we going to do? Well, said Laura,
22  take automatic deduction off your savings account.
23  Have the bill redirected to our office. I will take

52

1   care of it. What happens? Phil Urban does as he is
2   instructed. She takes care of it. In the end, Phil
3   Urban's mortgage never gets paid off, although he is
4   paid a substantial, but relatively, in this case, small
5   sum of money by Laura again and told this is from the
6   bank for your inconvenience and the damage to your
7   credit. Phil is a cousin of Dan Anker. He never goes
8   to Dan to complain or even to question what is going
9   on. Who does he go to? The person he knows is in
10  charge. Laura. The urban theft is not discovered for
11  a long period of time, but during this quiet time,
12  during this time of no alleged thefts, what is
13  happening? Remember the property transfer taxes we
14  were talking about I was talking about five minutes
15  ago, chickens are coming home to roost. Chandler Land
16  starts calling Laura and putting the heat on her.
17  These deeds have never been recorded. These taxes have
18  not been paid. Get it done.
19          Eventually, in early March of 2003, 26
20  thousand dollars is paid from the Anker escrow account
21  to pay portions of these property transfer taxes from
22  what has been described as the Tunnell property. What
23  happens the same week? Doug Ray's mortgage money goes

53

1  out the door. You can find, ladies and gentlemen, that
2  the Ray mortgage money was necessary to this operation
3  in order to payoff Sussex County transfer taxes. You
   can find that Peter was being robbed to pay Paul. What
5  you haven't heard in this case, ladies and gentlemen,
6  is that this theft is connected to -- this theft was
7  committed by Dan Anker, because Phil Urban has never
8  talked to him. Chandler Land, Rick Wooden have not
9  talked to put the heat on him. The contacts and heat
10 went to the co-defendant in this case.
11        There is no question, ladies and gentlemen,
12 that nine thefts were committed. You have been taken,
13 in painstaking detail, through each one of those, both
14 in testimony from the witness stand and in argument
15 from counsel. I am not going go into exhaustive detail
16 because you know how these thing were done. You have
17 heard direct evidence. You have heard evidence from
18 the victims. You have heard evidence from the State.
19 You found what was found in Laura's computer. You have
20 seen e-mails, both to clients, and from fictitious
21 people to my client. You have heard how these deeds
22 were done. With the theft of the Ray mortgage,
23 refinance money, a new chapter opened in this train of

54

1  thefts.
2        Now, they started coming pretty quick and
3  fast. You are talking about eight thefts occurring
4  over a period of a few months. The succession of
5  thefts, and the distribution of the money from those
6  thefts, shows that money was being stolen from the next
7  guy in order to pay the last guy off. And the way that
8  the thefts were covered up was in many cases, to payoff
9  the previous victims in order to keep theme quiet.
10 Your common sense has to come into focus. This was
11 hinted at in Dan Anker's testimony from the witness
12 stand yesterday. In the case of Dean Ray, he had a 200
13 thousand dollar plus mortgage refinanced. Dean Ray was
14 supposedly paid over 400 thousand dollars for his time
15 and inconvenience. Ladies and gentlemen, if you are in
16 the business or sideline of stealing money from people,
17 does it make sense that with 15 years of legal
18 experience, four years of law school and banking
   experience, are you going pay someone 400 thousand
   dollars in order to steal 200 thousand dollars from
21 him. It does not make sense.
22        In the case of the Pavezas, they were paid
23 much more money than their mortgage they lost in order

55

1  to be quiet. Again, ladies and gentlemen, if you have
2  all this experience, do you payout more than 100
3  percent of who you have stolen in order to make money?
4  It just does not make sense here either.
5        The pattern that goes through these last eight
6  thefts, is a pattern, ladies and gentlemen, that is
7  factually complicated. There are a whole lot of papers
8  that you are going to get to take back into the jury
9  room with you, but is conceptually simple. It is
10 consistent with the simplicity of a young mind with
11 someone who is making it up as they go along. I
12 suggest to you that common sense tells you it is not
13 consistent with the way a middle aged lawyer steals
14 money. The prosecution has told you that the conduct
15 of the defendant is one of the things that you can look
16 at in determining his believability. Ultimately,
17 ladies and gentlemen, determining whether you think he
18 is guilty or not. Look at the conduct of the defendant
19 in this case. The conduct of the defendant after these
20 thefts occurred, is that while on vacation in Florida
21 he gets a call that says, there is a problem. What
22 does the defendant do? He is already hundreds of miles
23 out of state. He is 90 miles from Cuba. He is a few

56

1  hundred miles from Mexico. What does he do? He gets
2  on a plane as soon as he possibly can and gets back to
3  Wilmington to face the problem, to take care of the
4  problem. He gathers up his kids, his wife, he changes
5  his plane reservations. He gets on his cell phone to
6  try to figure out what happened. Is this the action of
7  a guilty man who has just stolen one million dollars
8  from his clients and been caught? What does he do when
9  he gets back to Wilmington? Does he hide? Does he go
10 home? Did guess to his in-laws house? Does he wait
11 for the cops to come? Does he lawyer up? No, he goes
12 into the office with his wife, and there with his wife
13 and as it turns out one of these victims in this case,
14 he goes through files and tries to find answers. He is
15 in shock. Even Mr. McCullough, earlier in this matter
16 agreed that he is in shock. The people who were there
17 agree he is in shock. He is a Zombie. He can barely
18 function but he is there trying to find answers. Is he
19 there shredding documents, shoveling trash out the
20 door? No. He is looking. He is helping. Is this the
21 action of a guilty man? What does he do after the
22 first 24 hours, after he is met with Joe McCullough who
23 at that point is auditing his office for suspected

57

1   theft. What does he do? He allows Detective Carmine
2   to come in and take things out. Is this the act of a
3   guilty man? He communicates with the receiver who is
    appointed after Dan is suspend from the practice of
5   law. He talks time and again with the receiver who is
6   not his lawyer, not appointed to be his friend, but who
7   is appointed to look after his practice and his
8   clients. He helps that man Richard Forsten to help his
9   clients to find the answers, to trace the money, to
10  find the paper. Is this the act of a guilty man?
11         Finally, ladies and gentlemen, every defendant
12  in a criminal case has the opportunity not to take the
13  stand and talk to you. In this case, Dan Anker spent
14  the best part of a day and a half on the stand. The
15  State couldn't call him. He had the right to the
16  presumption of innocence. He has the right not to
17  testify; on the other hand, knowing having heard all
18  the things that the State has been piling up against
19  him for the past two weeks takes the stand on direct
20  examination and knowing that he is going to be subject
21  to cross examination by the prosecutor. He tells you
22  what he knows. He tells you what he thought. He tells
23  you what he did. Is this the act of a guilty man?

58

1          Emotions in the Anker family, let's be brutal
2   about it, call it the first Anker family, wife, and the
3   children, three children from the first marriage,
4   obviously run deep. You saw on the witness stand poor
5   Lynn Anker yesterday, a bit of what has been going on
6   in that family for years. You saw, not the emotions of
7   Laura, she is not here, but you saw the effect on the
8   second daughter. You heard her words, barely audible
9   as they were. There is one act, ladies and gentlemen,
10  that maybe speaks louder than Lynn's words yesterday,
11  that shows you the extent, frankly, of the malice that
12  was at work here to ruin Dan Anker. That is the one
13  transaction we have not talked about, that is the Anker
14  refinance. This is the one series of transactions, or
15  single transaction in this case that does not make any
16  sense unless you attribute it to pure spite.
17         Dan and Ann went to refinance their house in
18  early 2003. The reason that they did that is because
    they had been getting Dunning notices from their
    mortgage company that their mortgage, which was
21  supposed to have been paid out of the office, operating
22  account, according to Dan, which Laura was entrusted to
23  pay, had not been paid. The problem couldn't be

59

1   resolved. Dan kept telling Laura, fix this. Fix this,
2   did not get fixed, phone calls kept coming, so in
3   frustration what Dan and Ann did, they testified
4   separately they decided to refinance the loan, started
5   over again. Let's start over with a clean slate, get a
6   better mortgage rate, get some cash back, substantial
7   amount back. They owned the house for many years,
8   worth a lot more than they paid for it. Let's solve
9   the problem that way. To whom was this task of
10  refinancing turned over? Laura. The application was
11  filled out, paperwork was done, given to Laura. That
12  paperwork was found in Dan Anker's office after the
13  blow fell. It was never sent out. It was never done.
14  There was an elaborate scheme cooked up to convince Dan
15  and Ann they had refinancing, but if you choose not to
16  believe the defendant because he is the defendant,
17  remember his wife's testimony as to her reaction when
18  she found out that her house was in foreclosure. She
19  never had a refinancing at all. Ladies and gentlemen,
20  nobody made any money out of that deal. Dan and Ann
21  thought they were getting 68 thousand dollars cash back
22  in addition to getting a bunch of debts paid off. That
23  money was complete illusory, as we say in the law. It

60

1   was phony. But what happened, the house went into
2   foreclosure. Their credit went into the tank. Is this
3   sting that someone who is stealing money does to
4   himself four months before he is allegedly caught? No,
5   ladies and gentlemen, this is a pure act of spite.
6   That is the only explanation for that. There is no
7   reason for the Ankers to have done this to themselves
8   just before setting out to steal a million dollars --
9   plus dollars from the clients in this case. It does
10  not make sense.
11         There are other indications that you have as
12  to what was going on in Laura's mind while all this was
13  going on. You have heard two witnesses, one of whom is
14  a victim in the case, Maya Paveza tell you what Laura
15  told them about what was going on in the office and how
16  she felt about her father. You have heard that Laura
17  has confessed to taking a loan, or loans from that
18  office without telling her father. You have heard that
19  Laura asked one of the witnesses in this case to pose as
20  a bookkeeper to talk to another client possibly a
21  victim in this case, to allay their fears about what
22  was going on. You have heard Laura -- you have heard
23  that Laura has told a friend both of her's and her

61

1  dad's that he is a son of a bitch. She is only there
2  because the money is good. Cynically I am tempted to
3  say yes it was good. It was so good that one of the
4  spread sheets prepared by Mr. McCullough that you will
5  take back to the jury room, will show two of the
6  sheets, will show that an 18 month period of time,
7  Laura Larks got over 200 thousand dollars in cash
8  directly to her, out of the operating and escrow
9  accounts, in checks when her father testifies that her
10  salary was 25 thousand dollars a year.
11       Finally, you have heard testimony in this case
12  from one man who knew both Dan and Laura, after this
13  blows up, and after the roof fell in, she talked to him
14  on the telephone. The conversation went two ways,
15  Laura you have got to set this straight. What does
16  Laura say? I will paraphrase it, I screwed up, not we
17  screwed up, not we stole this money. I screwed up.
18  You have got to make this right. I will do it. They
19  are not going to kill you, Laura. I will go.
20       Ladies and gentlemen, the Judge has given you
21  instructions about presumption of innocence. Every
22  client gets it, every defendant gets it, regardless, as
23  I told you three weeks ago of what they do for a

62

1  living. There has been testimony in this case from
2  more than one witness that Dan Anker violated certain
3  rules of the legal community established by the State
4  Supreme Court rules, that don't apply to anybody but
5  lawyers. There is no question in this case, ladies and
6  gentlemen, that those rules were violated. There is no
7  question that the books were not properly kept. No
8  question that reconciliations were not done every month
9  during the period that we talked about. There is no
10  question that the accountant who was identified in the
11  2003 registration with the Supreme Court was let go
12  sometime in 2002, but those, ladies and gentlemen, are
13  not what Dan Anker is charged with, although at least
14  three witnesses have testified in this case as to what
15  the Supreme Court's rules are, not one of them that
16  told you that violation of those rules is a crime.
17  Also, not one of them has told you in this case that in
18  1995 Daniel Anker was investigated, that anything was
19  found wrong with his books.
20       MR. LUGG: Objection, Your Honor.
21       THE COURT: You are going to have to -- it's
22  the jury's recollection of the evidence that is going
23  to control that. Counsel in rebuttal can respond to

63

1  that.
2       MR. WENDELBURG: You have seen no documents
3  sanctioning Mr. Anker, you have heard no testimony that
4  Mr. Anker was sanctioned. You have heard no testimony
5  other than the fact that Dan Anker responded to a
6  routine audit in 1995 and nothing else after that. The
7  only thing, ladies and gentlemen, that that 1995 random
8  audit testimony has told you is that he knew that the
9  rules existed. He was not accused of a crime. He was
10  not convicted of a crime. You are not to take it as
11  evidence that he committed any crimes.
12       Three weeks ago I told you that nobody is
13  happy about the journey that you are about to embark
14  on. You are now getting to the last phase of it. You
15  get talk about it, sift and weigh the evidence. The
16  evidence, in order to return a conviction, the evidence
17  has to convince you beyond a reasonable doubt that Dan
18  Anker took money, knowing it to be the property of
19  another, with intent to deprive them of it. The Judge
20  instructed you on two different types of defense. One
21  is mistake. One is claim of right. Mistake is an
22  ordinary term. Claim of right is a legal concept which
23  is explained in the instructions. What Dan Anker has

64

1  told you from the witness stand in this case, ladies
2  and gentlemen, is that he got a lot of money. He got a
3  lot of money, thinking that this money was rightfully
4  his having been told verbally and in writing, that this
5  was his money. He spent that money, ladies and
6  gentlemen, consistently with a man who thought he was
7  doing right. Does a man who is stealing money in a
8  scheme that he knows has to fail soon buy a new house
9  in the same county where he currently lives? He might
10  buy a new house in Europe. Does he buy a house in
11  Chester County? Does a man who is running a million
12  dollars check-kiting-type scheme, make sure that his
13  kids can stay in the same school system, make sure he
14  can take of his parents and in-laws in the community in
15  which he resides? Does a man running scheme like this,
16  with knowledge that he is living on stolen money, do
17  the things that Dan Anker hs done in this case? After
18  it's found out, does that same man come back and do the
19  same things that he has done for the past two years
20  since all this was found out? If that question raises
21  in your minds a reasonable doubt as to Dan Anker's
22  guilt of the crimes of theft, and conspiracy, then you
23  should return a verdict of not guilty. Thank you.

**A. HUD-1 UNIFORM SETTLEMENT STATEMENT**

**B. Type of Loan**

| 1.[] FHA 2.[] FmHA 3.[] Conv. Unins.<br>4.[] VA 5.[] Conv. Ins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|

C. NOTE: This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name, Address & TIN of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Drew O. Chambers<br>228 Turnberry Court<br>Bear   , DE 19701 | Humera N and Iqbal Bashir<br>326 Rockmeade Drive<br>Wilmington   , DE 19810 | Gilpin Financial Services<br>1400 North Dupont Road<br>Wilmington   , DE 19806 |

| G. Property Location: | TIN of Seller: | H. Settlement Agent: |
|---|---|---|
| 326 Rockmeade Drive<br>Wilmington, DE 19810 | Place of Settlement<br>1100 Lovering Avenue, Suite 20<br>Wilmington, DE 19806 | Daniel J. Anker, Esquire<br><br>I. Settlement Date:   June 4, 2003 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower:** | | **400. Gross Amount Due to Seller:** | |
| 101. Contract sales price | $263,000.00 | 401. Contract sales price | $263,000.0 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $6,669.78 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City Taxes    to | | 406. City Taxes    to | |
| 107. County Taxes   6/4/2003 to 6/30/2003 | $108.47 | 407. County Taxes   6/4/2003 to 6/30/2003 | $108.4 |
| 108. Sewer/Water   6/4/2003 to 12/31/2003 | $89.17 | 408. Sewer/Water   6/4/2003 to 12/31/2003 | $89.1 |
| 109. Assessments    to | | 409. Assessments    to | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| **120. Gross Amount Due from Borrower** | $269,867.42 | **420. Gross Amount Due to Seller** | $263,197.6 |
| **200. Amounts Paid by or in Behalf of Borrower:** | | **500. Reductions In Amount Due to Seller:** | |
| 201. Deposits or earnest money | $30,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $210,400.00 | 502. Settlement charges to seller (line 1400) | $19,740.0 |
| 203. Existing loan(s) taken subject to | $22,600.00 | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage | $152,984.2 |
| 205. | | 505. Payoff of second mortgage | $27,482.6 |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    to | | 510. City/town taxes    to | |
| 211. County taxes    to | | 511. County taxes    to | |
| 212. Assessments    to | | 512. Assessments    to | |
| 213.    to | | 513.    to | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/for Borrower** | $263,000.00 | **520. Total Reduction Amount Due Seller** | $200,206.9 |
| **300. Cash at Settlement From/to Borrower** | | **600. Cash at Settlement To/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $269,867.42 | 601. Gross amount due to seller (line 420) | $263,197.6 |
| 302. Less amounts paid by/for borrower (line 220) | $263,000.00 | 602. Less reductions in amount due seller (line 520) | $200,206.9 |
| 303. Cash [X] from [] to Borrower | $6,867.42 | 603. Cash [X] to [] from Seller | $62,990.7 |

**Substitute Form 1099 Seller Statement**

The information in Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is bein furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to b reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, Sale Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of For 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your corre taxpayer identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject t civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpaye identification number.

