# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL J. ANKER,<br>Petitioner,<br><br>v.<br><br>ELIZABETH NEAL, Acting Warden,<br>John L. Webb Correctional Facility,<br>and JOSEPH R. BIDEN, III, Attorney<br>General of the State of Delaware,<br>Respondents. | :<br>:<br>:<br>:<br>: Civil Action No. 08-203 SLR<br>:<br>:<br>:<br>:<br>:<br>: |

## AFFIDAVIT OF WILLIAM F. GLANZ

COMMONWEALTH OF PENNSYLVANIA
CHESTER COUNTY

BE IT REMEMBERED that on this ⎯⎯ day of June, 2008, personally appeared before me, the Subscriber, a Notary Public of the State and County aforesaid, WILLIAM F. GLANZ, who being first duly sworn according to law, did depose and state as follows:

1. I am a licensed private investigator in the State of Delaware and I have been actively engaged as a private investigator for 9 years. Prior to my current employment, I was a Special Agent for the U.S. Drug Enforcement Administration for approximately 30 years. Prior to that employment, I was a Special Agent for the Criminal Investigation Division of the Internal Revenue Service.

2. In March 2004, I was retained by Allan Wendelburg, Esquire ("Wendelburg") to provide investigative services on behalf of his client, Daniel J. Anker ("Anker"). It was my understanding that Anker was a Delaware attorney who maintained a solo law practice in Wilmington, Delaware. I also understood that Anker's law practice was primarily involved in handling closings for residential real estate sales and refinancings. I was also told that Anker had

-1-

been indicted on numerous counts of Felony Theft and that the theft charges all related to alleged misappropriations from the client escrow account he maintained for his law practice. I was also told that nearly all of the alleged thefts occurred between March 2003 and July 2003, when Anker's law practice was closed down by the Delaware Office of Disciplinary Counsel and Anker was suspended from practicing law by the Delaware Supreme Court.

3. I learned that during the time period of the alleged thefts, the only persons who had access to Anker's office accounts were Anker himself and his then 19 year old daughter, Laura Larks ("Larks"), who was the sole employee in the office. I was also provided with a great deal of background information, primarily from Anker, concerning the personal relationship between Anker and Larks. According to Anker, during the period of time that the thefts occurred, he had entrusted Larks to handle all of the details and preparation of the documents, including the HUD-1 forms, related to the closings. Larks also was in charge of handling all of the post-closing details, including mortgage payoffs and recording of documents. Larks also answered the phones, screened Anker's incoming mail and fielded nearly all of the client inquiries that were related to the closing transactions. According to Anker, his role in the closing transactions was limited to being present at the closing itself and explaining the details of the transaction to the clients. What Anker told me about Larks' role in "controlling" the office was corroborated in my interviews with many of the "victims" in the case. I also learned from my interviews with "victims" that, in at least two cases, Anker was not even present for the closing itself.

4. In order to assist in my investigation, I was also given access to all of the "discovery" materials that had been turned over to Wendelburg by the State, including audit spreadsheets for Anker's office account and client escrow account. I also received copies of statements that Larks had provided to State investigators and documents that were related to Larks' statements. Based

on a review of Larks' statements, I learned that Larks had admitted that she had signed Anker's name to many checks drawn on the escrow account, although she also claimed that Anker had given her permission to do so.

5. Based on my discussions with Anker and Wendelburg, and based on my own review of the evidence, it was clear to me that the financial records and files in Anker's office were in complete disarray. It was also clear to me, based primarily on my review of the State's evidence, that over one million dollars had been misappropriated from the escrow account. During the course of my investigation, it also became clear to me that all of the individual theft charges involved a similar fact pattern: Anker's office would receive money from a mortgage lender to fund a refinancing transaction, which usually were sent to Anker's escrow account by wire transfer. For each transaction, a HUD-1 form was prepared for the closing. The HUD-1 showed the sources of the funds received and also showed the disbursements that were to be made in order to complete the transaction. Typically, for each transaction, the HUD-1 would show that one or more "old" mortgages were to be paid off. My investigation clearly showed that in each case the "old" mortgages were never paid off. What happened after the closings also followed a similar pattern in each case: Within weeks after the closings, the "victims" would get letters and phone calls from the "old" mortgage company informing them that the mortgage payments were delinquent. The victim would then tell the "old" mortgage company that they had refinanced or sold the property and the old mortgage was paid off at the closing. The "old" mortgage company would then tell the "victim" that the payoff was never received. The "victim" would then contact Anker's office to find out what had happened. In nearly every case, the victims reported that their only post-closing contact was with Larks. Larks would always tell them that the mortgage company was mistaken and that the payoffs had been made. If the

forensic audit of Larks' personal account at WSFS Bank. A summary of that audit is attached hereto as Exhibit "B." The result of that audit was that between January 2002 and July 2003, Larks had deposited into her personal account at WSFS $194,155 that had been taken from Anker's office accounts. This included $94,391 from Anker's escrow account and $99,764 from Anker's operating account. Also, that Larks had stolen and deposited into her personal account, three checks which had been issued to Anker totaling $6,197.50. They included a check from Jeffrey Biddle for $1200.00 deposited 4/2/02; a check from Miller Gun Center for $1997.50 deposited 4/10/02; and a check from Russell Burkett for $3,000.00 deposited 4/25/02. This information was also given to Wendelburg.

