# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **DANIEL J. ANKER**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-203-SLR |
| | ) | |
| **ELIZABETH NEAL**, Acting Warden, | ) | |
| and **JOSEPH R. BIDEN, III**, Attorney | ) | |
| General of the State of Delaware, | ) | |
| | ) | |
| Respondents. | ) | |

## ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. § 2254, respondents state the following in response to the petition for a writ of habeas corpus:

In February 2005, a New Castle County grand jury indicted the petitioner, Daniel J. Anker, and his daughter, Laura Larks, on nineteen counts of felony theft and one count of second degree conspiracy, alleging that Anker and his daughter misappropriated funds from Anker's client escrow account maintained as part of Anker's law practice. *See* A1-2.[1]  In April 2005, Superior Court granted Anker's motion to sever the defendants for trial.  *See* A7; *State v. Anker*, 2005 WL 823750 (Del. Super. Ct.).  Anker's jury trial began in Superior Court on July 19, 2005. On August 4, the jury found Anker guilty as charged on nine counts of felony theft and one count of second degree conspiracy.[2]  A9-10.  Superior Court in November 2005 sentenced Anker to nineteen years of incarceration, suspended after five years for probation.[3]  The Delaware

---

[1] References to "A" and "B" refer to the *Appendix to Appellant's Opening Brief* and *Appendix to State's Answering Brief* in *Anker v. State*, Del. Supr. No. 412, 2007 respectively.

[2] The other charges had been *nolle prossed* by the State prior to trial.  A1.

[3] On the same day that Anker was sentenced, Larks pled guilty to one count of felony theft and one count of second degree conspiracy.  She was sentenced in January 2006 to a total of seven

Supreme Court affirmed Anker's convictions and sentence on direct appeal. *Anker v. State*, 2006 WL 3087169 (Del.).[4]

In July 2007, Anker moved for postconviction relief under Superior Court Criminal Rule 61. A18-27. Superior Court summarily denied Anker's motion on July 26, 2007. *State v. Anker*, 2007 WL 2200007 (Del. Super. Ct.). On appeal, the Delaware Supreme Court affirmed Superior Court's denial of Anker's postconviction motion. *Anker v. State*, 2008 WL 187962 (Del.). Anker's federal habeas petition was filed on April 9, 2008. D.I. 1.

<u>Facts</u>[5]

Daniel J. Anker was a practicing Delaware real estate attorney until an emergency hearing before the Delaware Supreme Court when he was suspended from practice pending a criminal investigation. This suspension resulted after Joseph McCullough, an investigative auditor for the Delaware Lawyer's Fund for Client Protection, investigated Anker on June 29, 2003. McCullough learned that Anker had not updated his bank account records in the program Quick Books, contrary to Anker's representation of his account's status. McCullough found numerous unrelated checks written to various people and businesses leaving Anker's client escrow account $1.5 million short.

Anker's financial practices began unraveling on December 28, 2001. On that day, Anker represented his cousin, Phillip Urban, during a refinance settlement. Urban obtained a new loan

---

years in prison, suspended for five years of Level IV home confinement, suspended in turn after twenty-four months for Level II probation. Larks' sentence was modified in August 2007 to allow her to move immediately to Level III probation with GPS monitoring. Larks was ordered to pay $554,046.34 in restitution.

[4] The Delaware Supreme Court denied a motion for rehearing *en banc* on December 5, 2006. Anker also filed a motion for modification of sentence in Superior Court in December 2006; the motion was denied in January 2007. A16. No appeal was taken.

[5] These facts are taken directly from the *State's Answering Brief* in *Anker v. State*, Del. Supr. No. 552, 2005 (citations to record omitted).

from GMAC in the amount of $88,000. This new loan was supposed to cover Urban's old loan held by Wilmington Savings Fund Society (WSFS) in the amount of $57,408.56. Urban later learned that the loan through WSFS had not been paid off and was in default. Urban notified Anker's office about the problem with his mortgage. Laura Larks, Anker's secretary and daughter, told Urban it was a problem with the bank. Larks provided Urban with reimbursement checks and legal settlement checks allegedly originating from WSFS up until January 13, 2003. Larks represented to Urban that the mortgage had been satisfied.