_____ (Seller)      _____ (Seller)

State's
#2

L. Settlement Charges

| 700. Total Sales/Broker's Commission: (based on price) | | | $263,000.00 @ | | 6 | % | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | | | | | |
| 701. | | | | | | | | |
| 702. | | | | | | | | |
| 703. Commission paid at Settlement to Prudential Fox & Roach | | | | | | | | $7,890.00 |
| 704. Commission paid at Settlement to Patterson-Schwartz Wilmington | | | | | | | | $7,890.00 |
| 800. Items Payable in Connection with Loan | | | | | | | | |
| 801. Loan Origination Fee | | | | | | | | |
| 802. Application Fee to Lender to $295.00 | | | | | | | | |
| 803. Document Preparation and Tax Service Fee to Lender $250.00 | | | | | | | p.o.c. | |
| 804. Underwriting Fee to Lender $100.00 | | | | | | | p.o.c. | |
| 805. Underwriting Fee/2nd Mortgage to Lender $200.00 $150.00 p.o.c. | | | | | | | p.o.c. | |
| 806. | | | | | | | $50.00 | |
| 807. | | | | | | | | |
| 808. | | | | | | | | |
| 809. | | | | | | | | |
| 810. | | | | | | | | |
| 811. | | | | | | | | |
| 812. | | | | | | | | |
| 813. | | | | | | | | |
| 814. | | | | | | | | |
| 900. Items Required by Lender to Be Paid in Advance | | | | | | | | |
| 901. Interest from    6/4/03    To    7/1/03    @ $    33.15    per day | | | | | | | $895.05 | |
| 902. Interest from    6/4/03    To    7/1/03    @$    4.64    per day | | | | | | | $175.28 | |
| 903. Hazard insurance Premium for 1 year to Allstate | | | | | | | $360.00 | • |
| 904. | | | | | | | | |
| 905. | | | | | | | | |
| 1000. Reserves Deposited with Lender | | | | | | | | |
| 1001. Hazard Insurance    2    months @ $    30.00    per month | | | | | | | $60.00 | |
| 1002. Mortgage insurance    months @ $    per month | | | | | | | | |
| 1003. City property taxes    months @ $    per month | | | | | | | | |
| 1004. County property taxes    12    months @ $    36.96    per month | | | | | | | $443.52 | |
| 1005. Annual assessments    months @ $    per month | | | | | | | | |
| 1006. School Taxes    12    months @ $    85.24    per month | | | | | | | $1,022.88 | |
| 1007. | | | | | | | | |
| 1008. | | | | | | | | |
| 1009. Aggregate Accounting Adjustment | | | | | | | ($59.95) | |
| 1100. Title Charges | | | | | | | | |
| 1101. Settlement/closing fee | | | | | | | | |
| 1102. Abstract/title search to Attorneys Title Services | | | | | | | $150.00 | |
| 1103. Title examination | | | | | | | | |
| 1104. Title insurance binder to Attorneys Title Services | | | | | | | $100.00 | |
| 1105. Document preparation | | | | | | | | |
| 1106. Notary fees | | | | | | | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire | | | | | | | $375.00 | • |
| (includes above item numbers | | | | | | | | |
| 1108. Title insurance to Attorneys Title Services | | | | | | | | |
| (includes above item numbers | | | | | | | | |
| 1109. Lender's coverage $210,400.00 and $22,600.00 (premiums $526.00 and $56.50) | | | | | | | $582.50 | |
| 1110. Owner's coverage $263,000.00 | | | | | | | | |
| 1111. | | | | | | | | |
| 1112. | | | | | | | | |
| 1113. | | | | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | | | |
| 1201. Recording fees:    Deed $36.00    Mortgage $252.00    Release | | | | | | | $288.00 | |
| 1202. City/county tax/stamps:    Deed $3,945.00    Mortgage | | | | | | | | $1,972.50 |
| 1203. State tax/stamps:    Deed $3,945.00    Mortgage | | | | | | | $1,972.50 | $1,972.50 |
| 1204. | | | | | | | | |
| 1205. | | | | | | | | |
| 1206. | | | | | | | | |
| 1300. Additional Settlement Charges | | | | | | | | |
| 1301. Survey to East Coast Survey | | | | | | | $225.00 | |
| 1302. Pest Inspection to | | | | | | | | |
| 1303. Courier Fee to Daniel J. Anker | | | | | | | $30.00 | $15.00 |
| 1304. | | | | | | | | |
| 1305. | | | | | | | | |
| 1306. | | | | | | | | |
| 1307. | | | | | | | | |
| 1308. | | | | | | | | |
| 1400. Total Settlement Charges (This Number Transfers to Lines 103 & 502 Above) | | | | | | | $6,669.78 | $19,740.00 |

CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Seller    _____ Borrower

_____ Seller    _____ Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent    6/4/03    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**Settlement Statement**                    HUD-1 A          OMB Approval No. 2502-0491

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| Phillip P. Urban<br>940 Wildel Avenue<br>New Castle, DE 19720 | GMAC Mortgage Corporation |
| Property Location: (if different from above) | Settlement Agent: |
| | Daniel J. Anker, Esquire |
| | Place of Settlement: |
| | 1100 Lovering Avenue, Suite 20<br>Wilmington, DE 19806 |
| Loan Number:<br>523941500 | Settlement Date:<br>December 28, 2001 |

## L. Settlement Charges

| | | | | | | M. Disbursement to Others | |
|---|---|---|---|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | | | | 1501. | |
| 801. Loan Origination Fee of 1% to LENDER $880.00 tot 450.00 poc 430.00L | | | | | | | |
| 802. Loan Discount | | | | | | 1502. | |
| 803. Appraisal Fee to | | | | | | | |
| 804. Document Preparation Fee to LENDER | | | | | | | |
| 805. Flood Certification to LENDER | | | | $245.00 | | 1503. | |
| 806. Application Fee to LENDER $325.00 | | | | $17.00 | | | |
| 807. Tax Service Contract to LENDER | | | | p.o.c. | | 1504. | |
| 808. Life of Loan Flood Certification to LENDER | | | | $85.00 | | | |
| 809. | | | | $2.00 | | 1505. | |
| 810. | | | | | | | |
| 611. | | | | | | 1506. | |
| 900. Items Required by Lender to be Paid in Advance | | | | | | | |
| 901. Interest from  01/03/02  to  01/01/02 -2 days @ $ 17.78  per day | | | | | | 1507. | |
| 902. Mortgage Insurance Premium for   months to | | | | ($35.56) | | | |
| | | | | | | 1508. | |
| 903. Hazard Insurance Premium for  1  year(s) to | | | | | | | |
| 904. | | | | | | 1509. | |
| 1000. Reserves Deposited with Lender | | | | | | 1510. | |
| 1001. Hazard Insurance | 12 | Months @ $ | $23.00 | per month | | 1511. | |
| 1002. Mortgage Insurance | | Months @ $ | | per month | $278.00 | | |
| 1003. City Property Taxes | - | Months @ $ | | per month | | 1512. | |
| 1004. County Property Taxes | 6 | Months @ $ | $54.76 | per month | | | |
| 1005. Annual Assessments | | Months @ $ | | per month | $328.56 | 1513. | |
| 1006. | | Months @ $ | | per month | | | |
| 1007. | | Months @ $ | | per month | | 1514. | |
| 1008. | | Months @ $ | | per month | | | |
| 1100. Aggregate Adjustment | | | | | ($138.45) | 1515. | |
| 1101. Settlement or Closing Fee to | | | | | | | |
| 1102. Abstract or Title Search to ATTORNEY'S TITLE SERVICES | | | | | $125.00 | 1520. TOTAL DISBURSED<br>(enter on line 1603) | |
| 1103. Title Examination to | | | | | | | |
| 1104. Title Insurance Binder to ATTORNEY'S TITLE SERVICES | | | | | | | |
| 1105. Document Preparation to | | | | | $50.00 | | |
| 1108. Title Insurance to ATTORNEY'S TITLE SERVICES | | | | | | | |
| 1109. Lender's Coverage          $88,000.00 | | | | | 333.00 | | |
| 1110. Owner's Coverage          $88,000.00 | | | | | | | |
| 1111. Attorney's Fees to DANIEL J. ANKER, ESQUIRE | | | | | | | |
| 1112. | | | | | $350.00 | | |
| 1113. | | | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | | |
| 1201. Recording Fees: | | | | | | | |
| 1202. City/County Tax/Stamps: | | | | | $189.00 | | |
| 1203. State Tax/Stamps | | | | | | | |
| 1204. | | | | | | | |
| 1205. | | | | | | | |
| 1300. Additional Settlement Charges | | | | | | | |
| 1301. Mortgage Payoff to WILMINGTON SAVINGS SOCIETY | | | | | | | |
| 1302. | | | | | $57,408.56 | | |
| 1303. Overnight Charges to DANIEL J. ANKER, ESQUIRE | | | | | | N. NET SETTLEMENT | |
| 1304. | | | | | $25.00 | 1600. Loan Amount | $88,000.00 |
| 1305. | | | | | | 1601. Plus Cash/Check from Borrower | $0.00 |
| 1306. | | | | | | 1602. Minus Total Settlement Charges (Line 1400) | $59,261.06 |
| 1307. | | | | | | 1603. Minus Total Disbursements to Others (Line 1520) | |
| 1400. Total Settlement Charges (enter on line 1602) | | | | | $59,261.06 | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | $28,738.94 |

Borrower(s) Signature(s)

x _Phillip P. Urban_



Stati # 4

Optional Form for
Transactions without Sellers

U.S. Department of Housing
and Urban Development

| Name & Address of Borrower:<br>Douglas E. Ray and Caroline L. Ray<br>26 Southridge Drive<br>Kennett Square, PA 19348 | Name & Address of Lender:<br>Chase Manhattan Mortgage Corporation<br>200 Continental Drive, Suite 405<br>Newark, DE 19713 |
|---|---|
| Property Location: (if different from above)<br>28 Southridge Drive<br>Kennett Square, PA 19348 | Settlement Agent: Daniel J. Anker, Esquire |
| | Place of Settlement: 1100 Lovering Avenue, Suite 20<br>Wilmington, DE 19806 |
| Loan Number: 1161169291 | Settlement Date:   03/06/2003<br>Disbursement Date:  03/11/2003 |

| L.    Settlement Charges | | | | M.    Disbursement to Others | |
|---|---|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | | | |
| 801. Loan origination fee | % to | | | 1501. Chase Manhattan Mortgage Company | 222,778.26 |
| 802. Loan discount | % to | | | | |
| 803. Appraisal fee to | Mullens Valuation Service $275 | | P.O.C. | 1502. Chase Manahattan Mortgage Company | 28,347.18 |
| 804. Credit report to | The Credit Network | | 14.50 | | |
| 805 Inspection fee to | | | | 1503. | |
| 806. Mortgage insurance application fee to | | | | | |
| 807. Mortgage broker fee to | | | | 1504. | |
| 808. Tax Service Fee to CVHI | | | 69.00 | | |
| 809. Document Prep to Lender | | | 195.00 | 1505. | |
| 810. Flood Cert to Lender | | | 18.00 | | |
| 811. | | | | 1506. | |
| 900. Items Required by Lender to be Paid in Advance | | | | | |
| 901. Interest from 03/11/03 to 03/01/03 @ $ 36.0600 per day | | | -360.60 | 1507. | |
| 902. Mortgage insurance premium for | | | | | |
| | | | | 1508. | |
| 903. Hazard insurance premium for           1<br>$654.95 | | | | 1509. | |
| 904. | | | | | |
| 1000. Reserves Deposited with Lender | | | | 1510. | |
| 1001. Hazard insurance | 8 | 54.58 | 436.64 | | |
| 1002. Mortgage insurance | | | | 1511. | |
| 1003. City property taxes | 2 | 7.06 | 14.12 | | |
| 1004. County property taxes | 2 | 56.12 | 112.24 | 1512. | |
| 1005. Annual assessments | 10 | 307.74 | 3,077.40 | | |
| 1006. Aggregate Adjustment | | | -798.52 | 1513. | |
| 1007. | | | | | |
| 1008. | | | | 1514. | |
| 1100. Title Charges | | | | | |
| 1101. Settlement or closing fees to | | | | 1515. | |
| 1102. Abstract or title search to | Attorneys Title Services | | 125.00 | | |
| 1103. Title examination to | | | | 1520. TOTAL DISBURSED (enter on line 1603) | 251,125.44 |
| 1104. Title insurance binder to | Attorneys Title Services | | 50.00 | | |
| 1105. Document preparation to | | | | | |
| 1106. Notary fees to | | | | | |
| 1107. Attorney fees to  Daniel J. Anker, Esquire $350.00<br>(includes above item numbers                )  | | | P.O.C. | | |
| 1108. Title insurance to  Attorneys Title Services<br>(includes above item numbers                )  | | | 857.50 | | |
| 1109. Lender's coverage | $ 245,000 | | | | |
| 1110. Owner's coverage | $ 245,000 | | | | |
| 1111. | | | | | |
| 1112. | | | | | |
| 1113. | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | |
| 1201. Recording fees: | | | 225.00 | N.    NET SETTLEMENT | |
| 1202. City/county tax/stamps: | | | | | |
| 1203. State tax/stamps: | | | | 1600. Loan Amount | $   245,000.00 |
| 1204. | | | | | |
| 1205. | | | | 1601. Plus Cash/Check from Borrower | $   10,240.52 |
| 1300. Additional Settlement Charges | | | | | |
| 1301. Survey to | | | | 1602. Minus Total Settlement Charges (line 1400) | $   4,115.08 |
| 1302. Pest inspection to | | | | | |
| 1303. Architectural/engineering serv | | | | 1603. Minus Total Disbursements to Others (line 1520) | $   251,125.44 |
| 1304. Building permit to | | | | | |
| 1305. Courier Fee to Daniel J. Anker | | | 30.00 | 1604. Equals  Disbursements to Borrower | $ 0.00 |
| 1306. Overnight Charges to Daniel J. Anker | | | 50.00 | (after expiration of any applicable | |
| 1307. | | | | rescission period required by law) | |
| 1400. Total Settlement Charges (enter on line 1602) | | | 4,115.08 | | |

I have carefully reviewed the HUD-1A Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement
of all receipts and disbursements made on my account in this transaction.  I further certify that I have received a copy of the HUD-1A
Settlement Statement.

_Douglas E. Ray_
Douglas E. Ray

_Caroline L. Ray_
Caroline L. Ray

_Signature_
Settlement Agent

form HUD-1A (2/94)
ref. RESPA

State # 11



LAW OFFICE OF DANIEL J. ANKER                    WILMINGTON TRUST COMPANY                    10633

MEMO  Ray v. Chase

$ 300,000.00

Three Hundred Thousand and 00/100**********************************  DOLLARS

06/06/01

"010633" :031100092: 2514 2128"  "0030000000"

Stat# 13

# CHASE MANHATTAN MORTGAGE CORPORATION
### 3415 VISION DRIVE
### COLUMBUS, OHIO 43219
### 1 (800) 848-9136

Via Email and Regular Mail

June 2, 2003

Douglas and Caroline Ray
c/o Daniel J. Anker, Esquire
1100 Lovering Avenue, Suite 20
Wilmington, DE 19806

Dear Mr. and Mrs. Ray:

On behalf of Chase Manhattan Mortgage Corporation, please accept my sincere apology. The frustration and stress caused to you during this situation was entirely preventable and had no reason to continue for as long as it did with no resolution.

Our standard practice when refinancing with an existing customer is to deduct the payoff(s) for any existing loan(s) from the wire sent from our office. Your second mortgage with our company was paid off in this manner. The payoff from the first mortgage was also deducted, but, for still unexplained reasons, was not applied to your loan balance.

Please accept my assurance that any derogatory reports on your credit report will be removed and/or repaired within sixty (60) days from the date of this letter. After that you will be paid a per diem rate of $250.00 for any day your credit remains tarnished.

A wire transfer totaling $400,000.00 will be sent to Mr. Anker's escrow account tomorrow by 2:00 pm central standard time. I will provide a federal reference number to Mr. Anker upon receipt.

If you still have any questions or concerns that were not addressed in this letter please address them with me through Mr. Anker.

Sincerely yours,

Kevin Snyderman



State H

LAW OFFICE OF
## DANIEL J. ANKER
ATTORNEY AT LAW
PARK PLAZA
1100 LOVERING AVENUE, SUITE 20
WILMINGTON, DE 19806
**(302) 655-6263**
**FAX (302) 655-7138**

### DISBURSEMENT AGREEMENT
*Douglas and Caroline Ray v. Chase Manhattan Mortgage Corporation*

| | |
|---|---|
| Previous Recovery | $400,000.00 |
| Cash Recovery | $700,000.00 |
| Cancellation of Mortgage | $245,000.00 |
| Total Recovery of 2nd Settlement | $945,000.00 |
| Total Combined Recovery | $1,345,000.00 · |
| Disbursements | |
| Attorneys Fees of 30% on $700,000.00 | $210,000.00 |
| Check #10656 to Douglas and Caroline Ray | $490,000.00 |
| Total Disbursements | $700,000.00 |

Attorneys Fees, are waived on the cancellation of mortgage recovery.

The foregoing disbursements are hereby agreed to and authorized by Douglas and Caroline Ray.

Date:                                    _____ (Seal)
                                         Douglas Ray

                                         _____ (Seal)
                                         Caroline Ray

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT (OMB # 2502-0265)

**A. HUD-1 UNIFORM SETTLEMENT STATEMENT**

**B. Type of Loan**

1.[ ] FHA 2.[ ] FmHA 3.[ ] Conv. Unins.  4.[ ] VA  5.[ ] Conv. Ins.

6. File Number:    7. Loan Number:    8. Mortgage Insurance Case Number:

**C. NOTE:** This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. Name & Address of Borrower:
John A. and Amy L. Lesko
16 Sheldon Drive
Newark      , DE 19711

E. Name, Address & TIN of Seller:
Not Applicable

F. Name & Address of Lender:
Washington Mutual Home Loans
2000 Oxford Drive
Bethel Park      , PA 15102

G. Property Location:
16 Sheldon Drive
Newark, DE 19711

TIN of Seller:
Place of Settlement
1100 Lovering Avenue, Suite 20
Wilmington, DE 19806

H. Settlement Agent:
Daniel J. Anker, Esquire

I. Settlement Date:    April 3, 2003

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due from Borrower: | | 400. Gross Amount Due to Seller: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $5,422.83 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. to | | 409. to | |
| 110. Payoff of first loan to Washington Mutual | $128,790.56 | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 120. Gross Amount Due from Borrower | $134,213.39 | 420. Gross Amount Due to Seller | |
| 200. Amounts Paid by or in Behalf of Borrower: | | 500. Reductions In Amount Due to Seller: | |
| 201. Deposits or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $137,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Deposit by Borrower | $295.00 | 504. Payoff of first mortgage | |
| 205. | | 505. Payoff of second mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes to | | 511. County taxes to | |
| 212. Assessments to | | 512. Assessments to | |
| 213. to | | 513. to | |
| 214. | | 514. New Castle County Taxes | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/for Borrower | $137,295.00 | 520. Total Reduction Amount Due Seller | |
| 300. Cash at Settlement From/to Borrower | | 600. Cash at Settlement To/from Seller | |
| 301. Gross amount due from borrower (line 120) | $134,213.39 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $137,295.00 | 602. Less reductions in amount due seller (line 520) | |
| 303. Cash  From [X] to Borrower | $3,081.61 | 603. Cash  to  from Seller | |

**Substitute Form 1099 Seller Statement**

The information in Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, *Sale or Exchange of Principal Residence*, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your correct taxpayer identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_____ (Seller)    _____ (Seller)