8. I was also present in the courtroom for nearly all of Anker's trial in the Delaware Superior Court. On the last day of the trial, I was called as a defense witness. A transcript of my trial testimony is attached as Exhibit "C." As noted herein, prior to the trial, I had developed considerable evidence and documentation which pointed to Larks as being solely responsible for the thefts and also showing how Larks herself had personally benefited from the thefts. Wendelburg, inexplicably, did not ask me any questions about the evidence I had developed concerning Larks' role in the thefts.

*William F Glanz  6/11/2008*
WILLIAM F. GLANZ

SWORN TO AND SUBSCRIBED before me the date and year above written.

*Richard J Jenkins  06/11/2008*
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Richard J. Jenkins, Notary Public
West Sadsbury Twp., Chester County
My Commission Expires Jan. 29, 2012
Member, Pennsylvania Association of Notaries

-5-

# REPORT OF INVESTIGATION

Date: April, 2004          Case # DE041467A          By: William F. Glanz

---

### Analysis of Gary and Maya Paveza Transaction

Count V11 and V111 of the indictment charge Daniel Anker and Laura Larks of obtaining with intent to appropriate, United Sates Currency in an amount in excess of $50,000 but less then $100,000 belonging to Gary Paveza (Count V11) and Conseco Corporation. (Count V111) on or about April 7, 2003. The transaction involved the refinancing by the Pavezas of their home loan. Maya Paveza is a real estate agent. Laura Larks and Maya Paveza are friends.

Analysis of the transaction shows Laura Larks wrote a check to Gary Paveza for $7500 on April 1, 2003 and notated it "gift from Laura". (Check #9191 on Larks checking account at WSFS) The source of Larks funds was mostly from two checks she forged and drew on the client's operating account. They were check # 7938 in the amount of $4,000.00 on March 31, 2003 and check # 7939 in the amount of $2666.67 on March 31, 2003. Each was forged with Laura Larks signature. She has admitted to the Attorney General's Office she got the money for Paveza from the client's accounts. She told the Attorney General's Office her father was aware of the transaction.

Larks also signed a Request for Verification of Gift Letter for the $7500 which Paveza submitted to the lender. Larks falsely stated on the Verification she was a cousin. She has admitted to the Attorney General's Office she is not a cousin but she claimed to be so the gift would not be scrutinized. She also said she got the money from the client's account. Paveza filed the false verification to get her refinancing.

Maya Paveza returned the money plus $1500 to Larks via a $9000 check on Paveza's account at Artisan's Bank. The check was dated May 9, 2003 and marked "reimb for loan". Larks has admitted to the Attorney General's Office that she kept the money instead of returning it to the client's account. She said the client told her to keep the money.

Based partly on the false gift and verification, Gilpin Mortgage Services refinanced Paveza's home with the settlement taking place on April 7, 2003 and the disbursements scheduled for April 11, 2003 due to the three day recision clause in refinancing.

At the time of refinancing the Pavezas owed about $132,897 on a first mortgage to GMAC and $62,978 on a second loan to Conseco.

EXHIBIT "A"

Larks paid the first loan on May 3, 2003 via check # 10596 on the client's escrow account in the amount of $133,712. Larks did not pay the $62,978 Conseco loan, however, on the same day, May 3, 2003 Larks forged and issued to Gary and Maya Paveza check # 10595 on the client's escrow account in the amount of $80,600. This check exceeded the amount that would have been needed to payoff the Conseco loan by $17,262. As mentioned above, Paveza gave Larks a check in the amount of $9,000.00 on May 9, 2003 which was apparently from the proceeds of the forged $80,600 check.

Larks subsequently forged and turned over to Gary and Maya Paveza another check (# 10620) in the amount of $6,000 on May 30, 2003 on the client's escrow account to Gary and Maya Paveza.

On June 25, 2003 Larks forged and turned over a third check (# 10651) in the amount of $60,000 to Gary and Maya Paveza. The three checks given to Paveza exceeded the Conseco payoff by $83,262.

Maya Paveza has told the client she is willing to submit to an interview but only with the permission of her attorney, Richard Wier.

The client advises he was not aware of the "gift" or the reimbursement. Nor was he aware of the failure of Larks to payoff the Conseco loan or to give the Pavezas $146,000 of his funds.