On March 6, 2003, Anker conducted a second refinance settlement for Douglas Ray. Ray, then Dean of Widener Law School, was refinancing his mortgage loan with Chase Manhattan Bank through Chase. Soon Ray learned that one of his mortgages in the amount of $28,000 had been satisfied, but that his other mortgage for $220,000 was not satisfied. Ray contacted Anker to inform him of the problem with his larger mortgage, and Anker told Ray that he was having similar problems with other clients. Anker asked for authorization from Ray to settle a claim against Chase. Ray received a settlement check for $400,000 from Anker and Larks accompanied by a letter allegedly from Chase on the bank's letterhead, but the letter was not signed. Following this "Settlement" payment, Ray received foreclosure papers which he faxed to Anker's office. Anker indicated that the bank offered another $700,000 settlement, and Anker provided Ray with a "Disbursement Agreement" and a check for $490,000 which did not clear. Foreclosure proceedings on Ray's property began in the early fall of 2003.

John Lesko met with Anker on April 3, 2003 to conduct a third refinance settlement on his mortgage. Lesko was refinancing his old mortgage loan from Washington Mutual through a new loan from Washington Mutual in the amount of $140,000. Lesko received a notice from Washington Mutual in late April stating that the March and April payments were late. Lesko

contacted Anker's office in late May to update Anker on the problems he was having with the mortgage payoff. Anker talked to Lesko about a legal settlement against Washington Mutual for $250,000 on June 3, 2003. Lesko received a letter from Washington Mutual collections department on June 18, 2003, presumably stating that his mortgage was not satisfied.

On April 7, 2003, Gary and Maya Paveza met at Anker's office to refinance their property located in Wilmington. They wanted to consolidate two mortgages, one through GMAC and one from Conseco, into one mortgage with Gilpin. The Pavezas had an outstanding balance of $132,897.36 on the GMAC loan and owed $62,987.37 on the Conseco loan. The Pavezas borrowed a total of $195,740 from Gilpin. The Pavezas found out that there was a problem with the GMAC mortgage near the end of April. When Ms. Pavesza contacted Anker about the problem, he told her about a legal settlement offered by GMAC.

On April 25, 2003, Margaret and Frank Caucci went to meet with Anker for their mortgage refinance settlement, but Anker never arrived at the meeting. The Cauccis signed paperwork to refinance the mortgage on their Hockessin home with Home Comings Financial for approximately $231,000 through Nationwide Advantage Mortgage. The refinanced mortgage they obtained from Nationwide amounted to $237,000. During the summer of 2003, people from Home Comings Mortgage appeared at their home and inquired about the unpaid mortgage loan.

On June 4, 2003, Humera Bashir met with Drew Chambers at Anker's office for the closing on the sale of Bashir's property located in Wilmington. Bashir, the seller, had a mortgage from Principal Bank. Chambers' mortgage, to purchase the property, was through Gilpin in the amount of $210,400. Chambers also secured a second mortgage of $22,600. Bashir learned that the mortgage owed to Principal Bank had not been satisfied. Bashir went to Anker's office, but it was closed. It took Chambers over a year to obtain clear title for his property.

On June 20, 2003, Patricia Paoli signed settlement papers to refinance her property located in Rehoboth.  Paoli had Anker represent her in the refinancing process.  Paoli owed $271,643 on her old loan with ABN Amro, and she secured a new loan through ABN Amro fro $276,250.  When Paoli received late notices for her old mortgage she attempted to contact Anker, but he was always busy.  When Paoli drove to Anker's law office, it was closed.

Kathleen Leahy sold her property in Wilmington to Nancy Devine and Julius Meisel. The settlement for the sale of this property was held at Anker's Park Plaza office on July 15, 2003.  Leahy's mortgage was held by Wachovia in the amount of $50,826.90.  Around the end of July or beginning of August, Leahy was notified that the Wachovia loan had not been satisfied.

On July 17, 2003, Russell Burkett, the buyer, and Barry Kintz, the seller, met at Anker's office in order to have Anker assist them in the sale of Kintz's Middletown property.  Burkett gave Anker a $10,000 deposit to be held in escrow, and, later, Burkett wire transferred the remainder of the sale price of $315,000 to Anker.  Kintz owed $156,149.62 on his mortgage through Chase.  When Burkett researched his title, he found that the title did not clear in his name.  Kintz was informed by his wife that their mortgage was not paid, so he went to Anker's office only to find it closed.