L. Settlement Charges

| 700. Total Sales/Broker's Commission: (based on price) $ 0.00 @ % | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|
| Division of Commission (line 700) as follows: | | |
| 701. | | |
| 702. | | |
| 703. Commission paid at Settlement | | |
| 704. | | |
| 800. Items Payable in Connection with Loan | | |
| 801. Loan Origination Fee to Washington Mutual | $3,082.50 | |
| 802. Loan Discount | | |
| 803. Appraisal Department Fees to Robert Merrill | $285.00 | |
| 804. Credit Report to The Credit Network | $14.50 | |
| 805. Lender's Inspection Fee | | |
| 806. Wire Transfer Fee to Washington Mutual | $35.00 | |
| 807. Tax Procurement/Tracking Fee to Transamerica | $50.00 | |
| 808. Tax Research/payment service fee to Washington Mutual | $31.00 | |
| 809. Payment Processing to Washington Mutual | $200.00 | |
| 810. Flood Determination to LERETA CORP. | $13.00 | |
| 811. | | |
| 812. | | |
| 813. | | |
| 814. | | |
| 900. Items Required by Lender to Be Paid in Advance | | |
| 901. Interest from 04/08/03 to 05/01/03 @ 19.71 per day | $453.33 | |
| 902. Mortgage Insurance Premium for | | |
| 903. Hazard Insurance Premium for | | |
| 904. Homeowner's Insurance for | | |
| 905. | | |
| 1000. Reserves Deposited with Lender | | |
| 1001. Hazard insurance months @ $ per month | | |
| 1002. Mortgage insurance months @ $ per month | | |
| 1003. City property taxes months @ $ per month | | |
| 1004. County property taxes months @ $ per month | | |
| 1005. Annual assessments months @ $ per month | | |
| 1006. months @ $ per month | | |
| 1007. | | |
| 1008. | | |
| 1009. Aggregate Accounting Adjustment | | |
| 1100. Title Charges | | |
| 1101. Settlement/closing fee | | |
| 1102. Abstract/title search to Ticor Title Insurance | $120.00 | |
| 1103. Title examination | | |
| 1104. Title insurance binder to Ticor Title Insurance | $50.00 | |
| 1105. Document preparation | | |
| 1106. Notary fees | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire | $375.00 | |
| (includes above item numbers | | |
| 1108. Title insurance to Ticor Title Insurance | $479.50 | |
| (includes above item numbers | | |
| 1109. Lender's coverage $137,000.00 | | |
| 1110. Owner's coverage $137,000.00 | | |
| 1111. | | |
| 1112. | | |
| 1113. | | |
| 1200. Government Recording and Transfer Charges | | |
| 1201. Recording fees: Deed Mortgage $171.00 Release | $171.00 | $ 0.00 |
| 1202. City/county tax/stamps: Deed Mortgage | $ 0.00 | |
| 1203. State tax/stamps: Deed Mortgage | $ 0.00 | |
| 1204. | | |
| 1205. | | |
| 1206. | | |
| 1300. Additional Settlement Charges | | |
| 1301. Survey | | |
| 1302. Pest Inspection | | |
| 1303. Overnight charges to Daniel J. Anker | $25.00 | |
| 1304. Courier Fee to Daniel J. Anker | $30.00 | |
| 1305. Wire Transfer Fee to Daniel J. Anker | $8.00 | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1400. Total Settlement Charges (This Number Transfers to Lines 103 & 502 Above) | $5,422.83 | $ 0.00 |

CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Seller    _____ Borrower

_____ Seller    _____ Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent    _____ Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

A-178

**A. HUD-1 UNIFORM SETTLEMENT STATEMENT**

**B. Type of Loan**

| 1.[ ] FHA 2.[ ] FmHA 3.[ ] Conv. Unins.<br>4.[ ] VA  5.[ ] Conv. Ins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|

**C. NOTE:** This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower:<br>Gary L. Paveza, Jr.<br>2808 Fawkes Drive<br>Wilmington        , DE  19808 | E. Name, Address & TIN of Seller:<br>Not Applicable | F. Name & Address of Lender:<br>Gilpin Mortgage Services<br>1400 N. Dupont Street<br>Wilmington        , DE  19806 |
|---|---|---|
| G. Property Location:<br>16 Sheldon Drive<br>Newark, DE  19711 | TIN of Seller:<br>Place of Settlement<br>1100 Lovering Avenue, Suite 20<br>Wilmington, DE  19806 | H. Settlement Agent:<br>Daniel J. Anker, Esquire |
| | | I. Settlement Date:    April 7, 2003 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower:** | | **400. Gross Amount Due to Seller:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $6,050.46 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes             to | | 407. County taxes             to | |
| 108. Assessments              to | | 408. Assessments              to | |
| 109.                          to | | 409.                          to | |
| 110. Payoff of first loan to GMAC | $132,897.36 | 410. | |
| 111. Payoff to Conseco | $62,978.37 | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| **120. Gross Amount Due from Borrower** | $201,926.19 | **420. Gross Amount Due to Seller** | |
| **200. Amounts Paid by or in Behalf of Borrower:** | | **500. Reductions in Amount Due to Seller:** | |
| 201. Deposits or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | $195,740.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Deposit by Borrower | | 504. Payoff of first mortgage | |
| 205. | | 505. Payoff of second mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes             to | | 511. County taxes             to | |
| 212. Assessments              to | | 512. Assessments              to | |
| 213.                          to | | 513. | |
| 214. | | 514. New Castle County Taxes | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/for Borrower** | $195,740.00 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash at Settlement From/to Borrower** | | **600. Cash at Settlement To/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $201,926.19 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $195,740.00 | 602. Less reductions in amount due seller (line 520) | |
| 303. Cash  [ ]  From  [X] to Borrower | $6,186.19 | 603. Cash  [ ]  to  [ ] from Seller | |

**Substitute Form 1099 Seller Statement**

The information in Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is bei furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, *Sale Exchange of Principal Residence*, for any gain, with your income tax return; for other transactions, complete the applicable parts of Fo 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your corr taxpayer identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my corr taxpayer identification number.

_____ (Seller)              _____ (Seller)





A-179

| L. Settlement Charges | | | | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission: (based on price) | | | $ 0.00 @ | % | | |
| Division of Commission (line 700) as follows: | | | | | | |
| 701. | | | | | | |
| 702. | | | | | | |
| 703. Commission paid at Settlement | | | | | | |
| 704. | | | | | | |
| 800. Items Payable in Connection with Loan | | | | | | |
| 801. Loan Origination Fee to | | | | | | |
| 802. Loan Discount | | | | | | |
| 803. Appraisal Fee to Lender | | | | | $300.00 | |
| 804. Credit Report to Lender | | | | | $12.50 | |
| 805. Lender's Inspection Fee | | | | | | |
| 806. Flood Certification to Lender | | | | | $18.50 | |
| 807. | | | | | | |
| 808. | | | | | | |
| 809. | | | | | | |
| 810. | | | | | | |
| 811. | | | | | | |
| 812. | | | | | | |
| 813. | | | | | | |
| 814. | | | | | | |
| 900. Items Required by Lender to Be Paid in Advance | | | | | | |
| 901. Interest from 04/11/03 to 05/01/03 @ | | 31.26 | per day | | $625.20 | |
| 902. Mortgage Insurance Premium for 1 year to Gilpin Financial Services, Inc. | | | | | $2,892.75 | |
| 903. Hazard Insurance Premium for | | | | | | |
| 904. Homeowner's Insurance for | | | | | | |
| 905. | | | | | | |
| 1000. Reserves Deposited with Lender | | | | | | |
| 1001. Hazard insurance | 12 | months @ $ | 27.33 | per month | $327.96 | |
| 1002. Mortgage Insurance | 0 | months @ $ | 79.88 | per month | | |
| 1003. City property taxes | | months @ $ | | per month | | |
| 1004. County property taxes | 12 | months @ $ | 35.49 | per month | $425.88 | |
| 1005. Annual assessments | | months @ $ | | per month | | |
| 1006. School Taxes | 12 | months @ $ | 67.43 | per month | $809.16 | |
| 1007. | | | | | | |
| 1008. | | | | | | |
| 1009. Aggregate Accounting Adjustment | | | | | ($0.04) | |
| 1100. Title Charges | | | | | | |
| 1101. Settlement/closing fee | | | | | | |
| 1102. Abstract/title search to Ticor Title Insurance | | | | | $50.00 | |
| 1103. Title examination | | | | | | |
| 1104. Title insurance binder to Ticor Title Insurance | | | | | $25.00 | |
| 1105. Document preparation | | | | | | |
| 1106. Notary fees | | | | | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire $375.00 | | | | | p.o.c. | |
| (includes above item numbers | | | | | | |
| 1108. Title insurance to Ticor Title Insurance | | | | | $342.55 | |
| (includes above item numbers | | | | | | |
| 1109. Lender's coverage $195,740.00 | | | | | | |
| 1110. Owner's coverage $195,740.00 | | | | | | |
| 1111. | | | | | | |
| 1112. | | | | | | |
| 1113. | | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | |
| 1201. Recording fees: Deed | | Mortgage $171.00 | Release | | $171.00 | |
| 1202. City/county tax/stamps: | Deed | Mortgage | | | | |
| 1203. State tax/stamps: | Deed | Mortgage | | | | |
| 1204. | | | | | | |
| 1205. | | | | | | |
| 1206. | | | | | | |
| 1300. Additional Settlement Charges | | | | | | |
| 1301. Survey | | | | | | |
| 1302. Pest Inspection | | | | | | |
| 1303. Overnight charges to Daniel J. Anker | | | | | $30.00 | |
| 1304. Courier Fee to Daniel J. Anker | | | | | $20.00 | |
| 1305. | | | | | | |
| 1306. | | | | | | |
| 1307. | | | | | | |
| 1308. | | | | | | |
| 1400. Total Settlement Charges (This Number Transfers to Lines 103 & 502 Above) | | | | | $6,050.46 | |

CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____  Seller    _____  Borrower

_____  Seller    _____  Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____  _____    _____
Settlement Agent                                    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

LAW OFFICE OF DANIEL J. ANKER
ESCROW ACCOUNT
1100 LOVERING AVENUE, SUITE 20
WILMINGTON, DE 19806
(302) 655-6263

WILMINGTON TRUST/COMPANY
WILMINGTON, DE 19890
62-9/311

10595

5/8/2003

PAY TO THE
ORDER OF          Gary and Maya Paveza

$ **80,600.00

Eighty Thousand Six Hundred and 00/100************************************************************

Gary and Maya Paveza                                                                    DOLLARS

MEMO    GMAC Resolution

Daniel J Anker

⑆010595⑆ ⑇031100092⑈ 2514 2128⑆  Jol  ⑇00080600000⑈

Stati's #23

A-181

| B. Type of Loan | | | | |
|---|---|---|---|---|
| 1.[ ] FHA 2.[ ] FmHA 3.[ ] Conv. Unins. 4.[ ] VA 5.[ ] Conv. Ins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: | |

C. NOTE: This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: Russell F. and Eleanor C. Burkett, Jr. | E. Name, Address & TIN of Seller: Barry and Donna Kintz 3107 Duncan Road Wilmington, DE          19808 | F. Name & Address of Lender: Not applicable |
|---|---|---|
| G. Property Location: 104 Andrea Drive Middletown, DE 19709 | TIN of Seller: Place of Settlement 1100 Lovering Avenue, Suite 20 Wilmington, DE 19806 | H. Settlement Agent: Daniel J. Anker, Esquire |
| | | I. Settlement Date:    July 15, 2003 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower:** | | **400. Gross Amount Due to Seller:** | |
| 101. Contract sales price | $325,000.00 | 401. Contract sales price | $325,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $6,659.50 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109.          to | | 409.          to | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| **120. Gross Amount Due from Borrower** | $331,659.50 | **420. Gross Amount Due to Seller** | $325,000.00 |
| **200. Amounts Paid by or in Behalf of Borrower:** | | **500. Reductions In Amount Due to Seller:** | |
| 201. Deposits or earnest money | $10,000.00 | 501. Excess deposit (see instructions) | $10,000.00 |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | $4,900.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage | $156,149.63 |
| 205. | | 505. Payoff of second mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes   7/1/2003   to  7/18/2003 | $52.26 | 511. County taxes   7/1/2003   to   7/18/2003 | $52.26 |
| 212. Assessments          to | | 512. Assessments          to | |
| 213.          to | | 513.          to | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/for Borrower** | $10,052.26 | **520. Total Reduction Amount Due Seller** | $171,049.63 |
| **300. Cash at Settlement From/to Borrower** | | **600. Cash at Settlement To/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $331,544.50 | 601. Gross amount due to seller (line 420) | $325,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | $10,052.26 | 602. Less reductions in amount due seller (line 520) | $171,049.63 |
| 303. Cash  [X] from  [ ] to Borrower | $321,607.24 | 603. Cash  [X] to  [ ] from Seller | $153,950.37 |

**Substitute Form 1099 Seller Statement**

The Information In Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax Information and is being furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, *Sale or Exchange of Principal Residence*, for any gain, with your Income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your correct taxpayer Identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_(signature)_ (Seller)          _(signature)_ Donna M. Kintz (Seller)

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission: (based on price) | | @ | % | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | | |
| 701. | | | | | |
| 702. | | | | | |
| 703. Commission paid at Settlement to | | | | | |
| 704. | | | | | |
| 800. Items Payable in Connection with Loan | | | | | |
| 801. Loan Origination Fee to | | | | | |
| 802. Loan Discount | | | | | |
| 803. Appraisal Fee | | | | | |
| 804. Credit Report | | | | | |
| 805. Lender's Inspection Fee | | | | | |
| 806. Mortgage Insurance Application Fee | | | | | |
| 807. Mortgage Satisfaction Fee to Lender | | | | | |
| 808. | | | | | |
| 809. | | | | | |
| 810. Flood Certification | | | | | |
| 811. Mortgage Satisfaction | | | | | |
| 812. | | | | | |
| 813. | | | | | |
| 814. | | | | | |
| 900. Items Required by Lender to Be Paid in Advance | | | | | |
| 901. Interest from | to | @ $ | per day | | |
| 902. Mortgage Insurance Premium for | | | | | |
| 903. Hazard Insurance Premium for | | | | | |
| 904. | | | | | |
| 905. | | | | | |
| 1000. Reserves Deposited with Lender | | | | | |
| 1001. Hazard Insurance | months @ $ | | per month | | |
| 1002. Mortgage Insurance | months @ $ | | per month | | |
| 1003. City property taxes | months @ $ | | per month | | |
| 1004. County property taxes | months @ $ | | per month | | |
| 1005. Annual assessments | months @ $ | | per month | | |
| 1006. | months @ $ | | per month | | |
| 1007. | | | | | |
| 1008. | | | | | |
| 1009. Aggregate Accounting Adjustment | | | | | |
| 1100. Title Charges | | | | | |
| 1101. Settlement/closing fee | | | | | |
| 1102. Abstract/title search to Attorneys Title Services | | | | | |
| 1103. Title examination | | | | $150.00 | |
| 1104. Title insurance binder to Attorneys Title Services | | | | | |
| 1105. Document preparation | | | | $25.00 | |
| 1106. Notary fees | | | | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire | | | | | |
| (includes above item numbers | | | | $400.00 | |
| 1108. Title Insurance to Attorneys Title Services | | | | | |
| (includes above item numbers | | | | $812.50 | |
| 1109. Lender's coverage | | | | | |
| 1110. Owner's coverage $325,000.00 | | | | | |
| 1111. | | | | | |
| 1112. | | | | | |
| 1113. | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | |
| 1201. Recording fees: | Deed $27.00 | Mortgage | Release | $27.00 | |
| 1202. City/county tax/stamps: | Deed $4,875.00 | Mortgage | | $2,437.50 | $2,437.50 |
| 1203. State tax/stamps: | Deed $4,875.00 | Mortgage | | $2,437.50 | $2,437.50 |
| 1204. | | | | | |
| 1205. | | | | | |
| 1206. | | | | | |
| 1300. Additional Settlement Charges | | | | | |
| 1301. Survey | | | | | |
| 1302. Pest Inspection | | | | $225.00 | |
| 1303. Courier Fee to Daniel J. Anker | | | | | |
| 1304. Overnight Charges to Daniel J. Anker | | | | $30.00 | |
| 1305. Reimbursement to B & D for Diane Berry (Water Report) | | | | | $25.00 |
| 1306. Reimbursement to Seller for Radon Test | | | | $60.00 | |
| 1307. | | | | $55.00 | |
| 1308. | | | | | |
| 1400. Total Settlement Charges (This Number Transfers to Lines 103 & 502 Above) | | | | $6,659.50 | $4,900.00 |

**CERTIFICATION**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Seller          _____ Borrower

_____ Seller          _____ Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent     _____ Date

Daniel J. Anker, Esquire

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see Title 18 U.S. Code Section 1001 and Section 1010.

B. Type of Loan

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ Conv. Unins. | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Numb |
|---|---|---|---|---|---|
| 4. ☐ VA | 5. ☐ Conv. Ins. | | 2000104895 | 2000104895 | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by th settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown her for informational purposes and are not included in the totals.

**D. NAME AND ADDRESS OF BORROWER:**
Margaret J Caucci, Francis X Caucci II
38 Westwood Blvd
Hockessin, DE 19707

**E. NAME AND ADDRESS OF SELLER:**

**F. NAME AND ADDRESS OF LENDER:** Nationwide Advantage Mortgage Company    TIN:
4546 Corporate Drive, Suite 100
West Des Moines, IA 50266

**G. PROPERTY LOCATION:**
38 Westwood Blvd
Hockessin, DE 19707

**H. SETTLEMENT AGENT:** Daniel J Anker, Esquire
1100 Lovering Ave, Park Plaza Ste 20
Wilmington, DE 19806
PLACE OF SETTLEMENT: Hockessin, DE    Phone: 302-655-6263

**I. SETTLEMENT DATE:** April 25, 2003    DISBURSEMENT DATE: 05/01/2003    TIN: 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

| J. | SUMMARY OF BORROWER'S TRANSACTION | | K. | SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | | **400. GROSS AMOUNT DUE TO SELLER:** | | |
| 101. Contract sales price | | | 401. Contract sales price | | |
| 102. Personal property | | | 402. Personal property | | |
| 103. Settlement charges to borrower: | | | 403. | | |
| (from line 1400) | | 3,204.72 | | | |
| 104. Payoff First Mortgage   Homecomings | | 231,426.42 | 404. | | |
| 105. | | | 405. | | |
| **ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE:** | | | **ADJUSTMENTS FOR ITEMS PAID BY SELLER IN ADVANCE:** | | |
| 106. City/town taxes | to | | 406. City/town taxes | to | |
| 107. County taxes | to | | 407. County taxes | to | |
| 108. Assessments | to | | 408. Assessments | to | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| **120. GROSS AMOUNT DUE FROM BORROWER:** | ▶ | 234,631.14 | **420. GROSS AMOUNT DUE TO SELLER:** | ▶ | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | | |
| 201. Deposit or earnest money | | | 501. Excess deposit (see instructions) | | |
| 202. Principal amount of new loan(s) | | 237,000.00 | 502. Settlement charges to seller (line 1400) | | |
| 203. Existing loan(s) taken subject to | | | 503. Existing loan(s) taken subject to | | |
| 204. Application deposit | | 400.00 | 504. Payoff of first mortgage loan | | |
| 205. | | | 505. Payoff of second mortgage loan | | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| **ADJUSTMENTS FOR ITEMS UNPAID BY SELLER:** | | | **ADJUSTMENTS FOR ITEMS UNPAID BY SELLER:** | | |
| 210. City/town taxes | to | | 510. City/town taxes | to | |
| 211. County taxes | to | | 511. County taxes | to | |
| 212. Assessments | to | | 512. Assessments | to | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| **220. TOTAL PAID BY/FOR BORROWER:** | ▶ | 237,400.00 | **520. TOTAL REDUCTIONS IN AMOUNT DUE SELLER:** | ▶ | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | | |
| 301. Gross amount due from borrower (line 120) | | 234,631.14 | 601. Gross amount due to seller (line 420) | | |
| 302. Less amount paid by/for borrower (line 220) | | 237,400.00 | 602. Less total reductions in amount due seller (line 520) | ( | ) |
| 303. CASH ☒ FROM ☐ TO  BORROWER: ▶ | | $2,768.86 | 603. CASH ☐ TO ☐ FROM ☐ SELLER: ▶ | | $0.00 |

Previous Edition is Obsolete    HUD-1 (3-86) – RESPA, HB 4305.2

SUBSTITUTE FORM 1099 SELLER STATEMENT: The information contained in Blocks E, G, H, and I and on line 401 (or, if line 401 is asterisked, lines 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported.