| Date Dep. | Amount | DEPOSITS TO LAURA LARKS CHECKING ACCOUNT Source of Funds & Remarks | CK# |
|---|---|---|---|
| 1/7/02 | $75.00 | Donna M Judicello | |
| 1/8/02 | $110.00 | cash | |
| 1/15/02 | $1,050.60 | Anker Ops A/C  No Remarks | 7619 |
| 2/1/02 | $200.00 | Check to Dante Larks from L & E Towing | |
| 2/1/02 | $1,050.00 | Anker Ops A/C  No Remarks | 7622 |
| 2/1/02 | $1,050.00 | Anker Ops A/C  No Remarks | 7622 |
| 2/1/02 | $400.00 | Remax of Wilmington 2501 Olden/ Release of Agreement | |
| 2/12/02 | $1,125.60 | Anker Ops A/C  No Remarks | 7647 |
| 2/20/02 | $3,500.00 | Anker Escrow A/C No Remarks | 9810 |
| 2/26/02 | $500.00 | Anker Ops A/C  No Remarks | 7678 |
| 2/26/02 | $505.00 | State of DE Revenue Refund Account | |
| 3/7/02 | $1,300.00 | Anker Ops A/C | 7685 |
| 3/11/02 | $4,969.00 | US Treasury  Tax Refund to Laura and Dante, 2501 Olden Ave., Newark | |
| 3/15/02 | $1,000.00 | Anker Ops A/C  "Reimbursement" | 7692 |
| 3/15/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7691 |
| 3/28/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7701 |
| 4/2/02 | $1,200.00 | From Jeffrey A Biddle  payable to Dan Anker STOLEN | |
| 4/10/02 | $0.90 | First National Bank, Boston, MA to Patricia A Anker cust Laura Anker UGMA | |
| 4/10/02 | $1,997.50 | From Miller Gun Center payable to Dan Anker STOLEN | |
| 4/10/02 | $50.00 | From Tiffany C. McCall, Addison, TX (Car Wash and Detail) | |
| 4/10/02 | $27.00 | Nationwide Mutual Fure Insurance Co. | |
| 4/15/02 | $1,211.56 | Anker Ops A/C "Payroll 4/15/02" | 7719 |
| 4/15/02 | $1,110.00 | Anker Ops A/C "reimbursement" | 7718 |
| 4/15/02 | $55.00 | Check to Dant from Richard & Eliz Poole  "Thank you" | |
| 4/25/02 | $389.62 | First Horizon Home Loans | |
| 4/25/02 | $50.00 | From Dorine Scharf | |
| 4/25/02 | $3,000.00 | From Russell Burkett, Jr to Dan Anker STOLEN | |
| 5/8/02 | $1,050.12 | Anker Ops A/C  No Remarks | 7721 |
| 5/16/02 | $799.50 | Western Protectors Insurance Co | |
| 5/17/02 | $1,200.00 | Anker Ops A/C  No Remarks | 7753 |
| 6/4/02 | $2,000.00 | Anker Ops A/C  No Remarks | 7773 |
| 6/13/02 | $1,300.00 | Anker Ops A/C  No Remarks | 7777 |
| 6/25/02 | $6,000.00 | Unknown- can't get copy: must be ESC CK# 9891 6/25/02 | 9891 |
| 7/9/02 | $4,000.00 | Anker Ops A/C  No Remarks | 8222 |
| 7/11/02 | $4,000.00 | Anker Ops A/C  No Remarks | 8223 |
| 7/15/02 | $1,400.00 | Anker Ops A/C  No Remarks | 8229 |
| 7/24/02 | $2,800.00 | Anker Ops A/C  No Remarks | 8239 |
| 7/30/02 | $3,300.00 | Anker Ops A/C  No Remarks | 8244 |
| 8/8/02 | $660.00 | Anker Ops A/C  No Remarks | 8253 |
| 8/9/02 | $200.00 | Lynn Marie Anker | |
| 8/14/02 | $3,000.00 | Anker Escrow A/C No Remarks | 10015 |
| 8/14/02 | $490.00 | Anker Ops A/C  No Remarks | 8258 |
| 8/29/02 | $3,727.00 | Porter Chevrolet Hyundai to Laura Ann Larks, 345 Edjil Dr., Newark, DE 19711 | |
| 9/3/02 | $250.00 | Lynn Marie Anker | |
| 9/17/02 | $736.47 | Anker Ops A/C "LAL" | 8297 |
| 9/18/02 | $905.89 | Anker Ops A/C "LAL" | 8303 |
| 10/1/02 | $874.37 | Anker Ops A/C "Payroll" | 8328 |
| 10/2/02 | $3,000.00 | Anker Escrow A/C "draw" | 10166 |