Richard Stellfox, a car salesman for Porter Chevrolet, made car sales to Anker in 2003. On February 22, 2003, Anker wrote a check in the amount of $43,127 to purchase a 2001 Chevrolet Suburban from Porter Chevrolet.  When making the purchase of the 2001 Suburban, Anker traded in his 1999 Suburban.  Anker then returned to repurchase the 1999 Suburban for his daughter on February 24, 2003 for $9,906.

Just four days later, on February 28, 2003, Anker visited Union Park Automotive Group in Wilmington where he purchased a 2000 Volvo V70 for $14,970, after trading in another 2000

Volvo V40 station wagon. The Volvo was purchased with a check from Daniel J. Anker, Esquire.

On May 20, 2003, Anker returned to Union Park to trade in his 2001 Suburban and purchase a 2003 Yukon with a $19,000 check. On June 12, 2003, Anker next purchased a 2001 BMW 330 from Union Park with a check for $31,479. On June 25, 2003, Anker returned to Union Park to trade in this 2001 BMW 330 for a 2003 BMW X5. The additional purchase price of $18,567 again was paid by check. On June 28, 2003, Anker traded a 2000 Volvo V70 for another 2003 BMW X5. The additional purchase price for this second BMW X5 was $27,815, paid for by check from Daniel Anker, Esquire. Anker's total expenses for automobile purchases made from Union Park amounted to $114,918.

McCullough discovered that Anker was also writing checks for things other than motor vehicles. Anker wrote a check to Andy Duffy for $11,500. Anker wrote two checks to his wife totaling $19,358. Anker also wrote three checks to Clay Target for a total of $44,088. On March 17, 2003, a check was made out to Dan and Ann Anker for $19,500. In May 2003, there was a check for $65,000 written to an unidentified payee. There were two checks written to Douglas and Caroline Ray totaling $310,000. Another three checks to the Pavezas totaled $146,600. Two checks to the IRS were for $44,924.65 and $9,740.84. Larks received a disbursement of $97,391.04. A check was written to Lynn Anker, Anker's daughter from his first marriage, in the amount of $900. Finally, McCullough discovered a check written to PNC Bank for $17,000 to pay off Anker's mortgage and credit card bill.

These numerous checks revealed a pattern of divergence of client escrow funds by Anker to defray his substantial personal expenses, including an apparent motor vehicle addiction.

Discussion

In his opening brief in support of his petition for federal habeas relief, Anker[6] raises two grounds for relief:  (1) Anker was deprived of his Sixth Amendment right to counsel under *United States v. Cronic*, 466 U.S. 648 (1984); and (2) the decision of the Delaware Supreme Court that Anker failed to prove that he had been prejudiced under *Strickland v. Washington*, 466 U.S. 688 (1984), was contrary to and an unreasonable application of *Strickland*. D.I. 10.  Anker's claims, however, are unavailing.

(1)  *Cronic* claim

It is well settled that before a federal court can consider a habeas petitioner's claim, the petitioner must first exhaust any available state court remedies.  28 U.S.C. § 2254(b)(1); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his federal claims to the highest state court before bringing them in federal court.  *See Duncan v. Henry*, 513 U.S. 364, 366 (1995); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002).  To "fairly present" a federal claim to a state court, a petitioner must have presented the claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  "[I]t is not sufficient that all the facts necessary to support the federal claim were before the state courts."  *Anderson v. Harless*, 459 U.S. 4, 6 (1982).  Anker did not fairly present his claim to the state supreme court that he was constructively deprived of counsel at a critical stage of the criminal proceedings, and he thus has failed to exhaust the claim.  *See* 28 U.S.C. § 2254(b).

---

[6]  Anker's present counsel represented Anker at sentencing, on direct appeal to the Delaware Supreme Court, and in the state postconviction proceedings.