SELLER INSTRUCTIONS: If this real estate was your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040).

You are required by law to provide the Settlement Agent (listed in box H) with your correct taxpayer identification number. If you do not provide the Settlement Agent (listed in box H) with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law, and Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

⌂ⓂⓅ -501B (0205)   ᵗᴹ⁵⁰ 0305    DOC #:061801

VMP MORTGAGE FORMS - (800)521-7291

Seller's Signature

Ahti's #25

PAGE 1

A-184

| | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|
| **700. TOTAL SALES / BROKER'S COMMISSION:** BASED ON PRICE | | @ .000 % = $0.00 | | |
| DIVISION OF COMMISSION (LINE 700) AS FOLLOWS: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN:** | | | | |
| 801. Loan origination fee | % | | | |
| 802. Loan discount | % | | | |
| 803. Appraisal fee to: | | | | |
| 804. Credit report to: | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. | | | | |
| 809. Subordination Agreement to: CLC Consumer Credit Services | | | | |
| 810. Tax Service Fee to: Nationwide Advantage Mortgage Company | | | 100.00 | |
| 811. Flood Cert Fee to: Nationwide Advantage Mortgage Company | | POC-L 62.00 | | |
| 812. Subordination Fee | | POC-L 16.00 | | |
| 813. Mortgage Consultant Fee | | | | |
| 814. Commitment Fee to: Nationwide Advantage Mortgage Company | | POC-L 300.00 | | |
| 815. | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE:** | | | | |
| 901. Interest from / / | | @$ 18.14726 /day | | |
| 902. Mortgage insurance premium for | mos. to | | | |
| 903. Hazard insurance premium for | yrs. to | | | |
| 904. Flood Insurance Premium for | yrs. to | | | |
| 905. Misc Insur Prem | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER:** | | | | |
| 1001. Hazard Insurance 4.00 | months @ $ 63.33 | | | |
| 1002. Mortgage Insurance | months @ $ | per month | 253.32 | |
| 1003. City property taxes | months @ $ | per month | | |
| 1004. County property taxes 10.00 | months @ $ 61.33 | per month | | |
| 1005. Annual assessments | months @ $ | per month | 613.30 | |
| 1006. Flood Insurance | months @ $ | per month | | |
| 1007. School Tax 10.00 | months @ $ 111.35 | per month | | |
| 1008. Aggregate Adjustment | | per month | 1,113.50 | |
| **1100. TITLE CHARGES:** | | | 380.00- | |
| 1101. Settlement or closing fee to | | | | |
| 1102. Abstract or title search to Dan Anker | | | | |
| 1103. Title examination to | | | 120.00 | |
| 1104. Title insurance binder to Dan Anker | | | | |
| 1105. Document preparation to | | | 50.00 | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to Daniel Anker, Esquire | | | | |
| 1108. Title insurance to Daniel J Anker, Esquire | | POC-L 214.50 | 210.50 | |
| 1109. Lender's coverage $ | | | 892.50 | |
| 1110. Owner's coverage $ | | | | |
| 1111. | | | | |
| 1112. Courier fee to: Dan Anker | | | | |
| 1113. | | | 30.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES:** | | | | |
| 1201. Recording fees: Deed $ ; Mortgage $ 171.00 ; Releases $ | | | | |
| 1202. City/county tax / stamps: Deed $ ; Mortgage $ | | | 171.00 | |
| 1203. State tax / stamps Deed $ ; Mortgage $ | | | | |
| 1204. Record Subordination | | | | |
| 1205. Transfer Tax | | | 18.00 | |
| **1300. ADDITIONAL SETTLEMENT CHARGES:** | | | | |
| 1301. Survey to | | | | |
| 1302. Pest inspection to | | | | |
| 1303. Overnight Fee to: Nationwide Advantage Mortgage Company | | | | |
| 1304. Mortgage Tax | | | | |
| 1305. NB Wire Fee | | | 12.60 | |
| 1306. WC/PA/Buydown | | | | |
| 1307. | | | | |
| 1308. MCC -Reissuance to NBMC | | | | |
| **1400. TOTAL SETTLEMENT CHARGES** (Enter on line 103, Section J and line 502, Section K) ▶ | | | 3,204.72 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower: Margaret J Caucci    Date: 10/08/03    Seller: _____ Date: _____

Borrower: Francis X Caucci II    Date: _____    Seller: _____ Date: _____

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Daniel J Anker, Esquire    Date: _____    Settlement Agent: _____ Date: _____

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

UMB0 9506.11  UMB -502DY (9506).01    VMP MORTGAGE FORMS - (800)521-7291

PAGE 2

**A. HUD UNIFORM SETTLEMENT STATEMENT** (OMB # 2502-…)

**B. Type of Loan**

1.[] FHA 2.[] FmHA 3.[] Conv. Unins.
4.[] VA 5.[] Conv. Ins.

| 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|

**C. NOTE:** This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name, Address & TIN of Seller: | F. Name & Address of Lender: |
|---|---|---|
| | | |

| G. Property Location: | TIN of Seller: | H. Settlement Agent: |
|---|---|---|
| | Place of Settlement | |
| | | I. Settlement Date: |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower:** | | **400. Gross Amount Due to Seller:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $2,573.80 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes to | | 406. City/town taxes to | $ 0.00 |
| 107. County taxes to | | 407. County taxes to | $ 0.00 |
| 108. Assessments to | | 408. Assessments to | $ 0.00 |
| 109. to | | 409. to | $ 0.00 |
| 110. Payoff of first loan to ABN AMRO | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| **120. Gross Amount Due from Borrower** | $274,216.98 | **420. Gross Amount Due to Seller** | $ .0.00 |
| **200. Amounts Paid by or in Behalf of Borrower:** | | **500. Reductions in Amount Due to Seller:** | |
| 201. Deposits or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | $ 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage | |
| 205. | | 505. Payoff of second mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes to | | 510. City/town taxes to | $ 0.00 |
| 211. County taxes to | | 511. County taxes to | $ 0.00 |
| 212. Assessments to | | 512. Assessments to | $ 0.00 |
| 213. to | | 513. to | $ 0.00 |
| 214. | | 514. New Castle County Taxes | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/for Borrower** | $276,250.00 | **520. Total Reduction Amount Due Seller** | $ 0.00 |
| **300. Cash at Settlement From/to Borrower** | | **600. Cash at Settlement To/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $274,216.98 | 601. Gross amount due to seller (line 420) | $ 0.00 |
| 302. Less amounts paid by/for borrower (line 220) | $276,250.00 | 602. Less reductions in amount due seller (line 520) | $ 0.00 |
| 303. Cash [X] From [ ] to Borrower | $2,033.02 | 603. Cash [ ] to [ ] from Seller | $ 0.00 |

**Substitute Form 1099 Seller Statement**

The information in Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, *Sale or Exchange of Principal Residence*, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your correct taxpayer identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_____ (Seller)  _____ (Seller)



#27

A 186

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission: (based on price) $ 0.00 @ % | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| Division of Commission (line 700) as follows: | | | |
| 701. | | | |
| 702. | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan Origination Fee | | | |
| 802. Loan Discount | | | |
| 803. Appraisal Fee to Lender | | | |
| 804. Credit Report to Lender | | | |
| 805. Lender's Inspection Fee | | | |
| 806. Mortgage Insurance Application Fee | | | |
| 807. Application Fee | | | |
| 808. Processing Fee to Lender | | | |
| 809. Underwriting Fee to | | | |
| 810. Commitment Fee to Lender | | | |
| 811. | | | |
| 812. | | | |
| 813. | | | |
| 814. | | | |
| **900. Items Required by Lender to Be Paid in Advance** | | | |
| 901. Interest from to @ per day | | | |
| 902. Mortgage Insurance Premium for | | | |
| 903. Hazard Insurance Premium for 1 year | | | |
| 904. Homeowner's Insurance for | | | |
| 905. | | | |
| **1000. Reserves Deposited with Lender** | | | |
| 1001. Hazard Insurance months @ $ per month | | | |
| 1002. Mortgage Insurance months @ $ per month | | $285.88 | |
| 1003. City property taxes months @ $ per month | | | |
| 1004. County property taxes months @ $ per month | | | |
| 1005. Annual assessments months @ $ per month | | $461.52 | |
| 1006. months @ $ per month | | | |
| 1007. | | | |
| 1008. | | | |
| 1009. Aggregate Accounting Adjustment | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement/closing fee | | | |
| 1102. Abstract/title search to Ticor Title Insurance | | | |
| 1103. Title examination | | | |
| 1104. Title Insurance binder to Ticor Title Insurance | | | |
| 1105. Document preparation | | | |
| 1106. Notary fees | | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire | | | |
| (includes above item numbers | | | |
| 1108. Title Insurance to Ticor Title Insurance | | | |
| (includes above item numbers | | | |
| 1109. Lender's coverage | | | |
| 1110. Owner's coverage | | | |
| 1111. | | | |
| 1112. | | | |
| 1113. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording fees: Deed Mortgage Release | | $171.00 | |
| 1202. City/county tax/stamps: Deed Mortgage | | | |
| 1203. State tax/stamps: Deed Mortgage | | | |
| 1204. | | | |
| 1205. | | | |
| 1206. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. Survey | | | |
| 1302. Pest Inspection | | | |
| 1303. Overnight charges to Daniel J. Anker | | | |
| 1304. Courier Fee to Daniel J. Anker | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| **1400. Total Settlement Charges (This Number Transfers to Lines 103 & 602 Above)** | | $2,573.80 | $ 0.00 |

**CERTIFICATION**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Seller        _____ Borrower

_____ Seller        _____ Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent        6-20-03  Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT  (OMB # 2502-0265)

**A. HUD-1 UNIFORM SETTLEMENT STATEMENT**

**B. Type of Loan**

| 1.[ ] FHA 2.[ ] FmHA 3.[ ] Conv. Unins. 4.[ ] VA  5.[ ] Conv. Ins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|

C. NOTE: This form furnishes a statement of settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name, Address & TIN of Seller: | F. Name & Address of Lender: |
|---|---|---|
| C. Julius Meisel and Nancy A. Devine 2111 Gilles Street Wilmington, DE      19805 | Kathleen Leahy 2022 Delaware Avenue Wilmington, DE      19806 | Gilpin Financial Services 1400 N. Dupont Street Wilmington, DE      19806 |
| G. Property Location: 2022 Delaware Avenue Wilmington, DE 19806 | TIN of Seller: | H. Settlement Agent: Daniel J. Anker, Esquire |
|  | Place of Settlement 1100 Lovering Avenue, Suite 20 Wilmington, DE  19806 | I. Settlement Date:   July 15, 2003 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower:** | | **400. Gross Amount Due to Seller:** | |
| 101. Contract sales price | $350,000.00 | 401. Contract sales price | $350,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Borrower's settlement charges (line 1400) | $10,719.68 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes      to | | 406. City/town taxes      to | |
| 107. County taxes      to | | 407. County taxes      to | |
| 108. Assessments      · to | | 408. Assessments      to | |
| 109.      to | | 409.      to | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| **120. Gross Amount Due from Borrower** | $360,719.68 | **420. Gross Amount Due to Seller** | $350,000.00 |
| **200. Amounts Paid by or In Behalf of Borrower:** | | **500. Reductions In Amount Due to Seller:** | |
| 201. Deposits or earnest money | $35,000.00 | 501. Excess deposit (see instructions) | • |
| 202. Principal amount of new loan(s) | $212,000.00 | 502. Settlement charges to seller (line 1400) | $26,275.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage | $50,826.90 |
| 205. | | 505. Payoff of second mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes  7/1/2003  to  7/15/2003 | $25.96 | 510. City/town taxes  7/1/2003  to  7/15/2003 | $25.96 |
| 211. County taxes  7/1/2003  to  7/15/2003 | $42.77 | 511. County taxes  7/1/2003  to  7/15/2003 | $42.77 |
| 212. Assessments      to | | 512. Assessments      to | |
| 213.      to | | 513.      to | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. Water Escrow | $250.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/for Borrower** | $247,068.73 | **520. Total Reduction Amount Due Seller** | $77,420.63 |
| **300. Cash at Settlement From/to Borrower** | | **600. Cash at Settlement To/from Seller** | |
| 301. Gross amount due from borrower (line 120) | $360,719.68 | 601. Gross amount due to seller (line 420) | $350,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | $247,068.73 | 602. Less reductions in amount due seller (line 520) | $77,420.63 |
| 303. Cash  [X] from  [ ] to Borrower | $113,650.95 | 603. Cash  [X] to  [ ] from Seller | $272,579.37 |

**Substitute Form 1099 Seller Statement**

The information in Blocks E, G, H, I & line 401 (or, if line 401 is asterisked, line 403 and 404) is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. If this real estate is your principal residence, file Form 2119, Sale or Exchange of Principal Residence, for any gain, with your income tax return; for other transactions, complete the applicable parts of Form 4797, Form 6252 and/or Schedule D (Form 1040). You are required to provide the Settlement Agent (named above) with your correct taxpayer identification number. If you do not provide the Settlement Agent with your taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

_____  (Seller)          _____  (Seller)



A-188

**L. Settlement Charges**

| | | | | | | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission: (based on price) @ % | | | | | | | |
| Division of Commission (line 700) as follows: | | | | | | | |
| 701. | | | | | | | |
| 702. | | | | | | | |
| 703. Commission paid at Settlement to Patterson Schwartz | | | | | | | |
| 704. | | | | | | | $21,000.00 |
| 800. Items Payable in Connection with Loan | | | | | | | |
| 801. Loan Origination Fee to | | | | | | | |
| 802. Loan Discount | | | | | | | |
| 803. Appraisal Fee | | | | | | | |
| 804. Credit Report | | | | | | | |
| 805. Lender's Inspection Fee | | | | | | | |
| 806. Underwriting Fee to Lender | | | | | | $100.00 | * |
| 807. Document Preparation and Tax Service Fee to Lender | | | | | | $250.00 | |
| 808. Application Fee to Lender $285.00 | | | | | | p.o.c. | |
| 809. | | | | | | | |
| 810. | | | | | | | |
| 811. | | | | | | | |
| 812. | | | | | | | |
| 813. | | | | | | | |
| 814. | | | | | | | |
| 900. Items Required by Lender to Be Paid in Advance | | | | | | | |
| 901. Interest from 7/15/03 to 8/1/03 @ $ 28.32 per day | | | | | | $481.44 | |
| 902. Mortgage Insurance Premium for | | | | | | | |
| 903. Hazard Insurance Premium for 1 year to Nationwide Insurance Company | | | | | | $651.00 | |
| 904. | | | | | | | |
| 905. | | | | | | | |
| 1000. Reserves Deposited with Lender | | | | | | | |
| 1001. Hazard insurance | 3 | months @ $ | 54.25 | per month | | $162.75 | |
| 1002. Mortgage insurance | | months @ $ | | per month | | | |
| 1003. City property taxes | 13 | months @ $ | 56.55 | per month | | $735.15 | |
| 1004. County property taxes | 13 | months @ $ | 12.63 | per month | | $164.19 | |
| 1005. Annual assessments | | months @ $ | | per month | | | |
| 1006. School Taxes | 13 | months @ $ | 80.55 | per month | | $1,047.15 | |
| 1007. | | | | | | | |
| 1008. | | | | | | | |
| 1009. Aggregate Accounting Adjustment | | | | | | | |
| 1100. Title Charges | | | | | | | |
| 1101. Settlement/closing fee | | | | | | | |
| 1102. Abstract/title search to Attorneys Title Services | | | | | | $125.00 | |
| 1103. Title examination | | | | | | | |
| 1104. Title insurance binder to Attorneys Title Services | | | | | | $50.00 | |
| 1105. Document preparation | | | | | | | |
| 1106. Notary fees | | | | | | | |
| 1107. Attorney's fees to Daniel J. Anker, Esquire | | | | | | $375.00 | |
| (includes above item numbers | | | | | | | |
| 1108. Title insurance to Attorneys Title Services | | | | | | $875.00 | |
| (includes above item numbers | | | | | | | |
| 1109. Lender's coverage $212,000.00 | | | | | | | |
| 1110. Owner's coverage $350,000.00 | | | | | | | |
| 1111. | | | | | | | |
| 1112. | | | | | | | |
| 1113. | | | | | | | |
| 1200. Government Recording and Transfer Charges | | | | | | | |
| 1201. Recording fees: Deed $27.00 Mortgage $171.00 Release | | | | | | $198.00 | |
| 1202. City/county tax/stamps: Deed $5,250.00 Mortgage | | | | | | $2,625.00 | $2,625.00 |
| 1203. State tax/stamps: Deed $5,250.00 Mortgage | | | | | | $2,625.00 | $2,625.00 |
| 1204. | | | | | | | |
| 1205. | | | | | | | |
| 1206. | | | | | | | |
| 1300. Additional Settlement Charges | | | | | | | |
| 1301. Survey to East Coast Survey | | | | | | $225.00 | |
| 1302. Pest Inspection | | | | | | | |
| 1303. Courier Fee to Daniel J. Anker | | | | | | $30.00 | |
| 1304. Overnight Charges to Daniel J. Anker | | | | | | | $25.00 |
| 1305. | | | | | | | |
| 1306. | | | | | | | |
| 1307. | | | | | | | |
| 1308. | | | | | | | |
| 1400. Total Settlement Charges (This Number Transfers to Lines 103 & 502 Above) | | | | | | $10,719.68 | $26,275.00 |

**CERTIFICATION**

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____ Seller   _____ Borrower

_____ Seller   _____ Borrower

To the best of my knowledge the HUD-1 Settlement Statement which I have prepared is true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____ Settlement Agent   _____ Date

Daniel J. Anker, Esquire

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

A-189

## CHASE MANHATTAN MORTGAGE CORPORATION
### 3415 VISION DRIVE
### COLUMBUS, OHIO 43219
### 1 (800) 848-9136

Via Email and Regular Mail

June 2, 2003

Douglas and Caroline Ray
c/o Daniel J. Anker, Esquire
1100 Lovering Avenue, Suite 20
Wilmington, DE 19806

Dear Mr. and Mrs. Ray:

On behalf of Chase Manhattan Mortgage Corporation, please accept my sincere apology. The frustration and stress caused to you during this situation was entirely preventable and had no reason to continue for as long as it did with no resolution.

Our standard practice when refinancing with an existing customer is to deduct the payoff(s) for any existing loan(s) from the wire sent from our office. Your second mortgage with our company was paid off in this manner. The payoff from the first mortgage was also deducted, but, for still unexplained reasons, was not applied to your loan balance.

Please accept my assurance that any derogatory reports on your credit report will be removed and/or repaired within sixty (60) days from the date of this letter. After that you will be paid a per diem rate of $250.00 for any day your credit remains tarnished.