EXHIBIT B

| Date | Amount | Description | Check # |
|---|---|---|---|
| 10/15/02 | $874.37 | Anker Ops A/C  This is probably a payroll check | 8358 |
| 10/29/02 | $2,500.00 | Anker Escrow A/C "Draw" | 10207 |
| 10/31/02 | $946.83 | Anker Ops A/C "Payroll" | 8383 |
| 11/15/02 | $7,500.00 | Anker Escrow A/C  "Draw" | 10215 |
| 11/15/02 | $874.37 | Anker Ops A/C "payroll" | 8420 |
| 11/18/02 | $1,107.70 | US TreasuryHUD | |
| 11/26/02 | $874.00 | Anker Ops A/C  This is probably a payroll check | 8446 |
| 11/27/02 | $668.81 | Anker Ops A/C "payroll" | 8448 |
| 12/3/02 | $1,200.00 | Anker Ops A/C  No Remarks | 8437 |
| 12/6/02 | $600.00 | Anker Ops A/C  No Remarks | 8438 |
| 12/9/02 | $0.90 | AT&T | |
| 12/9/02 | $18.20 | Comcast | |
| 12/9/02 | $485.97 | Wilmington Trust  "Refund 8745-8830" | |
| 12/10/02 | $1,711.49 | Anker Ops A/C "Payroll + Xmas Bonus" | 7791 |
| 12/13/02 | $907.38 | Anker Ops A/C  "Xmas Bonus" | 8492 |
| 12/13/02 | $804.11 | Anker Ops A/C  No Remarks | 8488 |
| 12/19/02 | $450.00 | Anker Ops A/C  No Remarks | 7789 |
| 12/19/02 | $144.97 | Anker Ops A/C "Reimbursemnet of office equipment" | 8493 |
| 12/20/02 | $2,000.00 | Anker Escrow A/C  "Draw" | 10317 |
| 12/30/02 | $262.04 | Anker Escrow A/C "Draw' | 10322 |
| 12/30/02 | $3,029.00 | Anker Escrow A/C "draw" | 10321 |
| 1/2/03 | $804.11 | Anker Ops A/C "payroll" | 7802 |
| 1/15/03 | $899.37 | Anker Ops A/C "1/15/03 pay" | 7840 |
| 1/16/03 | $800.00 | Anker Ops A/C | 7825 |
| 1/17/03 | $300.00 | Anker Ops A/C "Reimbursemnet for office supplies" | 7834 |
| 1/23/03 | $1,000.00 | Anker Ops A/C  No Remarks | 7845 |
| 1/23/03 | $276.00 | Ann C. and Daniel J Anker | |
| 1/29/03 | $902.32 | Anker Ops A/C  No Remarks | 7852 |
| 1/31/03 | $971.63 | Anker Ops A/C  No Remarks | 7860 |
| 2/5/03 | $3,500.00 | Anker Escrow A/C No Remarks | 10398 |
| 2/14/03 | $1,003.58 | Anker Ops A/C  "2/14 pay' | 7885 |
| 2/26/03 | $0.75 | AT&T | |
| 2/26/03 | $427.00 | State of DE, Rev Refund Account | |
| 2/28/03 | $1,003.58 | Anker Ops A/C  "2/28 pay" | 7895 |
| 3/5/03 | $1,000.00 | Anker Ops A/C  No Remarks | 7913 |
| 3/11/03 | $1,100.00 | Anker Ops A/C  No Remarks | 10465 |
| 3/14/03 | $1,003.58 | Anker Ops A/C  No Remarks  Probably 3/14/03 Payroll | 7922 |
| 3/14/03 | $854.95 | Anker Ops A/C "quarterly discretionary bonus" | 7921 |
| 3/14/03 | $28.50 | Chantell Larks, 152 S. Union St., Easton, PA 610-250-6971 | |
| 3/14/03 | $18.00 | Sonya and Shannon Hess, Easton, PA | |
| 3/17/03 | $4,237.00 | US Treasury Tax ref. To Laura and Dante for 12/02 | |
| 3/31/03 | $500.00 | RE/MA Associates Inc; Return deposit 41 Louise Rd. | |
| 4/1/03 | $4,000.00 | Anker Ops A/C  No Remarks | 7938 |
| 4/1/03 | $2,666.67 | Anker Ops A/C  No Remarks | 7939 |
| 4/15/03 | $2,600.00 | Anker Ops A/C  No Remarks | 7950 |
| 5/1/03 | $2,600.00 | Anker Ops A/C  No Remarks | 7962 |
| 5/12/03 | $9,000.00 | Gary and Maya Paveza, 2808 Fawkes Dr., Wilm., DE 19808 "Reimb for loan"  " | |
| 5/19/03 | $10,000.00 | Anker Escrow A/C  No Remarks | 10607 |
| 5/29/03 | $4,500.00 | Anker Ops A/C  No Remarks | 7994 |
| 5/30/03 | $5,000.00 | Anker Ops A/C  No Remarks | 7996 |
| 6/6/03 | $2,083.41 | Anker Ops A/C  No Remarks | 7998 |

| Date | Amount | Description | Check # |
|---|---|---|---|
| 6/16/03 | $4,000.00 | Anker Ops A/C  No Remarks | 7499 |
| 6/20/03 | $5,000.00 | Anker Escrow A/C No Remarks | 10646 |
| 6/25/03 | $10,000.00 | Anker Escrow A/C  No Remarks | 10652 |
| 7/3/03 | $8,000.00 | Anker Ops A/C  No Remarks | 7491 |
| 7/9/03 | $8,000.00 | Anker Escrow A/C  No Remarks | 10668 |
| 7/9/03 | $2,000.00 | Anker Ops A/C No Remarks | 7483 |
| 7/9/03 | $4,000.00 | Unknown: Must be Anker Escrow A/C check # 10669 | 10669 |
| 7/17/03 | $5,000.00 | Anker Ops A/C  No Remarks | 7320 |
| 7/18/03 | $2,000.00 | Anker Escrow A/C "DJA" (Split deposit: Ck 10691 for $5000 minus cash out of $3000 | 10691 |
| 7/21/03 | $10,000.00 | Anker Escrow A/C  No Remarks This was apparently the funds used by Laura Larks to get two certified checks of $5000 each for Dan and Ann while they on vacation. | 10692 |
| 7/23/03 | $10,000.00 | Anker Escrow A/C  No Remarks | 10696 |