In his Superior Court postconviction motion, Anker presented two grounds for relief. Under the heading of "Ground One," Anker wrote: "The performance of defendant's counsel in the trial amounted to ineffective assistance of counsel under the 6th Amendment to the U.S. Constitution and Article I, §7 of the Delaware Constitution in the following respects . . . ." A19. Then, Anker enumerated six separate claims of ineffective assistance of trial counsel, reciting various alleged deficiencies of his counsel's performance at trial. *See* A19-26. Anker's sixth claim under Ground One was that he was deprived of his right to effective assistance of counsel because his counsel failed to disclose that he was suffering from a "major depressive disorder." A26. The only citation in support of this claim was to the disciplinary case against Anker's trial counsel lodged by the Office of Disciplinary Counsel. A26. Under the "Ground Two" heading, Anker's assertion, in its entirety, was that: "Even if none of the individual errors specified in Ground One above, standing alone, amounted to a violation of Anker's Sixth Amendment right to effective assistance of counsel, when viewed cumulatively, the multiple errors show that Anker's Sixth Amendment rights were violated." A26. No separate supporting facts or legal citations were included with Ground Two. A26. In considering Anker's motion, Superior Court did not ask for a response from state prosecutors; instead, the court analyzed Anker's claims under *Strickland v. Washington*, 466 U.S. 668 (1984), and denied the motion because Anker failed to "make any attempt to show that the deficient performance caused defendant prejudice." *Anker*, 2007 WL 2200007 at *2.

On appeal from the denial of his postconviction motion, Anker presented two claims to the state supreme court. Anker first complained that the trial court had erred as a matter of law in deciding that a finding of no plain error on direct appeal precluded a claim of ineffective assistance of counsel based on the same errors. *See Appellant's Op. Brf.*, *Anker v. State*, Del.

Supr. Ct. No. 412, 2007, at 5.  The Delaware Supreme Court rejected that argument, noting that "Superior Court decided this case upon a different ground."  *Anker*, 2008 WL 187962 at *2.  Anker's second claim for relief asserted that Superior Court's decision to summarily deny his postconviction motion because of a failure to allege prejudice under *Strickland* was incorrect as a matter of law.  *See Appellant's Op. Brf.*, *Anker v. State*, Del. Supr. Ct. No. 412, 2007, at 14.  This second argument addressed the question of "how specific [] an allegation of 'prejudice' . . . [must] be in order to avoid summary denial."  *Id.*  Four pages into that second argument in his opening brief, Anker asserted that the impairments of trial counsel alleged in Claim 6 of his postconviction motion, "coupled with the serious nature of trial counsel's derelictions during the trial, as outlined in Claims 1 through 5, were *substantial enough to raise the possibility that there was a 'constructive' denial of counsel* during Anker's trial."  *Id.* at 18 (emphasis added).  This sentence was followed by citations to *United States v. Cronic*, 466 U.S. 648 (1984) and *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001).[7]  Then, two sentences later, Anker concluded his argument with:  "The conclusion in the *Rule 61 Decision* that relief on this claim should be summarily denied without any further proceedings was incorrect as a matter of law."  *Appellant's Op. Brf.*, *Anker v. State*, Del. Supr. Ct. No. 412, 2007, at 18-19 (citing to *Horne v. State*, 887 A.2d 973, 975 (Del. 2005), for the proposition that the best practice for trial courts for claims of ineffective assistance of counsel is to require a response from the trial attorney).

    In his reply brief, Anker had only one argument heading:  "THE SUPERIOR COURT BELOW WAS INCORRECT AS A MATTER OF LAW IN SUMMARILY DENYING ANKER'S MOTION FOR POST-CONVICTION RELIEF."  *Appellant's Reply Brf.*, *Anker v. State*, Del. Supr. Ct. No. 412, 2007, at 1.  Pages 1-5 of the argument addressed the sufficiency of

---

[7]  Neither case, however, was listed in the brief's Table of Authorities.  *See Appellant's Op. Brf.*, *Anker v. State*, Del. Supr. Ct. No. 412, 2007.

Anker's allegations of prejudice under *Strickland*. *See id.* at 1-5. Then, the remaining pages of the reply brief (pages 5-9) fell under a heading labeled: "Analysis of Attorney 'Performance' Under *Strickland*." The sum and substance of the reply brief appears to have been a complaint that the postconviction motion should not have been *summarily* denied, not that prejudice should have been presumed. In fact, in his only reference to *Cronic*[8] in his reply brief, Anker wrote:

> In the court below, Anker was not afforded any opportunity to prove that his attorney was not functioning as an attorney during his trial so that he was prejudiced, as defined in *Strickland*, by the accumulation of errors made by his trial attorney. See, [*sic*] *See, United States v. Cronic*, 466 U.S. 648 (1984)(prejudice is presumed where there is a constructive denial of counsel).