A wire transfer totaling $400,000.00 will be sent to Mr. Anker's escrow account tomorrow by 2:00 pm central standard time. I will provide a federal reference number to Mr. Anker upon receipt.

If you still have any questions or concerns that were not addressed in this letter please address them with me through Mr. Anker.

Sincerely yours,

Kevin Snyderman



State's
37

11(b)

| | |
|---|---|
| Subj: | **Re: Douglas and Caroline Ray** |
| Date: | 6/26/2003 9:04:21 AM Eastern Daylight Time |
| From: | Snydermankevin |
| To: | Danankerlaw |

## Dear Dan -

I realized this morning that it would probably be more convenient for both you and your clients if I put the entire settlement agreement into one email, rather than the several we exchanged over the last few days.

1.   $700,000 cash has been wired to your account.

2.   Both the new and old mortgages the Rays have with Chase will be canceled and marked paid off.  The canceled mortgages and notes will be provided to you by July 1, 2003.  All payments received on the new loan will be returned as well as all escrows and any and all points paid at closing.

3.   The Rays credit is being repaired as we speak and is being given the utmost priority.  I expect to have his credit fully restored early next week.

Please let me know if there is anything else I  neglected to include.



A-19

II(a.)

| Subj: | (no subject) |
|-------|--------------|
| Date: | 6/23/2003 4:19:59 PM Eastern Daylight Time |
| From: | Danankerlaw |
| To: | Snydermankevin |

Dear Kevin:

You have offered the following:

1. canceling both the new and old mortgages
2. $700,000 cash

This is acceptable to my clients subject to the following;

1. The original canceled note and mortgage for both loans along with a satisfaction of mortgage suitable for recording is sent to me as soon as possible but not later than July 7, 2003.

2. The original signed letter of apology from the last settlement was never received by this office. I assume it was lost in the mail. Could you kindly overnight it.

3. Restoring my clients' good credit as expeditiously as possible.

4. Another letter of explanation/apology for the current situation addressed to the Rays (but sent to me) that does not contain the financial settlement provisions. This letter is needed in the likely event that his employer gains access to his credit report prior to your completion of # 3 above.

5. It is imperative that your collection personnel immediately stop calling his home and especially his office.

6. The $700,000 wire should be sent this week, preferably tomorrow.

If this is acceptable please confirm by return email.

Thank you.

Daniel Anker



| Subj: | **Settlement** |
|---|---|
| Date: | 5/12/2003 4:21:35 PM Eastern Daylight Time |
| From: | Macentiredoug |
| To: | Danankerlaw |

Dear Mr. Daniel J. Anker;

Please allow me until tomorrow to give you a written confirmation of the final settlement.

I need to determine exactly when all money will be sent to you. You will receive $250,000 tomorrow.

Thank you.

Doug




Monday, May 12, 2003 America Online: Danankerlaw

**Subj:**    **Washington Mutual**
**Date:**    5/30/2003 10:52:16 AM Eastern Daylight Time
**From:**    Macentiredoug
**To:**      Danankerlaw

Dear Dan:

Over the past several days I have been discussing several possibilities of employment for you with my colleagues here in Texas. We unanimously feel that you would prove to be a great asset for our company. At this time we would like to make this initial offer:

You will be our local counsel in Delaware. Your main function would be to handle our numerous foreclosures for your state. Other responsibilities can be discussed or decided at your discretion.

You will be put on a yearly retainer of $250,000.00, replenished as necessary. A contract will also be supplied which requires that Washington Mutual keep you on retainer for a minimum of 5 years.

Please get back to me with negotiations or acceptance at your convenience.

Doug




| | |
|---|---|
| Subj: | **Washington Mutual** |
| Date: | 6/5/2003 8:51:28 AM Eastern Daylight Time |
| From: | Macentiredoug |
| To: | Danankerlaw |

Dear Dan:

Please allow this email to serve as our "official" offer to you:

The sum of $5 million dollars will be paid to you over a minimum of 3 months but could be extended over any time period acceptable to you.

In addition to that, Washington Mutual would be honored to have you join their team. You would be placed on a retainer of $250,000.00 a year. If you would consider employment by Washington Mutual, we would love to further discuss your ideas on training and compliance.

I will be on vacation for the next 10 days (beginning Friday, June 6). Please get back to me at your leisure.

Thank you.

Doug



A-195

LAW OFFICE OF
# DANIEL J. ANKER
ATTORNEY AT LAW
PARK PLAZA
1100 LOVERING AVENUE, SUITE 20
WILMINGTON, DE 19806
(302) 655-6263
FAX (302) 655-7138

Daniel J. Anker

June 5, 2003

Douglas Macentire, Esquire
Washington Mutual

Re:    Anker/Washington Mutual

Dear Doug:

Thank you for your offer of settlement dated June 5, 2003. The cash settlement offer of 5 million dollars payable in three months (or sooner) is hereby accepted. I assume the first third of the settlement will be wired in the near future. Please confirm the dates of each payment.

I would also like to convey my sincere interest in your employment offer. However, since the specific terms of the employment offer need to be worked out, I am not in a position to accept it at this juncture. In addition, from a legal and ethical perspective, I believe it would be prudent to consummate the settlement agreements prior to any prospective employment with Washington Mutual. With the foregoing caveat stated, I would like to commence discussions regarding the details of possible employment opportunities with your institution. Thank you.

Very truly yours,

Daniel J. Anker





# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF A | § | |
| MEMBER OF THE BAR OF THE | § | |
| SUPREME COURT OF THE | § | |
| STATE OF DELAWARE: | § | No. 501, 2006 |
| | § | |
| ALLAN WENDELBURG, ESQUIRE | § | Board Case Nos. 16 and 44, 2005 |
| | § | |
| | § | |

Submitted: October 10, 2006
Decided: December 6, 2006

Before **STEELE**, Chief Justice, **HOLLAND**, and **RIDGELY**, Justices.

## O R D E R

This 6th day of December 2006, it appears to the Court that the Board on Professional Responsibility has filed its Report in this matter pursuant to Rule 9(d) of the Delaware Lawyers' Rules of Disciplinary Procedure. Neither the Respondent nor the Office of Disciplinary Counsel has filed objections to the Board's Report. The Court has reviewed the matter pursuant to Rule 9(e) and concludes that the Board's Report should be approved.

NOW, THEREFORE, IT IS ORDERED, that the Report of the Board on Professional Responsibility, filed on September 13, 2006 (copy attached), is hereby **APPROVED**. The matter is hereby **CLOSED**.

BY THE COURT:

Chief Justice

A-197

**BOARD ON PROFESSIONAL RESPONSIBILITY**
**OF THE**
**SUPREME COURT OF THE STATE OF DELAWARE**

Supreme Court of the State of Delaware
Received and Filed
SEP 13 2006
DEPUTY CLERK
WILMINGTON
CC·0

In the Matter of a        )
Member of the Bar of      )     CONFIDENTIAL
the Supreme Court of      )
Delaware:                 )
                          )     NO: 501, 2006
                          )
   ALLAN WENDELBURG,      )     Board Case Nos. 16 and 44, 2005
        Respondent.       )
                          )
                          )

## REPORT OF THE BOARD ON PROFESSIONAL RESPONSIBILITY

The Panel of the Board on Professional Responsibility appointed to hear this matter consisted of Emilie R. Ninan, Esquire, Betsy Holden, and David J. Ferry, Jr., Esquire (Chair). A hearing was held in the Supreme Court Courtroom in Wilmington, Delaware on May 10, 2006. The Office of Disciplinary Counsel ("ODC") was represented by Patricia Bartley Schwartz, Esquire, and Michael S. McGinniss, Esquire, and Respondent, Allan Wendelburg, Esquire, was present at the hearing and was represented by Charles Slanina, Esquire. A Prehearing Stipulation was filed with the Board on that date.

### BACKGROUND

A petition for discipline was filed against the respondent by the ODC on April 5, 2006. The petition for discipline was approved by a Panel of the Preliminary Review Committee. The petition alleged seventeen violations of the Delaware Lawyers' Rules of Professional Conduct ("the Rules") as follows:

1

A-198

**COUNT ONE:**     **FAILURE TO PROVIDE COMPETENT REPRESENTATION.**  In violation of Rule 1.1, Respondent failed to enter his appearance, answer a pleading, respond to the plaintiff's Request for Entry of Default, or take any further action following the entry of a default on behalf of his client in an Adversary Proceeding in Bankruptcy Court.

**COUNT TWO:**     **FAILURE TO ABIDE BY THE CLIENT'S OBJECTIVES OF THE REPRESENTATION.**  In violation of Rule 1.2, Respondent failed to enter his appearance, answer the adversary complaint, respond to Plaintiff's Request for Entry of Default, or take further action following the entry of a default on behalf of his client in an Adversary Proceeding in Bankruptcy Court.

**COUNT THREE:**     **FAILURE TO ACT WITH DILIGENCE AND PROMPTNESS.**  In violation of Rule 1.3, Respondent failed to enter his appearance, answer the adversary complaint, respond to Plaintiff's Request for Entry of Default, or take any action following the entry of a default on behalf of his client in an Adversary Proceeding in Bankruptcy Court.

**COUNT FOUR:**     **FAILURE TO COMMUNICATE WITH A CLIENT.**  In violation of Rule 1.4(a), Respondent failed to keep his client informed of the status of the Adversary Proceeding and he failed to respond to telephone calls and facsimile transmissions requesting information on the status of his work on the matter.

**COUNT FIVE:**     **FAILURE TO COMMUNICATE WITH A CLIENT.**  In violation of Rule 1.4(b), the Respondent failed to explain the events occurring in the Adversary Proceeding to his client.

**COUNT SIX:**     **CHARGING AN UNREASONABLE FEE.**  In violation of Rule 1.5(b), Respondent charged a $2,000.00 retainer to represent the company in the Adversary Proceeding but failed to provide the services for which he was retained, and failed to refund any portion of the retainer.

2

**COUNT SEVEN:**   **FAILURE TO PROMPTLY DELIVER FUNDS TO his client.**   In violation of Rule 1.15(b), Respondent failed to refund his client's $2,000.00 retainer following his abandonment of the representation.

**COUNT EIGHT:**   **TERMINATING THE REPRESENTATION.**   In violation of Rule 1.16(d), Respondent abandoned the legal representation of his client, by failing to protect his client's interest in the Adversary Proceeding such that a $14,670.00 default judgment was entered against it, and by failing to refund all or any unearned part of his client's retainer.

**COUNT NINE:**   **FAILURE TO RESPOND TO ODC.**   In violation of Rule 8.1(b), Respondent failed to respond to his client's numerous requests for a response in a certain matter.

**COUNT TEN:**   **FAILURE TO SAFEGUARD CLIENT FUNDS.**   In violation of Rule 1.15(a), Respondent disbursed funds from his escrow account in an amount greater than the amount being held for clients and third parties, thereby creating a total of 24 negative balances, and by accumulating unidentified client funds in a Miscellaneous client category.

**COUNT ELEVEN: FAILURE TO PROMPTLY DELIVER FUNDS TO A THIRD PARTY.**   In violation of Rule 1.15(b), Respondent failed to file and/or pay various law practice employer and employee law practice payroll taxes due to federal and state tax authorities for the 3rd and 4th quarters of 2002 and the years 2003, 2004, and 2005.

**COUNT TWELVE: FAILURE TO MAINTAIN BOOKS AND RECORDS.**   In violation of Rule 1.15(d), Respondent failed to properly maintain his law practice books and records for his law practice from 2002 through October 2005, specifically by maintaining negative client/third party balances in 24 client/third party listings on his client subsidiary ledger; failing to transfer funds from his non-fiduciary account in a timely manner to cover these excess disbursements; failing to ensure that the reconciled cash balance for the escrow account agreed with the total of the client/third party balance listing; by maintaining a Miscellaneous listing on the client

3

subsidiary ledger containing unidentified funds; and by failing to monitor and promptly disburse funds from numerous client accounts in the Active Escrow Account with two year old balances.

**COUNT THIRTEEN:  ENGAGING IN CRIMINAL CONDUCT.**  In violation of Rule 8.4(b), as construed by the interpretive guideline therefor, Respondent willingly failed to file any federal and state income tax returns for five (5) consecutive tax years (2000, 2001, 2002, 2003, and 2004) and only filing his 2000 returns on January 6, 2006, and by willfully failing to pay federal and state income taxes due for those tax years in a timely manner.

**COUNT FOURTEEN:  CONDUCT INVOLVING MISREPRESENTATION.**  In violation of Rule 8.4(c), Respondent filed with the Supreme Court Certificates of Compliance in four (4) consecutive years (2002, 2003, 2004, and 2005), each of which contained false representations to the Court relating to the Respondent's maintenance of his law office books and records.

**COUNT  FIFTEEN:     ENGAGING  IN  CONDUCT  PREJUDICIAL  TO  THE ADMINISTRATION OF JUSTICE.**  In violation of Rule 8.4(d), Respondent failed to file with the Supreme Court Certificates of Compliance in four (4) consecutive years (2002, 2003, 2004, and 2005), each of which contained false representations to the Court relating to the Respondent's maintenance of his law office books and records.

**COUNT SIXTEEN: CONDUCT INVOLVING MISREPRESENTATION.**  In violation of Rule 8.4(c), Respondent failed to file with the Supreme Court Certificates of Compliance in five (5) consecutive years (2001, 2002, 2003, 2004, and 2005), each of which contained false representations to the Court that all of the Respondent's federal and state income taxes had been filed and paid on a timely basis and in three (3) consecutive years (2003, 2004, and 2005) each of which contained false statements that all of Respondent's payroll taxes had been filed and paid on a timely basis.

**COUNT  SEVENTEEN:  ENGAGING IN CONDUCT PREJUDICIAL TO THE**

4

**ADMINISTRATION OF JUSTICE.** In violation of Rule 8.4(d), Respondent filed with the Supreme Court Certificates of Compliance in five (5) consecutive years (2001, 2002, 2003, 2004, and 2005), each of which contained false representations to the Court that all of the Respondent's federal and state income taxes had been filed and paid on a timely basis and in three (3) consecutive years (2003, 2004, and 2005), each of which contained false statements that all of Respondent's payroll taxes had been filed and paid on a timely basis.

In advance of the hearing, the parties submitted a Prehearing Stipulation (hereinafter "Stipulation") setting forth certain admitted facts and violations and certain disputed violations.

## ADMITTED FACTS AND VIOLATIONS

1.     The Respondent is a member of the Bar of the Supreme Court of Delaware. He was admitted to the Bar in 1979. At all times relevant to this Petition, the Respondent was engaged in the private practice of law with an office in Hockessin, Delaware.

### Board Case No. 16, 2005 (Alan Jackson—D/B Constructors, Inc.)

2.     In or about July 2004, the Respondent was contacted by Alan Jackson, President of D/B Constructors, Inc. ("his client") and his client's local Texas counsel ("Texas-Counsel"), about representing his client's interests as local Delaware counsel in an Adversary Proceeding filed in the United States Bankruptcy Court for the District of Delaware on June 25, 2004.

3.     By letter dated July 20, 2004, the Respondent agreed to represent his client and set forth the terms of the representation, including the payment of a $2,000.00 retainer that would be drawn down upon at an hourly rate of $200.00 for attorney time, $100.00 for law clerk time, and $70.00 for paralegal time.

4.     On or about July 21, 2004, Alan Jackson, paid the Respondent a $2,000.00 retainer for his legal services. According to the Respondent's client subsidiary ledger, this check was credited to his client's client balance and has not been drawn down.

5

A-202

5.    By facsimile transmission dated August 23, 2004, Mr. Jackson sent the Respondent a Status Hearing Notice and questioned the status of the matter.

6.    On or about August 24, 2004, the plaintiff in the Bankruptcy case ("Plaintiff") filed a Request for Entry of Default against his client. The Status Hearing Notice issued by the Court indicated that no answer had been filed on behalf of his client. By facsimile transmission dated August 27, 2004, Mr. Jackson sent the Respondent Plaintiffs Request for Entry of Default.

7.    On or about October 18, 2004, the Plaintiff filed a second Request for Entry of Default judgment against his client, alleging that his client had been properly served and had failed to answer, move or otherwise plead in the Bankruptcy matter. On or about October 22, 2004, following a telephone call to the Respondent, Mr. Jackson sent Plaintiff's Request for Entry of Default Judgment to the Respondent by facsimile transmission voicing his confusion as to why he would be receiving these filings as he understood that the Respondent was representing his client in the matter.

8.    By order dated October 22, 2004, an Entry of Default was entered against his client and a judgment for $14,670.00 was entered against his client.

9.    In February 2005, his client received a collection letter dated February 14, 2005 from an Illinois attorney on behalf of the Plaintiff ("Illinois-Counsel") requesting remittance of the judgment amount. Mr. Jackson faxed this letter to the Respondent on February 17, 2005.

10.    A subsequent collection letter dated March 16, 2005 was received by his client. Mr. Jackson responded to this letter by fax requesting that Illinois-Counsel contact his Delaware attorney, the Respondent.

11.    Mr. Jackson was advised by Illinois-Counsel's office that there was no record of the Respondent's entry of appearance in the Delaware Bankruptcy matter and that all attempts by the Illinois-Counsel to contact the Respondent had been unsuccessful.

A-203

12.   By letter to the Respondent dated March 24, 2005, Mr. Jackson outlined the history of the Respondent's representation of his client and the problems encountered, and he demanded reimbursement of the $2,000.00 retainer. By letter dated March 29, 2005 from his client's Texas-Counsel to the Respondent, he demanded that the Respondent reimburse his client for the cost of the Judgment, either personally or through an insurance carrier.

13. .  Mr. Jackson filed a disciplinary complaint with the ODC on April 5, 2005.

14.   By letter dated April 19, 2005, the ODC informed the Respondent that the complaint had been filed and requested his written response thereto no later than May 4, 2005. Having received no response, on May 5, 2005, the ODC left a message with the Respondent's secretary to have him call the ODC. He failed to return the telephone call.

15.   On May 9, 2005, the ODC contacted Robert Leoni, Esquire to intercede and to determine whether the Respondent was well and able to respond to the ODC. Mr. Leoni did contact the Respondent, who advised him that he would have a response to the ODC within the week. The Respondent failed to provide a response or otherwise communicate with the ODC in this matter. On May 18, 2005, the ODC again requested Mr. Leoni's help in interceding in this matter. Mr. Leoni contacted the Respondent but heard nothing in return.

16.   By letter dated May 25, 2005, the ODC notified the Respondent that the matter was under formal investigation by the ODC. He was notified that the matter could be presented to the Preliminary Review Committee. The ODC requested to meet with the Respondent as soon as possible. The Respondent failed to respond. By letter dated August 8, 2005, the ODC again requested to meet with the Respondent and strongly suggested that he retain counsel. The Respondent failed to respond.