Anker Lark Deposits : Excel spreadsheet containing Laura Larks deposits into her WSFS Checking A/C 2074-5270 for January 1, 2002 through July 23, 2003

Checks stolen from Dan Anker, forged, and deposited  $6197.50

Deposits from Dan Anker's Escrow    $94,391

Deposits from Dan Anker's OPS A/C  $99764

1  Q. At that time what occurred between you and
2  Dan?
3  A. I saw Dan up in the garage parking Level III
4  which is where he would park. He was having a
5  cigarette. I confronted basically asked him based on
6  what Laura had told me. He was angry. I wanted to
7  know if that was true, explain to him why I sent him
8  the letters that I did.
9  Q. What did he tell you?
10  A. He said that he was upset because I had known
11  him. We had known each other for all those years to
12  imply that either he was embezzle the or steal money or
13  whatever, he thought was unfair. And that, you know,
14  there were some problems and stuff a lot of it was
15  related to Fed Express losing shipments mail not
16  delivering things, that he had experienced some
17  problems with like a Fed Express shipments that went in
18  the unclaimed section and he had been having a lot of
19  trouble and so he was just surprised that I would send
20  him a letter in the tone that I did.
21  Q. Did he give you any advice as to what you
22  might do?
23  A. In the letter he did. That I got, subsequent

138

1  after he had talked Laura told me he had prepared a
2  letter in response to my letter which she did not want
3  to give it to me because we were good friends. I would
4  be upset with what he responded back. I asked her
5  several times to give me the letter, we will see what
6  happens from there. Finally after talking to Dan up in
7  Park Plaza garage I did get a copy of the letter. In
8  that letter, you know, he pointed out that I could go
9  to the Office of Disciplinary Counsel which I was not
10  aware there was such a thing or the Attorney General's
11  Office.
12  MR. WENDELBURG: Moment, please, Your Honor.
13  (Discussion held off the record.)
14  MR. WENDELBURG: No further questions at this
15  time Your Honor.
16  CROSS EXAMINATION
17  BY MR. LUGG:
18  Q. How are you doing. We have not met before,
have we?
20  A. Correct.
21  Q. Just a few questions for you. You explained
22  that you worked at that Park Plaza building for 17
23  years?

1  A. Correct.
2  Q. So you have been there as long as the
3  defendant, Dan Anker, has been a tenant at that
4  building?
5  A. Correct, he became a tenant through the time I
6  was working for Ed Desetta who built it, Dan's brother
7  Tom worked there. When Dan was going into business
8  was looking for an office. There was one available.
9  Q. Over the time that you were there were you
10  able to kind of see how often the defendant stayed in
11  the office, how frequently he was there?
12  A. Yes, for the most part.
13  Q. You were contacted at some point by an
14  investigator in this case; is that correct?
15  A. Yes Bill Glanz.
16  Q. And you were asked about comparison of time
17  spent in the office in the past versus time spent in
18  2003; do you recall that?
19  A. Yes.
20  Q. Can you tell the jury your assessment of the
21  time spent in the office by the defendant at the time
22  frame your transaction discussed for 2003?
23  A. I noticed Dan was in the office a lot less

140

1  than he had been. I was told it was because he was
2  watching his son, Dan, but definitely he was not in as
3  often as he had been in the past.
4  Q. When you say not in his office, how often had
5  he been in there in the past?
6  A. Normally he was in pretty much every day; in
7  time frame he might be in but only for an hour or two
8  then leave.
9  MR. LUGG: Thank you.
10  MR. WENDELBURG: Nothing further, Your Honor
11  Thank you.
12  THE COURT: You may step down. Thank you.
13  MR. WENDELBURG: Call William Glanz, Your
14  Honor.
15  WILLIAM GLANZ,
16  having been first called by the Defense was sworn
17  on oath, was examined and testified as follows:
18  DIRECT EXAMINATION
19  BY MR. WENDELBURG:
20  Q. Mr. Glanz, what do you currently do for a
21  living?
22  A. Private investigator.
23  Q. Can you tell the jury an overview of your

1 professional background?

2   A. I was an agent, Special Agent for the Drug
3 Enforcement Administration for about 30 years. Prior
4 to that I was a special Agent for the Internal Revenue
5 Service Criminal Investigation Division, prior to that
6 I was in the Army, prior to that I was in college.

7   Q. How far have you gone in school?
8   A. I have a college degree in Accounting.
9   Q. Who is your current employer?
10  A. Well, I am working for a company called Heyden
11 and Associates which is a private investigating company
12 in Delaware.
13  Q. Are you working as a subcontractor for Heyden
14 and Associate?
15  A. Among other companies. Yes, sir.
16  Q. Do you also do work on your own?
17  A. Yes, I do.
18  Q. Were you asked to assist in the investigation
19 of this case on behalf other the defendant, Dan Anker?
20  A. Yes, I was.
21  Q. And what -- do you recall, approximately, when
22 you were first asked to become involved in this case?
23  A. I think it was around March of 2004.