*Appellant's Reply Brf.*, *Anker v. State*, Del. Supr. Ct. No. 412, 2007, at 8.

Any assertion that Anker was denied an opportunity to prove prejudice in order to make out a claim under *Strickland*, is antithetical to the claim that prejudice should be presumed under *Cronic*. A claim that Anker was prejudiced due to the cumulative effect of trial counsel's shortcomings is not equivalent to a claim that prejudice should be presumed because Anker's attorney entirely failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U.S. 685, 697 (2002) (failures "of the same ilk as other specific attorney errors" are subject to "*Strickland*'s performance and prejudice components"). "Indeed, where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotes and citations omitted). Because the clear thrust of Anker's claim was that he had sufficiently pleaded prejudice under *Strickland* for his series of alleged attorney deficiencies, Anker failed to advance a claim that prejudice should have been presumed under *Cronic*. *E.g., Wolfe v. Dretke*, 2004 WL 2538383 (5th Cir. 2004) (finding

---

[8] Once again, *Cronic* was not included in the Table of Authorities.

*Cronic* claim to be unexhausted because the petitioner did not argue in state court that his counsel's "pre-trial and trial failures rendered his criminal proceeding non-adversarial, ask[] the state court to presume prejudice from [his counsel's] purported failures, or rel[y] on *Cronic*.").

The claim, moreover, was not addressed by the state supreme court in its order affirming the denial of postconviction relief. *See Anker*, 2008 WL 187962. Unsurprisingly, the Delaware Supreme Court did not interpret the singular sentence regarding the "possibility" of constructive denial of counsel to be raising a *Cronic* claim, especially in light of the language in the brief both preceding and following the sentence at issue, that indicated that Anker was most concerned that his allegations of prejudice had been sufficient – not the classic *Cronic* claim where prejudice should be presumed. *See generally Anker*, 2008 WL 187962. *See also Baird v. Davis*, 388 F.3d 1110, 1116 (7th Cir. 2004); *Howell v. Mississippi*, 543 U.S. 440, 441 (2005) (per curiam) (federal issue was not raised in state court "which unsurprisingly did not discuss it."). The state courts are not required to search out possible claims lurking in prisoners' state court filings in order to address them. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). The First Circuit requires that the petitioner "do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." Oblique references which hint "that a theory may be lurking in the woodwork will not turn the trick." *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988). Thus, Anker failed to "fairly present" his *Cronic* claim to the state courts, and the claim remains unexhausted.

Ordinarily, a failure to exhaust a claim results in dismissal of the habeas petition, *Rose v. Lundy,* 455 U.S. 509 (1982), or a stay of the federal habeas proceedings to allow the prisoner to exhaust state court remedies (*Rhines v. Weber*, 544 U.S. 269 (2005)). If, however, there is no

available state remedy, then Anker is excused from the exhaustion requirement with respect to this claim. *See Teague v. Lane*, 489 U.S. 288, 298 (1989); *Castille v. Peoples*, 489 U.S. 346, 351-52 (1989). If Anker now tried to raise any of his claims from his July 2007 postconviction motion again in a second postconviction motion, the claims would be barred under Superior Court Criminal Rule 61(i)(2) for failure to have raised the claim in his first postconviction motion. *See, e.g., McLaughlin v. Carroll*, 270 F. Supp. 2d 490, 510 (D. Del. 2003). Moreover, any second postconviction motion filed in state court would now be untimely under state law. *See* DEL. SUPER. CT. CRIM. R. 61(i)(1) (a postconviction motion may not be filed more than one year after the judgment of conviction is final). Consequently, Anker cannot overcome the procedural bar.