18.   The Respondent returned the $2,000.00 his client retainer on May 8, 2006.

## ADMITTED VIOLATIONS

7

A-204

19.  The Respondent admits he violated **Rule 1.1** by failing to enter his appearance, answer the pleading, respond to the plaintiffs Request for Entry of Default, or take any further action following the entry of a default on behalf of his client in the Adversary Proceeding in Bankruptcy Court. **(Count One)**

20.  The Respondent admits he violated **Rule 1.2(a)** by failing to enter his appearance, answer the adversary complaint, respond to Plaintiffs Request for Entry of Default, or take further action following the entry of a default on behalf of his client in the Adversary Proceeding in Bankruptcy Court. **(Count Two)**

21.  The Respondent admits he violated **Rule 1.3** by failing to enter his appearance, answer the adversary complaint, respond to Plaintiffs Request for Entry of Default, or take any action following the entry of a default on behalf of his client in the Adversary Proceeding in Bankruptcy Court. **(Count Three)**

22.  The Respondent admits he violated **Rule 1.4(a)** by failing to keep Mr. Jackson informed of the status of the Adversary Proceeding and his failure to return telephone calls and facsimile transmissions requesting information on the status of his work on the matter. **(Count Four)**

23.  The Respondent admits he violated **Rule 1.4(b)** by failing to explain the events occurring in the Adversary Proceeding to Mr. Jackson. **(Count Five)**

24.  The Respondent admits he violated **Rule 1.16(d)** by failing to protect his clients interests in the adversary proceeding and failing to promptly return his clients retainer. **(Count Eight)**

**Disputed Violations**

25.  The Respondent denies the $2,000.00 retainer his client paid constitutes an unreasonable fee in violation of **Rule 1.5(a)**. **(Count Six)**

8

26.    The Respondent admits he failed to promptly deliver funds to his client but denies he failed to refund the retainer in violation of **Rule 1.15(b). (Count Seven)**

27.    The Respondent admits he failed to respond to all ODC requests or that his responses were timely but denies his actions constitute a violation of **Rule 8.1(b).  (Count Nine)**

## Board Case No. 44, 2005 (Leah Hoopes)

28.    In or about September 2005, the Respondent became counsel for Nationwide Insurance Company and began working out of its office. He continued to maintain his old office space to complete his private practice.

29.    Leah Hoopes had been employed by the Respondent as a paralegal since January 2001. On or about September 7, 2005, the Respondent informed Ms. Hoopes that he would be starting a new job on September 15, 2005.  The Respondent and Ms. Hoopes discussed procedures for the closure of his office by September 30, 2005. He advised Ms. Hoopes that he would dictate a form letter to be sent to his clients. This did not occur.

30.    The last time Ms. Hoopes spoke with the Respondent was September 29, 2005, when he advised her that he would be closing the office on October 30, 2005.  Because the Respondent failed to contact Ms. Hoopes regarding further instructions, Ms. Hoopes ceased working for the Respondent on or about October 14, 2005.

31.    Ms. Hoopes wrote a paycheck for herself and left it in the Respondent's safe for his signature.  She returned to the office on October 18, 2005 to retrieve her paycheck but it remained unsigned.  There was no evidence that the Respondent had been in the office since October 14. Ms. Hoopes returned to the office on October 21 and October 24, 2005 to retrieve her paycheck. The check remained unsigned and there was no sign that the Respondent had been in the office.  On November 3, 2005, Ms. Hoopes directed an e-mail to the Respondent stating

9

A-206

that she had left her letter of resignation in the office and she requested that he sign her last paycheck and send it to her home address. The Respondent failed to respond to her.

32.    On November 7, 2005, Ms. Hoopes left a voice mail message on the Respondent's new office telephone answering machine requesting that he sign her paycheck and mail it to her home address.

33.    On this same day, Ms. Hoopes contacted the Delaware Unemployment Office concerning her unemployment benefits, and she was advised that no money had been paid into the account of the Respondent's law office. Ms. Hoopes went to the Unemployment Office to file for unemployment and was advised that she had no wage history for the past 2 ½ years. The last payment from the law office had been for the second quarter of 2002. Ms. Hoopes provided the Department of Labor with copies of her 2005 pay stubs and copies of all of her W-2 forms through 2004.

34.    On November 11, 2005, Ms. Hoopes left a message for the Respondent's secretary. She received no response. On November 14 and 15, 2005, Ms. Hoopes spoke with the Respondent's current secretary and requested that he call her. He failed to return her calls. On November 15, 2005, Ms. Hoopes left a voice message on the Respondent's cellular telephone. The Respondent failed to respond.

35.    On November 19, 2005, Ms. Hoopes final paycheck from the Respondent was hand delivered to her home mailbox. To date, she has not received her W-2 form for 2005.

36.    . Based on the Respondent's failure to refund the retainer to Mr. Jackson, his failure to respond to the ODC in that matter, his failure to pay unemployment taxes on behalf of Ms. Hoopes, his failure to timely compensate Ms. Hoopes for her work, and his failure to communicate with Ms. Hoopes, the ODC requested an audit of the Respondent's books and records by the Lawyers Fund for Client Protection ("LFCP").

10

37.     Ronald E. Derr, CPA, auditor for the LFCP, conducted two audits of the Respondent's financial books and records on December 5, 2005 and January 11, 2006. Mr. Derr issued his final audit report dated February 27, 2006.

38.     The audit report revealed that the Respondent:

- failed to file and pay Delaware Gross Receipts taxes since December 31, 2001;

- failed to file and pay Federal and Delaware payroll taxes since the second quarter of 2002;

- failed to file and pay Federal and Delaware Individual Income taxes since 2001;

- untimely filed calendar year 2000 Federal and Delaware income taxes on January 6, 2006;

- failed to balance his client subsidiary ledger with the total reconciled bank balance since prior to 2001;

- failed to transfer funds into his client escrow account despite debit client balances on his subsidiary ledger dating back prior to 2001 (24 negative balances);

- failed to identify all client funds in his client escrow account; created a Miscellaneous client sub-account;

- failed to promptly disburse client/third party funds as client balances on 25 client sub-accounts have remained the same for almost two years;

- failed to maintain files related to funds being held;

- failed to refund the Jackson retainer.

39.     On his Certificates of Compliance filed with the Court in 2002 through 2005, the Respondent represented to the Court that he was complying with financial recordkeeping requirements. On his Certificates of Compliance filed with the Court in 2001 through 2005, the Respondent represented to the Court that he was filing and paying his payroll and income taxes

11

A-208

in a timely manner.

## Admitted Violations

40.    The Respondent admits he violated **Rule 1.15(b)** by failing to file and/or pay various law practice employer and employee law practice payroll taxes due to federal and state tax authorities for the 3rd and 4th quarters of 2002 and the years 2003, 2004, and 2005. **(Count Eleven)**

41.    The Respondent admits he violated **Rule 1.15(d)** by failing to properly maintain his law practice books and records for his law practice from 2002 through October 2005, specifically by maintaining negative client/third party balances in 24 client/third party listings on his client subsidiary ledger; failing to transfer funds from his non-fiduciary account in a timely manner to cover these excess disbursements; failing to ensure that the reconciled cash balance for the escrow account agreed with the total of the client/third party balance listing; by maintaining a Miscellaneous listing on the client subsidiary ledger containing unidentified funds; and by failing to monitor and promptly disburse funds from numerous client accounts in the Active Escrow Account with two year old balances. **(Count Twelve)**

42.    The Respondent admits he violated **Rule 8.4(d)** by filing with the Supreme Court Certificates of Compliance in four (4) consecutive years (2002, 2003, 2004, and 2005), each of which contained inaccurate representations to the Court relating to the Respondent's maintenance of his law office books and records. **(Count Fifteen)**

43.    The Respondent admits he violated **Rule 8.4(c)** by filing with the Supreme Court Certificates of Compliance in five (5) consecutive years (2001, 2002, 2003, 2004, and 2005), each of which contained inaccurate representations to the Court that all of the Respondent's federal and state income taxes had been filed and paid on a timely basis and in three (3) consecutive years (2003, 2004, and 2005) each of which contained misstatements that all of

Respondent's payroll taxes had been filed and paid on a timely basis. **(Count Sixteen)**

44.    The Respondent admits he violated **Rule 8.4(d)** by filing with the Supreme Court Certificates of Compliance in five (5) consecutive years (2001, 2002, 2003, 2004, and 2005), each of which contained inaccurate representations to the Court that all of the Respondent's federal and state income taxes had been filed and paid on a timely basis and in three (3) consecutive years (2003, 2004, and 2005), each of which contained misstatements that all of Respondent's payroll taxes had been filed and paid on a timely basis. **(Count Seventeen)**

**Disputed Violations**

45.    The Respondent denies that disbursing funds from his escrow account in an amount greater than the amount being held for clients and third parties, thereby creating a total of 24 negative balances, and by accumulating unidentified client funds in a Miscellaneous client category constitutes a violation of **Rule 1.15(a)**. **(Count Ten)**

46.    The Respondent denies that his failure to file <u>any</u> federal and state income tax returns for five (5) consecutive tax years (2000, 2001, 2002, 2003, and 2004) and only filing his 2000 returns on January 6, 2006, and by failing to pay federal and state income taxes due for those tax years in a timely manner, was either willful or criminal or constituted a violation of **Rule 8.4(b)** as construed by the **Interpretive Guideline**. **(Count Thirteen)**

47.    The Respondent admits that his Certificates of Compliance filed with the Supreme Court in 2002, 2003, 2004, and 2005 contained inaccurate representations in violation of **Rule 8.4(c)** but denies that his conduct in doing so was willful. **(Count Fourteen)**

## STATEMENT OF FACTS

The Panel proceeded with the hearing beginning at approximately 9:30 a.m. The Panel received, reviewed, and accepted the Stipulation in its entirety. The Panel heard brief testimony from Leah Hoopes, the Respondent's law former paralegal; Dr. Carol Tavani, a neuropsychiatrist

13

and the Respondent's treating physician; and from the Respondent.

### *Testimony of Leah Hoopes*

Leah Hoopes testified that she was hired by the Respondent to do office work in January 2001. Shortly thereafter, Ms. Hoopes became a paralegal. In such capacity, she prepared documents for filing but had no responsibility for bookkeeping and records. According to Ms. Hoopes testimony, the Respondent informed her in September 2005 that he would be closing his law practice. Ms. Hoopes worked until mid-October but did not receive a final pay check until mid-November. In the interim, Ms. Hoopes went to file for unemployment but was informed that there was no record of her being employed. In addition, she never receive a W-2 from Respondent for 2005.

### *Testimony of Respondent*

The Respondent testified that he has been a member of the Delaware Bar since December 1979. For twenty years he held various legal positions in the AG's office and in private practice before starting his own practice in 1999.

Respondent married his wife Diane in 1985. Diane was Respondent's office administrator after he opened his own practice. She also bore the laboring oar with respect to their personal finance and tax obligations. After a long illness and several surgeries beginning in 2001, Diane died in November, 2004. Respondent has three minor children.

During her illness, Diane was unable to perform office administrator functions (sending bills, paying bills, etc.). A part-time bookkeeper was hired but never took over Diane's full responsibilities. In addition, during his wife's illness, Respondent was unable to devote time necessary for insurance defense work due to obligations at home and moved to largely paralegal-driven subrogation practice.

In early 2005, Respondent decided to close his office. On September 7, 2005 he went to

14

work as in-house counsel for Nationwide Insurance Company. He wound down most but not all of the practice. The same factors which kept respondent from cleaning out Diane's office, kept him from winding down practice completely. Respondent was opening some but not all mail at both home and work.

In April 2006, Respondent's family doctor diagnosed him with acute depression and hypertension. Respondent began taking prescribed antidepressant. Respondent described himself as depressed, not sad all the time but withdrawn and resistant to outside contact. In late April, Respondent was place on medical disability by his employer. Respondent has plans in place for treatment.

With respect to obligations to clients, to file taxes, and to file certificates of compliance which were not upheld, Respondent testified that he realized that certain things had to be done but he just could not bring himself to do them.

### *Testimony of Dr. Tavani*

Dr. Tavani testified with respect to psychiatric conditions and personal and emotional problems. In reviewing the Respondent's history, Dr. Tavani noted that the Respondent had suffered from closed-head injury which predisposes him to depression. The Respondent had also suffered from some sort of depression once before in 1990 when his father died. Dr. Tavani testified that professional functionality is usually the last thing to go in high achievers and professionals like doctors and lawyers. She noted that Respondent's grandfather had committed suicide which increases risk of suicide for Respondent. In addition, Respondent exhibits other indicators of depression such as tearfulness, insomnia, erratic eating, irritability and social withdrawal. Respondent's mother suffered from depression and was treated for several years which predisposes Respondent for depression.

Dr. Tavani found no evidence of psychosis but Respondent's memory, self-esteem and

15

self-motivation are all suffering. Dr. Tavani's diagnosis is that Respondent has a very profound depression, a major depression derived from a severe prolonged not only bereavement but anticipatory bereavement from his wife's lengthy illness. Respondent is depressed to the point of nonfunctionality. Respondent's condition is debilitating and his cognitive realizations and processing are very impaired. Dr. Tavani testified that Respondent's deficiency was not volitional; he was simply "unplugged".

Dr. Tavani went on to testify that Respondent had left his home and office largely untouched since his wife's death. Denial and a distorted view of reality are all part of the Respondent's depression. In addition, Respondent is a stoic man so its not surprising that he did not seek treatment or accept help offered from others.

She testified that the Respondent's depression is treatable with a combination of medication and therapy, and that his prognosis for a successful recovery is "excellent."

## VIOLATIONS

The Panel finds that the respondent violated Rule 1.1, 1.2(a), 1.3, 1.4(a), 1.4(b), 1.15(b), 1.15(d), 1.16(d), 8.4(b), 8.4(c),and Rule 8.4(d) (two counts). The Panel accepts the stipulated violations set forth in the Stipulation. In addition, the Panel considered the following aggravating and mitigating factors:

## AGGRAVATING FACTORS

The Panel has identified certain aggravating factors including the Respondent's prior disciplinary record and his long and substantial experience as a practicing attorney.

## MITIGATING FACTORS

The Panel has identified mitigating factors including Respondent's long history of service to the community and the severe unanticipated personal problems resulting from the death of his spouse.

16

A-213

## RECOMMENDATIONS

Upon consideration of the evidence presented, the Stipulation of the parties, and the aggravating and mitigating factors set forth above, the Panel recommends that the Respondent be publicly reprimanded for his violations of the aforesaid rules and be placed on a three year public suspension retroactive to May 8, 2006, the date on which Respondent was put on disability inactive status.

17

Dated: Sept. 13, 2006

_Emilie R. Ninan_
EMILIE R. NINAN

Dated:

BETSY HOLDEN

Dated:

DAVID J. FERRY, JR.

745529

18

Dated:

_____

EMILIE R. NINAN

Dated:

_____

BETSY HOLDEN

Dated: 9-13-06

_____

DAVID J. FERRY, JR.

745529

18

Dated:

_____
EMILIE R. NINAN

Dated: 9.13.06

_Betsy Holden_
BETSY HOLDEN

Dated:

_____
DAVID J. FERRY, JR.

745329

18

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the within Report of the Board on Professional Responsibility was served in the manner indicated on September 13, 2006 upon the following:

### BY HAND

Patricia Bartley Schwartz, Esquire
Office of Disciplinary Counsel
Carvel State Office Building, 11th Floor
820 N. French Street
Wilmington, DE 19801

### BY FIRST CLASS MAIL

Charles Slanina, Esquire
Finger & Slanina, LLC
P. O. Box 1449
Hockessin, DE 19707-1449

DAVID J. FERRY, JR.

19

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DANIEL J. ANKER,**<br>Petitioner, | :<br>:<br>: |
| v. | : Civil Action No. 08-203 SLR |
| **ELIZABETH NEAL,** Acting Warden,<br>John L. Webb Correctional Facility,<br>and **JOSEPH R. BIDEN, III,** Attorney<br>General of the State of Delaware,<br>Respondents. | :<br>:<br>:<br>:<br>: |

### AFFIDAVIT OF WILLIAM F. GLANZ

COMMONWEALTH OF PENNSYLVANIA
CHESTER COUNTY

BE IT REMEMBERED that on this __*il*__ day of June, 2008, personally appeared before

me, the Subscriber, a Notary Public of the State and County aforesaid, WILLIAM F. GLANZ,

who being first duly sworn according to law, did depose and state as follows:

1. I am a licensed private investigator in the State of Delaware and I have been actively

engaged as a private investigator for 9 years. Prior to my current employment, I was a Special

Agent for the U.S. Drug Enforcement Administration for approximately 30 years. Prior to that

employment, I was a Special Agent for the Criminal Investigation Division of the Internal

Revenue Service.

2. In March 2004, I was retained by Allan Wendelburg, Esquire ("Wendelburg") to

provide investigative services on behalf of his client, Daniel J. Anker ("Anker"). It was my

understanding that Anker was a Delaware attorney who maintained a solo law practice in

Wilmington, Delaware. I also understood that Anker's law practice was primarily involved in

handling closings for residential real estate sales and refinancings. I was also told that Anker had

-1-

been indicted on numerous counts of Felony Theft and that the theft charges all related to alleged misappropriations from the client escrow account he maintained for his law practice. I was also told that nearly all of the alleged thefts occurred between March 2003 and July 2003, when Anker's law practice was closed down by the Delaware Office of Disciplinary Counsel and Anker was suspended from practicing law by the Delaware Supreme Court.

3. I learned that during the time period of the alleged thefts, the only persons who had access to Anker's office accounts were Anker himself and his then 19 year old daughter, Laura Larks ("Larks"), who was the sole employee in the office. I was also provided with a great deal of background information, primarily from Anker, concerning the personal relationship between Anker and Larks. According to Anker, during the period of time that the thefts occurred, he had entrusted Larks to handle all of the details and preparation of the documents, including the HUD-1 forms, related to the closings. Larks also was in charge of handling all of the post-closing details, including mortgage payoffs and recording of documents. Larks also answered the phones, screened Anker's incoming mail and fielded nearly all of the client inquiries that were related to the closing transactions. According to Anker, his role in the closing transactions was limited to being present at the closing itself and explaining the details of the transaction to the clients. What Anker told me about Larks' role in "controlling" the office was corroborated in my interviews with many of the "victims" in the case. I also learned from my interviews with "victims" that, in at least two cases, Anker was not even present for the closing itself.

4. In order to assist in my investigation, I was also given access to all of the "discovery" materials that had been turned over to Wendelburg by the State, including audit spreadsheets for Anker's office account and client escrow account. I also received copies of statements that Larks had provided to State investigators and documents that were related to Larks' statements. Based

-2-

A-220

on a review of Larks' statements, I learned that Larks had admitted that she had signed Anker's name to many checks drawn on the escrow account, although she also claimed that Anker had given her permission to do so.