142

1   Q. And have you worked on the case to some degree
2 or other since that date?
3   A. Yes, I have.
4   Q. Have you been asked to contact and interview
5 potential witness in the matter?
6   A. Yes, many witnesses, many contacts.
7   Q. I want to first refer you to Mr. Joseph
8 McCullough, auditor for the Lawyers Fund for Client
9 Protection for the office of Disciplinary Counsel. Did
10 you contact Mr. McCullough and interview him in
11 connection with this case?
12  A. Yes, I did a formal interview, did numerous
13 follow-up conversations with him starting last June,
14 June 10, 2004, almost to the present.
15  Q. Do you know Mr. McCullough from other matters?
16  A. Yes, I knew him when we were both in law
17 enforcement. I have known Joe for probably since the
18 1970s we worked together on cases as private
19 investigators probably went I was in narcotics Agent,
20 he was an IRS special agent.
21  Q. I want to direct your attention to any
22 conversation you may have had with Mr. McCullough
23 regarding an initial meeting that you had with Mr.

1 Anker. You have been exempted from sequestration in
2 this matter. You heard Mr. McCullough's testimony last
3 week, did you not?
4   A. Yes, I did.
5   Q. And did you hear his characterization of Mr.
6 Anker's demeanor during that initial contact?
7   A. Yes, I did.
8   Q. Did Mr. McCullough give you any, in your
9 interviews of Mr. McCullough pretrial, did he describe
10 for you Mr. Anker's demeanor during that initial
11 meeting?
12  A. Yes.
13  Q. How did Mr. McCullough describe it then?
14  A. He said that it seemed to him that Dan was
15 virtually helpless to him on the evening, first night
16 of the ODC visit characterized him walking around like
17 a zombie. He was in total shock.
18  Q. I want to talk about another witness in this
19 case, Mr. Caucci. Did you have any contact with Mr.
20 Caucci before the trial of this matter?
21  A. Yes.
22  Q. What was the purpose of that contact?
23  A. To serve him a subpoena to attempt to

144

1 interview him.
2   Q. Can you tell us approximately when this took
3 place?
4   A. July 11, 2005.
5   Q. Where was it that you met up with Mr. Caucci?
6   A. At his residence in Hockessin.
7   Q. Did you identify your at that time?
8   A. Yes, I did.
9   Q. Did you tell Mr. Caucci the purpose of your
10 visit?
11  A. Yes, I did.
12  Q. Did you tell Mr. Caucci who you were working
13 on behalf of at that time?
14  A. Yes, I did.
15  Q. Describe, tell the jury how Mr. Caucci
16 responded to that?
17  A. He was obviously very annoyed that I had come
18 to his house and given him a subpoena, and I said he
19 would not say anything that would help acquit that scum
20 bag Dan Anker and his sociopathic -- or psychopathic
21 daughter. I don't know if it was sociopathic or
22 psychopathic because I use the terms interchangeably, I
23 know it was one of those two words.

145

```
1    Q.  Mr. Caucci testified during the first week of
2  trial you were present?
3    A.  Yes.
4    Q.  Do you remember a reference Mr. Caucci made to
5  busting his balls?
6    A.  Yes.
7    Q.  Did that phrase, in fact, come into your
8  conversation with Mr. Caucci?
9    A.  Yes, it did.
10   Q.  Can you tell the jury the context this which
11 that arose?
12   A.  I explained to him that way it works with
13 witnesses, is that you don't want witnesses sitting
14 around for, like, a whole week. You don't want to
15 subpoena them for, like, July 18, make them sit around
16 until today whatever today is. We are subpoenaing him
17 for the 25th. What we would like here is a letter from
18 Mr. Wendelburg, we would like to you give us your
19 telephone number so that we can call you the day
20 before, tell you to be here, so that you are not
21 inconvenienced because he told me he had businesses to
22 take care of, settlements to do, stuff like that. I
23 said if you would do that, then we will accommodate
```

146

```
1  you, but if not, we are going have to ask you to be
2  here on the 25th when he calls for -- we are going to
3  have it ask you is to sit her until we call you. It
4  could be a week. I said we don't want to bust your
5  balls. I was talking because that's the way he talked
6  to me. I said we don't want to bust your balls,
7  defense didn't want to, but if we have to, you won't
8  give me your phone number which he refused to do. He
9  told me he was not going to honor the subpoena,
10 wouldn't read the letter from Mr. Wendelburg. I said
11 if you won't do this, won't cooperate with us I am
12 sorry but the defense is going to bust your balls.
13   Q.  Did you make me attempt to intimidate
14 Mr. Caucci during that meeting with him?
15   A.  No, I made none.
16   Q.  How long did the conversation last; do you
17 recall?
18   A.  Less than five minutes.
19      MR. WENDELBURG: May I have this document
20 marked for identification, Your Honor.
21      THE COURT: Yes.
22      THE CLERK: Defense identification double I.
23 BY MR. WENDELBURG:
```