Thus, because there is no available state remedy, Anker is excused from the exhaustion requirement. *See Teague*, 489 U.S. at 297-98; *Castille*, 489 U.S. at 351-52; *Lines v. Larkin*, 208 F.3d 153, 160 (3d Cir. 2000); *Lawrie v. Snyder*, 9 F. Supp. 2d 428, 454 (D. Del. 1998); *Dawson v. Snyder*, 988 F. Supp. 783, 804 (D. Del. 1997). Although deemed exhausted, such claims are still considered to be procedurally defaulted. *Lines*, 208 F.3d at 160. Thus, because Anker procedurally defaulted his claim in the state courts, federal habeas review is barred unless he establishes cause for his procedural default in the state courts and actual prejudice, or that a fundamental miscarriage of justice will result if the court does not review his claim. *See Coleman*, 501 U.S. at 750-51; *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Caswell v. Ryan*, 953 F.2d 853, 861-62 (3d Cir. 1992); *McLaughlin*, 270 F. Supp. 2d at 513. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense" precluded his compliance with state procedural rules. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 487 (1986). To establish

prejudice in this context, Anker "must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  *Carrier*, 477 U.S. at 493-94 (quoting *United States v. Frady*, 456 U.S. 152, 179 (1982)); *Dawson*, 988 F. Supp. at 804-05.

Anker has not alleged cause for his procedural default in the state courts.  *See generally* D.I. 10.  In the absence of cause, this Court is not required to address the issue of prejudice.  *See Smith v. Murray,* 477 U.S. 527, 533 (1986); *White v. Carroll*, 416 F. Supp. 2d 270, 282 (D. Del. 2006.  Moreover, the miscarriage of justice exception does not apply because Anker has not presented any new evidence to establish his actual innocence.[9]  *See Hubbard v. Pinchak,* 378 F.3d 333, 339-40 (3d Cir. 2004) (holding that, in order to establish actual innocence sufficient to demonstrate a miscarriage of justice, a petitioner must assert "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--- that was not presented at trial.").

In any case, Anker cannot demonstrate prejudice.  In order to establish a claim under *Cronic*, Anker had to allege that one of the following three types of situations arose in his case: (1) Anker was denied the presence of counsel at a critical stage of his criminal proceedings; (2) his counsel entirely failed to subject the prosecution's case to meaningful adversarial testing; or (3) his counsel was called upon to render assistance under circumstances where competent counsel very likely could not.  *Bell*, 535 U.S. at 695-96.  As noted by the Court in *Bell*, "[w]hen we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete."  535 U.S. at 696-97.  Here, just as the prisoner did in *Bell*, Anker alleges that his counsel failed at specific

---

[9]  Anker's submission of his trial counsel's investigator's affidavit does not establish Anker's actual innocence, nor is the evidence new.  D.I. 13.

points, not in the entirety. Trial counsel's failures to object to certain evidence or to use other available evidence are not indicative of a total failure on the part of trial counsel to test the prosecution's case. In fact, Anker's counsel actively pursued pre-trial motions, successfully obtaining severance of the two defendants for trial. The severance allowed Anker to argue, which his trial counsel strenuously did, that Larks had been solely responsible for the thefts and that Anker was unaware of her actions. Trial counsel filed motions, made oral arguments, attended pre-trial conferences, hired an investigator, cross-examined witnesses, called witnesses, made opening and closing arguments, and presented a defense that Larks stole the money without Anker's knowledge. In light of this record, Anker could not have succeeded in making a *Cronic* claim even if he had properly presented the claim in his filings in state court. Although trial counsel may have been suffering from a "major depressive disorder," the record confirms that the "disorder" did not prevent trial counsel from actively participating in Anker's defense. *See, e.g., Bellamy v. Cogdell*, 974 F.2d 302, 308 (2d Cir. 1992) (*en banc*) ("claims of ineffective assistance based on attorney illness are best suited to the fact-specific prejudice inquiry mandated by *Strickland*"); *Johnson v. Norris*, 207, F.3d 515, 518 (8th Cir. 2000) (declining to adopt a rule requiring a per se presumption of prejudice regarding an attorney's mental illness); *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987) (trial counsel's drug addiction not per se prejudicial). Because Anker cannot demonstrate prejudice from his trial counsel's diagnosis of mental illness, Anker cannot establish prejudice from his failure to fairly present his *Cronic* claim in the state courts. Thus, because Anker has failed to demonstrate either cause for, or prejudice from, his procedural default in state court, this claim should be dismissed.