5. Based on my discussions with Anker and Wendelburg, and based on my own review of the evidence, it was clear to me that the financial records and files in Anker's office were in complete disarray. It was also clear to me, based primarily on my review of the State's evidence, that over one million dollars had been misappropriated from the escrow account. During the course of my investigation, it also became clear to me that all of the individual theft charges involved a similar fact pattern: Anker's office would receive money from a mortgage lender to fund a refinancing transaction, which usually were sent to Anker's escrow account by wire transfer. For each transaction, a HUD-1 form was prepared for the closing. The HUD-1 showed the sources of the funds received and also showed the disbursements that were to be made in order to complete the transaction. Typically, for each transaction, the HUD-1 would show that one or more "old" mortgages were to be paid off. My investigation clearly showed that in each case the "old" mortgages were never paid off. What happened after the closings also followed a similar pattern in each case: Within weeks after the closings, the "victims" would get letters and phone calls from the "old" mortgage company informing them that the mortgage payments were delinquent. The victim would then tell the "old" mortgage company that they had refinanced or sold the property and the old mortgage was paid off at the closing. The "old" mortgage company would then tell the "victim" that the payoff was never received. The "victim" would then contact Anker's office to find out what had happened. In nearly every case, the victims reported that their only post-closing contact was with Larks. Larks would always tell them that the mortgage company was mistaken and that the payoffs had been made. If the

-3-

"victim" pressed Larks for details or wanted some documentation, Larks would come up with some excuse for not being able to provide that information. In several cases Larks told the "victim" that the mortgage company had admitted that they made a "mistake" and Larks asked them for authorization to make a "settlement" with the mortgage company. My investigation showed that in the cases involving alleged "settlements," including Anker's refinancing of his personal residence and the $300,000 "settlement" actually paid to Douglas Ray, all of the documents evidencing the "settlement" had been prepared on Larks' office computer and that the documents themselves were complete fabrications.

6. Anker never denied that substantial sums of money had been taken from the escrow account. Anker maintained , however, that he had entrusted Larks to handle all of the financial transactions in the office and that Larks had committed the thefts without his knowledge or authorization. Anker also maintained that he had not knowingly misappropriated any funds from the escrow account. Anker believed that he had "earned" the funds that he withdrew from the escrow account based on Larks' representations concerning the "settlements" with the mortgage companies. Anker also believed that Larks' motivation to commit the thefts arose from her longstanding "hatred" of Anker, who Larks held responsible for her long estrangement from him during her childhood.

7. In my opinion, the real issue in the case was not whether the money was stolen from the escrow account. Rather, the real issue was whether or not Anker was criminally responsible for the thefts. Thus, my investigation came to focus on whether any of the money taken from Anker's office accounts could be traced back to Larks, or traced to misconduct committed by Larks. One such transaction involved the "Paveza" refinancing. The Report that I sent to Wendelburg concerning this transaction is attached hereto as Exhibit "A." I also conducted a

-4-

forensic audit of Larks' personal account at WSFS Bank. A summary of that audit is attached hereto as Exhibit "B." The result of that audit was that between January 2002 and July 2003, Larks had deposited into her personal account at WSFS $194,155 that had been taken from Anker's office accounts. This included $94,391 from Anker's escrow account and $99,764 from Anker's operating account. Also, that Larks had stolen and deposited into her personal account, three checks which had been issued to Anker totaling $6,197.50. They included a check from Jeffrey Biddle for $1200.00 deposited 4/2/02; a check from Miller Gun Center for $1997.50 deposited 4/10/02; and a check from Russell Burkett for $3,000.00 deposited 4/25/02. This information was also given to Wendelburg.

8. I was also present in the courtroom for nearly all of Anker's trial in the Delaware Superior Court. On the last day of the trial, I was called as a defense witness. A transcript of my trial testimony is attached as Exhibit "C." As noted herein, prior to the trial, I had developed considerable evidence and documentation which pointed to Larks as being solely responsible for the thefts and also showing how Larks herself had personally benefited from the thefts. Wendelburg, inexplicably, did not ask me any questions about the evidence I had developed concerning Larks' role in the thefts.

_William F. Glanz_ 6/11/2008
WILLIAM F. GLANZ

SWORN TO AND SUBSCRIBED before me the date and year above written.

_Richard J. Jenkins_ 06/11/2008
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Richard J. Jenkins, Notary Public
West Sadsbury Twp., Chester County
My Commission Expires Jan. 29, 2012
Member, Pennsylvania Association of Notaries

-5-

A-223

## REPORT OF INVESTIGATION

**Date: April, 2004**        **Case # DE041467A**        **By: William F. Glanz**

---

Analysis of Gary and Maya Paveza Transaction

Count V11 and V111 of the indictment charge Daniel Anker and Laura Larks of obtaining with intent to appropriate, United Sates Currency in an amount in excess of $50,000 but less then $100,000 belonging to Gary Paveza (Count V11) and Conseco Corporation. (Count V111) on or about April 7, 2003. The transaction involved the refinancing by the Pavezas of their home loan. Maya Paveza is a real estate agent. Laura Larks and Maya Paveza are friends.

Analysis of the transaction shows Laura Larks wrote a check to Gary Paveza for $7500 on April 1, 2003 and notated it "gift from Laura". (Check #9191 on Larks checking account at WSFS) The source of Larks funds was mostly from two checks she forged and drew on the client's operating account. They were check # 7938 in the amount of $4,000.00 on March 31, 2003 and check # 7939 in the amount of $2666.67 on March 31, 2003. Each was forged with Laura Larks signature. She has admitted to the Attorney General's Office she got the money for Paveza from the client's accounts. She told the Attorney General's Office her father was aware of the transaction.

Larks also signed a Request for Verification of Gift Letter for the $7500 which Paveza submitted to the lender. Larks falsely stated on the Verification she was a cousin. She has admitted to the Attorney General's Office she is not a cousin but she claimed to be so the gift would not be scrutinized. She also said she got the money from the client's account. Paveza filed the false verification to get her refinancing.

Maya Paveza returned the money plus $1500 to Larks via a $9000 check on Paveza's account at Artisan's Bank. The check was dated May 9, 2003 and marked "reimb for loan". Larks has admitted to the Attorney General's Office that she kept the money instead of returning it to the client's account. She said the client told her to keep the money.

Based partly on the false gift and verification, Gilpin Mortgage Services refinanced Paveza's home with the settlement taking place on April 7, 2003 and the disbursements scheduled for April 11, 2003 due to the three day recision clause in refinancing.

At the time of refinancing the Pavezas owed about $132,897 on a first mortgage to GMAC and $62,978 on a second loan to Conseco.

CONFIDENTIAL ATTORNEY WORK PRODUCT

EXHIBIT A

Larks paid the first loan on May 3, 2003 via check # 10596 on the client's escrow account in the amount of $133,712. Larks did not pay the $62,978 Conseco loan, however, on the same day, May 3, 2003 Larks forged and issued to Gary and Maya Paveza check # 10595 on the client's escrow account in the amount of $80,600. This check exceeded the amount that would have been needed to payoff the Conseco loan by $17,262. As mentioned above, Paveza gave Larks a check in the amount of $9,000.00 on May 9, 2003 which was apparently from the proceeds of the forged $80,600 check.

Larks subsequently forged and turned over to Gary and Maya Paveza another check (# 10620) in the amount of $6,000 on May 30, 2003 on the client's escrow account to Gary and Maya Paveza.

On June 25, 2003 Larks forged and turned over a third check (# 10651) in the amount of $60,000 to Gary and Maya Paveza. The three checks given to Paveza exceeded the Conseco payoff by $83,262.

Maya Paveza has told the client she is willing to submit to an interview but only with the permission of her attorney, Richard Wier.

The client advises he was not aware of the "gift" or the reimbursement. Nor was he aware of the failure of Larks to payoff the Conseco loan or to give the Pavezas $146,000 of his funds.

CONFIDENTIAL ATTORNEY WORK PRODUCT
Page 2 of 2

| Date Dep. | Amount | DEPOSITS TO LAURA LARKS CHECKING ACCOUNT of Funds & Remarks | Source CK# |
|---|---|---|---|
| 1/7/02 | $75.00 | Donna M Judicello | |
| 1/8/02 | $110.00 | cash | |
| 1/15/02 | $1,050.60 | Anker Ops A/C  No Remarks | |
| 2/1/02 | $200.00 | Check to Dante Larks from L & E Towing | 7619 |
| 2/1/02 | $1,050.00 | Anker Ops A/C  No Remarks | |
| 2/1/02 | $1,050.00 | Anker Ops A/C  No Remarks | 7622 |
| 2/1/02 | $400.00 | Remax of Wilmington 2501 Olden/ Release of Agreement | 7622 |
| 2/12/02 | $1,125.60 | Anker Ops A/C  No Remarks | |
| 2/20/02 | $3,500.00 | Anker Escrow A/C No Remarks | 7647 |
| 2/26/02 | $500.00 | Anker Ops A/C  No Remarks | 9810 |
| 2/26/02 | $505.00 | State of DE Revenue Refund Account | 7678 |
| 3/7/02 | $1,300.00 | Anker Ops A/C | |
| 3/11/02 | $4,969.00 | US Treasury  Tax Refund to Laura and Dante, 2501 Olden Ave., Newark | 7685 |
| 3/15/02 | $1,000.00 | Anker Ops A/C  "Reimbursement" | |
| 3/15/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7692 |
| 3/28/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7691 |
| 4/2/02 | $1,200.00 | From Jeffrey A Biddle  payable to Dan Anker STOLEN | 7701 |
| 4/10/02 | $0.90 | First National Bank, Boston, MA to Patricia A Anker cust Laura Anker UGMA | |
| 4/10/02 | $1,997.50 | From Miller Gun Center payable to Dan Anker STOLEN | |
| 4/10/02 | $50.00 | From Tiffany C. McCall, Addison, TX (Car Wash and Detail) | |
| 4/10/02 | $27.00 | Nationwide Mutual Fure Insurance Co. | |
| 4/15/02 | $1,211.56 | Anker Ops A/C "Payroll 4/15/02" | |
| 4/15/02 | $1,110.00 | Anker Ops A/C "reimbursement" | 7719 |
| 4/15/02 | $55.00 | Check to Dant from Richard & Eliz Poole  "Thank you" | 7718 |
| 4/25/02 | $389.62 | First Horizon Home Loans | |
| 4/25/02 | $50.00 | From Dorine Scharf | |
| 4/25/02 | $3,000.00 | From Russell Burkett, Jr to Dan Anker STOLEN | |
| 5/8/02 | $1,050.12 | Anker Ops A/C  No Remarks | |
| 5/16/02 | $799.50 | Western Protecors Insurance Co | 7721 |
| 5/17/02 | $1,200.00 | Anker Ops A/C  No Remarks | |
| 6/4/02 | $2,000.00 | Anker Ops A/C  No Remarks | 7753 |
| 6/13/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7773 |
| 6/25/02 | $6,000.00 | Unknown- can't get copy: must be ESC CK# 9891 6/25/02 | 7777 |
| 7/9/02 | $4,000.00 | Anker Ops A/C  No Remarks | 9891 |
| 7/11/02 | $4,000.00 | Anker Ops A/C  No Remarks | 8222 |
| 7/15/02 | $1,400.00 | Anker Ops A/C  No Remarks | 8223 |
| 7/24/02 | $2,800.00 | Anker Ops A/C  No Remarks | 8229 |
| 7/30/02 | $3,300.00 | Anker Ops A/C  No Remarks | 8239 |
| 8/8/02 | $660.00 | Anker Ops A/C  No Remarks | 8244 |
| 8/9/02 | $200.00 | Lynn Marie Anker | 8253 |
| 8/14/02 | $3,000.00 | Anker Escrow A/C No Remarks | |
| 8/14/02 | $490.00 | Anker Ops A/C  No Remarks | 10015 |
| 8/29/02 | $3,727.00 | Porter Chevrolet Hyundai to Laura Ann Larks, 345 Edjil Dr., Newark, DE 19711 | 8258 |
| 9/3/02 | $250.00 | Lynn Marie Anker | |
| 9/17/02 | $736.47 | Anker Ops A/C "LAL" | |
| 9/18/02 | $905.89 | Anker Ops A/C "LAL" | 8297 |
| 10/1/02 | $874.37 | Anker Ops A/C "Payroll" | 8303 |
| 10/2/02 | $3,000.00 | Anker Escrow A/C "draw" | 8328 |
| | | | 10166 |

EXHIBIT B

A-226

| Date | Description | Check # |
|---|---|---|
| 10/15/02 | $874.37 Anker Ops A/C  This is probably a payroll check | |
| 10/29/02 | $2,500.00 Anker Escrow A/C "Draw" | 8358 |
| 10/31/02 | $946.83 Anker Ops A/C "Payroll" | 10207 |
| 11/15/02 | $7,500.00 Anker Escrow A/C  "Draw" | 8383 |
| 11/15/02 | $874.37 Anker Ops A/C "payroll" | 10215 |
| 11/18/02 | $1,107.70 US TreasuryHUD | 8420 |
| 11/26/02 | $874.00 Anker Ops A/C  This is probably a payroll check | |
| 11/27/02 | $668.81 Anker Ops A/C  "payroll" | 8446 |
| 12/3/02 | $1,200.00 Anker Ops A/C  No Remarks | 8448 |
| 12/6/02 | $600.00 Anker Ops A/C  No Remarks | 8437 |
| 12/9/02 | $0.90 AT&T | 8438 |
| 12/9/02 | $18.20 Comcast | |
| 12/9/02 | $485.97 Wilmington Trust  "Refund 8745-8830" | |
| 12/10/02 | $1,711.49 Anker Ops A/C "Payroll + Xmas Bonus" | |
| 12/13/02 | $907.38 Anker Ops A/C  "Xmas Bonus" | 7791 |
| 12/13/02 | $804.11 Anker Ops A/C  No Remarks | 8492 |
| 12/19/02 | $450.00 Anker Ops A/C  No Remarks | 8488 |
| 12/19/02 | $144.97 Anker Ops A/C "Reimbursemnet of office equipment" | 7789 |
| 12/20/02 | $2,000.00 Anker Escrow A/C "Draw" | 8493 |
| 12/30/02 | $262.04 Anker Escrow A/C "Draw" | 10317 |
| 12/30/02 | $3,029.00 Anker Escrow A/C "draw" | 10322 |
| 1/2/03 | $804.11 Anker Ops A/C "payroll" | 10321 |
| 1/15/03 | $899.37 Anker Ops A/C "1/15/03 pay" | 7802 |
| 1/16/03 | $800.00 Anker Ops A/C | 7840 |
| 1/17/03 | $300.00 Anker Ops A/C "Reimbursemnet for office supplies" | 7825 |
| 1/23/03 | $1,000.00 Anker Ops A/C  No Remarks | 7834 |
| 1/23/03 | $276.00 Ann C. and Daniel J Anker | 7845 |
| 1/29/03 | $902.32 Anker Ops A/C  No Remarks | |
| 1/31/03 | $971.63 Anker Ops A/C  No Remarks | 7852 |
| 2/5/03 | $3,500.00 Anker Escrow A/C No Remarks | 7860 |
| 2/14/03 | $1,003.58 Anker Ops A/C "2/14 pay" | 10398 |
| 2/26/03 | $0.75 AT&T | 7885 |
| 2/26/03 | $427.00 State of DE, Rev Refund Account | |
| 2/28/03 | $1,003.58 Anker Ops A/C  "2/28 pay" | |
| 3/5/03 | $1,000.00 Anker Ops A/C  No Remarks | 7895 |
| 3/11/03 | $1,100.00 Anker Ops A/C  No Remarks | 7913 |
| 3/14/03 | $1,003.58 Anker Ops A/C  No Remarks  Probably 3/14/03 Payroll | 10465 |
| 3/14/03 | $854.95 Anker Ops A/C "quarterly discretionary bonus" | 7922 |
| 3/14/03 | $28.50 Chantell Larks, 152 S. Union St., Easton, PA 610-250-6971 | 7921 |
| 3/14/03 | $18.00 Sonya and Shannon Hess, Easton, PA | |
| 3/17/03 | $4,237.00 US Treasury Tax ref. To Laura and Dante for 12/02 | |
| 3/31/03 | $500.00 RE/MA Associates Inc; Return deposit 41 Louise Rd. | |
| 4/1/03 | $4,000.00 Anker Ops A/C  No Remarks | |
| 4/1/03 | $2,666.67 Anker Ops A/C  No Remarks | 7938 |
| 4/15/03 | $2,600.00 Anker Ops A/C  No Remarks | 7939 |
| 5/1/03 | $2,600.00 Anker Ops A/C  No Remarks | 7950 |
| 5/12/03 | $9,000.00 Gary and Maya Paveza, 2808 Fawkes Dr., Wilm., DE 19808 "Reimb for loan" " | 7962 |
| 5/19/03 | $10,000.00 Anker Escrow A/C  No Remarks | |
| 5/29/03 | $4,500.00 Anker Ops A/C  No Remarks | 10607 |
| 5/30/03 | $5,000.00 Anker Ops A/C  No Remarks | 7994 |
| 6/6/03 | $2,083.41 Anker Ops A/C  No Remarks | 7996 |
| | | 7998 |

A-227

| Date | Amount and Description | Check # |
|------|------------------------|---------|
| 6/16/03 | $4,000.00 Anker Ops A/C  No Remarks | |
| 6/20/03 | $5,000.00 Anker Escrow A/C No Remarks | 7499 |
| 6/25/03 | $10,000.00 Anker Escrow A/C  No Remarks | 10646 |
| 7/3/03 | $8,000.00 Anker Ops A/C  No Remarks | 10652 |
| 7/9/03 | $8,000.00 Anker Escrow A/C  No Remarks | 7491 |
| 7/9/03 | $2,000.00 Anker Ops A/C No Remarks | 10668 |
| 7/9/03 | $4,000.00 Unknown: Must be Anker Escrow A/C check # 10669 | 7483 |
| 7/17/03 | $5,000.00 Anker Ops A/C  No Remarks | 10669 |
| 7/18/03 | $2,000.00 Anker Escrow A/C "DJA" (Split deposit: Ck 10691 for $5000 minus cash out of $3000 | 7320 |
| 7/21/03 | $10,000.00 Anker Escrow A/C  No Remarks This was apparently the funds used by Laura Larks to get two certified checks of $5000 each for Dan and Ann while they on vacation. | 10691 |
| 7/23/03 | $10,000.00 Anker Escrow A/C  No Remarks | 10692 |
| | | 10696 |

Anker Lark Deposits : Excel spreadsheet containing Laura Larks deposits into her WSFS Checking A/C 2074-5270 for January 1, 2002 through July 23, 2003

Checks stolen from Dan Anker, forged, and deposited  $6197.50

Deposits from Dan Anker's Escrow    $94,391

Deposits from Dan Anker's OPS A/C  $99764

137

1.   Q.  At that time what occurred between you and
2   Dan?
3      A.  I saw Dan up in the garage parking Level III
4   which is where he would park.  He was having a
5   cigarette.  I confronted basically asked him based on
6   what Laura had told me.  He was angry.  I wanted to
7   know if that was true, explain to him why I sent him
8   the letters that I did.
9      Q.  What did he tell you?
10     A.  He said that he was upset because I had known
11  him.  We had known each other for all those years to
12  imply that either he was embezzle the or steal money or
13  whatever, he thought was unfair.  And that, you know,
14  there were some problems and stuff a lot of it was
15  related to Fed Express losing shipments mail not
16  delivering things, that he had experienced some
17  problems with like a Fed Express shipments that went in
18  the unclaimed section and he had been having a lot of
19  trouble and so he was just surprised that I would send
20  him a letter in the tone that I did.
21     Q.  Did he give you any advice as to what you
22  might do?
23     A.  In the letter he did.  That I got, subsequent

138

1   after he had talked Laura told me he had prepared a
2   letter in response to my letter which she did not want
3   to give it to me because we were good friends.  I would
4   be upset with what he responded back.  I asked her
5   several times to give me the letter, we will see what
6   happens from there.  Finally after talking to Dan up in
7   Park Plaza garage I did get a copy of the letter.  In
8   that letter, you know, he pointed out that I could go
9   to the Office of Disciplinary Counsel which I was not
10  aware there was such a thing or the Attorney General's
11  Office.
12          MR. WENDELBURG:  Moment, please, Your Honor.
13          (Discussion held off the record.)
14          MR. WENDELBURG:  No further questions at this
15  time Your Honor.
16          CROSS EXAMINATION
17  BY MR. LUGG:
18     Q.  How are you doing.  We have not met before,
    have we?
    A.  Correct.
21     Q.  Just a few questions for you.  You explained
22  that you worked at that Park Plaza building for 17
23/  years?