147

```
1    Q.  I am handing you Defense for Identification
2  double I. Let me ask you a couple questions. Part of
3  your investigation, in this case, were you asked to
4  review public documents regarding a house belonging to
5  Phil Urban?
6    A.  Yes, most specifically the refinancing of the
7  house.
8    Q.  What were you asked to go look at or for?
9    A.  I was asked one of the things I was asked to
10 do was to verify that the mortgage that he testified
11 that he had, that wasn't paid was, in fact, satisfied
12 in the Office of the Recorder of Deeds for New Castle
13 County.
14   Q.  What did you do in order to determine that?
15   A.  I went to the Office of the Recorder of Deeds
16 from New Castle County. I purchased a certified copy
17 that shows that the mortgage he had testified was not
18 paid, was marked as satisfied by the Office of Recorder
19 of Deeds.
20   Q.  As of what date?
21   A.  May 2, 2000.
22   Q.  May 2, 2000. What is marked for
23 identification double I that you have, what is that?
```

148

```
1    A.  That is a certified copy of the document on
2  file at the Recorder of Deeds that shows that the
3  mortgage that Mr. Urban was talking about was actually
4  satisfied.
5       MR. WENDELBURG: Moment please, Your Honor
6       (Discussion held off the record.)
7       MR. WENDELBURG: No further questions of this
8  witness.
9       CROSS EXAMINATION
10 BY MR. LUGG:
11   Q.  Mr. Glanz, Mr. Anker is your client, is he
12 not?
13   A.  Yes, he is.
14   Q.  If you found that document, you have some IRS
15 experience, some accounting experience, if in fact the
16 mortgage was satisfied in May of 2000, why would
17 Mr. Urban need to have secured a loan to payoff that
18 mortgage?
19   A.  I don't know.
20   Q.  And also would you agree that funds that were
21 made on his behalf inputted on his behalf into your
22 client's escrow accounts, in fact, still belong to Mr.
23 Urban?
```

Page 149

1    A. Sorry. Which funds are you talking about?
2    Q. You have been in the courtroom just about
3 everyday?
4    A. Yes.
5    Q. Were you here for Mr. Urban's testimony?
6    A. Yes.
7    Q. Mr. Urban that his new loan was, in fact,
8 funded and that, in fact, Mr. Anker's account was
9 funded on behalf of that loan?
10    A. Yes, I believe it was 88 thousand dollars.
11    Q. So regardless of satisfaction of earlier
12 mortgage, you would agree that that money that came
13 into the escrow account still belongs to Mr. Urban; is
14 that right?
15    A. I don't know, that is matter for a lawyer to
16 decide when Title changed from whom to whom, that is a
17 question been throughout this case, I don't know.
18    Q. As far as your presence throughout this trial,
19 very appropriately dressed to testify wearing suits and
20 tie as you appear in court today?
21    A. Yes, I guess.
22    Q. Is that how you presented yourself with your
23 demeanor and your dress to Mr. Caucci on the 11th of

Page 150

1 July?
2    A. No, it is not.
3    Q. In fact, it was not a quiet conversation as
4 you have indicated to us now, in fact, you were telling
5 him you want to know information, you wanted to
6 interview him for your client, correct?
7    A. Yes.
8    Q. And in many of your -- did you document this
9 communication with Mr. Caucci, write it down,
10 memorialize it?
11    A. Only in general.
12    Q. In general. And in some you had recorded some
13 of the statements that you taken from various people;
14 is that right?
15    A. Yes.
16    Q. In a variety of statements you have typically
17 ask is there anything that you know that have would be
18 helpful to my client, correct?
19    A. That's right.
20    Q. Did you ask that question of Mr. Caucci on the
21 11th?
22    A. I told Mr. Caucci that I wanted to interview
23 him. He said I am not going to tell you anything that

Page 151

1 -- you already heard what I said. I said well, look, I
2 am not asking for you to lie. I am not asking for you
3 to make things up. Our outfit is very, very strict on
4 that. We are all former federal agents. We only ask
5 you what happened, that is what we report.
6    Q. What were you wearing went you showed up to
7 meet with him?
8    A. Probably very similar to the way I have been
9 the last few weeks, you know, I guess you might call it
10 dress casual.
11    Q. You had never met Mr. Caucci prior to that
12 day; is that right?
13    A. No.
14    Q. You had this investigated, you learned where
15 he lived; is that right?
16    A. Yes, I -- sorry.
17    Q. Probably wasn't too tough because you had a
18 re-finance, you had certain documents that you
19 investigated, correct?
20    A. Yes.
21    Q. You made no prearrangements meeting to meet
22 with him; is that right?
23    A. I had tried several times.