(2) *Strickland* claim

Under *Strickland v. Washington*, 466 U.S. 688 (1984), a petitioner must show prejudice. The Delaware state courts held that Anker had not sufficiently pled or established prejudice as to his claims of ineffective assistance of trial counsel.  In his second claim, Anker contends that the state court decision was contrary to and an unreasonable application of *Strickland*. D.I. 10. Anker presented his claim that the Superior Court erred by summarily rejecting his claims of ineffective assistance of counsel for failure to demonstrate prejudice under *Strickland* to the Delaware Supreme Court on appeal from the denial of his July 2006 state postconviction motion, thereby exhausting the claim.  *See Smith v. Digmon,* 434 U.S. 332, 333-34 (1978); *Swanger v. Zimmerman,* 750 F.2d 291, 295 (3d Cir. 1984).

In the first instance, to the extent Anker is alleging that Superior Court should have had an evidentiary hearing or ordered additional responses or briefing, Anker has failed to allege a claim cognizable in federal habeas review. Federal courts are authorized to provide habeas relief only where a petitioner is in custody imposed in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998).  The "federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's *collateral* proceedings does not enter into the habeas calculation." *Hassine*, 160 F.3d at 954.  Errors or defects in the state postconviction proceedings are material only in the context of exhaustion of state remedies, the deference given to a state court's finding of a procedural default, and similar procedural aspects of federal habeas litigation. Thus, allegations of error in state postconviction relief proceedings do not form a basis for federal habeas relief.  *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2005) (quoting

*Hassine v.* 160 F.3d at 954-55); *Laboy v. Carroll*, 437 F.Supp.2d 260, 263 (D. Del. 2006); *White*

*v. Carroll*, 416 F.Supp. 270, 282 (D. Del. 2006). Accordingly, Anker's allegation that the state

courts should not have summarily denied his postconviction motion states no independent basis

for relief.

As to Anker's contention that the state court decision was contrary to and an unreasonable

application of *Strickland* itself, that claim is foreclosed by the Third Circuit's recent decision in

*Campbell v. Burris*, 515 F.3d 172 (3d Cir. 2008). As an initial matter, the Third Circuit noted

that:

> In order to establish the prejudice required by *Strickland,* the party claiming
> ineffective assistance "must show that there is a reasonable probability that, but
> for counsel's unprofessional errors, the result of the proceeding would have been
> different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "It is not enough for the
> defendant to show that the errors had some conceivable effect on the outcome of
> the proceeding ... not every error that conceivably could have influenced the
> outcome undermines the reliability of the result of the proceeding." *Id.* at 693, 104
> S.Ct. 2052.

*Campbell*, 515 F.3d at 184. Anker asserts that his burden was simply to "point to facts in the

record or outside of the record that show attorney error and also make at least a preliminary

showing that he would have prevailed on the merits of the claimed error." D.I. 10 at 44. At that

point, he argues, the state court should have made a legal determination of whether or not he had

demonstrated prejudice under *Strickland*. *Id.* Under *Strickland*, the first consideration in the

"prejudice" analysis alone "requires more than a showing of theoretical possibility that the

outcome was affected." *Frey v. Fulcomer*, 974 F.2d 348, 358 (3d Cir. 1992). Anker must

actually show a reasonable probability of a different result but for trial counsel's alleged errors.

*Strickland*, 466 U.S. at 694; *Reese v. Fulcomer*, 946 F.2d 247, 256-57 (3d Cir. 1991). In turn,

"actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a

general requirement that the defendant *affirmatively prove* prejudice." *Strickland*, 466 U.S. at

693 (emphasis added). *See id.* at 696 (court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors").

In his state postconviction motion, Anker advanced two grounds for relief, the first ground alleging six specifications of ineffective assistance of counsel. In the first specification, Anker listed eight instances where his trial counsel either failed to object to testimony or elicited testimony regarding the Lawyer's Fund for Client Protection or the Office of Disciplinary Counsel ("ODC"). A19-20. Under the subheading "Supporting legal authorities," Anker then argued that "[a]ny relevance of the mortgage payoff evidence ... is far outweighed by the potential for such evidence to confuse and mislead the jury." A22. After discussing the holdings in cases in New Jersey and California regarding the presentation of evidence that a defendant had violated the state bar's rules of professional conduct, Anker then complained that, in rejecting Anker's motion for reargument on direct appeal, the state supreme court "cited no authority and apparently ignored the fact that courts in New Jersey and California had ruled to the contrary" and that the court "thus compounded the denial of a fundamentally fair trial." A23-24. These conclusory statements failed to provide any explanation as to how Anker was prejudiced by the admission of the disputed evidence. *E.g., Campbell* 515 F.3d at 184 ("Campbell does not explain, however, how this alleged error could have had a 'reasonable probability' of affecting the outcome of the proceeding.").