139

1      A.  Correct.
2      Q.  So you have been there as long as the
3   defendant, Dan Anker, has been a tenant at that
4   building?
5      A.  Correct, he became a tenant through the time I
6   was working for Ed Desetta who built it, Dan's brother
7   Tom worked there.  When Dan was going into business
8   was looking for an office.  There was one available.
9      Q.  Over the time that you were there were you
10  able to kind of see how often the defendant stayed in
11  the office, how frequently he was there?
12     A.  Yes, for the most part.
13     Q.  You were contacted at some point by an
14  investigator in this case; is that correct?
15     A.  Yes Bill Glanz.
16     Q.  And you were asked about comparison of time
17  spent in the office in the past versus time spent in
18  2003; do you recall that?
19     A.  Yes.
20     Q.  Can you tell the jury your assessment of the
21  time spent in the office by the defendant at the time
22  frame your transaction discussed for 2003?
23     A.  I noticed Dan was in the office a lot less

140

1   than he had been.  I was told it was because he was
2   watching his son, Dan, but definitely he was not in as
3   often as he had been in the past.
4      Q.  When you say not in his office, how often had
5   he been in there in the past?
6      A.  Normally he was in pretty much every day; in
7   time frame he might be in but only for an hour or two
8   then leave.
9          MR. LUGG:  Thank you.
10         MR. WENDELBURG:  Nothing further, Your Honor
11  Thank you.
12         THE COURT:  You may step down.  Thank you.
13         MR. WENDELBURG:  Call William Glanz, Your
14  Honor.
15         WILLIAM GLANZ,
16  having been first called by the Defense was sworn
17  on oath, was examined and testified as follows:
18         DIRECT EXAMINATION
19  BY MR. WENDELBURG:
20     Q.  Mr. Glanz, what do you currently do for a
21  living?
22     A.  Private investigator.
23     Q.  Can you tell the jury an overview of your

EXHIBIT C

A-229

141

1  professional background?

2     A.  I was an agent, Special Agent for the Drug

3  Enforcement Administration for about 30 years.  Prior

4  to that I was a special Agent for the Internal Revenue

5  Service Criminal Investigation Division, prior to that

6  I was in the Army, prior to that I was in college.

7     Q.  How far have you gone in school?

8     A.  I have a college degree in Accounting.

9     Q.  Who is your current employer?

10    A.  Well, I am working for a company called Heyden

11  and Associates which is a private investigating company

12  in Delaware.

13    Q.  Are you working as a subcontractor for Heyden

14  and Associate?

15    A.  Among other companies.  Yes, sir.

16    Q.  Do you also do work on your own?

17    A.  Yes, I do.

18    Q.  Were you asked to assist in the investigation

19  of this case on behalf other the defendant, Dan Anker?

20    A.  Yes, I was.

21    Q.  And what -- do you recall, approximately, when

22  you were first asked to become involved in this case?

23    A.  I think it was around March of 2004.

142

1     Q.  And have you worked on the case to some degree

2  or other since that date?

3     A.  Yes, I have.

4     Q.  Have you been asked to contact and interview

5  potential witness in the matter?

6     A.  Yes, many witnesses, many contacts.

7     Q.  I want to first refer you to Mr. Joseph

8  McCullough, auditor for the Lawyers Fund for Client

9  Protection for the office of Disciplinary Counsel.  Did

10  you contact Mr. McCullough and interview him in

11  connection with this case?

12    A.  Yes, I did a formal interview, did numerous

13  follow-up conversations with him starting last June,

14  June 10, 2004, almost to the present.

15    Q.  Do you know Mr. McCullough from other matters?

16    A.  Yes, I knew him when we were both in law

17  enforcement.  I have known Joe for probably since the

18  1970s we worked together on cases as private

19  investigators probably went I was in narcotics Agent,

20  he was an IRS special agent.

21    Q.  I want to direct your attention to any

22  conversation you may have had with Mr. McCullough

23  regarding an initial meeting that you had with Mr.

143

1  Anker.  You have been exempted from sequestration in

2  this matter.  You heard Mr. McCullough's testimony last

3  week, did you not?

4     A.  Yes, I did.

5     Q.  And did you hear his characterization of Mr.

6  Anker's demeanor during that initial contact?

7     A.  Yes, I did.

8     Q.  Did Mr. McCullough give you any, in your

9  interviews of Mr. McCullough pretrial, did he describe

10  for you Mr. Anker's demeanor during that initial

11  meeting?

12    A.  Yes.

13    Q.  How did Mr. McCullough describe it then?

14    A.  He said that it seemed to him that Dan was

15  virtually helpless to him on the evening, first night

16  of the ODC visit characterized him walking around like

17  a zombie.  He was in total shock.

18    Q.  I want to talk about another witness in this

19  case, Mr. Caucci.  Did you have any contact with Mr.

20  Caucci before the trial of this matter?

21    A.  Yes.

22    Q.  What was the purpose of that contact?

23    A.  To serve him a subpoena to attempt to

144

1  interview him.

2     Q.  Can you tell us approximately when this took

3  place?

4     A.  July 11, 2005.

5     Q.  Where was it that you met up with Mr. Caucci?

6     A.  At his residence in Hockessin.

7     Q.  Did you identify your at that time?

8     A.  Yes, I did.

9     Q.  Did you tell Mr. Caucci the purpose of your

10  visit?

11    A.  Yes, I did.

12    Q.  Did you tell Mr. Caucci who you were working

13  on behalf of at that time?

14    A.  Yes, I did.

15    Q.  Describe, tell the jury how Mr. Caucci

16  responded to that?

17    A.  He was obviously very annoyed that I had come

18  to his house and given him a subpoena, and I said he

19  would not say anything that would help acquit that scum

20  bag Dan Anker and his sociopathic -- or psychopathic

21  daughter.  I don't know if it was sociopathic or

22  psychopathic because I use the terms interchangeably, I

23  know it was one of those two words.

145

1    Q.  Mr. Caucci testified during the first week of
2    trial you were present?
3    A.  Yes.
4    Q.  Do you remember a reference Mr. Caucci made to
5    busting his balls?
6    A.  Yes.
7    Q.  Did that phrase, in fact, come into your
8    conversation with Mr. Caucci?
9    A.  Yes, it did.
10   Q.  Can you tell the jury the context this which
11   that arose?
12   A.  I explained to him that way it works with
13   witnesses, is that you don't want witnesses sitting
14   around for, like, a whole week.  You don't want to
15   subpoena them for, like, July 18, make them sit around
16   until today whatever today is.  We are subpoenaing him
17   for the 25th.  What we would like here is a letter from
18   Mr. Wendelburg, we would like to you give us your
19   telephone number so that we can call you the day
20   before, tell you to be here, so that you are not
21   inconvenienced because he told me he had businesses to
22   take care of, settlements to do, stuff like that.  I
23   said if you would do that, then we will accommodate

148

1    you, but if not, we are going have to ask you to be
2    here on the 25th when he calls for -- we are going to
3    have it ask you is to sit her until we call you.  It
4    could be a week.  I said we don't want to bust your
5    balls.  I was talking because that's the way he talked
6    to me.  I said we don't want to bust your balls,
7    defense didn't want to, but if we have to, you won't
8    give me your phone number which he refused to do.  He
9    told me he was not going to honor the subpoena,
10   wouldn't read the letter from Mr. Wendelburg.  I said
11   if you won't do this, won't cooperate with us I am
12   sorry but the defense is going to bust your balls.
13   Q.  Did you make me attempt to intimidate
14   Mr. Caucci during that meeting with him?
15   A.  No, I made none.
16   Q.  How long did the conversation last; do you
17   recall?
18   A.  Less than five minutes.
     MR. WENDELBURG:  May I have this document
     marked for identification, Your Honor.
21        THE COURT:  Yes.
22        THE CLERK:  Defense identification double I.
23   BY MR. WENDELBURG:

147

1    Q.  I am handing you Defense for Identification
2    double I.  Let me ask you a couple questions.  Part of
3    your investigation, in this case, were you asked to
4    review public documents regarding a house belonging to
5    Phil Urban?
6    A.  Yes, most specifically the refinancing of the
7    house.
8    Q.  What were you asked to go look at or for?
9    A.  I was asked one of the things I was asked to
10   do was to verify that the mortgage that he testified
11   that he had, that wasn't paid, was, in fact, satisfied
12   in the Office of the Recorder of Deeds for New Castle
13   County.
14   Q.  What did you do in order to determine that?
15   A.  I went to the Office of the Recorder of Deeds
16   from New Castle County.  I purchased a certified copy
17   that shows that the mortgage he had testified was not
18   paid, was marked as satisfied by the Office of Recorder
19   of Deeds.
20   Q.  As of what date?
21   A.  May 2, 2000.
22   Q.  May 2, 2000.  What is marked for
23   identification double I that you have, what is that?

148

1    A.  That is a certified copy of the document on
2    file at the Recorder of Deeds that shows that the
3    mortgage that Mr. Urban was talking about was actually
4    satisfied.
5         MR. WENDELBURG:  Moment please, Your Honor
6         (Discussion held off the record.)
7         MR. WENDELBURG:  No further questions of this
8    witness.
9         CROSS EXAMINATION
10   BY MR. LUGG:
11   Q.  Mr. Glanz, Mr. Anker is your client, is he
12   not?
13   A.  Yes, he is.
14   Q.  If you found that document, you have some IRS
15   experience, some accounting experience, if in fact the
16   mortgage was satisfied in May of 2000, why would
17   Mr. Urban need to have secured a loan to payoff that
18   mortgage?
19   A.  I don't know.
20   Q.  And also would you agree that funds that were
21   made on his behalf inputted on his behalf into your
22   client's escrow accounts, in fact, still belong to Mr.
23   Urban?

A-231

149

1    A.  Sorry.  Which funds are you talking about?

2    Q.  You have been in the courtroom just about

3  everyday?

4    A.  Yes.

5    Q.  Were you here for Mr. Urban's testimony?

6    A.  Yes.

7    Q.  Mr. Urban that his new loan was, in fact,

8  funded and that, in fact, Mr. Anker's account was

9  funded on behalf of that loan?

10    A.  Yes, I believe it was 88 thousand dollars.

11    Q.  So regardless of satisfaction of earlier

12  mortgage, you would agree that that money that came

13  into the escrow account still belongs to Mr. Urban; is

14  that right?

15    A.  I don't know, that is matter for a lawyer to

16  decide when Title changed from whom to whom, that is a

17  question been throughout this case, I don't know.

18    Q.  As far as your presence throughout this trial,

19  very appropriately dressed to testify wearing suits and

20  tie as you appear in court today?

21    A.  Yes, I guess.

22    Q.  Is that how you presented yourself with your

23  demeanor and your dress to Mr. Caucci on the 11th of

150

1  July?

2    A.  No, it is not.

3    Q.  In fact, it was not a quiet conversation as

4  you have indicated to us now, in fact, you were telling

5  him you want to know information, you wanted to

6  interview him for your client, correct?

7    A.  Yes.

8    Q.  And in many of your -- did you document this

9  communication with Mr. Caucci, write it down,

10  memorialize it?

11    A.  Only in general.

12    Q.  In general.  And in some you had recorded some

13  of the statements that you taken from various people;

14  is that right?

15    A.  Yes.

16    Q.  In a variety of statements you have typically

17  ask is there anything that you know that have would be

18  helpful to my client, correct?

19    A.  That's right.

20    Q.  Did you ask that question of Mr. Caucci on the

21  11th?

22    A.  I told Mr. Caucci that I wanted to interview

23  him.  He said I am not going to tell you anything that

151

1  -- you already heard what I said.  I said well, look, I

2  am not asking for you to lie.  I am not asking for you

3  to make things up.  Our outfit is very, very strict on

4  that.  We are all former federal agents.  We only ask

5  you what happened, that is what we report.

6    Q.  What were you wearing went you showed up to

7  meet with him?

8    A.  Probably very similar to the way I have been

9  the last few weeks, you know, I guess you might call it

10  dress casual.

11    Q.  You had never met Mr. Caucci prior to that

12  day; is that right?

13    A.  No.

14    Q.  You had this investigated, you learned where

15  he lived; is that right?

16    A.  Yes, I -- sorry.

17    Q.  Probably wasn't too tough because you had a

18  re-finance, you had certain documents that you

19  investigated, correct?

20    A.  Yes.

21    Q.  You made no prearrangements meeting to meet

22  with him; is that right?

23    A.  I had tried several times.

152

1    Q.  To see him you would agree you are a stranger

2  coming onto his property on July 11; is that right?

3    A.  Yes.

4    Q.  He also told you that he had already made

5  arrangements to appear in court; is that right?

6    A.  No, he refused to tell me.

7    Q.  Okay.  In a description of Mr. McCullough, did

8  you document what you have testified to here today as

9  far as his description of your client's demeanor back

10  in 2003?

11    A.  No, I did not.

12    Q.  So you are testifying after observing

13  Mr. McCullough to something you had not previously

14  document?

15    A.  Yes.

16    Q.  You offering this on your client's behalf in

17  the courtroom today?

18    A.  Yes, I am.

19      MR. LUGG:  Sir, I appreciate your time.

20      REDIRECT EXAMINATION

21  BY MR. WENDELBURG:

22    Q.  Mr. Glanz, going back to Mr. Caucci, your

23  meeting with him, been almost three weeks since we have

153

1  seen Mr. Caucci. Can you describe your recollection of
2  Mr. Caucci's physical stature compared with your own?
3      A.  Yes, I can.
4      Q.  How is it?
5      A.  Probably about an inch shorter than me. He is
6  about say about 45 50 pounds heavier, much more
7  muscular than me. Probably about 20 years younger.
8      Q.  Do you carry a weapon with you during these
9  investigations, attempted interviews?
10     A.  No I am not lined to carry a weapon in
11 Delaware.
12     Q.  Have you any objects with you in your hands or
13 on your hanging from your belt during that interview?
14     A.  No, just that little letter thing that I carry
15 that I use for a note pad.
16     MR. WENDELBURG:  Nothing further. Thank you.
17     MR. LUGG:  Prompts nothing from the State,
18 Your Honor.
19     THE COURT:  You may step down sir. Ask you to
20 come back at 2:30.
21     (Jury left the courtroom at 1:23 p.m.)
22     THE COURT:  Why don't we have the jury come
23 tomorrow at nine o'clock. We will have closings then.

154

1  No need to squeeze --
2      MR. WENDELBURG:  We do have a housekeeping
3  matter. We intend to offer a number of the defense
4  identification Exhibits. I don't mind whether the jury
5  sees it or not.
6      THE COURT:  It is not necessary. You can hand
7  it up to them at one time, it's been introduced. You
8  don't have to -- you do it out of the presence of the
9  jury and say after I admit just so the jury does not
10 come like a strange thing to them.
11     MR. LUGG:  I would like an opportunity to
12 review them. I was surprised they were marked for
13 identification no movement beyond that, some of them I
14 don't know if there is an appropriate foundation laid.
15     THE COURT:  Why don't you two confer on that.
16 Do it now I guess this would be the appropriate time.
17     MR. WENDELBURG:  We intend to rest. There are
18 no more witnesses for the defense. I understand the
19 State has one. I have handed Mr. Lug a list.
20     THE COURT:  Why don't you just confer. If I
21 have to make my rulings I will be happy to make them.
22 I don't have to address anything that is agreed to.
23     MR. LUGG:  Your Honor, I reviewed the

155

1  documents that Mr. Wendelburg wants to admit. I am
2  handing, there is no dispute as to Defendant's B, D, E,
3  F, G, H, K, CC, DD, E.E, FF, and II.
4      THE COURT:  Can we have them admitted; is that
5  okay?
6      MR. WENDELBURG:  Yes, Your Honor.
7      THE COURT:  They are admitted as defense
8  Exhibits. They will be in sequence.
9      MR. LUGG:  As to X which, was a file that was
10 handed to the defendant. This is Defendant's X, which
11 identifies being documents recovered from -- identified
12 being documents he is familiar with. If that is the
13 foundation as I understand it that he is familiar with
14 the documents, he believes them to relate to a
15 settlement I do not oppose their admission. There was
16 a dispute as to where they were found, if there is not
17 being arguments that, finding of the documents, I don't
18 object to their admission.
19     MR. WENDELBURG:  Your Honor, Defendant's X fi
20 Identification was handed to Mr. Anker. He identified
21 it as documents relating to his supposed refinances.
22     THE COURT:  Washington Mutual.
23     MR. WENDELBURG:  Yes, one from March 15 of

156

1  2003. And he identified a number of individual
2  contents of this file. There has been testimony it was
3  found in his office after the -- as the thefts were
4  being discovered, may have been some conflicting
5  testimony who picked it up or put them together. They
6  are being offered for the purpose of Mr. Anker
7  believing he had a refinance in March of 2003, later
8  finding out that he did not.
9      THE COURT:  Anything more to discuss at this
10 point?
11     MR. LUGG:  I don't think -- well, my
12 recollection is that same folder was handed to Ms.
13 Anker or Conway. She indicated that was not the stack
14 of materials that was found in the office which is why
15 I raised that issue.
16     THE COURT:  I think under the totality of
17 evidence, if that is a big point, the jury is going to
18 have to flesh that out, if that is a really a big
19 point. That will be admitted.
20     MR. LUGG:  I next turn the Court's attention
21 to Defendant's for Identification J. This is an
22 Exhibit comprised of four pages. I do not object to
23 the admission of the subject coverletter. This is a

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2008, I electronically filed the foregoing **Appendix to Petitioner's Opening Brief in Support of Petition for Habeas Corpus, Volume II** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Elizabeth R. McFarlan, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

_/ s/ Joseph M. Bernstein_
JOSEPH M. BERNSTEIN (Bar #780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
E-mail: jmbernstein@embarqmail.com