Page 152

1    Q. To see him you would agree you are a stranger
2 coming onto his property on July 11; is that right?
3    A. Yes.
4    Q. He also told you that he had already made
5 arrangements to appear in court; is that right?
6    A. No, he refused to tell me.
7    Q. Okay. In a description of Mr. McCullough, did
8 you document what you have testified to here today as
9 far as his description of your client's demeanor back
10 in 2003?
11    A. No, I did not.
12    Q. So you are testifying after observing
13 Mr. McCullough to something you had not previously
14 document?
15    A. Yes.
16    Q. You offering this on your client's behalf in
17 the courtroom today?
18    A. Yes, I am.
19        MR. LUGG: Sir, I appreciate your time.
20        REDIRECT EXAMINATION
21 BY MR. WENDELBURG:
22    Q. Mr. Glanz, going back to Mr. Caucci, your
23 meeting with him, been almost three weeks since we have

```
 1  seen Mr. Caucci. Can you describe your recollection of
 2  Mr. Caucci's physical stature compared with your own?
 3      A.  Yes, I can.
 4      Q.  How is it?
 5      A.  Probably about an inch shorter than me. He is
 6  about say about 45 50 pounds heavier, much more
 7  muscular than me. Probably about 20 years younger.
 8      Q.  Do you carry a weapon with you during these
 9  investigations, attempted interviews?
10      A.  No I am not lined to carry a weapon in
11  Delaware.
12      Q.  Have you any objects with you in your hands or
13  on your hanging from your belt during that interview?
14      A.  No, just that little letter thing that I carry
15  that I use for a note pad.
16          MR. WENDELBURG: Nothing further. Thank you.
17          MR. LUGG: Prompts nothing from the State,
18  Your Honor.
19          THE COURT: You may step down sir. Ask you to
20  come back at 2:30.
21          (Jury left the courtroom at 1:23 p.m.)
22          THE COURT: Why don't we have the jury come
23  tomorrow at nine o'clock. We will have closings then.
```

                                                        154
```
 1  No need to squeeze --
 2          MR. WENDELBURG: We do have a housekeeping
 3  matter. We intend to offer a number of the defense
 4  identification Exhibits. I don't mind whether the jury
 5  sees it or not.
 6          THE COURT: It is not necessary. You can hand
 7  it up to them at one time, it's been introduced. You
 8  don't have to -- you do it out of the presence of the
 9  jury and say after I admit just so the jury does not
10  come like a strange thing to them.
11          MR. LUGG: I would like an opportunity to
12  review them. I was surprised they were marked for
13  identification no movement beyond that, some of them I
14  don't know if there is an appropriate foundation laid.
15          THE COURT: Why don't you two confer on that.
16  Do it now I guess this would be the appropriate time.
17          MR. WENDELBURG: We intend to rest. There are
18  no more witnesses for the defense. I understand the
19  State has one. I have handed Mr. Lug a list.
20          THE COURT: Why don't you just confer. If I
21  have to make my rulings I will be happy to make them.
22  I don't have to address anything that is agreed to.
23          MR. LUGG: Your Honor, I reviewed the
```

```
 1  documents that Mr. Wendelburg wants to admit. I am
 2  handing, there is no dispute as to Defendant's B, D, E,
 3  F, G, H, K, CC, DD, E.E, FF, and II.
 4          THE COURT: Can we have them admitted; is that
 5  okay?
 6          MR. WENDELBURG: Yes, Your Honor.
 7          THE COURT: They are admitted as defense
 8  Exhibits. They will be in sequence.
 9          MR. LUGG: As to X which, was a file that was
10  handed to the defendant. This is Defendant's X, which
11  identifies being documents recovered from -- identified
12  being documents he is familiar with. If that is the
13  foundation as I understand it that he is familiar with
14  the documents, he believes them to relate to a
15  settlement I do not oppose their admission. There was
16  a dispute as to where they were found, if there is not
17  being arguments that, finding of the documents, I don't
18  object to their admission.
19          MR. WENDELBURG: Your Honor, Defendant's X f
20  Identification was handed to Mr. Anker. He identified
21  it as documents relating to his supposed refinances.
22          THE COURT: Washington Mutual.
23          MR. WENDELBURG: Yes, one from March 15 of
```

                                                        156
```
 1  2003. And he identified a number of individual
 2  contents of this file. There has been testimony it was
 3  found in his office after the -- as the thefts were
 4  being discovered, may have been some conflicting
 5  testimony who picked it up or put them together. They
 6  are being offered for the purpose of Mr. Anker
 7  believing he had a refinance in March of 2003, later
 8  finding out that he did not.
 9          THE COURT: Anything more to discuss at this
10  point?
11          MR. LUGG: I don't think -- well, my
12  recollection is that same folder was handed to Ms.
13  Anker or Conway. She indicated that was not the stack
14  of materials that was found in the office which is why
15  I raised that issue.
16          THE COURT: I think under the totality of
17  evidence, if that is a big point, the jury is going to
18  have to flesh that out, if that is a really a big
19  point. That will be admitted.
20          MR. LUGG: I next turn the Court's attention
21  to Defendant's for Identification J. This is an
22  Exhibit comprised of four pages. I do not object to
23  the admission of the subject coverletter. This is a
```

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2008, I electronically filed the foregoing **Affidavit of William F. Glanz** with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

> Elizabeth R. McFarlan, Esquire
> Department of Justice
> 820 N. French Street
> Wilmington, DE 19801

> */s/ Joseph M. Bernstein*
> JOSEPH M. BERNSTEIN (Bar #780)
> 800 N. King Street - Suite 302
> Wilmington, DE 19801
> 302-656-9850
> E-mail: jmbernstein@embarqmail.com