In another specification of error in his state postconviction motion, Anker complained that his counsel did not object to the introduction in the State's case-in-chief of the emotional and financial effect of the thefts upon the victims, listing three specific occasions when allegedly improper testimony was admitted. A24. The only discussion beyond a listing of the offending

testimony is the statement that "Victim impact evidence is inadmissible in a trial, except in the penalty phase of a capital murder trial." A24 (citation omitted). Once again, Anker failed to allege any specific prejudice from the admission of evidence that four of the victims experienced adverse affects on their credit ratings as a result of the nonpayment of their mortgages. In specifications 3-6, Anker failed to even cite case law or support his conclusory claims in any way other than citing to the record. *See* A24-26. The claims consisted of lists of objectionable evidence to which trial counsel failed to object or favorable testimony his counsel allegedly failed to present. None of these claims specified that Anker was prejudiced, much less explained how he was prejudiced. Anker's final claim in his postconviction motion, Ground Two, asserted in its entirety that "when viewed cumulatively, the multiple errors show that Anker's Sixth Amendment rights were violated." A26. This claim certainly failed to allege any actual prejudice, especially as none of the "multiple errors" were alleged to have prejudiced Anker in any specific way.

There is a distinct difference between pointing to record evidence of trial counsel's alleged deficiencies and explaining how those deficiencies affected the outcome of the proceedings. Citing to other cases where a similar error by counsel affected that proceeding is not sufficient to establish the probability that the error in this case affected this proceeding. The state supreme court's decision then that Anker had failed to "substantiate any specific allegations of actual prejudice" was not contrary to or an unreasonable application of *Strickland*. *Campbell*, 515 F.3d at 183 (". . . the Court clearly was ruling that Campbell had provided no reason to believe he could present a prima facie case of prejudice if the matter proceeded to a hearing. This was not an unreasonable application of *Strickland*."). As noted in *Campbell*, the Third Circuit in *Wells v. Petsock*, 941 F.2d 253, 259 (3d Cir. 1991), affirmed the dismissal of a habeas

petition without a hearing "where the petitioner, in his petition and brief, had 'pointed to no evidence of such prejudice.'"  515 F.3d at 183.  Further, "[e]ven if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they actually had an adverse effect on the defense."  *Strickland*, 466 U.S. at 692.  Thus, Anker was certainly required to do more than point to places in the record that he believed his trial counsel had exhibited deficient performance.  Consequently, the state courts properly denied Anker's conclusory claims of ineffective assistance of counsel for failure to allege prejudice under *Strickland*, and that decision was not contrary to or an unreasonable application of federal supreme court precedent.  *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). *See also Wiggins v. Smith*, 539 U.S. 510 (2003) (the two-pronged standard enunciated by *Strickland* is the clearly established federal law which governs ineffective assistance of counsel claims).

*State Court Records*

Based upon the Superior Court docket sheet, it appears that the transcripts of Anker's trial (July 18-August 3, 2005) and sentencing (Nov. 4, 2005) have been prepared.  A transcript of the trial court's ruling on the State's pre-trial motion in limine (July 18, 2005) has also been prepared. In the event that the Court directs the production of any transcript, respondents cannot state with specificity when such transcript would be available.  However, respondents reasonably anticipate that such production would take 90 days from the issuance of any such order by the Court.

<u>Conclusion</u>

For the foregoing reasons, the petition for a writ of habeas corpus should be dismissed without further proceedings.

/s/ Elizabeth R. McFarlan
Deputy Attorney General
Del. Bar. ID No. 3759
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
elizabeth.mcfarlan@state.de.us

Date:  August 27, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2008, I electronically filed the answer to petitioner's habeas petition with the Clerk of Court. I also hereby certify that on August 27, 2008, I served Joseph M. Bernstein, Esq, the same document by CM/ECF by United States Service.

.

/s/ Elizabeth R. McFarlan
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 3759
elizabeth.mcfarlan@state.de.us